**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| LOOT CRATE, INC., *et al.*,[1] | ) ) ) | Case No. 19-11791 (   ) |
|  | ) | (Joint Administration Requested) |
| Debtors. | ) ) |  |

**DECLARATION OF STUART KAUFMAN IN SUPPORT
<u>OF FIRST DAY MOTIONS AND RELATED RELIEF</u>**

I, Stuart Kaufman, being duly sworn, declare under penalty of perjury as follows:

1.  I am the appointed Chief Restructuring Officer of Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc. (collectively, the "***Debtors***") in these Chapter 11 cases (collectively, the "***Cases***").  I am a partner with Portage Point Partners, LLC ("***PPP***").  It is my understanding that the Debtors will file an application with the Court seeking entry of an order authorizing the Debtors to retain and employ PPP to provide temporary resources to the Debtors to assist in their sale and approves my appointment as Chief Restructuring Officer.

2.  As part of my employment and services in this capacity, I am generally familiar with the Debtors' history, day-to-day operations, business and financial affairs, and books and records, as well as the Debtors' restructuring efforts.

3.  On August 11, 2019 for Loot Crate Inc. and Loot Crate Holdings, Inc., and on August 12, 2019 for LC Funding, Inc. and Loot Crate Parent, Inc. (for each debtor, the "***Petition Date***"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United

---

[1]   The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Loot Crate, Inc. (7119); Loot Crate Holdings, Inc.; LC Funding, Inc.; Loot Crate Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Avenue, Los Angeles, CA 90031.

States Code (the "**Bankruptcy Code**").  To minimize the adverse effects of filing for Chapter 11 protection while at the same time preserving value for the benefit of their stakeholders, and concurrently with the filing of this declaration (this "**Declaration**"), the Debtors have filed a number of pleadings requesting various forms of "first day" relief (collectively, the "**First Day Motions**").

4. The First Day Motions are intended to enable the Debtors to operate effectively and efficiently within these Cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement thereof.  Among other things, the First Day Motions seek relief aimed at maintaining: (a) the loyalty of the Debtors' customers, (b) the confidence of the Debtors' other stakeholders, including the Debtors' vendors, (c) the morale of the Debtors' employees, and (d) the enterprise value of the business.  Gaining and retaining the support of these key constituencies is critical to the Debtors' efforts to maximize the value of their estates for all parties-in-interests.

5. In addition, the Debtors are filing a motion to effectuate an expedited sale of substantially all of their assets, for the reasons set forth below.

6. I am over the age of 18 and am authorized by the Debtors to submit this Declaration.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtors' management team, the Debtors' employees, or advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as witness, I could and would competently testify to the facts set forth in this Declaration.

537791908

7. This Declaration is divided into four parts. Part I of this Declaration summarizes the Debtors' history and operations. Part II describes the Debtors' corporate and capital structure. Part III sets forth the Debtors' plan for these Cases. Part IV affirms and incorporates the facts that support the relief requested in the First Day Motions.

## Part I

## The Debtors' History and Operations

8. Loot Crate is headquartered in Los Angeles, California. It is an eCommerce subscription company that specializes in providing its customers with curated boxes (or "crates") of "geek and gamer products" each month. These products consist of exclusive figurines, shirts, gear, and gadgets, as well as limited edition collectibles.

9. As a young entrepreneur and boyhood fan of video games, comics, science fiction, and other pop culture, Christopher Davis created Loot Crate in 2012, teaming up with Matthew Arevalo. From a small start-up, Loot Crate grew quickly. Indeed, since 2012, more than 32 million crates of customized merchandise have been shipped, across the world.

10. As a result of its rapid success, Loot Crate has become the worldwide leader in fan subscription boxes. It now partners with industry leaders in entertainment, gaming, sports, and pop culture to deliver monthly and limited edition themed crates, produces interactive experiences and digital content, and original video content. Look Crate was voted #1 Geek Box in 2018 by over 250,000 users; voted #3 for customer service for Subscription Box Services, and was the 2018 Subscription Trade Association CUBE award winner for "Best Overall Box.

