## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LOOT CRATE, INC., *et al.*,[1] | ) | Case No. 19-11791 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) |  |

---

## MOTION OF DEBTORS, PURSUANT TO SECTIONS 105, 361, 362, 363, 364, AND 507 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 4001, AND LOCAL RULE 4001-2, FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS AND ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF

Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc. (collectively, the "**Debtors**"), pursuant to Sections 105, 361, 362, 363, 364, and 507(b) of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), file this Motion (the "**Motion**") for an interim and final orders authorizing the Debtors to obtain postpetition financing and use cash collateral, and granting related relief necessary to effectuate such postpetition financing.

In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors are the following 4 entities (the last 4 digits of their respective taxpayer identification numbers, if any, follow in parentheses): Loot Crate, Inc. (7119); Loot Crate Holdings, Inc.; LC Funding, Inc.; and Loot Crate Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Avenue, Los Angeles, CA 90031.

**Background**

1.       On August 11, 2019 for Loot Crate Inc. and Loot Crate Holdings, Inc., and on August 12, 2019 for LC Funding, Inc. and Loot Crate Parent, Inc. (for each debtor, the "***Petition Date***"), the Debtors filed voluntary petitions with this Court under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***").  By a motion filed on the Petition Date, the Debtors have requested that their Chapter 11 cases (collectively, the "***Cases***") be consolidated for procedural purposes only and administered jointly.  The Debtors are authorized to continue to operate and manage their businesses and assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.       The Debtors operate a subscription box service that caters to fandom and enthusiasts through "crates" curated with "geek and gamer products" each month.  The Debtors partner with industry leaders in entertainment, gaming, sports, and pop culture to deliver monthly themed crates, produce interactive experiences and digital content, and film original video productions.  Products include exclusive shirts, gear, and gadgets, as well as limited edition collectibles.  Since 2012, more than 32 million crates have been shipped.  The Debtors are the worldwide leader in pop-culture subscription boxes, and currently have over 250,000 recurring subscribers.

3.       A comprehensive description of the Debtors' business and operations, capital structure, and the events lending to the commencement of these Cases can be found in the *Declaration of Stuart Kaufman in Support of First Day Motions and Related Relief* (the "***First Day Declaration***")[2] [D.I. 4], which is incorporated by reference.

4.       No Committee, trustee, or examiner has been appointed in these Cases.

---

[2]       Capitalized terms not otherwise defined herein have the meanings ascribed to them in the First Day Declaration.

537813598

**Jurisdiction, Venue, and Statutory Predicate**

5.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.     Venue of these Cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The statutory predicates for the relief requested in this Motion are Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, and Rules 4001 and 6003 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

**Relief Requested**

8.     The Debtors seek, pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of an interim and final order authorizing the Debtors to obtain postpetition financing.  Following the recent purchase by Money Chest, LLC (together with any other lenders party thereto and their respective affiliates, successors and assigns, the "***DIP Lenders***") of the secured loans of the Debtors' prior lender, the Debtors and their professionals have worked non-stop over the past several days with the DIP Lenders to finalize the necessary preparations for these filings, all as discussed in the Kaufman Affidavit.

9.     The Debtors and the DIP Lenders have arrived at documentation, including a budget, to see the Debtors through an expedited sale process, in which the DIP Lenders intend to credit bid through an affiliate.

10.     Given the nature of the Debtors' business – completely customer driven – and the nature of the Debtors' assets – which are comprised of limited tangible assets – the risks to the DIP Lenders are real.  That said, the Debtors have worked to arrive at a post-petition loan that fits within the confines of Section 364 and 507, and the precedent of this Court.

11.     In accordance with Rule 4001 of the Bankruptcy Rules below is a summary of the terms of the proposed DIP Loans and the Debtors' use of Cash Collateral:[3]

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| **Parties**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, at cover page<br><br>Interim Order, ¶ pp. 1 and 2 | Borrowers:  Loot Crate Inc.<br><br>Guarantors:  The remaining Debtors<br><br>DIP Agent:  Money Chest, LLC<br><br>DIP Lenders:  Money Chest, LLC |
| **Commitment**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, Schedule 1.01 | $10,000,000 |
| **Maturity/Termination Date**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | "*Maturity Date*" shall mean the earliest to occur of: (a) 40 days after the Petition Date, (b) the earliest of (x) the date that is 25 days after the Petition Date unless the Final Order has been entered and has become effective prior to the expiration of such period (or such later date as the Administrative Agent and each of the Lenders  may approve in writing in their respective sole and absolute discretion) and (y) the date that the |

---

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Loan Facility.  The description of the DIP Loans is only a summary of the terms in the DIP Loan Facility, and if there is any discrepancy between this summary and the DIP Loan Facility, the DIP Loan Facility controls.

537813598

| | |
|---|---|
| DIP Credit Agreement, at definition of Maturity Date | Interim Order or the Final Order, as applicable, is reversed, modified, amended, stayed or vacated absent the Administrative Agent's and Required Lenders' written consent, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a plan of reorganization filed in the Bankruptcy Case that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the consummation of a sale of all or substantially all of the assets of the Credit Parties under Section 363 of the Bankruptcy Code, (e) the date the Bankruptcy Court orders the conversion of the Bankruptcy Case to a Chapter 7 liquidation or the dismissal of the Bankruptcy Case or the appointment of a trustee or examiner with expanded power in the Bankruptcy Case, and (f) the acceleration of the Loans and the termination of the Commitments in accordance with the terms and conditions of this Agreement. |
| **Interest Rate and Premiums** Fed. R. Bankr. P. 4001(c)(1)(B) DIP Credit Agreement, Section 2.09(a) | The unpaid principal amount of Loans shall bear interest from the Closing Date (or the applicable borrowing date with respect to the Delayed Draw Term Loans) at a rate per annum rate equal to seven percent (7%) per annum. Interest on the Loans shall accrue from and including the Closing Date (or the applicable borrowing date with respect to the Delayed Draw Term Loans) until but excluding the date of any repayment in full thereof. |
| **Fees and Expenses** Fed. R. Bankr. P. 4001(c)(1)(B) DIP Credit Agreement, section 3.01, 5.01(j) | On the Closing Date, the Borrower shall pay (i) to each Lender, a fee in the form of original issue discount in an amount equal to 1.5% of the amount of the Commitments of such Lender on the Closing Date. Each of the Agents and Lenders shall have received, for its own respective account (or shall receive, upon the funding of the Closing Date Term Loan pursuant to the disbursement instructions made by Borrower with respect to the Closing Date Term Loan), (i) all fees and expenses due and payable to such Person hereunder, and (ii) the reasonable and documented fees, costs and expenses due and payable to such Person pursuant <u>Sections 3.01</u> and <u>12.05</u> (including the reasonable fees, disbursements and other charges of counsel) for which request for payment has been made to the Borrower on or prior to the Closing Date. |
| **Use of Funds** Fed. R. Bankr. P. 4001(c)(1)(B) DIP Credit Agreement, section 8.12 | The proceeds of the shall be used by Borrower in accordance with the terms of the Financing Order and the Budget, and in accordance with the terms described herein, including to pay (i) fees, costs and expenses incurred in connection with the transactions contemplated hereby, (ii) other administration costs incurred in connection with the Bankruptcy Case, and (iii) payments in respect of Adequate Protection as authorized by the Bankruptcy Court in the Financing Order. Without limiting the generality of the foregoing, Borrower will not, and will not permit any of its Subsidiaries to use the proceeds of any Loan made hereunder or any proceeds of Collateral to be applied to (i) repay the Subordinated Debt and (ii) to affirmatively commence or support, or to pay any professional fees |

| | |
|---|---|
| | incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent enforceability or priority of the Liens, claims or rights in favor of any Agent, any Lender, any Prepetition Agent or any Prepetition Lender, except as may be permitted under the Financing Order.  Not more than an aggregate amount of $50,000 of proceeds of Loans or the Collateral may be used for payment of allowed fees, expenses, and costs incurred by an official committee of unsecured creditors to investigate the extent, validity, characterization and priority of the claims and Liens under the Prepetition Credit Documents. |
| **Material Conditions to Closing – Interim Funding Conditions**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, Section 5.01 | The Administrative Agent shall have received a certificate for each Credit Party, dated the Closing Date, duly executed and delivered by such Credit Party's secretary or assistant secretary, managing director, managing member, general partner, or other authorized officer, as applicable, as to resolutions, incumbency, organizational documents, and the like.<br><br>Both before and after giving effect to the Transactions, including the borrowing of the Loans on the Closing Date, no Default or Event of Default shall have occurred; and<br><br>The representations and warranties set forth in Article VII of the Credit Agreement must be true and correct in all material respects<br><br>The Debtors must provide a Funding Request. setting forth, among other things, the proposed Closing Date and the aggregate principal amount of such requested Loan.<br><br>Material Adverse Effect.  The Administrative Agent and Lenders shall have determined that, both immediately before and immediately after giving effect to the Transactions, no Material Adverse Effect has occurred since June 30, 2019.<br><br>No Default or Event of Default shall have occurred and be continuing;<br><br>Budget.  Administrative Agent and Lenders shall have received a copy of the Budget.<br><br>Bankruptcy Case.  The Bankruptcy Case shall have been commenced in the Bankruptcy Court and all "first day orders" and all related pleadings to be entered at or promptly following the commencement of the Bankruptcy Case have been provided in advance to Agents and Lenders, each in form and substance reasonably satisfactory to Agents and Lenders.<br><br>Interim Order.  The Bankruptcy Court shall have entered the Interim Order within three (3) Business Days after the commencement of the Bankruptcy Case, entered on notice to such parties as may be satisfactory to Agents and Lenders. |
| **Material Conditions to Subsequent Borrowings** | Such requested Delayed Draw Term Loan shall comply with the provisions of Section 2.01(b) and 2.04; |

537813598

| | |
|---|---|
| Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, Section 5.02 | Before and after giving effect to the making of such Delayed Draw Term Loan and to the application of the proceeds therefrom, the representations and warranties of the Credit Parties in this Agreement and Credit Documents to which they are a party shall be true and correct in all material respects (without duplication of any materiality or Material Adverse Effect standard in such representation or warranty) with the same effect as though made on and as of the date such Delayed Draw Term Loan is made (it being understood and agreed that the making of any request for the funding of any Delayed Draw Term Loan shall be deemed to constitute the making of such representations and warranties by the Borrower and the Credit Parties on the applicable Draw Date);<br><br>Before and after giving effect to the making of such Delayed Draw Term Loan and to the application of the proceeds therefrom, no Default or Event of Default shall have occurred and be continuing;<br><br>The making of such Delayed Draw Term Loan shall comply with the Budget;<br><br>The Financing Order shall be in full force and effect and shall not have been vacated, reversed or stayed in any respect of, except with the written consent of Administrative Agent and Required Lenders, modified or amended in any manner, and the amount making of such Delayed Draw Term Loan shall not result in the aggregate outstanding Loans hereunder exceeding the amount authorized by the Financing Order;<br><br>With respect to any Delayed Draw Term Loans in excess of $4,000,000 in the aggregate funded after the Closing Date, the Bankruptcy Court shall have entered the Final Order, entered on notice to such parties as may be satisfactory to Administrative Agent and Lenders; and<br>With respect to any Delayed Draw Term Loans to be funded after the date that is twenty-five (25) days after the Petition Date (or such later date as the Administrative Agent and Required Lenders may consent), the Bankruptcy Court shall have entered the Final Order, entered on notice to such parties as may be satisfactory to Administrative Agent and Lenders. |
| Events of Default<br><br>Fed.   R.   Bankr.   P. 4001(c)(1)(B)<br><br>DIP   Credit   Agreement, Section 10.01 | Non-Payment of Obligations.  A Credit Party shall default in the payment of:<br><br>any principal of any Loan when such amount is due; or<br><br>any interest on any Loan and such default shall continue unremedied for a period of two (2) Business Days after such amount is due; or<br><br>any fee described in Article III or any other monetary Obligation, and such default shall continue unremedied for a period of five (5) Business Days after such amount is due.<br><br>Breach of Representations or Warranties.  Any representation or warranty by any Credit Party made or deemed to be made in any Credit Document (including any certificates delivered pursuant to Article V), is or shall be incorrect in any material respect (unless such representation and warranty |

is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) when made or deemed to have been made.

<u>Non-Performance of Certain Covenants and Obligations</u>.  Any Credit Party shall default in the due performance or observance of any of its obligations under <u>Section 8.01</u>, <u>Section 8.02</u>, <u>Section 8.03</u>, <u>Section 8.04</u>, <u>Section 8.05</u> (solely with respect to such Credit Party's existence in its jurisdiction of organization), <u>Section 8.10</u>, <u>Section 8.11</u>, <u>Section 8.12</u>, <u>Section 8.13</u>, <u>Section 8.15</u>, <u>Section 8.17</u>, <u>Section 8.18</u>, <u>Section 8.21</u>, <u>Section 8.22</u> or <u>Article IX</u>, or any Credit Party shall default in the due performance or observance of its obligations under any covenant applicable to it under any Security Document (subject to any grace or cure period specified in such Security Document).

<u>Non-Performance of Other Covenants and Obligations</u>.  Any Credit Party shall default in the due performance or observance of any of its obligations under Section 8.05 (solely with respect to such Credit Party's maintenance of good standing in its jurisdiction of organization), <u>Section 8.06</u>, <u>Section 8.07</u> or <u>Section 8.16</u>, and such default shall continue unremedied for a period of ten (10) days after the earlier to occur of: (i) the date any Credit Party or any Subsidiary first becomes aware of such default and (ii) the date that the Administrative Agent notifies such Credit Party of such default.

<u>Non-Performance of Other Covenants and Obligations</u>.  Any Credit Party shall default in the due performance and observance of any obligation contained in any Credit Document executed by it (other than as specified in Sections 10.01(a), 10.01(b). 10.01(c), or 10.01(d)), and such default shall continue unremedied for a period of thirty (30) days after the earlier to occur of: (i) the date any Credit Party or any Subsidiary first becomes aware (or should have become aware) of such default and (ii) the date that the Administrative Agent notifies such Credit Party of such default.

<u>Judgments; Fines</u>.  Any judgment, order for the payment of money, fines, settlements or enforcement penalties in an amount individually or in the aggregate in excess of $100,000 (exclusive of any amounts covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) shall be rendered against any Credit Party or any of its Subsidiaries and such judgment, order, fine, settlement or penalty shall not have been vacated or discharged or stayed or bonded pending appeal within sixty (60) days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

<u>Plans</u>.  Any of the following events shall occur with respect to any Plan:

the institution of any steps by any Credit Party, any Subsidiary of a Credit Party, any ERISA Affiliate or any other Person to terminate or partially terminate a Plan of any Credit Party or any Subsidiary of any Credit Party if, as a result of such termination or partial termination, any Credit Party or Subsidiary of any Credit Party could be required to make a contribution

- 8 -

to such Plan, or could reasonably be expected to incur a liability or obligation to such Plan, in excess of $100,000 in the aggregate;

there is or arises any potential withdrawal liability under Section 4201 of ERISA, if any Credit Party, any Subsidiary of a Credit Party or any ERISA Affiliate were to completely or partially withdraw from one or more Multiemployer Plans, in excess of $100,000, in the aggregate; or a contribution failure occurs with respect to any Plan sufficient to give rise to a Lien under Sections 303(k) or 4068 of ERISA or Section 430(k) of the Code.

Impairment of Security, etc.  Any Credit Document or any Lien granted thereunder shall (except in accordance with its terms), in whole or in part, terminates, ceases to be effective or ceases to be the legally valid, binding and enforceable obligation of any Credit Party party thereto with respect to Collateral in an aggregate amount in excess of $50,000, or any Credit Party or any other Person shall, directly or indirectly, contest or limit in any manner any Credit Document or the effectiveness, validity, binding nature or enforceability of any Credit Document; or, except as permitted under any Credit Document, any Lien (subject only to Permitted Liens) securing any Obligation shall, in whole or in part, cease to be a perfected Lien with respect to Collateral in an aggregate amount in excess of $100,000 (other than as a result of voluntary and intentional discharge of the Lien by the Collateral Agent, including Dispositions permitted under this Agreement).

Change of Control.  Any Change of Control shall occur.

Change of Management.  Any Change of Management shall occur.

Restraint of Operations; Loss of Assets.  If any Credit Party or any Subsidiary of a Credit Party is enjoined, restrained, or in any way prevented by court order or other Governmental Authority from continuing to conduct all or any material part of its business affairs or if any material portion of any Credit Party's or any of its Subsidiary's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and the same is not discharged before the earlier of sixty (60) days after the date it first arises or 5 days prior to the date on which such property or asset is subject to forfeiture by such Credit Party or such Subsidiary of a Credit Party.

Any Credit Party makes any payment on account of any Indebtedness existing as of the Petition Date, except for payments of the Prepetition Obligations or any payments expressly authorized by the Financing Order and this Agreement or by any other order of the Bankruptcy Court consented to in writing by Agent;

The Interim Order is not entered within three (3) Business Days of the Petition Date, or the Final Order is not entered within twenty-five (25) days (or such other period as Administrative Agent and Required Lenders may agree to in writing) following the Petition Date; or any Financing Order is stayed, revised, revoked, remanded, rescinded, amended,

- 9 -

reversed, vacated, or modified in any manner not acceptable to Administrative Agent and Required Lenders;

an order with respect to the Bankruptcy Case shall be entered by the Bankruptcy Court (or any Credit Party shall have applied for, consented to or acquiesced in any of the foregoing) (i) appointing a trustee or examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 (other than a fee examiner), including without limitation an examiner with enlarged powers relating to the operation of the business of the Credit Parties under Section 1106(b) of the Bankruptcy Code, or (ii) terminating any Credit Party's exclusive rights to file and solicit acceptances for a chapter 11 plan;

the exclusivity period for any Credit Party to file and solicit acceptances for a chapter 11 plan otherwise lapses;

any Person other than the Credit Parties shall commence any action in the Bankruptcy Case adverse to any Agent, any Prepetition Agent, any Lender or any Prepetition Lender or any of any Agent's or Lenders' rights and remedies under the Credit Documents, the Financing Order or any other order of the Bankruptcy Court and any such action shall not be dismissed or withdrawn, with prejudice, within ten (10) Business Days after the assertion thereof;

(x) any Credit Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of any Agent and the Lenders or any Prepetition Agent and the Prepetition Lenders, claims or rights against Credit Parties or any of their Subsidiaries or to subject any Collateral (or any collateral securing the Prepetition Obligations) to surcharge pursuant to Section 506(c) of the Bankruptcy Code or to assessment under Section 552(b) of the Bankruptcy Code, (y) any Lien or security interest created by this Agreement or the Financing Order shall, for any reason, ceases to be valid, or (z) any action is commenced by any Credit Party or any of its Subsidiaries which contests the validity, perfection or enforceability of any of the Liens and security interests of any Agent and the Lenders created by this Agreement or the Financing Order or the Liens and security interests of any Prepetition Agent and the Prepetition Lenders with respect to the Prepetition Credit Documents;

an order with respect to the Bankruptcy Case shall be entered by the Bankruptcy Court converting the Bankruptcy Case (or any case comprising part of the Bankruptcy Case) to a case under chapter 7 of the Bankruptcy Code;

any plan of reorganization is filed by Borrower or any other Credit Party that, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan in the Bankruptcy Case which, does not (i) contain a provision for termination of this Agreement and the Prepetition Credit Agreement, the cash collateralization of all contingent obligations hereunder, the indefeasible payment in full in cash of all Obligations and all Prepetition Obligations and the termination of all lending commitments

- 10 -

pertaining thereto ("Paid in Full") in a manner satisfactory to the Administrative Agent and Required Lenders on or before the effective date, or substantial consummation, of such plan and (ii) provide for the continuation of the Liens and security interests granted to Collateral Agent (for the benefit of Secured Parties) and priorities until such plan effective date all Obligations and Prepetition Obligations are Paid in Full;

an order shall be entered by the Bankruptcy Court dismissing the Bankruptcy Case which does not contain a provision for termination of this Agreement and the Prepetition Credit Agreement and the Obligations and Prepetition Obligations are not Paid in Full on or before such dismissal;

an order with respect to the Bankruptcy Case shall be entered without the express prior written consent of Administrative Agent and Required Lenders, (i) to revoke, vacate, reverse, stay, modify, supplement or amend this Agreement and the transactions contemplated hereby, any Credit Document or the Financing Order, or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to Borrower's equal or superior to the priority of the Agents and the Lenders in respect of the Obligations and the Prepetition Obligations, except for the amounts having a priority over the Obligations to the extent set forth in the definition of Carve-Out;

an order shall be entered by the Bankruptcy Court granting relief from the automatic stay to any creditor(s) of any Credit Party or any Subsidiary of any Credit Party with respect to any claim in an amount equal to or exceeding $25,000 in the aggregate; provided, however, that it shall not be an Event of Default if relief from the automatic stay is granted (i) solely for the purpose of allowing such creditor to determine the liquidated amount of its claim against any such Person or (ii) to permit the commencement of or prosecution of a proceeding to collect solely against an insurance company;

a motion shall be filed seeking authority, or an order shall be entered in the Bankruptcy Case, that (i) permits any Credit Party or any Subsidiary of any Credit Party to incur Debt secured by any claim under Bankruptcy Code Section 364(c)(1) or by a Lien pari passu with or superior to the Lien granted under the Credit Documents and the Prepetition Credit Documents and Bankruptcy Code Sections 364(c)(2) or (d), unless (A) all of the Obligations and Prepetition Obligations have been Paid in Full at the time of the entry of any such order, or (B) the Obligations and the Prepetition Obligations are Paid in Full with such debt, or (ii) permits any Credit Party or any Subsidiary of any Credit Party the right to use Collateral other than in accordance with the terms of the Financing Order, unless all of the Obligations and Prepetition Obligations shall have been Paid in Full;

proceeds of any sale of all or substantially all assets of Credit Parties are not directly remitted to the Collateral Agent (up to the amount of the Obligations hereunder at such time) and the Prepetition Collateral Agent

537813598

|  | at the closing thereof, and the Obligations and the Prepetition Obligations are not Paid in Full in accordance with the terms of this Agreement from such proceeds; |
|--|--|
|  | any motions to sell Collateral or approve procedures regarding the same, any plan or disclosure statement or supplements or amendments thereto, or any orders approving or amending any of the foregoing, are not in form and substance reasonably acceptable to Administrative Agent and Required Lenders; |
|  | the automatic stay terminates or expires unless all of the Obligations and Prepetition Obligations shall have been Paid in Full; |
|  | any Credit Party or any Subsidiary of any Credit Party challenges the extent, validity or priority of the Obligations or the Prepetition Obligations or the application of any payments or collections received by Agents, Lenders, Prepetition Agents, Prepetition Lenders to the Obligations or Prepetition Obligations as provided for herein or in the Financing Order; or any Credit Party challenges the validity, extent, perfection or priority of any Liens granted in the Collateral to secure the Obligations or the Prepetition Obligations; |
|  | an order shall be entered by the Bankruptcy Court surcharging Agents, Lenders or the Collateral pursuant to Sections 105, 506(c), or any other section of the Bankruptcy Code or limiting the extent of the Liens on the Collateral pursuant to Section 552(b) or any other section of the Bankruptcy Code; or |
|  | any payment of or granting of adequate protection with respect to any Indebtedness that was existing prior to the Petition Date (other than as provided herein or as approved by Administrative Agent, Required Lenders and the Bankruptcy Court) is made. |
| **Effectiveness of Interim Order Provisions if Final Relief Is Denied**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 4 | During the period that the Interim Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and the Interim Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to access the Interim DIP Financing pursuant to and in accordance with the terms herein and the terms of the DIP Documents. |
| **Security and Priority**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 6 | Effective immediately upon the entry of the Interim Order, the DIP Agent, on its own behalf and on behalf of the DIP Lenders, is hereby granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code first priority, priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens (collectively, the "<u>DIP Liens</u>"), senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in this Interim Order and the Final Order, upon and to all presently owned and hereafter acquired |

- 12 -

assets and real and personal property of the Debtors, including, without limitation, the following: all of the Debtors' Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, goods, instruments, Inventory, commercial tort claims (including without limitation those specifically identified as part of the Prepetition Credit Documents), Investment Property, letter-of-credit rights, letters of credit, all sums on deposit; together with (a) all substitutions and replacements for and products of any of the foregoing; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (e) all Prepetition Collateral and Prepetition Second Lien Collateral; (f) any money, or other assets of the Debtors that now or hereafter come into the possession, custody, or control of the DIP Agent or the DIP Lenders; (g) all sums on deposit in any bank account of the Debtors; (h) proceeds of any and all of the foregoing; (i) books and records of the Debtors, including all mail or electronic mail addressed to the Debtors; and (j) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Debtors now have or hereafter acquire any rights (together, the "DIP Collateral"), as security for the payment and performance of the DIP Obligations.  The DIP Liens to be created and granted to the DIP Agent and the DIP Lenders, as provided herein, (A) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and (B) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise be junior to any Permitted Liens. The DIP Collateral shall include any proceeds or property recovered, unencumbered or otherwise (the "Avoidance Proceeds") from claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (the "Avoidance Actions") and, subject to entry of the Final Order, on Avoidance Actions. Further, the DIP Collateral shall include the proceeds of leases, but not the leases themselves, whether or not perfected prior to the Petition Date. The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the order and priority set forth in the DIP Credit Agreement and this Interim Order. Except as otherwise provided herein, the DIP Liens shall not be made subject to or pari passu with any lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case(s) and/or upon the dismissal of any of the Chapter 11 Cases. The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code.

| **Adequate Protection** | As adequate protection for the interest of the Successor Prepetition Agent |
|---|---|

| | |
|---|---|
| Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 11 | and Successor Prepetition Lender in the Prepetition Collateral (including Cash Collateral) on account of the Diminution in Value, the Successor Prepetition Agent and Successor Prepetition Lender shall receive the following adequate protection:<br><br>Successor Prepetition Agent and Lender Replacement Liens.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the Diminution in Value of the interest of the Successor Prepetition Agent and Successor Prepetition Lender in the Prepetition Collateral, the Successor Prepetition Agent and Successor Prepetition Lender shall have, subject to the terms and conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (the "<u>Prepetition Secured Creditors Replacement Liens</u>"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, and any Permitted Liens.<br><br>Successor Prepetition Agent and Lender Superpriority Claim. Solely to the extent of the Diminution in Value of the interests of the Successor Prepetition Agent and Successor Prepetition Lender in the Prepetition Collateral, the Successor Prepetition Agent and Successor Prepetition Lender shall have an allowed superpriority administrative expense claim (the "<u>Prepetition Secured Creditors Superpriority Claim</u>"), which shall have priority, except with respect to the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, and 726 of the Bankruptcy Code, and, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. Other than the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on parity with the Prepetition Secured Creditors Superpriority Claim.<br><br>Adequate Protection Interest Accrual. As further adequate protection, the Successor Prepetition Agent, on behalf of the Successor Prepetition Lender, shall receive from the Debtors, (i) on the date hereof, payment in-kind of all accrued and unpaid interest on the Prepetition Obligations (which interest shall be capitalized and added to the principal amount of the applicable Prepetition Obligations on the date hereof) and (ii) on the last business day of each month, payment in-kind of all interest that accrued on the Prepetition Obligations during the monthly period (or portion thereof) ending on such last business day (which interest shall be capitalized and added to the principal amount of the applicable Prepetition |

537813598

Obligations on such last business day), with interest on the Prepetition Obligations, for purposes of this clauses (ii), being calculated based upon the Default Rate as set forth in the Prepetition Credit Documents. In the event that it is determined by a final order, which order shall not be subject to any appeal, stay, reversal or vacatur, that (i) no Diminution in Value of the Successor Prepetition Agent or the Successor Prepetition Lender's interests has occurred, or (ii) such Successor Prepetition Agent and Successor Prepetition Lender is determined to be undersecured, then a party in interest shall have the right to assert that such payments of adequate protection shall be applied toward repayment of the principal amount due on such Prepetition Obligations as is owing to such Successor Prepetition Agent and Successor Prepetition Lender.

