## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
|  | ) | Case No. 19-11791 (BLS) |
| LOOT CRATE, INC., *et al.*,[1] | ) |  |
|  | ) | (Joint Administration Requested) |
| Debtors. | ) |  |
|  | ) |  |

**MOTION OF THE DEBTORS FOR ENTRY OF: (I) AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING RELATED CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, (C) AUTHORIZING THE DEBTORS TO ENTER INTO STALKING HORSE AGREEMENTS AND APPROVING CERTAIN BID PROTECTIONS, SUBJECT TO A FURTHER HEARING, (D) SCHEDULING A SALE HEARING, AND (E) GRANTING CERTAIN RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc. (collectively, the "***Debtors***" or the "***Company***") hereby file this Motion (the "***Motion***") for the entry of: (i) an order substantially in the form attached hereto as <u>Exhibit A</u> (the "***Bid Procedures Order***") (a) approving the bid procedures attached as <u>Exhibit 1</u> to the Bid Procedures Order (the "***Bid Procedures***") in connection with a sale or sales (collectively, one or more such sales, the "***Sale***") of all or substantially all of the Debtors' Assets (as defined below); (b) approving certain notice procedures; (c) approving procedures (the "***Contract Procedures***") for the assumption and assignment of the Executory Contracts (as defined below); (d) subject to a further hearing, authorizing the Debtors to enter into stalking horse agreement(s) and approving certain customary bid protections for any stalking horse bidder(s) in connection with a sale transaction;

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Loot Crate, Inc. (7119); Loot Crate Holdings, Inc.; LC Funding, Inc.; and Loot Crate Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Avenue, Los Angeles, CA 90031.

(e) scheduling a hearing to approve the Sale (the "***Sale Hearing***"); and (f) granting certain related relief; and (ii) an order (the "***Sale Order***") (a) approving the Sale free and clear of all claims, liens, liabilities, interests and encumbrances; (b) approving the assumption and assignment of certain designated Executory Contracts; and (c) granting certain related relief.  In support of this Motion, the Debtors respectfully represent as follows:

### Background

1.     On August 11, 2019 for Loot Crate Inc., Loot Crate Holdings, Inc., and LC Funding, Inc. and on August 12, 2019 for Loot Crate Parent, Inc. (for each Debtor, the "***Petition Date***"), the Debtors filed voluntary petitions with this Court under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***").  By a motion filed on the Petition Date, the Debtors have requested that their Chapter 11 cases (collectively, the "***Cases***") be consolidated for procedural purposes only and administered jointly.  The Debtors are authorized to continue to operate and manage their businesses and assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.     The Debtors operate a subscription box service that caters to fandom and enthusiasts through "crates" curated with "geek and gamer products" each month.  The Debtors partner with industry leaders in entertainment, gaming, sports, and pop culture to deliver monthly themed crates, produce interactive experiences and digital content, and film original video productions.  Products include exclusive shirts, gear, and gadgets, as well as limited edition collectibles.  Since 2012, more than 32 million crates have been shipped.  The Debtors are the worldwide leader in pop-culture subscription boxes, and currently have over 250,000 recurring subscribers.

3.     Further information about the Debtors and these Cases, a corporate chart showing the structure of the Debtors, and pertinent facts in support of this Motion can be found in the

*Declaration of Stuart Kaufman in Support of First Day Motions and Related Relief* (the "***First Day Declaration***")[2] [D.I. 4], which is incorporated by reference.

4.      No Committee, trustee, or examiner has been appointed in these Cases.

### Jurisdiction, Venue, and Statutory Predicates

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M).

6.      Venue of these Cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicates for the relief requested in this Motion are Sections 105(a), 363, 365, and 503 of the Bankruptcy Code, Rules 2002, 6003, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

### Relief Requested

8.      First, the Debtors seek entry of the Bid Procedures Order, substantially in the form attached hereto as Exhibit A: (i) approving the Bid Procedures, attached as Exhibit 1 to the Bid Procedures Order, in connection with the Sale; (ii) approving certain notice procedures with respect to the Sale; (iii) establishing the Contract Procedures; (iv) subject to a further hearing, authorizing the Debtors to enter into stalking horse agreement(s) and approving certain

---

2       Capitalized terms not otherwise defined herein have the meanings ascribed to them in the First Day Declaration.

customary bid protections for any stalking horse bidder(s) in connection with a sale transaction; and (v) scheduling the Sale Hearing (collectively, the "***Bid Procedures Relief***").

9.     By this Motion, the Debtors also seek approval of the successful bid(s) after completion of the bidding and auction process.  The Motion seeks the customary relief for sales of the Debtors' assets free and clear of liens, claims, and encumbrances (the "***Sale Relief***").

10.     By this Motion, the Debtors also seek: (i) a determination that service of this Motion as set forth herein constitutes due and adequate notice under the Local Rules and Bankruptcy Rules; and (ii) waivers waiver of the stay provisions of Bankruptcy Rules 6004(h) and 6006(d), if applicable.

<u>**Facts Relevant to This Motion**</u>

**A.     The Debtors' Efforts to Market Their Assets.**

11.     As set forth in the First Day Declaration, in February of 2019, the Debtors, with support from their prior lender (Midtown Madison Management, LLC ("***Midtown***"), an affiliate of Atalaya Capital Management), engaged FocalPoint Securities, LLC ("***FocalPoint***") as their investment banker to provide various services, including consideration of all alternatives that might be available to help the Debtors continue their mission.

