# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Loot Crate, Inc., *et al.*,[1] | ) | Case No. 19-11791 (BLS) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | **Related D.I. 13** |
|  | ) |  |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND SUPER-PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPEITTION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] [Docket No. 13], dated August 12, 2019, of Loot Crate, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (each, a "Debtor" and, collectively, the "Debtors") pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d), 364(e), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of an interim order (this "Interim Order") providing for, among other things:

(i)      authority for the Debtors to obtain senior secured, priming, postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Debtor in Possession

---

[1]      The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Loot Crate, Inc. (7119); Loot Crate Holdings, Inc.; LC Funding, Inc.; and Loot Crate Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Avenue, Los Angeles, CA 90031.

[2]      Capitalized terms used by not defined herein shall have the meanings ascribed to them in the Motion.

Credit Agreement by and among Debtor Loot Crate, Inc. as Borrower, and Debtor Loot Crate Parent, Inc., Debtor LC Funding, Inc., and Debtor Loot Crate Holdings, Inc. as Guarantors, and Money Chest LLC, as administrative agent and collateral agent (in its capacity as administrative and collateral agent, and including any of its Affiliates (including any branches thereof) performing any of the functions of administrative agent or collateral agent hereunder or under any of the other Loan Documents, the "DIP Agent") for Money Chest LLC (together with any other lenders party thereto and their respective affiliates, successors and assigns, the "DIP Lenders"), substantially in the form attached hereto as Exhibit 1 (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Credit Agreement" and the financing and financial accommodations made available pursuant to the DIP Credit Agreement and the other DIP Documents (as defined below), the "DIP Facility");

(ii)       authority for the Debtors to (a) execute, deliver, and perform under the DIP Credit Agreement and all other related or ancillary documents and agreements (including the Budget (as defined below)), and (b) perform such other acts as may be necessary or desirable in connection with the DIP Documents (as defined below);

(iii)      authority for the Debtors to obtain senior secured, priming, postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Debtor In Possession Security Agreement by and among the Debtors and the DIP Agent, substantially in the form attached hereto as Exhibit 2 (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Security Agreement");

(iv)     authority for the Debtors to (a) execute, deliver, and perform under the DIP Credit Agreement and the Closing Date Term Notes and the Delayed Draw Term Notes defined therein and to be issued thereunder (the "DIP Notes"), the DIP Security Agreement, and all other related or ancillary documents and agreements (including the Budget) (collectively, the "DIP Documents"), and (b) perform such other acts as  may be necessary or desirable in connection with the DIP Documents;

(v)     authority for the Debtors to (a) use "cash collateral," as such term is defined  in section  363 of the Bankruptcy  Code  and/or  under the DIP  Documents, as applicable (the "Cash Collateral"), subject to (x) the restrictions set forth in the DIP Documents and this Interim Order, and (y) the grant of adequate protection to the Current Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral and the Prepetition Second Lien Collateral (each as defined herein), and (b) access and use the liquidity provided under the DIP Facility on an interim basis until the Final Hearing (as defined below) (the "Interim Period"), as follows:

(1)     access and use up to $4,000,000 of the postpetition term loans made available under the DIP Facility during the Interim Period (the "Interim DIP Financing") to (x) fund the Debtors' chapter 11 cases and the continued operation of their businesses as Debtors, and (y) fund certain fees and expenses associated with the consummation of the transactions contemplated in the DIP Documents, each on the terms set forth herein and the DIP Documents, and in each case consistent with the Budget; and

(2)     pay the fees and expenses arising in accordance with the terms of the DIP Documents; and

(vi)    a grant of automatically perfected, valid, enforceable, and unavoidable security interests and liens, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(l) of the Bankruptcy Code, on all DIP Collateral (as defined herein) and assets of the Debtors, including, subject to entry of the Final Order, Avoidance Proceeds and Avoidance Actions (each as defined below) and the products and proceeds thereof but solely to the extent provided in this Interim Order, as more fully described herein;

(vii)    a grant, with respect to the obligations of the Debtors hereunder and under the other DIP Documents (and subject only to the Carve-Out described in paragraph 32 hereof), of an allowed super-priority administrative expense claim in each of the Debtors' bankruptcy cases (and against each of the Debtors' estates created pursuant to section 541 of the Bankruptcy Code) pursuant to section 364(c)(l) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(6), 546(c), or 726 thereof);

(viii)    authority for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including the reasonable and documented fees and disbursements of the DIP Agent and the DIP Lenders' attorneys, advisers, accountants, and other consultants (collectively, the "DIP Obligations"), all to the extent provided in and in accordance with the terms of the DIP Documents and this Interim Order;

(ix)    a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as set forth herein;

(x)    approval of the Milestones as defined in the DIP Credit Agreement (the "Milestones") in respect of the 363 sale process as described in the Declaration of Stuart

4

Kaufman in Support of First Day Motions and Related Relief (the "<u>First Day Declaration</u>") (as defined below), which Milestones are attached hereto as Exhibit 3; and

      (xi)    scheduling of a final hearing (the "<u>Final Hearing</u>") to consider entry of an order approving the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing;

and the Court having considered the Motion, the First Day Declaration filed concurrently with the Motion, the DIP Documents, the evidence submitted or proffered at the interim hearing to consider the relief requested in the Motion held on August 13, 2019 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d), and 9014 and any applicable Local Rule, including Local Rule 9013-1(m); and the Interim Hearing having been held and concluded; and all objections to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and based on all pleadings filed with this Court, and all proceedings held before the Court; and it appearing to the Court that granting the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses and is necessary to avoid immediate and irreparable harm to the Debtors' estates; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and adequate protection being provided on account of the interests of certain holders of liens on the property of the estates on which liens are to be granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE

DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND

CONCLUSIONS OF LAW:

A.  *Petition Date*. On August 11 and 12, 2019 (the "Petition Date"), each of the

Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy

Code in the United States Bankruptcy Court for the District of Delaware (the

"Court") commencing these chapter 11 cases (collectively, the "Chapter 11

Cases").

B.  *Debtors in Possession.* The Debtors continue to operate their businesses and

properties as debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code. No trustee or examiner has been appointed in these Chapter

11 Cases.

C.  *Jurisdiction and Venue*. This Court has jurisdiction over these proceedings

and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b)

and 1334, and the *Amended Standing Order of Reference from the United*

*States District Court for the District of Delaware,* dated as of February 29,

2012. Consideration of the Motion constitutes a core proceeding under 28

U.S.C. § 157(b)(2). The Court may enter a final order consistent with Article

III of the United States Constitution. Venue for these Chapter 11 Cases and

proceedings on the Motion is proper in this district pursuant to 28 U.S.C. *§§*

1408 and 1409.

D.  *Committee Formation.* As of the date hereof, the Office of the United States

Trustee for the District of Delaware (the "U.S. Trustee") has not yet appointed

6

an official committee of unsecured creditors (the "Committee") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

E.    *Debtors' Stipulations*. Subject only to the rights of parties in interest as set forth in paragraph 35 hereof, after consultation with their counsel and financial advisors, the Debtors (on behalf of and for themselves and their estates) admit, stipulate, acknowledge, and agree to the following:

(i)    *Prepetition Credit Facility*. Loot Crate, Inc. ("Borrower"), Loot Crate Parent, Inc. ("Parent"), the other Guarantors party to the Credit Agreement (defined below) from time to time (collectively with Parent, "Prepetition Guarantors", and each individually, "Prepetition Guarantor", collectively with Borrower, "Prepetition Credit Parties", and each individually, a "Prepetition Credit Party"), Midtown Madison Management LLC, as administrative agent and collateral agent for the Lenders under the Credit Agreement described below (in such capacity, together with its successors and assigns, "Prepetition Agent") and the Lenders thereunder (the "Prepetition Lenders"), are parties to that certain Credit Agreement dated as of August 3, 2018 (as it may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "Prepetition Credit Agreement"). The Prepetition Credit Agreement provided the Borrower with a credit facility (the "Prepetition Credit Facility") in the original amount of $21,000,000 as set forth in the Prepetition Credit Agreement, which was fully drawn, and under which additional advances were funded through amendments to the Prepetition Credit Agreement. The Debtors estimate that approximately $31,622,057 in principal and interest was

outstanding under the Prepetition Credit Facility as of the Petition Date, and the Debtors estimate that an additional amount of not less than $10,000.000 would be payable as a required Make Whole Amount under the Prepetition Credit Facility (calculated as if the Prepetition Credit Facility were repaid on the Petition Date) (collectively, the "Prepetition Obligations"). The Prepetition Credit Facility is secured by first priority security interests and liens (the "Prepetition Liens") on substantially all prepetition assets of the Prepetition Credit Parties (the "Prepetition Collateral") pursuant to that certain Security Agreement dated as of August 3, 2018 and that certain Intellectual Property Security Agreement dated as of August 3, 2018 (as each may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date) (the "Prepetition Security Agreements"). On August 9, 2019, the Prepetition Credit Agreement and Prepetition Security Agreements were assigned to Money Chest LLC and Money Chest LLC became the sole Prepetition Lender ("Successor Prepetition Lender") and the administrative agent and collateral agent for the sole Prepetition Lender under the Prepetition Credit Agreement and Prepetition Security Agreements ("Successor Prepetition Agent"). The Prepetition Credit Agreement, Prepetition Security Agreements, together with all other notes, loans, guarantees, security, and related agreements and documents entered into in connection therewith are the "Prepetition Credit Documents."

(ii)    *Prepetition Second Lien Obligations*. Borrower, Loot Crate Holdings, Inc. ("Holdings"), the other Guarantors party to the Prepetition Purchase Agreement (defined below) from time to time (collectively with Holdings, "Prepetition

Second Lien Guarantors", and each individually, "Prepetition Second Lien Guarantor", collectively with Borrower, "Prepetition Second Lien Credit Parties", and each individually, a "Prepetition Second Lien Credit Party"), and Money Chest LLC ("Prepetition Second Lien Lender") are parties to that certain Securities Purchase Agreement dated as of August 3, 2018 (as it may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "Prepetition Purchase Agreement"). Pursuant to the Prepetition Purchase Agreement, the Prepetition Second Lien Lender purchased a Subordinated Convertible Promissory Note (the "Prepetition Second Lien Note") in the amount of $2,500,000 on or about August 3, 2018. As of the Petition Date, the Debtors estimate that approximately $2,994,939.00 was outstanding under the Prepetition Second Lien Note (the "Prepetition Second Lien Obligations"). The Prepetition Second Lien Obligations are secured by security interests and liens (the "Prepetition Second Liens") on substantially all prepetition assets of the Prepetition Second Lien Credit Parties (the "Prepetition Second Lien Collateral") pursuant to that certain Security Agreement dated as of August 3, 2018 and that certain Intellectual Property Security Agreement dated as of August 3, 2018 (as each may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "Prepetition Second Lien Security Agreements"). The Prepetition Purchase Agreement, the Prepetition Second Lien Note, the Prepetition Second Lien Security Agreements, together with all other notes, loan, guarantee, security, and related agreements and documents entered into in connection therewith, are the "Prepetition Second Lien Documents". The

9

Prepetition Agent, the Prepetition Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender collectively are the "<u>Prepetition Secured Parties</u>" and the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender collectively are the "<u>Current Prepetition Secured Parties</u>".

(iii)    *Prepetition Intercreditor Agreement*.  On or about August 3, 2018, the Prepetition Agent and the Prepetition Second Lien Lender entered into that certain Subordination and Intercreditor Agreement that, among other things, assigned relative priorities to certain claims and liens arising under the Prepetition Credit Documents and the Prepetition Second Lien Documents (the "<u>Prepetition Intercreditor Agreement</u>").  The Prepetition Intercreditor Agreement is a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code in the Chapter 11 Cases.

(iv)    *Validity and Priority of Prepetition Senior Indebtedness and Liens.* The Debtors acknowledge, agree, and stipulate that (a) the liens on the Prepetition Collateral granted pursuant to the Prepetition Credit Documents are binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (b) the liens granted pursuant to the Prepetition Credit Documents are senior to all security interests and liens in the Prepetition Collateral other than any Permitted Priority Liens (as defined

in the DIP Credit Agreement); (c) the Prepetition Credit Documents are valid and enforceable by the Successor Prepetition Agent and Successor Prepetition Lender against each of the Debtors party to such agreements; (d) the obligations under the Prepetition Credit Facility constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the Prepetition Credit Documents; (e) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the Prepetition Credit Facility exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law; (f) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action; and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Prepetition Agent, the Prepetition Lenders, the Successor Prepetition Agent, or the Successor Prepetition Lender and/or any of such parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the Prepetition Credit Documents (or the transactions contemplated thereunder), the obligations under the Prepetition Credit Facility, or the security interests

11

and liens in the Prepetition Collateral; (g) as of the Petition Date, the Prepetition Obligations constitute allowed, secured claims within the meaning of sections 506(a) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees (including attorneys' fees and related expenses), costs, expenses, and other charges of whatever nature owing in respect thereof; (k) the Debtors hereby waive, discharge and release any right to challenge any of the obligations under the Prepetition Credit Facility, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Agent, Prepetition Lenders, Successor Prepetition Agent, or the Successor Prepetition Lender, and/or any of their respective officers, directors, or employees; and (1) any payments made on account of the obligations under the Prepetition Credit Facility including the Prepetition Obligations to or for the benefit of the Prepetition Agent, Prepetition Lenders, Successor Prepetition Agent, or the Successor Prepetition Lender prior to the Petition Date were payments out of the Prepetition Collateral in accordance with the Prepetition Intercreditor Agreement, as applicable, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(v)     *Validity and Priority of Prepetition Second Lien Indebtedness and Liens.* The Debtors acknowledge, agree, and stipulate that (a) the liens on the Prepetition Second Lien Collateral granted pursuant to the Prepetition Credit

Documents are binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (b) the liens granted pursuant to the Prepetition Second Lien Documents are senior to all security interests and liens in the Prepetition Second Lien Collateral except with respect to the Prepetition Liens as provided in the Prepetition Intercreditor Agreement and any Permitted Priority Liens; (c) the Prepetition Second Lien Documents are valid and enforceable by the Prepetition Second Lien Lender against each of the Debtors party to such agreements; (d) the obligations under the Prepetition Second Lien Documents constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the Prepetition Second Lien Documents; (e) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the Prepetition Second Lien Documents exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law; (f) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action; and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Prepetition Second Lien Lender and/or any of its affiliates, parents, subsidiaries, controlling persons, agents, attorneys,

13

advisors, professionals, officers, directors, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the Prepetition Second Lien Documents (or the transactions contemplated thereunder), the obligations under the Prepetition Second Lien Documents, or the security interests and liens in the Prepetition Second Lien Collateral; (g) as of the Petition Date, the Prepetition Second Lien Obligations constitute allowed, secured claims within the meaning of sections 506(a) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees (including attorneys' fees and related expenses), costs, expenses, and other charges of whatever nature owing in respect thereof; (k) the Debtors hereby waive, discharge and release any right to challenge any of the obligations under the Prepetition Second Lien Documents, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Second Lien Lender and/or any of its officers, directors, or employees; and (1) any payments made on account of the obligations under the Prepetition Second Lien Documents including the Prepetition Second Lien Obligations to or for the benefit of the Prepetition Second Lien Lender prior to the Petition Date were payments out of the Prepetition Second Lien Collateral in accordance with the Prepetition

14

Intercreditor Agreement, as applicable, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(vi)    *Cash Collateral.* The Debtors acknowledge and stipulate that substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral or the Prepetition Second Lien Collateral, constitutes "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) ("Cash Collateral") of the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender, as and to the extent applicable.

(vii)    *Default by the Debtors.* The Debtors acknowledge and stipulate that by filing petitions for relief under chapter 11 of the Bankruptcy Code and commencing these Chapter 11 Cases, and due to other events of default under the Prepetition Credit Documents and the Prepetition Second Lien Documents, all of their debts and obligations under the Prepetition Credit Documents and the Prepetition Second Lien Documents (including, without limitation, any premiums payable thereunder) are immediately due and payable.

F.    Consent to Adequate Protection and Priming Liens. The Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender each have provided consent to (i) the adequate protection provided in paragraph 11 of this Interim Order and (ii) the priming of their respective liens on the

Prepetition Collateral and the Prepetition Second Lien Collateral on the terms set forth in paragraph 6 of this Interim Order.

G.    <u>Findings Regarding the Postpetition Financing</u>.

(i)    *Request for Postpetition Financing*. The Debtors seek authority on an interim basis to: (a) use Cash Collateral on the terms described herein, and (b) access and use the liquidity provided under the DIP Facility to: (i) finance ongoing debtor in possession working capital purposes, as provided for in the Budget, and other general corporate purposes; and (ii) finance transaction fees, costs and expenses related to the DIP Credit Agreement, in each case, solely to the extent permitted under the DIP Documents and as provided for in the Budget.

(ii)    *Priming of Certain Prepetition Liens.* The priming of the liens of the Prepetition Secured Parties on the Prepetition Collateral and the Prepetition Second Lien Collateral, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors. However, the Current Prepetition Secured Parties are each entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for and to the extent of any postpetition diminution in the value of each of their respective interests in the Prepetition Collateral or the Prepetition Second Lien Collateral (including Cash Collateral) resulting from the Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, the priming of the prepetition liens granted on the Prepetition Collateral or the Prepetition Second Lien Collateral, and the subordination to the

16

Carve-Out described in paragraph 32 hereof and the DIP Liens (as defined herein) (collectively, the "Diminution in Value"). As adequate protection, the Current Prepetition Secured Parties will receive the adequate protection described in paragraph 11 of this Interim Order.

(iii)    *Need for Postpetition Financing and Use of Cash Collateral*.    The Debtors' need to use Cash Collateral and to obtain credit pursuant to the DIP Facility as provided for herein is necessary to enable the Debtors to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise to finance their operations requires working capital from the DIP Facility and the use of Cash Collateral. Without the ability to access the DIP Facility or Cash Collateral, the Debtors, their estates, their creditors, and the possibility for a successful reorganization would suffer immediate and irreparable harm. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)    *No Credit Available on More Favorable Terms.* Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit (a)

having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (a) perfected security interests in and liens on all of the Debtors' existing and after-acquired assets, (b) superpriority claims and priming liens, and (c) the other protections set forth in this Interim Order, in each case with the priorities and on the other terms set forth herein.

(v)      *Adequacy of the Budget*. As set forth in the DIP Documents, the Debtors have prepared and delivered to the DIP Agent and the DIP Lenders a budget, a copy of which is annexed hereto as Exhibit 4 (as it may be updated, modified, amended, restated or supplemented with the consent of the DIP Agent, in its sole discretion, on the terms set forth in the DIP Documents and paragraph 14 hereof, the "Budget"). The Budget has been thoroughly reviewed by the Debtors, their management, and their advisors. The Debtors, their management, and their advisors believe the Budget and the estimate of administrative expenses due or accruing during the period covered by the Budget were developed using reasonable assumptions, and based on those assumptions the Debtors believe there should be sufficient available assets to pay all administrative expenses due or accruing during the period covered by the Budget.

H.    <u>Section 506(c)</u>. In exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and (ii) the Current Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out  and the DIP Liens, the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties shall each receive a waiver of the provisions of section 506(c) of the Bankruptcy Code, subject to entry of the Final Order.

I.    <u>Section 552</u>.   In exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (ii) the Current Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out and the DIP Liens, the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply, subject to entry of the Final Order.

J.    <u>Good Faith of the DIP Agent and the DIP Lenders</u>.

(i)    *Willingness to Provide Financing*. The  DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) the entry by this Court of this Interim Order, in a form satisfactory to the DIP Agent, to secure all obligations under the DIP Documents; (b) approval by this Court of the terms and conditions of the DIP Facility; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent

19

reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order, or any other order.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms and conditions of this Interim Order and the extension of credit under the the DIP Facility, and the DIP Documents, and the interest and fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent and sound business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties. The use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the Current Prepetition Secured Parties, the DIP Agent, and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

K.     <u>Notice</u>. Notice of the Interim Hearing and the emergency relief requested in the Motion  has  been provided by the Debtors, whether by facsimile,  email, overnight courier, or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) counsel to the Current Prepetition Secured Parties; (iii) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in the Chapter 11 Cases; (iv) any such other party entitled to notice pursuant to Local Rule 9013-l(m) (collectively, the "<u>Notice Parties</u>"). The parties have made reasonable

efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that, as set forth herein on an interim basis:

1.    <u>Interim DIP Financing Approved</u>.  The Interim DIP Financing is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order and the DIP Documents (including the Budget).

2.    <u>Objections Overruled</u>.  All objections to the Interim DIP Financing and/or entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled.

**<u>DIP Facility Authorization</u>**

3.    <u>Authorization of the Interim DIP Financing and Entry into the DIP Documents; Application of DIP Proceeds.</u>    The DIP Facility is hereby approved for the Interim DIP Financing. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents that may be necessary or required for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens provided for by this Interim Order and the DIP Documents. The DIP Documents evidence valid and binding obligations of the Debtors, which shall be enforceable against the Debtors, their estates, and their creditors in accordance with the terms and conditions of the DIP Documents and this Interim Order. The Debtors are hereby authorized to pay, in accordance with this Interim Order, the principal, interest, fees, expenses, and other amounts described in the DIP Documents and all

other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Documents. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. All of the obligations described in the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with the terms of the DIP Documents. The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used for: (a) the payment of fees, expenses and costs incurred in connection with the Chapter 11 Cases; (b) the payment of transaction expenses; and (c) working capital, capital expenditures, and other general corporate purposes of the Debtors, in each case, subject to the Budget.

4.      <u>Authorization to Access the Interim DIP Financing</u>. During the period that this Interim Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to access the Interim DIP Financing pursuant to and in accordance with the terms herein and the terms of the DIP Documents.

5.      <u>DIP Obligations</u>.  Upon entry of this Interim Order, the DIP Documents and this Interim Order shall constitute and evidence the validity of the DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including any trustee appointed in these Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other

proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim Order, the DIP Obligations will include all loans, notes and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agents or to any of the DIP Lenders, under the DIP Documents or this Interim Order, including all principal, accrued interest, costs, fees, expenses, and other amounts under the DIP Documents. The DIP Obligations shall be due and payable as provided for herein and in the DIP Documents.

6.      DIP Liens and Collateral. Effective immediately upon the entry of this Interim Order, the DIP Agent, on its own behalf and on behalf of the DIP Lenders, is hereby granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code first priority, priming, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens (collectively, the "DIP Liens"), senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in this Interim Order and the Final Order, upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors, including, without limitation, the following: all of the Debtors' Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, goods, instruments, Inventory, commercial tort claims (including without limitation those specifically identified as part of the Prepetition Credit Documents), Investment Property, letter-of-credit rights, letters of credit, all sums on deposit; together with (a) all substitutions and replacements for and products of any of the foregoing; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title now or hereafter

covering such goods; (e) all Prepetition Collateral and Prepetition Second Lien Collateral; (f) any money, or other assets of the Debtors that now or hereafter come into the possession, custody, or control of the DIP Agent or the DIP Lenders; (g) all sums on deposit in any bank account of the Debtors; (h) proceeds of any and all of the foregoing; (i) books and records of the Debtors, including all mail or electronic mail addressed to the Debtors; and (j) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Debtors now have or hereafter acquire any rights (together, the "DIP Collateral"), as security for the payment and performance of the DIP Obligations.  The DIP Liens to be created and granted to the DIP Agent and the DIP Lenders, as provided herein, (A) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and (B) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out as set forth in this Interim Order and shall otherwise be junior to any Permitted Priority Liens. The DIP Collateral shall include, subject to entry of the Final Order, (i) any proceeds or property recovered, unencumbered or otherwise (the "Avoidance Proceeds") from claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (the "Avoidance Actions") and (ii) Avoidance Actions. Further, the DIP Collateral shall include the proceeds of leases, but not the leases themselves, whether or not perfected prior to the Petition Date. The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the order and priority set forth in the DIP Credit Agreement and this Interim Order. Except as otherwise provided herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and

enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case(s) and/or upon the dismissal of any of the Chapter 11 Cases. The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception of section 552 of the Bankruptcy Code and section 506(c) of the Bankruptcy Code.

7.      DIP Superpriority Claims. Subject to the Carve-Out, the DIP Obligations shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Debtors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b),  507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.  The DIP Agent and DIP Lenders shall have a superpriority administrative expense claim against the Debtors' estates pursuant to section 364(c)(1) of the Bankruptcy Code for the DIP Obligations and all related costs and expenses, which shall be prior, senior and superior to any other claim, including any other superpriority administrative expense claim of any kind or nature, except as provided herein and/or in the DIP Credit Agreement.  The DIP Obligations are claims to be afforded priority over administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code, as provided herein and in the DIP Credit Agreement and secured by liens pursuant to section 364 of the Bankruptcy Code as provided herein.  All such superpriority claims referred to herein collectively as the "DIP Superpriority Claims".

8.      Extension of Credit. The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance or purchase any note, as applicable, unless all of the

209670301 v2

conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent in its sole discretion.

9.       Use of DIP Facility Proceeds. From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only pursuant to the terms herein and the terms of the DIP Documents, including as contemplated and limited by the Budget (including any variance therefrom as may be permitted under the DIP Documents).

**Authorization to Use Cash Collateral and Adequate Protection**

10.      Authorization to Use Cash Collateral. Subject to the terms and conditions set forth in, and in accordance with, this Interim Order, the DIP Facility, and the DIP Documents, the Debtors are authorized to use Cash Collateral. Except as expressly permitted in this Interim Order, the DIP Facility, and the DIP Documents, nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of Cash Collateral or other proceeds resulting therefrom. Upon the occurrence of an Event of Default (as defined herein and in the DIP Documents), and the filing and service of a Default Notice (as defined here) (the date of the filing and service of a Default Notice being the "Termination Date"), the Debtors' right to use Cash Collateral shall automatically terminate; provided, however, that during the Default Notice Period (defined below), the Debtors may use Cash Collateral solely to meet payroll obligations (other than severance) and to pay expenses critical to keep the Debtors' businesses operating, in each case only to the extent provided for in the Budget for the time period corresponding to the Default Notice Period (defined below) or as otherwise agreed to in writing by the DIP Agent.

11.      Adequate Protection. As adequate protection for the interest of the Successor Prepetition Agent and Successor Prepetition Lender in the Prepetition Collateral

209670301 v2

(including Cash Collateral) on account of the Diminution in Value, the Successor Prepetition Agent and Successor Prepetition Lender shall receive the following adequate protection:

(a)      *Successor Prepetition Agent and Lender Replacement Liens.*  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the Diminution in Value of the interest of the Successor Prepetition Agent and Successor Prepetition Lender in the Prepetition Collateral, the Successor Prepetition Agent and Successor Prepetition Lender shall have, subject to the terms and conditions set forth below and subject to the rights of parties in interest as set forth in paragraph 35 hereof, additional and replacement security interests and liens in the DIP Collateral (the "Prepetition Secured Creditors Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, and any Permitted Priority Liens.

(b)      *Successor Prepetition Agent and Lender Superpriority Claim.* Solely to the extent the Replacement Liens are insufficient to adequately protect the Successor Prepetition Agent and Successor Prepetition Lender, the Successor Prepetition Agent and Successor Prepetition Lender shall have an allowed superpriority administrative expense claim (the "Prepetition Secured Creditors Superpriority Claim"), which shall have priority, except with respect to the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates,

now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, and 726 of the Bankruptcy Code, and, subject to entry of the Final Order, sections 552(b) and 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. Other than the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on parity with the Prepetition Secured Creditors Superpriority Claim.

(c)    *Adequate Protection Interest Accrual*. As further adequate protection, the Successor Prepetition Agent, on behalf of the Successor Prepetition Lender, shall receive from the Debtors, (i) on the date hereof, payment in-kind of all accrued and unpaid interest on the Prepetition Obligations (which interest shall be capitalized and added to the principal amount of the applicable Prepetition Obligations on the date hereof) and (ii) on the last business day of each month, payment in-kind of all interest that accrued on the Prepetition Obligations during the monthly period (or portion thereof) ending on such last business day (which interest shall be

209670301 v2

capitalized and added to the principal amount of the applicable Prepetition Obligations on such last business day), with interest on the Prepetition Obligations, for purposes of this clauses (ii), being calculated based upon the Default Rate as set forth in the Prepetition Credit Documents. In the event that it is determined by a final order, which order shall not be subject to any appeal, stay, reversal or vacatur, that (i) no Diminution in Value of the Successor Prepetition Agent or the Successor Prepetition Lender's interests has occurred, or (ii) such Successor Prepetition Agent and Successor Prepetition Lender is determined to be undersecured, then a party in interest shall have the right to assert that such accrual of interest should be reversed.

(d)     *Prepetition Second Lien Lender Replacement Lien*.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent the Replacement Liens are insufficient to adequately protect the Second Lien Lender, the Prepetition Second Lien Lender shall have, subject to the rights of parties in interest as set forth in paragraph 35 hereof, additional and replacement security interests and liens in the DIP Collateral (the "Prepetition Second Lien Lender Replacement Liens" and, together with the Prepetition Secured Creditors Replacement Liens, the "Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, any Permitted Priority Liens, and the Prepetition Secured Creditors Replacement Liens, and subject to the Prepetition Intercreditor Agreement.

29

(e)     *Prepetition Second Lien Lender Superpriority Claim*. Solely to the extent of the Diminution in Value of the interests of the Prepetition Second Lien Lender in the Prepetition Second Lien Collateral, the Prepetition Second Lien Lender shall have an allowed superpriority administrative expense claim (the "Prepetition Second Lien Lender Superpriority Claim"), which shall have priority, except with respect to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, and the Prepetition Secured Creditors Superpriority Claim, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kids specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, and 726 of the Bankruptcy Code, and, subject to entry of the Final Order, sections 552(b) and 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. Other than the DIP Liens, the DIP Superpriority Claims, the Carve-Out, and the Current Prepetition Secured Parties' Superpriority Claim, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in

any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on parity with the Prepetition Second Lien Lender Superpriority Claim.

(f)     *Milestones; 363 Sale Process*. The Milestones constitute adequate protection for the benefit of the Current Prepetition Secured Parties. Further, upon the disposition of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, the Prepetition Liens and the Prepetition Second Liens shall attach to the proceeds of any such sale in the same manner and priority as such liens attached to the Prepetition Collateral, the Prepetition Second Lien Collateral, and the DIP Collateral, subject to the Prepetition Intercreditor Agreement, and all such proceeds shall be promptly paid at closing on any such sale to the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender in order of their respective priorities as provided in this Interim Order and the Prepetition Intercreditor Agreement.

(g)     *Prepetition Indemnity Account*. Subject to entry of the Final Order, following the payment in full in cash of the Prepetition Obligations in accordance with the Prepetition Credit Documents, the Debtors shall establish an account in the "control" (as defined in the UCC (as defined in the DIP Credit Agreement)) of the Successor Prepetition Agent (the "Prepetition Indemnity Account"), into which the sum of $500,000.00 of available cash shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor

of the Current Prepetition Secured Parties under the Prepetition Credit Documents, including, without limitation, any obligations arising under Section 12.05 of the Prepetition Credit Agreement (the "<u>Prepetition Indemnity Obligations</u>"). The Prepetition Indemnity Account shall not be subject to the Carve-Out.

(i)     Upon (a) the expiration of the Challenge Period (as defined below) if, as of such date, no party has filed (x) an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in paragraph 35 hereof, or a request for standing related to the same, or (y) an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any of the Prepetition Secured Parties related to the Prepetition Credit Facility, whether in the Chapter 11 Cases or independently in another forum, court, or venue, or a request for standing related to the same (the last such date being the "<u>Prepetition Indemnity Account Termination Date</u>"), or (b) the delivery of written notice to the Debtors by the Successor Prepetition Agent of the earlier receipt by the Successor Prepetition Agent and the Successor Prepetition Lender of releases and discharges of claims and liabilities in form and substance satisfactory to the Successor Prepetition Agent and the Successor Prepetition Lender in their sole discretion, all amounts then remaining and being held in the Prepetition Indemnity Account (net of any unreimbursed

obligations owing to the Successor Prepetition Agent and/or the Successor Prepetition Lender on such date) shall be released to the Debtors and shall be subject to the DIP Liens and the Replacement Liens.

(ii)     The Prepetition Indemnity Obligations shall be secured by a first priority lien on the Prepetition Indemnity Account and all funds on deposit therein in favor of the Successor Prepetition Agent and the Successor Prepetition Lender.

(iii)     The Successor Prepetition Agent and the Successor Prepetition Lender may apply amounts in the Prepetition Indemnity Account as and when they arise, without further notice to or consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court, upon compliance with the provisions of paragraph 27 below.

(iv)     Upon request by the Successor Prepetition Agent, the Debtors shall deposit additional available cash in the Prepetition Indemnity Account as may be reasonably necessary adequately to cover anticipated Prepetition Indemnity Obligations. The Debtors shall remain liable for the Prepetition Indemnity Obligations, even if the amounts in the Prepetition Indemnity Account prove insufficient to pay in full the Prepetition Indemnity Obligations.

(h)     In addition to the establishment and maintenance of the Prepetition Indemnity Account, until the Prepetition Indemnity Account Termination

Date, the Successor Prepetition Agent, for itself and on behalf of the Successor Prepetition Lender, shall retain and maintain the Prepetition Liens as security for the amount of any Prepetition Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition Indemnity Account, subject to the priorities set forth in paragraph 6 of this Interim Order.

12.    Section 507(b) Reservation. Subject only to the Carve-Out described in paragraph 32 hereof, nothing contained herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided in this Interim Order is insufficient to compensate for any Diminution of Value of the respective interests of the Current Prepetition Secured Parties in the Prepetition Collateral or the Prepetition Second Lien Collateral during these Chapter 11 Cases or any Successor Cases.

**Provisions Common to DIP Financing and Cash Collateral Authorizations**

13.    Amendment of the DIP Documents. The DIP Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto upon five (5) days prior written notice to the U.S. Trustee and counsel to any Committee, but without notice or a hearing (unless requested by the U.S. Trustee or any Committee) if the amendment, amendment and restatement, modification, or supplement is (a) in accordance with the DIP Documents and (b) not prejudicial in any material respect to the rights of the Debtors or any third parties; provided, however, that notwithstanding the foregoing, except for actions expressly permitted to be taken by the DIP Agent or the DIP Lenders as provided in the DIP Documents, no amendment, modification, supplement, termination, or waiver of any provision of the DIP Documents, or any consent to any departure by any of the Debtors therefrom, shall in

34

any event be effective unless the consents required under the terms of the DIP Documents have first been obtained.

14.     Budget Compliance. The Debtors shall not, and shall not permit any subsidiary to, directly or indirectly, use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with the DIP Documents and this Interim Order. The Budget annexed hereto as Exhibit 4 is hereby approved, and any modification to, or amendment or update of, the Budget shall be in form and substance acceptable to and approved in writing by the DIP Agent its sole discretion.

15.     Modification of Automatic Stay. The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may request in its sole discretion to assure the perfection and priority of the DIP Liens, (b) the Debtors to take all appropriate action to grant the Replacement Liens, and to take all appropriate action to ensure that the Replacement Liens granted thereunder are perfected and maintain the priority set forth herein, (c) the Debtors to incur all liabilities and obligations to the DIP Agent as contemplated under the DIP Documents, (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order and the DIP Documents, and (e) the implementation of the terms of this Interim Order.