11. Loot Crate develops, designs, and sources popular merchandise from over 350 distinct entertainment properties, each of which utilize the Debtors as a key intellectual property monetization partner. 97% of Loot Crate's products are exclusive to it, driving fan enthusiasm

and loyalty for these "must-have" collectibles. The Debtors, setting aside their legacy liabilities, have a vibrant and successful business. On the supplier and licensor side, the Debtors benefit from companies eager to use the Debtors to expand their product offerings, and cross-market television, film, and other popular media with fun-filled items, toys, collectibles, clothes, and other unique accoutrements. The Debtors enjoy a customer base that returns again and again to purchase the Debtors' goods, in order to enjoy and take part in the spectacular popularity of science fiction, gaming, sports, pop culture, and the like that drives much of our Nation's, indeed, our world's, entertainment business.

12. This is a company that has succeeded from ground zero – it is not an "old economy" business, shrinking every year, trying to determine how to remain relevant. Instead, it is the view of the Debtors' management that once better capitalized and freed from legacy liabilities through the proposed sale of assets in these cases, the Debtors will return to success.

13. Loot Crate has approximately 60 full-time employees, after taking into account certain reductions in force that have been necessary over the past months and days.

## Part II

### Corporate and Capital Structures of the Debtors

**A.  Corporate Structure**

14. The Debtors' corporate structure is as follows:

(a) Loot Crate Parent, Inc. is owned by dozens of shareholders (mostly initial and subsequent start up investors), and primarily by Christopher Davis (50.5761%), Matthew Arevalo (20.92%), and a separate entity called Upfront V, L.P. (10.0527%). There are other miscellaneous shareholders, and then many holders of options and warrants, customary for a start-up to incentivize lenders and employees to support a new company.

(b)     LC Funding, Inc. is 100% owned by Loot Crate Parent, Inc. It was formed to facilitate potential future investment and loans, but has no distinct operations.

(c)     Loot Crate Holdings, Inc. is 100% owned by LC Funding, Inc. It was formed to serve as an intermediate holding company, but has no distinct operations.

(d)     Loot Crate, Inc. is the operating company that services the customers, incurs trade and other debt, and has all of the Debtors' employees.

**B.     Prepetition Capital Structure and Key Debts**

15.     In order to meet the needs of its rapidly growing customer base, the Debtors needed substantial financing and capital. This was done through various forms of equity, subordinated notes,[2] and secured debt; the debt portions of this tended to be expensive, which is customary for smaller and start-up companies.

16.     The following paragraphs describe the key creditors of the Debtors – and their interplay with the Debtors' operations, liquidity shortfalls, and growing distress, in a manner meant to describe how the Debtors came to be in this Court.

17.     By late 2017, the Debtors were having financial issues. The subscription and entertainment market has a healthy and sometimes insatiable appetite for marketing dollars. While the Debtors were very popular with their fan base, the need to continue to spend on marketing was hampering the Debtors' finances. In addition, the Debtors had a distribution system that was not optimal, operating out of both Vernon, California (a very high wage state)[3]

---

[2]     One such note was issued to Money Chest LLC, an affiliate of which is now to become the proposed stalking horse bidder for the Debtors' assets, as discussed below.

[3]     The Debtors now fulfill most of their shipments with a third party warehouse and shipper, operating out of Tijuana, Mexico. Based on the advice of a prior advisor to the Debtors, This will substantially improve the Debtors' costs and margins, but the transition to this facility and

and Pennsylvania. The impact of the *Wayfair* decision affected the Debtors, requiring them to accrue sales tax charges for goods sold in the past. And the Debtors' then-current $15 million loan facility with Breakwater Credit Opportunities Fund, L.P. ("***Breakwater***") was insufficient.

18. As the Debtors moved into default on their Breakwater loan in 2017 and going into 2018, Breakwater obtained certain concessions:

(a) Breakwater obtained $2 million of Original Issue Discount ("***OID***") on the sixtieth day following the effective date of a forbearance agreement with the Debtors, but with a reduction to $1 million OID if the Breakwater loan was refinanced by a date certain.

(b) Breakwater appointed a designee to the board.

(c) The Debtors created a Strategic Transaction Committee comprised of the two independent directors – Alexandre Zyngier and Osman Khan, as well as the Breakwater designee.[4]

(d) The Debtors had to raise a specified amount of capital as subordinated debt or equity by a date certain. If the specified capital was not raised by the date certain that was acceptable to Breakwater, in its sole discretion, the Board of Directors would be expanded to seven, Breakwater would appoint a majority of the Board, and Breakwater would appoint a majority of the Strategic Transaction Committee.