Prepetition Second Lien Lender Replacement Lien.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the Diminution in Value of the interest of the Prepetition Second Lien Lender in the Prepetition Collateral, the Prepetition Second Lien Lender shall have, subject to the terms and conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (the "Prepetition Second Lien Lender Replacement Liens" and, together with the Prepetition Secured Creditors Replacement Liens, the "Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, any Permitted Liens, and the Prepetition Secured Creditors Replacement Liens, and subject to the Prepetition Intercreditor Agreement.

Prepetition Second Lien Lender Superpriority Claim. Solely to the extent of the Diminution in Value of the interests of the Prepetition Second Lien Lender in the Prepetition Second Lien Collateral, the Prepetition Second Lien Lender shall have an allowed superpriority administrative expense claim (the "Prepetition Second Lien Lender Superpriority Claim"), which shall have priority, except with respect to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, and the Prepetition Secured Creditors Superpriority Claim, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kids specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, and 726 of the Bankruptcy Code, and, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. Other than the DIP Liens, the DIP Superpriority Claims, the Carve-Out, and the Current Prepetition Secured Parties' Superpriority Claim, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on parity with the Prepetition Second Lien Lender Superpriority Claim.

- 15 -

| | |
|---|---|
| **Acknowledgements and Stipulations**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ E | Subject only to the rights of parties in interest as set forth in paragraph 35 hereof, after consultation with their counsel and financial advisors, the Debtors (on behalf of and for themselves and their estates) admit, stipulate, acknowledge, and agree to the following:<br><br>(i)    Prepetition Credit Facility. Loot Crate, Inc. ("<u>Borrower</u>"), Loot Crate Parent, Inc. ("<u>Parent</u>"), the other Guarantors party to the Credit Agreement (defined below) from time to time (collectively with Parent, "<u>Prepetition Guarantors</u>", and each individually, "<u>Prepetition Guarantor</u>", collectively with Borrower, "<u>Prepetition Credit Parties</u>", and each individually, a "<u>Prepetition Credit Party</u>"), Midtown Madison Management LLC, as administrative agent and collateral agent for the Lenders under the Credit Agreement described below (in such capacity, together with its successors and assigns, "<u>Prepetition Agent</u>") and the Lenders thereunder (the "<u>Prepetition Lenders</u>"), are parties to that certain Credit Agreement dated as of August 3, 2018 (as it may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "<u>Prepetition Credit Agreement</u>"). The Prepetition Credit Agreement provided the Borrower with a credit facility (the "<u>Prepetition Credit Facility</u>") in the original amount of $21,000,000 as set forth in the Prepetition Credit Agreement, which was fully drawn, and under which additional advances were funded through amendments to the Prepetition Credit Agreement. The Debtors estimate that approximately $31,622,057 in principal and interest was outstanding under the Prepetition Credit Facility as of the Petition Date, and the Debtors estimate that an additional amount of not less than $10,000.000 would be payable as a required Make Whole Amount under the Prepetition Credit Facility (calculated as if the Prepetition Credit Facility were repaid on the Petition Date) (collectively, the "<u>Prepetition Obligations</u>"). The Prepetition Credit Facility is secured by first priority security interests and liens (the "<u>Prepetition Liens</u>") on substantially all prepetition assets of the Prepetition Credit Parties (the "<u>Prepetition Collateral</u>") pursuant to that certain Security Agreement dated as of August 3, 2018 and that certain Intellectual Property Security Agreement dated as of August 3, 2018 (as each may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date) (the "<u>Prepetition Security Agreements</u>"). On August 9, 2019, the Prepetition Credit Agreement and Prepetition Security Agreements were assigned to Money Chest LLC and Money Chest LLC became the sole Prepetition Lender ("<u>Successor Prepetition Lender</u>") and the administrative agent and collateral agent for the sole Prepetition Lender under the Prepetition Credit Agreement and Prepetition Security Agreements ("<u>Successor Prepetition Agent</u>"). The Prepetition Credit Agreement, Prepetition Security Agreements, together with all other notes, loans, guarantees, security, and related agreements and documents entered into in connection therewith are the "<u>Prepetition Credit Documents</u>."<br><br>(ii)    Prepetition Second Lien Obligations. Borrower, Loot Crate |

Holdings, Inc. ("Holdings"), the other Guarantors party to the Prepetition Purchase Agreement (defined below) from time to time (collectively with Holdings, "Prepetition Second Lien Guarantors", and each individually, "Prepetition Second Lien Guarantor", collectively with Borrower, "Prepetition Second Lien Credit Parties", and each individually, a "Prepetition Second Lien Credit Party") and Money Chest LLC ("Prepetition Second Lien Lender") are parties to that certain Securities Purchase Agreement dated as of August 3, 2018 (as it may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "Prepetition Purchase Agreement"). Pursuant to the Prepetition Purchase Agreement, the Prepetition Second Lien Lender purchased a Subordinated Convertible Promissory Note (the "Prepetition Second Lien Note") in the amount of $2,500,000 on or about August 3, 2018. As of the Petition Date, the amount set forth in the Interim DIP Order was outstanding under the Prepetition Second Lien Note (the "Prepetition Second Lien Obligations"). The Prepetition Second Lien Obligations are secured by security interests and liens (the "Prepetition Second Liens") on substantially all prepetition assets of the Prepetition Second Lien Credit Parties (the "Prepetition Second Lien Collateral") pursuant to that certain Security Agreement dated as of August 3, 2018 and that certain Intellectual Property Security Agreement dated as of August 3, 2018 (as each may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "Prepetition Second Lien Security Agreements"). The Prepetition Purchase Agreement, the Prepetition Second Lien Note, the Prepetition Second Lien Security Agreements, together with all other notes, loan, guarantee, security, and related agreements and documents entered into in connection therewith, are the "Prepetition Second Lien Documents". The Prepetition Agent, the Prepetition Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender collectively are the "Prepetition Secured Parties" and the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender collectively are the "Current Prepetition Secured Parties".

(iii)     Prepetition Intercreditor Agreement.  On or about August 3, 2018, the Prepetition Agent and the Prepetition Second Lien Lender entered into that certain Subordination and Intercreditor Agreement that, among other things, assigned relative priorities to certain claims and liens arising under the Prepetition Credit Documents and the Prepetition Second Lien Documents (the "Prepetition Intercreditor Agreement"). The Prepetition Intercreditor Agreement is a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code in the Chapter 11 Cases.

(iv)     Validity and Priority of Prepetition Senior Indebtedness and Liens. The Debtors acknowledge, agree, and stipulate that (a) the liens on the Prepetition Collateral granted pursuant to the Prepetition Credit Documents are binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement,

- 17 -

counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (b) the liens granted pursuant to the Prepetition Credit Documents are senior to all security interests and liens in the Prepetition Collateral other than any Permitted Priority Liens (as defined in the DIP Credit Agreement); (c) the Prepetition Credit Documents are valid and enforceable by the Successor Prepetition Agent and Successor Prepetition Lender against each of the Debtors party to such agreements; (d) the obligations under the Prepetition Credit Facility constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the Prepetition Credit Documents; (e) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the Prepetition Credit Facility exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law; (f) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Prepetition Agent, the Prepetition Lenders, the Successor Prepetition Agent, or the Successor Prepetition Lender and/or any of such parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the Prepetition Credit Documents (or the transactions contemplated thereunder), the obligations under the Prepetition Credit Facility, or the security interests and liens in the Prepetition Collateral; (g) as of the Petition Date, the Prepetition Obligations constitute allowed, secured claims within the meaning of sections 506(a) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees (including attorneys' fees and related expenses), costs, expenses, and other charges of whatever nature owing in respect thereof; (k) the Debtors hereby waive, discharge and release any right to challenge any of the obligations under the Prepetition Credit Facility, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Agent, Prepetition Lenders, Successor Prepetition Agent, or the Successor Prepetition Lender, and/or any of their respective officers, directors, or employees; and (1) any payments made on account of the obligations under the Prepetition Credit Facility including the Prepetition Obligations to or for the benefit of the Prepetition Agent, Prepetition Lenders, Successor Prepetition Agent, or the Successor Prepetition Lender prior to the Petition Date were payments out of the Prepetition Collateral in accordance with the Prepetition Intercreditor Agreement, as applicable, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

- 18 -

(v)     Validity and Priority of Prepetition Second Lien Indebtedness and Liens. The Debtors acknowledge, agree, and stipulate that (a) the liens on the Prepetition Second Lien Collateral granted pursuant to the Prepetition Credit Documents are binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (b) the liens granted pursuant to the Prepetition Second Lien Documents are senior to all security interests and liens in the Prepetition Second Lien Collateral except with respect to the Prepetition Liens as provided in the Prepetition Intercreditor Agreement and any Permitted Priority Liens; (c) the Prepetition Second Lien Documents are valid and enforceable by the Prepetition Second Lien Lender against each of the Debtors party to such agreements; (d) the obligations under the Prepetition Second Lien Documents constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the Prepetition Second Lien Documents; (e) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the Prepetition Second Lien Documents exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law; (f) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action; and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Prepetition Second Lien Lender and/or any of its affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the Prepetition Second Lien Documents (or the transactions contemplated thereunder), the obligations under the Prepetition Second Lien Documents, or the security interests and liens in the Prepetition Second Lien Collateral; (g) as of the Petition Date, the Prepetition Second Lien Obligations constitute allowed, secured claims within the meaning of sections 506(a) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees (including attorneys' fees and related expenses), costs, expenses, and other charges of whatever nature owing in respect thereof; (k) the Debtors hereby waive, discharge and release any right to challenge any of the obligations under the Prepetition Second Lien Documents, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Second Lien Lender and/or any of its officers, directors, or employees; and (1) any payments made on

- 19 -

| | |
|---|---|
| | account of the obligations under the Prepetition Second Lien Documents including the Prepetition Second Lien Obligations to or for the benefit of the Prepetition Second Lien Lender prior to the Petition Date were payments out of the Prepetition Second Lien Collateral in accordance with the Prepetition Intercreditor Agreement, as applicable, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.<br><br>(vi)    Cash Collateral. The Debtors acknowledge and stipulate that substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral or the Prepetition Second Lien Collateral, constitutes "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) ("Cash Collateral") of the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender, as and to the extent applicable.<br><br>(vii)    Default by the Debtors. The Debtors acknowledge and stipulate that by filing petitions for relief under chapter 11 of the Bankruptcy Code and commencing these Chapter 11 Cases, and due to other events of default under the Prepetition Credit Documents and the Prepetition Second Lien Documents, all of their debts and obligations under the Prepetition Credit Documents and the Prepetition Second Lien Documents (including, without limitation, any premiums payable thereunder) are immediately due and payable. |
| **Automatic Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 24 | Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 midnight prevailing Eastern Time on the 5th calendar day after the date the DIP Agent files a notice of an Event of Default (a "Default Notice") on the docket of the Chapter 11 Cases and serves the Default Notice by electronic mail (or other electronic means) to counsel for the Debtors, counsel for any Committee, and the U.S. Trustee (such period, the "Default Notice Period"), the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of this Court to allow the DIP Agent to take any and all actions permitted by law or under the DIP Documents, as if no case were pending under the Bankruptcy Code. Immediately upon the DIP Agent's filing and service of a Default Notice, the Debtors shall be prohibited from using Cash Collateral, including accounts receivable, inventory, and the proceeds thereof, which prohibition shall be subject to Paragraph 10 of this Interim Order and shall remain in effect unless otherwise ordered by the Court within the Default Notice Period. During the Default Notice Period, the Debtors and other parties-in-interest may request an expedited hearing on any motion regarding an alleged Event of Default. In the event the automatic stay is lifted following the expiration of the Default Notice Period in accordance with this paragraph, the Debtors shall also be prohibited from obtaining credit or incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or security interest held by the DIP Agent or which is entitled to priority |

| | |
|---|---|
| | administrative status which is equal or superior to that granted to the DIP Agent for the benefit of the DIP Lenders or one granted to the Current Prepetition Secured Parties, as the case may be, except in connection with repayment in full in cash of the DIP Obligations. Subject to any applicable grace periods, upon the occurrence of any Event of Default, the DIP Agent may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lenders' obligations to make additional loans under the DIP Facility. Upon the occurrence of an Event of Default, all loans and notes under the DIP Facility shall become due and payable in accordance with the DIP Documents. Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in the DIP Credit Agreement. |
| **Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement Schedule 8.21 and<br><br>Interim Order, para. (x)¶ | Credit Parties shall satisfy the milestones set forth below by the deadline specified below (in each case, as such deadline may be extended by Administrative Agent and each Lender in their sole and absolute discretion):<br><br><table><tr><td>**Milestone**</td><td>**Specified Deadline**</td></tr><tr><td>Deadline to file Sale Motion</td><td>1 Business Day after Petition Date</td></tr><tr><td>Deadline for Bankruptcy Court to enter Interim Order</td><td>3 Business Days after Petition Date</td></tr><tr><td>Deadline for Bankruptcy Court to enter Sale Procedures Order</td><td>15 days after Petition Date</td></tr><tr><td>Deadline for Bankruptcy Court to enter Final Order</td><td>25 days after Petition Date</td></tr><tr><td>Deadline to file a motion to extend the lease assumption/rejection period</td><td>25 days after Petition Date</td></tr><tr><td>Deadline to conduct the Auction</td><td>35 days after Petition Date</td></tr><tr><td>Deadline for Bankruptcy Court to enter the Sale Order</td><td>40 days after Petition Date</td></tr></table> |
| **Lien Perfection/Enforcement**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 16 | This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein including the DIP Liens and the Replacement Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action  (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Replacement Liens, or to entitle the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, or the Prepetition Second Lien Lender to the priorities granted |

- 21 -

| | |
|---|---|
| | herein. Without limiting the foregoing, the DIP Agent and the DIP Lenders shall be deemed to have "control" over all accounts maintained by the Debtors for purposes of perfection under the Uniform Commercial Code. Notwithstanding the foregoing, the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender each is authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Replacement Liens. The Debtors are authorized to execute and promptly deliver to the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender all such financing statements, mortgages, notices, and other documents as the DIP Agent, the Successor Prepetition Agent, or the Prepetition Second Lien Lender may reasonably request. The DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender, in their respective sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments. |
| **Release**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 29 | Subject to entry of the Final Order, and without limiting the rights of the parties in interest as set forth in paragraph 35 hereof, the Debtors hereby waive any and all actions related to, and hereby release, each of (a) the DIP Agent and the DIP Lenders, (b) the Successor Prepetition Agent and Successor Prepetition Lender, (c) the Prepetition Second Lien Lender, and (d) each of their respective shareholders, partners, unitholders, members, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such (each such person or entity identified in sub-clauses (a) through (d) of this paragraph, a "Released Party" and, collectively, the "Released Parties") from any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, or any Challenge, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising prior to the Petition Date and to the extent related to the Prepetition Credit Documents, the Prepetition Second Lien Documents, the DIP Credit Agreement, or this Interim Order, any documents related thereto, any aspect of the prepetition relationship with the Released Parties, any Debtor, or any other acts or omissions by the Released Parties in connection with the Prepetition Credit Documents, the Prepetition Second Lien Documents, the DIP Credit Agreements, or this Interim Order, any documents related to the Prepetition Credit Documents, the Prepetition |

- 22 -

|  | Second Lien Documents, the DIP Credit Agreements, or this Interim Order, or any aspect of their prepetition relationship with any Debtor. |
|---|---|
| **Indemnity**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 11(g) | Prepetition Indemnity Account. Following the payment in full in cash of the Prepetition Obligations in accordance with the Prepetition Credit Documents, the Debtors shall establish an account in the "control" (as defined in the UCC (as defined in the DIP Credit Agreement)) of the Successor Prepetition Agent (the "<u>Prepetition Indemnity Account</u>"), into which the sum of $500,000.00 of available cash shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Current Prepetition Secured Parties under the Prepetition Credit Documents, including, without limitation, any obligations arising under Section 12.05 of the Prepetition Credit Agreement. The Prepetition Indemnity Account shall not be subject to the Carve-Out.<br><br>Upon (a) the expiration of the Challenge Period (as defined below) if, as of such date, no party has filed (x) an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in paragraph 35 hereof, or a request for standing related to the same, or (y) an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any of the Prepetition Secured Parties related to the Prepetition Credit Facility, whether in the Chapter 11 Cases or independently in another forum, court, or venue, or a request for standing related to the same (the last such date being the "<u>Prepetition Indemnity Account Termination Date</u>"), or (b) the delivery of written notice to the Debtors by the Successor Prepetition Agent of the earlier receipt by the Successor Prepetition Agent and the Successor Prepetition Lender of releases and discharges of claims and liabilities in form and substance satisfactory to the Successor Prepetition Agent and the Successor Prepetition Lender in their sole discretion, all amounts then remaining and being held in the Prepetition Indemnity Account (net of any unreimbursed obligations owing to the Successor Prepetition Agent and/or the Successor Prepetition Lender on such date) shall be released to the Debtors and shall be subject to the DIP Liens and the Prepetition Secured Creditors Replacement Liens and the Prepetition Second Lien Lenders Replacement Liens.<br><br>The Prepetition Indemnity Obligations shall be secured by a first priority lien on the Prepetition Indemnity Account and all funds on deposit therein in favor of the Successor Prepetition Agent and the Successor Prepetition Lender.<br><br>The Successor Prepetition Agent and the Successor Prepetition Lender may apply amounts in the Prepetition Indemnity Account as and when they arise, without further notice to or consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court, upon compliance with the provisions of paragraph 27 below.<br><br>Upon request by the Successor Prepetition Agent, the Debtors shall deposit additional funds in the Prepetition Indemnity Account as may be |

| | |
|---|---|
| | reasonably necessary adequately to cover anticipated Prepetition Indemnity Obligations. The Debtors shall remain liable for the Prepetition Indemnity Obligations, even if the amounts in the Prepetition Indemnity Account prove insufficient to pay in full the Prepetition Indemnity Obligations. |
| **506(c) Waiver**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ H; see also para. 38 (payments to the DIP Lender are free and clear) | In exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and (ii) the Current Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out and the DIP Liens, the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties shall each receive a waiver of the provisions of section 506(c) of the Bankruptcy Code, subject to entry of the Final Order. |
| **Liens on Avoidance Actions**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ iv and para. 6 | The DIP Lender is given a grant of automatically perfected, valid, enforceable, and unavoidable security interests and liens, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(l) of the Bankruptcy Code, on all DIP Collateral (as defined herein) and assets of the Debtors, including with respect to Avoidance Proceeds and Avoidance Actions (each as defined below) and the products and proceeds thereof but solely to the extent provided in this Interim Order, as more fully described herein;<br><br>The DIP Collateral shall include any proceeds or property recovered, unencumbered or otherwise (the "Avoidance Proceeds") from claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (the "Avoidance Actions") and, subject to entry of the Final Order, on Avoidance Actions. |
| **Termination of the Use of Cash Collateral**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 10 | Upon the occurrence of an Event of Default (as defined herein and in the DIP Documents), and the filing and service of a Default Notice (as defined here) (the date of the filing and service of a Default Notice being the "Termination Date"), the Debtors' right to use Cash Collateral shall automatically terminate; provided, however, that during the Default Notice Period the Debtors may use Cash Collateral solely to meet payroll obligations (other than severance) and to pay expenses critical to keep the Debtors' businesses operating in accordance with the Budget and as otherwise agreed by the DIP Agent. |

## **Argument**

12.     Without adequate postpetition financing, the Debtors will not have sufficient available sources of working capital to operate in the ordinary course for a period of time sufficient to maximize the value of their assets through a sale.  The uncertainty concerning the Debtors' financial condition, plus the expected short duration of this case (which limits the interest a lender could obtain to compensate for risk), necessarily limits credit on affordable terms.  Under the present circumstances, the Debtors' ability to finance their operations is dependent on the DIP Loans.

13.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  *See* 11 U .S.C. § 364(c); *see also In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").  The DIP Loans will enable the Debtors to operate pending a sale, preceded by a competitive process in which the Debtors hope will drive more value to their estates.

14.     The Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code in an amount sufficient

- 25 -

and readily available to maintain ongoing operations, nor have the Debtors been able to obtain postpetition financing from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

15.     Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (business judgments should be left to the board room and not to this court).  See also, *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious).  Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."  *Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

16.     The Debtors submit that the foregoing reflects they have exercised sound business judgment in determining the merits and necessity of the DIP Loans and that the terms are in the best interests of the Debtors' estate.  Accordingly, the Debtors should be granted the requested relief to borrow funds on a secured and superpriority basis, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code.

**B.      The Proposed Use of Collateral, Including Cash Collateral**

30.     The Debtors' request to use all of their assets that serve as Collateral, including Cash Collateral, should also be granted.  Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use,

- 26 -

sale, or lease in accordance with the provisions of this section." *See* 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that on request by an entity that has an interest in property, the court, with or without a hearing, shall prohibit or condition the use, sale, or lease of such property as necessary to provide adequate protection of such interest.  The DIP Lender has indicated that it requires adequate protection of its interests in existing collateral as a condition to its consent to such use of cash collateral, and then only on the terms reflected in this Motion and in the proposed form of Interim Order.

31.    The Debtors' business judgment as to adequate protection here is evident in the terms of the Interim Order – all of which are customary in connection with the use of collateral in operating Chapter 11 cases of this scale and consistent with the broad flexibility inherent in the concepts of adequate protection.  *See In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) ("[a]dequate protection will take many forms, only some of which are set forth in section 361…"); *In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987) ("[t]he absence of a definition of adequate protection in the Code coupled with the 'flexibility' of Section 361(3) suggests that adequate protection may be shown in a variety of ways"); *In re Wilson*, 30 B.R. 371, 373 (Bankr. E.D. Pa. 1983) ("[w]hile 'adequate protection' is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equity principles").