12.     FocalPoint undertook a detailed study of the Debtors' operations to identify the appropriate process to effect a transaction; this included identifying the various potential parties to a transaction.  Concurrently, FocalPoint prepared offering materials that provided an overview of the Company and its activities, its key strengths, and the investment highlights that potential parties should consider when evaluating a transaction.

13.     FocalPoint developed a broad list of over 100 potential buyers and investors, which FocalPoint and management believed might have an interest and the financial wherewithal to consummate a transaction with the Debtors.

14.     Of the over 100 parties contacted, thirty-one executed a confidentiality agreement and began to undertake due diligence.  The Debtors and their professionals established an on-line "data room" with thousands of documents about the Debtors' current and past financial and operational performance, legal status and associated issues, and related information.  There were substantial discussions with these parties, leading to the Debtors' receipt of two initial indications of interest in June / July 2019.  However, these indications of interest failed to provide a feasible path forward for the Debtors.

15.     Unfortunately, the complexity of the transaction, the uncertainty surrounding eCommerce subscription companies, the amount of the Debtors' funded, trade, and tax debt, and the recent challenges of the Debtors' operations due to liquidity shortfalls, made it difficult to entice investors.

16.     On the eve of potential closure, the Debtors were spending substantial time with another potential buyer, Loot Crate Acquisition LLC ("*LCA*"), an affiliate of Money Chest, LLC, a current noteholder of the Debtors.  LCA and Money Chest are also affiliated with an investment group that includes one of the largest and best-run collectible manufacturers and distributors in the world.

17.     Over the last two weeks before filing these Cases, LCA and its professionals engaged in round-the-clock diligence, culminating in a deal that began to be documented on Friday, August 9, 2019.  On that date, Money Chest purchased the secured debt owed by the Debtors, known as the "*Midtown Loan*."  As part of that transaction, Midtown advanced several hundred thousand dollars to the Debtors which had been in suspense in the Debtors' controlled bank account, used for critical payments, including final payments to approximately fifty employees that were terminated on August 9 between California and Pennsylvania.  This

reduction in force was necessary for the Debtors' survival, as it cannot sustain a full-bodied workforce in light of challenging sales and collections – even with the DIP financing Money Chest is providing.

18.    As the Debtors' are finalizing an asset purchase agreement with LCA, the Debtors will also file an application to retain FocalPoint to seek other bids or investors.

19.    The Debtors file this Motion requesting that the Court approve bid procedures for the sale of the Debtors' assets.  The Bid Procedures are designed to generate the greatest level of interest and the highest or otherwise best offer for the Debtors' assets, including, without limitation, the Debtors' inventory, accounts receivable, deposits, fixtures, furniture and equipment, customer lists, intellectual property, interests in unexpired contracts and leases (the "*Executory Contracts*") and any other available assets (collectively, the "*Assets*").

**B.    The Proposed Bid Procedures.**

20.    The Debtors seek approval of the Bid Procedures, which they have designed to be flexible and open to all variations of bids and facilitate a robust sale process thereby generating the greatest value for the Assets.

21.    As set forth in the First Day Declaration, these are precarious Cases – even more so than most Chapter 11 debtors.  The Debtors' business is entirely consumer and subscription based – without subscriptions, the business grows more precarious.  The Debtors already have suffered months of liquidity challenges, straining operations, vendor support, licensor support, and customer support to the limit.  The Debtors are confident that the asset purchase agreement will provide a way for creditors to recover as much as possible through ongoing operations.  More traditional sale alternatives – a plan, or a liquidation – are not feasible, or would not result in much recovery (as the Debtors have limited hard assets).

22.     Moreover, the marketing process by FoculPoint has already been robust.  It will re-double its efforts, but this is not a case in which a banker was hired just a few weeks before and the process was pre-ordained.

23.     In light of these exigencies, the Debtors propose the following timeline for the solicitation of bids, the Auction (as defined below) and the Sale Hearing.

| **Action** | **Deadline** |
|---|---|
| **Bid Procedures Objection Deadline** | August 19, 2019 at 4:00 p.m. (ET) |
| **Bid Procedures Hearing** | August 26, 2019 or as soon thereafter as the Court is available |
| **Sale Notice/Cure Notice Service** | August 27, 2019 |
| **Sale/Cure Objection Deadline** | September 9, 2019 at 4:00 p.m. (ET) |
| **Bid Deadline** | September 10, 2019 at 5:00 p.m. (ET) |
| **Auction** | September 12, 2019 at 10:00 a.m. (ET) |
| **Adequate Assurance Objection Deadline** | September 13, 2019 |
| **Sale Hearing**[3] | September 16, 2019 or as soon thereafter as the Court is available |

24.     The Bid Procedures describe, among other things, the requirements and manner in which bidders and bids become "qualified," the coordination of diligence efforts, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of any ultimately successful bidders.[4]

      a)    <u>Bidder Requirements</u>:  A party must submit the following documents to the Debtors in order to be a "***Qualified Bidder***" and be allowed to participate in the bidding process and receive access to conduct due diligence:

---

[3]     The Debtors reserve all rights to request that the Court postpone or adjourn the Sale Hearing to later date for any reason.

[4]     The summary of the Bid Procedures contained herein is qualified in its entirety by the provisions of the proposed form Bid Procedures Order and its exhibit.  To the extent that there is any inconsistency between the terms of the proposed Bid Procedures Order and this summary, the terms of the proposed Bid Procedures Order shall control.

(1)      An executed confidentiality agreement substantially in form and substance satisfactory to the Debtors; and

(2)      Reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Assets identified in such party's bid.