16.     Perfection of DIP Liens and Replacement Liens. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein including the DIP Liens and, subject to the rights of parties in interest as set forth in paragraph 35 hereof, the Replacement Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be

required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Replacement Liens, or to entitle the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, or the Prepetition Second Lien Lender to the priorities granted herein. Without limiting the foregoing, the DIP Agent and the DIP Lenders shall be deemed to have "control" over all accounts maintained by the Debtors for purposes of perfection under the Uniform Commercial Code. Notwithstanding the foregoing, the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender each is authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Replacement Liens. The Debtors are authorized to execute and promptly deliver to the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender all such financing statements, mortgages, notices, and other documents as the DIP Agent, the Successor Prepetition Agent, or the Prepetition Second Lien Lender may reasonably request. The DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender, in their respective sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

17.     <u>After-Acquired Property</u>. Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including all DIP Collateral pledged or otherwise granted to the DIP Agent, on behalf of the DIP Lenders, pursuant to the DIP Documents and this Interim Order is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date that is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

18.     <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b), (c), or (d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the indefeasible payment in full of all DIP Obligations, the cancellation, backing, or cash collateralization of the letters of credit provided for under the DIP Credit Agreement, the satisfaction of the DIP Superpriority Claims, and the termination of the DIP Agent's and DIP Lenders' obligations to extend credit under the DIP Facility, then all of the cash proceeds derived from such credit or debt shall immediately be turned over first to the DIP Agent to partially satisfy the DIP Obligations in accordance with the DIP Documents.

19.     <u>Maintenance of DIP Collateral</u>. Until the indefeasible payment in full of all DIP Obligations, all indebtedness outstanding in accordance with the Prepetition Financing Documents, and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the

DIP Facility and the Prepetition Credit Documents and the Prepetition Second Lien Documents, as applicable, and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court in accordance with the DIP Documents.

20.    <u>Insurance Policies</u>.  Subject to entry of the Final Order, the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by any of the Debtors that in any way relates to the DIP Collateral. Notwithstanding the foregoing, the Debtors are authorized and directed to take all necessary actions to cause the DIP Agent and the DIP Lenders to be named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

21.    <u>Disposition of Collateral</u>. Except as otherwise expressly provided for in this Interim Order, and in the DIP Documents and subject to the Prepetition Intercreditor Agreement, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, the Prepetition Collateral, or the Prepetition Second Lien Collateral, (collectively, "<u>Collateral</u>") without the prior written consent of each of the DIP Agent, the Successor Prepetition Agent, and the Prepetition Second Lien Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent, the Successor Prepetition Agent, the Prepetition Second Lien Lender, or an order of this Court, except for sales, transfers, leases or uses of Debtors' inventory in the ordinary course of their businesses). Until such time as the DIP Obligations, the Prepetition Obligations and the Prepetition Second Lien Obligations have been paid in full in accordance with the terms of the applicable DIP Documents, Prepetition Credit Documents, and Prepetition Second Lien Documents, the Debtors shall remit or cause to be remitted to the DIP Agent, the Successor

Prepetition Agent, and/or the Prepetition Second Lien Lender all proceeds of Collateral for application against the DIP Obligations, the Prepetition Obligations, and/or the Prepetition Second Lien Obligations in accordance with the terms of the applicable DIP Documents, the Prepetition Credit Documents, the Prepetition Second Lien Documents, the Prepetition Intercreditor Agreement, and this Interim Order.

22.     _Inventory_. The Debtors shall not, without the consent of the DIP Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

23.     _Events of Default_. The term "Event of Default" shall have the same meaning under this Interim Order as such term has under the DIP Documents and shall include, for the avoidance of doubt, the failure to meet any of the Milestones.

24.     _Rights and Remedies upon Event of Default_. Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 midnight prevailing Eastern Time on the 5th calendar day after the date the DIP Agent files a notice of an Event of Default (a "_Default Notice_") on the docket of the Chapter 11 Cases and serves the Default Notice by electronic mail (or other electronic means) to counsel for the Debtors, counsel for any Committee, and the U.S. Trustee (such period, the "_Default Notice Period_"), the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of this Court to allow the DIP Agent to take any and all actions permitted by law or under the DIP Documents, as if no case were pending under the Bankruptcy Code.

209670301 v2

Immediately upon the DIP Agent's filing and service of a Default Notice, the Debtors shall be prohibited from using Cash Collateral, including accounts receivable, inventory, and the proceeds thereof, which prohibition shall be subject to Paragraph 10 of this Interim Order and shall remain in effect unless otherwise ordered by the Court within the Default Notice Period. During the Default Notice Period, the Debtors and other parties-in-interest may request an expedited hearing on any motion regarding an alleged Event of Default. In the event the automatic stay is lifted following the expiration of the Default Notice Period in accordance with this paragraph, the Debtors shall also be prohibited from obtaining credit or incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or security interest held by the DIP Agent or which is entitled to priority administrative status which is equal or superior to that granted to the DIP Agent for the benefit of the DIP Lenders or one granted to the Current Prepetition Secured Parties, as the case may be, except in connection with repayment in full in cash of the DIP Obligations. Subject to any applicable grace periods, upon the occurrence of any Event of Default, the DIP Agent may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lenders' obligations to make additional loans under the DIP Facility. Upon the occurrence of an Event of Default, all loans and notes under the DIP Facility shall become due and payable in accordance with the DIP Documents. Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in the DIP Credit Agreement.

      25.    _JPMorgan._ The DIP Liens and any adequate protections liens are junior to (i) the customary charges of JPMorgan Chase, N.A. ("_JPMorgan_") for the Debtors' bank accounts ("_JPMorgan Accounts_"), which JPMorgan Accounts shall be made subject to

209670301 v2

a deposit account control agreement to be entered into among JPMorgan, the DIP Agent, and the DIP Lenders, and (ii) any claims of JPMorgan for the Debtor's use of the corporate credit card issued by JPMorgan.

26.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>.  Each of the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties have acted in good faith in connection with this Interim Order, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties are entitled to the fullest extent to the protections provided in section 364(e) of the Bankruptcy Code.

27.    <u>DIP Fees and Other Expenses</u>.  All reasonable and documented out-of-pocket costs and expenses of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, and the Successor Prepetition Lender, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses, whether or not contained in the Budget and without limitation with respect to the dollar estimates contained in the Budget (provided, however, that such overages shall not weigh against the Debtors in any testing related to compliance with the Budget), shall promptly be paid by the Debtors, as provided in the DIP Documents and the Prepetition Credit Documents.  Payment of such fees shall not be subject to allowance by this Court; <u>provided</u>, however, the U.S. Trustee or counsel for any Committee may

41

seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below. The Debtors shall provide to the U.S. Trustee and any Committee a copy of any invoices received from the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, and the Successor Prepetition Lender for professional fees and expenses during the pendency of the Chapter 11 Cases. Each such invoice shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential, or sensitive information). If the U.S. Trustee or any Committee object to the reasonableness of the invoices submitted by the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, or the Successor Prepetition Lender, and the parties cannot resolve such objection within ten (10) days of receipt of such invoices, the U.S. Trustee or such Committee, as the case may be, shall file with the Court and serve on the DIP Agent, the DIP Lender, the Successor Prepetition Agent, and the Successor Prepetition Lender, an objection (a "Fee Objection") of such fees and expenses.  The Debtors shall promptly pay the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, and/or the Successor Prepetition Lender (as applicable), and the DIP Agent is hereby authorized to make an advance under the DIP Facility to timely pay, the submitted invoices after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period. If a Fee Objection is timely received, the Debtors shall promptly pay the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, and/or the Successor Prepetition Lender (as applicable), and/or the DIP Agent is hereby authorized to make an advance under the DIP Facility to timely pay, the undisputed amount only of the invoice(s) that is the subject of such Fee Objection, and the Court shall have jurisdiction to determine the disputed portion of such invoice(s) if the parties are unable to resolve the Fee Objection.

209670301 v2

28.    <u>Indemnification</u>. The Debtors shall indemnify and hold harmless the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, the Prepetition Second Lien Lender, and each of their respective shareholders, partners, unitholders, members, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investor funds, advisors, attorneys, professionals, representatives, investment bankers, and consultants, each in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Documents, the Prepetition Credit Documents, the Prepetition Second Lien Documents, and/or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents, and the Prepetition Credit Documents, the Prepetition Second Lien Documents, and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the exercise of discretionary rights granted under the DIP Documents, the Prepetition Credit Documents, and/or the Prepetition Second Lien Documents by the DIP Agent, any DIP Lenders, Successor Prepetition Agent, Successor Prepetition Lender, and/or Prepetition Second Lien Lender, as the context makes applicable. In all such litigation, or the preparation therefor, the DIP Agent and the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, the Prepetition Second Lien Lender, respectively, shall be

entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

       29.   <u>Released Parties</u>. Subject to entry of the Final Order, and without limiting the rights of the parties in interest as set forth in paragraph 35 hereof, the Debtors hereby waive any and all actions related to, and hereby release, each of (a) the DIP Agent and the DIP Lenders, (b) the Successor Prepetition Agent and Successor Prepetition Lender, (c) the Prepetition Second Lien Lender, and (d) each of their respective shareholders, partners, unitholders, members, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such (each such person or entity identified in sub-clauses (a) through (d) of this paragraph, a "<u>Released Party</u>" and, collectively, the "<u>Released Parties</u>") from any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, or any Challenge, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising prior to the Petition Date and to the extent related to the Prepetition Credit Documents, the Prepetition Second Lien Documents, the DIP Credit Agreement, or this Interim Order, any documents related thereto, any aspect of the prepetition relationship with the Released Parties, any Debtor, or any other acts or omissions by the Released Parties in connection with the Prepetition Credit Documents, the Prepetition Second Lien Documents, the DIP Credit Agreements, or this Interim Order, any documents related to the Prepetition Credit Documents, the Prepetition Second Lien Documents, the DIP Credit Agreements, or this Interim Order, or any aspect of their prepetition relationship with any Debtor.

209670301 v2

30.    <u>Proofs of Claim</u>. The DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties shall not be required to file proofs of claim in any of these Chapter 11 Cases or Successor Cases for any claim allowed herein. Any proof of claim filed by the DIP Agent, the Successor Prepetition Agent, or the Prepetition Second Lien Lender shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the DIP Lenders or the Current Prepetition Secured Parties. Any order entered by this Court in relation to the establishment of a bar date in any of these cases or Successor Cases shall not apply to any claims of the DIP Agent, the DIP Lenders, and the Current Prepetition Secured Parties allowed herein.

31.    <u>Access to Collateral; No Landlord's Liens</u>. Subject to entry of the Final Order, ubject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents and this Interim Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Documents, the DIP Agent may, subject to applicable non-bankruptcy law or any separate agreement by and between such landlord and the DIP Agent (a "<u>Separate Agreement</u>"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and, subject to any Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, however, that, subject to any such Separate Agreement, the DIP Agent shall only pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the Agent,

45

calculated on a per diem basis. Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph. The DIP Agent shall have the right to seek relief by separate motion to this Court respect to access to leased premises, with notice to the applicable landlords of such leased premises and an opportunity for such landlords to respond and be heard.

32.    Carve-Out. Upon the DIP Agent's issuance of a Carve-Out Trigger Notice (as defined below), all liens, claims, and other security interests held by the DIP Lenders and the Current Prepetition Secured Parties shall be subject to the payment of the Carve-Out. For purposes of this Interim Order, "Carve-Out" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code together with the statutory rate of interest; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) all unpaid fees (inclusive of success or transaction fees) and expenses accrued or incurred by persons or firms retained by the Debtors or any Committee pursuant to sections 327, 328, 363, and 1103 of the Bankruptcy Code (the "Estate Professionals"), but solely to the extent included in the Budget (collectively, the "Estate Professional Fees"), at any time before the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, up to a maximum amount of $460,000 for Estate Professionals retained by the Debtors and a maximum amount of $20,000 for Estate Professionals retained by any Committee; and (iv) Estate Professional Fees for Estate Professionals retained by the Debtors in an aggregate amount not to exceed $75,000 and Estate Professional Fees for Estate Professionals retained by any Committee in an aggregate amount not to exceed $20,000, in each instance that are incurred on or after the first business day following

46

delivery by the DIP Agent of a Carve-Out Trigger Notice, solely to the extent included in the Budget for such time period, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Carve-Out Trigger Cap"); provided, however, that the foregoing amounts shall not apply to any fees or expenses incurred in connection with any Proscribed Actions (defined below). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee, which notice may be delivered (a) in connection with the repayment in full (whether in cash or by credit bid) of the DIP Obligations, or (b) following the occurrence of the Termination Date, stating that the Carve-Out Trigger Cap has been invoked. Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been issued, the Debtors shall be permitted to pay fees to Estate Professionals and reimburse expenses incurred by Estate Professionals to the extent set forth in the Budget and otherwise permitted under the DIP Documents and that are allowed by the Court and payable under sections 328, 330, 331, and 1103 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and the DIP Agent, as the same may be due and payable, and the same shall not reduce the Carve-Out Trigger Cap.

33.    Payment of Compensation. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Committee, if any, or of any person, or shall affect the rights of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts in excess of the amounts contained, or not set forth, in the Budget.

34.  <u>Proscribed Actions</u>.

(a)  No DIP Collateral, Cash Collateral, proceeds of the DIP Facility, portion of the Carve-Out, or any other amounts may be used directly or indirectly by any of the Debtors, any Committee, or any trustee or other estate representative appointed in these Chapter 11 Cases or any Successor Cases or any other person (or to pay any professional fees, disbursements, costs or expenses incurred   in connection therewith) for any of the following actions or activities (the "<u>Proscribed Actions</u>"):

(i)  to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the liens granted under the DIP Documents, this Interim Order, or the Final Order (including the DIP Superpriority Claim);

(ii)  to investigate (except as provided in subparagraph (b) below), including by way of examinations or discovery proceedings, prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, the DIP Agent, any of the DIP Lenders, any of the   Prepetition Secured Parties, or any of the shareholders, partners, unitholders, members, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents,

investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants of any of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens granted under the DIP Documents, or the claims or liens granted under or contemplated by the Prepetition Credit Documents or the Prepetition Second Lien Documents, (D) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the Prepetition Obligations, or the Prepetition Second Lien Obligations; (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any of (1) the DIP Agent or the DIP Lenders under this Interim Order or under any of the DIP Documents, or (2) the Prepetition Secured Parties (in each case, as applicable, including claims, proceedings or actions that might prevent, hinder or delay any of

their respective assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the DIP Documents, this Interim Order, and the Final Order); or (F) objecting to, consenting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred (as set forth in the DIP Documents).

(b)    Notwithstanding anything to the contrary herein, any Committee may use up to $50,000 in the aggregate amount of the Carve-Out, any Cash Collateral, or proceeds of the DIP Facility to investigate, but not prosecute (or prepare for the prosecution of) any challenge to, the claims and liens of the Prepetition Secured Parties (the "Committee Investigation Budget"). Any and all claims incurred by any Committee related to or in connection with any Proscribed Activities other than up to the Committee Investigation Budget shall be satisfied solely from the unencumbered assets of the Debtors (if any) (the "Unencumbered Assets"), thereby reducing recoveries to the holders of unsecured claims (other than any deficiency claim held by any of the Current Prepetition Secured Parties).

35.    Challenge Period.

(a)    Subject only to the terms of this paragraph 35, the grant of adequate protection to the Successor Prepetition Agent, Successor Prepetition Lender, and Prepetition Second Lien Lender, and the various stipulations and waivers contained in paragraph E hereof shall be without prejudice to the rights

of any Committee or any other party in interest with appropriate standing to seek to disallow the claims of the Successor Prepetition Agent, Successor Prepetition Lender, and Prepetition Second Lien Lender in respect of the Prepetition Credit Documents and the Prepetition Second Lien Documents, pursue any claims or seek appropriate remedies against the Prepetition Secured Parties in connection with the Prepetition Credit Documents or the Prepetition Second Lien Documents or avoid all or substantially all of the security interests or liens in the Prepetition Collateral or Prepetition Second Lien Collateral or in any other asset or property of Debtors in which the Prepetition Secured Parties claim an interest, including any claim, action, or proceeding brought against the Current Prepetition Secured Parties in accordance with this paragraph 35 that requires the Current Prepetition Secured Parties to give up adequate protection liens and superpriority claims, to disgorge adequate protection interest payments received or accruals credited, or to disgorge as repaid pursuant to this Interim Order as a result of any of the Prepetition Secured Parties' claims against Debtors or liens upon and security interests in the assets and properties of Debtors (including the Prepetition Collateral and Prepetition Second Lien Collateral) being invalidated, avoided, subordinated, impaired, or compromised in any way, either by an order of this Court (or other court of competent jurisdiction) or by settlement. Any party (other than the Debtors, which have waived all such rights), including any Committee, must commence, as appropriate, a contested matter or adversary proceeding raising any objection, claim, defense, suit or other challenge (a "Challenge") with respect to any claim, security interest, or any other rights of

209670301 v2

the Prepetition Secured Parties under the Prepetition Credit Documents or the Prepetition Second Lien Documents, as applicable, including in the nature of a setoff, counterclaim, or defense on or before (i) with respect to any Committee, sixty (60) calendar days from the date the U.S. Trustee appoints such Committee, or (ii) with respect to all other parties, seventy-five (75) calendar days following the entry of the Interim Order (the "Challenge Period"). The Challenge Period may only be extended (x) as to the Successor Prepetition Agent and/or the Successor Prepetition Lender, by the Successor Prepetition Agent, (y) as to the Prepetition Second Lien Lender, by such Prepetition Second Lien Lender, or (z) as otherwise ordered by the Court prior to the conclusion of the Challenge Period for cause shown.  For the avoidance of doubt, any chapter 7 or chapter 11 trustee appointed or elected in these cases during the Challenge Period, shall, until the expiration of the Challenge Period, be deemed to be a party other than the Debtors and shall not, for purposes of an adversary proceeding or contested matter appropriately commenced during the Challenge Period by a party with standing, be bound by the acknowledgements, admissions, confirmations, stipulations, releases, and waivers contained in this Interim Order with respect to, among other things, the extent, legality, validity, perfection, enforceability and other matters noted in the Interim Order with respect to the Prepetition Credit Documents.

(b)      Upon the expiration of the Challenge Period, to the extent not specifically included in a timely and properly filed pleading asserting a Challenge: (i) any other possible Challenge, whether such Challenge is

52

separately filed or otherwise asserted through an amendment of any timely and properly filed pleading asserting a Challenge, shall be deemed to be forever waived and barred; (ii) all of the Debtors' agreements, acknowledgments, stipulations, waivers, releases, and affirmations as to the priority, extent, and validity of the Prepetition Secured Parties' claims, liens, and interests, of any nature, under the Prepetition Credit Documents and Prepetition Second Lien Documents, or otherwise incorporated or set forth in this Interim Order, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these Chapter 11 Cases and any Successor Cases without further action by any party or this Court, and any Committee and any other party in interest, and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (iii) the liens and security interests granted pursuant to the Prepetition Credit Documents and Prepetition Second Lien Documents shall (to the extent not otherwise satisfied in full) be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable bankruptcy law; and (iv) without further order of the Court, the claims and obligations under the Prepetition Credit Documents and Prepetition Second Lien Documents shall (to the extent not otherwise satisfied in full) be finally allowed as fully secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Chapter 11

Cases and any Successor Cases and shall not be subject to challenge by any party in interest as to validity, priority, amount, or otherwise.

(c)    Nothing in this Interim Order vests or confers on any person, including any Committee or any other statutory committee that may be appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates. For the avoidance of doubt, entry of this Interim Order shall not grant standing or authority to any Committee to pursue any cause of action, claim, defense, or other right on behalf of the Debtors or their estates.

36.    <u>No Third Party Claims</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

37.    <u>No Marshaling; Application of Proceeds</u>. Subject to entry of the Final Order, the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and the Prepetition Second Lien Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral and/or the Prepetition Collateral or Prepetition Second Lien Collateral, as the case may be, and all proceeds shall be received and applied in accordance with the DIP Documents, the Prepetition Credit Documents and Prepetition Second Lien Documents, and the Prepetition Intercreditor Agreement.

38.    <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted to the DIP Agent by, through or on behalf of the DIP Lenders, on account of the DIP Obligations, pursuant to the provisions of this Interim Order, or the DIP Documents or any subsequent order of the

209670301 v2

Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code (subject to entry of the Final Order, and to the extent set forth therein, approving the waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code), whether asserted or assessed by through or on behalf of the Debtors.

39.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

40.    <u>Limitation of Liability</u>.  Subject to the entry of the Final Order, in determining to make extensions of credit under the DIP Facility, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), the DIP Documents, or the Prepetition Credit Documents or Prepetition Second Lien Documents, as applicable, none of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability, Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Financing Documents shall in any way be construed or interpreted to impose or allow

the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or any successor of any of the foregoing, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

41.     <u>Credit Bidding</u>.  The DIP Agent shall have the unqualified right to credit bid up to the full amount of the DIP Obligations in any sale of the DIP Collateral (or any part thereof) without the need for further Court order and whether such sale is pursuant to section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. The Successor Prepetition Agent and the Successor Prepetition Lender shall have, subject to the terms of Section 363(k) of the Bankruptcy Code, the right to credit bid up to the full amount of the Prepetition Obligations in any sale of the Prepetition Collateral (or any part thereof) without the need for further Court order and whether such sale is pursuant to section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

42.     <u>Discharge Waiver</u>.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in these Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of such confirmed plan of reorganization. None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash of the DIP Obligations on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.

43.     <u>Rights Preserved</u>.  The entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Agent, the DIP

Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and/or the Prepetition Second Lien Lender to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and/or the Prepetition Second Lien Lender under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, and/or the Prepetition Second Lien Lender. The DIP Agent, DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, the Prepetition Second Lien Lender, and the Debtors hereby agree that the Prepetition Intercreditor Agreement remains in full force and effect, subject to the terms and conditions of this Interim Order.

44.     <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, or the Prepetition Second Lien Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents, the Prepetition Second Lien Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor Prepetition Lender, or the Prepetition Second Lien Lender.

45.     <u>Binding Effect of Interim Order</u>.  Immediately upon entry by the Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Successor Prepetition Agent, the Successor

209670301 v2

Prepetition Lender, the Prepetition Second Lien Lender, all other creditors of the Debtors, any Committee, any other statutory committee that may be appointed in these Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these cases, any Successor Cases, or upon dismissal of any of these Chapter 11 Cases or Successor Cases.

46.    <u>No Right to Seek Modification</u>. Unless requested by the DIP Agent, the Debtors irrevocably waive any right to seek any modification or extension of this Interim Order (in whole or in part) without the prior consent of the DIP Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent.

47.    <u>Survival</u>. The terms of this Interim Order and any actions taken pursuant hereto, shall survive the entry of any order which may be entered: (a) confirming any plan in the Chapter 11 Cases; (b) dismissing the Chapter 11 Cases; (c) converting the Chapter 11 Cases to any other chapter under the Bankruptcy Code; (d) withdrawing of the references of the Chapter 11 Cases from the Bankruptcy Court; and (e) providing for abstention from handling or retaining of jurisdiction of these Chapter 11 Cases in the Bankruptcy Court.  The terms and provisions of this Interim Order as well as the protections granted pursuant to this Interim Order and the DIP Credit Agreement, shall continue in full force and effect notwithstanding the entry of such order, and such protections shall maintain their priority as provided by this Interim Order until all the obligations of the Debtors to the DIP Agent and the DIP Lenders pursuant to the DIP Credit Agreement are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The DIP Obligations shall not be discharged by the entry of an order confirming a plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy

Code.  The Debtors shall not propose or support any plan that is not conditioned upon the payment in full in cash of all of the DIP Obligations, on or prior to the earlier to occur of (i) the effective date of such plan; and (ii) the Maturity Date.

48.    <u>Interim Order Controls; Priority of Terms</u>.  To the extent of any conflict between or among the Motion, the DIP Documents, and this Interim Order, the terms and provisions of this Interim Order shall govern. The failure to reference any provision of the DIP Documents in this Interim Order shall not affect the enforceability of such provision.

49.    <u>Waiver of Applicable Stay</u>.  Any applicable stay (including, without limitation, under Bankruptcy Rules 4001(a)(3), 6004(h), and 7062) is hereby waived and shall not apply to this Interim Order.

50.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for September 3, 2019, at 1:00 p.m. (prevailing Eastern Time) before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801. Objections to the entry of the proposed Final Order shall be in writing and filed with the Clerk of the Court no later than on August 23, 2019, at 4:00 p.m. (prevailing Eastern Time), with copies served upon: (i) proposed counsel to the Debtors, (a) Robinson & Cole LLP, 1000 N. West Street, Suite 1200, Wilmington, Delaware 19801 (Attn: Jamie L. Edmonson, email: jedmonson@rc.com), and (b) Bryan Cave Leighton Paisner LLP, 1201 W. Peachtree Street, NW, 14th Floor, Atlanta, Georgia 30309-3471 (Attn: Mark Duedall, email: mark.duedall@bclplaw.com and Andrew J. Schoulder, email: andrew.schoulder@bclplaw.com), (ii) counsel for the DIP Lender, (a) Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036 (Attn: Cathy Hershcopf, email:

209670301 v2

chershcopf@cooley.com), and (b) Bayard P.A., 600 North King Street, Ste. 400, Wilmington, DE 19801 (Attn Erin R. Fay email: efay@bayardlaw.com; (iii) counsel to any statutory committee appointed in these Cases; and (iv) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Benjamin Hackman,, email: Benjamin.A.Hackman@usdoj.gov).  If no objections to entry of the Final Order on the Motion are timely received, this Court may enter such final order without further notice or hearing.

51.    *Nunc Pro Tunc* Effect of Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.

52.    Retention of Jurisdiction. The Court has retained and will retain jurisdiction to interpret, implement, and enforce this Interim Order and the DIP Documents according to their terms.


**Dated: August 14th, 2019**
**Wilmington, Delaware**

**BRENDAN L. SHANNON**
**UNITED STATES BANKRUPTCY JUDGE**

# **EXHIBIT A**

## **DIP CREDIT AGREEMENT**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

by and among

**LOOT CRATE, INC.,**
as Borrower,

**LOOT CRATE PARENT, INC.,**
as Parent and a Guarantor,

the Subsidiaries of Parent
from time to time party hereto as Guarantors,

the Lenders
from time to time party hereto

and

**MONEY CHEST LLC,**
as Administrative Agent and Collateral Agent

Dated as of August [__], 2019

# TABLE OF CONTENTS

**Page**

ARTICLE I
Definitions ............................................................................................................... 1
    SECTION 1.01.   Defined Terms ........................................................... 1
    SECTION 1.02.   Other Interpretive Provisions ................................... 26
    SECTION 1.03.   Accounting Terms and Principles ............................ 27
    SECTION 1.04.   Rounding .................................................................. 28
    SECTION 1.05.   References to Agreements, Laws, etc. ...................... 28
    SECTION 1.06.   Times of Day ............................................................ 28
    SECTION 1.07.   Timing of Payment or Performance ......................... 28
    SECTION 1.08.   Corporate Terminology ............................................ 28

ARTICLE II
Amount and Terms of Loans ................................................................................... 28
    SECTION 2.01.   Term Loans ............................................................... 28
    SECTION 2.02.   Change of Lending Office ........................................ 29
    SECTION 2.03.   Lender Branches ....................................................... 29
    SECTION 2.04.   Notice of Borrowing for Delayed Draw Term Loans ................................. 30
    SECTION 2.05.   Disbursement of Funds ............................................ 30
    SECTION 2.06.   Payment of Loans; Evidence of Debt ...................... 30
    SECTION 2.07.   Reserved. .................................................................. 31
    SECTION 2.08.   Reserved. .................................................................. 31
    SECTION 2.09.   Interest. ..................................................................... 31
    SECTION 2.10.   Increased Costs, Illegality, etc. ................................ 32
    SECTION 2.11.   Reserved. .................................................................. 34
    SECTION 2.12.   Defaulting Lender ..................................................... 34

ARTICLE III
Fees and Commitment Terminations ....................................................................... 35
    SECTION 3.01.   Fees ........................................................................... 35
    SECTION 3.02.   Termination and Reduction of Commitments ........... 36

ARTICLE IV
Payments ................................................................................................................. 36
    SECTION 4.01.   Voluntary Prepayments ............................................ 36
    SECTION 4.02.   Mandatory Prepayments ........................................... 36
    SECTION 4.03.   Payment of Obligations; Method and Place of Payment ............................. 38

SECTION 4.04.    Taxes ................................................................................. 38

SECTION 4.05.    Reserved ............................................................................ 42

SECTION 4.06.    Computations of Interest and Fees ..................................... 42

ARTICLE V
Conditions Precedent to Loans ..................................................................... 42

SECTION 5.01.    Conditions Precedent to Closing Date Term Loan ............ 42

SECTION 5.02.    Conditions Precedent to Delayed Draw Term Loans ........ 47

SECTION 5.03.    ........................................................................................... 47

ARTICLE VI
Guarantee ...................................................................................................... 48

SECTION 6.01.    Guarantee ........................................................................... 48

SECTION 6.02.    Right of Contribution ........................................................ 49

SECTION 6.03.    No Subrogation ................................................................. 49

SECTION 6.04.    Modification of the Guarantor Obligations ...................... 49

SECTION 6.05.    Guarantee Absolute and Unconditional ............................ 50

SECTION 6.06.    Reinstatement .................................................................... 51

SECTION 6.07.    Payments ........................................................................... 51

SECTION 6.08.    Taxes ................................................................................. 51

ARTICLE VII
Representations, Warranties and Agreements .............................................. 51

SECTION 7.01.    Status ................................................................................. 51

SECTION 7.02.    Power and Authority ......................................................... 51

SECTION 7.03.    No Violation ...................................................................... 52

SECTION 7.04.    Litigation, Labor Controversies, etc ................................. 52

SECTION 7.05.    Use of Proceeds; Regulations U and X ............................ 52

SECTION 7.06.    Approvals, Consents, etc .................................................. 52

SECTION 7.07.    Investment Company Act .................................................. 53

SECTION 7.08.    Accuracy of Information. .................................................. 53

SECTION 7.09.    Financial Condition; Financial Statements ....................... 53

SECTION 7.10.    Tax Returns and Payments ............................................... 54

SECTION 7.11.    Compliance with ERISA ................................................... 54

SECTION 7.12.    Subsidiaries ....................................................................... 55

SECTION 7.13.    Intellectual Property; Licenses, etc .................................. 55

SECTION 7.14.    Environmental Warranties ................................................ 56

SECTION 7.15.    Ownership of Properties .................................................... 58

SECTION 7.16.    Reserved ................................................................................. 58
SECTION 7.17.    [Reserved]. .............................................................................. 58
SECTION 7.18.    Locations of Offices, Records and Collateral ............................ 58
SECTION 7.19.    Compliance with Laws and Permits; Authorizations. ................ 58
SECTION 7.20.    No Material Adverse Effect ....................................................... 59
SECTION 7.21.    Contractual or Other Restrictions .............................................. 59
SECTION 7.22.    Collective Bargaining Agreements ............................................ 59
SECTION 7.23.    Insurance ................................................................................... 59
SECTION 7.24.    Evidence of Other Indebtedness ................................................ 59
SECTION 7.25.    Deposit Accounts and Securities Accounts ................................ 60
SECTION 7.26.    Absence of any Undisclosed Liabilities ..................................... 60
SECTION 7.27.    Reserved. ................................................................................... 60
SECTION 7.28.    Anti-Terrorism Laws ................................................................. 60
SECTION 7.29.    Privacy and Data Security. ......................................................... 60
SECTION 7.30.    Parent, LC Funding and Holdings Activities ............................ 62
SECTION 7.31.    Superpriority Claims .................................................................. 62
SECTION 7.32.    Budget ....................................................................................... 62
SECTION 7.33.    Financing Order ......................................................................... 62

ARTICLE VIII
Affirmative Covenants .......................................................................................... 62
SECTION 8.01.    Financial Information, Reports, Notices and Information ......... 63
SECTION 8.02.    Books, Records and Inspections; Field Exams .......................... 65
SECTION 8.03.    Maintenance of Insurance .......................................................... 66
SECTION 8.04.    Payment of Taxes ...................................................................... 66
SECTION 8.05.    Maintenance of Existence; Compliance with Laws, etc. ........... 66
SECTION 8.06.    Environmental Compliance. ....................................................... 66
SECTION 8.07.    ERISA ....................................................................................... 68
SECTION 8.08.    Maintenance of Properties ......................................................... 69
SECTION 8.09.    End of Fiscal Years; Fiscal Quarters ......................................... 69
SECTION 8.10.    Additional Guarantors and Grantors .......................................... 70
SECTION 8.11.    Pledges of Additional Stock ...................................................... 70
SECTION 8.12.    Use of Proceeds ......................................................................... 70
SECTION 8.13.    Further Assurances ..................................................................... 70
SECTION 8.14.    Collateral Access Agreements .................................................... 71
SECTION 8.15.    Bank Accounts. .......................................................................... 71

SECTION 8.16.   Lender Meetings .................................................................... 71

SECTION 8.17.   Post-Closing Covenants ......................................................... 72

SECTION 8.18.   Sanctions; Anti-Corruption Laws............................................ 72

SECTION 8.19.   [Reserved]. ............................................................................ 72

SECTION 8.20.   Privacy and Data Security. .................................................... 72

SECTION 8.21.   Milestones .............................................................................. 73

SECTION 8.22.   Collection Account .................................................................. 73

ARTICLE IX
Negative Covenants ........................................................................................... 74

SECTION 9.01.   Limitation on Indebtedness ..................................................... 74

SECTION 9.02.   Limitation on Liens ................................................................. 75

SECTION 9.03.   Consolidation, Merger, etc ..................................................... 77

SECTION 9.04.   Permitted Dispositions ............................................................ 77

SECTION 9.05.   Investments.............................................................................. 79

SECTION 9.06.   Restricted Payments ................................................................ 80

SECTION 9.07.   Prepayments and Modification of Certain Agreements ............... 80

SECTION 9.08.   Sale and Leaseback ................................................................. 81

SECTION 9.09.   Transactions with Affiliates .................................................... 81

SECTION 9.10.   Restrictive Agreements, etc..................................................... 81

SECTION 9.11.   Hedging Agreements ............................................................... 82

SECTION 9.12.   Changes in Business and Fiscal Year....................................... 82

SECTION 9.13.   Financing Order; Administrative Expense Priority; Payments ........ 82

ARTICLE X
Events of Default ............................................................................................... 83

SECTION 10.01.   Listing of Events of Default ................................................... 83

SECTION 10.02.   Remedies Upon Event of Default............................................ 89

ARTICLE XI
The Agents ........................................................................................................ 89

SECTION 11.01.   Appointment........................................................................... 89

SECTION 11.02.   Delegation of Duties............................................................... 90

SECTION 11.03.   Exculpatory Provisions........................................................... 90

SECTION 11.04.   Reliance by Agents ................................................................. 90

SECTION 11.05.   Notice of Default .................................................................... 91

SECTION 11.06.   Non-Reliance on Agents and Other Lenders............................ 91

SECTION 11.07.   Indemnification ...................................................................... 92

SECTION 11.08.   Agent in Its Individual Capacity ................................................ 92

SECTION 11.09.   Successor Agents.................................................................. 92

SECTION 11.10.   Agents Generally................................................................... 93

SECTION 11.11.   Restrictions on Actions by Secured Parties; Sharing of Payments; Credit
Bidding.                 ........................................................................................... 93

SECTION 11.12.   Agency for Perfection ............................................................ 94

ARTICLE XII
Miscellaneous ................................................................................................. 94

SECTION 12.01.   Amendments and Waivers........................................................ 94

SECTION 12.02.   Notices and Other Communications; Facsimile Copies............................ 95

SECTION 12.03.   No Waiver; Cumulative Remedies ............................................... 96

SECTION 12.04.   Survival of Representations and Warranties ................................... 97

SECTION 12.05.   Payment of Expenses and Taxes; Indemnification................................ 97

SECTION 12.06.   Successors and Assigns; Participations and Assignments; Replacement of
Lender.                  ........................................................................................... 98

SECTION 12.07.   Pledge of Loans .................................................................. 102

SECTION 12.08.   Adjustments; Set-off.............................................................. 102

SECTION 12.09.   Counterparts ...................................................................... 103

SECTION 12.10.   Severability........................................................................ 103

SECTION 12.11.   Integration ........................................................................ 103

SECTION 12.12.   GOVERNING LAW ............................................................... 103

SECTION 12.13.   Submission to Jurisdiction; Waivers ........................................... 103

SECTION 12.14.   Acknowledgments ................................................................ 104

SECTION 12.15.   WAIVERS OF JURY TRIAL ...................................................... 105

SECTION 12.16.   Confidentiality.................................................................... 105

SECTION 12.17.   Press Releases, etc ............................................................... 107

SECTION 12.18.   Releases of Guarantees and Liens ............................................... 107

SECTION 12.19.   USA Patriot Act................................................................... 108

SECTION 12.20.   No Fiduciary Duty................................................................ 108

SECTION 12.21.   Authorized Officers .............................................................. 108

SECTION 12.22.   Subordination of Intercompany Indebtedness .................................. 108

SECTION 12.23.   Public Lenders .................................................................... 108

SECTION 12.24.   Reserved. .......................................................................... 109

SECTION 12.25.   Tax Treatment .................................................................... 109

SCHEDULES

Schedule 1.01 Commitments
Schedule 7.04 Litigation
Schedule 7.10 Tax Liens
Schedule 7.12 Subsidiaries
Schedule 7.13 Intellectual Property
Schedule 7.14 Environmental Matters
Schedule 7.15 Real Property
Schedule 7.18 Principal Place of Business/Chief Executive Office
Schedule 7.21 Contractual or Other Restrictions
Schedule 7.22 Collective Bargaining Agreements
Schedule 7.23 Insurance
Schedule 7.24 Existing Indebtedness
Schedule 7.25 Deposit Accounts and Securities Accounts
Schedule 9.02 Liens
Schedule 9.05 Investments
Schedule 9.09 Transactions with Affiliates
Schedule 9.12 Description of Business
Schedule 12.02        Addresses for Notices

EXHIBITS

Exhibit A            Form of Assignment and Acceptance
Exhibit B            [Reserved]
Exhibit C-1          Form of Closing Date Term Note
Exhibit C-2          Form of Delayed Draw Term Note
Exhibit D            [Reserved]
Exhibit E            Form of Funding Request

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of August [__], 2019, is among **LOOT CRATE, INC.**, a Delaware corporation (the "*Borrower*"), **LOOT CRATE PARENT, INC.**, a Delaware corporation (the "*Parent*"), any Subsidiaries of Parent party hereto that are Guarantors or become Guarantors hereunder pursuant to Section 8.10 below, the lenders from time to time party hereto (each a "*Lender*" and, collectively, the "*Lenders*"), **MONEY CHEST LLC** ("*Money Chest*"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "*Administrative Agent*") and Money Chest, as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "*Collateral Agent*", and together with the Administrative Agent, collectively, the "*Agents*" and each an "*Agent*").