19. In light of this – and the need for additional financing that the Debtors could not obtain from Breakwater or other past investors – after a search process of several months, in August 2018, Midtown Madison Management, LLC ("***Midtown***"), an affiliate of Atalaya Capital

---

termination of the prior warehouse lease in Vernon was one of many liquidity drains in the last several months – others are discussed below.

[4] Messrs. Zyngier and Khan remain independent directors of the Debtors, and have provided disinterested and thoughtful guidance as the Debtors' situation has become increasingly precarious.

Management, refinanced the Breakwater Loan. This provided Loot Crate, Inc. with a $21 million term loan (the "*Midtown Loan*"), the proceeds of which were used as follows:

(a) $16,972,159 was used to refinance the Breakwater Loan;

(b) $1,659,659 was used to pay accrued and unpaid interest, default interest, and fees, and $1 million went to pay the OID to Breakwater;

(c) A small cash reserve;

(d) Catching up some past due vendors;

(e) Paying associated transaction fees.

Midtown also received a warrant for 17% of the common stock of Loot Crate Inc.

20. As a condition to the closing of the Midtown Loan, the Debtors issued convertible subordinated notes and warrants in approximately $4.4 million (the "*Note Financing*" and together with the Midtown Loan, the "*August 2018 Financing*"), of which $202,750 represents OID, to Money Chest LLC ("*Money Chest*"), Bio World Merchandising Inc., George Davis (the parent of the founder and majority shareholders of the Debtors, Christopher Davis), Brian Laibow, Pacific Capital Management, Josh Payne, and in a subsequent issuance, Dendera Advisory, LLC ("*Dendera*").[5] Certain of these notes, including that issued to Money Chest,

---

[5] In November 2017, Dendera began advising the Debtors in stabilizing the company vis-a-vis its major stakeholders, primarily Breakwater, and in seeking new capital. The Dendera team was compromised of Geoff Arens, Shannon Hsu, and Mark Palmer. While Dendera was successful in its role – allowing for a refinance of the defaulted Breakwater loan - the Debtors had insufficient cash to pay the transaction fees owed to Dendera. In good faith and in the interests of their client, the Debtors, Dendera took notes instead, along with warrants, and then allocated them to the deal team. Mr. Palmer, a proven and driven operator and a distress specialist, changed to Chief Transformation Officer and continues to provide the Debtors with operational and financial guidance, and has played a key role in negotiating and structuring the proposed sale of the Debtors' assets. The Debtors will be filing separate papers to continue to utilize his services, and he has waived his note claims against the Debtors.

were secured in a position behind the August 2018 Financing, but upon information and belief, only Money Chest perfected its liens.

21.  While the August 2018 Financing provided the Debtors with a slight liquidity reprieve, the fees and expenses that had to be repaid to Breakwater made this amount far less than expected, resulting in continued difficulty with vendors after the transaction, resulting in turn in difficulty in filling crates due to missing custom items, causing subscriber chargebacks and cancellations, and then resulting in serious concerns by the Debtors' credit card processor, and its withholding of funds from the Debtors.  All of this caused greater liquidity issues with each passing week and month.  In short, the cycle in this unfortunate paragraph never stopped, with each negative event causing other negative events, again and again, and liquidity problems continued into 2019 and until these filing of these Cases.

22.  Another large creditor is Clear Finance Technology Corporation d/b/a Clearbanc ("*Clearbanc*").  Clearbanc and the Debtors signed billings sharing agreements over the past several months under which Clearbanc would pay certain of the Debtors' vendors, at the Debtors' direction, and in return Clearbanc would receive a specified percentage of the Debtors' billings.

23.  Clearbanc has not filed a UCC-1, and the transaction documents with Clearbanc have, based on the advice of counsel to the Debtors, all the hallmarks of a disguised financing, including that once Clearbanc obtained a return of the funds it advanced and a percentage return on its advance, Clearbanc's ownership interest in certain of the Debtors' revenues would cease.