32.    The Interim Order is otherwise authorized and warranted pursuant to Section 363(c)(2) of the Bankruptcy Code given the core function of adequate protection to protect secured parties against diminution or decrease as a result of the proposed use of their collateral. *See In re Gasel Transp. Lines, Inc.*, 326 B.R. 683 (6th Cir. B.A.P. 2005).  Adequate protection in these cases should ensure that the Bond Trustee receives the value bargained for prior to the

Debtors' bankruptcy. *In re WorldCom, Inc.*, 304 B.R. 611, 618 (Bankr. S.D.N.Y. 2004) (discussing generally the requirement of Section 363 that where a creditor has a security interest in the property, such creditor is entitled to adequate protection of such interest).

33.    For the foregoing reasons, granting the relief requested herein is appropriate and in the best interests of its estate.

## Request for Immediate Relief and Waiver of Stay

34.    Pending a final hearing, the Debtors require immediate financing and use of existing collateral.  The Debtors' interim request represents the Debtors' good faith projection of the cash necessary to operate during the period prior to a final hearing.  It is essential that the Debtors maintain stability and continue paying ordinary operating expenses postpetition to facilitate the sale process and maximize the value of their assets.  Absent immediate financing and use of existing collateral, the Debtors will not have any funding to pay expenses and therefore will be unable to avoid an immediate liquidation pending a final hearing.

35.    Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003(b).  The Debtors submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

36.    Bankruptcy Rule 4001 has the same standard, with respect to interim relief.  Fed. R. Bankr. P. 4001(b)(2); Fed. R. Bankr. P. 4001(c)(2) ("If the motion so requests, the court may conduct a hearing before such 14-day period [after service of the motion] expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and

- 28 -

irreparable harm to the estate pending a final hearing." The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, and that Bankruptcy Rules 6003 and 4001 have been satisfied.

37.    In addition, in order to implement the foregoing successfully, the Debtors respectfully request a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the operations, value, and ability of the Debtors to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## No Prior Request

38.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

## Consent to Jurisdiction

39.    Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## Notice

40.    Notice of this Motion will be given to the following parties, or to their counsel: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' thirty largest unsecured creditors on a consolidated basis, as identified in their Chapter 11 petitions; (c) counsel to Money Chest, LLC, the Debtors' proposed post-petition Lender; and (d) Wells Fargo Bank, National Association.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties entitled to notice pursuant to Local Rule 9013-1(m).  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form attached hereto, granting the relief requested herein and granting the Debtors such other relief as the Court deems appropriate.

537813598

Dated: August 12,2019
Wilmington, Delaware

**ROBINSON & COLE LLP**
Natalie D. Ramsey (No. 5378)
Jamie L. Edmonson (No. 4247)
Mark A. Fink (No. 3946)
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 295-4800
Facsimile:  (302) 351-8618
Email:  nramsey@rc.com
          jedmonson@rc.com
          mfink@rc.com

**BRYAN CAVE LEIGHTON PAISNER LLP**
*/s/ Mark I. Duedall*
Mark I. Duedall (No. 3346)
Leah Fiorenza McNeill (*pro hac vice* pending)
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email: mark.duedall@bclplaw.com
          leah.fiorenza@bclplaw.com

**BRYAN CAVE LEIGHTON PAISNER LLP**
Andrew J. Schoulder (*pro hac vice* pending)
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-2000
Facsimile:  (212) 541-4630
Email: andrew.schoulder@bclplaw.com

*Proposed counsel to the Debtors and Debtors in Possession*

**EXHIBIT A TO MOTION**

**PROPOSED INTERIM ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Loot Crate, Inc., *et al.*,[1] | ) | Case No. 19- 11791 (BLS)]] |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) |  |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS
AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND SUPER-
PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN
PREPEITTION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV)
SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] [Docket No. __], dated August 12, 2019, of Loot Crate,

Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases

(each, a "Debtor" and, collectively, the "Debtors") pursuant to sections 105, 361, 362, 363(c),

363(e), 364(c), 364(d), 364(e), and 507 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking

entry of an interim order (this "Interim Order") providing for, among other things:

(i)     authority for the Debtors to obtain senior secured, priming, postpetition financing

on a super-priority basis pursuant to the terms and conditions of that certain Debtor in Possession

---

[1]     The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Loot Crate, Inc. (7119); Loot Crate Holdings, Inc.; LC Funding, Inc.; and Loot Crate Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Avenue, Los Angeles, CA 90031.

[2]     Capitalized terms used by not defined herein shall have the meanings ascribed to them in the Motion.

Credit Agreement by and among Debtor Loot Crate, Inc. as Borrower, and Debtor Loot Crate Parent, Inc., Debtor LC Funding, Inc., and Debtor Loot Crate Holdings, Inc. as Guarantors, and Money Chest LLC, as administrative agent and collateral agent (in its capacity as administrative and collateral agent, and including any of its Affiliates (including any branches thereof) performing any of the functions of administrative agent or collateral agent hereunder or under any of the other Loan Documents, the "DIP Agent") for Money Chest LLC (together with any other lenders party thereto and their respective affiliates, successors and assigns, the "DIP Lenders"), substantially in the form attached hereto as Exhibit 1 (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Credit Agreement" and the financing and financial accommodations made available pursuant to the DIP Credit Agreement and the other DIP Documents (as defined below), the "DIP Facility");

(ii)    authority for the Debtors to (a) execute, deliver, and perform under the DIP Credit Agreement and all other related or ancillary documents and agreements (including the Budget (as defined below)), and (b) perform such other acts as may be necessary or desirable in connection with the DIP Documents (as defined below);

(iii)    authority for the Debtors to obtain senior secured, priming, postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Debtor In Possession Security Agreement by and among the Debtors and the DIP Agent, substantially in the form attached hereto as Exhibit 2 (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Security Agreement");

(iv)     authority for the Debtors to (a) execute, deliver, and perform under the DIP Credit Agreement and the Closing Date Term Notes and the Delayed Draw Term Notes defined therein and to be issued thereunder (the "DIP Notes"), the DIP Security Agreement, and all other related or ancillary documents and agreements (including the Budget) (collectively, the "DIP Documents"), and (b) perform such other acts as  may be necessary or desirable in connection with the DIP Documents;

(v)     authority for the Debtors to (a) use "cash collateral," as such term is defined  in section  363 of the Bankruptcy  Code  and/or  under the DIP  Documents, as applicable (the "Cash Collateral"), subject to (x) the restrictions set forth in the DIP Documents and this Interim Order, and (y) the grant of adequate protection to the Current Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral and the Prepetition Second Lien Collateral (each as defined herein), and (b) access and use the liquidity provided under the DIP Facility on an interim basis until the Final Hearing (as defined below) (the "Interim Period"), as follows:

(1)     access and use up to $4,000,000 of the postpetition term loans made available under the DIP Facility during the Interim Period (the "Interim DIP Financing") to (x) fund the Debtors' chapter 11 cases and the continued operation of their businesses as Debtors, and (y) fund certain fees and expenses associated with the consummation of the transactions contemplated in the DIP Documents, each on the terms set forth herein and the DIP Documents, and in each case consistent with the Budget; and

(2)     pay the fees and expenses arising in accordance with the terms of the DIP Documents; and

(vi)    a grant of automatically perfected, valid, enforceable, and unavoidable security interests and liens, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(l) of the Bankruptcy Code, on all DIP Collateral (as defined herein) and assets of the Debtors, including with respect to Avoidance Proceeds and Avoidance Actions (each as defined below) and the products and proceeds thereof but solely to the extent provided in this Interim Order, as more fully described herein;

(vii)    a grant, with respect to the obligations of the Debtors hereunder and under the other DIP Documents (and subject only to the Carve-Out described in paragraph 32 hereof), of an allowed super-priority administrative expense claim in each of the Debtors' bankruptcy cases (and against each of the Debtors' estates created pursuant to section 541 of the Bankruptcy Code) pursuant to section 364(c)(l) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(6), 546(c), or 726 thereof);

(viii)    authority for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including the reasonable and documented fees and disbursements of the DIP Agent and the DIP Lenders' attorneys, advisers, accountants, and other consultants (collectively, the "DIP Obligations"), all to the extent provided in and in accordance with the terms of the DIP Documents and this Interim Order;

(ix)    a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as set forth herein;

(x)    approval of the Milestones as defined in the DIP Credit Agreement (the "Milestones") in respect of the 363 sale process as described in the Declaration of Stuart

4

Kaufman in Support of First Day Motions and Related Relief (the "<u>First Day Declaration</u>") (as defined below), which Milestones are attached hereto as Exhibit 3; and

(xi)    scheduling of a final hearing (the "<u>Final Hearing</u>") to consider entry of an order approving the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing;

and the Court having considered the Motion, the First Day Declaration filed concurrently with the Motion, the DIP Documents, the evidence submitted or proffered at the interim hearing to consider the relief requested in the Motion held on August __, 2019 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d), and 9014 and any applicable Local Rule, including Local Rule 9013-1(m); and the Interim Hearing having been held and concluded; and all objections to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and based on all pleadings filed with this Court, and all proceedings held before the Court; and it appearing to the Court that granting the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses and is necessary to avoid immediate and irreparable harm to the Debtors' estates; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and adequate protection being provided on account of the interests of certain holders of liens on the property of the estates on which liens are to be granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE

DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND

CONCLUSIONS OF LAW:

A.      *Petition Date*. On August __, 2019 (the "Petition Date"), each of the Debtors filed

a separate voluntary petition under chapter 11 of the Bankruptcy Code in the

United States Bankruptcy Court for the District of Delaware (the "Court")

commencing these chapter 11 cases (collectively, the "Chapter 11 Cases").

B.      *Debtors in Possession*. The Debtors continue to operate their businesses and

properties as debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code. No trustee or examiner has been appointed in these Chapter

11 Cases.

C.      *Jurisdiction and Venue*. This Court has jurisdiction over these proceedings

and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b)

and 1334, and the *Amended Standing Order of Reference from the United*

*States District Court for the District of Delaware,* dated as of February 29,

2012. Consideration of the Motion constitutes a core proceeding under 28

U.S.C. § 157(b)(2). The Court may enter a final order consistent with Article

III of the United States Constitution. Venue for these Chapter 11 Cases and

proceedings on the Motion is proper in this district pursuant to 28 U.S.C. *§§*

1408 and 1409.

D.      *Committee Formation*. As of the date hereof, the Office of the United States

Trustee for the District of Delaware (the "U.S. Trustee") has not yet appointed

an official committee of unsecured creditors (the "Committee") in these Chapter

11 Cases pursuant to section 1102 of the Bankruptcy Code.

E.    *Debtors' Stipulations*. Subject only to the rights of parties in interest as set forth in paragraph 35 hereof, after consultation with their counsel and financial advisors, the Debtors (on behalf of and for themselves and their estates) admit, stipulate, acknowledge, and agree to the following:

(i)    *Prepetition Credit Facility*. Loot Crate, Inc. ("Borrower"), Loot Crate Parent, Inc. ("Parent"), the other Guarantors party to the Credit Agreement (defined below) from time to time (collectively with Parent, "Prepetition Guarantors", and each individually, "Prepetition Guarantor", collectively with Borrower, "Prepetition Credit Parties", and each individually, a "Prepetition Credit Party"), Midtown Madison Management LLC, as administrative agent and collateral agent for the Lenders under the Credit Agreement described below (in such capacity, together with its successors and assigns, "Prepetition Agent") and the Lenders thereunder (the "Prepetition Lenders"), are parties to that certain Credit Agreement dated as of August 3, 2018 (as it may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "Prepetition Credit Agreement"). The Prepetition Credit Agreement provided the Borrower with a credit facility (the "Prepetition Credit Facility") in the original amount of $21,000,000 as set forth in the Prepetition Credit Agreement, which was fully drawn, and under which additional advances were funded through amendments to the Prepetition Credit Agreement. The Debtors estimate that approximately $31,622,057 in principal and interest was outstanding under the Prepetition Credit Facility as of the Petition Date, and the

Debtors estimate that an additional amount of not less than $10,000.000 would be payable as a required Make Whole Amount under the Prepetition Credit Facility (calculated as if the Prepetition Credit Facility were repaid on the Petition Date) (collectively, the "Prepetition Obligations"). The Prepetition Credit Facility is secured by first priority security interests and liens (the "Prepetition Liens") on substantially all prepetition assets of the Prepetition Credit Parties (the "Prepetition Collateral") pursuant to that certain Security Agreement dated as of August 3, 2018 and that certain Intellectual Property Security Agreement dated as of August 3, 2018 (as each may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date) (the "Prepetition Security Agreements"). On August 9, 2019, the Prepetition Credit Agreement and Prepetition Security Agreements were assigned to Money Chest LLC and Money Chest LLC became the sole Prepetition Lender ("Successor Prepetition Lender") and the administrative agent and collateral agent for the sole Prepetition Lender under the Prepetition Credit Agreement and Prepetition Security Agreements ("Successor Prepetition Agent"). The Prepetition Credit Agreement, Prepetition Security Agreements, together with all other notes, loans, guarantees, security, and related agreements and documents entered into in connection therewith are the "Prepetition Credit Documents."

(ii)      *Prepetition Second Lien Obligations*. Borrower, Loot Crate Holdings, Inc. ("Holdings"), the other Guarantors party to the Prepetition Purchase Agreement (defined below) from time to time (collectively with Holdings, "Prepetition Second Lien Guarantors", and each individually, "Prepetition Second Lien

Guarantor", collectively with Borrower, "Prepetition Second Lien Credit Parties", and each individually, a "Prepetition Second Lien Credit Party") and Money Chest LLC ("Prepetition Second Lien Lender") are parties to that certain Securities Purchase Agreement dated as of August 3, 2018 (as it may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "Prepetition Purchase Agreement"). Pursuant to the Prepetition Purchase Agreement, the Prepetition Second Lien Lender purchased a Subordinated Convertible Promissory Note (the "Prepetition Second Lien Note") in the amount of $2,500,000 on or about August 3, 2018. As of the Petition Date, the Debtors estimate that approximately $2,994,939.00 was outstanding under the Prepetition Second Lien Note (the "Prepetition Second Lien Obligations"). The Prepetition Second Lien Obligations are secured by security interests and liens (the "Prepetition Second Liens") on substantially all prepetition assets of the Prepetition Second Lien Credit Parties (the "Prepetition Second Lien Collateral") pursuant to that certain Security Agreement dated as of August 3, 2018 and that certain Intellectual Property Security Agreement dated as of August 3, 2018 (as each may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "Prepetition Second Lien Security Agreements"). The Prepetition Purchase Agreement, the Prepetition Second Lien Note, the Prepetition Second Lien Security Agreements, together with all other notes, loan, guarantee, security, and related agreements and documents entered into in connection therewith, are the "Prepetition Second Lien Documents". The Prepetition Agent, the Prepetition Lenders, the Successor Prepetition Agent, the

Successor Prepetition Lender, and the Prepetition Second Lien Lender collectively are the "<u>Prepetition Secured Parties</u>" and the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender collectively are the "<u>Current Prepetition Secured Parties</u>".

(iii)    *Prepetition Intercreditor Agreement*.  On or about August 3, 2018, the Prepetition Agent and the Prepetition Second Lien Lender entered into that certain Subordination and Intercreditor Agreement that, among other things, assigned relative priorities to certain claims and liens arising under the Prepetition Credit Documents and the Prepetition Second Lien Documents (the "<u>Prepetition Intercreditor Agreement</u>").  The Prepetition Intercreditor Agreement is a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code in the Chapter 11 Cases.

(iv)    *Validity and Priority of Prepetition Senior Indebtedness and Liens*. The Debtors acknowledge, agree, and stipulate that (a) the liens on the Prepetition Collateral granted pursuant to the Prepetition Credit Documents are binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (b) the liens granted pursuant to the Prepetition Credit Documents are senior to all security interests and liens in the Prepetition Collateral other than any Permitted Priority Liens (as defined in the DIP Credit Agreement); (c) the Prepetition Credit Documents are valid

and enforceable by the Successor Prepetition Agent and Successor Prepetition Lender against each of the Debtors party to such agreements; (d) the obligations under the Prepetition Credit Facility constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the Prepetition Credit Documents; (e) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the Prepetition Credit Facility exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law; (f) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action; and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Prepetition Agent, the Prepetition Lenders, the Successor Prepetition Agent, or the Successor Prepetition Lender and/or any of such parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the Prepetition Credit Documents (or the transactions contemplated thereunder), the obligations under the Prepetition Credit Facility, or the security interests and liens in the Prepetition Collateral; (g) as of the Petition Date, the

11

Prepetition Obligations constitute allowed, secured claims within the meaning of sections 506(a) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees (including attorneys' fees and related expenses), costs, expenses, and other charges of whatever nature owing in respect thereof; (k) the Debtors hereby waive, discharge and release any right to challenge any of the obligations under the Prepetition Credit Facility, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Agent, Prepetition Lenders, Successor Prepetition Agent, or the Successor Prepetition Lender, and/or any of their respective officers, directors, or employees; and (1) any payments made on account of the obligations under the Prepetition Credit Facility including the Prepetition Obligations to or for the benefit of the Prepetition Agent, Prepetition Lenders, Successor Prepetition Agent, or the Successor Prepetition Lender prior to the Petition Date were payments out of the Prepetition Collateral in accordance with the Prepetition Intercreditor Agreement, as applicable, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

 (v)    *Validity and Priority of Prepetition Second Lien Indebtedness and Liens.* The Debtors acknowledge, agree, and stipulate that (a) the liens on the Prepetition Second Lien Collateral granted pursuant to the Prepetition Credit Documents are binding, enforceable, non-avoidable, and perfected liens, and

are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (b) the liens granted pursuant to the Prepetition Second Lien Documents are senior to all security interests and liens in the Prepetition Second Lien Collateral except with respect to the Prepetition Liens as provided in the Prepetition Intercreditor Agreement and any Permitted Priority Liens; (c) the Prepetition Second Lien Documents are valid and enforceable by the Prepetition Second Lien Lender against each of the Debtors party to such agreements; (d) the obligations under the Prepetition Second Lien Documents constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the Prepetition Second Lien Documents; (e) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the Prepetition Second Lien Documents exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law; (f) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action; and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Prepetition Second Lien Lender and/or any of its affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors, or employees whether arising

13

under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the Prepetition Second Lien Documents (or the transactions contemplated thereunder), the obligations under the Prepetition Second Lien Documents, or the security interests and liens in the Prepetition Second Lien Collateral; (g) as of the Petition Date, the Prepetition Second Lien Obligations constitute allowed, secured claims within the meaning of sections 506(a) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees (including attorneys' fees and related expenses), costs, expenses, and other charges of whatever nature owing in respect thereof; (k) the Debtors hereby waive, discharge and release any right to challenge any of the obligations under the Prepetition Second Lien Documents, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Second Lien Lender and/or any of its officers, directors, or employees; and (1) any payments made on account of the obligations under the Prepetition Second Lien Documents including the Prepetition Second Lien Obligations to or for the benefit of the Prepetition Second Lien Lender prior to the Petition Date were payments out of the Prepetition Second Lien Collateral in accordance with the Prepetition

14

Intercreditor Agreement, as applicable, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(vi) *Cash Collateral.* The Debtors acknowledge and stipulate that substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral or the Prepetition Second Lien Collateral, constitutes "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) ("Cash Collateral") of the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender, as and to the extent applicable.

(vii) *Default by the Debtors*. The Debtors acknowledge and stipulate that by filing petitions for relief under chapter 11 of the Bankruptcy Code and commencing these Chapter 11 Cases, and due to other events of default under the Prepetition Credit Documents and the Prepetition Second Lien Documents, all of their debts and obligations under the Prepetition Credit Documents and the Prepetition Second Lien Documents (including, without limitation, any premiums payable thereunder) are immediately due and payable.

F. Consent to Adequate Protection and Priming Liens. The Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender each have provided consent to (i) the adequate protection provided in paragraph 11 of this Interim Order and (ii) the priming of their respective liens on the

Prepetition Collateral and the Prepetition Second Lien Collateral on the terms set forth in paragraph 6 of this Interim Order.

G.      Findings Regarding the Postpetition Financing.

(i)      *Request for Postpetition Financing*. The Debtors seek authority on an interim basis to: (a) use Cash Collateral on the terms described herein, and (b) access and use the liquidity provided under the DIP Facility to: (i) finance ongoing debtor in possession working capital purposes, as provided for in the Budget, and other general corporate purposes; and (ii) finance transaction fees, costs and expenses related to the DIP Credit Agreement, in each case, solely to the extent permitted under the DIP Documents and as provided for in the Budget.

(ii)      *Priming of Certain Prepetition Liens.* The priming of the liens of the Prepetition Secured Parties on the Prepetition Collateral and the Prepetition Second Lien Collateral, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors. However, the Current Prepetition Secured Parties are each entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for and to the extent of any postpetition diminution in the value of  each of their respective interests in the Prepetition Collateral or the Prepetition Second Lien Collateral (including Cash Collateral) resulting from the Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, the priming of the prepetition liens granted on the Prepetition Collateral or the Prepetition Second Lien Collateral, and the subordination to the

Carve-Out described in paragraph 35 hereof and the DIP Liens (as defined herein) (collectively, the "Diminution in Value"). As adequate protection, the Current Prepetition Secured Parties will receive the adequate protection described in paragraph 11 of this Interim Order.

(iii)    *Need for Postpetition Financing and Use of Cash Collateral.*    The Debtors' need to use Cash Collateral and to obtain credit pursuant to the DIP Facility as provided for herein is necessary to enable the Debtors to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise to finance their operations requires working capital from the DIP Facility and the use of Cash Collateral. Without the ability to access the DIP Facility or Cash Collateral, the Debtors, their estates, their creditors, and the possibility for a successful reorganization would suffer immediate and irreparable harm. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)    *No Credit Available on More Favorable Terms.* Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit (a)

having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (a) perfected security interests in and liens on all of the Debtors' existing and after-acquired assets, (b) superpriority claims and priming liens, and (c) the other protections set forth in this Interim Order, in each case with the priorities and on the other terms set forth herein.

(v)     *Adequacy of the Budget*. As set forth in the DIP Documents, the Debtors have prepared and delivered to the DIP Agent and the DIP Lenders a budget, a copy of which is annexed hereto as Exhibit 4 (as it may be updated, modified, amended, restated or supplemented with the consent of the DIP Agent, in its sole discretion, on the terms set forth in the DIP Documents and paragraph 14 hereof, the "Budget"). The Budget has been thoroughly reviewed by the Debtors, their management, and their advisors. The Debtors, their management, and their advisors believe the Budget and the estimate of administrative expenses due or accruing during the period covered by the Budget were developed using reasonable assumptions, and based on those assumptions the Debtors believe there should be sufficient available assets to pay all administrative expenses due or accruing during the period covered by the Budget.

H.    <u>Section 506(c)</u>. In exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and (ii) the Current Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out  and the DIP Liens, the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties shall each receive a waiver of the provisions of section 506(c) of the Bankruptcy Code, subject to entry of the Final Order.

I.    <u>Section 552</u>.   In exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (ii) the Current Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out and the DIP Liens, the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply.

J.    <u>Good Faith of the DIP Agent and the DIP Lenders</u>.

(i)        *Willingness  to Provide Financing*. The  DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) the entry by this Court of this Interim Order, in a form satisfactory to the DIP Agent, to secure all obligations under the DIP Documents; (b) approval by this Court of the terms and conditions of the DIP Facility; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent

reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order, or any other order.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e).* The terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents, and the interest and fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent and sound business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties. The use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the Current Prepetition Secured Parties, the DIP Agent, and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

K.     <u>Notice</u>. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) counsel to the Current Prepetition Secured Parties; (iii) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in the Chapter 11 Cases; (iv) any such other party entitled to notice pursuant to Local Rule 9013-l(m) (collectively, the "<u>Notice Parties</u>"). The parties have made reasonable

efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that, as set forth herein on an interim basis:

1.      <u>Interim DIP Financing Approved</u>. The Interim DIP Financing is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order and the DIP Documents (including the Budget).

2.      <u>Objections Overruled</u>.  All objections to the Interim DIP Financing and/or entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled.

**<u>DIP Facility Authorization</u>**

3.      <u>Authorization of the Interim DIP Financing and Entry into the DIP Documents; Application of DIP Proceeds.</u>    The DIP Facility is hereby approved for the Interim DIP Financing. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents that may be necessary or required for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens provided for by this Interim Order and the DIP Documents. The DIP Documents evidence valid and binding obligations of the Debtors, which shall be enforceable against the Debtors, their estates, and their creditors in accordance with the terms and conditions of the DIP Documents and this Interim Order. The Debtors are hereby authorized to pay, in accordance with this Interim Order, the principal, interest, fees, expenses, and other amounts described in the DIP Documents and all

other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Documents. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. All of the obligations described in the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with the terms of the DIP Documents. The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used for: (a) the payment of fees, expenses and costs incurred in connection with the Chapter 11 Cases; (b) the payment of transaction expenses; and (c) working capital, capital expenditures, and other general corporate purposes of the Debtors, in each case, subject to the Budget.