*See* Bid Procedures, ¶ A.

b)      <u>Bid Requirements</u>: In order to be eligible to participate in the Auction, a Qualified Bidder must, on or before the Bid Deadline, deliver to the Debtors a written and executed copy of an asset purchase agreement and ancillary documents by which the potential bidder offers to purchase some or all of the Assets at a purchase price and upon the terms and conditions set forth therein and which provides, or otherwise complies with, the items noted below (any such offer, a "***Qualified Bid***"):

(1)      Identifies the Assets (or the portion thereof) to be purchased, including any Executory Contracts that would be assumed and assigned in connection with the proposed transaction;

(2)      Identifies, if applicable, the proposed form of adequate assurance of future performance with respect to any Executory Contracts that would be assumed and assigned in connection with the proposed transaction;

(3)      Constitutes a binding proposal regarding the assets sought to be acquired and the consideration to be paid; and

(4)      Remains irrevocable until 48 hours after the Sale Hearing;

(5)      Other than as agreed by the Debtors in connection with seeking approval of protections for a Stalking Horse Bidder (defined below), is not subject to any breakup fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement; and

(6)      Is accompanied by a good faith deposit in the amount of 10% of the proposed purchase price (a "***Good Faith Deposit***").[5]

*See* Bid Procedures, ¶ B.  The DIP Lender (as defined below) shall be deemed a Qualified Bidder and shall not be required to provide a Good Faith Deposit.  *See* Bid Procedures, ¶ C.

c)      <u>Credit Bidding</u>:  Qualified Bidders may credit bid some or all of their claims to the full extent permitted by Section 363(k) of the Bankruptcy Code.  *See* Bid Procedures, ¶ I.  The DIP Lender may participate in the Auction and to the extent set forth in the Final DIP Order, may credit bid

---

[5]      The Debtors may waive the deposit requirement for bidders that submit credit bids.

at any time up to the conclusion of the Auction, in its sole and absolute discretion, any portion and up to the entire amount of its prepetition or postpetition claims (a "***Credit Bid***").  The DIP Lender will not be a Backup Bidder unless it consents in writing otherwise.  *See* Bid Procedures, ¶ C.

d)   <u>Due Diligence</u>: The Bid Procedures permit all Qualified Bidders to participate in the diligence process.  *See* Bid Procedures, ¶ D.

e)   <u>Conduct of Auction</u>: If more than one Qualified Bid is received with respect to the Sale, the Debtors will conduct an auction on September 12, 2019 at 10:00 a.m. (ET) at the offices of Bryan Cave Leighton Paisner, LLP, 1290 Avenue of the Americas New York, NY 10104-3300 (the "***Auction***").  Bidding shall begin initially with the highest Qualified Bid and subsequently continue in minimum increments that will be announced by the Debtors after consultation with: (i) Money Chest, LLC (the "***DIP Lender***"), **solely** to the extent that the DIP Lender or LCA (or any affiliate thereof) are **not** presently bidding for the Assets; and (ii) any official committee of unsecured creditors appointed in the Cases (the "***Committee***" and collectively with the DIP Lender, the "***Consultation Parties***").  The Debtors may conduct the Auction in the manner they determine will result in the highest, best or otherwise financially superior offer(s) for the Assets.  The Auction shall be conducted openly and all creditors will be permitted to attend.  *See* Bid Procedures, ¶ E.

f)   <u>Evaluation of Qualified Bids</u>: A Qualified Bid may be for all or some portion of the Assets.  The Debtors reserve the right to determine the value of any Qualified Bid (either by itself or in connection with one or more other Qualified Bid), and which Qualified Bid constitutes the highest, best or otherwise financially superior offer.  *See* Bid Procedures, ¶¶ B, F.

g)   <u>Selection of Successful Bid(s)</u>: Upon the conclusion of the Auction, the Debtors and their advisors, in consultation with the Consultation Parties, shall: (i) identify the bid or bids that constitute the highest and best offer for the Assets (such bid, the "***Successful Bid***" and such person submitting such bid the "***Successful Bidder***"); and (ii) may identify, in their discretion, the bid or bids that constitutes the next highest or best offer for the Assets (such bid the "***Backup Bid***" and such person submitting such bid the "***Backup Bidder***"), and, in each case, so notify the Successful Bidder and Backup Bidder.  *See* Bid Procedures, ¶ F.

h)   <u>Sale Hearing</u>: The Debtors request, subject to the Court's availability, that the Sale Hearing take place on September 16, 2019.  However, the Debtors reserve all rights to request that the Court postpone such Sale Hearing for any reason.  *See* Bid Procedures, ¶ G.

i)    <u>Provisions Related to Stalking Horse Bidder(s)</u>: The Debtors (after consultation with the Consultation Parties) may enter into one or more stalking horse purchase agreement (each, a "***Stalking Horse Agreement***") with Qualified Bidders (each, a "***Stalking Horse Bidder***"). The Debtors shall not enter into Stalking Horse Agreements with more than one potential purchaser for a distinct set of Assets. Each Stalking Horse Agreement shall be subject to higher or better offers at the Auction and shall establish a minimum bid at the Auction for the Assets included in the Stalking Horse Agreement. The Stalking Horse Agreement may contain customary terms and conditions providing the Stalking Horse Bidder with reasonable bid protections (the "***Bid Protections***"). If the Debtors enter into any such Stalking Horse Agreement(s): (i) the agreement(s) shall be placed on the Court's docket and notice thereof shall be given to all parties who received notice of this Motion, all parties on the Debtors' 2002 notice list, and all potential bidders; and (ii) the Court shall conduct a hearing on a date that is one or more business days thereafter, subject to the Court's availability, to approve the Debtors' entry into any Stalking Horse Agreements and consider approval of the proposed Bid Protections. The Bid Protections hearing may be adjourned or rescheduled without notice other than as stated on the record in court or in an appropriate agenda letter. *See* Bid Procedures, ¶ J.