## RECITALS

**WHEREAS**, on August 11, 2019 (the "*Petition Date*"), each of the Credit Parties filed voluntary bankruptcy petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

**WHEREAS**, in order to provide funds for the Credit Parties working capital and other general corporate purposes during the Bankruptcy Case, the Credit Parties have requested that the Lenders make loans and other financial accommodations to the Borrower as more fully set forth herein; and

**WHEREAS**, the Lenders have agreed to make such loans and other financial accommodations to the Borrower subject to the terms and conditions of this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## ARTICLE I
## Definitions

SECTION 1.01.    Defined Terms.  As used herein, the following terms shall have the meanings specified in this Section 1.01 unless the context otherwise requires:

"*Adequate Protection*" shall have the meaning set forth in the Financing Order.

"*Administrative Agent*" shall have the meaning set forth in the preamble to this Agreement.

"*Administrative Questionnaire*" shall mean a questionnaire completed by each Lender, in a form approved by the Administrative Agent, in which such Lender, among other things, (a) designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Credit Parties and their Related Parties or their respective securities) will be made available and who may receive such information in

accordance with such Lender's compliance procedures and Applicable Laws, including federal and state securities laws and (b) designates an address, facsimile number, electronic mail address and/or telephone number for notices and communications with such Lender.

"*Affiliate*" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"*Agents*" shall have the meaning set forth in the preamble to this Agreement.

"*Agreement*" shall mean this Debtor-in-Possession Credit Agreement, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"*Applicable Laws*" shall mean, as to any Person, any law (including common law), statute, regulation, ordinance, rule, order, policy, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority or determination of an arbitrator, in each case applicable to or binding on such Person or any of its property, products, business, assets or operations or to which such Person or any of its property, products, business, assets or operations is subject.

"*Application Event*" shall have the meaning set forth in Section 4.02(d).

"*Approved Fund*" shall mean any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"*Asset Sale*" shall mean any Disposition of any property, assets, or interests in property of the Credit Parties that constitutes Collateral outside of the ordinary course of business.

"*Assignment and Acceptance*" shall mean an assignment and acceptance substantially in the form of Exhibit A.

"*Attributable Indebtedness*" shall mean, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear as a liability on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"*Auction*" means an auction for the sale of all or substantially all of the Credit Parties' assets in accordance with the requirements for the Sale Procedures Order.

"*Authorized Officer*" shall mean, with respect to any Credit Party, the president, the chief financial officer, the chief operating officer, the chief restructuring officer, the chief transformation officer, the secretary, the treasurer or any other senior officer of such Credit Party, but, in any event, with respect to financial matters, the chief financial officer of such

Credit Party or such other senior officer of such Credit Party designated as such by the applicable Credit Party in writing.

"***Avoidance Actions***" shall mean any and all claims and causes of action of any Credit Party's estate arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"***Bankruptcy Case***" shall mean collectively the cases of the Credit Parties jointly administered under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court, bearing case number 19-11791 (BLS) and any superseding chapter 7 case.

"***Bankruptcy Code***" shall mean the United States Bankruptcy Code (11 U.S.C. § 101 et seq.), as amended, and any successor statute.

"***Bankruptcy Court***" shall have the meaning set forth in the recitals to this Agreement.

"***Benefited Lender***" shall have the meaning set forth in Section 12.08(a).

"***Board***" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"***Board of Directors***" means the board of directors, board of managers or other equivalent governing body of a Person.

"***Borrower***" shall have the meaning set forth in the preamble to this Agreement.

"***Budget***" shall mean the thirteen (13) week consolidated weekly operating budget of Borrower setting forth the Projected Information for the periods described therein, a copy of the initial one of which is attached as Exhibit D; such thirteen-week Budget to be updated (in substantially the same format as the prior thirteen-week Budget) weekly by Borrower, submitted to Administrative Agent and, upon acceptance in writing by the Administrative Agent in its sole discretion, the prior approved Budget, as updated, shall constitute the then approved Budget.

"***Business Day***" shall mean any day excluding Saturday, Sunday and any day that shall be in the City of New York a legal holiday or a day on which banking institutions are authorized by law or other governmental actions to close.

"***Capital Stock***" shall mean any and all shares, interests, participations, units or other equivalents (however designated) of capital stock of a corporation, membership interests in or the issued share capital in a limited liability company, partnership interests of a limited partnership, any and all equivalent ownership interests in a Person and any and all warrants, rights or options to purchase any of the foregoing.

"***Capitalized Lease Obligations***" shall mean, as applied to any Person, all obligations under Capitalized Leases of such Person or any of its Subsidiaries, in each case taken at the amount thereof accounted for as liabilities on the balance sheet (excluding the footnotes thereto) of such Person in accordance with GAAP.

"***Capitalized Leases***" shall mean, as applied to any Person, all leases of property that have been or should be, in accordance with GAAP, recorded as capitalized leases on the balance sheet of such Person or any of its Subsidiaries, on a consolidated basis; provided, that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability on the balance sheet (excluding the footnotes thereto) of such Person in accordance with GAAP.

"***Carve-Out***" has the meaning set forth in the Financing Order.

"***Carve-Out Expense Reserve***" shall mean, as of any date of determination, a reserve established on account of the Carve-Out and Other Statutory Liabilities.

"***Cash Equivalents***" shall mean:

(a)    any direct obligation of (or unconditional guarantee by) the United States (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States) maturing not more than one year after the date of acquisition thereof;

(b)    commercial paper maturing not more than one year from the date of issue and issued by (i) a corporation (other than an Affiliate of any Credit Party) organized under the laws of any state of the United States or of the District of Columbia or the laws of the United Kingdom and, at the time of acquisition thereof, rated A-1 or higher by S&P or P-1 or higher by Moody's, or carrying an equivalent rating by a nationally recognized rating agency if at any time neither S&P or Moody's shall be rating such obligations, or (ii) any Lender (or its holding company);

(c)    any certificate of deposit, time deposit or bankers acceptance, maturing not more than one year after its date of issuance, which is issued by either:  (i) a bank organized under the laws of the United States (or any state thereof) which has, at the time of acquisition thereof, (A) a credit rating of A-2 or higher from Moody's or A or higher from S&P and (B) a combined capital and surplus greater than $500,000,000, or (ii) a Lender;

(d)    any repurchase agreement having a term of thirty (30) days or less entered into with any Lender or any commercial banking institution satisfying, at the time of acquisition thereof, the criteria set forth in clause (c)(i) which (i) is secured by a fully perfected security interest in any obligation of the type described in clause (a), and (ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder;

(e)    [reserved];

(f)    mutual funds investing primarily in assets described in clauses (a) through (e) of this definition; and

(g)     funds which have been released to Borrower from PayPal or CCP and are in transit to a permitted Deposit Account.

"***Cash Management Bank***" shall mean First Republic Bank or such other bank as Collateral Agent may in its discretion determine, in each case, together with its affiliates and correspondent banks.

"***Cash Management Date***" shall mean the Closing Date.

"***Casualty Event***" shall mean the damage, destruction or condemnation, as the case may be, of property of any Person or any of its Subsidiaries.

"***CCP***" shall mean Vantiv, LLC or any other credit card processor of the Credit Parties, each of which must be reasonably acceptable to the Administrative Agent.

"***CERCLA***" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"***Change in Law***" shall mean (a) the adoption of any law, rule, regulation or treaty after the date of this Agreement, (b) any change in any law, rule, regulation or treaty or in the interpretation, implementation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives issued thereunder or in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the day enacted, adopted, issued or implemented.

"***Change of Control***" shall mean an event or series of events by which (a) any Person or group (within the meaning of Rule 13d-5 of the Securities Exchange Act of 1934 as in effect on the Closing Date) shall acquire directly or indirectly, beneficially or of record, shares representing more than 50% of the aggregate ordinary voting power or economic interests represented by the issued and outstanding Capital Stock of the Parent on a fully diluted basis, (b) Parent shall fail to own, directly or indirectly, free and clear of all Liens or other encumbrances (other than Liens created pursuant to any Credit Document), 100% of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Capital Stock of LC Funding except where such failure is as a result of a transaction permitted by the Credit Documents, (c) LC Funding shall fail to own, directly or indirectly, free and clear of all Liens or other encumbrances (other than Liens created pursuant to any Credit Document), 100% of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Capital Stock of Holdings except where such failure is as a result of a transaction permitted by the Credit Documents, (d) except in connection with the exercise of the Warrants, Holdings shall fail to own, directly or indirectly, free and clear of all Liens or other encumbrances (other than Liens created pursuant to any Credit Document), 100% of the

aggregate ordinary voting power and economic interests represented by the issued and outstanding Capital Stock of Borrower (except where such failure is as a result of a transaction permitted by the Credit Documents, (e) the Borrower shall fail to own, directly or indirectly, free and clear of all Liens or other encumbrances (other than Liens created pursuant to any Credit Document), 100% of the aggregate ordinary voting power and economic interests represented by the issued and outstanding Capital Stock of each of its Subsidiaries (or such lesser percentage as may be owned, directly or indirectly, as of the Closing Date or the later acquisition thereof) except where such failure is as a result of a transaction permitted by the Credit Documents or (f) all or substantially all of the assets of Borrower are sold, assigned, transferred or otherwise disposed of to another Person in which a Person or group (within the meaning of Rule 13d-5 of the Securities Exchange Act of 1934 as in effect on the Closing Date), holds more than 50% of the aggregate ordinary voting power over such other Person following such event or series of events.  Notwithstanding anything to the contrary set forth herein, no Lender shall be deemed to be an Affiliate of any Credit Party solely by virtue of receiving, holding or exercising the Warrants or otherwise complying with the terms and provisions of this Agreement and the other Credit Documents.

"***Change of Management***" shall mean an event or series of events by which (a) Stuart Kaufman ceases to be employed as the chief restructuring officer of each Credit Party or Portage Point Partners ceases to be engaged by the Credit Parties as a financial advisor, in each case pursuant to an engagement letter or similar agreement reasonably satisfactory to Administrative Agent; (b) Mark Palmer ceases to be employed as chief transformation officer of each Credit Party or (c) Alex Zyngier ceases to be a member of the Board of Directors of each Credit Party, in each case, unless a successor to such position reasonably acceptable to Administrative Agent has been appointed within thirty (30) days.

"***Claims***" shall have the meaning set forth in the definition of Environmental Claims.

"***Closing Date***" shall mean August [___], 2019.

"***Closing Date Fees***" shall have the meaning set forth in <u>Section 3.01</u> of this Agreement.

"***Closing Date Lenders***" shall mean the Lenders who are extending the Closing Date Term Loan to the Borrower.

"***Closing Date Term Loan***" has the meaning set forth in <u>Section 2.01(a)</u>.

"***Closing Date Term Loan Commitment***" shall mean the obligation of the Closing Date Lenders to make the Closing Date Term Loan hereunder on the Closing Date, in each case in the amounts set forth beside such Closing Date Lender's name under the applicable heading on <u>Schedule 1.01</u> attached hereto or in the Assignment and Acceptance pursuant to which such Closing Date Lender became a Lender under this Agreement, as such amounts may be changed from time to time pursuant to the terms of this Agreement.  On the Closing Date, the total of the Closing Date Term Loan Commitments for all Lenders shall be $1,347,601 as set forth on <u>Schedule 1.01</u>.

"***Closing Date Term Note***" means a promissory note by the Borrower payable to the order of each of the Closing Date Lenders in the amount of each such Closing Date Lender's portion of the Closing Date Term Loan, in substantially the form of Exhibit C-1 attached hereto.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated and rulings issued thereunder.

"***Collateral***" shall mean any assets of any Credit Party (or other assets upon which the Collateral Agent has been, or has purportedly been, granted a Lien in connection with this Agreement pursuant to any Credit Document or the Financing Order), excluding any Excluded Property (as defined in the Security Agreement) but including, without limitation, (a) commercial tort claims (as defined in the UCC), (b) proceeds of director's and officer's insurance policies that constitute property of the bankruptcy estates of the Credit Parties and (c) subject to entry of the Final Order, all claims and causes of action of the Credit Parties' estates and all proceeds thereof, including Avoidance Actions and proceeds of Avoidance Actions.

"***Collateral Access Agreements***" shall mean a collateral access agreement in form and substance reasonably satisfactory to the Collateral Agent between Collateral Agent and any lessor, warehouseman, processor, bailee, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in, any Credit Party's books and records or assets.

"***Collateral Agent***" shall have the meaning set forth in the preamble to this Agreement.

"***Collateral Assignee***" shall have the meaning set forth in Section 12.06(d) of this Agreement.

"***Collections***" shall mean all cash, checks, credit card slips or receipts, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds) of the Credit Parties.

"***Collection Account***" shall mean that certain U.S. Dollar deposit account maintained by the Cash Management Bank in the name of the Borrower to which all payments from PayPal, each CCP and all other Collections are to be remitted as provided in Section 8.22, which account is (subject to the Financing Order) subject to the sole dominion and control of the Prepetition Collateral Agent.

"***Commitment***" shall mean the Closing Date Term Loan Commitment and the Delayed Draw Term Loan Commitment, or any combination thereof (as the context shall permit or require).

"***Commitment Percentage***" shall mean, as to any Lender, the Commitment Percentage (if any) set forth below such Lender's name in Schedule 1.01 hereof (or, in the case of any Lender that became party to this Agreement after the Closing Date pursuant to Section 12.06(b) or (c) hereof, the Commitment Percentage (if any) of such Lender as set forth in the applicable Assignment and Acceptance), as the same may be adjusted upon any assignment by or to such Lender pursuant to Section 12.06(b) or (c) hereof.

"*Committee*" means, collectively, the official committee of unsecured creditors or any other committee formed, appointed or approved in the Bankruptcy Case.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"*Communications*" means, collectively, any notice, demand, communication, information, document or other material that any Credit Party provides to the Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to Section 12.02(a)(ii), including through the Platform.

"*Confidential Information*" shall have the meaning set forth in Section 12.16.

"*Connection Income Taxes*" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Contingent Liability*" shall mean, for any Person, any agreement, undertaking or arrangement by which such Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Stock of any other Person.  The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"*Contractual Obligation*" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound other than the Obligations.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise; provided that, for purposes of this definition, any Person which owns directly or indirectly 10% or more of the equity interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person.  Notwithstanding anything to the contrary set forth herein, neither any Agent nor any Lender shall be deemed to be an Affiliate of any Credit Party solely by virtue of complying with the terms and provisions of, or exercising its rights under, this Agreement and the other Credit Documents. The terms "Controlling" and "Controlled" have meanings correlative thereto.

"*Control Agreement*" shall mean a pledge, collateral assignment, control agreement or bank consent letter, in form and substance reasonably satisfactory to the Collateral Agent, executed and delivered by the applicable Credit Party, the Collateral Agent, and the applicable securities intermediary or bank, which agreement is sufficient to give the Collateral Agent

"control" over each of such Credit Party's securities accounts, deposit accounts or investment property, as the case may be, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"***Copyright Security Agreements***" shall mean any and all copyright security agreements entered into by the Credit Parties in favor of Collateral Agent (as required by the Agreement or any other Credit Document), in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"***Credit Documents***" shall mean (a) this Agreement, the Security Documents, any Notes, any subordination or intercreditor agreements in favor of any Agent with respect to this Agreement, and (b) any other document or agreement executed by any Credit Party, or by Borrower on behalf of the Credit Parties, or any of them, and delivered to any Agent or Lender in connection with any of the foregoing or the Obligations, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time. For the avoidance of doubt, the Credit Documents shall not include any Hedging Agreements.

"***Credit Parties***" shall mean, collectively, Borrower and the Guarantors, and "***Credit Party***" shall mean any of the Credit Parties, individually.

"***Default***" shall mean any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"***Default Rate***" shall mean a rate per annum equal to the applicable rate described in Section 2.09(a) plus three percent (3.00%) per annum.

"***Defaulting Lender***" shall mean any Lender that: (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Commitment, (ii) pay over to either Agent or any Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including a particular Default or Event of Default, if any) has not been satisfied; (b) has notified Borrower or the Administrative Agent in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including a particular Default or Event of Default, if any) to funding a Loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit; (c) has failed, within two (2) Business Days after request by the Administrative Agent, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's receipt of such certification in form and substance satisfactory to the Administrative Agent or (d) has become the subject of an Insolvency Event.

"***Delayed Draw Term Loan***" shall have the meaning set forth in <u>Section 2.01(b)</u>.

"*Delayed Draw Term Loan Commitment*" shall mean the obligation of the Lenders to make the Delayed Draw Term Loan hereunder in accordance with the terms hereof, in each case in the amounts (if any) set forth beside such Lender's name under the applicable heading on Schedule 1.01 attached hereto or in the Assignment and Acceptance pursuant to which such Lender became a Lender under this Agreement, as such amounts may be changed from time to time pursuant to the terms of this Agreement.  On the Closing Date, the total of the Delayed Draw Term Loan Commitments for all Lenders shall be $8,652,399 as set forth on Schedule 1.01.

"*Delayed Draw Term Loan Commitment Percentage*" shall mean, as to any Lender, the Delayed Draw Term Loan Commitment Percentage (if any) set forth below such Lender's name in Schedule 1.01 hereof (or, in the case of any Lender that became party to this Agreement after the Closing Date pursuant to Section 12.06(b) or (c) hereof, the Delayed Draw Term Loan Commitment Percentage (if any) of such Lender as set forth in the applicable Assignment and Acceptance), as the same may be adjusted upon any assignment by or to such Lender pursuant to Section 12.06(b) or (c) hereof.

"*Delayed Draw Term Note*" means a promissory note by the Borrower payable to the order of each of the Lenders in the amount of each such Lender's portion of an Delayed Draw Term Loan, in substantially the form of Exhibit C-2 to the Credit Agreement.

"*Designated Jurisdiction*" means any country or territory to the extent that such country or territory is the subject of any Sanction.

"*DIP Motion*" shall mean a motion, in form and substance acceptable to the Administrative Agent and Required Lenders, to be filed in the Bankruptcy Court, pursuant to which motion the Credit Parties shall seek entry of the (i) Interim Order, and (ii) Final Order.

"*Disposition*" shall mean, with respect to any Person, any sale, transfer, lease, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of such Person's or their respective Subsidiaries' assets (including Capital Stock of Subsidiaries) to any other Person in a single transaction or series of transactions.

"*Disqualified Capital Stock*" shall mean any Capital Stock that, by its terms (or by the terms of any security or other Capital Stock into which it is convertible or for which it is exchangeable) or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Qualified Capital Stock or after the Secured Parties are paid in full), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Capital Stock or in connection with a transaction that would constitute an Event of Default under Section 10.01(k) hereof after the Secured Parties are paid in full), in whole or in part, (c) provides for the scheduled payment of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Capital Stock that would constitute Disqualified Capital Stock, in each case, prior to the date that is one hundred and eighty (180) days after the latest Maturity Date; provided, that if such Capital Stock is issued pursuant to a plan for the benefit of employees of Borrower or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock

solely because it may be required to be repurchased by Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"***Dollars***" and "***$***" shall mean dollars in lawful currency of the United States of America.

"***Domestic Subsidiary***" shall mean each Subsidiary of a Credit Party that is a U.S. Person.

"*Draw Date*" shall have the meaning ascribed thereto in Section 2.01(b).

"***Environmental Claims***" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than internal reports prepared by the Credit Parties (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings relating to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law ("***Claims***"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the Release or threatened Release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to the exposure to Hazardous Materials) or the environment.

"***Environmental Law***" shall mean any applicable federal, state or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment or human health or safety (to the extent relating to exposure to Hazardous Materials).

"***ERISA***" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.  Section references to ERISA are to ERISA as in effect at the date of this Agreement and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"***ERISA Affiliate***" shall mean each Person (as defined in Section 3(9) of ERISA), as to which any Credit Party or any Subsidiary of any Credit Party, is, or within the last six (6) years was, treated as a "single employer" (i) within the meaning of Section 414(b), (c) of the Code (and sections 414(m) and (o) of the Code for purposes of provisions relating to section 412 of the Code and section 302 of ERISA) or (ii) as a result of any Credit Party or any Subsidiary of any Credit Party being or having been a general partner of such Person.

"***EST***" shall mean eastern standard time or eastern daylight time, as applicable.

"***Event of Default***" shall have the meaning set forth in Article X.

"***Excluded Accounts***" means any deposit account (a) that is used solely for payment of (i) payroll, bonuses, commissions, other compensation and related expenses or (ii) medical and

dental claims to employees of Borrower or any of its Subsidiaries, or (b) the balance of which consists exclusively of withheld income taxes and federal, state or local employment taxes required to be paid to the IRS or state or local government agencies with respect to employees of Parent or any of its Subsidiaries.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"***Excluded Hedging Obligation***" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"***Excluded Taxes***" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient:  (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by Borrower under Section 12.06) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 4.04, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 4.04(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"***FATCA***" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury Regulations thereunder or official interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above), and any intergovernmental agreements (together with any Laws implementing such agreements) implementing the foregoing.

"***Fees***" shall mean all amounts payable pursuant to, or referred to in, Section 3.01.

"*Final Order*" means the order of the Bankruptcy Court entered in the Bankruptcy Case after a final hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent and Required Lenders in their sole discretion, which, among other matters but not by way of limitation, authorizes, on a final basis, the Credit Parties to execute and perform under the terms of this Agreement and the other Credit Documents.

"*Financing Order*" means, (i) until the entry of the Final Order, the Interim Order, and (ii) after the entry of the Final Order, the Final Order, together with all amendments, modifications and supplements to such Interim Order or Final Order, as applicable.

"*Foreign Lender*" means (a) if a Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if a Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"*Foreign Subsidiary*" shall mean each Subsidiary of a Credit Party that is not a Domestic Subsidiary.

"*Funding Request*" shall mean a written request for a Loan in substantially the form attached hereto to as Exhibit E.

"*GAAP*" shall mean generally accepted accounting principles in the United States of America set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), including the FASB Accounting Standards Codification™, which are applicable to the circumstances as of the date of determination, subject to Section 1.03.

"*Governmental Authority*" shall mean the government of the United States, any foreign country or any multinational or supranational authority, or any state, commonwealth, protectorate or political subdivision thereof, and any entity, body or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, the PBGC and other administrative bodies or quasi-governmental entities established to perform the functions of any such agency or authority.

"*Guarantee Obligations*" shall mean, as to any Person, any Contingent Liability of such Person or other obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the

primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; provided that the term "*Guarantee Obligations*" shall not include endorsements of instruments for deposit or collection in the ordinary course of business and consistent with past practice or customary and reasonable indemnity obligations in effect on the Closing Date, entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith and reasonable business judgment.

"*Guarantors*" shall mean (a) Parent, (b) each direct or indirect Subsidiary of Parent and (c) any other Person that provides a guarantee for the payment and performance of the Obligations pursuant to an agreement reasonably acceptable to the Administrative Agent after the Closing Date pursuant to Section 8.10.

"*Hazardous Materials*" shall mean (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "waste", "recycled materials", "sludge", "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law; and (c) any other chemical, waste, recycled material, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"*Hedging Agreement*" shall mean (a) any and all agreements or documents not entered into for speculative purposes that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging exposure to fluctuations in interest or exchange rates, loan, credit exchange, security, or currency valuations or commodity prices, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement including any such obligations or liabilities under any such master agreement.

"*Hedging Obligations*" shall mean, with respect to any Person, the obligations of such Person under Hedging Agreements.

"*Historical Financial Statements*" shall mean the unaudited consolidated balance sheets of Parent and its Subsidiaries as of the last day of the fiscal quarter ended June 30, 2019, together with the related consolidated statements of income and cash flows for such fiscal quarter.

"*Holdings*" shall mean Loot Crate Holdings, Inc., a Delaware corporation.

"*Indebtedness*" shall mean, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

      (a)      all indebtedness of such Person for borrowed money and all indebtedness of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

      (b)      the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

      (c)      net Hedging Obligations of such Person;

      (d)      all obligations of such Person to pay the deferred purchase price of property or services, but excluding (i) trade accounts payable in the ordinary course of business and (ii) negotiated payment obligations to vendors agreed to by the Credit Parties and disclosed by Credit Parties to Agents and Lenders prior to the Closing;

      (e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

      (f)      all Attributable Indebtedness;

      (g)      all obligations of such Person with respect to the redemption, repayment or other repurchase or payment in respect of any Disqualified Capital Stock; and

      (h)      all Guarantee Obligations of such Person in respect of any of the foregoing;

provided, that Indebtedness shall not include (i) prepaid or deferred revenue arising in the ordinary course of business on customary terms, (ii) purchase price holdbacks arising in the ordinary course of business and on customary terms in respect of a portion of the purchase price of an asset to satisfy warranties or other unperformed obligations of the seller of such asset, (iii) endorsements of checks or drafts arising in the ordinary course of business and consistent with past practice, and (iv) preferred Capital Stock to the extent not constituting Disqualified Capital Stock.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or another entity not disregarded for tax purposes) in which such Person is a general partner or a joint venture (whether partner or member), except to the extent such Person's liability for such Indebtedness is otherwise limited. The amount of Indebtedness of any Person for purposes of clause (e) above shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of

such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith and reasonable business judgment.

"***Indemnified Liabilities***" shall have the meaning set forth in <u>Section 12.05</u>.

"***Indemnified Taxes***" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"***Insolvency Event***" shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy, insolvency or examinership proceeding (including any proceeding under Title 11 of the United States Code), or regulatory restrictions, (b) has had a receiver, examiner, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it or has called a meeting of its creditors, (c) admits in writing its inability, or be generally unable, to pay its debts as they become due or cease material operations of its present business, (d) with respect to a Lender, such Lender is unable to perform hereunder due to the application of Applicable Law, or (e) in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Authority or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"***Interest Payment Date***" shall have the meaning set forth in <u>Section 2.09(b)</u>.

"***Interim Order***" means collectively, the order of the Bankruptcy Court entered in the Bankruptcy Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent and Required Lenders in their sole discretion, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Credit Parties to execute and perform under the terms of this Agreement and the other Credit Documents.

"***Investment***" shall mean, relative to any Person, (a) any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such first Person of any bonds, notes, debentures or other debt securities of any such other Person; (b) the incurrence of Contingent Liabilities for the benefit of any other Person; and (c) acquisition of any Capital Stock or other investment held by such Person in any other Person.  The amount of any Investment at any time shall be the original principal or capital amount thereof less all returns of principal or equity thereon made on or before such time and shall, if made by the transfer or

exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"***IP Rights***" shall have the meaning set forth in <u>Section 7.13</u>.

"***LC Funding***" shall mean LC Funding, Inc., a Delaware corporation.

"***Lender***" shall have the meaning set forth in the preamble to this Agreement.

"***Lien***" shall mean any mortgage, pledge, security interest, hypothecation, assignment for collateral purposes, lien (statutory or other) or similar encumbrance, and any easement, right-of-way, license, restriction (including zoning restrictions), defect, exception or irregularity in title or similar charge or encumbrance (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), including all "liens" as defined by Section 101(37) of the Bankruptcy Code; <u>provided</u> that in no event shall an operating lease entered into in the ordinary course of business and on customary terms or any precautionary UCC filings made pursuant thereto by an applicable lessor or lessee, be deemed to be a Lien.

"***Loans***" means the Closing Date Term Loan and any Delayed Draw Term Loans, in the aggregate, or any of them, as the context shall require.

"***Mandatory Payment Amount***" shall have the meaning set forth in <u>Section 4.02(a)(i)</u>.

"***Mandatory Payment Date***" shall have the meaning set forth in <u>Section 4.02(a)(i)</u>.

"***Material Adverse Effect***" shall mean, individually or in the aggregate, a material adverse effect on (a) the business, assets, liabilities (actual or contingent), operations, financial condition, results of operations or performance of the Credit Parties, taken as a whole, (b) the validity or enforceability of this Agreement or any of the other Credit Documents (it being agreed that documents described in clause (b) of the definition of "Credit Documents" shall be taken as a whole), (c) the ability of any Credit Party to perform its obligations under any Credit Document (it being agreed that documents described in clause (b) of the definition of "Credit Documents" shall be taken as a whole) to which it is a party, (d) the rights or remedies of the Secured Parties or the Lenders hereunder or thereunder, or (e) the priority of any Liens granted to Collateral Agent in or to any material Collateral (other than as a result of voluntary and intentional discharge of the Lien by the Collateral Agent), in each case except for the commencement of the Bankruptcy Case and the events that customarily and reasonably result from the commencement of the Bankruptcy Case.

"***Maturity Date***" shall mean the earliest to occur of: (a) 40 days after the Petition Date, (b) the earlier of (x) the date that is 25 days after the Petition Date unless the Final Order has been entered and has become effective prior to the expiration of such period (or such later date as the Administrative Agent and each of the Lenders  may approve in writing in their respective sole and absolute discretion) and (y) the date that the Interim Order or the Final Order, as applicable, is reversed, modified, amended, stayed or vacated absent the Administrative Agent's and Required Lenders' written consent, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective

date") of a plan of reorganization filed in the Bankruptcy Case that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the consummation of a sale of all or substantially all of the assets of the Credit Parties under Section 363 of the Bankruptcy Code, (e) the date the Bankruptcy Court orders the conversion of any of the Credit Parties' bankruptcy cases to a Chapter 7 liquidation or the dismissal of the Bankruptcy Case or the appointment of a trustee or examiner with expanded power in the Bankruptcy Case, and (f) the acceleration of the Loans and the termination of the Commitments in accordance with the terms and conditions of this Agreement.

"*Milestones*" shall have the meaning set forth in Section 8.21.

"*Moody's*" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"*Mortgage*" shall mean each mortgage, deed of trust, or deed to secure debt, trust deed or other security document granted by any applicable Credit Party to the Collateral Agent for the benefit of the Secured Parties in respect of any Real Property owned or leased by such Credit Party, in such form as agreed between such Credit Party and the Collateral Agent.

"*Multiemployer Plan*" shall mean any multiemployer plan, as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) any Credit Party, any Subsidiary of any Credit Party or any ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which any Credit Party, any Subsidiary of any Credit Party or any ERISA Affiliate contributed to or had an obligation to contribute to such plan.

"*Non-Defaulting Lender*" shall mean, at any time, any Lender holding a Commitment which is not a Defaulting Lender.

"*Notes*" means, collectively, the Closing Date Term Notes and any Delayed Draw Term Notes.

"*Notice of Control*" shall have the meaning set forth in Section 8.15(b).

"*Obligations*" shall mean (a) with respect to Borrower, all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of Borrower arising under or in connection with any Credit Document, including all original issue discount, fees, costs, expenses (including fees, costs and expenses incurred during the pendency of any proceeding of the type described in Section 10.01(i), whether or not allowed or allowable in such proceeding) and premiums payable under any Credit Document, the principal of and interest (including interest accruing during the pendency of any proceeding of the type described in Section 10.01(i), whether or not allowed or allowable in such proceeding) on the Loans, all indemnification obligations and all obligations to pay or reimburse any Secured Party for paying any costs or expenses under any Credit Document, or (b) with respect to each Credit Party other than Borrower, all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of such Credit Party arising under or in connection with any Credit Document, all indemnification obligations and all obligations to pay or reimburse any Secured Party for paying any costs or expenses under any Credit Document.  For the avoidance of doubt, the Obligations

-18-

shall not include (a) any Hedging Obligations or (b) solely with respect to Parent, any obligations with respect to the Warrants.

"*Organization Documents*" shall mean, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate of incorporation, constitution or articles of formation or organization and operating agreement (if relevant); and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and, if applicable, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"*Original Subordinated Debt*" shall have the meaning given to such term in the definition of Subordinated Debt.

"*Original Secured Subordinated Debt*" shall have the meaning given to such term in the definition of Subordinated Debt.

"*Original Subordinated Lenders*" shall mean Brian Laibow, Pacific Capital Management LLC, Josh Payne, George Davis, Money Chest, Bio World Merchandising, Inc., Geoffrey Arens, and Shannon Hsu, together with the other holders of the Original Subordinated Debt from time to time.

"*Original Subordination Agreements*" shall mean those certain Subordination and Intercreditor Agreements dated as of August 3, 2018 or January 1, 2019, by and among Prepetition Agents, the Original Subordinated Lenders and the Credit Parties, as may be amended, restated, supplemented and otherwise modified from time to time.

"*Original Unsecured Subordinated Debt*" shall have the meaning given to such term in the definition of Subordinated Debt.

"*Other Connection Taxes*" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"*Other Statutory Liabilities*" shall mean accrued and unpaid statutory liabilities of the Credit Parties which (a) may result in claims that have lien priority or priority of payment over all or any portion of the Obligations, (b) are a statutory trust or (c) are legally required to be paid prior to the repayment in full of such Obligations, other than the amount of those liabilities included in the Carve-Out.

"*Other Taxes*" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution,

delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 12.06</u>).

"***Parent***" shall have the meaning set forth in the preamble to this Agreement.

"***Participant***" shall have the meaning set forth in <u>Section 12.06(c)(i)</u>.

"***Participant Register***" shall have the meaning set forth in <u>Section 12.06(c)(iii)</u>.

"***Patent Security Agreements***" shall mean any patent security agreements entered into by a Credit Party in favor of Collateral Agent (as required by the Agreement or any other Credit Document), in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"***Patriot Act***" shall have the meaning set forth in <u>Section 12.19</u>.

"***PayPal***" shall mean PayPal, Inc., a Delaware corporation.

"***PayPal Agreement***" shall mean the PayPal User Agreement as posted on the PayPal website by PayPal and agreed to by Borrower, as amended by that certain Amendment to PayPal User Agreement (Pricing Amendment) dated as of July 7, 2015, together with all annexes, exhibits, schedules and supplements thereto, as the same may be amended, extended, renewed, replaced, restated or otherwise modified from time to time in accordance with the terms of this Agreement.