24.  As of the Petition Date, Clearbanc was owed $2.2 million.

25.  The Debtors will shortly be filing a complaint against Clearbanc to determine the nature and extent of its interest in the Debtors' property – specifically, a finding that Clearbanc is

a lender, and not an owner of any assets, and by virtue of the lack of any UCC-1s, or any lien releases by secured lenders, that Clearbanc is an unsecured lender.

26. Another substantial creditor – albeit a contingent one – is the Debtors' credit card processor, Vantiv, LLC ("*Vantiv*"). Vantiv has a contingent claim to the extent the Debtors do not ship goods to their customers for which such customers have already paid via credit card. Such customers could then, depending on their credit card agreements and applicable law, reverse or dispute prior charges, which may then have to be returned to the customers' credit card issuer (and in turn, the customer) by Vantiv. Due to serious liquidity issues over the past months – including Vantiv's withholding substantial sums to protect itself against this risk – the Debtors' have over $20 million in customer orders for which the Debtors have obtained payment, but for which the Debtors have not shipped goods, when including August, 2019. Vantiv is holding approximately $1.7 million of collections it made for the Debtors and, as of the Petition Date, continues to reserve 100% of the Debtors' customer billings thereby guaranteeing a continuation of the vicious cycle that has strangled liquidity. The Debtors are hopeful that these cases and their DIP financing will allow them to ship several million dollars of pre-petition goods, and then of course remain current on new orders and shipments. In addition, the Debtors are working with their buyer on a solution to the balance of the crates that have not been shipped. While there are no guarantees, the Debtors believe that their post-petition operations, and their sale, will greatly reduce Vantiv's exposure.

27. I note as well that Vantiv's increased concerns over the past months resulted in it seeking to terminate credit card processing with the Debtors, purportedly effective August 12, 2019. By this filing the Debtors will seek to use the Bankruptcy Code to preclude termination (which again, will allow the Debtors to operate, ship pre-sold crates, and provide a path to the

balance of the pre-sold crates, all for Vantiv's and the other stakeholders' benefit).  In any event, the timing of this potential termination of processing – as well as the Debtors' complete lack of liquidity – played a large part in the timing of these Cases.

28. In addition to the above, the Debtors have more than $30 million in trade debt outstanding.  As the situation became further dire in the past months – with Vantiv withholding funds, the Debtors falling behind on shipments (leading to subscriber loss, and less revenue – an endless cycle of liquidity shortfalls) - vendor payments fell further behind.  Many vendors have filed lawsuits against the Debtors.

29. As briefly alluded to above, the Debtors have also fallen very far behind on their sales tax payments; currently, it is estimated that over $5.87 million in sales taxes are due, for several reasons.  Typically, when the Debtors make a "sale," the Debtors receive payment in advance of fulfilling that sale.  Thus the Debtors are faced with the question of whether, for sales tax purposes, they should report a sale and pay sales tax based on the date payment is received or, later, when the crate associated with that payment is actually shipped.

30. Under the "billings method" the sales taxes are recorded and paid the month after the customer is billed for the subscription – even though the Debtors do not recognize that revenue until the crate corresponding to that payment is shipped.  In contrast, under the "revenue recognition method," the sales taxes are recorded and paid the month after the crate corresponding to that payment is shipped to the customer.  The "billings" method typically does not defer paying taxes, but sometimes those taxes are paid in error, on sales that are later cancelled.  The "revenue recognition" method means the Debtors have funds on hand including sales taxes paid by customers, but no ability to pay until the Debtors ship the crates (and may not ever, if the shipment is delayed and cancelled).

537791908

31.    Prior to 2016, the Debtors employed the billings method.  The Debtors switched to the revenue recognition method from 2016 through October 2018.  In October 2018, following several internal audits and reviews, the Debtors switched back to the billings method.  The switch from revenue recognition method to the billings method and the associated changes in the Debtors' state tax returns resulted in a substantial past-due sales tax liability.  To address that liability and the resulting cash flow problems presented with the immediate payment of the past-due amounts, the Debtors entered repayment plans with the certain taxing authorities.

32.    Since I was engaged a few weeks ago, I have spent substantial time on this issue, and spoken to professionals about getting to the bottom of all tax filings.  The Debtors' DIP budget proposes to pay all sales tax incurred on a current basis, and to pay approximately $600,000 in past due sales taxes owed pursuant to payment plans.