4.     <u>Authorization to Access the Interim DIP Financing</u>. During the period that this Interim Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to access the Interim DIP Financing pursuant to and in accordance with the terms herein and the terms of the DIP Documents.

5.     <u>DIP Obligations</u>.  Upon entry of this Interim Order, the DIP Documents and this Interim Order shall constitute and evidence the validity of the DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including any trustee appointed in these Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other

proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim Order, the DIP Obligations will include all loans, notes and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agents or to any of the DIP Lenders, under the DIP Documents or this Interim Order, including all principal, accrued interest, costs, fees, expenses, and other amounts under the DIP Documents. The DIP Obligations shall be due and payable as provided for herein and in the DIP Documents.

6.      DIP Liens and Collateral. Effective immediately upon the entry of this Interim Order, the DIP Agent, on its own behalf and on behalf of the DIP Lenders, is hereby granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code first priority, priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens (collectively, the "DIP Liens"), senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in this Interim Order and the Final Order, upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors, including, without limitation, the following: all of the Debtors' Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, goods, instruments, Inventory, commercial tort claims (including without limitation those specifically identified as part of the Prepetition Credit Documents), Investment Property, letter-of-credit rights, letters of credit, all sums on deposit; together with (a) all substitutions and replacements for and products of any of the foregoing; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title now or hereafter

covering such goods; (e) all Prepetition Collateral and Prepetition Second Lien Collateral; (f) any money, or other assets of the Debtors that now or hereafter come into the possession, custody, or control of the DIP Agent or the DIP Lenders; (g) all sums on deposit in any bank account of the Debtors; (h) proceeds of any and all of the foregoing; (i) books and records of the Debtors, including all mail or electronic mail addressed to the Debtors; and (j) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Debtors now have or hereafter acquire any rights (together, the "DIP Collateral"), as security for the payment and performance of the DIP Obligations.  The DIP Liens to be created and granted to the DIP Agent and the DIP Lenders, as provided herein, (A) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and (B) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise be junior to any Permitted Priority Liens. The DIP Collateral shall include any proceeds or property recovered, unencumbered or otherwise (the "Avoidance Proceeds") from claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (the "Avoidance Actions") and, subject to entry of the Final Order, on Avoidance Actions. Further, the DIP Collateral shall include the proceeds of leases, but not the leases themselves, whether or not perfected prior to the Petition Date. The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the order and priority set forth in the DIP Credit Agreement and this Interim Order. Except as otherwise provided herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against

24

any trustee appointed in the Chapter 11 Cases or any Successor Case(s) and/or upon the dismissal of any of the Chapter 11 Cases. The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code.

7.    <u>DIP Superpriority Claims</u>. Subject to the Carve-Out, the DIP Obligations shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Debtors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b),  507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.  The DIP Agent and DIP Lenders shall have a superpriority administrative expense claim against the Debtors' estates pursuant to section 364(c)(1) of the Bankruptcy Code for the DIP Obligations and all related costs and expenses, which shall be prior, senior and superior to any other claim, including any other superpriority administrative expense claim of any kind or nature, except as provided herein and/or in the DIP Credit Agreement.  The DIP Obligations are claims to be afforded priority over administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code, as provided herein and in the DIP Credit Agreement and secured by liens pursuant to section 364 of the Bankruptcy Code as provided herein.  All such superpriority claims referred to herein collectively as the "<u>DIP Superpriority Claims</u>".

8.    <u>Extension of Credit</u>. The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance or purchase any note, as applicable, unless all of the

conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent in its sole discretion.

9.    <u>Use of DIP Facility Proceeds</u>. From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only pursuant to the terms herein and the terms of the DIP Documents, including as contemplated and limited by the Budget (including any variance therefrom as may be permitted under the DIP Documents).

**<u>Authorization to Use Cash Collateral and Adequate Protection</u>**

10.    <u>Authorization to Use Cash Collateral</u>. Subject to the terms and conditions set forth in, and in accordance with, this Interim Order, the DIP Facility, and the DIP Documents, the Debtors are authorized to use Cash Collateral. Except as expressly permitted in this Interim Order, the DIP Facility, and the DIP Documents, nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of Cash Collateral or other proceeds resulting therefrom. Upon the occurrence of an Event of Default (as defined herein and in the DIP Documents), and the filing and service of a Default Notice (as defined here) (the date of the filing and service of a Default Notice being the "<u>Termination Date</u>"), the Debtors' right to use Cash Collateral shall automatically terminate; provided, however, that during the Default Notice Period (defined below), the Debtors may use Cash Collateral solely to meet payroll obligations (other than severance) and to pay expenses critical to keep the Debtors' businesses operating, in each case only to the extent provided for in the Budget for the time period corresponding to the Default Notice Period (defined below) or as otherwise agreed to in writing by the DIP Agent.

11.    <u>Adequate Protection</u>. As adequate protection for the interest of the Successor Prepetition Agent and Successor Prepetition Lender in the Prepetition Collateral

(including Cash Collateral) on account of the Diminution in Value, the Successor Prepetition Agent and Successor Prepetition Lender shall receive the following adequate protection:

(a)     *Successor Prepetition Agent and Lender Replacement Liens.*  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the Diminution in Value of the interest of the Successor Prepetition Agent and Successor Prepetition Lender in the Prepetition Collateral, the Successor Prepetition Agent and Successor Prepetition Lender shall have, subject to the terms and conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (the "Prepetition Secured Creditors Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, and any Permitted Priority Liens.

(b)     *Successor Prepetition Agent and Lender Superpriority Claim.* Solely to the extent of the Diminution in Value of the interests of the Successor Prepetition Agent and Successor Prepetition Lender in the Prepetition Collateral, the Successor Prepetition Agent and Successor Prepetition Lender shall have an allowed superpriority administrative expense claim (the "Prepetition Secured Creditors Superpriority Claim"), which shall have priority, except with respect to the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or

27

nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, and 726 of the Bankruptcy Code, and, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. Other than the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on parity with the Prepetition Secured Creditors Superpriority Claim.

(c)    *Adequate Protection Interest Accrual*. As further adequate protection, the Successor Prepetition Agent, on behalf of the Successor Prepetition Lender, shall receive from the Debtors, (i) on the date hereof, payment in-kind of all accrued and unpaid interest on the Prepetition Obligations (which interest shall be capitalized and added to the principal amount of the applicable Prepetition Obligations on the date hereof) and (ii) on the last business day of each month, payment in-kind of all interest that accrued on the Prepetition Obligations during the monthly period (or portion thereof) ending on such last business day (which interest shall be capitalized and added to the principal amount of the applicable Prepetition

Obligations on such last business day), with interest on the Prepetition Obligations, for purposes of this clauses (ii), being calculated based upon the Default Rate as set forth in the Prepetition Credit Documents. In the event that it is determined by a final order, which order shall not be subject to any appeal, stay, reversal or vacatur, that (i) no Diminution in Value of the Successor Prepetition Agent or the Successor Prepetition Lender's interests has occurred, or (ii) such Successor Prepetition Agent and Successor Prepetition Lender is determined to be undersecured, then a party in interest shall have the right to assert that such accrual of interest should be reversed.

(d)     *Prepetition Second Lien Lender Replacement Lien*.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the Diminution in Value of the interest of the Prepetition Second Lien Lender in the Prepetition Collateral, the Prepetition Second Lien Lender shall have, subject to the terms and conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (the "Prepetition Second Lien Lender Replacement Liens" and, together with the Prepetition Secured Creditors Replacement Liens, the "Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, any Permitted Priority Liens, and the Prepetition Secured Creditors Replacement Liens, and subject to the Prepetition Intercreditor Agreement.

(e)     *Prepetition Second Lien Lender Superpriority Claim*. Solely to the extent of the Diminution in Value of the interests of the Prepetition Second Lien Lender in the Prepetition Second Lien Collateral, the Prepetition Second Lien Lender shall have an allowed superpriority administrative expense claim (the "<u>Prepetition Second Lien Lender Superpriority Claim</u>"), which shall have priority, except with respect to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, and the Prepetition Secured Creditors Superpriority Claim, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kids specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, and 726 of the Bankruptcy Code, and, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. Other than the DIP Liens, the DIP Superpriority Claims, the Carve-Out, and the Current Prepetition Secured Parties' Superpriority Claim, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor

30

Cases, and (ii) no priority claims are, or will be, senior to, prior to or on parity with the Prepetition Second Lien Lender Superpriority Claim.

(f) *Milestones; 363 Sale Process*. The Milestones are approved as adequate protection for the benefit of the Current Prepetition Secured Parties. Further, upon the disposition of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, the Prepetition Liens and the Prepetition Second Liens shall attach to the proceeds of any such sale in the same manner and priority as such liens attached to the Prepetition Collateral, the Prepetition Second Lien Collateral, and the DIP Collateral, subject to the Prepetition Intercreditor Agreement, and all such proceeds shall be promptly paid at closing on any such sale to the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender in order of their respective priorities as provided in this Interim Order and the Prepetition Intercreditor Agreement.

(g) *Prepetition Indemnity Account*. Following the payment in full in cash of the Prepetition Obligations in accordance with the Prepetition Credit Documents, the Debtors shall establish an account in the "control" (as defined in the UCC (as defined in the DIP Credit Agreement)) of the Successor Prepetition Agent (the "Prepetition Indemnity Account"), into which the sum of $500,000.00 of available cash shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Current Prepetition Secured Parties under the Prepetition Credit Documents, including, without

31

limitation, any obligations arising under Section 12.05 of the Prepetition Credit Agreement (the "Prepetition Indemnity Obligations"). The Prepetition Indemnity Account shall not be subject to the Carve-Out.

(i)      Upon (a) the expiration of the Challenge Period (as defined below) if, as of such date, no party has filed (x) an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in paragraph 35 hereof, or a request for standing related to the same, or (y) an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any of the Prepetition Secured Parties related to the Prepetition Credit Facility, whether in the Chapter 11 Cases or independently in another forum, court, or venue, or a request for standing related to the same (the last such date being the "Prepetition Indemnity Account Termination Date"), or (b) the delivery of written notice to the Debtors by the Successor Prepetition Agent of the earlier receipt by the Successor Prepetition Agent and the Successor Prepetition Lender of releases and discharges of claims and liabilities in form and substance satisfactory to the Successor Prepetition Agent and the Successor Prepetition Lender in their sole discretion, all amounts then remaining and being held in the Prepetition Indemnity Account (net of any unreimbursed obligations owing to the Successor Prepetition Agent and/or the Successor Prepetition Lender on such date) shall be released to the

Debtors and shall be subject to the DIP Liens and the Replacement Liens.

(ii)     The Prepetition Indemnity Obligations shall be secured by a first priority lien on the Prepetition Indemnity Account and all funds on deposit therein in favor of the Successor Prepetition Agent and the Successor Prepetition Lender.

(iii)    The Successor Prepetition Agent and the Successor Prepetition Lender may apply amounts in the Prepetition Indemnity Account as and when they arise, without further notice to or consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court, upon compliance with the provisions of paragraph 27 below.

(iv)    Upon request by the Successor Prepetition Agent, the Debtors shall deposit additional available cash in the Prepetition Indemnity Account as may be reasonably necessary adequately to cover anticipated Prepetition Indemnity Obligations. The Debtors shall remain liable for the Prepetition Indemnity Obligations, even if the amounts in the Prepetition Indemnity Account prove insufficient to pay in full the Prepetition Indemnity Obligations.

(h)     In addition to the establishment and maintenance of the Prepetition Indemnity Account, until the Prepetition Indemnity Account Termination Date, the Successor Prepetition Agent, for itself and on behalf of the Successor Prepetition Lender, shall retain and maintain the Prepetition

Liens as security for the amount of any Prepetition Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition Indemnity Account, subject to the priorities set forth in paragraph 6 of this Interim Order.

12.    Section 507(b) Reservation. Subject only to the Carve-Out described in paragraph 32 hereof, nothing contained herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided in this Interim Order is insufficient to compensate for any Diminution of Value of the respective interests of the Current Prepetition Secured Parties in the Prepetition Collateral or the Prepetition Second Lien Collateral during these Chapter 11 Cases or any Successor Cases.

**Provisions Common to DIP Financing and Cash Collateral Authorizations**

13.    Amendment of the DIP Documents. The DIP Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto upon five (5) days prior written notice to the U.S. Trustee and counsel to any Committee, but without notice or a hearing (unless requested by the U.S. Trustee or any Committee) if the amendment, amendment and restatement, modification, or supplement is (a) in accordance with the DIP Documents and (b) not prejudicial in any material respect to the rights of the Debtors or any third parties; provided, however, that notwithstanding the foregoing, except for actions expressly permitted to be taken by the DIP Agent or the DIP Lenders as provided in the DIP Documents, no amendment, modification, supplement, termination, or waiver of any provision of the DIP Documents, or any consent to any departure by any of the Debtors therefrom, shall in any event be effective unless the consents required under the terms of the DIP Documents have first been obtained.

14.    <u>Budget Compliance</u>. The Debtors shall not, and shall not permit any subsidiary to, directly or indirectly, use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with the DIP Documents and this Interim Order. The Budget annexed hereto as Exhibit 4 is hereby approved, and any modification to, or amendment or update of, the Budget shall be in form and substance acceptable to and approved in writing by the DIP Agent its sole discretion.

15.    <u>Modification of Automatic Stay</u>. The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may request in its sole discretion to assure the perfection and priority of the DIP Liens, (b) the Debtors to take all appropriate action to grant the Replacement Liens, and to take all appropriate action to ensure that the Replacement Liens granted thereunder are perfected and maintain the priority set forth herein, (c) the Debtors to incur all liabilities and obligations to the DIP Agent as contemplated under the DIP Documents, (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order and the DIP Documents, and (e) the implementation of the terms of this Interim Order.

16.    <u>Perfection of DIP Liens and Replacement Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein including the DIP Liens and the Replacement Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action    (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP

Liens or the Replacement Liens, or to entitle the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, or the Prepetition Second Lien Lender to the priorities granted herein. Without limiting the foregoing, the DIP Agent and the DIP Lenders shall be deemed to have "control" over all accounts maintained by the Debtors for purposes of perfection under the Uniform Commercial Code. Notwithstanding the foregoing, the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender each is authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Replacement Liens. The Debtors are authorized to execute and promptly deliver to the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender all such financing statements, mortgages, notices, and other documents as the DIP Agent, the Successor Prepetition Agent, or the Prepetition Second Lien Lender may reasonably request. The DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender, in their respective sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

17.     <u>After-Acquired Property</u>. Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including all DIP Collateral pledged or otherwise granted to the DIP

Agent, on behalf of the DIP Lenders, pursuant to the DIP Documents and this Interim Order is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date that is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

18.    <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b), (c), or (d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the indefeasible payment in full of all DIP Obligations, the cancellation, backing, or cash collateralization of the letters of credit provided for under the DIP Credit Agreement, the satisfaction of the DIP Superpriority Claims, and the termination of the DIP Agent's and DIP Lenders' obligations to extend credit under the DIP Facility, then all of the cash proceeds derived from such credit or debt shall (a) immediately be turned over first to the DIP Agent to partially satisfy the DIP Obligations in accordance with the DIP Documents, and (b) thereafter, after the DIP Obligations have been satisfied in full and fully and indefeasibly paid, to the Successor Prepetition Agent and thereafter to the Prepetition Second Lien Lender, subject to the Prepetition Intercreditor Agreement, to satisfy the Prepetition Obligations and the Prepetition Second Lien Obligations, respectively.

19.    <u>Maintenance of DIP Collateral</u>. Until the indefeasible payment in full of all DIP Obligations, all indebtedness outstanding in accordance with the Prepetition Financing Documents, and the termination of the DIP Agent's and the DIP Lenders' obligation to extend

credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the DIP Facility and the Prepetition Credit Documents and the Prepetition Second Lien Documents, as applicable, and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court in accordance with the DIP Documents.

20.    <u>Insurance Policies</u>. Upon entry of this Interim Order, the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by any of the Debtors that in any way relates to the DIP Collateral. Notwithstanding the foregoing, the Debtors are authorized and directed to take all necessary actions to cause the DIP Agent and the DIP Lenders to be named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

21.    <u>Disposition of Collateral</u>. Except as otherwise expressly provided for in this Interim Order, and in the DIP Documents and subject to the Prepetition Intercreditor Agreement, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, the Prepetition Collateral, or the Prepetition Second Lien Collateral, (collectively, "<u>Collateral</u>") without the prior written consent of each of the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent, the Successor Prepetition Agent, the Prepetition Second Lien Lender, or an order of this Court, except for sales, transfers, leases or uses of Debtors' inventory in the ordinary course of their businesses). Until such time as the DIP Obligations, the Prepetition Obligations and the Prepetition Second Lien Obligations have been paid in full in accordance with the terms of the applicable DIP Documents, Prepetition Credit Documents, and Prepetition Second Lien

Documents, the Debtors shall remit or cause to be remitted to the DIP Agent, the Successor Prepetition Agent, and/or the Prepetition Second Lien Lender all proceeds of Collateral for application against the DIP Obligations, the Prepetition Obligations, and/or the Prepetition Second Lien Obligations in accordance with the terms of the applicable DIP Documents, the Prepetition Credit Documents, the Prepetition Second Lien Documents, the Prepetition Intercreditor Agreement, and this Interim Order.

22.    <u>Inventory</u>. The Debtors shall not, without the consent of the DIP Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

23.    <u>Events of Default</u>. The term "Event of Default" shall have the same meaning under this Interim Order as such term has under the DIP Documents and shall include, for the avoidance of doubt, the failure to meet any of the Milestones.

24.    <u>Rights and Remedies upon Event of Default</u>. Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 midnight prevailing Eastern Time on the 5th calendar day after the date the DIP Agent files a notice of an Event of Default (a "<u>Default Notice</u>") on the docket of the Chapter 11 Cases and serves the Default Notice by electronic mail (or other electronic means) to counsel for the Debtors, counsel for any Committee, and the U.S. Trustee (such period, the "<u>Default Notice Period</u>"), the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of this Court to allow the DIP Agent to take any and all actions permitted by law or

under the DIP Documents, as if no case were pending under the Bankruptcy Code. Immediately upon the DIP Agent's filing and service of a Default Notice, the Debtors shall be prohibited from using Cash Collateral, including accounts receivable, inventory, and the proceeds thereof, which prohibition shall be subject to Paragraph 10 of this Interim Order and shall remain in effect unless otherwise ordered by the Court within the Default Notice Period. During the Default Notice Period, the Debtors and other parties-in-interest may request an expedited hearing on any motion regarding an alleged Event of Default. In the event the automatic stay is lifted following the expiration of the Default Notice Period in accordance with this paragraph, the Debtors shall also be prohibited from obtaining credit or incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or security interest held by the DIP Agent or which is entitled to priority administrative status which is equal or superior to that granted to the DIP Agent for the benefit of the DIP Lenders or one granted to the Current Prepetition Secured Parties, as the case may be, except in connection with repayment in full in cash of the DIP Obligations. Subject to any applicable grace periods, upon the occurrence of any Event of Default, the DIP Agent may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lenders' obligations to make additional loans under the DIP Facility. Upon the occurrence of an Event of Default, all loans and notes under the DIP Facility shall become due and payable in accordance with the DIP Documents. Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in the DIP Credit Agreement.

   25. <u>Reserved.</u>

26.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>.  Each of the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties have acted in good faith in connection with this Interim Order, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties are entitled to the fullest extent to the protections provided in section 364(e) of the Bankruptcy Code.

27.     <u>DIP Fees and Other Expenses</u>.  All reasonable and documented out-of-pocket costs and expenses of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, and the Successor Prepetition Lender, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses, whether or not contained in the Budget and without limitation with respect to the dollar estimates contained in the Budget (provided, however, that such overages shall not weigh against the Debtors in any testing related to compliance with the Budget), shall promptly be paid by the Debtors, as provided in the DIP Documents and the Prepetition Credit Documents.  Payment of such fees shall not be subject to allowance by this Court; <u>provided,</u> however, the U.S. Trustee or counsel for any Committee may seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below. Under no circumstances shall professionals for the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, and the Successor Prepetition Lender be required to comply

with the U.S. Trustee fee guidelines; provided, however, the Debtors shall provide to the U.S. Trustee and any Committee a copy of any invoices received from the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, and the Successor Prepetition Lender for professional fees and expenses during the pendency of the Chapter 11 Cases. Each such invoice shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential, or sensitive information). If the U.S. Trustee or any Committee object to the reasonableness of the invoices submitted by the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, or the Successor Prepetition Lender, and the parties cannot resolve such objection within ten (10) days of receipt of such invoices, the U.S. Trustee or such Committee, as the case may be, shall file with the Court and serve on the DIP Agent, the DIP Lender, the Successor Prepetition Agent, and the Successor Prepetition Lender, an objection (a "Fee Objection") limited to the issue of reasonableness of such fees and expenses.  The Debtors shall promptly pay the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, and/or the Successor Prepetition Lender (as applicable), and the DIP Agent is hereby authorized to make an advance under the DIP Facility to timely pay, the submitted invoices after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period. If a Fee Objection is timely received, the Debtors shall promptly pay the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, and/or the Successor Prepetition Lender (as applicable), and/or the DIP Agent is hereby authorized to make an advance under the DIP Facility to timely pay, the undisputed amount only of the invoice(s) that is the subject of such Fee Objection, and the Court shall have jurisdiction to determine the disputed portion of such invoice(s) if the parties are unable to resolve the Fee Objection.

28.    <u>Indemnification</u>. The Debtors shall indemnify and hold harmless the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, the Prepetition Second Lien Lender, and each of their respective shareholders, partners, unitholders, members, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investor funds, advisors, attorneys, professionals, representatives, investment bankers, and consultants, each in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Documents, the Prepetition Credit Documents, the Prepetition Second Lien Documents, and/or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents, and the Prepetition Credit Documents, the Prepetition Second Lien Documents, and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the exercise of discretionary rights granted under the DIP Documents, the Prepetition Credit Documents, and/or the Prepetition Second Lien Documents by the DIP Agent, any DIP Lenders, Successor Prepetition Agent, Successor Prepetition Lender, and/or Prepetition Second Lien Lender, as the context makes applicable. In all such litigation, or the preparation therefor, the DIP Agent and the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, the Prepetition Second Lien Lender, respectively, shall be

entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

        29.    <u>Released Parties</u>. Subject to entry of the Final Order, and without limiting the rights of the parties in interest as set forth in paragraph 35 hereof, the Debtors hereby waive any and all actions related to, and hereby release, each of (a) the DIP Agent and the DIP Lenders, (b) the Successor Prepetition Agent and Successor Prepetition Lender, (c) the Prepetition Second Lien Lender, and (d) each of their respective shareholders, partners, unitholders, members, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such (each such person or entity identified in sub-clauses (a) through (d) of this paragraph, a "<u>Released Party</u>" and, collectively, the "<u>Released Parties</u>") from any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, or any Challenge, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising prior to the Petition Date and to the extent related to the Prepetition Credit Documents, the Prepetition Second Lien Documents, the DIP Credit Agreement, or this Interim Order, any documents related thereto, any aspect of the prepetition relationship with the Released Parties, any Debtor, or any other acts or omissions by the Released Parties in connection with the Prepetition Credit Documents, the Prepetition Second Lien Documents, the DIP Credit Agreements, or this Interim Order, any documents related to the Prepetition Credit Documents, the Prepetition Second Lien Documents, the DIP Credit Agreements, or this Interim Order, or any aspect of their prepetition relationship with any Debtor.

30. <u>Proofs of Claim</u>. The DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties shall not be required to file proofs of claim in any of these Chapter 11 Cases or Successor Cases for any claim allowed herein. Any proof of claim filed by the DIP Agent, the Successor Prepetition Agent, or the Prepetition Second Lien Lender shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the DIP Lenders or the Current Prepetition Secured Parties. Any order entered by this Court in relation to the establishment of a bar date in any of these cases or Successor Cases shall not apply to any claims of the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties allowed herein.

31. <u>Access to Collateral; No Landlord's Liens</u>. Subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents and this Interim Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Documents, the DIP Agent may, subject to applicable non-bankruptcy law or any separate agreement by and between such landlord and the DIP Agent (a "<u>Separate Agreement</u>"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and, subject to any Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, however, that, subject to any such Separate Agreement, the DIP Agent shall only pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the Agent, calculated on a per diem basis. Nothing

45

herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph. The DIP Agent shall have the right to seek relief by separate motion to this Court respect to access to leased premises, with notice to the applicable landlords of such leased premises and an opportunity for such landlords to respond and be heard.