25.    Other Highlighted Terms Under Local Rule 6004-1(b)(iv):

j)    <u>Local Rule 6004-1(b)(iv)(A)</u>. To the extent a proposed purchaser is an insider (within the meaning of Section 101(31) of the Bankruptcy Code), the Debtors will make the necessary disclosures to the Court and take measures to ensure the fairness of the sale process and the proposed transaction.

k)    <u>Local Rule 6004-1(b)(iv)(B)</u>. The Debtors do not have any agreement between any interested bidder and the Debtors' management or key employees.

l)    <u>Local Rule 6004-1(b)(iv)(C)</u>. The Bid Procedures Relief does not include the granting of any release in favor of any entity.

m)    <u>Local Rule 6004-1(b)(iv)(F)</u>. The Debtors are requiring Qualified Bids to include a 10% good faith deposit, unless waived by the Debtors for credit bidding parties.

n)    <u>Local Rule 6004-1(b)(iv)(G)</u>. The Debtors do not currently have any interim management or other agreement with any party.

o)    <u>Local Rule 6004-1(b)(iv)(H)</u>. The Debtors are not seeking to release any sale proceeds without further order of the Court.

p)      Local Rule 6004-1(b)(iv)(I).  The Debtors are not seeking pursuant to this Motion to have the Sale declared exempt from taxes under Section 1146(a) of the Bankruptcy Code.

q)      Local Rule 6004-1(b)(iv)(J).  The Debtors will retain necessary books and records, copies thereof, or access thereto, to enable them to administer their bankruptcy cases in any Sale.

r)      Local Rule 6004-1(b)(iv)(K).  The Debtors will seek to sell avoidance actions.

s)      Local Rule 6004-1(b)(iv)(L).  The Debtors are seeking to sell the Assets free and clear of successor liability claims.

t)      Local Rule 6004-1(b)(iv)(M).  The Debtors are seeking to sell the Assets free and clear of all liens, claims and encumbrances to the fullest extent permitted by Sections 363 and 365 of the Bankruptcy Code.

u)      Local Rule 6004-1(b)(iv)(N).  Pursuant to the proposed Bid Procedures, Qualified Bidders may credit bid some or all of their claims to the full extent permitted by Section 363(k) of the Bankruptcy Code

v)      Local Rule 6004-1(b)(iv)(O).  The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for any sale.

26.      The Debtors may modify the Bid Deadline, the date of the Auction or the date of the Sale Hearing to the extent necessary to obtain the highest or best offer for the available Assets.

**C.**      **Proposed Sale Notice Procedures.**

27.      <u>Sale Notice</u>.  Within one day after the entry of the Bid Procedures Order, or as soon thereafter as practicable (the "***Mailing Date***"), the Debtors (or their agents) shall serve a notice of the Auction and the Sale substantially in the form annexed hereto as <u>Exhibit B</u> (the "***Sale Notice***") by e-mail (if known) and first-class mail, postage prepaid, upon: (a) the Office of the United States Trustee for the District of Delaware (the "***U.S. Trustee***"); (b) the Securities & Exchange Commission; (c) the Internal Revenue Service; (d) the Delaware State Treasury; (e) the Delaware Secretary of State; (f) the Debtors' thirty largest unsecured creditors on a

consolidated basis, as identified in their Chapter 11 petitions or counsel to any unsecured creditors' committee, if appointed by such time; (g) counsel to the DIP Lender, Cooley LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Cathy Hershcopf and Robert Winning), chershcopf@cooley.com and rwinning@cooley.com and Bayard, P.A., 600 N. King Street, Wilmington, Delaware 19806 (Attn: Erin R. Fay, Esq.), efay@bayardlaw.com; (h) Wells Fargo Bank, National Association; (i) U.S. Attorney's Office for the District of Delaware; (j) any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the Debtors' Assets; (k) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Debtors' Assets; and (l) any parties that have requested notice in these Cases pursuant to Bankruptcy Rule 2002.  Such notice shall be sufficient and proper notice of the sale with respect to known interested parties.

28.  <u>Publication Notice</u>.  The Debtors also propose that, pursuant to Bankruptcy Rules 2002 and 6004, publication of the Sale Notice (as may be modified for publication purposes) as the Debtors deem appropriate on the Mailing Date or as soon as practicable thereafter, be deemed sufficient notice to any other interested parties whose identities are unknown to the Debtors.

29.  The Debtors have requested that the deadline for filing an objection to the Sale shall be **September 9, 2019 at 4:00 p.m. (ET)** (the "***Sale Objection Deadline***").  Objections, if any, shall be in writing, filed with the Court and served upon: (i) co-counsel to the Debtors: (a) Bryan Cave Leighton Paisner LLP, 1201 W. Peachtree Street, NW, 14th Floor, Atlanta, Georgia 30309-3471 (Attn: Mark I. Duedall), mark.duedall@bclplaw.com; and (b) Robinson & Cole LLP, 1000 N. West Street, Suite 1200, Wilmington, Delaware 19801 (Attn: Jamie L. Edmonson) jedmonson@rc.com; (ii) the U.S. Trustee; (iii) counsel to the DIP Lender, Cooley

LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Cathy Hershcopf and Robert Winning), chershcopf@cooley.com and rwinning@cooley.com and Bayard, P.A., 600 N. King Street, Wilmington, Delaware 19806 (Attn: Erin R. Fay, Esq.), efay@bayardlaw.com; and (iv) counsel to any Committee, so that it is actually received on or before the Sale Objection Deadline (collectively, the "***Objection Notice Parties***").