"***PBGC***" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"***Permits***" shall mean, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or operations or to which such Person or any of its property or operations is subject.

"***Permitted Liens***" shall have the meaning set forth in <u>Section 9.02</u>.

"***Permitted Priority Liens***" means (a) the Carve-Out and (b) all Liens in favor of third parties, which third-party liens, as of the Petition Date, had priority under applicable law over the Liens in favor of the Prepetition Lenders, solely to the extent that such Liens are valid, perfected and non-avoidable as of the Petition Date and were not subordinated by agreement or Applicable Laws; in each case subject to the terms of the Financing Order and otherwise agreed to by Administrative Agent and Required Lenders.

"***Permitted Transferee***" means, with respect to any such Person, each other Person who acquires Capital Stock of Borrower as a result of a transfer to lineal descendants or a transfer (including transfers to trusts) for estate planning purposes.

"***Person***" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"***Petition Date***" shall have the meaning set forth in the recitals to this Agreement.

"***Plan***" shall mean any Multiemployer Plan or any "employee benefit plan," as defined in Section 3 of ERISA subject to Title IV of ERISA, Section 412 of the Code or Sections 302 or 303 of ERISA, sponsored, maintained or contributed to by any Credit Party, Subsidiary of a Credit Party or any ERISA Affiliate (or to which any Credit Party, Subsidiary of a Credit Party or any ERISA Affiliate has or may have an obligation to contribute or to make payments), and each such plan for the five-year period immediately following the latest date on which any Credit Party, Subsidiary of a Credit Party or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Sections 4069 or 4212(c) of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"***Prepayment Event***" shall mean (a) any Asset Sale, (b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Credit Party that constitutes Collateral having a book value or fair market value in excess of $250,000, (c) the receipt of any cash or Cash Equivalents that constitutes Collateral in excess of $50,000 by any Credit Party not in the ordinary course of business, including without limitation (i) tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) indemnity payments and (vi) any purchase price adjustment received in connection with any purchase agreement to the extent not needed to reimburse the Borrower or applicable Subsidiary for any reasonable and customary out-of-pockets costs and expenses previously incurred by the Borrower or applicable Subsidiary with respect to which such purchase price adjustment was received, or (d) the incurrence by the Borrower or any Subsidiary of any Indebtedness, other than the Loans or as permitted by the Agent and Lenders as set forth herein.

"***Prepetition Agents***" shall mean the "Agents", as defined in the Prepetition Credit Agreement.

"***Prepetition Administrative Agent***" shall mean the "Administrative Agent", as defined in the Prepetition Credit Agreement.

"***Prepetition Collateral Agent***" shall mean the "Collateral Agent", as defined in the Prepetition Credit Agreement.

"***Prepetition Credit Agreement***" shall mean that certain Credit Agreement dated as of August 3, 2018 (as amended, supplemented or modified from time to time prior to the date hereof) among Borrower, the Guarantors party thereto, the Prepetition Agents and the Prepetition Lenders.

"***Prepetition Lenders***" shall mean the "Lenders" as defined in the Prepetition Credit Agreement.

"***Prepetition Credit Documents***" shall mean the "Credit Documents" as defined in the Prepetition Credit Agreement.

"***Prepetition Obligations***" shall mean the "Obligations" as defined in the Prepetition Credit Agreement.

"***Projected Information***" means (i) the projected operating cash receipts for each week, (ii) the projected disbursements for each week, (iii) the projected net cash flow for each week, (iv) the projected net sales for each week, (v) the projected aggregate principal amount of Obligations outstanding for each week, and (vi) such other information that Administrative Agent or any Lender may request.

"***Qualified Capital Stock***" shall mean any Capital Stock that is not Disqualified Capital Stock.

"***Real Property***" shall mean, with respect to any Person, all right, title and interest of such Person (including, without limitation, any leasehold estate) in and to a parcel of real property owned, leased or operated by such Person together with, in each case, all improvements and appurtenant fixtures, equipment, personal property, easements and other property and rights incidental to the ownership, lease or operation thereof.

"***Recipient***" shall mean (a) the Administrative Agent and (b) any Lender.

"***Register***" shall have the meaning set forth in <u>Section 12.06(b)(iv)</u>.

"***Regulation D***" shall mean Regulation D of the Board as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"***Regulation U***" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"***Regulation X***" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"***Related Parties***" shall mean, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, advisors of such Person and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"***Release***" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing, disposing, emanating or migrating of Hazardous Materials in the environment.

"***Reportable Event***" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30 day notice period is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043.

"*Required Lenders*" shall mean, at any time when there is more than one Lender which is not a Defaulting Lender, at least two Lenders which are not Defaulting Lenders having Loans and unused Commitments representing greater than 50% of the sum of the aggregate Loans and unused Commitments at such time, or at any time when there is only one Lender which is not a Defaulting Lender, such Lender.

"*Restricted Payment*" shall mean, with respect to any Person, (a) the declaration or payment of any dividend on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any class of Capital Stock of such Person or any warrants or options to purchase any such Capital Stock, whether now or hereafter outstanding, or the making of any other distribution to such Person, either directly or indirectly, whether in cash or property, (b) any payment of a management fee (or other fee of a similar nature) or any reimbursable costs and expenses related thereto by such Person to any holder of its Capital Stock or any Affiliate thereof and (c) the payment or prepayment of principal of, or premium or interest on, any Indebtedness subordinate to the Obligations.

"*S&P*" shall mean Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

"*Sale Motion*" means a motion requesting entry of orders from the Bankruptcy Court (a) approving bid procedures relating to the solicitations of qualified bids for the sale of substantially all assets of the Credit Parties, and (b) approving a sale of substantially all assets of the Credit Parties, each in form and substance acceptable to the Administrative Agent and Required Lenders in their sole and absolute discretion.

"*Sale Order*" means an order approving a sale of substantially all assets of the Credit Parties, in form and substance acceptable to the Administrative Agent and Required Lenders in their sole and absolute discretion.

"*Sale Procedures Order*" means an order approving the bid procedures set forth in the Sale Procedures Motion, in form and substance acceptable to the Administrative Agent and Required Lenders in their sole and absolute discretion.

"*Sanction(s)*" means any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council or other relevant sanctions authority.

"*SEC*" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Secured Parties*" shall mean, collectively, (a) the Lenders, (b) the Agents, (c) the beneficiaries of each indemnification obligation undertaken by any Credit Party under the Credit Documents, (d) any successors, endorsees, transferees and assigns of each of the foregoing to the extent any such transfer or assign is permitted by the terms of this Agreement and (e) any other holder of any Secured Obligation (as defined in any applicable Security Document).

"*Security Agreement*" shall mean that certain Superpriority Pledge and Security Agreement dated as of the Closing Date, by and among each of the Credit Parties and the Collateral Agent for the benefit of the Secured Parties, as amended, restated, supplemented or otherwise modified from time to time.

"*Security Documents*" shall mean, collectively, the Security Agreement, any Collateral Access Agreements, any Control Agreements, any Patent Security Agreements, any Trademark Security Agreements, any Copyright Security Agreements, any Mortgage, and each other instrument or document executed and delivered pursuant to this Agreement or pursuant to any of the Security Documents to guarantee or secure any of the Obligations.

"*Solvent*" shall mean, with respect to any Person, at any date, that (a) the sum of such Person's debts is not greater than all of such Person's property at a fair valuation, (b) such Person's capital is not unreasonably small in relation to its business and (c) such Person has not incurred and does not intend to incur debts including current obligations beyond its ability to generally pay such debts as they become due (whether at maturity or otherwise).

"*Subject Quarter*" shall have the meaning set forth in Section 4.02(a)(i).

"*Subordinated Original Debt Documents*" means shall mean those certain (i) Securities Purchase Agreements of dated as of the August 3, 2019 or January 1, 2019, by and between the Parent, Borrower and each Original Subordinated Lender, together with any other document, instrument, certificate or agreement executed from time to time in connection therewith; and (ii) convertible promissory notes in the original aggregate principal amount of $4,525,000 executed and delivered by Borrower to Original Subordinated Lenders, together with any other document, instrument, certificate or agreement securing the Original Subordinated Debt or executed from time to time in connection therewith.

"*Subordinated Debt*" means, collectively, (a) the Indebtedness held by Money Chest incurred pursuant to the Subordinated Original Debt Documents which is secured by Liens permitted by Section 9.02(p) (the "*Original Secured Subordinated Debt*"), (b) the Indebtedness held by each of the Original Subordinated Lenders other than Money Chest incurred pursuant to the Subordinated Original Debt Documents which is unsecured (the "*Original Unsecured Subordinated Debt*", and collectively with the Original Secured Subordinated Debt, the "*Original Subordinated Debt*") and (c) other Indebtedness which is subordinated to the Obligations pursuant to a Subordination Agreement.

"*Subordination Agreements*" shall mean, collectively, (a) the Original Subordination Agreements and (b) other subordination agreements in favor of the Agents containing terms and provisions acceptable to the Agents.

"*Subsidiary*" of any Person shall mean and include (a) any corporation more than 50% of whose Voting Stock having by the terms thereof power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any partnership, limited liability company, association, joint venture or other entity in which

such Person directly or indirectly through one or more Subsidiaries has more than (i) a 50% equity interest measured by either vote or value at the time or (ii) a 50% general partnership interest at the time.  Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of Borrower.

"*Superpriority Claims*" shall have the meaning set forth in Section 7.31.

"*Swap Obligation*" means with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"*Taxes*" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Termination Date*" shall mean the date on which the Loans and the other Obligations (other than Unasserted Contingent Obligations) shall have been paid in full in cash in accordance with the terms of this Agreement.

"*Total Credit Exposure*" shall mean, as of any date of determination (a) with respect to each Lender, (i) prior to the termination of all of the Commitments (including, for the avoidance of doubt, Delayed Draw Term Loan Commitments), the sum of such Lender's Commitment plus the outstanding principal amount of such Lender's Loans (including, for the avoidance of doubt, Closing Date Term Loans and Delayed Draw Term Loans) or (ii) upon the termination of all of the Commitments, the outstanding principal amount of such Lender's Loans and (b) with respect to all Lenders, (i) prior to the termination of the Commitments, the sum of all of the Lenders' Commitments plus the aggregate outstanding principal amount of all Loans and (ii) upon the termination of all of the Commitments, the aggregate outstanding principal amount of all Loans.

"*Trademark Security Agreements*" shall mean the Trademark Security Agreements made in favor of Collateral Agent and Lenders by each applicable Credit Party (as required by the Agreement or any other Credit Document), in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"*Transactions*" shall mean the funding of the Loans pursuant hereto and the use of the proceeds thereof and all other transactions contemplated by or described in the Credit Documents.

"*Treasury Regulations*" means the United States Treasury regulations promulgated under the Code.

"*U.S.*" and "United States" shall mean the United States of America.

"*U.S. Person*" shall mean any person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"*U.S. Tax Compliance Certificate*" has the meaning specified in <u>Section 4.04(f)(ii)(3)</u>.

"*UCC*" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York and any other applicable jurisdiction.

"*Unasserted Contingent Obligations*" shall mean, at any time, Obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment or indemnification (whether oral or written) has been made or threatened.

"*Unfunded Current Liability*" shall mean, with respect to any Plan the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"*Variance Report*" shall mean a weekly variance report prepared by the Chief Restructuring Officer of Borrower and to be provided by Borrower to Administrative Agent and Lenders dated as of the last day of the immediately preceding calendar week and reflecting actual cash receipts and actual disbursements on a line item basis for (i) the calendar week ending on the date of such variance report, (ii) the period from the commencement of the Bankruptcy Case to the date of such variance report and (iii) to the extent actual disbursements for any line items are lower than the amounts set forth in the Budget with respect to such line items, an analysis with respect to whether such variance reflects a permanent cost savings, a delay in the accrual of such expense, or whether such expense has been incurred but not yet paid; each such variance report to be provided to the Administrative Agent and Lenders within one Business Day after the end of the period covered by such variance report, and reflecting the amount and the percentage variance of actual receipts and disbursements (on a line item basis) from those receipts and disbursements reflected in the Budget for such periods.

 "*Voting Stock*" shall mean, with respect to any Person, shares of such Person's Capital Stock having the right to vote for the election of directors (or Persons acting in a comparable capacity) of such Person under ordinary circumstances.

"*Warrants*" shall mean the Warrants (as defined in the Pre-Petition Credit Agreement).

"*Withholding Agent*" shall mean any Credit Party and Administrative Agent.

SECTION 1.02.    Other Interpretive Provisions.  With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)      Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)      The term "including" is by way of example and not limitation.

(e)      The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(g)      Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(h)      All references in any Credit Document to the consent of or approval by any Agent or Lender shall be deemed to mean the consent of or approval by such Agent or Lender in its sole discretion, except as otherwise expressly provided in the applicable Credit Document.

SECTION 1.03.      Accounting Terms and Principles.    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Historical Financial Statements, except as otherwise specifically prescribed herein.  No change in the accounting principles used in the preparation of any financial statement hereafter adopted by Parent or any of its Subsidiaries shall be given effect for purposes of measuring compliance with any provision of Article IX, , or otherwise in this Agreement unless Borrower, the Administrative Agent and the Required Lenders agree in writing to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, certificates containing financial calculations and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article IX shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value".  A breach of a financial covenant contained in Article IX shall be deemed to have occurred as of any date of determination by the Administrative Agent or as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to any Agent.  Anything in this Agreement to the contrary notwithstanding, any obligation of a Person under a lease (whether existing as of the Closing Date or entered into after the Closing Date) that is not (or would not be) required to be classified and accounted for as a capital lease on the balance sheet

of such Person under GAAP as in effect on the Closing Date shall not be treated as a Capital Lease solely as a result of (x) the adoption of any changes in, or (y) changes in the application of, GAAP after the Closing Date.

SECTION 1.04.    Rounding.    Any financial ratios required to be maintained or complied with by the Credit Parties pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05.    References to Agreements, Laws, etc.    Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including this Agreement and each of the other Credit Documents) and other Contractual Obligations shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document; and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.Times of Day.    Unless otherwise specified, all references herein to times of day shall be references to EST.

SECTION 1.07.    Timing of Payment or Performance.    When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.  All payments required hereunder shall be paid in immediately available funds unless otherwise expressly provided herein.

SECTION 1.08.    Corporate Terminology.    Any reference to officers, shareholders, stock, shares, directors, boards of directors, corporate authority, articles of incorporation, bylaws or any other such references to matters relating to a corporation made herein or in any other Credit Document with respect to a Person that is not a corporation shall mean and be references to the comparable terms used with respect to such Person.

## ARTICLE II
## Amount and Terms of Loans

SECTION 2.01.    Term Loans.

(a)    Closing Date Term Loans.    Subject to and upon the terms and conditions herein set forth, each Closing Date Lender having a Closing Date Term Loan Commitment shall, on the Closing Date, severally (and not jointly), make a single term loan to Borrower (the "***Closing Date Term Loan***"), which Closing Date Term Loan shall be in an amount equal to the Closing Date Term Loan Commitment for such Lender.  Each Closing Date Term Loan may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

(b)    Delayed Draw Term Loans.  Subject to the terms and conditions of this Agreement, each Lender, severally and not jointly, will make term loans after the Closing Date (collectively, the "***Delayed Draw Term Loans***", and each individually a "***Delayed Draw Term Loan***") to Borrower in the amount equal to such Lender's Delayed Draw Term Loan Commitment Percentage of each Delayed Draw Term Loan requested by Borrower hereunder; provided that no Lender shall have any obligation to fund Delayed Draw Term Loans in excess of such Lender's then existing Delayed Draw Term Loan Commitment less the amount of any Delayed Draw Term Loans previously funded by such Lender.  The amount of any Delayed Draw Term Loan requested by Borrower hereunder to be funded on any date (any such date, a "***Draw Date***") may not (absent the prior written consent of Administrative Agent and Required Lenders) be greater than the amount of cash disbursements set forth in the Budget for the calendar week commencing immediately after such Draw Date, minus any cash on hand of the Credit Parties.  Absent the prior written consent of Administrative Agent and Required Lenders, Borrower may not request the occurrence of more than one Draw Date in any calendar week. Absent the prior written consent of Administrative Agent and Required Lenders and subject to the terms of the Financing Order, the amount of the Delayed Draw Term Loans that Borrower shall be permitted to borrow hereunder shall be reduced by the Carve-Out Expense Reserve except in respect of a final borrowing of Delayed Draw Term Loans hereunder that is used to pay all amounts of the Carve-Out and Other Statutory Liabilities that have priority over the Liens of Collateral Agent securing the Obligations.  Each Delayed Draw Term Loan may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

SECTION 2.02.    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Sections 2.10(a)(ii), 2.10(a)(iii), or requires Borrower to pay any Indemnified Taxes or additional amounts to such Lender or any Governmental Authority for the account of any Lender pursuant to Section 4.04, such Lender will, if requested by Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided, that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  Nothing in this Section 2.02 shall affect or postpone any of the obligations of Borrower or the right of any Lender provided in Sections 2.10 or 4.04.  Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

SECTION 2.03.    Lender Branches.  Each Lender may at its option, make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make any Loan; provided that (i) any exercise of such option shall not affect the obligation of Borrower to repay such Loan and (ii) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to Borrower resulting therefrom (which obligation of such Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it, and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.09 shall apply).

SECTION 2.04.        Notice of Borrowing for Delayed Draw Term Loans.  Borrower shall deliver to Administrative Agent and Lenders a Funding Request with respect to each proposed borrowing of a Delayed Draw Term Loan, such Funding Request to be compliant with the requirements of Section 2.01(b), to certify compliance with Section 5.02, and to be delivered no later than noon (New York time) on the Business Day prior to any proposed Draw Date. Each request for a Delayed Draw Term Loan pursuant to this Section 2.04 shall be in a minimum amount of $500,000 and, if in excess of such amount, in an integral multiple of $500,000 in excess of such amount.  Once given, a Funding Request shall be irrevocable and Borrower shall be bound thereby.

SECTION 2.05.        Disbursement of Funds.

(a)        If all the conditions set forth in Section 5.01 to the effectiveness of this Agreement are met prior to 4:00 p.m. EST on the Closing Date, then, each Lender will make available its *pro rata* portion of the Closing Date Term Loan to be made on the Closing Date in the manner provided in clause (b) below no later than 4:00 p.m. EST on the Closing Date.  If all the conditions set forth in Sections 2.01(b), 2.04 and 5.02 to the funding of a Delayed Draw Term Loan requested by Borrower are met prior to 4:00 p.m. EST on the applicable Draw Date, then, each Lender will make available its *pro rata* portion (determined by reference to its Delayed Draw Term Loan Commitment Percentage) of the Delayed Draw Term Loan to be made on such Draw Date in the manner provided in clause (b) below no later than 4:00 p.m. EST on applicable Draw Date.

(b)        Each Lender shall make available all amounts it is to fund to Borrower in respect of the Loans in immediately available funds to the Administrative Agent, and, following receipt thereof in an account designated by the Administrative Agent, the Administrative Agent will remit such amounts, in immediately available funds and in Dollars to Borrower, by remitting the same to such Persons and such accounts as may be designated by Borrower to the Administrative Agent in writing.  The failure of any Lender to make available the amounts it is to fund to Borrower hereunder or to make a payment required to be made by it under any Credit Document shall not relieve any other Lender of its obligations under any Credit Document, but no Lender shall be responsible for the failure of any other Lender to make any payment required to be made by such other Lender under any Credit Document.

(c)        Nothing in this Section 2.05 shall be deemed to relieve any Lender from its obligation to fulfill its commitments and obligations hereunder or to prejudice any rights that Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments and obligations hereunder).

SECTION 2.06.        Payment of Loans; Evidence of Debt.

(a)        Borrower agrees to pay to the Administrative Agent, for the benefit of the Lenders, all outstanding principal and interest due on the Loans on the Maturity Date or upon such earlier date on which the Obligations are accelerated pursuant to the terms of this Agreement.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office of such Lender from time to time, including the amounts of principal and interest payable and paid to such lending office of such Lender from time to time under this Agreement.

(c)     Borrower agrees that from time to time on and after the Closing Date, upon the reasonable request to the Administrative Agent by any Lender, at Borrower's own expense, Borrower will execute and deliver to such Lender a Note, evidencing the Loans, and payable to such Lender or registered assigns in a maximum principal amount equal to such Lender's applicable Commitment.  Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall conclusively indicate, absent manifest error, inter alia, the date of, the outstanding principal amount of, and the interest rate applicable to, the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the Register, be conclusive and binding on each Credit Party absent manifest error; provided that the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Credit Party.  The Administrative Agent shall maintain the Register pursuant to Section 12.06(b)(iii), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent from Borrower and each Lender's share thereof.

(d)     The entries made in the Register and accounts and subaccounts maintained pursuant to paragraphs (b) and (c) of this Section 2.06 shall, to the extent permitted by Applicable Law, be conclusive evidence (absent manifest error) of the existence and amounts of the obligations of Borrower therein recorded; provided that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of Borrower to repay (with applicable interest) the Loans made to Borrower by such Lender in accordance with the terms of this Agreement.

SECTION 2.07.     Reserved.

SECTION 2.08.     Reserved.

SECTION 2.09.     Interest.

(a)     The unpaid principal amount of Loans shall bear interest from the Closing Date (or the applicable borrowing date with respect to the Delayed Draw Term Loans) at a rate per annum rate equal to seven percent (7%) per annum. Interest on the Loans shall accrue from and including the Closing Date (or the applicable borrowing date with respect to the Delayed Draw Term Loans) until but excluding the date of any repayment in full thereof.

(b)     On the first day of each calendar quarter (each such date an "***Interest Payment Date***"), beginning on October 1, 2019 and continuing on each Interest Payment Date thereafter, interest on the Loans shall be paid in kind and shall be capitalized and added to the outstanding principal amount of the Loans.  All accrued and unpaid interest shall be due and payable on the Maturity Date.

(c)     From and after the occurrence and during the continuance of any Event of Default, Borrower shall pay interest on any overdue principal amount of all Loans and all other overdue unpaid Obligations, to the extent permitted by Applicable Law, at the Default Rate, which Default Rate shall accrue from the date of such Event of Default (regardless of the date of notice of the imposition of the Default Rate) until waived in writing and shall be payable on demand and in cash.

(d)     All computations of interest hereunder shall be made in accordance with Section 4.06.

(e)     The Administrative Agent, upon determining the interest rate for any Borrowing of Loans, shall promptly notify Borrower and the relevant Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

SECTION 2.10.     Increased Costs, Illegality, etc.

(a)     In the event that any Lender shall have reasonably determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) at any time, after the later of the Closing Date and the date such entity became a Lender hereunder, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to the Loans, including as a result of any Tax (other than any (x) Indemnified Taxes, (y) Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" or (z) Connection Income Taxes) because of any change since the date hereof in any Applicable Law (or in the interpretation or administration thereof and including the introduction of any new Applicable Law), such as, for example, without limitation, a change in official reserve requirements (but excluding changes in the rate of tax on the overall net income of such Lender), then, and in any such event, such Lender shall promptly give notice (if by telephone, confirmed in writing) to Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders).  Thereafter, Borrower shall pay to such Lender, within ten (10) days after receipt of written demand therefor such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its reasonable discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender submitted to Borrower by such Lender shall, absent manifest error, be final and conclusive and binding upon all parties hereto).

(b)     [reserved].

(c)    If, after the later of the date hereof and the date such entity becomes a Lender hereunder, the adoption of any Applicable Law regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by a Lender or its parent with any request or directive made or adopted after such date regarding capital adequacy (whether or not having the force of law) of any such authority, association, central bank or comparable agency, has the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration such Lender's or its parent's policies with respect to capital adequacy), then within ten (10) days after receipt of written demand by such Lender (with a copy to the Administrative Agent), Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any such Applicable Law as in effect on the date hereof. Each Lender (on its own behalf), upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will, as promptly as practicable upon ascertaining knowledge thereof, give written notice thereof to Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts. Without limiting Section 2.10(e) below, the failure to give any such notice with respect to a particular event shall not release or diminish any of Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) for amounts accrued or incurred after the date of such notice with respect to such event. Notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, orders, requests, guidelines or directives in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, in each case, are deemed to have been adopted and to have taken effect after the Closing Date.

(d)    [reserved].

(e)    This Section 2.10 shall not apply to Taxes to the extent duplicative of Section 4.04. In addition, this Section 2.10 shall not apply to any demand made after the 180th day following the requesting Lender's knowledge that it would be entitled to any such amounts.

(f)    If any Lender shall give notice to Borrower that such Lender is entitled to receive and is requesting payments under this Section 2.10 or requires Borrower to pay additional amounts pursuant to Section 4.04 (any such Lender, an "**_Increased Cost Lender_**"), then Borrower may, after (solely in the case of an Increased Cost Lender) giving such Increased Cost Lender an opportunity to mitigate pursuant to Section 2.02, if applicable, at its sole expense and effort, permanently replace such Increased Cost Lender with one or more substitute Lenders reasonably acceptable to the Administrative Agent (each, a "**_Replacement Lender_**"), and such Increased Cost Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Increased Cost Lender shall specify an effective date for such replacement, which date shall not be sooner than five (5) Business Days and not be later than ten (10) Business Days

after the date such notice is given, <u>provided</u> that (A) such Increased Cost Lender shall have received payment of an amount equal to the outstanding Obligations payable to it from the assignee (to the extent of outstanding principal and accrued interests and fees) or Borrower (in the case of all other amounts) and (B) such assignment does not conflict with Applicable Law. Notwithstanding anything to the contrary herein, a Lender shall not be required to make any such assignment pursuant to this <u>Section 2.10(f)</u> if, prior to the effective date for such replacement, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment pursuant to this <u>Section 2.10(f)</u> cease to apply.

(g)     Prior to the effective date of such replacement, the Increased Cost Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Increased Cost Lender being repaid all Obligations owed to it through the effective date of the replacement. If the Increased Cost Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Increased Cost Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Increased Cost Lender shall be made in accordance with the terms of <u>Section 12.06</u>.

SECTION 2.11.          <u>Reserved</u>.

SECTION 2.12.          <u>Defaulting Lender</u>.

(a)     Notwithstanding anything to the contrary contained herein, in the event any Lender is a Defaulting Lender, all rights and obligations hereunder of such Defaulting Lender and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.12 so long as such Lender is a Defaulting Lender.

(b)     except as otherwise expressly provided for in this Section 2.12, Loans shall be made pro rata from Lenders holding Commitments which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Loans required to be advanced by any Lender shall be increased as a result of any Lender being a Defaulting Lender.  Amounts received in respect of principal of any type of Loans shall be applied to reduce such type of Loans of each Lender (other than any Defaulting Lender) holding a Commitment in accordance with their Commitment Percentages; <u>provided</u>, that, the Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments received by the Administrative Agent for Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees).  Amounts payable to a Defaulting Lender shall instead be paid to or retained by the Administrative Agent.  The Administrative Agent may hold and, in its discretion, re-lend to Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender.

(i)     fees pursuant to Section <u>3.01(a)</u> or <u>(c)</u> hereof shall cease to accrue in favor of such Defaulting Lender.

(c)     A Defaulting Lender shall not be entitled to give instructions to the Administrative Agent or to approve, disapprove, consent to or vote on any matters relating to this

Agreement or the other Credit Documents, and all amendments, waivers and other modifications of this Agreement or the other Credit may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall not be deemed to be a Lender, to have any outstanding Loans or a Commitment Percentage; provided, that this clause (c) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification described in clauses (i) or (iii) of Section 12.01.

(d)    Other than as expressly set forth in this Section 2.12, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agents) and the other parties hereto shall remain unchanged. Nothing in this Section 2.12 shall be deemed to release any Defaulting Lender from its obligations under this Agreement or the other Credit Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, any Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)    In the event that the Administrative Agent and Borrower agree in writing that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Administrative Agent will so notify the parties hereto.

(f)    If any Lender is a Defaulting Lender, Borrower may, within ninety (90) days of receipt of such Lender becoming a Defaulting Lender, by notice in writing to the Administrative Agent and such Defaulting Lender (i) request the Defaulting Lender to cooperate with Borrower in obtaining a replacement Lender satisfactory to the Administrative Agent and Borrower (the ***Replacement Lender***"); (ii) request the Non-Defaulting Lenders to acquire and assume all of the Defaulting Lender's Loans and its Commitment Percentage as provided herein, but none of such Lenders shall be under any obligation to do so; or (iii) propose a Replacement Lender subject to approval by the Administrative Agent in its good faith business judgment. If any satisfactory Replacement Lender shall be obtained, and/or if any one or more of the Non-Defaulting Lenders shall agree to acquire and assume all of the Defaulting Lender's or the other Credit Loans and its Commitment Percentage, then such Defaulting Lender shall assign, in accordance with Section 12.01 hereof, all of its Loans and its Commitment Percentage and other rights and obligations under this Agreement and the other Credit Documents to such Replacement Lender or Non-Defaulting Lenders, as the case may be, in exchange for payment of the principal amount so assigned and all interest and fees accrued on the amount so assigned, plus all other Obligations then due and payable to the Defaulting Lender.

## ARTICLE III
## Fees and Commitment Terminations

SECTION 3.01.    Fees.    On the Closing Date, the Borrower shall pay (i) to each Lender, a fee in the form of original issue discount in an amount equal to 1.5% of the amount of the Commitments of such Lender on the Closing Date (the ***Closing Date Fees***"). The Closing Date Fees shall be fully and irrevocably due and payable in cash on the Closing Date and may be deducted by each Lender from the proceeds of the Loans made by such Lender on the Closing Date in the form of original issue discount. The Closing Date Fees shall be earned by the Lenders upon the funding of the Loans as a fee in consideration of the Commitments and the making of the Loans and for the time and costs expended in extending the Commitments and the making of

the Loans. THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE CLOSING DATE FEES. The Borrower expressly agrees that: (A) the Closing Date Fees are reasonable and are the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Closing Date Fees shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay the Closing Date Fees; and (D) the Borrower shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Borrower expressly acknowledges that its agreement to pay the Closing Date Fees to the Lenders as herein described is a material inducement for the Lenders to provide the Commitment and provide the Loans.

SECTION 3.02.     Termination and Reduction of Commitments.   Unless previously terminated, the Closing Date Term Loan Commitment shall terminate on the Closing Date upon the making of the Closing Date Term Loan pursuant to Section 2.01(a). Any commitments with respect to the Delayed Draw Term Loans pursuant to Section 2.01(b) shall be reduced by the amount of each Delayed Draw Term Loan that is funded upon the funding of such Delayed Draw Term Loan (and, to the extent not previously fully funded or terminated in accordance with the terms hereof, shall automatically terminate on the Maturity Date).

## ARTICLE IV
## Payments

SECTION 4.01.     Voluntary Prepayments.   Borrower shall have the right to prepay the outstanding remaining balance of the Loans in whole or in part on the following terms and conditions: (i) Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of (A) its intent to make such prepayment and (B) the amount of such prepayment, no later than 1:00 p.m. EST five (5) days prior thereto, and shall promptly be transmitted by the Administrative Agent to each of the relevant Lenders, as the case may be; (ii) [reserved]; and (iii) each such prepayment shall be in an amount at least equal to $1,000,000, or, if less, the entire principal amount then outstanding.

SECTION 4.02.     Mandatory Prepayments.

(a)     Types of Mandatory Prepayments.

(i)     Prepayment Event.  Not later than the fifth Business Day following the date of receipt by the Borrower or any Subsidiary of any net proceeds in respect of any Prepayment Event (or, in the case of a Prepayment Event described in clause (d) of the definition thereof, on the date of the incurrence of the applicable Indebtedness), the Borrower shall prepay the Borrowings in an aggregate amount equal to 100% of such net proceeds.

(ii)     Immediately upon any acceleration of the Maturity Date of any Loans pursuant to Section 10.02, Borrower shall repay all the Loans, unless only a

portion of all the Loans is so accelerated (in which case the portion so accelerated shall be repaid).

(b)    [Reserved].

(c)    Application of Payments.  With respect to each prepayment required by Section 4.02(a), the amounts prepaid shall be applied, so long as no Application Event (as defined below) shall have occurred and be continuing, (i) first ratably to any accrued and unpaid interest on the Loans until paid in full, (ii) second, ratably to any outstanding principal on the Loans until paid in full, (iii) third ratably to any accrued and unpaid interest on the Prepetition Obligations until paid in full, and (iv) fourth, ratably to any outstanding principal on the Prepetition Obligations until paid in full  With respect to each other prepayment of the Loans required by Section 4.02(a), the amounts prepaid shall be applied, so long as no Application Event (as defined below) shall have occurred and be continuing, first ratably to any accrued and unpaid interest on the Loans until paid in full, and second ratably to any outstanding principal on the Loans until the Loans are paid in full.

(d)    Application of Collateral Proceeds.  Notwithstanding anything to the contrary in Section 4.01 or this Section 4.02, all proceeds of Collateral received by the Collateral Agent or any other Person pursuant to the exercise of remedies against the Collateral, and all payments received upon and after the occurrence of the Maturity Date with respect to any of the Obligations (an "*Application Event*") shall be applied as follows (subject to adjustments pursuant to any agreements entered into among the Lenders):

(i)    first, [reserved],

(ii)    second, to pay any costs and expenses of the Agents (in their respective capacity as Agent) and fees then due to the Agents (in their respective capacity as Agent) under the Credit Documents, including any indemnities then due to any Agents (in their respective capacity as Agent) under the Credit Documents, until paid in full,

(iii)    third, to pay any fees and premiums then due to the Agents (in their respective capacity as Agent) and the Lenders under the Credit Documents until paid in full,

(iv)    fourth, ratably to pay any costs, expense reimbursements, fees or other premiums of the Lenders and indemnities then due to any of the Lenders under the Credit Documents until paid in full,

(v)    fifth, ratably to pay interest due in respect of the outstanding Loans until paid in full,

(vi)    sixth, ratably to pay the outstanding principal balance of the Loans until the Loans are paid in full,

(vii)    seventh, to pay any other Obligations,

(viii)    eighth, ratably to pay interest due in respect of the outstanding Prepetition Obligations until paid in full, and

(ix)    ninth, ratably to pay the outstanding principal balance of the Prepetition Obligations until the Loans are paid in full.

SECTION 4.03.    Payment of Obligations; Method and Place of Payment.

(a)    The obligations of each Credit Party hereunder and under each other Credit Document are not subject to counterclaim, set-off, rights of rescission, or any other defense.  Subject to Section 4.03(b), and except as otherwise specifically provided herein, all payments under any Credit Document shall be made by Borrower, without set-off, rights of rescission, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Secured Parties entitled thereto, not later than 2:00 p.m. EST on the date when due and shall be made in immediately available funds in Dollars to the Administrative Agent.  The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 2:00 p.m. EST, on such day) like funds relating to the payment of principal or interest or Fees ratably to the Secured Parties entitled thereto.

(b)    For purposes of computing interest or fees, any payments under this Agreement that are made later than 2:00 p.m. EST, shall be deemed to have been made on the next succeeding Business Day.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall continue to accrue during such extension at the applicable rate in effect immediately prior to such extension.

(c)    Borrower shall make each payment under any Credit Document by wire transfer to such deposit account as the Administrative Agent shall notify Borrower in writing from time to time within a reasonable time prior to such payment.

SECTION 4.04.    Taxes.

(a)    Any and all payments by or on account of any obligation of any Credit Party under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 4.04) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    The Credit Parties shall timely pay, and shall authorize the Administrative Agent to pay in their name, to the relevant Governmental Authority in accordance with

-38-

Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes. Within 30 days after the date of any payment of Taxes or Other Taxes by any Credit Party, the Credit Parties shall furnish to Agent, at its address referred to in Section 12.02, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to the Administrative Agent.

(c)     The Credit Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 4.04) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.06(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 4.04(d).