33.    Finally, the Debtors have a small amount owed to Wells Fargo, National Association – it was used to factor accounts for goods sold by the Debtors to a national retailer, as the Debtors briefly had their goods sold in retail stores.  Wells Fargo has a nominal amount of accounts left, in the range of less than $50,000, but is added here as it is listed in the notice section of the First Day Motions.  It is not expected to have a material role in these Cases.

C.    **The Most Recent Events Leading to These Cases**

34.    As noted above, the Debtors have suffered from liquidity issues since 2017.  The August 2018 Financing was intended by all to alleviate this – but its proceeds were insufficient to satisfy the Debtors' many and growing needs for cash.

35.    These liquidity shortfalls became exacerbated in recent months, and became dire in recent weeks.  Indeed, July featured hundreds of thousands of withholdings by Vantiv, to protect against its perceived risks.  Moreover, in the last ten days, Midtown – well within its

537791908

rights to do so, according to the Debtors' professionals – withheld funds in a "controlled account" and then promptly swept such amounts, fearing that the Debtors might fail without a buyer or a path forward.  Lawsuits continued to be filed, and some approached judgment.  Shipments of goods to the Debtors had all but stopped; even many vendors that were paid did not ship new goods to the Debtors.  As a result, crates were missing key goods, making fulfillment to customers even harder.

36. But now, the Debtors have a path forward, including a new lender that purchased Midtown's loan on Friday, August 9, 2019, and is willing to purchase the Debtors.

## Part III

### The Path Forward

37. In February of 2019, the Debtors, with support from Midtown, engaged FocalPoint Securities, LLC ("*FocalPoint*") as their investment banker to provide various services, including consideration of all alternatives that might be available to help the Debtors continue their mission.

38. FocalPoint undertook a detailed study of the Debtors' operations to identify the appropriate process to effect a transaction; this included identifying the various potential parties to a transaction.  Concurrently, FocalPoint prepared offering materials that provided an overview of the Company and its activities, its key strengths, and the investment highlights that potential parties should consider when evaluating a transaction.

39. FocalPoint developed a broad list of over 100 potential buyers and investors, which FocalPoint and management believed might have an interest and the financial wherewithal to consummate a transaction with the Debtors.

40. Of the over 100 parties contacted, thirty-one executed a confidentiality agreement and began to undertake due diligence. The Debtors and their professionals established an on-line "data room" with thousands of documents about the Debtors' current and past financial and operational performance, legal status and associated issues, and related information. There were substantial discussions with these parties, leading to the Debtors' receipt of two initial indications of interest in June / July 2019. However, these indications of interest failed to provide a feasible path forward for the Debtors.

41. Unfortunately, the complexity of the transaction, the uncertainty surrounding eCommerce subscription companies, the amount of the Debtors' funded, trade, and tax debt, and the recent challenges of the Debtors' operations due to liquidity shortfalls, made it difficult to entice investors. Breakwater was one of the parties interested, and it spent substantial time and incurred costs in mid-July 2019 doing diligence and working on preliminary deal documents. But its interest waned, and sale discussions ceased.

42. Meanwhile, the Debtors were spending substantial time with another potential buyer, Loot Crate Acquisition LLC ("*LCA*"), an affiliate of Money Chest, which as noted above is a current noteholder of the Debtors. LCA and Money Chest are also affiliated with an investment group that includes one of the largest and best-run collectible manufacturers and distributors in the world.

43. Over the last two weeks before filing these Cases, LCA and its professionals engaged in round-the-clock diligence, culminating in a deal that began to be documented on Friday, August 9, 2019. As noted above, on that date, Money Chest purchased the Midtown Loan. As part of that transaction, Midtown advanced several hundred thousand dollars to the Debtors which had been in suspense in the Debtors' controlled bank account, used for critical

payments, including final payments to approximately fifty employees that were terminated on August 9 between California and Pennsylvania. This reduction in force was necessary for the Debtors' survival, as it cannot sustain a full-bodied workforce in light of challenging sales and collections – even with the DIP financing Money Chest is providing.