           32.    <u>Carve-Out</u>. Upon the DIP Agent's issuance of a Carve-Out Trigger Notice (as defined below), all liens, claims, and other security interests held by the DIP Lenders and the Current Prepetition Secured Parties shall be subject to the payment of the Carve-Out. For purposes of this Interim Order, "<u>Carve-Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code together with the statutory rate of interest; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) all unpaid fees (inclusive of success or transaction fees) and expenses accrued or incurred by persons or firms retained by the Debtors or any Committee pursuant to sections 327, 328, 363, and 1103 of the Bankruptcy Code (the "<u>Estate Professionals</u>"), but solely to the extent included in the Budget (collectively, the "<u>Estate Professional Fees</u>"), at any time before the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, up to a maximum amount of $460,000 for Estate Professionals retained by the Debtors and a maximum amount of $20,000 for Estate Professionals retained by any Committee; and (iv) Estate Professional Fees for Estate Professionals retained by the Debtors in an aggregate amount not to exceed $75,000 and Estate Professional Fees for Estate Professionals retained by any Committee in an aggregate amount not to exceed $20,000, in each instance that are incurred on or after the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, solely to the extent included in the

Budget for such time period, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Carve-Out Trigger Cap"); provided, however, that the foregoing amounts shall not apply to any fees or expenses incurred in connection with any Proscribed Actions (defined below). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee, which notice may be delivered (a) in connection with the repayment in full (whether in cash or by credit bid) of the DIP Obligations, or (b) following the occurrence of the Termination Date, stating that the Carve-Out Trigger Cap has been invoked. Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been issued, the Debtors shall be permitted to pay fees to Estate Professionals and reimburse expenses incurred by Estate Professionals to the extent set forth in the Budget and otherwise permitted under the DIP Documents and that are allowed by the Court and payable under sections 328, 330, 331, and 1103 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and the DIP Agent, as the same may be due and payable, and the same shall not reduce the Carve-Out Trigger Cap.

33.    Payment of Compensation. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Committee, if any, or of any person, or shall affect the rights of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts in excess of the amounts contained, or not set forth, in the Budget.

34.    Proscribed Actions.

(a)     No DIP Collateral, Cash Collateral, proceeds of the DIP Facility, portion of the Carve-Out, or any other amounts may be used directly or indirectly by any of the Debtors, any Committee, or any trustee or other estate representative appointed in these Chapter 11 Cases or any Successor Cases or any other person (or to pay any professional fees, disbursements, costs or expenses incurred   in connection therewith) for any of the following actions or activities (the "Proscribed Actions"):

(i)      to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the liens granted under the DIP Documents, this Interim Order, or the Final Order (including the DIP Superpriority Claim);

(ii)     to investigate (except as provided in subparagraph (b) below), including by way of examinations or discovery proceedings, prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, the DIP Agent, any of the DIP Lenders, any of the   Prepetition Secured Parties, or any of the shareholders, partners, unitholders, members, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors,      funds,      advisors,      attorneys,      professionals,

representatives, accountants, investment bankers, and consultants of any of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens granted under the DIP Documents, or the claims or liens granted under or contemplated by the Prepetition Credit Documents or the Prepetition Second Lien Documents, (D) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the Prepetition Obligations, or the Prepetition Second Lien Obligations; (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any of (1) the DIP Agent or the DIP Lenders under this Interim Order or under any of the DIP Documents, or (2) the Prepetition Secured Parties (in each case, as applicable, including claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies

on or against the DIP Collateral in accordance with the DIP Documents, this Interim Order, and the Final Order); or (F) objecting to, consenting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred (as set forth in the DIP Documents).

(b)     Notwithstanding anything to the contrary herein, any Committee may use up to $50,000 in the aggregate amount of the Carve-Out, any Cash Collateral, or proceeds of the DIP Facility to investigate, but not prosecute (or prepare for the prosecution of) any challenge to, the claims and liens of the Prepetition Secured Parties (the "Committee Investigation Budget"). Any and all claims incurred by any Committee related to or in connection with any Proscribed Activities other than up to the Committee Investigation Budget shall be satisfied solely from the unencumbered assets of the Debtors (if any) (the "Unencumbered Assets"), thereby reducing recoveries to the holders of unsecured claims (other than any deficiency claim held by any of the Current Prepetition Secured Parties); provided, however, that to the extent there are no Unencumbered Assets available to satisfy such claims, then such claims (i) shall not be satisfied by the Carve-Out, any Cash Collateral, or proceeds of the DIP Facility, (ii) shall be automatically disallowed without further action by any party or Court order and shall not receive a recovery in these Chapter 11 Cases and any Successor Cases and (iii) shall not be considered for purposes of

50

determining compliance with section 1129(a)(9)(A) of the Bankruptcy Code.

35.    <u>Challenge Period</u>.

(a)    Subject only to the terms of this paragraph 35, the grant of adequate protection to the Successor Prepetition Agent, Successor Prepetition Lender, and Prepetition Second Lien Lender, and the various stipulations and waivers contained in paragraph E hereof shall be without prejudice to the rights of any Committee or any other party in interest with appropriate standing to seek to disallow the claims of the Successor Prepetition Agent, Successor Prepetition Lender, and Prepetition Second Lien Lender in respect of the Prepetition Credit Documents and the Prepetition Second Lien Documents, pursue any claims or seek appropriate remedies against the Prepetition Secured Parties in connection with the Prepetition Credit Documents or the Prepetition Second Lien Documents or avoid all or substantially all of the security interests or liens in the Prepetition Collateral or Prepetition Second Lien Collateral or in any other asset or property of Debtors in which the Prepetition Secured Parties claim an interest, including any claim, action, or proceeding brought against the Current Prepetition Secured Parties in accordance with this paragraph 35 that requires the Current Prepetition Secured Parties to give up adequate protection liens and superpriority claims, to disgorge adequate protection interest payments received or accruals credited, or to disgorge as repaid pursuant to this Interim Order as a result of any of the Prepetition Secured Parties' claims against Debtors or liens upon and security interests in the assets and properties of Debtors (including the

51

Prepetition Collateral and Prepetition Second Lien Collateral) being invalidated, avoided, subordinated, impaired, or compromised in any way, either by an order of this Court (or other court of competent jurisdiction) or by settlement. Any party (other than the Debtors, which have waived all such rights), including any Committee, must commence, as appropriate, a contested matter or adversary proceeding raising any objection, claim, defense, suit or other challenge (a "Challenge") with respect to any claim, security interest, or any other rights of the Prepetition Secured Parties under the Prepetition Credit Documents or the Prepetition Second Lien Documents, as applicable, including in the nature of a setoff, counterclaim, or defense on or before (i) with respect to any Committee, sixty (60) calendar days from the date the U.S. Trustee appoints such Committee, or (ii) with respect to all other parties, seventy-five (75) calendar days following the entry of the Interim Order (the "Challenge Period"). The Challenge Period may only be extended (x) as to the Successor Prepetition Agent and/or the Successor Prepetition Lender, by the Successor Prepetition Agent, (y) as to the Prepetition Second Lien Lender, by such Prepetition Second Lien Lender, or (z) as otherwise ordered by the Court prior to the conclusion of the Challenge Period for cause shown.

(b)     Upon the expiration of the Challenge Period, to the extent not specifically included in a timely and properly filed pleading asserting a Challenge: (i) any other possible Challenge, whether such Challenge is separately filed or otherwise asserted through an amendment of any timely and properly filed pleading asserting a Challenge, shall be deemed to be forever

waived and barred; (ii) all of the Debtors' agreements, acknowledgments, stipulations, waivers, releases, and affirmations as to the priority, extent, and validity of the Prepetition Secured Parties' claims, liens, and interests, of any nature, under the Prepetition Credit Documents and Prepetition Second Lien Documents, or otherwise incorporated or set forth in this Interim Order, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these Chapter 11 Cases and any Successor Cases without further action by any party or this Court, and any Committee and any other party in interest, and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (iii) the liens and security interests granted pursuant to the Prepetition Credit Documents and Prepetition Second Lien Documents shall (to the extent not otherwise satisfied in full) be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable bankruptcy law; and (iv) without further order of the Court, the claims and obligations under the Prepetition Credit Documents and Prepetition Second Lien Documents shall (to the extent not otherwise satisfied in full) be finally allowed as fully secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Chapter 11 Cases and any Successor Cases and shall not be subject to challenge by any party in interest as to validity, priority, amount, or otherwise.

(c)    Nothing in this Interim Order vests or confers on any person, including any Committee or any other statutory committee that may be appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates. For the avoidance of doubt, entry of this Interim Order shall not grant standing or authority to any Committee to pursue any cause of action, claim, defense, or other right on behalf of the Debtors or their estates.

36.    <u>No Third Party Claims</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

37.    <u>No Marshaling; Application of Proceeds</u>. The DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral and/or the Prepetition Collateral or Prepetition Second Lien Collateral, as the case may be, and all proceeds shall be received and applied in accordance with the DIP Documents, the Prepetition Credit Documents and Prepetition Second Lien Documents, and the Prepetition Intercreditor Agreement.

38.    <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted to the DIP Agent by, through or on behalf of the DIP Lenders pursuant to the provisions of this Interim Order, or the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code (subject to entry of the Final Order, and to the extent set forth

therein, approving the waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code), whether asserted or assessed by through or on behalf of the Debtors.

39.   <u>Payments Held in Trust</u>.   Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to payment in full of all DIP Obligations under the DIP Documents and termination of the obligations set forth in the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders (as applicable based on the specific asset at issue) and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

40.   <u>Joint and Several Liability</u>.   Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

41.   <u>Limitation of Liability</u>.   Subject to the entry of the Final Order, in determining to make extensions of credit under the DIP Facility, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), the DIP Documents, or the Prepetition Credit Documents or Prepetition Second Lien Documents, as applicable, none of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code)

of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability, Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or any successor of any of the foregoing, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

42.    Credit Bidding.  The DIP Agent shall have the unqualified right to credit bid up to the full amount of the DIP Obligations in any sale of the DIP Collateral (or any part thereof) without the need for further Court order and whether such sale is pursuant to section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. The Successor Prepetition Agent and the Successor Prepetition Lender shall have the unqualified right to credit bid up to the full amount of the Prepetition Obligations in any sale of the Prepetition Collateral (or any part thereof) without the need for further Court order and whether such sale is pursuant to section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

43.    Discharge Waiver.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in these Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of such confirmed plan of reorganization. None of the Debtors shall propose or support any plan of reorganization or sale

of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash of the DIP Obligations on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.

44.     <u>Rights Preserved</u>.  The entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and/or the Prepetition Second Lien Lender to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and/or the Prepetition Second Lien Lender under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and/or the Prepetition Second Lien Lender. The DIP Agent, DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, the Prepetition Second Lien Lender, and the Debtors hereby agree that the Prepetition Intercreditor Agreement remains in full force and effect, subject to the terms and conditions of this Interim Order.

45.     <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, or the Prepetition Second Lien Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents, the Prepetition Second Lien Documents, or applicable law, as the case may be, shall not constitute a waiver of any of

57

the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, or the Prepetition Second Lien Lender.

46.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry by the Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, the Prepetition Second Lien Lender, all other creditors of the Debtors, any Committee, any other statutory committee that may be appointed in these Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these cases, any Successor Cases, or upon dismissal of any of these Chapter 11 Cases or Successor Cases.

47.    <u>No Right to Seek Modification</u>. Unless requested by the DIP Agent, the Debtors irrevocably waive any right to seek any modification or extension of this Interim Order (in whole or in part) without the prior consent of the DIP Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent.

48.    <u>Survival</u>. The terms of this Interim Order and any actions taken pursuant hereto, shall survive the entry of any order which may be entered: (a) confirming any plan in the Chapter 11 Cases; (b) dismissing the Chapter 11 Cases; (c) converting the Chapter 11 Cases to any other chapter under the Bankruptcy Code; (d) withdrawing of the references of the Chapter 11 Cases from the Bankruptcy Court; and (e) providing for abstention from handling or retaining of jurisdiction of these Chapter 11 Cases in the Bankruptcy Court.  The terms and provisions of this Interim Order as well as the protections granted pursuant to this Interim Order and the DIP Credit Agreement, shall continue in full force and effect notwithstanding the entry of such order, and such protections shall maintain their priority as provided by this Interim Order until all the

obligations of the Debtors to the DIP Agent and the DIP Lenders pursuant to the DIP Credit Agreement are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms). The DIP Obligations shall not be discharged by the entry of an order confirming a plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code. The Debtors shall not propose or support any plan that is not conditioned upon the payment in full in cash of all of the DIP Obligations, on or prior to the earlier to occur of (i) the effective date of such plan; and (ii) the Maturity Date.

49.     <u>Interim Order Controls; Priority of Terms</u>.  To the extent of any conflict between or among the Motion, the DIP Documents, and this Interim Order, the terms and provisions of this Interim Order shall govern. The failure to reference any provision of the DIP Documents in this Interim Order shall not affect the enforceability of such provision.

50.     <u>Waiver of Applicable Stay</u>.  Any applicable stay (including, without limitation, under Bankruptcy Rules 4001(a)(3), 6004(h), and 7062) is hereby waived and shall not apply to this Interim Order.

51.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2019, at __:__ _.m. (prevailing Eastern Time) before the Honorable _____, United States Bankruptcy Judge, _____, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801. Objections to the entry of the proposed Final Order shall be in writing and filed with the Clerk of the Court no later than on _____, 2019, at 4:00 p.m. (prevailing Eastern Time), with copies served upon: (i) proposed counsel to the Debtors, (a) Robinson & Cole LLP, 1000 N. West Street, Suite 1200, Wilmington, Delaware 19801 (Attn:

Jamie L. Edmonson, email: jedmonson@rc.com), and (b) Bryan Cave Leighton Paisner LLP, 1201 W. Peachtree Street, NW, 14th Floor, Atlanta, Georgia 30309-3471 (Attn: Mark Duedall, email: mark.duedall@bclplaw.com and Andrew J. Schoulder, email: andrew.schoulder@bclplaw.com), (ii) counsel for the DIP Lender, (a) Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036 (Attn: Cathy Hershcopf, email: chershcopf@cooley.com), and (b) Bayard P.A., 600 North King Street, Ste. 400, Wilmington, DE 19801 (Attn Erin R. Fay email: efay@bayardlaw.com; (iii) counsel to any statutory committee appointed in these Cases; and (iv) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: _____, email: _____@usdoj.gov).  If no objections to entry of the Final Order on the Motion are timely received, this Court may enter such final order without further notice or hearing.

52.     *Nunc Pro Tunc* Effect of Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.

53.     Retention of Jurisdiction. The Court has retained and will retain jurisdiction to interpret, implement, and enforce this Interim Order and the DIP Documents according to their terms.

**EXHIBIT 1 TO INTERIM ORDER**

**Debtor in Possession Credit Agreement**

**TO BE FILED**

**EXHIBIT 2 TO INTERIM ORDER**

**Debtor In Possession Security Agreement**

---

**SUPERPRIORITY PLEDGE AND SECURITY AGREEMENT**

by and among

**LOOT CRATE, INC.,**

the other Grantors from time to time party hereto,

and

**MONEY CHEST LLC,**
as Collateral Agent

Dated as of August [_], 2019

---

209537196 v1

USA\600668585.2

Table of Contents

Page

SECTION 1.        DEFINED TERMS ..................................................................................... 1

    1.1    Definitions.............................................................................................................. 1
    1.2    Other Definitional Provisions ............................................................................... 5

SECTION 2.        [RESERVED] ........................................................................................... 5
SECTION 3.        GRANT OF SECURITY INTEREST ......................................................... 5

    3.1    General .................................................................................................................. 5
    3.2    Recourse to Security ............................................................................................. 6
    3.3    Special Provisions Relating to Inventory.............................................................. 7

SECTION 4.        REPRESENTATIONS AND WARRANTIES................................................ 7

    4.1    [Reserved] ............................................................................................................. 7
    4.2    Title; No Other Liens ............................................................................................ 7
    4.3    Perfected Priority Liens ........................................................................................ 7
    4.4    Perfection Certificate; Jurisdiction of Organization; Chief Executive
          Office .................................................................................................................... 7
    4.5    Farm Products ....................................................................................................... 8
    4.6    Investment Property; Pledged Stock ..................................................................... 8
    4.7    Receivables ........................................................................................................... 8
    4.8    Contracts ............................................................................................................... 9
    4.9    Intellectual Property.............................................................................................. 9
    4.10   Commercial Tort Claims...................................................................................... 10

SECTION 5.        COVENANTS ........................................................................................ 10

    5.1    Delivery of Instruments and Chattel Paper ........................................................ 10
    5.2    Maintenance of Perfected Security Interest; Further Documentation.................. 10
    5.3    Changes in Locations, Name, etc........................................................................ 11
    5.4    Investment Property; Pledged Stock ................................................................... 11
    5.5    Receivables ......................................................................................................... 12
    5.6    Intellectual Property............................................................................................ 12
    5.7    Intellectual Property Filing ................................................................................. 13
    5.8    Commercial Tort Claims..................................................................................... 14
    5.9    Collateral in the Possession of a Bailee ............................................................. 14
    5.10   Electronic Chattel Paper...................................................................................... 14
    5.11   Letter-of-Credit Rights........................................................................................ 15
    5.12   Further Assurances; Pledge of Instruments ........................................................ 15

SECTION 6.        REMEDIAL PROVISIONS ...................................................................... 15

    6.1    Certain Matters Relating to Receivables............................................................. 15
    6.2    Communications with Obligors; Grantors Remain Liable .................................. 16
    6.3    Pledged Stock...................................................................................................... 17

i

Table of Contents
(continued)

|  |  |  |  |
|---|---|---|---|
| 6.4 | Proceeds to be Turned Over to Collateral Agent | ................................................ | 17 |
| 6.5 | Application of Proceeds | ...................................................................................... | 17 |
| 6.6 | UCC and Other Remedies | .................................................................................... | 18 |
| 6.7 | Sales of Pledged Stock | ........................................................................................ | 18 |
| 6.8 | IP Licenses | ........................................................................................................... | 19 |
| 6.9 | Waiver; Deficiency | .............................................................................................. | 19 |

SECTION 7.    THE COLLATERAL AGENT ...................................................................... 19

| 7.1 | Collateral Agent's Appointment as Attorney-in-Fact, etc | ................................... | 19 |
|---|---|---|---|
| 7.2 | Duty of Collateral Agent | ..................................................................................... | 21 |
| 7.3 | Financing Statements | .......................................................................................... | 21 |
| 7.4 | Authority of Collateral Agent | ............................................................................ | 22 |
| 7.5 | Collateral Matters | ............................................................................................... | 22 |

SECTION 8.    MISCELLANEOUS ..................................................................................... 22

| 8.1 | Amendments in Writing | ...................................................................................... | 22 |
|---|---|---|---|
| 8.2 | Notices | ................................................................................................................. | 22 |
| 8.3 | No Waiver by Course of Conduct; Cumulative Remedies | .................................. | 22 |
| 8.4 | Successors and Assigns | ....................................................................................... | 22 |
| 8.5 | Set-Off | .................................................................................................................. | 22 |
| 8.6 | Counterparts | ........................................................................................................ | 23 |
| 8.7 | Severability | .......................................................................................................... | 23 |
| 8.8 | Section Headings | ................................................................................................. | 23 |
| 8.9 | Integration | ........................................................................................................... | 23 |
| 8.10 | GOVERNING LAW | ............................................................................................ | 23 |
| 8.11 | SUBMISSION TO JURISDICTION; WAIVERS | .................................................. | 23 |
| 8.12 | Acknowledgements | ............................................................................................. | 24 |
| 8.13 | Additional Grantors | ............................................................................................ | 25 |
| 8.14 | Releases of Liens | ................................................................................................. | 25 |
| 8.15 | Subordination | ...................................................................................................... | 25 |
| 8.16 | Marshaling | ........................................................................................................... | 25 |
| 8.17 | References to Schedules | ....................................................................................... | 26 |

ANNEXES

| Annex I | - | Form of Assumption Agreement |
|---|---|---|
| Annex II | - | Form of Intellectual Property Security Agreement |

## SUPERPRIORITY PLEDGE AND SECURITY AGREEMENT

This SUPERPRIORITY PLEDGE AND SECURITY AGREEMENT dated as of August [_], 2019, made by each of the grantors signatory hereto (together with any other entity that becomes a party hereto as provided herein, the "*Grantors*"), each Grantor a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (as defined in the Credit Agreement), in favor of MONEY CHEST LLC, a [Nevada] limited liability company, as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "*Collateral Agent*") acting pursuant to this Agreement for the benefit of the Secured Parties.

### W I T N E S S E T H :

WHEREAS, pursuant to the Debtor-in-Possession Credit Agreement dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among Loot Crate, Inc., a Delaware corporation ("*Borrower*"), Loot Crate Parent, Inc., a Delaware corporation ("*Parent*"), any Subsidiaries of Parent that are Guarantors or become Guarantors pursuant to Section 8.10 of the Credit Agreement (collectively, together with Parent, the "*Guarantors*", and, together with Borrower, the "*Credit Parties*"), the lenders from time to time party thereto (the "*Lenders*"), Money Chest LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "*Administrative Agent*") and the Collateral Agent (together with the Administrative Agent, collectively, the "*Agents*" and each an "*Agent*"), the Lenders have severally agreed to make the Loans to the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, the Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  The obligations of the Lenders to extend such credit are conditioned upon, among other things, the execution and delivery of this Agreement by each Grantor. The Grantors are Affiliates of one another, will derive substantial direct and indirect benefits from the extensions of credit to the Borrower pursuant to the Credit Agreement, and are willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit. Notwithstanding anything herein to the contrary, the Liens granted to Collateral Agent under this Agreement and the exercise of the rights and remedies of Collateral Agent hereunder and under any other Credit Document are subject to the Financing Order;

WHEREAS, execution, delivery and performance of this Agreement and the grant of a security interest, pledge and Lien on all of the Collateral (as hereinafter defined) of the Grantors and the proceeds thereof to secure the Secured Obligations have been authorized pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code by the Financing Order;

WHEREAS, from and after the entry of the Financing Order and subject to the Carve-Out, and pursuant to and only to the extent permitted in the Financing Order, the Secured Obligations will constitute allowed administrative expense claims in the Bankruptcy Case having priority over all administrative expense claims and unsecured claims against the Grantors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code; and

WHEREAS, to supplement the Financing Order without in any way diminishing or limiting the effect of the Financing Order or the security interest, pledge and Lien granted thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such security interest,

pledge and Lien as set forth herein.  In the event of a conflict between the terms and provisions of this Agreement or any other Credit Document and any order of the Bankruptcy Court, the terms and provisions of the Financing Order shall control.

NOW, THEREFORE, in consideration of the premises and to induce the Agents and the Lenders to enter into the Credit Agreement and to induce the Secured Parties to make the Loans and other financial accommodations to the Borrower thereunder, each Grantor hereby agrees with the Collateral Agent, for the benefit of the Secured Parties, as follows:

## SECTION 1.    DEFINED TERMS

1.1    <u>Definitions</u>.

(a)    Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement, and the following terms which are defined in the UCC are used herein as so defined: Account, Certificated Security, Chattel Paper, Commercial Tort Claim, control, Contract, Document, Farm Product, General Intangible, Goods, Instrument, Inventory, Letter-of-Credit Right, Securities Account, Securities Entitlement, Uncertificated Security and Supporting Obligation.  To the extent applicable, all other terms used herein without definition which are not defined in the Credit Agreement shall have the definitions given therefor in the UCC.

(b)    The following terms shall have the following meanings:

"*Agreement*" shall mean this Superpriority Pledge and Security Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"*Collateral*" shall have the meaning set forth in <u>Section 3</u>.

"*Collateral Account*" shall mean any Deposit Account that is (x) subject to a Control Agreement established pursuant to <u>Section 8.15</u> of the Credit Agreement or (y) established by the Collateral Agent as provided in <u>Sections 6.1</u> or <u>6.4</u> of this Agreement.

"*Collections*" shall mean all cash, checks, credit card slips or receipts, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of the Credit Parties, including, without limitation, the proceeds of all Accounts.

"*Copyrights*" shall mean (a) all copyrights, rights, titles and interests in and to published and unpublished works of authorship, including all software (whether or not considered to be a "good" rather than an intangible, and including the source code version thereof), and all copyrights in any original or derivative works of authorship, whether registered or unregistered and whether published or unpublished (including those listed in <u>Schedule 4</u>, if any), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or any other office throughout the world, (b) the right to obtain all renewals thereof and (c) all income, royalties, and proceeds at any time due or payable or asserted under or with respect to any of the foregoing, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, violation or other impairment thereof.

"*Copyright Licenses*" shall mean any written agreement naming any Grantor as licensor or licensee (including those listed in <u>Schedule 4</u>, if any), other than software license agreements

2

for "off-the-shelf", "shrink-wrap" or "click-through" agreements granting any right under any Copyright, including the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"*Deposit Account*" shall have the meaning set forth in the UCC and, in any event, include any demand, time, savings, passbook or like account maintained with a depositary institution.