30.    Bidding Results.  As soon as practicable after the Bid Deadline, but no later than one day after such deadline, the Debtors shall alert parties submitting bids as to whether more than one Qualified Bid has been received and whether the Debtors will proceed with the Auction.

31.    Auction Results.  As soon as practicable after the Auction, but no later than one day after conclusion of the Auction, the Debtors shall provide electronic notice of the results thereof on the case docket.

**D.     Proposed Notice of Assumption and Assignment of Contracts.**

32.    As part of the Sale, the Debtors seek authority to potentially assume and assign certain of the Executory Contracts to the Successful Bidder(s).

33.    With respect to the Executory Contracts, no later than August 27, 2019, the Debtors will file with the Court and serve on each counterparty to an Executory Contract (the "***Counterparty***") a notice substantially in the form attached hereto as Exhibit C (the "***Cure Notice***"): (i) setting forth the amount of cure owed thereunder according to the Debtors' books and records (the "***Cure Amount***"); (ii) notifying each Counterparty that such Counterparty's Executory Contract may be assumed and assigned to the Successful Bidder to be identified at the conclusion of the Auction; (iii) stating the date of the Sale Hearing; and (iv) stating the deadline by which the Counterparty party shall file an objection to the Cure Amount.

34.    The Debtors have requested that the deadline for filing an objection (a "***Cure Objection***") to the Cure Amounts shall be **September 9, 2019 at 4:00 p.m. (ET)** (the "***Cure***

*Objection Deadline*”).  Objections, if any, shall be in writing, filed with the Court and served upon the Objection Notice Parties so that they are actually received on or before the Cure Objection Deadline.  Any objection to a Cure Amount must state with specificity what cure the Counterparty believes is required with appropriate documentation in support thereof.  If no objection is timely received, the Cure Amount set forth on the Cure Notice shall be controlling notwithstanding anything to the contrary in any Executory Contract or other document as of the date hereof or the date of the Cure Notice, as applicable.  Any objections not resolved by the Sale Hearing may be adjourned to a later hearing date as fixed by the Court.

35.    Any Counterparty who does not file a Cure Objection by the Cure Objection Deadline shall be forever barred from objecting to the Cure Amount or asserting or claiming any Cure Amount (other than the Cure Amount listed on the Cure Notice) against the Debtors or any Successful Bidder.

36.    A Counterparty may seek additional adequate assurance information by emailing its request (and explicitly agreeing in writing that it will keep any information it receives confidential) to counsel for the Debtors, Mark I. Duedall (mark.duedall@bclplaw.com) and Jamie L. Edmonson (jedmonson@rc.com) at least one day prior to the Auction.  Counsel for the Debtors will email adequate assurance packages to those parties as soon as practicable but no later than one day after the Auction.

37.    The Debtors have requested that the deadline for filing an objection (an “*Adequate Assurance Objection*”) to the assumption and assignment of an Executory Contract on the basis of a lack of adequate assurance of future performance shall be **September 13, 2019** (the “*Adequate Assurance Objection Deadline*”).  Objections, if any, shall be in writing, filed with the Court and served upon the Objection Notice Parties, so that they are actually received

on or before the Adequate Assurance Objection Deadline.  Any objections not resolved by the Sale Hearing may be adjourned to a later hearing date as fixed by the Court.

38.    Any Counterparty who does not file a timely Cure Objection or Adequate Assurance Objection shall be deemed to have consented to the assumption and assignment of its Executory Contract to the Successful Bidder and will be forever barred from objecting to such assumption and assignment on account of the Cure Amount, lack of adequate assurance or any other grounds.

39.    The hearing with respect to any Cure Objections and/or Adequate Assurance Objections may be held: (i) at the Sale Hearing; or (ii) on such other date as the Bankruptcy Court may designate.  To the extent the Debtors and a Counterparty are able to consensually resolve a Cure Objection or Adequate Assurance Objection prior to the Sale Hearing, the Debtors shall promptly provide notice to the Committee, the U.S. Trustee and the Successful Bidder, as applicable, of such resolution.

**E.    Identification of a Stalking Horse Bidder.**

40.    To further facilitate the monetization of the Debtors' Assets, the Debtors seek authority to select one or more stalking horse bidders (each a "***Stalking Horse Bidder***"), in consultation with the Consultation Parties, and to provide any Stalking Horse Bidder with certain customary bid protections including a breakup fee and expense reimbursement.  The Debtors propose to file a notice of entry into any such agreements and to supplement this Motion with the applicable disclosures required by Local Rule 6004-1.  The Court would then hold a hearing to approve the Debtors' entry into any Stalking Horse Agreement and any Bid Protections.

**Basis for Relief**

A.    **The Bid Procedures are Appropriate and in the Best Interests of the Debtors, their Estates, and their Creditors.**

41.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction.  The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Mushroom Transp.  Co*., 382 F.3d 325, 339 (3d Cir. 2004) (noting that the debtor in possession "had a fiduciary duty to protect and maximize the estate's assets").

42.    Courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F. 3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v. Integrated Res.  Inc. (In re Integrated Res.  Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (noting that the bid procedures "encourage bidding and . . . maximize the value of the debtor's assets").