(e)     As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 4.04, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to Borrower and the Administrative Agent, at the time or times reasonably requested by Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of

withholding.  In addition, any Lender, if reasonably requested by Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrower or the Administrative Agent as will enable Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 4.04(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described

-40-

in Section 881(c)(3)(C) of the Code in customary form consistent with the Model Credit Agreement Provisions of the Loan Syndications and Trading Association (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 4.04 (including by the payment of additional amounts pursuant to this Section 4.04), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 4.04 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 4.04(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 4.04(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 4.04(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person

(h)     Reserved.

(i)     Each party's obligations under this Section 4.04 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all obligations under any Credit Document.

SECTION 4.05.     Reserved.

SECTION 4.06.     Computations of Interest and Fees.  All interest and fees shall be computed on the basis of the actual number of days occurring during the period for which such interest or fee is payable over a year comprised of 360 days.  Payments due on a day that is not a Business Day shall (except as otherwise required by) be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

**ARTICLE V**
**Conditions Precedent to Loans**

SECTION 5.01.     Conditions Precedent to Closing Date Term Loan.  The obligation of each Lender to make the Closing Date Term Loans on the Closing Date as provided for hereunder is subject to the fulfillment, to the satisfaction of the Agents and each Lender, of each of the following conditions precedent on or before the Closing Date, unless any such condition is waived in accordance with Section 12.01:

(a) <u>Credit Documents</u>.  The Administrative Agent and Lenders shall have received the following documents, unless otherwise agreed to in writing by the Administrative Agent, duly executed by an Authorized Officer of each applicable Credit Party and each other relevant party:

    (i)      this Agreement;

    (ii)     the Notes;

    (iii)    the Security Documents;

    (iv)    [reserved]; and

    (v)     each other Credit Document.

(b) <u>Collateral</u>.

    (i)      All Capital Stock of each Credit Party (other than Parent) shall have been pledged pursuant to the Security Documents and the Collateral Agent shall have received all certificates, if any, representing such securities pledged under the Security Documents, accompanied by instruments of transfer and undated stock powers endorsed in blank.

    (ii)     All Indebtedness owed to any of the Credit Parties that is evidenced by one or more promissory notes shall have been pledged pursuant to the Security Documents, and the Collateral Agent shall have received original executed versions of all such promissory notes, together with instruments of transfer with respect thereto endorsed in blank.

    (iii)    The Collateral Agent shall have received the results of a search of the UCC filings (or equivalent filings), in addition to tax Lien, judgment Lien, bankruptcy and litigation searches made with respect to each Credit Party, together with copies of the financing statements and other filings (or similar documents) disclosed by such searches, and accompanied by evidence satisfactory to the Collateral Agent that the Liens indicated in any such financing statement and other filings (or similar document) are Permitted Liens or have been released or will be released substantially simultaneously with the making of the Loans hereunder.

    (iv)    The Collateral Agent shall have received evidence, in form and substance satisfactory to the Collateral Agent, that appropriate UCC (or equivalent) financing statements (including fixture filings) have been duly filed in such office or offices as may be necessary or, in the opinion of Collateral Agent, desirable, to perfect the Collateral Agent's Liens in and to the Collateral and certified searches reflecting the filing of all such financing statements.

(c) <u>Officer's Certificates</u>.  The Administrative Agent shall have received a certificate for each Credit Party, dated the Closing Date, duly executed and delivered by such

Credit Party's secretary or assistant secretary, managing director, managing member, general partner, or other authorized officer, as applicable, as to:

        (i)      resolutions of each such Person's board of managers/directors (or other managing body, in the case of a Person that is not a corporation) then in full force and effect expressly and specifically authorizing, to the extent relevant, all aspects of the Credit Documents applicable to such Person and the execution, delivery and performance of each Credit Document, in each case, to be executed by such Person;

        (ii)     the incumbency and signatures of its Authorized Officers and any other of its officers, managing member or general partner, as applicable, authorized to act with respect to each Credit Document to be executed by such Person and a list of all officers and directors of the Credit Parties; and

        (iii)    each such Person's Organization Documents, as amended, modified or supplemented as of Closing Date, certified by the appropriate officer or official body of the jurisdiction of organization of such Person,

which certificates shall provide that each Secured Party may conclusively rely thereon until it shall have received a further certificate of the secretary, assistant secretary, managing director managing member, general partner, or other authorized officer, as applicable, of any such Person canceling or amending the prior certificate of such Person as provided in <u>Section 8.01(k)</u>.

        (d)     <u>Other Documents and Certificates</u>.  The Administrative Agent shall have received the originals of the following documents and certificates, each of which shall be dated the Closing Date and duly executed by an Authorized Officer of each applicable Credit Party, in form and substance reasonably satisfactory to the Administrative Agent:

        (i)      a certificate of an Authorized Officer of Parent and Borrower, certifying as to such items as reasonably requested by the Collateral Agent, including without limitation:

        (A)    the receipt of all required approvals and consents of all Governmental Authorities and other third parties, if applicable, with respect to the consummation of the Transactions and the operation of the Credit Parties' business, each of which shall be attached thereto and certified as being true, complete and correct copies thereof;

        (B)    both before and after giving effect to the Transactions, including the borrowing of the Loans on the Closing Date, no Default or Event of Default shall have occurred; and

        (C)    the representations and warranties set forth in Article VII are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof);

        (ii)     a Perfection Certificate of each Credit Party;

(iii)    (A) certificates of good standing or letter of status (or the local equivalent thereof, if applicable) with respect to each Credit Party, each dated within a recent date prior to the Closing Date, such certificates to be issued by the appropriate officer or official body of the jurisdiction of organization of such Credit Party, which certificate shall indicate that such Credit Party is in good standing in such jurisdiction, and (B) certificates of good standing (or the local equivalent thereof, if applicable) with respect to each Credit Party, each dated within a recent date prior to the Closing Date, such certificates to be issued by the appropriate officer of the jurisdictions where such Credit Party is qualified to do business as a foreign entity, which certificate shall indicate that such Credit Party is in good standing in such jurisdictions; and

(iv)    not less than three (3) days (or such shorter period as may be approved by the Administrative Agent) prior to the Closing Date, a Funding Request. setting forth, among other things, the proposed Closing Date and the aggregate principal amount of such requested Loan.

(e)    <u>Reserved</u>.

(f)    <u>Reserved</u>.

(g)    <u>Insurance</u>.    The Collateral Agent shall have received a certificate of insurance, together with the endorsements thereto, naming the Collateral Agent as an additional insured on behalf of the Lenders and loss payee as to casualty insurance, in each case, as to the insurance required by <u>Section 8.03</u>, in form and substance reasonably satisfactory to Administrative Agent.

(h)    <u>Reserved</u>.

(i)    <u>Material Adverse Effect</u>.    The Administrative Agent and Lenders shall have determined that, both immediately before and immediately after giving effect to the Transactions, no Material Adverse Effect has occurred since June 30, 2019.

(j)    <u>Fees and Expenses</u>.    Each of the Agents and Lenders shall have received, for its own respective account (or shall receive, upon the funding of the Closing Date Term Loan pursuant to the disbursement instructions made by Borrower with respect to the Closing Date Term Loan), (i) all fees and expenses due and payable to such Person hereunder, and (ii) the reasonable and documented fees, costs and expenses due and payable to such Person pursuant <u>Sections 3.01</u> and <u>12.05</u> (including the reasonable fees, disbursements and other charges of counsel) for which request for payment has been made to the Borrower on or prior to the Closing Date.

(k)    <u>Patriot Act Compliance and Reference Checks</u>.    The Administrative Agent shall have received completed reference checks with respect to each Credit Party's senior management, and any required Patriot Act compliance, the results of which are satisfactory to Administrative Agent in its sole discretion.

(l)    <u>Due Diligence</u>.    The Administrative Agent shall have completed and be reasonably satisfied its business, legal, and collateral due diligence on Parent and its

Subsidiaries, including (i) corporate, capital and legal structure of Parent and its Subsidiaries; (ii) securities, labor, insurance, tax, litigation and environmental matters; (iii) review of all third party reports; and (iv) an independent quality of earnings report, third party accounting review, and the results of Borrower's pipeline and backlog.

(m)   Reserved.

(n)   No Default, Representations and Warranties and No Injunctions.

(i)   No Default or Event of Default shall have occurred and be continuing;

(ii)   all representations and warranties made by each Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), in each case, with the same effect as though such representations and warranties had been made on and as of the Closing Date (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof));

(iii)   no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the Transactions shall have been issued and remain in force by any Governmental Authority against any Credit Party, any Agent or any Lender;

(iv)   there shall be no order or injunction or pending litigation in which there is a reasonable possibility of a decision that would reasonably be expected to have a Material Adverse Effect on Parent and its Subsidiaries, taken as a whole, and no pending litigation seeking to prohibit, enjoin or prevent any of the Transactions.

(o)   Reserved.

(p)   Reserved.

(q)   Reserved.

(r)   Budget.  Administrative Agent and Lenders shall have received a copy of the Budget.

(s)   Bankruptcy Case.  The Bankruptcy Case shall have been commenced in the Bankruptcy Court and all "first day orders" and all related pleadings to be entered at or promptly following the commencement of the Bankruptcy Case have been provided in advance to Agents and Lenders, each in form and substance reasonably satisfactory to Agents and Lenders.

(t)    Interim Order.  The Bankruptcy Court shall have entered the Interim Order within three (3) Business Days after the commencement of the Bankruptcy Case, entered on notice to such parties as may be satisfactory to Agents and Lenders.

SECTION 5.02.    Conditions Precedent to Delayed Draw Term Loans.    The obligation of each Lender to make Delayed Draw Term Loans as provided for hereunder (and the funding of each such Delayed Draw Term Loan as provided for hereunder) is subject to the fulfillment, to the satisfaction (in addition to the satisfaction of the conditions set forth in Section 5.01 on the Closing Date) of the Agents and each Lender, of each of the following conditions precedent as of the date of such funding, unless any such condition is waived in accordance with Section 12.01:

(a)    Such requested Delayed Draw Term Loan shall comply with the provisions of Section 2.01(b) and 2.04;

(b)    Before and after giving effect to the making of such Delayed Draw Term Loan and to the application of the proceeds therefrom, the representations and warranties of the Credit Parties in this Agreement and Credit Documents to which they are a party shall be true and correct in all material respects (without duplication of any materiality or Material Adverse Effect standard in such representation or warranty) with the same effect as though made on and as of the date such Delayed Draw Term Loan is made (it being understood and agreed that the making of any request for the funding of any Delayed Draw Term Loan shall be deemed to constitute the making of such representations and warranties by the Borrower and the Credit Parties on the applicable Draw Date);

(c)    Before and after giving effect to the making of such Delayed Draw Term Loan and to the application of the proceeds therefrom, no Default or Event of Default shall have occurred and be continuing;

(d)    The making of such Delayed Draw Term Loan shall comply with the Budget;

(e)    The Financing Order shall be in full force and effect and shall not have been vacated, reversed or stayed in any respect of, except with the written consent of Administrative Agent and Required Lenders, modified or amended in any manner, and the amount making of such Delayed Draw Term Loan shall not result in the aggregate outstanding Loans hereunder exceeding the amount authorized by the Financing Order;

(f)    With respect to any Loans in excess of $4,000,000 in the aggregate funded after the Closing Date, the Bankruptcy Court shall have entered the Final Order, entered on notice to such parties as may be satisfactory to Administrative Agent and Lenders; and

(g)    With respect to any Delayed Draw Term Loans to be funded after the date that is twenty-five (25) days after the Petition Date (or such later date as the Administrative Agent and Required Lenders may consent), the Bankruptcy Court shall have entered the Final Order, entered on notice to such parties as may be satisfactory to Administrative Agent and Lenders.

# ARTICLE VI
## Guarantee

SECTION 6.01.        Guarantee.

(a)        To induce the Lenders to make the Loans and each other Secured Party to make credit available to or for the benefit of one or more Credit Parties, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably, guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Credit Document, of all the Obligations of Borrower and of the other Guarantors whether existing on the date hereof or hereinafter incurred or created (the "*Guarantor Obligations*", which in no event shall include any Excluded Hedging Obligations). The Guarantor Obligations shall include, without limitation, interest accruing at the then applicable rate provided herein after the maturity thereof and interest accruing at the then applicable rate provided herein after the commencement of any Insolvency Event relating to Borrower or any other Credit Party, whether or not a claim for post-filing or post-petition interest is allowed or allowable in such proceeding, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with this Agreement or any other Credit Document, in each case whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including all fees and disbursements of counsel and other advisors retained by, or for the benefit of, the Agents or to the other Secured Parties that are required to be paid by Borrower pursuant to the terms of any of the foregoing agreements) and all obligations and liabilities of such Guarantor that arise or may arise under or in connection with this Agreement or any other Credit Document to which such Guarantor is a party, in each case whether on account of guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including all fees and disbursements of counsel and other advisors retained by, or for the benefit of, the Agents or the other Secured Parties that are required to be paid by such Guarantor pursuant to the terms of any such Credit Document) whether or not claims for any such amounts are allowed or allowable in any Insolvency Event. Each Guarantor's guarantee hereunder constitutes a guarantee of payment and not of collection.

(b)        Any term or provision of this Agreement or any other Credit Document to the contrary notwithstanding, the maximum aggregate amount for which any Guarantor shall be liable under this Guarantee shall not exceed the maximum amount for which such Guarantor can be liable without rendering the obligations of such Guarantor under this Agreement or any other Credit Document, as it relates to such Guarantor, subject to avoidance under Applicable Laws relating to fraudulent conveyance or fraudulent transfer (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and Section 548 of title 11 of the United States Code or any applicable provisions of comparable Applicable Laws) (collectively, the "*Fraudulent Transfer Laws*"). Any analysis of the provisions of this Article VI for purposes of the Fraudulent Transfer Laws shall take into account the right of contribution established in Section 6.02 and, for purposes of such analysis, give effect to any discharge of intercompany debt as a result of any payment made under this Article VI.

(c)     Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing this Guarantee or affecting the rights and remedies of any Secured Party hereunder.

(d)     This Guarantee shall remain in full force and effect until the Termination Date occurs, notwithstanding that from time to time during the term of this Agreement no Guarantor Obligations may be outstanding.

(e)     No payment made by Borrower, any of the Guarantors, any other guarantor or any other Person or received or collected by any Secured Party from Borrower, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder, and each Guarantor shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable for the Obligations up to the maximum liability of such Guarantor hereunder until the Termination Date occurs.

SECTION 6.02.     Right of Contribution.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 6.03.  The provisions of this Section 6.02 shall in no respect limit the obligations and liabilities of any Guarantor to the Secured Parties, and each Guarantor shall remain liable to the Secured Parties for the full amount guaranteed by such Guarantor hereunder.

SECTION 6.03.     No Subrogation.  Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by any Secured Party, no Guarantor shall be entitled to be subrogated to any of the rights of any Secured Party against Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by any Secured Party for the payment of the Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from Borrower or any other Guarantor in respect of payments made by such Guarantor under this Guarantee, in each case, until after the Termination Date occurs.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time on or prior to the Termination Date, such amount shall be held by such Guarantor for the benefit of Secured Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Collateral Agent in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Collateral Agent, if required), to be applied against the Obligations, whether matured or unmatured, in the order set forth in Section 4.02(d) of this Agreement.

SECTION 6.04.     Modification of the Guarantor Obligations.  Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Guarantor Obligations made by any Secured Party may be rescinded by such Secured

Party and any of the Guarantor Obligations continued, and the Guarantor Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered, subordinated or released by any Secured Party, and this Agreement and the other Credit Documents, and any other documents executed and delivered in connection therewith may be amended, amended and restated, supplemented or otherwise modified or terminated, in whole or in part, as the Agents (or the Required Lenders or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by any Secured Party for the payment of the Guarantor Obligations may be sold, exchanged, waived, surrendered, subordinated or released.  No Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Guarantor Obligations or for this Agreement or any other Credit Document or any property subject thereto.

SECTION 6.05.      <u>Guarantee Absolute and Unconditional</u>.  Each Guarantor waives to the fullest extent permitted by Applicable Law any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by any Secured Party upon this Agreement or acceptance of the guarantee contained in this Article VI.  The Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon this Article VI and all dealings between Borrower and any of the Guarantors, on the one hand, and the Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon this Article VI.  Each Guarantor, to the fullest extent permitted by Applicable Law, waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon Borrower or any of the Guarantors with respect to the Obligations.  Each Guarantor waives, to the fullest extent permitted by law, any right such Guarantor may now have or hereafter acquire to revoke, rescind, terminate or limit (except as expressly provided herein) the guarantee set forth in this Article VI or any of its obligations hereunder.  Each Guarantor understands and agrees, to the fullest extent permitted by Applicable Law, that the guarantee set forth in this Article VI shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity, enforceability or avoidability of this Agreement or any other Credit Document, any of the Guarantor Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by any Secured Party, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by Borrower or any other Person against any Secured Party, or (c) any other circumstance whatsoever (with or without notice to or knowledge of Borrower or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of Borrower with respect to any Obligations, or of such Guarantor under this guarantee, in bankruptcy or in any other instance.  When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, any Secured Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against Borrower, any other Guarantor or any other Person or against any collateral security or guarantee for the Guarantor Obligations or any right of offset with respect thereto, and any failure by any Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from Borrower, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of Borrower, any other

Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of any Secured Party against any Guarantor.  For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

SECTION 6.06.  Reinstatement.  The guarantee set forth in this Article VI shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Guarantor Obligations is rescinded or must otherwise be restored or returned by any Secured Party, including, without limitation, upon the insolvency, bankruptcy, examinership, dissolution, liquidation or reorganization of Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, examiner, intervenor or conservator of, or trustee or similar officer for, Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

SECTION 6.07.  Payments.  Each Guarantor hereby guarantees that payments hereunder will be paid to the Administrative Agent, for the benefit of the Lenders, without set-off or counterclaim in Dollars in accordance with Section 4.03(c).

SECTION 6.08.  Taxes.  Each payment of the Guarantor Obligations will be made by each Guarantor subject to the same provisions as are set forth in Section 4.04 hereof.

## ARTICLE VII
### Representations, Warranties and Agreements

In order to induce the Lenders to enter into this Agreement and make the Loans as provided for herein, the Credit Parties make the following representations and warranties to, and agreements with, the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans:

SECTION 7.01.  Status.  Each Credit Party (a) is a duly organized or formed and validly existing corporation, limited liability company or other registered entity in good standing under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact the business in which it is engaged and (b) has duly qualified and is authorized to do business and is in good standing in all jurisdictions where it does business or owns assets, except, in the case of this clause (b), where the failure to be so qualified would not reasonably be expected to result in a Material Adverse Effect.

SECTION 7.02.  Power and Authority.  Subject to the approval of the Bankruptcy Court pursuant to the Financing Order, each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party.  Each Credit Party has duly executed and delivered the Credit Documents to which it is a party and such Credit Documents constitute the legal, valid and binding obligation of such Credit Party enforceable against each Credit Party that is a party

thereto in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, moratorium, examinership, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

SECTION 7.03.    No Violation.  None of (a) the execution, delivery and performance by any Credit Party of the Credit Documents to which it is a party and compliance with the terms and provisions thereof, (b) the consummation of the Transactions, or (c) the consummation of the other transactions contemplated hereby or thereby on the relevant dates therefor will (i) contravene any applicable provision of any material Applicable Law of any Governmental Authority, (ii) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of any Credit Party (other than Liens created under the Credit Documents) pursuant to, (A) the terms of any material indenture, loan agreement, lease agreement, mortgage or deed of trust to which any Credit Party is a party or by which it or any of its property or assets is bound, or (iii) violate any provision of the Organization Documents or Permit of any Credit Party.

SECTION 7.04.    Litigation, Labor Controversies, etc.  Other than the Bankruptcy Case and the failure to pay trade creditors on a timely basis, there is no pending or, to the knowledge of any Credit Party, threatened, litigation, action, proceeding or labor controversy (including without limitation, strikes, lockouts or slowdowns against the Credit Parties or any of their respective Subsidiaries pending or, to the knowledge of any Credit Party, threatened) (a) except as disclosed in Schedule 7.04, none of which would reasonably be expected to have a Material Adverse Effect, (b) which purports to affect the legality, validity or enforceability of any Credit Document or the Transactions or (c) relating to any Indebtedness or purported Indebtedness of any Credit Party or any Subsidiary.  There is no outstanding judgment rendered by any court or tribunal against any Credit Party or any Subsidiary.

SECTION 7.05.    Use of Proceeds; Regulations U and X.  The proceeds of the Loans are intended to be and shall be used solely for the purposes set forth in and permitted by Section 8.12.  No Credit Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Loans will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with Regulation U or Regulation X.

SECTION 7.06.    Approvals, Consents, etc.  Subject to the approval of the Bankruptcy Court pursuant to the Financing Order, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person, and no consent or approval under any contract or instrument (other than (a) those that have been duly obtained or made and which are in full force and effect, or if not obtained or made, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, (b) the filing of UCC financing statements and other equivalent filings for foreign jurisdictions, and (c) the filings or other actions necessary to perfect Liens under the Credit Documents) is required for the consummation of the Transactions or the due execution, delivery or performance by any Credit Party of any Credit Document to which it is a party, or for the due execution, delivery or performance of the Credit Documents, in each case by any of the Credit Parties party thereto.

There does not exist any judgment, order, injunction or other restraint issued or filed with respect to the transactions contemplated by the Credit Documents, the consummation of the Transactions, the making of the Loans or the performance by the Credit Parties or any of their respective Subsidiaries of their Obligations under the Credit Documents.

SECTION 7.07.    Investment Company Act.  No Credit Party is, or will be after giving effect to the Transactions and the transactions contemplated under the Credit Documents, an "investment company" or a company "controlled" by a Person required to be registered as an "investment company", within the meaning of the Investment Company Act of 1940.

SECTION 7.08.    Accuracy of Information.

(a)    None of the factual information and data (taken as a whole) at any time furnished by any Credit Party, any of their respective Subsidiaries or any of their respective authorized representatives in writing to any Agent or any Lender (including all information contained in the Credit Documents) for purposes of or in connection with this Agreement or any of the Transactions contains any untrue statement of a material fact or omits to state any material fact necessary to make such information and data (taken as a whole) not materially misleading, in each case, at the time such information was provided in light of the circumstances under which such information or data was furnished; provided that, to the extent any such information was based upon or constitutes a forecast or projection, the Credit Parties represent only that the Credit Parties acted in good faith and utilized assumptions believed to be reasonable at the time made and due care in the preparation of such information, it being understood that forecast and projections are subject to uncertainties and contingencies and no assurance can be given that any forecast or projection will be realized.

(b)    The budget and pro forma financial information provided to the Agents and Lenders were prepared in good faith based upon assumptions believed by the Credit Parties to be reasonable at the time made, it being recognized by the Agents and the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

SECTION 7.09.    Financial Condition; Financial Statements.

(a)    The Historical Financial Statements present fairly in all material respects the financial position and results of operations of Parent and its Subsidiaries at the respective dates of such information and for the respective periods covered thereby, subject in the case of unaudited financial information, to changes resulting from normal year-end audit adjustments and to the absence of footnotes.

(b)    The Historical Financial Statements and all of the balance sheets, all statements of income and of cash flow and all other financial information furnished pursuant to Section 8.01 have been and will for all periods following the Closing Date be prepared in accordance with GAAP consistently applied.  All of the financial information to be furnished pursuant to Section 8.01 will present fairly in all material respects the financial position and results of operations of Parent and its Subsidiaries at the respective dates of such information and

for the respective periods covered thereby, subject in the case of unaudited financial information, to changes resulting from normal year-end audit adjustments and to the absence of footnotes.

SECTION 7.10.    <u>Tax Returns and Payments</u>.  Except as disclosed on Schedule 7.10, each Credit Party and its Subsidiaries has timely filed or caused to be timely filed all material Tax returns and reports required to have been filed (and all such Tax returns are true complete and correct in all material respects) and has paid or caused to be paid all material Taxes required to have been paid by it that are due and payable, except Taxes (or any requirement to file Tax returns with respect thereto) that are being contested in good faith by appropriate proceedings and for which the Credit Party or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP.  To the knowledge of each Credit Party and their respective Subsidiaries, there are no proposed or pending tax assessments, deficiencies, audits or other proceedings with respect to any material amount of Taxes.  None of the Credit Parties nor any of their Subsidiaries has ever "participated" in a "reportable transaction" within the meaning of Section 1.6011-4 of the Treasury Regulations.  None of the Credit Parties nor any of their Subsidiaries is a party to any tax sharing or similar agreement.  No Tax Lien has been filed and, to the knowledge of each Credit Party and their respective Subsidiaries, no material claim is being asserted, with respect to any such Tax, fee, or other charge, except as disclosed on <u>Schedule 7.10</u>.

SECTION 7.11.    <u>Compliance with ERISA</u>.  Each Plan (and each related trust, insurance contract or fund) is in compliance with its terms and with ERISA, the Code and all Applicable Laws; no Reportable Event has occurred (or is reasonably expected to occur) with respect to any Plan; each Plan (and each related trust, if any) that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service, and nothing has occurred subsequent to the issuance of such determination letter which would prevent, or cause the loss of, such qualification; no Plan is insolvent or in reorganization or in endangered or critical status within the meaning of Section 432 of the Code or Section 4241 or 4245 of Title IV of ERISA (or is reasonably expected to be insolvent or in reorganization), and no written notice of any such insolvency or reorganization has been given to any of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate; no Plan is, or is reasonably expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); no Plan (other than a Multiemployer Plan) has failed to satisfy the minimum funding standard of Section 412 of the Code or Section 302 of ERISA (whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA), or is reasonably expected to do so, and no Plan has applied for or received a waiver of the minimum funding standard or an extension of any amortization period within the meaning of Section 412 of the Code or Section 302, 303 or 304 of ERISA; no failure to make any required installment under Section 430(j) of the Code with respect to any Plan or to make any required contribution to a Multiemployer Plan when due has occurred; none of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate has incurred (or is reasonably expected to incur) any liability to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 436(f), 4971, 4975 or 4980 of the Code or has been notified in writing that it will incur any liability under any of the foregoing Sections with respect to any Plan; no proceedings have been instituted (or are reasonably expected to be instituted) to terminate or to reorganize any Plan or to appoint a trustee to administer any Plan, and no written notice of any such proceedings has been given to any of the Credit Parties, any of

their respective Subsidiaries or any ERISA Affiliate; no Lien imposed under the Code or ERISA on the assets of any of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate exists (or is reasonably expected to exist) nor have the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate been notified in writing that such a Lien will be imposed on the assets of any of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate on account of any Plan; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, expected or, to the knowledge of any Credit Party or any Subsidiary, threatened; there has been no violation of the applicable requirements of Section 404 or 405 of ERISA or the exclusive benefit rule under Section 401(a) of the Code by any fiduciary or disqualified person with respect to any Plan for which any of the Credit Parties, any of their respective Subsidiaries or any ERISA Affiliate may be directly or indirectly liable; and none of the Credit Parties, any of their respective Subsidiaries nor any ERISA Affiliate has filed, or is considering filing, an application under the United States Internal Revenue Service Employee Plans Compliance Resolution System or the Department of Labor's Voluntary Fiduciary Correction Program with respect to any Plan, except to the extent that a breach of any of the representations, warranties or agreements in this <u>Section 7.11</u> could not result, individually or in the aggregate, in an amount of liability that would be reasonably expected to have a Material Adverse Effect. No Plan (other than a Multiemployer Plan) has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this <u>Section 7.11</u>, be reasonably expected to have a Material Adverse Effect. No employee welfare benefit plan within the meaning of §3(1) or §3(2)(B) of ERISA of any Credit Party or any of their respective Subsidiaries, provides benefit coverage subsequent to termination of employment except as required by Title I, Part 6 of ERISA or applicable state insurance laws. No liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA has been, or is reasonably expected to be, incurred, except as could not reasonably be expected to have a Material Adverse Effect. With respect to any Plan that is a Multiemployer Plan, the representations and warranties in this <u>Section 7.11</u>, other than any made with respect to (a) liability under Section 4201 or 4204 of ERISA or (b) liability for termination or reorganization of such Plans under ERISA, are made to the best knowledge of the Credit Parties.

SECTION 7.12.    <u>Subsidiaries</u>.  None of the Credit Parties has any Subsidiaries other than the Subsidiaries listed on <u>Schedule 7.12</u>. <u>Schedule 7.12</u> describes the direct and indirect ownership interest of each of the Credit Parties in each Subsidiary.

SECTION 7.13.    <u>Intellectual Property; Licenses, etc</u>.  To the knowledge of such Credit Party, each Credit Party and each of its Subsidiaries owns, or possesses the right to use, all of the trademarks, service marks, trade names, Internet domain names, copyrights and copyrightable works, patents, inventions, trade secrets, know-how, proprietary computer software, franchises, intellectual property licenses and other intellectual property rights, including all registrations and applications to register any of the foregoing and all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof (collectively, the "***IP Rights***") that are reasonably necessary for the operation of their respective businesses.  To the knowledge of such Credit Party, the conduct and operations of the businesses of each Credit Party and each of its Subsidiaries and its and their products and services do not infringe, misappropriate, dilute, or

otherwise violate in any material respect any intellectual property owned by any other Person. No other Person has challenged in writing or questioned any right, title or interest of any Credit Party or any of its Subsidiaries in any material IP Rights of such Credit Party or Subsidiary.  No Credit Party or Subsidiary thereof has received a written challenge from any other Person contesting the use of any material IP Rights owned by such Credit Party or Subsidiary or the validity or enforceability of such material IP Rights.  Except as specifically set forth on Schedule 7.04, no claim or litigation regarding any of the foregoing is pending or, to the knowledge of such Credit Party threatened.  Schedule 7.13 is a complete and accurate list of (i) all IP Rights registered or pending registration with the United States Copyright Office (or any foreign counterpart thereof), the United States Patent and Trademark Office (or any foreign counterpart thereof), or the applicable registrar for Internet domain names and owned by each Credit Party and each of its Subsidiaries as of the Closing Date and (ii) all material license agreements or similar arrangements granting IP Rights of another Person to any Credit Party or any of its Subsidiaries, other than software license agreement for "off-the-shelf" or "click-through" agreements.  None of the products or services used in the business of any Credit Party or any of its Subsidiaries uses any software or freeware licensed in a manner which imposes any requirement that such software or freeware, or any of the products or services of any Credit Party or its Subsidiaries, or derivatives of such software, freeware or products or services, or software, products or services using, linked with, incorporating, distributed with, based on, or derived from such software or freeware or products or services, be (A) made available or distributed in source code form, (B) licensed for the purpose of making derivative works, (C) licensed under terms that allow reverse engineering, reverse assembly or disassembly of any kind, or (D) made redistributable at no charge.  As of the Closing Date, none of the IP Rights owned by any Credit Party or any of its Subsidiaries is subject to any licensing agreement, other than (i) non-exclusive licenses granted to customers in the ordinary business, or (ii) except as set forth on Schedule 7.13.  No Credit Party or Subsidiary of a Credit Party owns any IP Rights except for the Borrower.

SECTION 7.14.        Environmental Warranties.

(a)        Except as set forth in Schedule 7.14:

(i)        The Credit Parties, their Subsidiaries and their respective businesses, operations and Real Property are and have at all times during the Credit Parties' or their Subsidiaries' ownership, lease or operation thereof been in material compliance with, and the Credit Parties and their Subsidiaries have no material liability under, any applicable Environmental Law, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(ii)        The Credit Parties and their Subsidiaries have obtained all material permits, licenses, certificates or authorizations required under Environmental Law ("***Environmental Permits***") and necessary for the conduct of their businesses and operations, and the ownership, operation and use of their Real Property.  The Credit Parties and their Subsidiaries are in material compliance with the terms and conditions of such Environmental Permits, and all such Environmental Permits are valid and in good standing.

(iii)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there has been no Release or threatened Release or any handling, management, generation, treatment, storage or disposal of Hazardous Materials in, on, at, under, to, or from any Real Property presently or, to the knowledge of any Credit Party, formerly owned, leased or operated by any of the Credit Parties, their Subsidiaries or their respective predecessors in interest that has resulted in, or is reasonably expected to result in, material liability or obligations by any of the Credit Parties under Environmental Law or result in a material Environmental Claim.

(iv)    There is no material Environmental Claim pending or, to the knowledge of the Credit Parties, threatened against any of the Credit Parties or their Subsidiaries, or relating to the Real Property currently or formerly owned, leased or operated by any of the Credit Parties or their Subsidiaries or relating to the operations of the Credit Parties or their Subsidiaries, and, to the knowledge of the Credit Parties, there are no actions, activities, circumstances, conditions, events or incidents that are reasonably likely to form the basis of a material Environmental Claim.

(v)    To the knowledge of the Credit Parties, no person with an indemnity, contribution or other obligation to any of the Credit Parties or their Subsidiaries relating to compliance with or liability under Environmental Law is in default with respect to any such indemnity, contribution or other obligation.

(vi)    No Real Property owned, leased or operated by the Credit Parties or their Subsidiaries and, to the knowledge of the Credit Parties, no Real Property or facility formerly owned, leased or operated by any of the Credit Parties or any of their predecessors in interest is (i) listed or, to the knowledge of the Credit Parties, proposed for listing on the National Priorities List as defined in and promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any governmental or regulatory authority that indicates that any Credit Party or Subsidiary has or may have an obligation to undertake investigatory or remediation obligations under applicable Environmental Laws.

(vii)    No Lien has been recorded or, to the knowledge of any Credit Party, threatened under any Environmental Law with respect to any Real Property of the Credit Parties or their Subsidiaries.

(b)    None of the matters, individually or in the aggregate, disclosed in Schedule 7.14 would reasonably be expected to have a Material Adverse Effect.

(c)    The Credit Parties and their Subsidiaries have made available to the Administrative Agent and Lenders all material reports, assessments, audits, studies and investigations in the possession, custody or control of the Credit Parties and their Subsidiaries concerning Environmental Claims or compliance with or liability or obligation under Environmental Law, including those concerning the condition of the Real Property or the existence of Hazardous Materials at Real Property or facilities formerly owned, operated, leased or used by any of the Credit Parties, their Subsidiaries or their predecessors-in-interest.

SECTION 7.15.        Ownership of Properties.  Set forth on Schedule 7.15 is a list of all of the Real Property owned or leased by any of the Credit Parties or their respective Subsidiaries as of the Closing Date, indicating in each case whether the respective property is owned or leased, the identity of the owner or lessor and the location of the respective property.  Each Credit Party owns (a) in the case of owned Real Property, good and valid fee simple title to such Real Property, (b) in the case of owned personal property, good and valid title to such personal property, and (c) in the case of leased Real Property or material personal property, valid and enforceable (except as may be limited by bankruptcy, insolvency, examinership, moratorium, fraudulent conveyance or other laws applicable to creditors' rights generally and by generally applicable equitable principles, whether considered in an action at law or in equity) leasehold interests (as the case may be) in such leased property, in each case, free and clear in each case of all Liens or claims, except for Permitted Liens.

SECTION 7.16.        Reserved.

SECTION 7.17.        [Reserved].

SECTION 7.18.        Locations of Offices, Records and Collateral.  The address of the principal place of business and chief executive office of each Credit Party is, and the books and records of each Credit Party and all of its Chattel Paper and records of Receivables are maintained in the possession of such Credit Party at, the address of such Credit Party specified in Schedule 7.18(a) (or at such other address permitted by Section 5.3(a)(i) of the Security Agreement).  Schedule 7.18(b) specifies all Real Property of each Credit Party, and indicates whether each location specified therein is leased or owned by such Credit Party. Except for in-transit inventory, there is no location at which a Credit Party maintains any Collateral having a value in excess of $50,000 for any such location other than the locations specified for it in Schedule 7.18(b) (or at such other address permitted by Section 5.3(d) of the Security Agreement).

SECTION 7.19.        Compliance with Laws and Permits; Authorizations.