44. The Debtors will be immediately filing a motion to approve a sale and bidding procedures, with LCA as the proposed stalking horse under an asset purchase agreement to be filed in the coming days. Money Chest, LCA's affiliate, is also providing substantial post-petition financing to the Debtors.

45. In short, despite liquidity constraints unlike those I and the Debtors' other professionals have ever seen, the Debtors have created a path to get through Chapter 11, albeit quickly, to maintain their going concern, reduce the backlog of shipments (and Vantiv's potential exposure), allow for renewed dealings with valued vendors and licensors, and achieve a result that is the best we could foresee over the last few distressing weeks and months.

## Part IV

## The First Day Motions

A. *The First Day Motions*

46. In conjunction with their bankruptcy petitions, the Debtors filed various First Day Motions seeking initial relief to smooth the entry into Chapter 11. As a result of my discussions with counsel and other professionals, I have formed opinions as to: (a) the necessity of obtaining the relief sought in the First Day Motions, (b) the importance of the relief sought in the First Day Motions for the Debtors to continue to operate effectively, and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions. The First Day Motions include:

  (a) <u>Administrative Motions</u>

    (i) Motion of the Debtors for Order Directing Joint Administration of Related Chapter 11 Cases;

    (ii) Motion of the Debtors for (I) Authorization to (A) Maintain and File a Consolidated Creditor Matrix, (B) File a Consolidated List of 30 Largest Unsecured Creditors, (C) File a Consolidated Local Rule 2002-1(B) Service List, and (D) File the Names and Addresses of Consumer Creditors Under Seal and Maintain Sealed Status for Their Proofs of Claims, and (II) Approval of the Form and Manner of Notice of the Commencement of these Cases; and

    (iii) Debtors' Application for Appointment of Stretto as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date

  (b) <u>Operational Motions Requesting Immediate Relief</u>

    (i) Motion of Debtors, Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and use Cash Collateral; (II) Granting Liens and Super-Priority Claims; (III) Scheduling Final Hearing; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief;

    (ii) Motion of the Debtors for Interim and Final Orders: (I) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts, and Business Forms; (II) Extending the Debtors' Time to Comply with Section 345(b) of the Bankruptcy Code; and (III) Granting Related Relief;

    (iii) Motion of the Debtors for Interim and Final Orders Authorizing the Debtors to Pay Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits and Related Expenses to Employees;

    (iv) Motion of the Debtors for Interim and Final Orders (I) Authorizing (A) the Debtors to Pay Certain Pre-Petition Claims of Critical Vendors, and (B) Procedures Related Thereto, and (II) Granting Related Relief;

    (v) Motion of Debtors for Interim and Final Orders: (I) Authorizing the Debtors to Pay Certain of their Pre-Petition Sales, Use, Trust Fund, and Other Taxes and Related Obligations; and (II) Granting Related Relief;

    (vi) Motion of the Debtors for Interim and Final Orders: (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Payment, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief; and

(vii) Motion of the Debtors for Interim and Final Orders Authorizing the Debtors to Honor Certain Pre-petition Obligations to Customers in the Ordinary Course of Business.

47. The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing and use of cash collateral on an interim basis, honor employee-related wages and benefits obligations, pay prepetition accounts payable claims in the ordinary course of business, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is also necessary to allow the Debtors to successfully implement their goals, including a prompt sale via a Section 363 of the Bankruptcy Code.

48. Several of the First Day Motions request authority to pay certain pre-petition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first twenty days following the filing of a Chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain pre-petition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

49. I am familiar with the content and substance of the First Day Motions. I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' business.

50. For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these Cases, I respectfully request that

each of the First Day Motions be granted, together with such other and further relief as this Court deems just and proper.

## Conclusion

51. The Debtors believe that these Cases, and the strategy outlined above, represent the best and only way to provide a meaningful return to creditors, and maintain the Debtors' mission to serve their creditors, vendors, customers, and employees. The Debtors respectfully request that the First Day Motions be granted, that a hearing to consider the proposed Bidding Procedures Order be scheduled within twenty days of the Petition Date, and that the Court provide such other and further relief as is just and proper.

Executed this 11th day of August 2019.

/s/ Stuart Kaufman
STUART KAUFMAN
Chief Restructuring Officer of the Debtors

537791908