"*Equipment*" means: (a) any "equipment", as such term is defined in <u>Section 9-102(a)(33)</u> of the UCC; (b) all machinery, equipment, furnishings, Fixtures, and Vehicles; and (c) any and all additions, substitutions, and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment, and accessories installed thereon or affixed thereto (in each case, regardless of whether characterized as equipment under the UCC).

"*Excluded Property*" shall mean property that, but for any one or more of clauses (v)-(z) of the last paragraph of <u>Section 3</u>, would constitute Collateral.

"*Intellectual Property*" shall mean, collectively, all rights, priorities and privileges relating to intellectual property, including all Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks, Trademark Licenses, Internet Domain Names, Trade Secrets and Trade Secret Licenses.

"*Intercompany Note*" shall mean any promissory note evidencing loans made by any Obligor to any Grantor.

"*Internet Domain Names*" shall mean all rights, title and interests arising under any law in or relating to Internet domain names.

"*Investment Property*" shall mean, collectively, (a) all "investment property" as such term is defined in <u>Section 9-102(a)(49)</u> of the UCC and (b) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Stock.

"*IP License*" means all agreements, whether written or oral, granting any right, title or interest in any Intellectual Property, including all Copyright Licenses, Patent Licenses, and Trademark Licenses.

"*Issuers*" shall mean, collectively, each issuer of any Investment Property which does not constitute Excluded Property.

"*Material Intellectual Property*" shall have the meaning set forth in <u>Section 5.6</u>.

"*Obligors*" shall mean, collectively, the Grantors and any other Person that becomes obligated to any Secured Party with respect to any of the Secured Obligations.

"*Patents*" shall mean (a) all letters patent of the United States, any political subdivision thereof or any other jurisdiction throughout the world and all reissues and extensions thereof, including any of the foregoing referred to in <u>Schedule 4</u> (if any), (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, including any of the foregoing referred to in <u>Schedule 4</u> (if any), (c) all rights to obtain any reissues or extensions of the foregoing and (d) all income, royalties, and proceeds at any time due or payable or asserted under or with respect to any of the foregoing

3

including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, violation or other impairment thereof.

"***Patent License***" shall mean all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use, sell, offer for sale or import any invention covered in whole or in part by a Patent, including any of the foregoing referred to in Schedule 4 (if any).

"***Pledged***", when used in conjunction with any type of asset, shall mean, at any time, an asset of such type that is included or required to be included (or that creates rights that are included or required to be included) in the Collateral at such time pursuant to the terms of this Agreement.

"***Pledged Notes***" shall mean all promissory notes listed on Schedule 1, all Intercompany Notes at any time issued to any Grantor and all other promissory notes issued to or held by any Grantor (other than promissory notes issued in connection with extensions of trade credit by any Grantor in the ordinary course of business).

"***Pledged Stock***" shall mean the shares of Capital Stock listed on Schedule 1, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect, in each case, other than Excluded Property.

"***Proceeds***" shall mean all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"***Receivable***" shall mean any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including any Account).

"***Secured Obligations***" shall mean (a) in the case of the Borrower, the "Obligations" as defined in the Credit Agreement and (b) in the case of the Guarantors, the "Guarantee Obligations" as defined in the Credit Agreement and any and all other obligations (whether absolute or contingent, matured or unmatured) of the Obligors arising under or in connection with any Credit Document.

"***Securities Act***" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"***Trademarks***" shall mean (a) all trademarks, trade names, fictitious business names, service marks, logos, trade dress and other source or business identifiers (whether registered or unregistered), and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any jurisdiction throughout the world or any political subdivision thereof, or otherwise, and all common-law rights related thereto, including any of the foregoing referred to in Schedule 4 (if any), (b) the right to obtain all renewals thereof and (c) all income, royalties, and proceeds at any time due or payable or asserted under or with respect to any of the foregoing, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, violation or other impairment thereof.

4

"***Trademark License***" shall mean any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, including any of the foregoing referred to in Schedule 4 (if any).

"***Trade Secrets***" means anything that would constitute a trade secret under Applicable Law and information that derives independent economic value (actual or potential) from not being generally known to and not being readily ascertainable by proper means by a person able to obtain economic value from its use or disclosure, and all other inventions (whether patentable or not), industrial designs, discoveries, improvements, ideas, designs, models, formulae, patterns, compilations, databases, data collections, drawings, blueprints, mask works, devices, methods, techniques, processes, know-how, confidential information, proprietary information, customer lists, software, and technical information.

"***Trade Secrets License***" shall mean any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trade Secrets, including any of the foregoing referred to in Schedule 4 (if any).

"***Vehicles***" means all present and future automobiles, trucks, truck tractors, trailers, semi-trailers, or other motor vehicles or rolling stock, now owned or hereafter acquired by Grantors.

1.2     Other Definitional Provisions.

(a)     The words "hereof", "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Schedule references are to this Agreement unless otherwise specified.

(b)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

SECTION 2.     [Reserved]

SECTION 3.     GRANT OF SECURITY INTEREST

3.1     General. Each Grantor hereby pledges and collaterally assigns to the Collateral Agent, and hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a security interest in all of its personal property and other assets, whether now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest, including all of the following property, wherever located (collectively, the "***Collateral***"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of its Secured Obligations:

(a)     all Accounts, Receivables and Collections;

(b)     all Chattel Paper;

(c)     all Contracts;

(d)     all Deposit Accounts;

5

(e)    all Documents;

(f)    all Equipment;

(g)    all Vehicles;

(h)    all General Intangibles;

(i)    all Instruments;

(j)    all Intellectual Property;

(k)    all Inventory;

(l)    all Investment Property;

(m)    all Letter-of-Credit Rights;

(n)    all Goods and other property not otherwise described above;

(o)    all books and records pertaining to the Collateral;

(p)    all Commercial Tort Claims listed on <u>Schedule 5</u> or described in any notice sent pursuant to <u>Section 5.8</u>;

(q)    any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code;

(r)    Avoidance Actions and the Proceeds thereof (subject to the terms of the Financing Order); and

(s)    to the extent not otherwise included, all Proceeds (including Proceeds of all insurance policies), Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

Notwithstanding the foregoing, "Collateral" shall not include the following:[1] (y) any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office (but only until such statement is accepted by the United States Patent and Trademark Office); and (z) any rights or interests in any lease, license, contract, or agreement, as such or the assets subject thereto if under the terms of such lease, license, contract, or agreement, or Applicable Law with respect thereto, the valid grant of a Lien therein or in such assets to Collateral Agent is prohibited and such prohibition has not been or is not waived or the consent of the other party to such lease, license, contract, or agreement has not been or is not otherwise obtained or under Applicable Law such prohibition cannot be waived; <u>provided</u>, <u>however,</u> the exclusion in clause (z) above shall in no way be construed (i) to apply if any such prohibition would be rendered ineffective under the UCC (including <u>Sections 9-406</u>, <u>9-407</u> and <u>9-408</u> thereof) or other Applicable Law (including the United States bankruptcy code) or principles of equity, (ii) so as to limit, impair or otherwise affect Collateral Agent's

---

[1] JTC: Is there a specific reason the following was deleted: "deposit accounts that are used solely to fund payroll or employee benefits, so long as such deposit account is a zero balance account"? Either way, I think the deletion is probably ok given the situation.

unconditional continuing Liens upon any rights or interests of any Grantor in or to the Proceeds thereof (including proceeds from the sale, license, lease or other disposition thereof), including monies due or to become due under any such lease, license, contract, or agreement (including any Accounts or other Receivables), or (iii) to apply at such time as the condition causing such prohibition shall be remedied and, to the extent severable, "Collateral" shall include any portion of such lease, license, contract, agreement or assets subject thereto that does not result in such prohibition.

3.2     <u>Recourse to Security</u>.  Recourse to security shall not be required for any Obligation hereunder and each Grantor hereby waives, to the extent such waiver is not prohibited by Applicable Law, any requirement that the Collateral Agent or the Secured Parties exhaust any right or take any action against any of the Collateral before proceeding to enforce the Obligations against such Grantor.

3.3     <u>Special Provisions Relating to Inventory</u>.

(a)     <u>All Inventory</u>.  The security interest in the Inventory granted to the Collateral Agent hereunder shall continue through all steps of manufacture and sale and attach without further act to raw materials, work in process, finished goods, returned goods, documents of title and warehouse receipts, and to proceeds resulting from the sale or other disposition of such Inventory.

(b)     <u>Inventory Records</u>.  Each Grantor shall maintain, in the ordinary course of business, full, accurate and complete records of its Inventory describing the kind, type and quantity of such Inventory and the Grantor's cost therefor, withdrawals therefrom and additions thereto, including a perpetual inventory for raw materials, work in process and finished goods.

SECTION 4.     REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into the Credit Agreement and to induce the Secured Parties to make the Loans and other financial accommodations to the Borrower thereunder, each Grantor hereby represents and warrants to each Secured Party that:

4.1     [Reserved].

4.2     <u>Title; No Other Liens</u>.  No financing statement or other public notice or record of a Lien with respect to all or any part of the Collateral is on file or of record in any public office, except for (i) such as have been filed in favor of the Collateral Agent, for the benefit of the Secured Parties, pursuant to this Agreement, (ii) such as have been filed in favor of Money Chest LLC, in connection with the Original Secured Subordinated Debt, and (iii) such as are otherwise expressly permitted by the terms of the Credit Agreement.

4.3     <u>Perfected Priority Liens</u>.  Except with respect to intellectual property registered with an agency or governmental office or authority other than the United States Patent and Trademark Office, the United States Copyright Office or any similar agency in any political subdivision of the United States, the security interests granted pursuant to this Agreement upon completion of the filings and other actions specified on <u>Schedule 2</u> (which, in the case of all filings and other documents referred to on said Schedule, have been delivered to the Collateral Agent in completed and duly executed form) will constitute valid first priority perfected security interests in all of the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, as collateral security for the Secured Obligations, enforceable in accordance with the terms hereof against all creditors of each Grantor and any Persons purporting to purchase any Collateral from any Grantor and are prior to all other Liens on the Collateral, except for, (i) Liens permitted <u>by Sections 9.02(d)(h)</u> and <u>(i)</u> of the Credit Agreement and (ii) solely with respect to Collateral that does not constitute Pledged Stock, rights under Material Contracts, accounts

7

receivable, Collections or proceeds arising thereunder or with respect thereto, Permitted Liens which, pursuant to the terms of the Credit Agreement, are permitted to have priority over Collateral Agent's Liens thereon as collateral security for the Secured Obligations.

4.4     Perfection Certificate; Jurisdiction of Organization; Chief Executive Office.  Each of the Grantors has previously delivered (or is concurrently delivering with this Agreement) to the Collateral Agent a Perfection Certificate signed by such Grantor.  Each of the Grantors represents and warrants to the Secured Parties as follows: (a) such Grantor's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (b) such Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate, (c) the Perfection Certificate accurately sets forth such Grantor's organizational identification number or accurately states that such Grantor has none, (d) the Perfection Certificate accurately sets forth such Grantor's place of business or, if more than one, its chief executive office, as well as such Grantor's mailing address, if different, (e) all other information set forth on the Perfection Certificate pertaining to such Grantor is accurate and complete in all material respects, and (f) there has been no change in any of such information since the date on which the Perfection Certificate was signed by such Grantor.

4.5     Farm Products.  None of the Collateral constitutes, or is the Proceeds of, Farm Products.

4.6     Investment Property; Pledged Stock.

(a)     Schedule 3 sets forth all the issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by each Grantor.  The shares of Pledged Stock pledged by each Grantor hereunder, together with any Excluded Property owned by such Grantor, constitute all the issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor.

(b)     All the shares of the Pledged Stock issued by any Issuer have been duly and validly issued and are fully paid and nonassessable to the extent such concepts are applicable to such Pledged Stock.

(c)     Each of the Pledged Notes issued by any Obligor or Subsidiary of any Grantor constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

(d)     Each Grantor is the record and beneficial owner of, and has good and valid title to, the Investment Property (other than Excluded Property) pledged by it hereunder, prior to all other Liens on such Collateral except, (i) Liens permitted by Section 9.02(a) of the Credit Agreement and (ii) other than in the case of Pledged Stock, Permitted Liens which, pursuant to the terms of the Credit Agreement, are expressly permitted to have priority over Collateral Agent's Liens thereon to secure the Secured Obligations.

(e)     No Grantor is or will become a party to or otherwise bound by any agreement (except the Credit Documents), including any limited partnership agreement or limited liability company operating agreement, which restricts the right of the Collateral Agent to foreclose upon any such Pledged Stock.  None of such Pledged Stock is subject to any option, right of first refusal, call, purchase or similar right of any Person.

8

(f)    The Pledged Stock is represented by certificates and is a security governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

4.7    <u>Receivables</u>.

(a)    No amount payable to such Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the Collateral Agent to the extent required by Section 5.1.

(b)    The amounts represented by a Grantor to the Secured Parties from time to time as owing to such Grantor in respect of the Receivables will, to the best of Grantors' actual knowledge, at such times be accurate in all material respects.

4.8    <u>Contracts</u>.  No amount payable to a Grantor under or in connection with any Contract is evidenced by any Instrument or Chattel Paper which has not been delivered to the Collateral Agent to the extent required by Section 5.1.

4.9    <u>Intellectual Property</u>.

(a)    Schedule 4 lists all items of (i) Intellectual Property which are registered in the United States Patent and Trademark Office, the United States Copyright Office, the applicable registrar of Internet Domain Names,  or any similar office or agency in any political subdivision of the United States or any similar office or agency in any other country or any political subdivision thereof and (ii) all applications for such registered Intellectual Property that are owned by each Grantor, including for each of the foregoing items (1) the owner, (2) the title, (3) the jurisdiction in which the item has been registered or for which an application for registration has been filed, and (4) as applicable, the registration number and registration date or the application number and filing date.

(b)    To the Grantors' knowledge, all Material Intellectual Property of each Grantor described on <u>Schedule 4</u> as updated when required by <u>Section 8.01(d)</u> of the Credit Agreement is valid, subsisting, unexpired and enforceable, has not been abandoned and, as used in the business of the Borrower and each other Grantor, does not infringe the intellectual property rights of any other Person in any material respect.

(c)    Except as set forth in <u>Schedule 4</u>, as updated when required by <u>Section 8.01(d)</u> of the Credit Agreement, none of the Material Intellectual Property (other than Excluded Property) is the subject of any licensing or franchise agreement pursuant to which a Grantor is the licensor or franchisor.

(d)    None of the products or services used in the business of any Grantor or any Subsidiary thereof uses any software or freeware licensed in a manner which imposes any requirement that such software or freeware, or any of the products or services of any such Grantor or such Subsidiary, or derivatives of such software, freeware or products or services, or software, products or services using, linked with, incorporating, distributed with, based on, or derived from such software or freeware or products or services, be (i) made available or distributed in source code form, (ii) licensed for the purpose of making derivative works, (iii) licensed under terms that allow reverse engineering, reverse assembly or disassembly of any kind, or (iv) made redistributable at no charge.

(e)    No holding, decision or judgment has been rendered by any Governmental Authority which would, in any material respect, limit, cancel or question the validity of, or a Grantor's rights in, any Material Intellectual Property (other than office actions issued in the ordinary course of

9

prosecution of any pending applications for patents or applications for registration of other Intellectual Property).

        (f)      To the knowledge of any Grantor, no action, suit, claim, demand, order or proceeding is pending, or, threatened, (i) seeking to limit, cancel or question the validity of any Material Intellectual Property, or any Grantor's ownership interest therein (other than office actions issued in the ordinary course of prosecution of any pending applications for patents or applications for registration of other Intellectual Property), or (ii) which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

        (g)      To each Grantor's actual knowledge, except as set forth on <u>Schedule 4</u> no Person has been or is infringing, misappropriating, or diluting any Material Intellectual Property owned by any Grantor.

        (h)      Each Grantor, and to each Grantor's actual knowledge each other party thereto, is not in material breach or default of any material IP License and no breach or default of any material IP License shall be caused by the consummation of the transactions contemplated by any Credit Document.

    4.10    <u>Commercial Tort Claims</u>.

        (a)      No Grantor has rights in any Commercial Tort Claim for an amount in excess of $25,000 with respect to any one claim or in excess of $50,000 for all such claims, except as set forth on <u>Schedule 5</u>.

        (b)      Upon the granting to Collateral Agent of a security interest in any Commercial Tort Claim pursuant to <u>Section 5.8</u>, such security interest will constitute a valid perfected security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, as Collateral for the Secured Obligations, enforceable in accordance with the terms hereof against all creditors of each Grantor and any Persons purporting to purchase such Collateral from any Grantor, which security interest shall be prior to all other Liens on such Collateral except for Permitted Liens, which, pursuant to the terms of the Credit Agreement.

SECTION 5.   COVENANTS

    Each Grantor covenants and agrees with the Secured Parties that, from and after the date of this Agreement until the Termination Date:

    5.1    <u>Delivery of Instruments and Chattel Paper</u>.  Without limiting <u>Section 5.4</u>, if any amount in excess of $50,000 in any one instance or $150,000 in the aggregate for all such Collateral, payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Chattel Paper, such Instrument or Chattel Paper shall, within five (5) Business Days of such Collateral arising, being acquired or being so evidenced, be delivered to the Collateral Agent, together with such endorsements, notations and applicable transfer instruments with respect thereto as the Collateral Agent may reasonably request, duly endorsed in a manner satisfactory to the Collateral Agent, to be held for the benefit of the Secured Parties, as Collateral under this Agreement.

    5.2    <u>Maintenance of Perfected Security Interest; Further Documentation</u>.

        (a)      Each Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 4.3 and shall defend such security interest against the claims and demands of all Persons whomsoever.

10

(b)     Except as specifically waived by this Agreement or any other Credit Document, at any time and from time to time, upon the written request of the Collateral Agent, and at the sole expense of such Grantor, such Grantor will promptly, and in any event within five (5) Business Days, duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Collateral Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including (i) the filing of any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby, and (ii) without limitation of Section 5.5(c), in the case of Investment Property, Deposit Accounts, Securities Entitlements, Letter of Credit Rights (in each case, other than Excluded Property) and any other relevant Collateral, taking any actions necessary to enable the Collateral Agent to obtain "control" (within the meaning of the UCC) with respect thereto. For the avoidance of doubt, the Grantors' obligations to provide any such further documents with respect to intellectual property shall be governed by Sections 5.6(g) and 5.7.

5.3     Changes in Locations, Name, etc.

(a)     Such Grantor will not, without at least fifteen (15) Business Days prior written notice to Collateral Agent:

(i)     change its legal name or the location of its chief executive office or sole place of business from that referred to in Section 4.4; or

(ii)     except as permitted by Section 9.03 of the Credit Agreement, change its jurisdiction of organization, type of organization, identity or corporate structure.

(b)     To the extent entered into by a Grantor, such Grantor shall promptly provide the Collateral Agent with certified organizational documents reflecting any of the changes described in the preceding clause (a)(ii) of this Section.

(c)     No Grantor shall effect any change referred to in the preceding clause (a)(ii) of this Section unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected Lien on all the Collateral.

(d)     Each of the Grantors will keep all Equipment and Inventory (other than Inventory in transit to or from any such location) at the locations reflected in Section 2 of the Perfection Certificate or, upon not less than fifteen (15) Business Days' prior written notice to Collateral Agent accompanied by an updated Section 2 of the Perfection Certificate, to any such new locations within the continental United States of America (so long as such Grantor shall have provided Collateral Agent with such other information and documentation in connection therewith as the Collateral Agent may reasonably request and shall have taken all actions necessary or advisable to maintain the continuous validity, perfection and the same or better priority of the Collateral Agent's security interest in the relevant Equipment and Inventory intended to be granted and agreed to hereby, or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder and under the other Credit Documents, with respect to such Equipment and Inventory (provided, that in the case of any leased location or warehouse or other third party-controlled location, if the aggregate value of Equipment and Inventory at any such location exceeds $250,000 such grantors shall have used commercially reasonable efforts to obtain an executed Collateral Access Agreement with respect to such location).

11

5.4    <u>Investment Property; Pledged Stock</u>.

(a)    If such Grantor shall become entitled to receive or shall receive any certificate in respect of any Pledged Stock (including any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization of such Pledged Stock), option or rights in respect of any Pledged Stock, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Stock, or otherwise in respect thereof, such Grantor shall accept the same as the agent of the Secured Parties, hold the same for the benefit of the Secured Parties and, within five (5) Business Days of such receipt, deliver the same forthwith to the Collateral Agent in the exact form received, duly endorsed by such Grantor to the Collateral Agent, if required, together with an undated stock transfer power covering such certificate duly executed in blank by such Grantor and otherwise in form and substance satisfactory to Collateral Agent, to be held by the Collateral Agent as additional Collateral under this Agreement.  Any property distributed (other than cash or distributed property which constitutes Excluded Property) on or in respect of the Investment Property shall be delivered to the Collateral Agent within five (5) Business Days of its receipt, to be held by it as additional Collateral under this Agreement.

(b)    In the case of each Grantor which is an Issuer, such Issuer agrees that (i) it will be bound by the terms of this Agreement relating to the Investment Property issued by it which constitutes Collateral and will comply with such terms insofar as such terms are applicable to it and (ii) the terms of <u>Sections 6.3(b)</u> and <u>6.7</u> shall apply to it, *mutatis mutandis*, with respect to all actions that may be required of it pursuant to <u>Section 6.3(b)</u> with respect to such Investment Property issued by it.

(c)    Unless an Event of Default shall have occurred and be continuing and the payment of any such dividend or distribution is prohibited by Section 9.06 of the Credit Agreement, each Grantor shall be permitted to receive dividends and other distributions in respect of the Pledged Stock and all payments made in respect of the Pledged Notes, in each case, to the extent permitted by the Credit Agreement.  Subject to the provisions of <u>Section 6.3</u>, each Grantor shall be permitted to exercise all voting and corporate rights with respect to the Investment Property (other than Excluded Property); <u>provided</u>, that no vote shall be cast or corporate or other organizational right exercised or other action taken which would be inconsistent with or result in any violation of any provision of the Credit Agreement, this Agreement or any other Credit Document.

5.5    <u>Receivables</u>.  Other than in the ordinary course of business or otherwise as a result of the exercise of reasonable business judgment, such Grantor will not, in any manner that could reasonably be excepted to materially and adversely affect the value thereof, (a) grant any extension of the time of payment of any Receivable, (b) compromise or settle any Receivable for less than the full amount thereof, (c) release, wholly or partially, any Person liable for the payment of any Receivable, (d) allow any credit or discount whatsoever on any Receivable, or (e) amend, supplement or modify any Receivable in any manner that could adversely affect the value thereof; <u>provided</u>, that none of such actions may be taken by such Grantor upon the occurrence and continuation of an Event of Default.  The Collateral Agent hereby authorizes each Grantor to collect such Grantor's Receivables, subject to the limitations set forth in this Agreement or other Loan Documents, and the Collateral Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default.

5.6    <u>Intellectual Property</u>.  With respect to each item of Intellectual Property that is material to the conduct of any Grantor's business (collectively, "<u>Material Intellectual Property</u>"), except as permitted by Section 9.04(f) of the Credit Agreement and provided that clause (g) shall apply to all Intellectual Property referenced in such clause (g):

12

(a)     With respect to each Trademark which constitutes Material Intellectual Property, such Grantor (either itself or through licensees) will (i) continue to use each such Trademark on each and every trademarked class of goods applicable to its then current lines of products and services as reflected in its current sales materials in order to maintain such Trademark in full force and effect, free from any claim of abandonment for non-use, (ii) maintain the quality of products and services offered under each such Trademark, (iii) use each such Trademark with the appropriate notice of registration and all other notices and legends required by Applicable Laws, (iv) not use any mark which is confusingly similar or a colorable imitation of any such Trademark unless the Collateral Agent, for the benefit of the Secured Parties, shall obtain a perfected security interest in such mark pursuant to this Agreement, and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way.

(b)     Such Grantor (either itself or through licensees) will not do any act, or omit to do any act, whereby any Patent which constitutes Material Intellectual Property may become forfeited, abandoned or dedicated to the public (other than at the end of its applicable statutory term).

(c)     Such Grantor (either itself or through licensees) will not (and will not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any such Copyright which constitutes Material Intellectual Property may become invalidated or otherwise impaired.  Such Grantor will not (either itself or through licensees) do any act whereby any such Copyright which constitutes Material Intellectual Property may fall into the public domain (other than at the end of its applicable statutory term).

(d)     Such Grantor (either itself or through licensees) will not do any act that knowingly infringes the intellectual property rights of any other Person.

(e)     Such Grantor will take all reasonable and necessary steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application of Material Intellectual Property (and to obtain the relevant registration) and to maintain each registration of Material Intellectual Property, including filing of applications for renewal, affidavits of use and affidavits of incontestability.