43.    The Debtors believe that the Bid Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for the Assets because such procedures will ensure a competitive and fair bidding process.  The Debtors also believe that the Bid Procedures will promote active bidding from seriously interested parties and will generate the highest or otherwise best offer for the Assets.  The Bid Procedures will allow the Debtors to conduct the Auction (if more than one Qualified Bid is received), in a controlled and fair manner that will encourage participation by financially capable bidders that demonstrate the ability to close the Sale.

44.    The Debtors believe that the Bid Procedures are consistent with the bankruptcy bidding and auction procedures approved routinely in this District and are most likely to

maximize the realizable value of their assets for the benefit of the Debtors' estates, creditors, and other parties in interest.  Indeed, this Court and other bankruptcy courts in this District have routinely approved similar bid procedures.  *See, e.g., In re iGPS Co.  LLC*, No. 13-11459 (KG) (Bankr. D. Del. July 31, 2013) [D.I. 234]; *In re Centaur, LLC*, No. 10-10799 (KJC) (Bankr. D. Del. July 28, 2010) [D.I. 489]; *In re RNI Winddown Corp*., No. 06-10110 (CSS) (Bankr. D. Del. Feb. 24, 2006) [D.I. 80].[6] Accordingly, the Debtors respectfully request that the Court approve the Bid Procedures.

45.     The Debtors, with the assistance of their advisors, have been looking for strategic buyers, financial buyers, and capital providers for over six months.  Throughout that process, the Debtors have exhaustively marketed themselves and their assets for sale, and multiple interested parties have conducted significant due diligence.  Nonetheless, the Bid Procedures will allow any prospective bidders and other interested parties time before the Bid Deadline to conduct any due diligence required.  If other interested parties are discovered, the Debtors will provide every possible opportunity to such parties to conduct the due diligence such parties need to submit the best possible Qualified Bid.  The Debtors submit that a lengthier process is not likely to benefit any bidder, all of whom have had extensive time to engage in due diligence and will have yet more time to do so during this process.  Moreover, given current liquidity, a process on an expedited basis will best maximize value of the Debtors' Assets.

---

[6]     The referenced orders are voluminous in nature and are not attached to this Motion; however, in accordance with Local Rule 7007-2, as made applicable to main cases by the Court's General Chambers Procedures, undersigned counsel has copies of each order and will make them available to the Court or to any party that requests them.

**B.      The Proposed Stalking Horse Protections will also Maximize the Value of the Debtors' Assets.**

46.      The Debtors have determined, in their reasonable business judgment, that proceeding with the sale process as requested herein without first entering into a "stalking horse" agreement is warranted and necessary.  The Debtors intend to pursue discussions with potential Stalking Horse Bidders and seek the right to enter into one or more Stalking Horse Agreements and provide certain Bid Protections if the Debtors believe that such an agreement will further the purposes of the Auction, by among other things, enticing value-maximizing bids.

47.      Accordingly, the Debtors request authority, in the exercise of their sound business judgment, and in consultation with the Consultation Parties, to agree to Stalking Horse Agreements and Bid Protections, including, *inter alia*, a break-up fee in an amount not to exceed 3% of the total guaranteed cash or cash-equivalent price plus reimbursement of reasonable and documented expenses, subject to an appropriate monetary cap.  Any agreement to provide Bid Protections would be expressly conditioned on the Court's approval of such protections.  The Bid Protections would be an administrative expense claim against the Debtors' estates under section 503(b) of the Bankruptcy Code; *provided, however*, in the event that the Debtors agree to Bid Protections, and a sale of the property does not close for any reason on or before an agreed duration of time after entry of the Sale Order, then the Bid Protections would not be paid by the Debtors, their estates, or any other person or party, and no administrative obligation will be created, and any agreement by the Debtors to pay Bid Protections will provide and acknowledge the same.

48.      While such procedures are, admittedly, not always found in "naked" auctions, the Debtors believe that, in this case, such relief is warranted to ensure the Debtors' ability to take advantage of a potentially value-maximizing bid.  The ability of the Debtors to offer a Stalking

Horse Bidder the Bid Protections is beneficial to the Debtors' estates and creditors because it allows the Debtors to provide the incentive required to induce a potential bidder to submit or increase its bid prior to the Auction.  To the extent bids can be improved prior to the Auction, a higher floor is established for further bidding.  Thus, even if a Stalking Horse Bidder is offered the Bid Protections and ultimately is not the Successful Bidder, the Debtors and their estates will have benefited from the higher floor established by the improved bids.  The Debtors will exercise prudent business judgment before offering or agreeing to any of the Bid Protections and will only do so if such protections, in the reasonable business judgment of the Debtors and in consultation with the Consultation Parties, will likely result in the realization of greater value for the Debtors and their estates.

49.     Substantial justification exists for authorizing the Debtors to choose a Stalking Horse Bidder after approval of the Bidding Procedures but before an Auction in situations where: (a) the stalking horse bidder is not readily apparent or the stalking horse agreement was not readily available at the time the bidding procedures motion was filed; (b) any such later determination to enter into a stalking horse agreement will only be made with the consent of other constituents, such as the creditors' committee; and (c) further court approval is sought. *See In re AFA Investment Inc.*, Case No. 12-11127 (MFW) (Bankr. D. Del. May 9, 2012) (authorizing Debtors to provide bid protections in the form of: (i) a topping fee; (ii) a requirement that other bidders be obligated to agree to a form of asset purchase agreement no less favorable to debtors than the stalking horse agreement; and (iii) minimum initial and overbid increments; provided, that the topping fee is expressly conditioned on consummation of the sale to another party and subject to court approval on two business days' notice); *see also In re Archway Cookies LLC*, Case No. 08-12323 (CSS) (Bankr. D. Del. May 9, 2012) (approving

stalking horse bidder, where motion stated the Debtors' intent to entertain stalking horse offers and indicated that, if one was accepted, the Debtors would apply to the bankruptcy court for approval and prior to hearing, a stalking horse was identified).