(a)        Each Credit Party and each of its Subsidiaries (a) is in material compliance with all Applicable Laws and Permits and (b) has all requisite governmental licenses, Permits, authorizations, consents and approvals to operate its business as currently conducted, except in such instances in which (x) such requirement of Applicable Laws, Permits, government licenses, authorizations or approvals are being contested in good faith by appropriate proceedings diligently conducted or (y) the failure to have or comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  No Credit Party has received any written notice that is outstanding or unresolved to the effect that its operations are not in material compliance with any Environmental Law or Permit or are the subject of any investigation by any Governmental Authority evaluating whether any cleanup or other action is needed to respond to a Release or impose further controls on any existing discharge of Hazardous Materials to the environment.

(b)        No Credit Party, nor any Subsidiary, nor, to the knowledge of the Credit Parties and their Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity  that is, or is owned or controlled by any individual or entity

that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction.

(c)    The Credit Parties and their Subsidiaries have conducted their business in compliance with the United States Foreign Corrupt Practices Act of 1977 and other similar anti-corruption legislation in other jurisdictions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

SECTION 7.20.    No Material Adverse Effect.  Since March 31 2019, (a) there has been no Material Adverse Effect, and (b) there has been no circumstance, event or occurrence, and no fact is known to the Credit Parties that could reasonably be expected to result in a Material Adverse Effect.

SECTION 7.21.    Contractual or Other Restrictions.    Other than the Credit Documents, except as set forth in Schedule 7.21 and to the extent permitted by Section 9.10, no Credit Party or any of its Subsidiaries is a party to any agreement or arrangement or subject to any Applicable Law, other than customary state laws prohibiting unlawful distributions, that limits its ability to pay dividends to, or otherwise make Investments in or other payments to any Credit Party, that limits its ability to grant Liens in favor of the Collateral Agent or that otherwise limits its ability to perform the terms of the Credit Documents.

SECTION 7.22.    Collective Bargaining Agreements.  Set forth on Schedule 7.22 is a list and description (including dates of termination) of all collective bargaining or similar agreements between or applicable to any Credit Party or any of its Subsidiaries and any union, labor organization or other bargaining agent in respect of the employees of any Credit Party or any of its Subsidiaries.

SECTION 7.23.    Insurance.  The properties of each Credit Party are insured with financially sound and reputable insurance companies not Affiliates of any Credit Party against loss and damage in such amounts, with such deductibles and covering such risks as are customarily carried by Persons of comparable size and of established reputation engaged in the same or similar businesses and owning similar properties in the general locations where such Credit Party operates, in each case as described on Schedule 7.23.  As of the Closing Date, all premiums with respect thereto that are due and payable have been duly paid and no Credit Party has received or has actual knowledge of any notice of violation or cancellation thereof and each Credit Party has complied in all material respects with the requirements of such policy.

SECTION 7.24.    Evidence of Other Indebtedness.  Schedule 7.24 is a complete and correct list of each credit agreement, loan agreement, indenture, purchase agreement, guarantee, letter of credit or other arrangement providing for or otherwise relating to any Indebtedness or any extension of credit (or commitment for any extension of credit) to, any Credit Party or Subsidiary outstanding on the Closing Date which will remain outstanding after the Closing Date (other than this Agreement and the other Credit Documents), in each case, that has an outstanding amount or amount that may become outstanding that is in excess of $50,000, and the aggregate principal or face amount outstanding or that may become outstanding under each such arrangement as of the Closing Date is correctly described in Schedule 7.24.

SECTION 7.25.     Deposit Accounts and Securities Accounts.     Set forth in Schedule 7.25 is a list as of the Closing Date of all of the deposit accounts and securities accounts of each Credit Party, including, with respect to each bank or securities intermediary at which such accounts are maintained by such Credit Party (a) the name and location of such Person and (b) the account numbers of the deposit accounts or securities accounts maintained with such Person.

SECTION 7.26.     Absence of any Undisclosed Liabilities.     There are no material liabilities of any Credit Party of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, and, to the knowledge of the Credit Parties and their respective Subsidiaries, there is no existing condition, situation or set of circumstances which could reasonably be expected to result in any such liabilities, other than those liabilities provided for or disclosed in the Historical Financial Statements or the most recent financial statements delivered pursuant to Section 8.01.

SECTION 7.27.     Reserved.

SECTION 7.28.     Anti-Terrorism Laws.     No Credit Party or any Subsidiary is in violation of any Law relating to terrorism or money laundering ("***Anti-Terrorism Laws***"), including the Patriot Act and Executive Order No. 13224 on Terrorism Financing, effective September 24, 2001 (the "***Executive Order***").     No Credit Party, Subsidiary or agent acting or benefiting in any capacity in connection with the Loans is (a) a Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order, (b) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order, (c) a Person with whom any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order, or (e) a Person that is named as a "specially designated national and blocked person" on the most current list published by the United States Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list. No Credit Party or Subsidiary or, to the Credit Parties' knowledge, other agents acting or benefiting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in the preceding sentence, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in any property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Anti-Terrorism Laws.

SECTION 7.29.     Privacy and Data Security.

(a)     Compliance.     The Credit Parties and their Subsidiaries are in material compliance with all applicable U.S. and international privacy and data security laws and regulations ("***Data Protection Laws***"), including but not limited to the European Union General Data Protection Regulation, Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 ("***GDPR***").

(b)    Data Security Program. The Credit Parties and their Subsidiaries are adopting a written information security program that complies with the Data Protection Laws and any applicable customer contracts to govern the protection of all data that the Credit Parties and their Subsidiaries maintain or for which they have responsibility, including but not limited to all personal data that relates to an identified or identifiable natural person, and all other data related to the business of the Credit Parties and their Subsidiaries or that they hold for their customers ("Data"). Pursuant to such security program, the Credit Parties and their Subsidiaries have implemented technical and administrative security measures ensuring a level of security appropriate to the nature of the Data to be protected and the risks represented by its processing. Such technical and administrative measures are reasonably designed to protect the Data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access, or any unlawful forms of processing.

(c)    Vendor Agreements. The Credit Parties and their Subsidiaries have entered into written agreements with all of their relevant vendors, service providers and other entities (the "***Third Party Service Providers***") to which they provide Data or access to Data, requiring the Third Party Service Providers to protect such Data in a manner that is substantially similar to the protections that the Credit Parties and their Subsidiaries are required to provide by the Data Protection Laws and by any applicable contracts with customers.

(d)    Customer Contracts. The Credit Parties and their Subsidiaries (a) are in compliance with all contractual requirements pursuant to which they are obligated to protect (or to require the Third Party Service Providers to protect) Data, and (b) have not received notice (in writing or otherwise) regarding any actual, alleged or asserted violation of any such contractual obligation.

(e)    No Violations or Notice of Violations. There are no notices, claims, investigations or proceedings pending, or, to the knowledge of any Credit Party or any Subsidiary, threatened, by any state or federal agency, by any international government agency, or by any private party involving claims that any Data held or stored by a Credit Party or Subsidiary has been compromised, lost, taken, accessed or misused. No Credit Party or Subsidiary has received notice (in writing or otherwise) regarding any actual, alleged or asserted violation of any Data Protection Law.  To the knowledge of the Credit Parties and their respective Subsidiaries, no Data has been collected, used, or stored by a Credit Party or Subsidiary, transferred by a Credit Party or Subsidiary to third parties, or otherwise processed in violation of any Data Protection Law or any applicable customer contracts.

(f)    No Compromise. The Credit Parties and their Subsidiaries have no reason to believe that the confidentiality, security or availability of any Data collected or maintained by the Credit Parties or their Subsidiaries, or any confidential or proprietary information of the Credit Parties or their Subsidiaries, or any third party that the Credit Parties or their Subsidiaries maintain has been compromised or potentially compromised.  No Credit Party or Subsidiary has any knowledge of any act or attempt, successful or unsuccessful, to gain unauthorized access to, disrupt, or misuse any information system of the Credit Parties or Subsidiaries or Data stored on such information system that requires or would be reasonable likely to require notification to any person or governmental agency pursuant to (a) any Data Protection Laws or (b) any contractual obligation to which the Credit Parties or their Subsidiaries are subject.

SECTION 7.30.    <u>Parent, LC Funding and Holdings Activities</u>.  Parent, LC Funding and Holdings do not engage in any business activities or hold or own any property other than (i) ownership of the Capital Stock of LC Funding (in the case of Parent), Holdings (in the case of LC Funding) and Borrower (in the case of Holdings), (ii) activities and contractual rights incidental to maintenance of its corporate existence (including the issuance of the Indebtedness described on <u>Schedule 9.01</u> currently issued by such Person and Indebtedness pursuant to the Subordinated Original Debt Documents and the performance of its obligations thereunder to the extent permitted under this Agreement and the Original Subordination Agreements) and its ownership of such Credit Parties and (iii) subsequent to the Closing Date, performance of its obligations under the Credit Documents and the Subordinated Original Debt Documents to which it is a party and any obligations incidental thereto.  Parent does not engage in any business activities or hold or own any property prohibited by <u>Section 9.12(b)</u>.

SECTION 7.31.    <u>Superpriority Claims</u>.    The entry of the Financing Order is effective to create in favor of Collateral Agent, for the benefit of the Secured Parties, as security for the Obligations, (i) a valid first priority (other than with respect to the Permitted Priority Liens, the Carve-Out, and the Other Statutory Liabilities) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and (ii) an allowed administrative expense in the Bankruptcy Case having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens, the Carve-Out, and the Other Statutory Liabilities (the "***Superpriority Claims***").    Except for the Financing Order and any consents of the Lenders required hereunder, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for either (x) the pledge or grant by Borrower or any of its Subsidiaries of the Liens purported to be created in favor of Collateral Agent pursuant to this Agreement or any of the Credit Documents or (y) the exercise by Collateral Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created pursuant to this Agreement, any of the Credit Documents or created or provided for by applicable law), except as may be required in connection with the disposition of any pledged Collateral by laws generally affecting the offering and sale of securities.

SECTION 7.32.    <u>Budget</u>.  The Budget was prepared by the Chief Restructuring Officer of the Credit Parties and represents the good faith belief of such Person at such time as to the probable course of Borrower's business and financial affairs, over the periods shown therein, subject to the assumptions stated therein.

SECTION 7.33.    <u>Financing Order</u>.  The Financing Order is in full force and effect, is not subject to a pending appeal or motion for leave to appeal or other proceeding to set aside such order and has not been reversed, modified, amended, stayed or vacated absent Administrative Agent's and Required Lenders' written consent.

## ARTICLE VIII
## <u>Affirmative Covenants</u>

The Credit Parties hereby covenant and agree that on the Closing Date and thereafter, until the Loans, together with interest, Fees and all other Obligations incurred hereunder (other

than Unasserted Contingent Obligations) are paid in full in accordance with the terms of this Agreement:

SECTION 8.01.    Financial Information, Reports, Notices and Information. The Credit Parties will furnish the Administrative Agent copies of the following financial statements, reports, notices and information:

(a)    Monthly Financial Statements. As soon as available and in any event within thirty (30) days after the end of each month: (i) unaudited (A) consolidated and consolidating balance sheets of Parent and its Subsidiaries as of the end of such month, and (B) consolidated and consolidating statements of income and cash flow of Parent and its Subsidiaries as of the end of such month; and (ii) such key performance indicators as Administrative Agent shall reasonably request in form and substance reasonably acceptable to Administrative Agent and Lenders.

(b)    Reserved.

(c)    Reserved.

(d)    Reserved.

(e)    Reserved.

(f)    Defaults; Litigation. As soon as possible and in any event within five (5) Business Days after an Authorized Officer of any Credit Party or any of their respective Subsidiaries obtains knowledge thereof, notice from an Authorized Officer of Borrower of (i) the occurrence of any event that constitutes a Default or an Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the applicable Credit Parties propose to take with respect thereto and (ii) (A) the occurrence of any material adverse development with respect to any litigation, action, proceeding or labor controversy described in Schedule 7.04 or (B) the commencement of any litigation, action, proceeding or labor controversy of the type and the materiality described in Section 7.04, and to the extent the Administrative Agent requests, copies of all documentation related thereto.

(g)    Notices. The Credit Parties shall provide the Administrative Agent with a written notice promptly (and in no event later than five (5) Business Days after an Authorized Officer of any Credit Party has actual knowledge of) of the following:

(i)    any pending or threatened (in writing) litigation, action, proceeding or other controversy which purports to affect the legality, validity or enforceability of any Credit Document, or any other document or instrument referred to in Section 9.07, which notice shall be signed by an Authorized Officer of Borrower and shall specify the nature thereof, and what actions the applicable Credit Parties propose to take with respect thereto, together with copies of all relevant documentation;

(ii)    other than the Bankruptcy Case, the commencement of, or any material development in, any litigation, investigation (formal or informal), document request or proceeding affecting any Credit Party or any Subsidiary thereof, in which (A)

-63-

the amount of damages claimed is $200,000 (or its equivalent in another currency or currencies) or more, (B) injunctive or similar relief is or may be sought and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect, (C) the relief sought is or may be an injunction or other stay of the performance of this Agreement or any other Credit Document or (D) the SEC or any other Governmental Authority is involved;

(iii)    notice of any pending or threatened labor dispute, strike, walkout, or union organizing activity with respect to any employees of a Credit Party;

(iv)    notice of the discharge or withdrawal or resignation by Credit Parties' independent accountants;

(v)    copies of all amendments, consent letters, waivers or modifications to a Credit Party's Organization Documents (to the extent permitted hereunder), or by such Credit Party to any such Person;

(vi)    all significant written final reports submitted to the Credit Parties by its accountants in connection with each annual, interim or special audit or review of any type of the financial statements or related internal control systems, including any final comment letters delivered to management and all responses thereto; and

(vii)    notice of any security breach that (A) is required to be reported to any Governmental Authority (B) involves Data subject to any Data Protection Law, or (C) is required to be reported to a customer pursuant to an agreement with such customer.

(h)    Reserved.

(i)    Credit Documents.  As soon as possible and in any event within five (5) Business Days after any Authorized Officer of any Credit Party obtains knowledge of the occurrence of a breach or default or notice of termination by any party under, or material amendment entered into by any party to, any Credit Document or any other document or instrument referred to in Section 9.07, a statement of an Authorized Officer of Borrower setting forth details of such breach or default or notice of termination and the actions taken or to be taken with respect thereto and, if applicable, a copy of such amendment.

(j)    Management Letters.  Promptly upon, and in any event within five (5) Business Days after, receipt thereof, copies of all final "management letters" submitted to any Credit Party by the independent public accountants referred to in Section 8.01(c) in connection with each audit made by such accountants.

(k)    Corporate Information.  Promptly upon, and in any event within five (5) Business Days after, becoming aware of any additional corporate or limited liability company information of the type delivered pursuant to Section 5.04, or of any change to such information delivered on or prior to the Closing Date or pursuant to this Section 8.01 or otherwise under the Credit Documents, a certificate, certified to the extent of any change from a prior certification, from the secretary, assistant secretary, managing director, managing member or general partner

of such Credit Party notifying the Administrative Agent of such information or change and attaching thereto any relevant documentation in connection therewith.

(l)     <u>Environmental Notices</u>.    Copies of any material notice, submittal or documentation provided by any Credit Party to any Governmental Authority or other Person under any Environmental Law. Such notice, submittal or documentation shall be provided to Administrative Agent promptly and, in any event, within two (2) Business Days after such material is provided to any Governmental Authority or third party.

(m)     <u>Sales Report</u>. No later than the Friday of each week, a detailed report of the Credit Parties' revenue and new subscriptions booked and existing subscriptions renewed and cancelled for the preceding week.

(n)     <u>Updated Budget</u>.    On or before the second Business Day of each calendar week, an updated Budget for the thirteen-week period beginning with the calendar week in which the updated Budget is delivered.

(o)     <u>Variance Report</u>.    On or prior to the second Business Day of each calendar week, a Variance Report, dated as of the last day of the immediately preceding calendar week, in form and substance satisfactory to Administrative Agent and Required Lenders.

(p)     <u>Other Reports</u>.    Promptly upon their becoming available, copies of (i) all press releases and other statements made available generally by a Credit Party to the public concerning material developments in the business of a Credit Party, and (ii) copies of all monthly reports, projections or other information with respect to any Credit Party's business or financial condition or prospects (as redacted for privilege or work product), as well as all pleadings, motions, application and judicial information filed by or on behalf of any Credit Party with the Bankruptcy Court or provided by or to the U.S. Trustee or the Committee, at the time such document is filed or delivered, as applicable.

(q)     <u>Other Information</u>.    With reasonable promptness, such other information (financial or otherwise) as any Agent may reasonably request in writing from time to time.

SECTION 8.02.        <u>Books, Records and Inspections; Field Exams</u>.    The Credit Parties will, and will cause each of their respective Subsidiaries to, maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP (subject to normal year-end adjustments pursuant to the audit required under <u>Section 8.01(c)</u>) consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Credit Parties or such Subsidiary, as the case may be.    The Credit Parties will, and will cause each of their respective Subsidiaries to, permit the Administrative Agent, the Lenders, and their respective representatives and independent contractors to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Credit Parties.    Any information obtained by the Administrative Agent or any Lender pursuant to this <u>Section 8.02</u> may be shared with the any Agent or any Lender.    The

Administrative Agent and Lenders shall give the Credit Parties the opportunity to participate in any discussions with the Credit Parties' independent public accountants.

SECTION 8.03.    Maintenance of Insurance.  The Credit Parties will, and will cause each of their respective Subsidiaries to, at all times maintain in full force and effect, with insurance companies that the Credit Parties believe (in their reasonable business judgment) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance in at least such amounts and against at least such risks (and with such risk retentions) as are usually insured against in the same general area by companies engaged in businesses similar to those engaged in by the Credit Parties; and will furnish to the Collateral Agent, upon written request from the Collateral Agent, information presented in reasonable detail as to the insurance so carried, including (i) endorsements to (A) all "All Risk" policies naming the Collateral Agent, on behalf of the Secured Parties, as loss payee and (B) all general liability and other liability policies naming the Collateral Agent, on behalf of the Secured Parties, as additional insured and (ii) legends providing that no cancellation, material reduction in amount or material change in insurance coverage thereof shall be effective until at least thirty (30) days (ten (10) days with respect to failure to pay premium) after receipt by the Collateral Agent of written notice thereof.

SECTION 8.04.    Payment of Taxes.  The Credit Parties will timely pay and discharge before delinquency, and will cause each of their respective Subsidiaries to timely pay and discharge before delinquency, in each case, to the extent accrued from and after the Petition Date and in accordance with the Budget, all Taxes, assessments and governmental charges or levies imposed upon them or upon their income or profits, or upon any properties belonging to it, and all lawful claims; provided, that none of the Credit Parties or any of their respective Subsidiaries shall be required to pay any such Tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings that stays execution and as to which such Credit Party has maintained adequate reserves with respect thereto in accordance with GAAP.

SECTION 8.05.    Maintenance of Existence; Compliance with Laws, etc.  Each Credit Party will, and will cause its Subsidiaries to, (a) preserve and maintain in full force and effect its organizational existence (except in a transaction permitted by Section 9.03), (b) preserve and maintain its good standing under the laws of its state or jurisdiction of incorporation, organization or formation, and each state or other jurisdiction where such Person is qualified, or is required to be so qualified, to do business as a foreign entity, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect, and (c) comply in all material respects with all Applicable Laws, rules, regulations and orders, including without limitation compliance with safety regulations applicable to Borrower or any of its Subsidiaries.

SECTION 8.06.    Environmental Compliance.

(a)    Each Credit Party will, and will cause its Subsidiaries to, comply in all material respects with all Environmental Laws and Environmental Permits applicable to their business, operations and Real Property; obtain and maintain in full force and effect all material Environmental Permits applicable to its business, operations and Real Property; and conduct all response, investigation, remediation, cleanup or monitoring activity required by any

governmental or regulatory authority or any applicable Environmental Laws, and in accordance with, the requirements of any governmental or regulatory authority and applicable Environmental Laws.

(b)     Each Credit Party will, and will cause its Subsidiaries to, do or cause to be done all commercially reasonable things required by Environmental Laws to prevent any Release of Hazardous Materials in, on, at, under, to or from any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries except in full compliance with applicable Environmental Laws or an Environmental Permit, and ensure that there shall be no Hazardous Materials in, on, at, under or from any Real Property owned, leased or operated by any of the Credit Parties or their Subsidiaries except those that are present, used, stored, handled and managed in material compliance with applicable Environmental Laws.

(c)     Each Credit Party will, and will cause its Subsidiaries to, undertake all commercially reasonable actions, including response, investigation, remediation, cleanup or monitoring actions, necessary, at the sole cost and expense of the Credit Parties, (i) to address any Release of Hazardous Materials in, on, at, under, to or from any Real Property owned, leased or operated by any of the Credit Parties as required pursuant to Environmental Law or the requirements of any governmental or regulatory authority; (ii) to address as may be required by Environmental Law any environmental conditions relating to any Credit Party or its respective business or operations or to any Real Property owned, leased or operated by any of the Credit Parties pursuant to any reasonable written request of the Administrative Agent and, except for information and documents to the extent covered by attorney client privilege or attorney work product doctrine, share with the Administrative Agent all data, information and reports generated or prepared in connection therewith; (iii) to keep any Real Property owned, leased or operated by any of the Credit Parties free and clear of all Liens and other encumbrances pursuant to any Environmental Law, whether due to any act or omission of any Credit Party or any other person; and (iv) upon obtaining knowledge of any of the following, to promptly notify the Administrative Agent in writing of: (1) any material Release or threatened Release of Hazardous Materials in, on, at, under, to, or from any Real Property owned, leased or operated by any of the Credit Parties, except those that are pursuant to and in compliance with the terms and conditions of an Environmental Permit, (2) any material non-compliance with, or violation of, any Environmental Law applicable to any Credit Party, any Credit Party's business and any Real Property owned, leased or operated by any of the Credit Parties, (3) any Lien pursuant to Environmental Law imposed on any Real Property owned, leased or operated by any of the Credit Parties, (4) any response, investigation, remediation, cleanup or monitoring activity at any Real Property owned, leased or operated by any of the Credit Parties required to be undertaken pursuant to Environmental Law, and (5) any notice or other communication received by any Credit Party from any person or governmental or regulatory authority relating to any material Environmental Claim or material liability or potential liability of any Credit Party pursuant to any Environmental Law.

(d)     If a Default caused by reason of a breach of Section 7.14 or this Section 8.06 shall have occurred and is not reasonably curable within ten (10) days or shall be continuing for more than thirty (30) days without the Credit Parties commencing activities reasonably likely to cure such Default, the Credit Parties shall, at the written request of the Administrative Agent, (i) provide to the Administrative Agent within forty-five (45) days after

such request, at the expense of the Credit Parties, an environmental assessment report regarding the matters which are the subject of such Default, including, where appropriate, any soil and/or groundwater sampling, prepared by a nationally recognized environmental consulting firm reasonably acceptable to the Administrative Agent and Required Lenders and in the form and substance reasonably acceptable to the Administrative Agent and Required Lenders and evaluating the presence or absence of Hazardous Materials and the estimated cost of any compliance or response action to address such Default and findings; (ii) promptly undertake all actions required by applicable Environmental Law to address any non-compliance with or violation of Environmental Law; (iii) promptly undertake all response actions required by Environmental Laws to address any recognized environmental conditions identified in the environmental assessment report to the reasonable satisfaction of the Administrative Agent and Required Lenders; and (iv) permit the Administrative Agent and its representatives to have access to all Real Property and all facilities owned, leased or operated by any of the Credit Parties and their Subsidiaries which are the subject of such Default for the purpose of conducting such environmental audits and testing as is reasonably necessary, including subsurface sampling of soil and groundwater, the cost for which shall be payable by the Credit Parties.

SECTION 8.07.    ERISA.

(a)    As soon as possible and, in any event, within thirty (30) days after any Credit Party or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following events, Borrower will deliver to the Agents a certificate of an Authorized Officer of Borrower setting forth the full details as to such occurrence and the action, if any, that such Credit Party or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by such Credit Party, such Subsidiary, such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto:  (i) the institution of any steps by any Person to terminate any Plan; (ii) the failure to make a required contribution to any Plan if such failure is sufficient to give rise to a Lien under Sections 303(k) or 4068 of ERISA or under Section 430(k) of the Code; (iii) the taking of any action with respect to a Plan which could result in the requirement that any Credit Party furnish a bond or other security to the PBGC or such Plan; (iv) the occurrence of any event with respect to any Plan which could result in the incurrence by any Credit Party of any material liability, fine or penalty, notice thereof and copies of all documentation relating thereto; (v) that a Reportable Event has occurred (except to the extent that Borrower has previously delivered to the Agents a certificate and notices (if any) concerning such event pursuant to the next clause hereof); (vi) that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; (vii) that a failure to satisfy the minimum funding standard within the meaning of Section 430 of the Code or Section 303 of ERISA (whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA) has occurred (or is reasonably likely to occur) or an application may be or has been made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412, 430 or 431 of the Code or Section 302, 303 or 304 of ERISA with respect to a Plan; (viii) that a Plan having

any material Unfunded Current Liability has been or is to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA (including the giving of written notice thereof); (ix) that a Plan has an Unfunded Current Liability that has or will result in a Lien under ERISA or the Code; (x) that proceedings may be or have been instituted to terminate a Plan having an Unfunded Current Liability (including the giving of written notice thereof); (xi) that a proceeding may be or has been instituted against a Credit Party, a Subsidiary thereof or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; (xii) that the PBGC has notified any Credit Party, any Subsidiary thereof or any ERISA Affiliate of its intention to appoint a trustee to administer any Plan; (xiii) that any Credit Party, any Subsidiary thereof or any ERISA Affiliate has failed to make a required installment or other payment pursuant to Section 412 of the Code with respect to a Plan; (xiv) that any Credit Party, any Subsidiary thereof or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 436(f), 4971, 4975 or 4980 of the Code; or (xv) that any Credit Party, any Subsidiary thereof or any ERISA Affiliate may be directly or indirectly liable for a violation of the applicable requirements of Section 404 or 405 of ERISA or the exclusive benefit rule under Section 401(a) of the Code by any fiduciary or disqualified person with respect to any Plan.

(b)    Promptly following any request therefor, copies of any documents described in Section 101(k) of ERISA that any Credit Party, any of its Subsidiaries or any ERISA Affiliate may request with respect to any Plan, any notices described in Section 101(l) of ERISA that any Credit Party, any of its Subsidiaries or any ERISA Affiliate may request with respect to any Plan and any information that any Credit Party, any of its Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan in connection with Section 4221(e) of ERISA; provided, that if any Credit Party, any of its Subsidiaries or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Plan, the applicable Credit Party, the applicable Subsidiary(ies) or the ERISA Affiliate(s) shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

SECTION 8.08.    <u>Maintenance of Properties</u>.  Each Credit Party will, and will cause its Subsidiaries to, maintain, preserve, protect and keep its properties and assets in good repair, working order and condition (ordinary wear and tear excepted and subject to casualty, condemnation and dispositions permitted pursuant to <u>Section 9.04</u>), and make necessary repairs, renewals and replacements thereto and will maintain and renew as necessary all licenses, Permits and other clearances necessary to use and occupy such properties and assets, in each case so that the business carried on by such Person may be properly conducted at all times, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 8.09.    <u>End of Fiscal Years; Fiscal Quarters</u>.  The Credit Parties will, for financial reporting purposes, cause (a) each of their, and each of their Subsidiaries' fiscal years to end on December 31 of each year and (b) each of their, and each of their Subsidiaries', fiscal quarters to end on dates consistent with such fiscal year-end and Credit Parties' past practice.

SECTION 8.10.    <u>Additional Guarantors and Grantors</u>.  Subject to any applicable limitations set forth in the Security Documents, the Credit Parties will upon the formation or acquisition thereof (a) promptly cause any direct or indirect Subsidiary formed or otherwise purchased or acquired after the Closing Date to execute a joinder to this Agreement (as a Guarantor), the Security Agreement and any other applicable Credit Document, in form and substance satisfactory to the Collateral Agent and Required Lenders and (b) deliver or cause such Subsidiary to deliver such opinions, resolutions, certificates and other documents with respect to such Subsidiary as may be reasonably requested by any Agent or Lender.

SECTION 8.11.    <u>Pledges of Additional Stock</u>.  Subject to any applicable limitations set forth in the Security Documents, the Credit Parties will promptly pledge to Collateral Agent for the benefit of the Secured Parties, (i) all the Capital Stock of each Subsidiary (other than Excluded Property, as defined in the Security Agreement) formed or otherwise purchased or acquired after the Closing Date and directly held by a Credit Party and (ii) any promissory notes executed after the Closing Date evidencing Indebtedness owing to any Credit Party in an amount of $25,000 or more (as to any individual evidence of Indebtedness) received by the Credit Parties.

SECTION 8.12.    <u>Use of Proceeds</u>.  The proceeds of the shall be used by Borrower in accordance with the terms of the Financing Order and the Budget, and in accordance with the terms described herein, including to pay (i) fees, costs and expenses incurred in connection with the transactions contemplated hereby, (ii) other administration costs incurred in connection with the Bankruptcy Case, and (iii) payments in respect of Adequate Protection as authorized by the Bankruptcy Court in the Financing Order.  Without limiting the generality of the foregoing, Borrower will not, and will not permit any of its Subsidiaries to use the proceeds of any Loan made hereunder or any proceeds of Collateral to be applied to (i) repay the Subordinated Debt and (ii) to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent enforceability or priority of the Liens, claims or rights in favor of any Agent, any Lender, any Prepetition Agent or any Prepetition Lender, except as may be permitted under the Financing Order.  Not more than an aggregate amount of $50,000 of proceeds of Loans or the Collateral may be used for payment of allowed fees, expenses, and costs incurred by an official committee of unsecured creditors to investigate the extent, validity, characterization and priority of the claims and Liens under the Prepetition Credit Documents.

SECTION 8.13.    <u>Further Assurances</u>.

(a)    The Credit Parties will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), which may be required under any Applicable Law, or which the Collateral Agent may reasonably request, in order to grant, preserve, protect and perfect the validity, enforceability, priority and non-avoidability of the security interests created or intended to be created by any Credit Document, all at the sole cost and expense of Borrower.

SECTION 8.14.    Collateral Access Agreements.    The Credit Parties shall use commercially reasonable efforts to obtain a Collateral Access Agreement for any other leased location at the request of the Collateral Agent.

SECTION 8.15.    Bank Accounts.

(a)    The Credit Parties shall not allow (A) any Collections from PayPal or any CCP to be deposited in any account other than the Collection Account in accordance with (and subject to the exception set forth in) Section 8.22 or (B) any other Collections to be deposited to any accounts other than the Collection Account.  At the written request of Collateral Agent following the date hereof, the Credit Parties shall execute and deliver a customary account control agreement (or equivalent account control arrangement), in favor of Collateral Agent as to each securities account and deposit account of the Credit Parties no later than ten (10) Business Days after such request is made (or such other date as the Administrative Agent may reasonably agree).

(b)    Each Control Agreement shall provide, among other things, that (i) upon notice (a "***Notice of Control***") from the Collateral Agent, the bank, securities intermediary or other financial institution party thereto will comply with instructions of the Collateral Agent directing the disposition of funds or other financial assets in the account without further consent by the applicable Credit Party; provided that the Collateral Agent agrees not to issue a Notice of Control unless an Event of Default has occurred and is then continuing, and (ii) the bank, securities intermediary or other financial institution party thereto has no rights of setoff or recoupment or any other claim against the account subject thereto, other than for payment of its service fees and other charges directly related to the administration of such account and for returned checks or other items of payment.  In the event Collateral Agent issues a Notice of Control under any Control Agreement, all Collections or other amounts subject to such Control Agreement shall be transferred as directed by the Collateral Agent and used to pay the Obligations in the manner set forth in Section 4.02(d).

(c)    If, notwithstanding the provisions of this Section 8.15, the Credit Parties receive or otherwise have dominion over or control of any Collections or other amounts, the Credit Parties shall not commingle such Collections with any other funds of any Credit Party and shall immediately deposit such Collections in the Collection Account (unless otherwise instructed by the Collateral Agent and Required Lenders).

(d)    Within two (2) Business Days after written request by Administrative Agent, the Credit Parties shall provide the Collateral Agent with copies of all monthly (or other, periodic) bank (or other financial intermediary) statements of account with respect to all securities accounts, deposit accounts and investment property of the Credit Parties.

SECTION 8.16.    Lender Meetings.    Borrower will, and will cause each of its Subsidiaries to, upon the request by the Required Lenders, participate in a meeting of the Lenders as frequently as may be required by the Required Lenders, to be held via teleconference or in person as determined by Required Lenders, at a time selected by the Required Lenders and reasonably acceptable to the Credit Parties.

SECTION 8.17.        Post-Closing Covenants.

(a)        Each Credit Party shall enter into a customary account control agreement (or equivalent account control arrangement), with the Collateral Agent and any bank or other financial institution with which such Credit Party maintains Deposit Accounts (as defined in the Security Agreement), within ten (10) Business Days after the Closing Date (or such later date as the Administrative Agent may reasonably agree).

(b)        Each Credit Party shall use commercially reasonable efforts to deliver any Security Documents not otherwise delivered pursuant to Section 5.01(a) herein no later than ten (10) Business Days after the Closing Date (or such later date as the Administrative Agent may reasonably agree).

(c)        The Credit Parties and their Subsidiaries shall cause the performance and delivery of the items set forth on Schedule 8.21 on or before the dates specified therein with respect to such items.

SECTION 8.18.        Sanctions; Anti-Corruption Laws.

(a)        No Credit Party shall (or shall permit any Subsidiary to) directly or indirectly, use any Loan or the proceeds of any Loan, or lend, contribute or otherwise make available such Loan or the proceeds of any Loan to any Person, to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as Lender or otherwise) of Sanctions.

(b)        No Credit Party shall (or shall permit any Subsidiary to) directly or indirectly, use any Loan or the proceeds of any Loan for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977 and other similar anti-corruption legislation in other jurisdictions.

SECTION 8.19.        [Reserved].

SECTION 8.20.        Privacy and Data Security.

(a)        Compliance.  The Credit Parties and their Subsidiaries shall, at all times, remain in compliance with all Data Protection Laws, including but not limited to GDPR.

(b)        Data Security Program. The Credit Parties and their Subsidiaries shall continue to maintain a written information security program that complies with the Data Protection Laws and any applicable customer contracts to govern the protection of all Data. Pursuant to such security program, the Credit Parties and their Subsidiaries have shall continue to maintain technical and administrative security measures ensuring a level of security appropriate to the nature of the Data to be protected and the risks represented by its processing. Such technical and administrative measures shall at all times be reasonably designed to protect the Data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access, or any unlawful forms of processing.

(c)      <u>Vendor Agreements</u>. Prior to providing any Data or access to Data to any Third Party Service Provider, the Credit Parties and their Subsidiaries shall enter into a written agreement with such Third Party Service Provider requiring such Third Party Service Provider to protect such Data in a manner that is substantially similar to the protections that the Credit Parties and their Subsidiaries are required to provide by the Data Protection Laws and by any applicable contracts with customers.

(d)      <u>Customer Contracts</u>. The Credit Parties and their Subsidiaries shall at all times remain in compliance with all contractual requirements pursuant to which they are obligated to protect (or to require the Third Party Service Providers to protect) Data.

SECTION 8.21.      <u>Milestones</u>.  The Credit Parties and their Subsidiaries shall cause the performance and delivery of the items set forth on <u>Schedule 8.21</u> on or before the dates specified therein with respect to such items (the "***Milestones***").

SECTION 8.22.      <u>Collection Account</u>.

(a)      On or prior to the date hereof, the Collection Account has been established with the Cash Management Bank.  The Credit Parties agree that all monies, checks, notes, drafts or other payments from or relating to PayPal or any CCP received by the Credit Parties or any of their Subsidiaries shall be held in trust for, and as the sole and exclusive property of the Prepetition Collateral Agent, and the Credit Parties shall, and shall cause such Subsidiary to, immediately remit the same (or cause the same to be remitted) in hand to the Collection Account. The Credit Parties further agree that the Credit Parties shall (x) direct and use best efforts to cause (i) PayPal to remit all payments under the PayPal Agreement directly to the Collection Account (or to such other account as the Collateral Agent and Required Lenders may direct) and (ii) each CCP to remit all payments directly to the Collection Account (or to such other account as the Collateral Agent and Required Lenders may direct) and (y) shall not instruct PayPal or any CCP to remit payments to any account other than the Collection Account.  The Credit Parties acknowledge and agree that the Collection Account is under the sole dominion and control of the Prepetition Collateral Agent, that the Credit Parties have no access to or right to withdraw or transfer funds from the Collection Account at any time.  Notwithstanding the foregoing or the provisions of Section 8.15, remittances from Vantiv/Worldpay, Inc. may be directed to Borrower's operating account at JPMorgan Chase Bank, N.A. to the extent necessary to accommodate the processing of Automated Clearinghouse negative settlements.