(f)     Such Grantor shall take the actions reasonably necessary to protect the confidentiality of Material Intellectual Property and its rights therein, including (a) protecting the secrecy and confidentiality of its confidential information and Trade Secrets, (b) taking actions reasonably necessary to ensure that no Trade Secret falls or has fallen into the public domain, and (c) protecting the secrecy and confidentiality of the source code of all computer software programs and applications of which it is the owner or licensee by having and enforcing a policy requiring any licensees (or sublicensees) of such source code to enter into license agreements with appropriate use and non-disclosure restrictions.

(g)     Such Grantor shall execute and deliver to the Collateral Agent in form and substance reasonably acceptable to the Collateral Agent and suitable for (i) filing in the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any political subdivision of the United States, or any similar office or agency in any other country or any political subdivision thereof, the short-form intellectual property security agreements in the form attached hereto as Annex II, as modified as reasonably required for each such jurisdiction, for all Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks and Trademark Licenses of such Grantor and (ii) to the extent requested by the Collateral Agent, recording with the appropriate Internet Domain Name

13

registrar, a duly executed form of assignment for all Internet Domain Names of such Grantor (together with appropriate supporting documentation as may be requested by the Collateral Agent)

(h)       Such Grantor will take the actions reasonably necessary to ensure that ownership of all Material Intellectual Property used in the business of such Grantor, other than "off-the-shelf" software or software licensed under a "shrink-wrap" or "click-through" agreement, is assigned in writing to such Grantor by its employees, officers, founders, contractors or any other Person, as applicable.

5.7     Intellectual Property Filing.  If such Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, such Grantor shall report such filing to the Collateral Agent as required by Section 8.01(d) of the Credit Agreement; provided, that, upon receipt from the United States Patent and Trademark Office, the United States Copyright Office, or any similar office or agency in any other country or any political subdivision thereof, of notice of registration of any Intellectual Property, such Grantor shall promptly (but in no event later than five (5) Business Days following such receipt) notify Collateral Agent of such registration by delivering, or causing to be delivered to Collateral Agent, via overnight courier, electronic mail or telefacsimile at the addresses designated in the Credit Agreement, documentation sufficient for Collateral Agent to perfect Collateral Agent's Liens on such Intellectual Property.  Upon the request of the Collateral Agent, such Grantor shall execute and deliver, within five (5) Business Days of such request (or such later date as Collateral Agent may agree in its sole discretion), in recordable form, any and all agreements, instruments, documents, and papers as the Collateral Agent may request to evidence the Collateral Agent's Lien on any registered Copyright, Patent, Trademark or other Intellectual Property or application therefor and the goodwill and general intangibles of such Grantor relating thereto or represented thereby.

5.8     Commercial Tort Claims.  If such Grantor shall obtain an interest in any Commercial Tort Claim for an amount in excess of $50,000 for any one such claim or in excess of $150,000 in the aggregate for all such claims, such Grantor shall promptly (and in any event within five (5) Business Days after obtaining such Commercial Tort Claim) notify the Collateral Agent in writing, and upon the request of the Collateral Agent, promptly (and in any event within five (5) Business Days after such request) amend Schedule 5, authorizing the Collateral Agent to do such acts or things deemed necessary or desirable by the Collateral Agent to give the Collateral Agent a first priority (subject only to Permitted Liens which, pursuant to the terms of the Credit Agreement, are expressly permitted to have priority over Collateral Agent's Liens thereon) perfected security interest in any such Commercial Tort Claim. Without limiting the foregoing, such Grantor agrees that the notice described in the first sentence of this Section 5.8 shall constitute the grant to Collateral Agent by such Grantor of a first priority (subject only to Permitted Liens which, pursuant to the terms of the Credit Agreement, are expressly permitted to have priority over Collateral Agent's Liens thereon) security interest in the Commercial Tort Claim described therein.

5.9     Collateral in the Possession of a Bailee.  If any Collateral having a book value in excess of $250,000 for any one bailee is now or at any time hereafter, in the possession of a bailee, such Grantor shall promptly, but in any event within five (5) Business Days, notify the Collateral Agent thereof and, at the Collateral Agent's request and option, shall use commercially reasonable efforts to promptly obtain an acknowledgement from the bailee, in form and substance reasonably satisfactory to the Collateral Agent, that the bailee holds such Collateral for the benefit of the Collateral Agent and such bailee's agreement to comply, without further consent of such Grantor, at any time with instructions of the Collateral Agent as to such Collateral.  The Collateral Agent agrees with the Grantors that the Collateral Agent shall not give any such instructions unless an Event of Default has occurred and is continuing.

14

5.10    <u>Electronic Chattel Paper</u>.  If any Grantor, now or at any time hereafter, holds or acquires an interest in any electronic chattel paper, any electronic document or any "transferable record", as that term is defined in <u>Section 201</u> of the federal Electronic Signatures in Global and National Commerce Act, or in <u>Section 16</u> of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction having a value of $50,000 or more in any one instance or $150,000 or more in the aggregate for all such assets, such Grantor shall promptly (and in any event within five (5) Business Days after obtaining any such asset) notify the Collateral Agent thereof and, at the request and option of the Collateral Agent, shall promptly take such action as the Collateral Agent may request to vest in the Collateral Agent control, under <u>Section 9-105</u> of the UCC or the Uniform Commercial Code of any other relevant jurisdiction, of such electronic chattel paper, control, under <u>Section 7-106</u> of the UCC or the Uniform Commercial Code of any other relevant jurisdiction, of such electronic document or control, under <u>Section 201</u> of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.  The Collateral Agent agrees with each Grantor that the Collateral Agent will arrange, pursuant to procedures satisfactory to the Collateral Agent and so long as such procedures will not result in the Collateral Agent's loss of control, for such Grantor to make alterations to the electronic chattel paper, electronic document or transferable record permitted under UCC <u>Section 9-105</u>, UCC <u>Section 7-106</u>, or, as the case may be, <u>Section 201</u> of the federal Electronic Signatures in Global and National Commerce Act or <u>Section 16</u> of the Uniform Electronic Transactions Act for a party in control to make without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by such Grantor with respect to such electronic chattel paper, electronic document or transferable record.  The provisions of this <u>Section 5.10</u> relating to electronic documents and "control" under UCC <u>Section 7-106</u> apply in the event that the 2003 revisions to Article 7, with amendments to Article 9, of the Uniform Commercial Code, in substantially the form approved by the American Law Institute and the National Conference of Commissioners on Uniform State Laws, are now or hereafter adopted and become effective in New York or in any other relevant jurisdiction.

5.11    <u>Letter-of-Credit Rights</u>.  If any Grantor is, now or at any time hereafter, a beneficiary under a letter of credit having a face amount of $50,000 or more in any one instance or $150,000 or more for all such letters of credit, such Grantor shall promptly, but in any event within five (5) Business Days, notify the Collateral Agent thereof and, at the request of the Collateral Agent, such Grantor shall, promptly pursuant to an agreement in form and substance satisfactory to the Collateral Agent, either (a) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Collateral Agent of the proceeds of the letter of credit, or (b) arrange for the Collateral Agent to become the transferee beneficiary of the letter of credit, with the Collateral Agent agreeing, in each case, that the proceeds of the letter of credit are to be applied as provided in the Credit Agreement.

5.12    <u>Further Assurances; Pledge of Instruments</u>.  At the sole expense of such Grantor, such Grantor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as the Collateral Agent may reasonably request to obtain the full benefits of this Agreement and of the rights and powers herein granted, which shall in any case include, but shall not be limited to: (a) using commercially reasonable efforts if reasonably requested in writing by the Collateral Agent to secure all consents and approvals necessary or appropriate for the grant of a security interest to the Collateral Agent in any lease, license, contract or agreement held by such Grantor or in which such Grantor has any right or interest (or with respect to which such Grantor has any right or interest in the assets subject to such lease, license, contract or agreement) not heretofore assigned, (b) authorizing the filing of and delivering and causing to be filed any financing or continuation statements under the UCC with respect to the security interests granted hereby, (c) filing or reasonably cooperating with the Collateral Agent in filing any forms or other documents required to be recorded with the United States Patent and Trademark Office, the United States Copyright Office, or if reasonably

15

requested by the Collateral Agent, any actions, filings, recordings or registrations in any foreign jurisdiction or under any international treaty, required to secure or protect the Collateral Agent's interest in such Grantor's Collateral, (d) to the extent required by Section 5.1 or 5.4, at the Collateral Agent's reasonable request, transferring such Grantor's Collateral to the Collateral Agent's possession (if a security interest in such Collateral can be perfected by possession), (e) at the Collateral Agent's reasonable request, placing the interest of the Collateral Agent as lienholder on the certificate of title (or similar evidence of ownership) of any vehicle, watercraft or other Equipment constituting Collateral owned by such Grantor which is covered by a certificate of title (or similar evidence of ownership) and (f) upon the Collateral Agent's reasonable request, executing and delivering or causing to be delivered written notice to insurers of the Collateral Agent's security interest in, or claim in or under, any policy of insurance (including unearned premiums).  Such Grantor also hereby authorizes the Collateral Agent to file any such financing or continuation statement without the signature of such Grantor.

## SECTION 6.    REMEDIAL PROVISIONS

6.1    <u>Certain Matters Relating to Receivables</u>.  (a)    After the occurrence and during the continuance of an Event of Default, (i) upon five (5) days prior written notice to the Grantors, the Collateral Agent shall have the right to make test verifications of the Receivables in any manner and through any medium that it considers advisable, and each Grantor shall furnish all such assistance and information as the Collateral Agent may reasonably require, and shall reimburse the Collateral Agent for any and all reasonable expenses actually incurred by the Collateral Agent (subject to Section 12.05 of the Credit Agreement), in connection with such test verifications, and (ii) upon the Collateral Agent's reasonable request (but no more often than once per year prior to the occurrence and continuance of an Event of Default) and at the expense of the relevant Grantor, such Grantor shall promptly cause independent public accountants or others reasonably satisfactory to the Collateral Agent to furnish to the Collateral Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables.

(b)    If required by the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, any payments of Receivables, when collected by any Grantor, (i) shall be forthwith (and, in any event, within two (2) Business Days) deposited by such Grantor in the exact form received, duly endorsed by such Grantor to the Collateral Agent if required, in a Collateral Account maintained under the sole dominion and control of the Collateral Agent, subject to withdrawal by the Collateral Agent for the account of the Secured Parties only as provided in Section 6.4, and (ii) until so turned over, shall be held by such Grantor for the benefit of the Secured Parties, segregated from other funds of such Grantor.  Each such deposit of Proceeds of Receivables shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c)    At the Collateral Agent's request after the occurrence and during the continuance of an Event of Default, each Grantor shall promptly deliver to the Collateral Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including all original orders, invoices and shipping receipts.

6.2    <u>Communications with Obligors; Grantors Remain Liable</u>.

(a)    The Collateral Agent may in its own name or in the name of others at any time after the occurrence and during the continuance of an Event of Default, communicate with obligors under the Receivables and parties to the Contracts to verify with them to the Collateral Agent's satisfaction the existence, amount and terms of any Receivables or Contracts.

16

(b)        Upon the written request of the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall promptly notify obligors on the Receivables and parties to the Contracts that the Receivables and the Contracts have been assigned to the Collateral Agent for the benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Collateral Agent.

(c)        Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Receivables and Contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  No Secured Party shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) or Contract by reason of or arising out of this Agreement (or any other Credit Document) or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto) or Contract, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.  From and after the occurrence and during the continuation of an Event of Default and following the notice thereof by the Collateral Agent, the Collateral Agent shall have the exclusive authority to enforce all Contracts included within the Collateral and no Grantor shall take any action under any Contract, including amending, waiving, extending, terminating or cancelling any such Contract, or taking any action in furtherance thereof, without the prior written consent of the Collateral Agent in each instance.

6.3        <u>Pledged Stock</u>.

(a)        If an Event of Default shall have occurred and be continuing, (i) the Collateral Agent shall have the right to receive any and all dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Secured Obligations in the order set forth in Section 4.02(d) of the Credit Agreement, (ii) five (5) Business Days after prior written notice to Grantors, any or all of the Investment Property (other than Excluded Property) may be registered in the name of the Collateral Agent or its nominee, and (iii) five (5) Business Days after prior written notice to Grantors and the Collateral Agent or its nominee shall have (except to the extent specifically waived in each instance by the Collateral Agent) the exclusive right to exercise (1) all voting, corporate and other rights pertaining to such Investment Property (other than Excluded Property) at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (2) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property (other than Excluded Property) as if it were the absolute owner thereof (including the right to exchange, at its discretion, any and all of the Investment Property (other than Excluded Property) upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property (other than Excluded Property), and in connection therewith, the right to deposit and deliver any and all of the Investment Property (other than Excluded Property) with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(b)        Each Grantor hereby authorizes and instructs each Issuer of any Investment Property (other than Excluded Property) to comply with any instruction regarding Collateral Agent's

17

rights under the preceding clause (a) received by it from the Collateral Agent in writing that states that an Event of Default has occurred and is continuing, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying and shall have no duty or right to inquire as to the Collateral Agent's authority to give such instruction, including the payment of any dividends or other payments with respect to such Investment Property directly to the Collateral Agent.

6.4     Proceeds to be Turned Over to Collateral Agent.  In addition to the rights of the Secured Parties specified in Section 6.1 with respect to payments of Receivables, if an Event of Default shall have occurred and be continuing and the Collateral Agent shall so notify the Grantor in question in writing, all Collections thereon shall be held by such Grantor for benefit of the Secured Parties, segregated from other funds of such Grantor, and shall, forthwith (and in any event within two (2) Business Days) upon receipt by such Grantor, be turned over to the Collateral Agent in the exact form received by such Grantor (duly endorsed by such Grantor to the Collateral Agent, if required).  All Proceeds received by the Collateral Agent hereunder shall be held by the Collateral Agent in a Collateral Account maintained under its sole dominion and control.  All Proceeds, while held by the Collateral Agent in a Collateral Account (or by such Grantor for the benefit of the Secured Parties), shall continue to be held as Collateral under this Agreement and shall not constitute payment thereof until applied as provided in Section 6.5.

6.5     Application of Proceeds.  If an Event of Default shall have occurred and be continuing, at the Collateral Agent's election, the Collateral Agent may, at any such time, apply all or any part of the Proceeds of Collateral, whether or not held in any Collateral Account, in payment of the Secured Obligations in the order set forth in Section 4.02(d) of the Credit Agreement.

6.6     UCC and Other Remedies.  If an Event of Default shall have occurred and be continuing, the Collateral Agent, on behalf of the Secured Parties, may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any of the Secured Obligations, all rights and remedies of a secured party under the UCC or any other Applicable Law.  Without limiting the generality of the foregoing, the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except as specifically provided in this Agreement or the other Credit Documents) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such commercially reasonable terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit, or for future delivery, without assumption of any credit risk.  Any Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released.  Each Grantor further agrees, at the Collateral Agent's request, to assemble the Collateral, or any part thereof, and make it available to the Collateral Agent at places that the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere.  The Collateral Agent shall apply the proceeds of any action taken by it pursuant to this Section 6.6, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Parties hereunder, including reasonable and documented attorneys' fees and disbursements, to the payment in whole or in part of the Secured Obligations in accordance with Section 6.5, and only after such application and after the payment by the Collateral Agent of any other amount required by any

18

provision of law, including Section 9-615(a)(3) of the UCC, need the Collateral Agent account for the surplus, if any, to any Grantor. Collateral Agent shall have the right to the appointment of a receiver for the properties and assets of each Grantor, and each Grantor hereby consents to such rights and such appointment and hereby waives any objection such Grantor may have thereto or the right to have a bond or other security posted by Collateral Agent. To the extent permitted by Applicable Law, each Grantor waives all claims, damages and demands it may acquire against any Secured Party arising out of the exercise by them of any rights granted to the Secured Parties hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition. Without limiting the foregoing, the Collateral Agent shall have, in its sole and absolute discretion at any time if an Event of Default has occurred and is continuing, the right to take physical possession of such Inventory and to maintain it on the premises of the Borrower, in a public warehouse, or at such other place as the Collateral Agent may deem appropriate.

6.7    Sales of Pledged Stock. (a) Each Grantor recognizes that the Collateral Agent may be unable to effect a public sale of any or all the Pledged Stock, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that selling Collateral in a private sale as opposed to a public sale shall not be deemed to make such sale other than in a commercially reasonable manner. The Collateral Agent shall be under no obligation to delay a sale of any of the Pledged Stock for the period of time necessary to permit the Issuer thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so.

(b)    Each Grantor agrees to use its commercially reasonable efforts to promptly do or cause to be done all such other acts as may be necessary or advisable to make such sale or sales of all or any portion of the Pledged Stock pursuant to this Section 6.7 valid and binding and in compliance with any and all other Applicable Laws.

6.8    IP Licenses. For the purpose of enabling the Collateral Agent to exercise rights and remedies following the occurrence and during the continuance of an Event of Default (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, convey, transfer or grant options to purchase any Collateral) at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to Collateral Agent, for the benefit of the Secured Parties, (i) an irrevocable, nonexclusive, worldwide license (exercisable without payment of royalty or other compensation to such Grantor), subject, in the case of registered Trademarks, to the Collateral Agent maintaining, or causing to be maintained, the quality of the respective goods and services associated with the use of the registered Trademarks at substantially the same level maintained by the Grantor immediately prior to the Event of Default, including in such license the right to sublicense, use and practice any Intellectual Property now owned or hereafter acquired by such Grantor and access to all media in which any of the licensed items may be recorded or stored and to all software and programs used for the compilation or printout thereof.

6.9    Waiver; Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Secured Obligations and the reasonable and documented fees and disbursements of any attorneys employed by any Secured Party to collect such deficiency.

19

SECTION 7.    THE COLLATERAL AGENT

7.1    Collateral Agent's Appointment as Attorney-in-Fact, etc.

(a)    Each Grantor hereby irrevocably appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to (unless such notice is required by the terms of this Agreement or any other Credit Document) or further assent by such Grantor, to do any or all of the following, in each case at the Collateral Agent's sole option:

(i)    in the name of such Grantor or its own name, or otherwise, take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Receivable or Contract or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Receivable or Contract or with respect to any other Collateral whenever payable;

(ii)    in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Collateral Agent may reasonably request to evidence the Secured Parties' security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii)    pay or discharge taxes and Liens levied or placed on or threatened against any of the Collateral, effect any repairs to any of the Collateral and obtain any insurance called for by the terms of the Credit Agreement or any other Credit Document and pay all or any part of the premiums therefor and the costs thereof, which amounts shall constitute Secured Obligations;

(iv)    execute, in connection with any sale provided for in Sections 6.6 or 6.7, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral, or any part thereof;

(v)    (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or

20

proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; (7) assign any Copyright, Patent or Trademark (along with the goodwill of the business to which any such Copyright, Patent or Trademark pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine; (8) perform any obligations of any Grantor under any Contract; and (9) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Secured Parties' security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do; and

(vi)    take all actions and execute all documents in respect of Contracts and Pledged Stock contemplated by <u>Sections 6.2</u> and <u>6.3</u>.

Anything in this Agreement to the contrary notwithstanding, the Collateral Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 7.1 unless an Event of Default shall have occurred and be continuing and it has provided any notices required by the terms of this Agreement or the other Credit Documents, including, without limitation, notices required by <u>Section 6.3</u> with respect to Pledged Stock.

(b)    If any Grantor fails to perform or comply with any of its agreements contained herein or in any other Credit Document, the Collateral Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(c)    The expenses of the Collateral Agent incurred in connection with actions undertaken as provided in this <u>Section 7.1</u>, together with interest thereon at a rate per annum equal to the highest interest rate applicable to the Loans under the Credit Agreement, from the date of payment by the Collateral Agent to the date reimbursed by the relevant Grantor in cash, shall be payable by such Grantor to the Collateral Agent on demand.

(d)    Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

(e)    Each Grantor grants to the Collateral Agent an IRREVOCABLE PROXY, to vote all or any part of the Pledged Stock from time to time following the occurrence and during the continuance of an Event of Default, in each case in any manner the Collateral Agent deems advisable in its sole discretion for or against any or all matters submitted, or which may be submitted, to a vote of shareholders (including holders of any Investment Property issued by any Issuer), partners or members, as the case may be, and to exercise all other rights, powers, privileges and remedies to which any such shareholders (including holders of any Investment Property issued any Issuer), partners or members would be entitled (including, without limitation, giving or withholding written consents of holders of Investment Property issued by any Issuer, calling special meetings of the holders of the Investment Property issued by any Issuer and voting at such meetings).  The irrevocable proxy granted hereby shall be effective automatically upon the occurrence of an Event of Default without the necessity that any action (including, without limitation, that any transfer of any of the Pledged Stock be recorded on the

21

books and records of the relevant Credit Party) be taken by any Person (including the relevant Credit Party of any Pledged Stock or any officer or agent thereof), shall be coupled with an interest and shall be irrevocable, shall survive the bankruptcy, dissolution or winding up of any relevant Grantor, and shall terminate only on the Termination Date.

7.2     <u>Duty of Collateral Agent</u>.  The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under <u>Section 9-207</u> of the UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account.  No Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Secured Parties hereunder are solely to protect the Secured Parties' interests in the Collateral and shall not impose any duty upon any Secured Party to exercise any such powers.  The Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

7.3     <u>Financing Statements</u>.  Pursuant to any Applicable Law, each Grantor authorizes the Collateral Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral, without the signature of such Grantor, in such form (if no signature is required) and in such offices as the Collateral Agent determines appropriate to perfect the security interests of the Collateral Agent under this Agreement.  Each Grantor authorizes the Collateral Agent to use the collateral description "all personal property", "all assets" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC or the Uniform Commercial Code of any other applicable state, in any such financing statements.

7.4     <u>Authority of Collateral Agent</u>.  Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Secured Parties, be governed by the Credit Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and the Grantors, the Collateral Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

7.5     <u>Collateral Matters</u>.  As between the Collateral Agent and the Secured Parties, except as otherwise set forth herein, any action or exercise of powers by the Collateral Agent provided under the Credit Documents, together with such other powers as are reasonably incidental thereto, shall be deemed authorized by and binding upon all of the Secured Parties.  At any time and without notice to or consent from any Secured Party, the Collateral Agent may take any action necessary or advisable to perfect and maintain the perfection of the Liens upon the Collateral.

SECTION 8.     MISCELLANEOUS

22

8.1     <u>Amendments in Writing</u>.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with <u>Section 12.01</u> of the Credit Agreement.

8.2     <u>Notices</u>.  All notices, requests and demands to or upon the Collateral Agent or any Grantor hereunder shall be effected in the manner provided for in <u>Section 12.02</u> of the Credit Agreement.

8.3     <u>No Waiver by Course of Conduct; Cumulative Remedies</u>.  No Secured Party shall by any act (except by a written instrument pursuant to <u>Section 8.1</u>), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by any Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which such Secured Party would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

8.4     <u>Successors and Assigns</u>.  This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Collateral Agent and the other Secured Parties and their permitted successors and assigns; <u>provided</u>, that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Collateral Agent.

8.5     <u>Set-Off</u>.  Each Grantor hereby irrevocably authorizes the Agents and each Secured Party at any time and from time to time after the occurrence and during the continuance of an Event of Default, upon any amount becoming due and payable by such Grantor hereunder or under any other Credit Document (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Secured Party to or for the credit or the account of such Grantor, or any part thereof in such amounts as such Agent or such Secured Party may elect, against and on account of the obligations and liabilities of such Grantor to such Agent or such Secured Party hereunder and claims of every nature and description of such Agent or such Secured Party against such Grantor, in any currency, whether arising hereunder, under the Credit Agreement, any other Credit Document or otherwise, as such Agent or such Secured Party may elect, whether or not any Secured Party has made any demand for payment and although such obligations, liabilities and claims may be contingent or unmatured.  Each Secured Party, or Collateral Agent on their behalf, shall notify such Grantor promptly of any such set-off and the application made by such Secured Party of the proceeds thereof; <u>provided</u>, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Secured Party under this <u>Section 8.5</u> are in addition to other rights and remedies (including other rights of set-off) that such Secured Party may have and are subject to any applicable limitations set forth in the Credit Agreement.

8.6     <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

8.7     <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or

23

unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.8     Section Headings.  The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

8.9     Integration.  This Agreement and the other Credit Documents represent the entire agreement of the Grantors and the Secured Parties with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by any party hereto relative to the subject matter hereof and thereof not expressly set forth or referred to herein or in the other Credit Documents.

8.10     **GOVERNING LAW**.  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST- JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK OR (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.[2]**

8.11     **SUBMISSION TO JURISDICTION; WAIVERS**.  **EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY:**

(a)     **SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY APPLICABLE LAWS, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR OTHERWISE SHALL AFFECT ANY RIGHT THAT THE COLLATERAL AGENT, THE ADMINISTRATIVE AGENT OR ANY LENDER OR OTHER SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK TO THE EXTENT THE LAWS OF SUCH OTHER JURISDICTION GOVERN**

---

[2] JTC: This makes sense, but it's different than the corollary provision in the Credit Agreement.