50.      In this case, the Debtors have not yet been presented with acceptable stalking horse bids but remain optimistic that such a bid will emerge for certain of the Assets.  Under these circumstances, authorization of the Debtors to offer Bid Protections, subject to further Court approval, will be beneficial to the Debtors' efforts to maximize value for all constituents.

51.      Any Stalking Horse Bidder will have expended considerable time, money and energy pursuing and negotiating the transaction.  Accordingly, the Debtors may not be able to find a Stalking Horse Bidder without having the flexibility to offer the Bid Protections.  Further, such protections are warranted in light of the benefit to the Debtors' estates and creditors for providing a market-based indication of value to open the Auction and form the increased certainty of a transaction.  *See generally In re 95 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("breakup fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking."); *In re Integrated Res., Inc.*, 147 B.R. 650, 660-61 (S.D.N.Y. 1992) (noting that break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

52.      The Debtors submit that any Bid Protections will be consistent with the applicable standards and should be approved as fair and reasonable.  *See, e.g., In re O'Brien Env't Energy.*

*Inc.*, 181 F.3d 527 (3d Cir. 1999) (requiring bidding incentives such as break-up fees to provide benefit to the estate); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("the allowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate").

53.     First, the Debtors and their professionals will negotiate with any and all potential bidders to submit a Qualified Bid and serve as the Stalking Horse Bidder, which dispenses with any implication of self-dealing or a lack of arm's-length negotiations under the circumstances. Second, the Debtors believe, based on reasoned business judgment, and in consultation with the Consultation Parties, that the ability to designate a Stalking Horse Bidder is warranted and is likely to increase the value to the estates from the proposed sale process by signaling the existence of a contractually-committed bidder at a floor price believed to be fair and reasonable while providing the opportunity of potentially receiving a higher or otherwise better offer which, absent such a bid floor, might not otherwise be realized.  Additionally, any proposed Bid Protections will be within the range of such fees and expenses approved by this and other courts. Finally, if the Bid Protections were to be paid, it will be because the Debtors have received a higher or otherwise better offer.

### C.     The Sale Notice Procedures are Reasonable and Appropriate.

54.     Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the Sale, including a disclosure of the time and place of any Auction, the terms and conditions of the Sale and the deadline for filing any objections thereto.

55.     The Debtors submit that the notice procedures described above comply with Bankruptcy Rule 2002 and the Local Rules and are reasonably calculated to provide timely and adequate notice of the Bid Procedures, the Auction, and the Sale Hearing to the Debtors'

creditors and other interested parties that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Debtors' Assets.

56.     Accordingly, the Debtors request that the Court approve the notice procedures set forth herein, including the form and manner of service of the Sale Notice and that no other or further notice of the Bid Procedures, the Auction, and the Sale Hearing is necessary or required.

**D.     The Sale Relief Should be Approved.**

57.     By this Motion, the Debtors also request that the Court approve the Sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.  The Debtors request this portion of the relief to be entered after the Sale Hearing.  The Debtors submit that the sale of substantially all of their assets to a Successful Bidder(s) is in the best interests of the Debtors, their estates and stakeholders and should be approved.

**1.     Sale Pursuant to Section 363(b)(1).**

58.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

59.     A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan or reorganization if it demonstrates a sound business purpose for doing so.  *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (fining that the sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a sound business reason justifies such a sale); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063,

1070 (2d Cir. 1983); *In re Mid-Am. Waste Sys.*, Case No. 97-104 (PJW) (Bankr. D. Del. Mar. 7, 1997).

60.     Courts have applied the following four factors in determining whether a sound business justification exists: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided.  *See Delaware & Hudson Ry.*, 124 B.R. at 175 (adopting *Lionel* factors in determining whether sound business purpose exists for sale outside ordinary course of business in this District); *Lionel*, 722 F.2d at 1071 (setting forth the "sound business" purpose test); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the articulated business justification test of *Lionel* standard and adding the "good faith" requirement).

61.     As explained above, the Debtors have determined that their best opportunity to maximize creditor recoveries is to sell the Assets as described herein.  Accordingly, it is a valid exercise of the Debtors' business judgment to seek approval the transaction for the Sale of the Debtors' Assets.

## 2.      Sale Free and Clear Pursuant to Section 363(f).

62.     Bankruptcy Code Section 363(f) provides:

> The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if -

> (1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

> (2)     such entity consents;

> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363 (f).

63.     The Debtors maintain that one of the five subsections of Section 363(f) will be satisfied in connection with the Sale, and therefore, the Debtors may sell their assets free and clear of all liens, claims, and encumbrances.  Specifically, the Debtors will consult with the DIP Lender and seek to obtain its consent prior to seeking approval of the particular Sale Relief. Moreover, the Debtors submit that any such lien, claim, or encumbrance will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, the Debtors request that the assets be transferred to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances attaching to the proceeds of the sale of the Assets.

**3.     Authorization of Assumption and Assignment of Executory Contracts and Unexpired Leases.**

64.     To enhance the value of the Debtors' Assets, the Debtors request approval under Section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of the Executory Contracts, as applicable, to the Successful Bidder(s).  The Debtors further request that the Sale Order provide that such Executory Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such Executory Contracts, including those described in Sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code that prohibit such assignment.