(b)      [Reserved].

(c)      Subject to the terms of the Financing Order, upon the occurrence and during the continuance of any Event of Default, in addition to and not in lieu of all of the other rights and remedies hereunder, under the other Credit Documents and applicable law, the Prepetition Collateral Agent shall have the right at any time and from time to time on one or more occasions to withdraw or instruct the Cash Management Bank to withdraw all amounts on deposit in the Collection Account for application to the Prepetition Obligations and the Obligations in accordance with the Financing Order.

## ARTICLE IX
## Negative Covenants

The Credit Parties hereby covenant and agree that on the Closing Date and thereafter, until the Loans, together with interest, Fees and all other Obligations incurred hereunder (other than Unasserted Contingent Obligations) are paid in full in accordance with the terms of this Agreement:

SECTION 9.01.    Limitation on Indebtedness.  Each Credit Party will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee, suffer to exist or otherwise become directly or indirectly liable, contingently or otherwise with respect to any Indebtedness, except for, in each case, subject to Section 7.30:

(a)    Indebtedness in respect of the Obligations;

(b)    Indebtedness existing as of the Closing Date which is identified on Schedule 7.24 and which is not otherwise permitted by this Section 9.01;

(c)    unsecured Indebtedness in respect of performance, surety or appeal bonds provided in the ordinary course of business and consistent with past practice, but excluding (in each case) Indebtedness incurred through the borrowing of money or Contingent Liabilities in respect thereof;

(d)    Indebtedness (i) evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of equipment of such Credit Party and its Subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of such Credit Party and its Subsidiaries (provided that such Indebtedness is incurred within sixty (60) days of the acquisition of such property), and (ii) constituting Capitalized Lease Obligations; provided that (x) the principal amount of such Indebtedness under clauses (i) and (ii) shall not exceed $50,000 in the aggregate at any one time outstanding and (y) no Indebtedness shall be incurred under clauses (i) or (ii), nor shall any Credit Party or Subsidiary of a Credit Party enter into any equipment lease of any kind (whether constituting Indebtedness or otherwise), without the prior written consent of the Administrative Agent;

(e)    Guarantee Obligations of any Credit Party in respect of Indebtedness otherwise permitted hereunder of Borrower or any Subsidiary of Borrower which is a Credit Party;

(f)    Indebtedness in respect of the Prepetition Obligations;

(g)    intercompany Indebtedness (A) between any Credit Parties, (B) or by any Credit Party owing to any Subsidiary that is not a Credit Party, so long as such Indebtedness is evidenced by a note which is pledged to Collateral Agent and is subject to a subordination agreement (which subordination may be included in the note) in form and substance satisfactory to Collateral Agent and Required Lenders, and (C) between any Subsidiaries that are not Credit Parties.

(h)     the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(i)     Indebtedness in respect of netting services, overdraft protection and otherwise in connection with deposit accounts or similar accounts incurred in the ordinary course of business;

(j)     Indebtedness owed to any Person providing worker's compensation, health, disability or other employee benefits or property, casualty or liability insurance to Borrower or any Subsidiary incurred in connection with such Person providing such benefits or insurance pursuant to customary reimbursement or indemnification obligations to such Person;

(k)     unsecured Indebtedness with respect to the Credit Parties' credit card obligations in an aggregate amount not to exceed $100,000 at any time outstanding;

(l)     Indebtedness relating to judgments, including appeal bonds, or awards not constituting an Event of Default under Section 10.01(g);

(m)     Indebtedness representing letters of credit for the account of any Credit Party in an aggregate stated amount not to exceed $25,000 intended to provide security for payment obligations in the ordinary course of business; and

(n)     the Original Secured Subordinated Debt in an aggregate principal amount not to exceed $2,500,000 and the Original Unsecured Subordinated Debt in an aggregate principal amount not to exceed $5,300,00, in each case so long as the same is subject to and in compliance with its respective Original Subordination Agreements.

SECTION 9.02.     Limitation on Liens.  Each Credit Party will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of any such Person (including its Capital Stock), whether now owned or hereafter acquired, except for the following (collectively, the "*Permitted Liens*"):

(a)     Liens securing payment of the Obligations;

(b)     Liens existing as of the Closing Date and disclosed in Schedule 9.02 securing Indebtedness permitted under Section 9.01(b); provided that no such Lien shall encumber any additional property and the amount of Indebtedness secured by such Lien shall not be increased or its term extended from that existing on the Closing Date (as such Indebtedness may be permanently reduced subsequent to the Closing Date) except to the extent permitted by Section 9.01(b);

(c)     Liens securing Indebtedness of the type permitted under Section 9.01(d); provided that (i) such Lien is granted within sixty (60) days after such Indebtedness is incurred, (ii) the Indebtedness secured thereby does not exceed the lesser of the cost and the fair market value of the applicable property, improvements or equipment at the time of such acquisition (or construction) and (iii) such Lien secures only the assets that are the subject of the Indebtedness referred to in such clause and the proceeds thereof;

(d)    Liens arising by operation of law in favor of carriers, warehousemen, mechanics, materialmen and landlords incurred in the ordinary course of business for amounts not yet overdue or being diligently contested in good faith by appropriate proceedings that stay execution of such Lien and for which adequate reserves in accordance with GAAP shall have been established on its books;

(e)    Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business or to secure obligations on surety, appeal or performance bonds;

(f)    judgment Liens in existence for less than sixty (60) days after the entry thereof, or with respect to which execution has been bonded, stayed or the payment of which is covered in full by insurance, and which judgment Liens do not otherwise result in an Event of Default under Section 10.01(g);

(g)    easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other similar encumbrances not interfering in any material respect with the value or use of the property to which such Lien is attached;

(h)    Liens for Taxes, assessments or other governmental charges or levies not yet due and payable, or that are being diligently contested in good faith by appropriate proceedings that stays execution and for which adequate reserves in accordance with GAAP shall have been established on its books;

(i)    Liens arising in the ordinary course of business by virtue of any contractual, statutory or common law provision relating to banker's Liens, rights of set-off or similar rights and remedies covering deposit or securities accounts (including funds or other assets credited thereto) or other funds maintained with a depository institution or securities intermediary, so long as the applicable provisions of Section 8.15 have been complied with, in respect of such deposit accounts;

(j)    any interest or title of a lessor, licensor or sublessor under any lease, license or sublease (and precautionary UCC filings with respect thereto) entered into by any such Credit Party or Subsidiary in the ordinary course of its business and covering only the assets so leased, licensed or subleased;

(k)    [reserved];

(l)    Liens of sellers of goods to such Person arising under Article II of the Uniform Commercial Code or similar provisions of Applicable Law in the ordinary course of business, covering only the goods sold or securing only the unpaid purchase price of such goods and related expenses to the extent such Indebtedness is permitted hereunder;

(m)    Liens on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto to the extent such financing is permitted under Section 9.01(h);

(n)     Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits so long as the applicable provisions of Section 8.15 have been complied with;

(o)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds, letters of credit and other obligations of a like nature, to the extent the underlying contract or obligation is permitted hereunder, in each case in the ordinary course of business;

(p)     Liens securing the Original Secured Subordinated Debt to the extent permitted by the applicable Original Subordination Agreement; and

(q)     Liens in favor of the Prepetition Collateral Agent (for the benefit of the Prepetition Agents and Prepetition Lenders) securing the Prepetition Obligations.

Notwithstanding anything to the contrary set forth in this Section 9.02, in no event shall any Credit Party create, incur, assume or suffer to exist any Lien (other than (x) Liens in favor of the Collateral Agent pursuant to the Credit Documents and (y) Liens in favor of the Prepetition Collateral Agent described in clause (q) above) upon the rights of any Credit Party or Subsidiary under any accounts receivable, Collections or proceeds arising thereunder or with respect thereto.

Notwithstanding anything to the contrary in this Agreement or other Credit Documents, no Credit Party shall, and shall not permit any of its Subsidiaries to, create, incur, assume, or suffer to exist, directly or indirectly, any Lien with priority over the Liens created by the Credit Documents securing the Obligations, except the Permitted Priority Liens.

SECTION 9.03.     Consolidation, Merger, etc.  Each Credit Party will not, and will not permit any of its Subsidiaries, to liquidate or dissolve, consolidate with, or merge into or with, any other Person or purchase or otherwise acquire all or substantially all of the assets of any Person (or any division thereof); provided that (a) any Credit Party or Subsidiary of any Credit Party may liquidate or dissolve voluntarily into, and may merge with and into, Borrower (so long as Borrower is the surviving entity), (b) any Guarantor (other than Parent) may liquidate or dissolve voluntarily into, and may merge with and into any other Guarantor (other than Parent), (c) the assets or Capital Stock of any Credit Party (other than Parent, LC Funding or Holdings) may be purchased or otherwise acquired by Borrower, (d) the assets or Capital Stock of any Guarantor (other than Parent) may be purchased or otherwise acquired by any Credit Party (provided that the assets or Capital Stock of LC Funding and/or Holdings can only be purchased by Parent and/or LC Funding, respectively), and (e) the assets of any Subsidiary that is not a Credit Party may be purchased or otherwise acquired by any Credit Party (but only to the extent that any consideration payable by any Credit Party is non-cash consideration in the form of an unsecured intercompany note that is subordinated to the Obligations and the Prepetition Obligations on terms satisfactory to Administrative Agent and Required Lenders).

SECTION 9.04.     Permitted Dispositions.  Each Credit Party will not, and will not permit any of its Subsidiaries, to make a Disposition, or enter into any agreement to make a Disposition, of such Credit Party's or such other Person's assets (including Accounts Receivable

and Capital Stock of Subsidiaries) to any Person in one transaction or a series of related transactions unless such Disposition:

(a)    is in the ordinary course of its business and is of obsolete, surplus or worn out property or property no longer used in its business in an aggregate amount for all such property not to exceed $50,000; or

(b)    is made as a consequence of any loss, damage, distribution or other casualty or any condemnation or taking of such assets by eminent domain proceedings, provided that the proceeds thereof are applied in accordance with this Agreement; or

(c)    is for fair market value and the following conditions are met:

(i)    the aggregate amount of Dispositions during any fiscal year shall not exceed $100,000 and the amount of any single Disposition shall not exceed $25,000;

(ii)    immediately prior to and immediately after giving effect to such Disposition, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(iii)    [reserved]; and

(iv)    no less than eighty percent (80%) of the consideration received for such sale, transfer, lease, contribution or conveyance is received in cash;

(d)    is a sale of Inventory in the ordinary course of business;

(e)    is a sale or disposition of equipment to the extent that such equipment is exchanged for credit against the purchase price of similar replacement equipment, or the proceeds of such Dispositions are reasonably promptly applied to the purchase price of similar replacement equipment, all in the ordinary course of business in accordance with Section 4.02(a)(ii);

(f)    is an abandonment or failure to renew any intellectual property that is not material to the conduct of the business of any Credit Party or any Subsidiary of such Credit Party;

(g)    is otherwise permitted by Section 9.03, Section 9.05(d) or Section 9.05(h);

(h)    is by (i) any Credit Party or Subsidiary thereof to Borrower, (ii) any Subsidiary of a Credit Party (other than Borrower) to any Credit Party, (iii) any Credit Party (other than Borrower) to another Credit Party, or (iv) by any Subsidiary that is not a Credit Party to any other Subsidiary that is not a Credit Party;

(i)    consists of the granting of Permitted Liens;

(j)    consists of a Disposition of cash or Cash Equivalents;

(k)      is a sale or discount of accounts receivable arising in the ordinary course of business in connection with the collection thereof;

(l)      consists of the leasing (pursuant to leases entered into in the ordinary course of business) or licensing of real or personal property in the ordinary course of business; or

(m)      is a disposition of Real Property to a Governmental Authority that results from a condemnation, provided that the proceeds thereof are applied in accordance with this Agreement.

Notwithstanding anything to the contrary set forth in this Section 9.04, in no event shall any Credit Party sell, transfer, assign or otherwise dispose of (other than in connection with the grant of a Lien in favor of the Collateral Agent pursuant to the Credit Documents and the Prepetition Collateral Agent pursuant to the Prepetition Credit Documents) any of its rights under or in respect of any Collections or proceeds arising thereunder or with respect thereto.

SECTION 9.05.      Investments.  Each Credit Party will not, and will not permit any of its Subsidiaries to, purchase, make, incur, assume or permit to exist any Investment in any other Person, except:

(a)      Investments existing on the Closing Date and identified in Schedule 9.05;

(b)      Investments in cash and Cash Equivalents;

(c)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)      Investments by way of contributions to capital or purchases of Capital Stock (i) by any Credit Party in any of its Subsidiaries; provided that such Credit Party or such Subsidiary shall be required to comply with Section 9.01(g) in the event such Investment constitutes Indebtedness of the party making such Investment, (ii) [reserved], and (iii) by any Subsidiary that is not a Credit Party in another Subsidiary that is not a Credit Party;

(e)      Investments constituting (i) Accounts Receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business;

(f)      Investments consisting of any deferred portion of the sales price received by any Credit Party in connection with any Disposition permitted under Section 9.04;

(g)      other Investments in an aggregate principal amount at any time not to exceed $25,000;

(h)      intercompany Indebtedness permitted pursuant to Section 9.01(g);

(i)      the maintenance of deposit accounts in the ordinary course of business so long as the applicable provisions of <u>Section 8.15</u> have been complied with in respect of such deposit accounts;

(j)      Guarantee Obligations to the extent permitted by <u>Section 9.01(e)</u>;

(k)      loans and advances to officers, directors and employees of any Credit Party for reasonable and customary business related travel expenses, entertainment expenses, moving expenses and similar expenses, in each case incurred in the ordinary course of business, in an aggregate principal amount at any time not to exceed $10,000;

(l)      Investments consisting of loans made in lieu of Restricted Payments which are otherwise permitted under <u>Section 9.06</u>; and

(m)      Deposits, prepayments and other credits to suppliers and deposits in connection with lease obligations, taxes, insurance and similar items, in each case made in the ordinary course of business and securing contractual obligations of a Credit Party, in each case to the extent constituting a Permitted Lien;

<u>provided</u> that no Investment otherwise permitted under clauses (d)(ii), (f), (g) or (k) shall be permitted to be made if, at the time of making any such Investment, any Default or Event of Default has occurred and is continuing or would result therefrom.

SECTION 9.06.      <u>Restricted Payments</u>.  Each Credit Party will not, and will not permit any of its Subsidiaries, to make any Restricted Payment, or make any deposit for any Restricted Payment, other than:

(a)      Restricted Payments by any Subsidiary of a Credit Party to (i) its direct parent, so long as such parent is a direct or indirect wholly-owned subsidiary of Borrower or (ii) Borrower; and

(b)      Restricted Payments by any Credit Party or any its Subsidiaries to pay dividends with respect to its Capital Stock payable solely in additional shares of its common stock (other than Disqualified Capital Stock).

SECTION 9.07.      <u>Prepayments and Modification of Certain Agreements</u>.  Each Credit Party will not, and will not permit any of its Subsidiaries to:

(a)      Make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time under the subordination terms and conditions applicable thereto.

(b)      Consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in (i) any Organization Documents, in each case, other than any amendment, supplement, waiver, termination, modification or forbearance (A) that is not materially adverse to the Secured Parties and (B) notice of which was received by the Administrative Agent at least ten (10) Business Days' (or such shorter period as the Administrative Agent may permit in its

sole discretion) prior to its effectiveness, (ii) any document evidencing the Original Subordinated Debt, or (ii) any document, agreement or instrument evidencing or governing any Indebtedness that has been subordinated to the Obligations in right of payment or any Liens that have been subordinated in priority to the Liens of the Collateral Agent unless such amendment, supplement, waiver or other modification is permitted under the terms of the subordination agreement applicable thereto, in each case, other than any amendment, supplement, waiver or modification (A) that is not materially adverse to the Secured Parties and (B) notice of which was received by the Administrative Agent at least ten (10) Business Days' (or such shorter period as the Administrative Agent may permit in its sole discretion) prior to its effectiveness.

SECTION 9.08.    Sale and Leaseback.  Each Credit Party will not, directly or indirectly, to enter into any agreement or arrangement providing for the sale or transfer by it of any property (now owned or hereafter acquired) to a Person and the subsequent lease or rental of such property or other similar property from such Person.

SECTION 9.09.    Transactions with Affiliates.  Except as set forth on Schedule 9.09, each Credit Party will not, and will not permit any of its Subsidiaries, to enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any Affiliate (other than arrangements, transactions or contracts solely among the Credit Parties) except (a) on fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than it could obtain in an arm's-length transaction with a Person that is not an Affiliate, (b) any transaction expressly permitted under Section 9.01(g), Section 9.03, Section 9.05(d), Section 9.05(h), Section 9.05(j), Section 9.05(k) or Section 9.06, (c) so long as it has been approved by Borrower's or its applicable Subsidiary's Board in accordance with Applicable Law, (A) customary fees to, and indemnifications of, non-officer directors of the Credit Parties and their respective Subsidiaries pursuant to Section 9.06(a), (B) the payment of reasonable and customary indemnification arrangements and benefit plans for officers and employees of the Credit Parties and their respective Subsidiaries in the ordinary course of business and (C) the payment of compensation arrangements for officers and employees of the Credit Parties and their respective Subsidiaries consistent with past practice in the three (3) months prior to the Closing Date, and (d) transactions among Subsidiaries that are not Credit Parties in the ordinary course of business.

SECTION 9.10.    Restrictive Agreements, etc.  Each Credit Party will not, and will not permit any of its Subsidiaries, to enter into any agreement (other than a Credit Document or a Prepetition Credit Document) prohibiting:

(a)    the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

(b)    the ability of such Person to amend or otherwise modify any Credit Document or waive, consent to or otherwise deviate from any provision under any Credit Document; or

(c)    the ability of such Person to make any payments, directly or indirectly, to Borrower, including by way of dividends, advances, repayments of loans, reimbursements of

management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to customary restrictions of the type described in clause (a) above (which do not prohibit the Credit Parties from complying with or performing the terms of this Agreement and the other Credit Documents or the Prepetition Credit Agreement and the other Prepetition Credit Documents) which are contained in any agreement, (i) governing any Indebtedness permitted by Section 9.01(d) as to the transfer of assets financed with the proceeds of such Indebtedness, (ii) for the creation or assumption of any Lien on the sublet or assignment of any leasehold interest of any Credit Party or any of its Subsidiaries entered into in the ordinary course of business, (iii) for the assignment of any contract or licensed intellectual property entered into by any Credit Party or any of its Subsidiaries in the ordinary course of business or (iv) for the transfer of any asset pending the close of the sale of such asset pursuant to a Disposition permitted under this Agreement.

SECTION 9.11.    Hedging Agreements.  Each Credit Party will not, and will not permit any of its Subsidiaries to, enter into any Hedging Agreement.

SECTION 9.12.    Changes in Business and Fiscal Year.  Each Credit Party will not, and will not permit any of its Subsidiaries to:

(a)    other than Parent, engage in any business activity other than such business activities described on Schedule 9.12 and business activities incidental or reasonably related thereto;

(b)    with respect to Parent only, engage in any business activities, hold any material assets or incur any Indebtedness other than (i) acting as a holding company and transactions incidental thereto, (ii) entering into the Credit Documents and Prepetition Credit Documents to which it is party and the transactions required therein or permitted therein to be performed by Parent, (iii) entering into the agreements related to and consummating the Transactions, (iv) [reserved], (v) entering into engagement letters and similar contracts and agreements with attorneys, accountants and other professionals, (vi) owning the Equity Interests of the Borrower, (vii) issuing Equity Interests as permitted hereunder, (viii) engaging in activities necessary or incidental to any director, officer and/or employee option incentive plan at Parent, and (ix) providing guarantees for the benefit of the Borrower to the extent such Person is otherwise permitted to enter into the transaction under this Agreement (including guaranties of lease obligations); or

(c)    modify or change its fiscal year or its method of accounting (other than (i) as may be required to conform to GAAP or (ii) to the extent consented to by the Administrative Agent and Required Lenders.

SECTION 9.13.    Financing Order; Administrative Expense Priority; Payments.  Each Credit Party will not, and will not permit any of its Subsidiaries to:

(a)    seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Financing Order, except for modifications and amendments joined in or agreed to in writing by Administrative Agent and Required Lenders;

(b)　　permit the percentage variance of (i) "Subscription & Vault Receipts" in any Budget, as such percentage variances are reflected in the Variance Reports on a rolling four-week basis beginning with the fourth week set forth in the Budget (and on a one-, two- and three-week basis for the first, second and third weeks set forth in the Budget, respectively), to be less than 80% of the budgeted receipts or (ii) "Total Disbursements" in any Budget, as such percentage variances are reflected in the Variance Reports on a rolling four-week basis beginning with the fourth week set forth in the Budget (and on a one-, two- and three-week basis for the first, second and third weeks set forth in the Budget, respectively), to be greater than 120% of the budgeted disbursements; provided, however, that none of the fees, costs, and expenses payable to the Agents, the Lenders, the Prepetition Agents, or the Prepetition Lenders shall be used for purposes of calculating the variances;

(a)　　seek the use of "Cash Collateral" (as defined in the Financing Order) in a manner inconsistent with the terms of the Financing Order without the prior written consent of Administrative Agent and each Lender;

(b)　　suffer to exist at any time an allowed administrative expense or unsecured claim against any Credit Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503((b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code) which is equal or superior to the priority of the Agents or the Lenders in respect of the Obligations or the Prepetition Agents or the Prepetition Lenders in respect of the Prepetition Obligations, except for the amounts having a priority over the Obligations to the extent set forth in the definitions of Carve-Out or Other Statutory Liabilities;

(c)　　suffer to exist at any time any Lien allowed under Section 507 of the Bankruptcy Code on any properties, assets or rights except for Permitted Priority Liens, the Carve-Out, the Other Statutory Liabilities, and the Liens securing the Prepetition Obligations; and

(d)　　prior to the Termination Date, pay any administrative expenses, except administrative expenses incurred in the ordinary course of business of Credit Parties and set forth in the Budget, in each case subject to the extent and having the order of priority set forth in the definitions of Carve-Out and Other Statutory Liabilities.

Notwithstanding the foregoing, the Credit Parties shall be permitted to pay as the same may become due and payable (i) administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business and to the extent otherwise authorized under the Financing Order and this Agreement and (ii) compensation and reimbursement of expenses to professionals allowed and payable under Sections 330 and 331 of the Bankruptcy Code to the extent permitted by the Financing Order.

## ARTICLE X
## Events of Default

SECTION 10.01.　　Listing of Events of Default.　　Each of the following events or occurrences described in this Section 10.01 shall constitute an "***Event of Default***":

(a)    <u>Non-Payment of Obligations</u>.  A Credit Party shall default in the payment of:

(i)    any principal of any Loan when such amount is due; or

(ii)    any interest on any Loan and such default shall continue unremedied for a period of two (2) Business Days after such amount is due; or

(iii)    any fee described in <u>Article III</u> or any other monetary Obligation, and such default shall continue unremedied for a period of five (5) Business Days after such amount is due.

(b)    <u>Breach of Representations or Warranties</u>.  Any representation or warranty by any Credit Party made or deemed to be made in any Credit Document (including any certificates delivered pursuant to <u>Article V</u>), is or shall be incorrect in any material respect (unless such representation and warranty is qualified by materiality, in which case, such representation and warranty shall be true and correct in all respects) when made or deemed to have been made.

(c)    <u>Non-Performance of Certain Covenants and Obligations</u>.  Any Credit Party shall default in the due performance or observance of any of its obligations under <u>Section 8.01</u>, <u>Section 8.02</u>, <u>Section 8.03</u>, <u>Section 8.04</u>, <u>Section 8.05</u> (solely with respect to such Credit Party's existence in its jurisdiction of organization), <u>Section 8.10</u>, <u>Section 8.11</u>, <u>Section 8.12</u>, <u>Section 8.13</u>, <u>Section 8.15</u>, <u>Section 8.17</u>, <u>Section 8.18</u>, <u>Section 8.21</u>, <u>Section 8.22</u> or <u>Article IX</u>, or any Credit Party shall default in the due performance or observance of its obligations under any covenant applicable to it under any Security Document (subject to any grace or cure period specified in such Security Document).

(d)    <u>Non-Performance of Other Covenants and Obligations</u>.  Any Credit Party shall default in the due performance or observance of any of its obligations under Section 8.05 (solely with respect to such Credit Party's maintenance of good standing in its jurisdiction of organization), <u>Section 8.06</u>, <u>Section 8.07</u> or <u>Section 8.16</u>, and such default shall continue unremedied for a period of ten (10) days after the earlier to occur of: (i) the date any Credit Party or any Subsidiary first becomes aware of such default and (ii) the date that the Administrative Agent notifies such Credit Party of such default.

(e)    <u>Non-Performance of Other Covenants and Obligations</u>.  Any Credit Party shall default in the due performance and observance of any obligation contained in any Credit Document executed by it (other than as specified in Sections 10.01(a), 10.01(b). 10.01(c), or 10.01(d)), and such default shall continue unremedied for a period of thirty (30) days after the earlier to occur of: (i) the date any Credit Party or any Subsidiary first becomes aware (or should have become aware) of such default and (ii) the date that the Administrative Agent notifies such Credit Party of such default.

(f)    <u>Reserved</u>.

(g)    <u>Judgments; Fines</u>.  Any judgment, order for the payment of money, fines, settlements or enforcement penalties in an amount individually or in the aggregate in excess of

$100,000 (exclusive of any amounts covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) shall be rendered against any Credit Party or any of its Subsidiaries and such judgment, order, fine, settlement or penalty shall not have been vacated or discharged or stayed or bonded pending appeal within sixty (60) days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

(h)    Plans.  Any of the following events shall occur with respect to any Plan:

(i)    the institution of any steps by any Credit Party, any Subsidiary of a Credit Party, any ERISA Affiliate or any other Person to terminate or partially terminate a Plan of any Credit Party or any Subsidiary of any Credit Party if, as a result of such termination or partial termination, any Credit Party or Subsidiary of any Credit Party could be required to make a contribution to such Plan, or could reasonably be expected to incur a liability or obligation to such Plan, in excess of $100,000 in the aggregate;

(ii)    there is or arises any potential withdrawal liability under Section 4201 of ERISA, if any Credit Party, any Subsidiary of a Credit Party or any ERISA Affiliate were to completely or partially withdraw from one or more Multiemployer Plans, in excess of $100,000, in the aggregate; or

(iii)    a contribution failure occurs with respect to any Plan sufficient to give rise to a Lien under Sections 303(k) or 4068 of ERISA or Section 430(k) of the Code.

(i)    Reserved.

(j)    Impairment of Security, etc.  Any Credit Document or any Lien granted thereunder shall (except in accordance with its terms), in whole or in part, terminates, ceases to be effective or ceases to be the legally valid, binding and enforceable obligation of any Credit Party party thereto with respect to Collateral in an aggregate amount in excess of $50,000, or any Credit Party or any other Person shall, directly or indirectly, contest or limit in any manner any Credit Document or the effectiveness, validity, binding nature or enforceability of any Credit Document; or, except as permitted under any Credit Document, any Lien (subject only to Permitted Liens) securing any Obligation shall, in whole or in part, cease to be a perfected Lien with respect to Collateral in an aggregate amount in excess of $100,000 (other than as a result of voluntary and intentional discharge of the Lien by the Collateral Agent, including Dispositions permitted under this Agreement).

(k)    Change of Control.  Any Change of Control shall occur.

(l)    Change of Management.  Any Change of Management shall occur.

(m)    Reserved.

(n)    Restraint of Operations; Loss of Assets.  If any Credit Party or any Subsidiary of a Credit Party is enjoined, restrained, or in any way prevented by court order or other Governmental Authority from continuing to conduct all or any material part of its business

affairs or if any material portion of any Credit Party's or any of its Subsidiary's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and the same is not discharged before the earlier of sixty (60) days after the date it first arises or 5 days prior to the date on which such property or asset is subject to forfeiture by such Credit Party or such Subsidiary of a Credit Party.

(o)      Reserved.

(p)      Reserved.

(q)      Bankruptcy Matters.

(i)      Any Credit Party makes any payment on account of any Indebtedness existing as of the Petition Date, except for payments of the Prepetition Obligations or any payments expressly authorized by the Financing Order and this Agreement or by any other order of the Bankruptcy Court consented to in writing by Agent;

(ii)      The Interim Order is not entered within three (3) Business Days of the Petition Date, or the Final Order is not entered within twenty-five (25) days (or such other period as Administrative Agent and Required Lenders may agree to in writing) following the Petition Date; or any Financing Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified in any manner not acceptable to Administrative Agent and Required Lenders;

(iii)      an order with respect to the Bankruptcy Case shall be entered by the Bankruptcy Court (or any Credit Party shall have applied for, consented to or acquiesced in any of the foregoing) (i) appointing a trustee or examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 (other than a fee examiner), including without limitation an examiner with enlarged powers relating to the operation of the business of the Credit Parties under Section 1106(b) of the Bankruptcy Code, or (ii) terminating any Credit Party's exclusive rights to file and solicit acceptances for a chapter 11 plan;

(iv)      the exclusivity period for any Credit Party to file and solicit acceptances for a chapter 11 plan otherwise lapses;

(v)      any Person other than the Credit Parties shall commence any action in the Bankruptcy Case adverse to any Agent, any Prepetition Agent, any Lender or any Prepetition Lender or any of any Agent's or Lenders' rights and remedies under the Credit Documents, the Financing Order or any other order of the Bankruptcy Court and any such action shall not be dismissed or withdrawn, with prejudice, within ten (10) Business Days after the assertion thereof;

(vi)      (x) any Credit Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of any Agent and the Lenders or any Prepetition Agent and the Prepetition Lenders, claims or rights against Credit Parties or any of their Subsidiaries or to subject any Collateral (or any collateral securing the Prepetition

Obligations) to surcharge pursuant to Section 506(c) of the Bankruptcy Code or to assessment under Section 552(b) of the Bankruptcy Code, (y) any Lien or security interest created by this Agreement or the Financing Order shall, for any reason, ceases to be valid, or (z) any action is commenced by any Credit Party or any of its Subsidiaries which contests the validity, perfection or enforceability of any of the Liens and security interests of any Agent and the Lenders created by this Agreement or the Financing Order or the Liens and security interests of any Prepetition Agent and the Prepetition Lenders with respect to the Prepetition Credit Documents;

(vii)    an order with respect to the Bankruptcy Case shall be entered by the Bankruptcy Court converting the Bankruptcy Case (or any case comprising part of the Bankruptcy Case) to a case under chapter 7 of the Bankruptcy Code;

(viii)    any plan of reorganization is filed by Borrower or any other Credit Party that, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan in the Bankruptcy Case which, does not (i) contain a provision for termination of this Agreement and the Prepetition Credit Agreement, the cash collateralization of all contingent obligations hereunder, the indefeasible payment in full in cash of all Obligations and all Prepetition Obligations and the termination of all lending commitments pertaining thereto ("**_Paid in Full_**") in a manner satisfactory to the Administrative Agent and Required Lenders on or before the effective date, or substantial consummation, of such plan and (ii) provide for the continuation of the Liens and security interests granted to Collateral Agent (for the benefit of Secured Parties) and priorities until such plan effective date all Obligations and Prepetition Obligations are Paid in Full;

(ix)    an order shall be entered by the Bankruptcy Court dismissing the Bankruptcy Case which does not contain a provision for termination of this Agreement and the Prepetition Credit Agreement and the Obligations and Prepetition Obligations are not Paid in Full on or before such dismissal;

(x)    an order with respect to the Bankruptcy Case shall be entered without the express prior written consent of Administrative Agent and Required Lenders, (i) to revoke, vacate, reverse, stay, modify, supplement or amend this Agreement and the transactions contemplated hereby, any Credit Document or the Financing Order, or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to Borrower's equal or superior to the priority of the Agents and the Lenders in respect of the Obligations and the Prepetition Obligations, except for the amounts having a priority over the Obligations to the extent set forth in the definition of Carve-Out;

(xi)    an order shall be entered by the Bankruptcy Court granting relief from the automatic stay to any creditor(s) of any Credit Party or any Subsidiary of any Credit Party with respect to any claim in an amount equal to or exceeding $25,000 in the aggregate; provided, however, that it shall not be an Event of Default if relief from the automatic stay is granted (i) solely for the purpose of allowing such creditor to determine the liquidated amount of its claim against any such Person or (ii) to permit the

commencement of or prosecution of a proceeding to collect solely against an insurance company;

(xii)    a motion shall be filed seeking authority, or an order shall be entered in the Bankruptcy Case, that (i) permits any Credit Party or any Subsidiary of any Credit Party to incur Indebtedness secured by any claim under Bankruptcy Code Section 364(c)(1) or by a Lien pari passu with or superior to the Lien granted under the Credit Documents and the Prepetition Credit Documents and Bankruptcy Code Sections 364(c)(2) or (d), unless (A) all of the Obligations and Prepetition Obligations have been Paid in Full at the time of the entry of any such order, or (B) the Obligations and the Prepetition Obligations are Paid in Full with such debt, or (ii) permits any Credit Party or any Subsidiary of any Credit Party the right to use Collateral other than in accordance with the terms of the Financing Order, unless all of the Obligations and Prepetition Obligations shall have been Paid in Full;

(xiii)    proceeds of any sale of all or substantially all assets of Credit Parties are not directly remitted to the Collateral Agent (up to the amount of the Obligations hereunder at such time) and the Prepetition Collateral Agent at the closing thereof, and the Obligations and the Prepetition Obligations are not Paid in Full in accordance with the terms of this Agreement from such proceeds;

(xiv)    any motions to sell Collateral or approve procedures regarding the same, any plan or disclosure statement or supplements or amendments thereto, or any orders approving or amending any of the foregoing, are not in form and substance reasonably acceptable to Administrative Agent and Required Lenders;

(xv)    the automatic stay terminates or expires unless all of the Obligations and Prepetition Obligations shall have been Paid in Full;

(xvi)    any Credit Party or any Subsidiary of any Credit Party challenges the extent, validity or priority of the Obligations or the Prepetition Obligations or the application of any payments or collections received by Agents, Lenders, Prepetition Agents, Prepetition Lenders to the Obligations or Prepetition Obligations as provided for herein or in the Financing Order; or any Credit Party challenges the validity, extent, perfection or priority of any Liens granted in the Collateral to secure the Obligations or the Prepetition Obligations;

(xvii)    an order shall be entered by the Bankruptcy Court surcharging Agents, Lenders or the Collateral pursuant to Sections 105, 506(c), or any other section of the Bankruptcy Code or limiting the extent of the Liens on the Collateral pursuant to Section 552(b) or any other section of the Bankruptcy Code; or

(xviii)    any payment of or granting of adequate protection with respect to any Indebtedness that was existing prior to the Petition Date (other than as provided herein or as approved by Administrative Agent, Required Lenders and the Bankruptcy Court) is made.

SECTION 10.02.    Remedies Upon Event of Default.  If any Event of Default shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent may, and upon the direction of the Required Lenders shall, by notice to Borrower declare all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable and the Delayed Draw Term Loan Commitments and any other commitment hereunder be terminated, whereupon the full unpaid amount of such Loans and other Obligations that shall be so declared due and payable shall be and become immediately due and payable, in each case, without further notice, demand or presentment.