24

**THE PERFECTION OF THE SECURITY INTEREST IN, OR THEIR REMEDIES WITH RESPECT TO, ANY COLLATERAL;**

(b)        **CONSENTS THAT ANY SUCH ACTION OR PROCEEDING SHALL BE BROUGHT IN SUCH COURTS, AND AGREES NOT TO PLEAD OR CLAIM AND WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN SECTION 8.11(A). EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT;**

(c)        **CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY CREDIT DOCUMENT, IN THE MANNER PROVIDED IN SECTION 12.13(c) OF THE CREDIT AGREEMENT. NOTHING IN THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAWS;**

(d)        **WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; AND**

(e)        **WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION 8.11 ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.**

8.12    <u>Acknowledgements</u>.  Each party hereto hereby acknowledges that:

(a)        it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents to which it is a party, and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof;

(b)        no Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Credit Documents, and the relationship between the Grantors, on the one hand, and the Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)        no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantors and the Secured Parties.

8.13    <u>Additional Grantors</u>.  Each Subsidiary of any Credit Party that is required to become a party to this Agreement pursuant to Section 8.10 of the Credit Agreement shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement in the form of <u>Annex I</u> hereto.

8.14    <u>Releases of Liens</u>.

25

(a)     Notwithstanding anything to the contrary contained herein or in any other Credit Document, the Collateral Agent is hereby irrevocably authorized by each Secured Party (without requirement of notice to or consent of any Secured Party except as expressly required by Section 12.01 of the Credit Agreement) to take any action requested by the Grantor having the effect of releasing any Collateral (i) to the extent necessary to permit consummation of any transaction not prohibited by any Credit Document or that has been consented to in accordance with Section 12.01 of the Credit Agreement, or (ii) under the circumstances described in paragraph (b) below.

(b)     On the Termination Date, the Collateral shall be released from the Liens created by this Agreement and the other Security Documents, and this Agreement and the other Security Documents and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent and each Credit Party under this Agreement and the other Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(c)     Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property pursuant to this <u>Section 8.14</u>. In each case as specified in this <u>Section 8.14</u>, the Collateral Agent will (and each Lender irrevocably authorizes the Collateral Agent to), at the Credit Parties' expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under this Agreement and the other Security Documents, in each case in accordance with the terms of the Credit Documents and this <u>Section 8.14</u>.

8.15    <u>Subordination</u>. Notwithstanding any provision of this Agreement to the contrary, and except as otherwise provided by Applicable Law, all rights of the Grantors to indemnity, contribution or subrogation under Applicable Law or otherwise shall be fully subordinated to the payment in full in cash of the Secured Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted). No failure on the part of the Borrower or any other Grantor to make the payments required under Applicable Law or otherwise shall in any respect limit the obligations and liabilities of any Grantor with respect to its obligations hereunder, and each Grantor shall remain liable for the full amount of the obligations of such Grantor hereunder. Each Grantor hereby agrees that all Indebtedness owed to it by any other Grantor shall be fully subordinated to the payment in full in cash of the Secured Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted).

8.16    <u>Marshaling</u>. Neither the Agents nor any other Secured Party shall be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the rights and remedies of the Secured Parties hereunder and of the Secured Parties in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.

8.17    <u>References to Schedules</u>. References herein to Schedules to this Agreement are to such Schedules as updated when required by Section 8.01(d) of the Credit Agreement.

*[Signature Page Follows.]*

26

IN WITNESS WHEREOF, each of the undersigned has caused this Security Agreement to be duly executed and delivered as of the date first above written.

GRANTORS:

LOOT CRATE, INC.

By:_____
Name:
Title:


LOOT CRATE HOLDINGS, INC.

By:_____
Name:
Title:


LC FUNDING, INC.

By:_____
Name:
Title:


LOOT CRATE PARENT, INC.

By:_____
Name:
Title:

(Superpriority Pledge and Security Agreement)

(Superpriority Pledge and Security Agreement)

ACCEPTED:

**MONEY CHEST LLC**,
as Collateral Agent


By: _____
Name:  Joel Weinshanker
Title:  Managing Partner

**SCHEDULES TO SECURITY AGREEMENT**

<u>Schedule 1</u>

DESCRIPTION OF INVESTMENT PROPERTY

**Pledged Stock:**

| Name of Grantor | Name of Pledged Company | Class of Interests | Percentage of Class Owned | Percentage of Class Pledged | Certificate No. |
|---|---|---|---|---|---|
| Loot Crate Holdings, Inc. | Loot Crate, Inc. | Common | 100% | 100% | 20 |
| LC Funding, Inc. | Loot Crate Holdings, Inc. | Common | 100% | 100% | 3 |
| Loot Crate Parent, Inc. | LC Funding, Inc. | Common | 100% | 100% | 2 |

**Pledged Notes:**

None

<u>Schedule 2</u>

FILINGS AND OTHER ACTIONS
REQUIRED TO PERFECT SECURITY INTERESTS

<u>UCC Filings</u>

| Grantor | Jurisdictions |
|---|---|
| Loot Crate, Inc. | Delaware Secretary of State |
| Loot Crate Holdings, Inc. | Delaware Secretary of State |
| LC Fundings, Inc. | Delaware Secretary of State |
| Loot Crate Parent, Inc. | Delaware Secretary of State |

<u>Intellectual Property Filings</u>

Trademark Security Agreement to be filed with the United States Patent and Trademark Office.

<u>Actions with respect to Pledged Stock</u>
Original stock certificates with stock powers to be delivered to the Collateral Agent.

<u>Other Actions</u>

<u>None.</u>

CAPITAL STOCK

| Name of Grantor | Issuer of Capital Stock | Class of Interests | Percentage of Class Owned | Percentage of Class Pledged | Certificate No. |
|---|---|---|---|---|---|
| Loot Crate Holdings, Inc. | Loot Crate, Inc. | Common | 100% | 100% | 20 |
| LC Funding, Inc. | Loot Crate Holdings, Inc. | Common | 100% | 100% | 3 |
| Loot Crate Parent, Inc. | LC Funding, Inc. | Common | 100% | 100% | 2 |

INTELLECTUAL PROPERTY

I.      Copyrights and Copyright Licenses:

None.

II.     Patents and Patent Licenses:

None.

III.    Trademarks and Trademark Licenses:

<mark>See attached.</mark>

IV.     Trade Secret Licenses:

None.

V.      Internet Domain Names:

<mark>See attached.</mark>

## COMMERCIAL TORT CLAIMS

1. Any and all claims and causes of action of any Grantor against the directors or officers of any Grantor or any other Person, arising from or relating to the collection, accrual, disclosure, reporting or nonpayment of sales tax liabilities by or on behalf of any Grantor, whether arising in contract, tort or otherwise, and including but not limited to claims arising from or relating to (i) the understatement (and underpayment) of the Grantors' sales tax liabilities, (ii) any Grantor's collection and/or failure to remit sales taxes and (iii) any representations, warranties, financial statements and other information provided to the Secured Parties or their predecessors in interest, and their respective advisors, and reflecting such collected sales taxes and understated or unpaid sales tax liabilities.

2. Any and all claims and causes of action of any Grantor against the directors or officers of any Grantor, arising from or relating to the presentation of the financial condition of the Grantors to the Secured Parties or their predecessors in interest, and their respective advisors and/or the preparation of the financial statements and financial information of the Grantors delivered to the Secured Parties or their predecessors in interest, and their respective advisors, including, without limitation, in connection with the sales tax matters addressed in clause (1) above, in each case, whether arising in contract, tort or otherwise.

3. Any and all claims and causes of action of any Grantor against any insurer in respect of the claims specified in clauses (1) and (2) above under any director and officer insurance policy or other policy covering such claims and including any and all rights to amounts payable in respect of such policies.

ASSUMPTION AGREEMENT (this "***Assumption Agreement***"), dated as of _____, 20__, made by _____, a _____ (the "***Additional Grantor***"), in favor of Money Chest LLC, as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "***Collateral Agent***") acting pursuant to this Assumption Agreement for the benefit of the Secured Parties. All capitalized terms not defined herein shall have the meaning ascribed to them in the Security Agreement.

W I T N E S S E T H :

WHEREAS, Loot Crate, Inc., a Delaware corporation ("***Borrower***"), Loot Crate Parent, Inc., a Delaware corporation ("***Parent***"), any Subsidiaries of Parent that are Guarantors or become Guarantors pursuant to Section 8.10 of the Credit Agreement (including Parent, the "***Guarantors***", and, together with Borrower, the "***Credit Parties***"), the Lenders from time to time party thereto (the "***Lenders***"), Money Chest LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "***Administrative Agent***") and the Collateral Agent for the Lenders, have entered into a Debtor-In-Possession Credit Agreement, dated as of August [_], 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***");

WHEREAS, in connection with the Credit Agreement, the Credit Parties (other than the Additional Grantor) have entered into the Superpriority Pledge and Security Agreement dated as of August [_], 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Security Agreement***") in favor of the Collateral Agent, for the benefit of the Secured Parties;

WHEREAS, the Credit Agreement requires the Additional Grantor to become a party to the Security Agreement; and

WHEREAS, the Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Security Agreement;

NOW, THEREFORE, IT IS AGREED:

Security Agreement. By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 8.13 of the Security Agreement, hereby becomes a party to the Security Agreement as a Grantor thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby grants, pledges, collaterally assigns and transfers to the Collateral Agent, and hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a security interest in all of its personal property and other assets, wherever located, whether now owned or at any time hereafter acquired by such Grantor therein or in which such Grantor therein now has or at any time in the future may acquire any right, title or interest, including the Collateral, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of its Secured Obligations, and (b) expressly assumes all obligations and liabilities of a Grantor thereunder. The information set forth in Annex 1-A hereto is hereby added to the

information set forth in Schedule[s] [___][3] to the Security Agreement.  The Additional Grantor hereby represents and warrants that, with respect to the Additional Grantor, each of the representations and warranties contained in <u>Section 4</u> of the Security Agreement is true and correct on and as the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

<u>Governing Law</u>.  This assumption agreement shall be governed by, and construed and interpreted in accordance with, the law of the state of New York without reference to conflicts of law provisions.  In addition, the provisions of <u>Sections 8.6, 8.7, 8.8</u> and <u>8.12</u> of the Security Agreement are incorporated herein by reference, *mutatis mutandis*.

<u>No Novation or Release</u>.  Nothing in this Assumption Agreement shall be construed to release any other Grantor at any time party to the Security Agreement from its obligations and liabilities thereunder or otherwise affect any of such other Grantor's obligations or liabilities under any Credit Document.

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR],

By: _____
　　　Name:
　　　Title:

<u>ACKNOWLEDGED</u>:

Money Chest LLC,
as Collateral Agent

By: _____
　　　Name:
　　　Title:

---

[3] Refer to each Schedule which needs to be supplemented.

Annex 1-A

[INSERT INFORMATION TO BE ADDED TO
THE APPLICABLE SECURITY AGREEMENT SCHEDULES]

Annex II<br>
to<br>
<u>Superpriority Pledge and Security Agreement</u>

**FORM OF SUPERPRIORITY INTELLECTUAL PROPERTY SECURITY AGREEMENT**

THIS SUPERPRIORITY [COPYRIGHT] [PATENT] [TRADEMARK] SECURITY AGREEMENT, dated as of _____ __, 20__, is made by each of the entities listed on the signature pages hereof (each a "***Grantor***" and, collectively, the "***Grantors***"), in favor of Money Chest LLC, as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "***Collateral Agent***") for the Lenders and the other Secured Parties.

W I T N E S S E T H :

WHEREAS, Loot Crate, Inc., a Delaware corporation ("***Borrower***"), Loot Crate Parent, Inc., a Delaware corporation ("***Parent***"), any Subsidiaries of Parent that are Guarantors or become Guarantors pursuant to Section 8.10 of the Credit Agreement (including Parent, the "***Guarantors***", and, together with Borrower, the "***Credit Parties***"), the Lenders from time to time party thereto (the "***Lenders***"), Money Chest LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "***Administrative Agent***") and the Collateral Agent for the Lenders, have entered into a Debtor-in-Possession Credit Agreement, dated as of August [_], 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***");

WHEREAS, all of the Grantors are party to a Superpriority Pledge and Security Agreement of even date herewith in favor of the Collateral Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***Security Agreement***"), pursuant to which the Grantors are required to execute and deliver this Superpriority [Copyright] [Patent] [Trademark] Security Agreement;

NOW, THEREFORE, in consideration of the premises and to induce the Lenders and the Collateral Agent to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the Collateral Agent as follows:

Section 1.     <u>Defined Terms</u>.  Capitalized terms used herein without definition are used as defined in the Security Agreement.

Section 2.     <u>Grant of Security Interest in [Copyright] [Trademark] [Patent] Collateral</u>.  Each Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations of such Grantor, hereby mortgages and pledges to the Collateral Agent for the benefit of the Secured Parties, and grants to the Collateral Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the following Collateral of such Grantor (the "***[Copyright] [Patent] [Trademark] Collateral***"):

(a)     [all of its Copyrights and all Copyright Licenses providing for the grant by or to such Grantor of any right under any Copyright, including those referred to on Schedule 1 hereto;

(b)     all renewals, reversions and extensions of the foregoing; and

(c)      all income, royalties, proceeds and liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof.]

or

(a)      [all of its Patents and all Patent Licenses providing for the grant by or to such Grantor of any right under any Patent, including those referred to on Schedule 1 hereto];

(b)      all reissues, reexaminations, continuations, continuations-in-part, divisionals, and extensions of the foregoing; and

(c)      all income, royalties, proceeds and liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, violation or other impairment thereof.]

or

(a)      [all of its Trademarks and all Trademark Licenses providing for the grant by or to such Grantor of any right under any Trademark, including those referred to on Schedule 1 hereto];

(b)      all renewals and extensions of the foregoing;

(c)      all goodwill of the business connected with the use of, and symbolized by, each such Trademark; and

(d)      all income, royalties, proceeds and Liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof.  Notwithstanding the foregoing, there shall be no security interest or Lien on any Trademark application that is filed on an "intent-to-use" basis (until such time as a statement of use is filed with respect to such application and duly accepted by the United States Patent and Trademark Office).]

Section 3.      Security Agreement.  The security interest granted pursuant to this Superpriority [Copyright] [Patent] [Trademark] Security Agreement is granted in conjunction with the security interest granted to the Collateral Agent pursuant to the Security Agreement and each Grantor hereby acknowledges and agrees that the rights and remedies of the Collateral Agent with respect to the security interest in the [Copyright] [Patent] [Trademark] Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  In the event that any provision of this Superpriority [Copyright] [Patent] [Trademark] Security Agreement conflicts with any provision of the Security Agreement, the Security Agreement shall govern.

Section 4.      Grantor Remains Liable.  Each Grantor hereby agrees that, anything herein to the contrary notwithstanding, such Grantor shall assume full and complete responsibility for the prosecution, defense, enforcement or any other necessary or desirable actions in connection with their [Copyrights] [Patents] [Trademarks] subject to a security interest hereunder.

Section 5.    <u>Counterparts</u>.  This Superpriority [Copyright] [Patent] [Trademark] Security Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.

Section 6.    <u>Governing Law</u>.    **THIS SUPERPRIORITY [COPYRIGHT] [PATENT] [TRADEMARK] SECURITY AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CONFLICTS OF LAW PROVISIONS (OTHER THAN <u>SECTION 5-1401</u> OF THE NEW YORK GENERAL OBLIGATIONS LAW).**  In addition, the provisions of <u>Section 8.6, 8.7, 8.8</u> and <u>8.12</u> of the Security Agreement are incorporated herein by reference, *mutatis mutandis*.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each Grantor has caused this Superpriority [Copyright] [Patent] [Trademark] Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

[GRANTOR], as Grantor

By: _____

Name: _____

Title: _____

SCHEDULE I

TO

SUPERPRIORITY [COPYRIGHT] [PATENT] [TRADEMARK] SECURITY AGREEMENT

1.      REGISTERED [COPYRIGHTS] [PATENTS] [TRADEMARKS]

[Include Registration Number and Date]

2.      [COPYRIGHT] [PATENT] [TRADEMARK] APPLICATIONS

[Include Application Number and Date]

3.      [COPYRIGHT] [PATENT] [TRADEMARK] LICENSES

[Include complete legal description of agreement (name of agreement, parties and date)]

**EXHIBIT 3 TO INTERIM ORDER**

**Milestones**

| Milestone | Specified Deadline |
|---|---|
| Deadline to file Sale Motion | 1 Business Day after Petition Date |
| Deadline for Bankruptcy Court to enter Interim Order | 3 Business Days after Petition Date |
| Deadline for Bankruptcy Court to enter Sale Procedures Order | 15 days after Petition Date |
| Deadline for Bankruptcy Court to enter Final Order | 25 days after Petition Date |
| Deadline to file a motion to extend the lease assumption/rejection period | 25 days after Petition Date |
| Deadline to conduct the Auction | 35 days after Petition Date |
| Deadline for Bankruptcy Court to enter the Sale Order | 40 days after Petition Date |

**EXHIBIT 4 TO INTERIM ORDER**

**Budget**

537813598

*Loot Crate*
*DIP Forecast - 8/11/2019*

| Week Ending | 8/18/2019 | 8/25/2019 | 9/1/2019 | 9/8/2019 | 9/15/2019 | 9/22/2019 | 9/29/2019 *Final Sale Order* | 10/6/2019 | 10/13/2019 | 10/20/2019 | 10/27/2019 *Sale Closing* | 11 -week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | |
| Subscription & Vault Receipts | $ 478,719 | $ 676,998 | $ 550,921 | $ 1,331,205 | $ 981,065 | $ 535,858 | $ 557,931 | $ 1,315,811 | $ 1,526,235 | $ 706,957 | $ 331,736 | $ 8,993,436 |
| **Methodology Disbursements** | | | | | | | | | | | | |
| Payroll & Employee Benefits | $ 340,040 | $ 13,889 | $ 283,705 | $ 8,889 | $ 288,705 | $ 8,889 | $ 288,705 | $ 8,889 | $ 288,705 | $ 8,889 | $ 113,889 | $ 1,653,194 |
| Insurance | - | - | - | 63,316 | - | - | - | 45,816 | - | - | - | 109,131 |
| IT | - | - | 150,000 | 292,658 | - | - | - | 133,658 | - | - | - | 576,316 |
| Sales Tax | 218,219 | - | - | - | 151,632 | - | - | - | - | 128,289 | - | 498,140 |
| Ordinary Course Professionals | - | - | - | 57,500 | - | - | - | 37,500 | - | - | - | 95,000 |
| **Total Methodology Disbursements** | $ 558,259 | $ 13,889 | $ 433,705 | $ 422,362 | $ 440,337 | $ 8,889 | $ 288,705 | $ 225,862 | $ 288,705 | $ 137,178 | $ 113,889 | $ 2,931,782 |
| **Non-Methodology Disbursements** | | | | | | | | | | | | |
| Facilities & Supplies | $ 1,000 | $ 1,000 | $ 1,000 | $ 95,800 | $ 1,000 | $ 1,000 | $ 1,000 | $ 94,100 | $ 1,000 | $ 1,000 | $ 1,000 | $ 198,900 |
| Marketing | 26,980 | 26,980 | 47,157 | 47,157 | 47,157 | 47,157 | 47,157 | 47,157 | 47,157 | 47,157 | 47,157 | 478,376 |
| Shipping & Fulfillment | 219,307 | 214,336 | 659,094 | 108,249 | 1,237,132 | 94,628 | 104,819 | 410,573 | 515,994 | 76,673 | - | 3,640,805 |
| Licensor | - | - | - | - | - | - | - | - | - | - | 789,970 | 789,970 |
| Product | 183,655 | 17,850 | 77,503 | 116,664 | 70,680 | 19,113 | 214,386 | 305,060 | 478,461 | 573,534 | 313,627 | 2,370,531 |
| Contractor | - | - | - | 24,000 | - | - | - | 24,000 | - | - | - | 48,000 |
| **Total Non-Methodology Disbursements** | $ 430,941 | $ 260,166 | $ 784,754 | $ 391,870 | $ 1,355,970 | $ 161,898 | $ 367,362 | $ 880,891 | $ 1,042,613 | $ 698,364 | $ 1,151,754 | $ 7,526,582 |
| **Operating Cash Flow** | $ (510,481) | $ 402,944 | $ (667,539) | $ 516,973 | $ (815,242) | $ 365,072 | $ (98,136) | $ 209,057 | $ 194,917 | $ (128,585) | $ (933,907) | $ (1,464,928) |
| **Cumulative Operating Cash Flow** | (510,481) | (107,537) | (775,076) | (258,103) | (1,073,346) | (708,274) | (806,410) | (597,353) | (402,436) | (531,021) | (1,464,928) | (1,464,928) |
| **Non-Operating Disbursements** | | | | | | | | | | | | |
| DIP Interest | $ - | $ - | $ - | $ 20,713 | $ - | $ - | $ - | $ 31,423 | $ - | $ - | $ 37,232 | $ 89,367 |
| Sales Tax Payment Plans | - | - | - | - | - | 510,767 | - | - | 92,850 | - | - | 603,617 |
| Deferred Revenue Release | 547,726 | 1,320,286 | 1,320,286 | - | - | - | - | - | - | - | - | 3,188,297 |
| **Total Non-Operating Disbursements** | $ 547,726 | $ 1,320,286 | $ 1,320,286 | $ 20,713 | $ 510,767 | $ - | $ - | $ 31,423 | $ 92,850 | $ - | $ 37,232 | $ 3,881,281 |
| **Restructuring Costs** | | | | | | | | | | | | |
| Debtor Counsel | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 160,000 | $ - | $ 790,000 | $ 950,000 |
| Debtor Advisors | - | - | - | - | - | - | - | - | 120,000 | - | 890,000 | 1,010,000 |
| Secured Lender Advisors | 166,667 | - | - | - | 166,667 | - | - | 166,667 | - | - | 166,667 | 666,667 |
| Board Member Fees | - | - | 53,333 | - | - | - | - | 53,333 | - | - | 53,333 | 160,000 |
| UCC | 22,727 | 22,727 | 22,727 | 22,727 | 22,727 | 22,727 | 22,727 | 22,727 | 22,727 | 22,727 | 22,727 | 250,000 |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | 125,000 | - | 125,000 |
| Critical Vendor Payments | - | - | 250,000 | 250,000 | 250,000 | 250,000 | - | - | - | - | - | 1,000,000 |
| **Total Restructuring Costs** | $ 189,394 | $ 22,727 | $ 326,061 | $ 272,727 | $ 439,394 | $ 272,727 | $ 22,727 | $ 242,727 | $ 302,727 | $ 147,727 | $ 1,922,727 | $ 4,161,667 |
| **Total Disbursements** | $ 1,726,320 | $ 1,617,067 | $ 2,864,806 | $ 1,107,673 | $ 2,746,468 | $ 443,514 | $ 678,795 | $ 1,380,903 | $ 1,726,896 | $ 983,270 | $ 3,225,601 | $ 18,501,312 |
| **Net Cash Flow** | $ (1,247,601) | $ (940,069) | $ (2,313,885) | $ 223,533 | $ (1,765,403) | $ 92,344 | $ (120,864) | $ (65,093) | $ (200,660) | $ (276,312) | $ (2,893,866) | |
| **Cumulative Net Cash Flow** | (1,247,601) | (2,187,670) | (4,501,555) | (4,278,022) | (6,043,425) | (5,951,081) | (6,071,945) | (6,137,037) | (6,337,697) | (6,614,010) | (9,507,875) | |
| Beginning Cash (Book) | $ - | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | |
| *Net Cash Flow* | *(1,247,601)* | *(940,069)* | *(2,313,885)* | *223,533* | *(1,765,403)* | *92,344* | *(120,864)* | *(65,093)* | *(200,660)* | *(276,312)* | *(2,893,866)* | |
| *DIP Draw (Repayment)* | *1,347,601* | *940,069* | *2,313,885* | *(223,533)* | *1,765,403* | *(92,344)* | *120,864* | *65,093* | *200,660* | *276,312* | *2,893,866* | |
| **Ending Cash (Book)** | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | |
| **Debt Rollforward** | | | | | | | | | | | | |
| Beginning DIP Balance | - | 1,347,601 | 2,287,670 | 4,601,555 | 4,378,022 | 6,143,425 | 6,051,081 | 6,171,945 | 6,237,037 | 6,437,697 | 6,714,010 | |
| DIP Draw (Repayment) | 1,347,601 | 940,069 | 2,313,885 | (223,533) | 1,765,403 | (92,344) | 120,864 | 65,093 | 200,660 | 276,312 | 2,893,866 | |
| **Ending DIP Balance** | $ 1,347,601 | $ 2,287,670 | $ 4,601,555 | $ 4,378,022 | $ 6,143,425 | $ 6,051,081 | $ 6,171,945 | $ 6,237,037 | $ 6,437,697 | $ 6,714,010 | $ 9,607,875 | |