65.     Section 365 (f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if —

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

66.    Under Section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing, in pertinent part that:

> (b)(1)    If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default ...;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

67.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.),* 139 B. R. 585, 593 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla.  1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").

68.     Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc*., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

69.     The Debtors intend to present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder(s) to perform under any Executory Contracts the Debtors intend to assume and assign to such Successful Bidder(s).  The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder(s) to provide adequate assurance of future performance under such contracts, as required under Section 365(b)(1)(C) of the Bankruptcy Code.  Further, as set forth above, the Debtors will give notice to all parties to the Executory Contracts of their intention to assume the Executory Contracts and what the Debtors believe are the Cure Amounts. Accordingly, the Court should authorize the Debtors to assume and assign any or all Executory Contracts, as applicable, to the Successful Bidder(s).

## 4.     The Successful Bidder(s) (and Any Designee), Should be Afforded All Protections Under Section 363(m) of the Bankruptcy Code.

70.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from the debtor notwithstanding that authorization of the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, Section 363(m) provides, in relevant part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b)]  . . . does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

71.     Section 363(m) "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)).  *See also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) (same).

72.     As discussed above, the selection of the Successful Bidder(s) will be a product of arm's length and good faith negotiations.  Based on the foregoing, the Debtors request that the Court determine that the Successful Bidder(s) is a good faith purchaser entitled to protections of section 363(m) of the Bankruptcy Code.

**Reservation of Rights**

73.     The Debtors expressly reserve the right to amend, modify, and/or supplement the relief requested in this Motion in all respects prior to or at the applicable hearing (and the Bid Procedures prior to or during the Auction) and reserve the right to withdraw this Motion, in whole or in part, prior to or at the applicable hearing.

**Request for Waiver of Local Rule 6004-1(b)**

74.     Local Rule 6004-1(b) requires, among other things, that any motion to sell property of the estate pursuant to Section 363 of the Bankruptcy Code attach "[a] copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale [and a] copy of a proposed form of sale order."  Del. Bankr. L. R. 6004-1(b).  As set forth above, the Debtors and

their professionals have been and are continuing an aggressive marketing of the Assets. Nevertheless, the terms of the Sale of the Assets, including, in particular, the identification of the to-be purchased Assets, the purchase price of such Assets, and the extent of assumed liabilities, are uncertain as of the date hereof.  Any such forms the Debtors might submit at this time would be merely generic in nature, rather than based on any actual transaction or terms being proposed, and the ultimate transaction(s) and term(s) proposed could differ materially from any speculative forms presented at this time.  Consequently, filing such forms would offer little benefit and may be confusing to the parties receiving notice of this Motion.  Accordingly, the Debtors request a waiver of the provisions of Local Rule 6004-1 to the extent applicable.

### Requests for Immediate Relief and Waiver of Stay

75.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Similarly, pursuant to Bankruptcy Rule 6006(d), "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

76.     To implement the foregoing sale process successfully, the Debtors respectfully request waivers of the 14-day stays of Bankruptcy Rules 6004(h) and 6006(d), and the Debtors submit that ample cause exists to justify such waivers.  As set forth above, time is of the essence in approving and closing the sale, and any unnecessary delay in closing the sale could result in changes in circumstances, or events that could preclude the closing of the sale.  The Debtors therefore request that the Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

**No Prior Request**

77.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

**Consent to Jurisdiction**

78.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

**Notice**

79.     Notice of this Motion has been given to the following parties, or to their counsel: (a) the U.S. Trustee; (b) the Securities & Exchange Commission; (c) the Internal Revenue Service; (d) the Delaware State Treasury; (e) the Delaware Secretary of State; (f) the Debtors' thirty largest unsecured creditors on a consolidated basis, as identified in their Chapter 11 petitions; (g) co-counsel to the DIP Lender, Cooley LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Cathy Hershcopf and Robert Winning), chershcopf@cooley.com and rwinning@cooley.com and Bayard, P.A., 600 N. King Street, Wilmington, Delaware 19806 (Attn: Erin R. Fay, Esq.), efay@bayardlaw.com; (h) Wells Fargo Bank, National Association; (i) U.S. Attorney's Office for the District of Delaware; and (j) any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the Debtors' Assets; and (k) any parties that have requested notice in these Cases pursuant to Bankruptcy Rule 2002. In addition, no later than two business days after this Motion is filed, notice thereof will be served on (l) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Debtors' Assets; and, (m) all state, local, and foreign taxing authorities which according to the Debtors' books and records may have a claim in these Cases

(the "***Taxing Authorities***").  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that this Court enter the Bid Procedures Order, substantially in the form attached as Exhibit A, granting the relief requested herein and such other and further relief as is just and proper.

Dated: August 12, 2019
Wilmington, Delaware

**ROBINSON & COLE LLP**
Natalie D. Ramsey (No. 5378)
Jamie L. Edmonson (No. 4247)
Mark A. Fink (No. 3946)
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 295-4800
Facsimile:   (302) 351-8618
Email:  nramsey@rc.com
            jedmonson@rc.com
            mfink@rc.com

**BRYAN CAVE LEIGHTON PAISNER LLP**
*/s/ Mark I. Duedall*
Mark I. Duedall (No. 3346)
Leah Fiorenza McNeill (*pro hac vice* pending)
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email:  mark.duedall@bclplaw.com
            leah.fiorenza@bclplaw.com

**BRYAN CAVE LEIGHTON PAISNER LLP**
Andrew J. Schoulder (*pro hac vice* pending)
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-2000
Facsimile:  (212) 541-4630
Email:  andrew.schoulder@bclplaw.com

*Proposed counsel to the Debtors and Debtors in Possession*