## ARTICLE XI
### The Agents

SECTION 11.01.    Appointment.  Each Lender (and, if applicable, each other Secured Party) hereby appoints Money Chest as its Collateral Agent under and for purposes of each Credit Document, and hereby authorizes the Collateral Agent to act on behalf of such Lender (or if applicable, each other Secured Party) under each Credit Document, and, in the absence of other written instructions from the Lenders pursuant to the terms of the Credit Documents received from time to time by the Collateral Agent, to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Collateral Agent by the terms hereof and thereof, together with such powers as may be incidental thereto (excluding, for the avoidance of doubt, any actions expressly indicated to require the consent of Required Lenders or each affected Lender, in which case Collateral Agent may only take such action with the consent of Required Lenders or each affected Lender).  Each Lender (and, if applicable, each other Secured Party) hereby appoints Money Chest as its Administrative Agent under and for purposes of each Credit Document and hereby authorizes the Administrative Agent to act on behalf of such Lender (or, if applicable, each other Secured Party) under each Credit Document and, in the absence of other written instructions from the Lenders pursuant to the terms of the Credit Documents received from time to time by the Administrative Agent, to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto (excluding, for the avoidance of doubt, any actions expressly indicated to require the consent of Required Lenders or each affected Lender, in which case Collateral Agent may only take such action with the consent of Required Lenders or each affected Lender).  Each Lender (and, if applicable, each other Secured Party) hereby designates and appoints each Agent as the agent of such Lender for such purposes.  Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender or other Secured Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against any Agent.  Anything contained in any of the Credit Documents to the contrary notwithstanding, Borrower, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Security Agreement or any other Security Documents or to credit bid any of the Obligations in any context, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Agents, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Agents (subject to any consents of the Lenders required hereunder), and

(ii) in the event of a foreclosure by any of the Agents on any of the Collateral pursuant to a public or private sale or other disposition, any Agent or any Lender may, if and only if Required Lenders so consent in writing, be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and each Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations (including Obligations owed to any other Secured Party) as a credit on account of the purchase price for any Collateral payable by such Agent at such sale or other disposition.

SECTION 11.02.    <u>Delegation of Duties</u>.  Each Agent may execute any of its duties under this Agreement and the other Credit Documents by or through agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care.

SECTION 11.03.    <u>Exculpatory Provisions</u>.  Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Credit Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence, bad faith or willful misconduct) or (b) responsible in any manner to any of the Lenders or any other Secured Party for any recitals, statements, representations or warranties made by any Credit Party or any officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document or for any failure of any Credit Party or other Person to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party.

SECTION 11.04.    <u>Reliance by Agents</u>.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Credit Parties), independent accountants and other experts selected by such Agent.  The Agents may deem and treat the payee of any note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Agents.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all or other requisite Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders

against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans and all other Secured Parties.

SECTION 11.05.     Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder, except with respect to any Default or Event of Default in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders unless the Administrative Agent has received notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".   The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Collateral Agent has received notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".   In the event that an Agent receives such a notice, such Agent shall give notice thereof to the other Agent and the Lenders. Each Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided that unless and until each Agent shall have received such directions, the Agents may (but shall not be obligated to), except as otherwise provided in this Agreement (it being understood that credit bidding or paying the purchase price for Collateral with all or any portion of the Obligations in any context shall require the consent of Required Lenders), take such action, or refrain from taking such action, with respect to such Default or Event of Default as such Agent shall deem advisable in the best interests of the Secured Parties.

SECTION 11.06.     Non-Reliance on Agents and Other Lenders.  Each Lender (and, if applicable, each other Secured Party) expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Credit Party or any Affiliate of a Credit Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender or any other Secured Party. Each Lender (and, if applicable, each other Secured Party) represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender or any other Secured Party, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Credit Parties and their Affiliates and made its own decision to make its Loans hereunder.  Each Lender (and, if applicable, each other Secured Party) also represents that it will, independently and without reliance upon any Agent or any other Lender or any other Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Credit Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be

furnished to the Lenders by any Agent hereunder, the Agents shall not have any duty or responsibility to provide any Lender or any other Secured Party with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Credit Party or any Affiliate of a Credit Party that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

SECTION 11.07.    Indemnification.  The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective Total Credit Exposure in effect on the date on which indemnification is sought under this Section 11.07 (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Total Credit Exposure immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Credit Documents, or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence, bad faith or willful misconduct. The agreements in this Section 11.07 shall survive the payment of the Loans and all other amounts payable hereunder.

SECTION 11.08.    Agent in Its Individual Capacity.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Credit Party as though such Agent were not an Agent.  With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender", "Lenders", "Secured Party" and "Secured Parties" shall include each Agent in its individual capacity.

SECTION 11.09.    Successor Agents.  Either Agent may resign as Agent upon twenty (20) days' notice (or such shorter period as the Lenders may agree in their sole discretion) to the Lenders, such other Agent and Borrower.  If either Agent shall resign as such Agent in its applicable capacity under this Agreement and the other Credit Documents, then the Required Lenders shall appoint a successor agent, whereupon such successor agent shall succeed to the rights, powers and duties of such Agent in its applicable capacity, and the term "Administrative Agent" or "Collateral Agent", as the case may be, shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Agent in its applicable capacity shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Loans. If no applicable successor agent has accepted appointment as such Agent in its applicable capacity by the date that is twenty (20) days following such retiring Agent's notice of resignation, such

retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall assume and perform all of the duties of such Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  After any retiring Agent's resignation as the Administrative Agent or the Collateral Agent, as applicable, the provisions of this Article XI shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Credit Documents.

SECTION 11.10.      Agents Generally.  Except as expressly set forth herein, no Agent shall have any duties or responsibilities hereunder in its capacity as such.

SECTION 11.11.      Restrictions on Actions by Secured Parties; Sharing of Payments; Credit Bidding.

(a)      Each of the Lenders agrees that it shall not, without the express written consent of the Collateral Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Collateral Agent, set off against the Obligations, any amounts owing by such Lender to any Credit Party or any of their respective Subsidiaries or any deposit accounts of any Credit Party or any of their respective Subsidiaries now or hereafter maintained with such Lender.  Each of the Lenders (in its capacity as a Lender hereunder) further agrees that it shall not, unless specifically requested to do so in writing by Collateral Agent at the direction of Required Lenders, including, the commencement of any legal or equitable proceedings to enforce any Credit Document against any Credit Party or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)      Subject to Section 12.08(a), if, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from the Agents pursuant to the terms of this Agreement, or (ii) payments from the Agents in excess of such Lender's pro rata share of all such distributions by Agents, such Lender promptly shall (A) turn the same over to the Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Collateral Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their pro rata shares; provided that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

(c)      The benefit of the provisions of the Credit Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not an Agent or a Lender as long as, by accepting such benefits, such Secured Party agrees, as among the Agents and all other Secured Parties, that such Secured Party is bound by (and, if requested by any Agent, shall confirm such agreement in a writing in form and substance

acceptable to the such Agent) this <u>Article XI</u>, including <u>Sections 11.11(a)</u> and <u>(b)</u>, and the decisions and actions of the Agents and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) to the same extent a Lender is bound; provided that, notwithstanding the foregoing, (i) except as set forth specifically herein, each Agent and each Lender shall be entitled to act in its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (ii) except as specifically set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Credit Document.

(d)     The Agents and Prepetition Agents are hereby authorized by the Credit Parties, Secured Parties, and Prepetition Lenders to, based upon the instruction of the Required Lenders and Prepetition Lenders, as applicable, consent to the sale of, credit bid, or purchase of all or any portion of the Collateral at any sale thereof conducted under the provisions (including Section 363 thereof) of the Bankruptcy Code, the provisions of the UCC, or any other sale or foreclosure conducted or consented to by the Required Lenders and Prepetition Lenders, as applicable, in accordance with applicable law in any other applicable judicial proceeding or by the exercise of any equitable or legal remedy.  In connection with any such credit bid or purchase, the Obligations and Prepetition Obligations shall be entitled to be, and shall be, credit bid on a ratable basis and the Secured Parties and Prepetition Lenders, as applicable, whose Obligations and Prepetition Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations and Prepetition Obligations credit bid in relation to the aggregate amount of obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Capital Stock of the any entities that are used to consummate such credit bid or purchase).

SECTION 11.12.     <u>Agency for Perfection</u>.  Collateral Agent hereby appoints each other Secured Party as its agent and as sub-agent for the other Secured Parties (and each Secured Party hereby accepts such appointment) for the purpose of perfecting all Liens with respect to the Collateral, including with respect to assets which, in accordance with <u>Article VIII</u> or <u>Article IX</u>, as applicable, of the Uniform Commercial Code of any applicable state can be perfected only by possession or control.  Should any Secured Party obtain possession or control of any such Collateral (excluding, for the avoidance of doubt, in connection with the Prepetition Credit Agreement), such Secured Party shall notify Collateral Agent thereof, and, promptly upon Collateral Agent's request therefor shall deliver possession or control of such Collateral to Collateral Agent and take such other actions as agent or sub-agent in accordance with the Collateral Agent's instructions to the extent, and only to the extent, so authorized or directed by the Collateral Agent.

## ARTICLE XII
## Miscellaneous

SECTION 12.01.     <u>Amendments and Waivers</u>.  Neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented, modified or waived except in accordance with the provisions of this <u>Section 12.01</u>.  The Required Lenders

may, or, with the prior written consent of the Required Lenders, the Administrative Agent may, from time to time, enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or the Credit Parties hereunder or thereunder, waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents, (including any conditions to the funding of Loans hereunder), or any Default or Event of Default and its consequences or consent to any acts or omissions of the Credit Parties hereunder or under any other Credit Document that, but for such consent, would constitute a Default or Event of Default hereunder or thereunder; provided that no such waiver, amendment, supplement, modification, consent or waiver shall directly or indirectly:

(i)       reduce or forgive any portion of any Loan or extend the final scheduled maturity date of any Loan or reduce the stated interest rate (<u>provided</u> that only the consent of the Required Lenders shall be necessary to waive any obligation of Borrower to pay interest at the "default rate"), or (B) reduce or forgive any portion or extend the date for the payment, of any interest or fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates and other than as a result of a waiver or amendment of any mandatory prepayment of Loans (which shall not constitute an extension, forgiveness or postponement of any date for payment of principal, interest or fees)), or (C) decrease or forgive any Loan Repayment Amount, or (D) extend any scheduled Loan Repayment Date, or (E) amend or modify any provisions of Section 4.02(d) or any other provision that provides for the pro rata nature of disbursements by or payments to Lenders, in each case without the written consent of each Lender directly and adversely affected thereby;

(ii)      amend, modify or waive any provision of this <u>Section 12.01</u> or reduce the percentages specified in the definitions of the term "Required Lenders" or consent to the assignment or transfer by any Credit Party of its rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to <u>Section 9.03</u>), in each case without the written consent of each Lender directly and adversely affected thereby;

(iii)     increase the aggregate amount of any Commitment of any Lender without the consent of such Lender;

(iv)      amend, modify or waive any provision of <u>Article XI</u> without the written consent of the then-current Collateral Agent and Administrative Agent; or

(v)       release all or substantially all of the Guarantors under Article VI hereof (except as expressly permitted by such Article VI), or release any Liens in favor of the Agent or Lenders on all or substantially all of the Collateral under the Security Documents (except as expressly permitted thereby and in <u>Section 12.18</u>), in each case without the prior written consent of each Lender.

SECTION 12.02.      <u>Notices and Other Communications; Facsimile Copies</u>.

(a)    General.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Credit Parties or the Agents or any Lender designated on Schedule 12.02, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 12.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(ii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to Borrower and the Agents.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three (3) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 12.02(c)), when delivered; provided that notices and other communications to the Agents pursuant to Article II shall not be effective until actually received by such Person.

(b)    Effectiveness of Facsimile Documents and Signatures.  Credit Documents may be transmitted and/or signed by facsimile or other electronic communication.  The effectiveness of any such documents and signatures shall have the same force and effect as manually signed originals and shall be binding on all Credit Parties, the Agents and the Lenders.

(c)    Reliance by Agents and Lenders.  The Agents and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of any Credit Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic notices to either Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.

SECTION 12.03.    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

SECTION 12.04.     <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in the other Credit Documents shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

SECTION 12.05.     <u>Payment of Expenses and Taxes; Indemnification</u>.  Borrower agrees, (a) to pay or reimburse the Agents and the Lenders for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with due diligence in respect of the transactions contemplated by this Agreement and the Bankruptcy Case, the development, preparation and execution of, and any amendment, supplement, or modification to, this Agreement and the other Credit Documents and the Financing Order, including in connection with an initial syndication, and any other documents prepared in connection herewith or therewith, and the consummation, monitoring, oversight and administration of the transactions contemplated hereby and thereby, including the reasonable fees, disbursements and other charges of counsel retained by, or for the benefit of, the Agents and the Lenders, (b) to pay or reimburse each Lender and the Agents for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Credit Documents and any such other documents, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, and including the reasonable fees, disbursements and other charges of counsel to each Lender and of counsel retained by or for the benefit of the Agents and the Lenders, including any such costs and expenses incurred in connection with any action to lift the automatic stay of Section 362 of the Bankruptcy Code, or any other action or participation by any Agent or any Lender in the Bankruptcy Case, including any contested matters or adversary proceedings, to the extent related to any of the foregoing, (c) to pay, indemnify, and hold harmless each Lender and the Agents from any and all Other Taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Credit Documents and any such other documents, (d) to pay or reimburse Collateral Agent for all reasonable fees, costs and expenses incurred in exercising its rights under <u>Section 8.16</u> and (e) to pay, indemnify, and hold harmless each Lender and the Agents and their respective Related Parties from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, and reasonable and documented (to the extent available) reasonable out-of-pocket costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented (to the extent available) fees, disbursements and other charges of counsel, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Credit Documents, the Bankruptcy Case, the Financing Order, and any such other documents, including any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law or any actual or alleged presence of Hazardous Materials applicable to the operations of each Credit Party, any of their respective Subsidiaries or any of their Real Property (all the foregoing in this clause (e), collectively, the "***Indemnified Liabilities***"); <u>provided</u> that the Credit Parties shall not have any obligation hereunder to the Agents or any Lender nor any of their Related Parties with respect to Indemnified Liabilities arising from the gross negligence or willful misconduct of the party to be indemnified as determined by a final and non-appealable decision of a court of competent jurisdiction.  The agreements in this <u>Section 12.05</u> shall survive repayment of the Loans and all other amounts payable hereunder and termination of this

Agreement.  To the fullest extent permitted by Applicable Law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against any Lender, any Agent and their respective Related Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loans or the use of the proceeds thereof.  No Lender, no Agent nor any of their respective Related Parties shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

SECTION 12.06.    Successors and Assigns; Participations and Assignments; Replacement of Lender.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) except as set forth in Section 9.03, no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by any Credit Party without such consent shall be null and void), and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.06.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 12.06) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.  Notwithstanding anything to the contrary herein, (x) any Lender shall be permitted to pledge or grant a security interest in all or any portion of such Lender's rights hereunder including, but not limited to, any Loans (without the consent of, or notice to or any other action by, any other party hereto) to secure the obligations of such Lender or any of its Affiliates to any Person providing any loan, letter of credit or other extension of credit to or for the account of such Lender or any of its Affiliates and any agent, trustee or representative of such Person and (y) the Agents shall be permitted to pledge or grant a security interest in all or any portion of their respective rights hereunder or under the other Credit Documents, including, but not limited to, rights to payment (without the consent of, or notice to or any other action by, any other party hereto), to secure the obligations of such Agent or any of its Affiliates to any Person providing any loan, letter of credit or other extension of credit to or for the account of such Agent or any of its Affiliates and any agent, trustee or representative of such Person.

(b)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments or the Loans at the time owing to it) with the prior written consent (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed) of the Administrative Agent and Required Lenders; provided that no consent of the Administrative Agent and Required Lenders shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund and the withholding of consent by the

Administrative Agent and Required Lenders to an assignment to any Affiliate of Borrower shall be deemed to be not unreasonable;

(i)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, unless the Administrative Agent and Required Lenders otherwise consent, which consent, in each case, shall not be unreasonably withheld or delayed; provided, however, that contemporaneous assignments to a single assignee made by Affiliated Lenders or related Approved Funds and contemporaneous assignments by a single assignor to Affiliated Lenders or related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirement stated above;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement as to the Loans so assigned; provided that this paragraph shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect its Loans;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance;

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(E)    unless consented to by the Required Lenders, no assignment may be made to a Credit Party or an Affiliate of a Credit Party; and

(F)    unless consented to by the Required Lenders, for the purposes of any Loan owed by Borrower, assignment shall only be permitted if the person to whom Loans are assigned is a Non-Public Lender at all times.

(ii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 12.06, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled

-99-

to the benefits of <u>Sections 2.09</u>, <u>2.10</u>, <u>4.03(b)</u> and <u>12.05</u>).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this <u>Section 12.06</u> shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this <u>Section 12.06</u>.

(iii)    The Administrative Agent, acting for this purpose on behalf of Borrower (but not as an agent, fiduciary or for any other purposes), shall maintain a copy of each Assignment and Acceptance delivered to it and a register in the United States for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "***Register***").  Further, the Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive absent manifest error, and the Credit Parties, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register, as in effect at the close of business on the preceding Business Day, shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(iv)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder) and any written consent to such assignment required by paragraph (b)(i) of this <u>Section 12.06</u>, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless and until it has been recorded in the Register as provided in this paragraph.

(c)    Any Lender may, without the consent of Borrower but with the consent of Administrative Agent and Required Lenders (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed), sell participations to one or more banks or other entities (each, a "***Participant***") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (D) no such Participant may be a Credit Party or an Affiliate of a Credit Party. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and, as between such Lender, the Credit Parties, the Agents and the other Lenders, to approve any amendment, modification, consent or waiver of any provision of this Agreement or any other Credit Document; <u>provided</u> that, notwithstanding the foregoing, such agreement or instrument may provide that (x) if such Participant is an Affiliate of such Lender, the Participant may, as between itself and such Lender (but not as between such Lender, the Agents, the Credit Parties and the

other Lenders), approve any amendment, modification, consent or waiver of any provision of this Agreement or any other Credit Document and (y) such Lender will not, without the consent of the Participant agree to any amendment, modification, consent or waiver described in clause (i) of the first proviso to Section 12.01.  Subject to paragraph (c)(ii) of this Section 12.06, Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.09, 2.10 and 4.04(a) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 12.06.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08(a) as though it were a Lender; provided that such Participant agrees to be subject to Section 12.08(a) as though it were a Lender.

(i)        A Participant shall not be entitled to receive any greater payment under Sections 2.09, 2.10 or 4.04(a) than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, (A) unless the sale of the participation to such Participant is made with Borrower's prior written consent, and (B) except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 4.03(b) that are greater than the applicable Lender unless Borrower are notified of the participation sold to such Participant and such Participant agrees, for the benefit of Borrower, to comply with Section 4.04(a) and Section 4.04(c) as though it were a Lender.

(ii)        Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain at one of its offices in the United States a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "***Participant Register***").  The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement.  No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)        Nothing herein is intended to prevent, impair, limit or otherwise restrict the ability of a Lender to collaterally assign or pledge all or any portion of its interests in the Loans and the other rights and benefits under the Credit Documents to an unaffiliated third party lender of such Lender (each such Person, a "***Collateral Assignee***"); provided that unless and until Borrower receives notification from a Collateral Assignee of such assignment directing payments to be made to such Collateral Assignee, any payment made by Borrower for the benefit of such Lender in accordance with the terms of the Credit Documents shall satisfy Borrower's obligations thereunder to the extent of such payment.  Any such Collateral Assignee, upon

foreclosure of its security interests in the Loans pursuant to the terms of such assignment and in accordance with Applicable Law, shall succeed to all the interests of or shall be deemed to be a Lender, with all the rights and benefits afforded thereby, and such transfer shall not be deemed to be a transfer for purposes of and otherwise subject to the provisions of this Section 12.06. Notwithstanding the foregoing, Lender shall remain responsible for all obligations and liabilities arising hereunder or under any other Credit Document, and, except as otherwise expressly set forth in any applicable pledge or assignment, nothing herein is intended or shall be construed to impose any obligations upon or constitute an assumption by a Collateral Assignee thereof.

SECTION 12.07.    Pledge of Loans.  The Credit Parties hereby acknowledge that the Lenders and their Affiliates may pledge the Loans as collateral security for loans to the Lenders or their Affiliates, provided that any pledgee of the Loans shall be a Non-Public Lender at all times.  The Credit Parties shall, to the extent commercially reasonable, cooperate with the Lenders and their Affiliates to effect such pledges at the sole cost and expense of such Lender. Notwithstanding the foregoing, no pledge shall release the Lender party thereto from any of its obligations hereunder.

SECTION 12.08.    Adjustments; Set-off.

(a)    If any Lender (a "***Benefited Lender***") shall at any time receive any payment of all or part of its Loans, or interest thereon, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 10.01(i), or otherwise), in a greater proportion than any such payment to or Collateral received by any other Lender, if any, in respect of such other Lender's Loans or interest thereon, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided that if all or any portion of such excess payment or benefits is thereafter recovered from such benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.  The foregoing provisions of this Section 12.08 shall not apply to payments made and applied in accordance with the terms of this Agreement and the other Credit Documents.

(b)    After the occurrence and during the continuance of an Event of Default, to the extent consented to by Administrative Agent, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to Borrower or any other Credit Party, any such notice being expressly waived by the Credit Parties to the extent permitted by Applicable Law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final, but excluding, subject to the limitations set forth in Section 8.15(a), deposit accounts used solely to fund payroll or employee benefits, or deposit accounts that consist solely of cash collateral subject to Permitted Liens), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or

agency thereof to or for the credit or the account of Borrower, as the case may be.  Each Lender agrees promptly to notify Borrower and the Agents (who shall promptly notify each other Lender) after any such set-off and application made by such Lender; <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application.

SECTION 12.09.    <u>Counterparts</u>.  This Agreement and the other Credit Documents may be executed by one or more of the parties thereto on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Any signature page delivered by telecopy machine or transmitted electronically in Portable Document Format ("pdf") shall be valid and binding to the same extent as an original signature page.  Any party who delivers such a signature page agrees to later deliver an original counterpart to any party who requests it.  A set of the copies of this Agreement signed by all the parties shall be lodged with Borrower, the Collateral Agent and the Administrative Agent.

SECTION 12.10.    <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 12.11.    <u>Integration</u>.  This Agreement and the other Credit Documents represent the agreement of the Credit Parties, the Agents and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by any party hereto or thereto relative to the subject matter hereof not expressly set forth or referred to herein or in the other Credit Documents.

SECTION 12.12.    <u>GOVERNING LAW</u>.    THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS (UNLESS EXPRESSLY PROVIDED OTHERWISE THEREIN) AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE, WITHOUT REFERENCE TO CONFLICTS OF LAW PROVISIONS WHICH WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

SECTION 12.13.    <u>Submission to Jurisdiction; Waivers</u>.  IF (I) THE BANKRUPTCY CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO), OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO), THEN each party hereto hereby irrevocably and unconditionally:

(a)  submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Credit Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court or such New York State court or, to the extent permitted by Applicable Laws, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Laws.  Nothing in this Agreement or any other Credit Document or otherwise shall affect any right that the Administrative Agent, the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Credit Document against any Credit Party or its properties in the courts of any jurisdiction in connection with the exercise of any rights under any Security Document or the enforcement of any judgment;

(b)  consents that any such action or proceeding shall be brought in such courts, and agrees not to plead or claim and waives, to the fullest extent permitted by Applicable Laws, any objection that it may now or hereafter have to the venue of any such action or proceeding arising out of or relating to this Agreement or any other Credit Document in any court referred to in Section 12.13(a).  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court;

(c)  agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the applicable party at its respective address set forth in Schedule 12.02 or on Schedule 1.01 or at such other address of which the Agents shall have been notified pursuant thereto.  Nothing in this Agreement or any other Credit Document will affect the right of any party to this Agreement to serve process in any other manner permitted by Applicable Law;

(d)  waives, to the maximum extent not prohibited by law, all rights of rescission, setoff, counterclaims, and other defenses in connection with the repayment of the Obligations; and

(e)  waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 12.13 any special, exemplary, punitive or consequential damages.

SECTION 12.14.    Acknowledgments.  Each Credit Party hereby acknowledges that:

(a)  it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)  neither the Agents nor any Lender has any fiduciary relationship with or duty to the Credit Parties arising out of or in connection with this Agreement or any of the other

Credit Documents, and the relationship between any Agent and Lenders, on one hand, and the Credit Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Credit Parties and the Lenders.

SECTION 12.15.     WAIVERS OF JURY TRIAL.   THE CREDIT PARTIES, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 12.16.     Confidentiality.  Each Agent and Lender shall hold all non-public information relating to any Credit Party or any Subsidiary of any Credit Party obtained pursuant to the requirements of this Agreement or in connection with such Lender's evaluation of whether to become a Lender hereunder ("***Confidential Information***") confidential in accordance with its customary procedure for handling confidential information of this nature and (in the case of a Lender that is a bank) in accordance with safe and sound banking practices; provided that Confidential Information may be disclosed by any Agent or Lender:

(a)     as required or requested by any governmental or regulatory agency or representative thereof;

(b)     pursuant to legal or regulatory process;

(c)     in connection with the enforcement of any rights or exercise of any remedies by such Agent or Lender under this Agreement or any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document;

(d)     to such Agent's or Lender's attorneys, professional advisors, accountants, independent auditors, clients, service providers or Affiliates,

(e)     in connection with:

(i)     the establishment of any special purpose funding vehicle with respect to the Loans,

(ii)     any pledge permitted under Section 12.08;

(iii)     any prospective assignment of, or participation in, its rights and obligations pursuant to Section 12.06, to prospective assignees or Participants, as the case may be (it being understood that each such Persons will be informed of the confidential nature of such information and instructed to keep such information confidential on the same terms as this Section 12.16); and

(iv)    any actual or proposed credit facility for loans, letters of credit or other extensions of credit to or for the account of such Agent or Lender or any of its Affiliates, to any Person providing or proposing to provide such loan, letter of credit or other extension of credit or any agent, trustee or representative of such Person (it being understood that each such Persons will be informed of the confidential nature of such information and instructed to keep such information confidential on the same terms as this Section 12.16); or

(f)    to any rating agency;

(g)    with the consent of Borrower;

(h)    to the extent required, or to the extent counsel to the Agents or to any Lender reasonably determines is required to be disclosed in connection with any public filing by Agents or such Lender;

(i)    in connection with the Promotional Rights (as defined below);

(j)    provided that in the case of clause (e) hereof, the Person to whom Confidential Information is so disclosed is advised of and has been directed to comply with the provisions of this Section 12.16.

Notwithstanding the foregoing, Agents and each Lender shall have the right to publicize, for general marketing and related promotional purposes, their relationship to Borrower and the fact that they have extended the Loans to Borrower (the "***Promotional Rights***") and, in connection therewith, Borrower hereby grants to each Agent and each Lender a royalty free, non-exclusive limited license to use Borrower's name, trade name, trademarks, logos, trade dress and other identifying intellectual property, now existing or hereafter acquired, in any literature, advertisements, websites, promotional or other marketing materials now or hereafter used by such Agent or Lender.

Notwithstanding the foregoing, no Agent or Lender shall have any obligation to keep information confidential if such information: (i) is or becomes public from a source other than an Agent or a Lender, or one of an Agent's or a Lender's Affiliates, consultants or legal or financial advisors in breach of this Agreement, (ii) is, was or becomes known on a non-confidential basis (to the best of such Agent's or Lender's knowledge after reasonable inquiry) to or discovered by an Agent or Lender, Lenders or any of their Affiliates, consultants or legal or financial advisors independently from communications by or on behalf of any Credit Party, or (iii) is independently developed by an Agent without use of such confidential information, provided that, the source of such information was not known to be bound by a confidentiality agreement with (or subject to any other contractual, legal or fiduciary obligation of confidentiality to) the relevant Credit Party.

EACH LENDER ACKNOWLEDGES THAT CONFIDENTIAL INFORMATION (AS DEFINED IN THIS SECTION 12.16) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION

AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

ALL INFORMATION, INCLUDING WAIVERS AND AMENDMENTS, FURNISHED BY THE CREDIT PARTIES OR ANY AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE CREDIT PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE CREDIT PARTIES AND THE AGENTS THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

SECTION 12.17.    Press Releases, etc.  Each Credit Party will not, and will not permit any of its respective Subsidiaries, directly or indirectly, to publish any press release or other similar public disclosure or announcements (including any marketing materials) regarding this Agreement, the other Credit Documents, or any of the Transactions, without the consent of the Administrative Agent, which consent shall not be unreasonably withheld.

SECTION 12.18.    Releases of Guarantees and Liens.    Notwithstanding anything to the contrary contained herein or in any other Credit Document, the Collateral Agent is hereby irrevocably authorized by each Secured Party (without requirement of notice to or consent of any Secured Party) to take any action requested by Borrower having the effect of releasing any Liens on Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction expressly permitted by this Agreement or that has been consented to in accordance with Section 12.01 or (ii) under the circumstances described in paragraph (b) below.

(a)    At such time as (i) the Loans and the other Obligations (other than Unasserted Contingent Obligations) shall have been paid in full and (ii) the Commitments have been terminated, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Collateral Agent and each Credit Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(b)    Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property, or to release any guarantee obligations pursuant to this Section 12.18.  In each case as specified in this Section 12.18, the Collateral Agent will (and each Lender irrevocably authorizes the Collateral Agent to), at Borrower's expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral or guarantee obligation from the assignment and security interest granted under the Security Documents, in each case in accordance with the terms of the Credit Documents and this Section 12.18.

SECTION 12.19.    USA Patriot Act.  Each Lender hereby notifies each Credit Party that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*Patriot Act*"), it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.  Each Credit Party agrees to provide all such information to the Lenders upon request by any Agent at any time, whether with respect to any Person who is a Credit Party on the Closing Date or who becomes a Credit Party thereafter.

SECTION 12.20.    No Fiduciary Duty.  Each Credit Party, on behalf of itself and its Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Credit Parties, their respective Subsidiaries and Affiliates, on the one hand, and the Agents, the Lenders and their respective Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Agents the Lenders or their respective Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

SECTION 12.21.    Authorized Officers.  The execution of any certificate requirement hereunder by an Authorized Officer shall be considered to have been done solely in such Authorized Officer's capacity as an officer of the applicable Credit Party (and not individually). Notwithstanding anything to the contrary set forth herein, the Secured Parties shall be entitled to rely and act on any certificate, notice or other document delivered by or on behalf of any Person purporting to be an Authorized Officer of a Credit Party and shall have no duty to inquire as to the actual incumbency or authority of such Person.

SECTION 12.22.    Subordination of Intercompany Indebtedness.  The Credit Parties hereby agree that all present and future Indebtedness of any Credit Party to any other Credit Party ("*Intercompany Indebtedness*") shall be subordinate and junior in right of payment and priority to the Obligations, and each Credit Party agrees not to make, demand, accept or receive any payment in respect of any present or future Intercompany Indebtedness, including any payment received through the exercise of any right of setoff, counterclaim or cross claim, or any collateral therefor, unless and until such time as the Obligations shall have been indefeasibly paid in full.  Without in any way limiting the foregoing, in any Insolvency Event (including, for the avoidance of doubt, the Bankruptcy Case), or any receivership, liquidation, reorganization, dissolution or other similar proceedings relative to any Credit Party or to its businesses, properties or assets, the Lenders shall be entitled to receive payment in full of all of the Obligations before any Credit Party shall be entitled to receive any payment in respect of any present or future Intercompany Indebtedness.

SECTION 12.23.    Public Lenders.  Each Credit Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications available to the Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "*Platform*").  The Platform is provided "as is" and "as available."  Borrower hereby acknowledges that (a) the Administrative Agent may, but shall not be obligated to, make available to the Lenders materials and/or information provided by or on behalf of Borrower hereunder (collectively, the "*Borrower Materials*") by posting Borrower

Materials on the Platform and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Borrower or its securities) (each, a "***Public Lender***"). Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to Borrower or its securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in Section 12.17); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be deemed to have been marked "PUBLIC", unless Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Credit Documents, (2) notification of changes in the terms of the credit facility hereunder and (3) any financial statements and compliance certificates delivered by Borrower pursuant to Section 8.01 hereof.

SECTION 12.24.    Reserved.

SECTION 12.25.    Tax Treatment.  Borrower and Lenders agree that the Loans are indebtedness of Borrower for U.S. federal income Tax purposes.  Each party to this Agreement agrees not to take any Tax position inconsistent with such Tax characterization and shall not report the transactions arising under this Agreement in any manner other than the issuance of debt obligations on all applicable Tax returns unless otherwise required by a final determination within the meaning of Section 1313(a) of the Code (or a similar final determination under applicable state or local Law).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK - SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

<u>BORROWER</u>:


**LOOT CRATE, INC.**


By:_____
Name:_____
Title:_____


<u>GUARANTORS</u>:


**LOOT CRATE PARENT, INC.**


By:_____
Name:_____
Title:_____


**LC FUNDING, INC.**


By:_____
Name:_____
Title:_____


**LOOT CRATE HOLDINGS, INC.**


By:_____
Name:_____
Title:_____

<u>ADMINISTRATIVE AGENT AND</u>
<u>COLLATERAL AGENT</u>:


**MONEY CHEST LLC**, in its capacity as
Administrative Agent and Collateral Agent


By: _____
Name: Joel Weinshanker
Title: Managing Partner

<u>LENDERS</u>:


**MONEY CHEST LLC**, in its capacity as
Lender


By:_____
Name: Joel Weinshanker
Title: Managing Partner

# SCHEDULE 1.01

Commitments

| Lenders | Closing Date Term Loan Commitment | Closing Date Term Loan Commitment Percentage | Delayed Draw Term Loan Commitment | Delayed Draw Term Loan Commitment Percentage | Total Commitments | Commitment Percentage |
|---|---|---|---|---|---|---|
| MONEY CHEST LLC | $1,347,601 | 100% | $8,652,399 | 100% | $10,000,000 | 100% |
| TOTAL | $1,347,601 | 100.00% | $8,652,399 | 100% | $10,000,000 | 100% |

**SCHEDULE 8.21**

Credit Parties shall satisfy the milestones set forth below by the deadline specified below (in each case, as such deadline may be extended by Administrative Agent and each Lender in their sole and absolute discretion):

| Milestone | Specified Deadline |
|---|---|
| Deadline to file Sale Motion | 1 Business Day after Petition Date |
| Deadline for Bankruptcy Court to enter Interim Order | 3 Business Days after Petition Date |
| Deadline for Bankruptcy Court to enter Sale Procedures Order | 15 days after Petition Date |
| Deadline for Bankruptcy Court to enter Final Order | 25 days after Petition Date |
| Deadline to file a motion to extend the lease assumption/rejection period | 25 days after Petition Date |
| Deadline to conduct the Auction | 35 days after Petition Date |
| Deadline for Bankruptcy Court to enter the Sale Order | 40 days after Petition Date |

**SCHEDULE 12.02**

Addresses for Notices

<u>If to any Credit Party</u>:

Loot Crate, Inc.
3401 Pasadena Avenue
Los Angeles, California 90031
Attention:  Stuart Kaufman
Email:  skaufman@pppllc.com

<u>with a copy to</u>:

Bryan Cave Leighton Paisner LLP
1290 Avenue of the Americas
New York, NY 10104-3300
Attention:  Andrew Schoulder, Esq.
Email: andrew.schoulder@bclplaw.com

<u>If to Administrative Agent, Collateral Agent, and Lender</u>:

Money Chest LLC
c/o National Entertainment Collectibles Association, Inc.
603 Sweetland Ave.
Hillside, NJ 07205
Attention: Joel Weinshanker
Email:  joelw@necaonline.com

<u>with a copy to</u>:

Cooley LLP
55 Hudson Yards
New York, NY 10001
Attention: Cathy Hershcopf
              Robert Winning
Email:  chershcopf@cooley.com
          rwinning@cooley.com

<u>If to any other Lender</u>:

At its address or facsimile number set forth in its Administrative Questionnaire.