## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOOT CRATE, INC., *et al.*,[1] | ) | Case No. 19-11791 (BLS) |
| | ) | |
| Debtors. | ) | **Hearing Date: Sept. 3, 2019 at 1:00 p.m.** |
| | ) | **Obj. Deadline: Aug. 28, 2019 at 4:00 p.m. (extended** |
| | ) | **for the Committee)** |
| | ) | |
| | ) | **Re: D.I. 13, 18, 27, and 44** |
| | ) | |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' MOTIONS (I)(A) APPROVING BID PROCEDURES
FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B)
APPROVING RELATED CONTRACT ASSUMPTION AND ASSIGNMENT
PROCEDURES, (C) AUTHORIZING THE DEBTORS TO ENTER INTO STALKING
HORSE AGREEMENTS AND APPROVING CERTAIN BID PROTECTIONS,
SUBJECT TO A FURTHER HEARING, (D) SCHEDULING A SALE HEARING, AND
(E) GRANTING CERTAIN RELATED RELIEF; AND (II) FOR A FINAL ORDER (A)
AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE
CASH COLLATERAL; (B) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (C)
SCHEDULING FINAL HEARING; (D) MODIFYING THE AUTOMATIC STAY; AND
(E) GRANTING RELATED RELIEF**

The official committee of unsecured creditors (the "Committee"),[2] by and through the

undersigned counsel, hereby files this objection (the "Objection") to (I) the motion of the above-

captioned debtors (collectively, the "Debtors"), pursuant to Sections 105, 361, 362, 363, 364, and

507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for Interim and

Final Orders (A) Authorizing Debtors to Obtain Postpetition Financing and Use of Cash

Collateral; (B) Granting Liens and Super-Priority Claims; (C) Scheduling Final Hearing; (D)

Modifying the Automatic Stay; and (E) Granting Related Relief, and in support of the

---

[1]    The Debtors are the following 4 entities (the last 4 digits of their respective taxpayer identification numbers, if any, follow in parentheses): Loot Crate, Inc. (7119); Loot Crate Holdings, Inc.; LC Funding, Inc.; and Loot Crate Parent, Inc.

[2]    Capitalized terms not otherwise defined herein shall have the meaning set forth in the DIP Motion.

Preliminary Objection (the "DIP Motion"), and (II) the Debtors' motion for an order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Approving Related Contract Assumption and Assignment Procedures, (C) Authorizing the Debtors to Enter Into Stalking Horse Agreements and Approving Certain Bid Protections, Subject to a Further Hearing, (D) Scheduling a Sale Hearing, and (E) Granting Certain Related Relief (the "Bid Procedures Motion"), and in support of the Objection, the Committee states as follows:

## INTRODUCTION

The Debtors' story is hardly unique:  A company seeks bankruptcy protection, and substantially contemporaneously with the filing of the petition seeks approval of postpetition financing and an abbreviated sale process.  This immediate combination is intended to do two things: (i) authorize the debtor to borrow a minimal amount from the putative prepetition creditor on a postpetition basis for a short duration, in exchange for which the lender seeks a postpetition lien on all of the debtors' assets, whether previously encumbered or otherwise, and (ii) commencing a process for the sale of substantially all of the debtors' assets by and through which the lender (or an affiliate) will receive virtually every possible advantage in an abbreviated sale process so that it can obtain all of the value of the enterprise, free and clear of claims, liens and encumbrances, leaving little (if anything at all) for unsecured creditors.

Notwithstanding the commonality of this confluence of requested relief, this Court should not approve the relief sought by the DIP Motion and Bid Procedure Motion, as filed, particularly where the process leaves no assets available to pay all administrative expenses or to wind down the estates.

11128189/3

**The DIP Financing Motion**

By and through the DIP motion, the Debtors seek approval of financing that, on its face, would provide $10 million to the Debtors for the financing of a sale process. Among other things, the proposed financing proposes is premised certain milestones for a sale process. Accordingly, by the DIP Motion, the Debtors seek approval of the DIP Facility that sets a maturity date of, at most, forty (40) days after the Petition Date (and possibly fewer than twenty-five days). The estates would be liable to pay interest of 7% per annum interest accruing from and the Closing Date. Additionally, the Debtors would be responsible for payment of an amount equal to 1.5% of the Commitments to the Lenders on the Closing Date. Taken together, the estates would bear costs of interest and fees totaling more than $225,000, which is equal to an annualized rate of return[3] of approximately 23% if the DIP facility remains outstanding for its scheduled 40 day term so that the DIP Lender can preserve and maximize the value of its own collateral.

In exchange for the abbreviated loan, the DIP Lender will receive a first priority lien (other than with respect to the Permitted Priority Liens, the Carve-Out, and the Other Statutory Liabilities) on substantially all of the estates' assets including all commercial tort claims, proceeds of any of the estates' director's and officer's insurance policies, and proceeds from all of the estates' claims and causes of action including avoidance actions.

Further, the DIP Lender will also receive a superpriority administrative expense pursuant to Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c),

---

[3]     The calculation of this annualized rate of return does not include the $666,667 allotted for the Lenders' professional fees or the $500,000 that the Debtors need to fund for an indemnification reserve.

507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens, the Carve-Out, and the Other Statutory Liabilities (the "Superpriority Claims").

Were the abbreviated timing and draconican economic terms not enough, the DIP Motion and DIP Agreement are littered with a number of provisions that would, among other things, require that the estates (i) waive their right to surcharge the DIP Lenders, any of the Prepetition Lender or their agents or subsidiaries or their collateral pursuant to Sections 105(a), 506(c) or 552(b) of the Bankruptcy Code, and (ii) waive the estates' rights under the equitable doctrine of marshalling. Additionally, the DIP Motion seeks to require that the Committee seek derivative standing to bring an action against the Lenders.[4]

Finally, as set forth in the Budget, the Debtors' professionals are budgeted to receive fees and expenses totaling almost $2 million. Under the Budget, the Agents and Lenders are to receive up to $667,777 for their fees and expenses for the eleven-week period through the sale closing. It is unclear how much (if any) of that amount is related to the bid to be submitted by LCA. At the same time, the Committee's professionals are budgeted for a total of $250,000 for the same eleven-week period. Accordingly, the budgeted fees and expenses for the Debtors' professionals is eight times the amount of the Committee's professionals, and the budgeted fees and expenses for Lender's professionals are more than two and a half times the amount budgeted for the Committee's professionals in a case that is expedited at the DIP Lenders' direction. The budget for the Committee's professionals should be increased to a reasonable amount to enable the Committee to fulfill its statutory duties.

**The Proposed Bid Procedures**

---

[4]    Further, the assertion of any claim for a surcharge and the commencement of a challenge against the Lenders are both events of default, if not promptly withdrawn.

First and foremost, by the Bid Procedures Motion, the Debtors seek approval of a sale process that is far too short. There is always a tension between conducting a comprehensive sale process and minimizing postpetition administrative expenses. Here, the Debtors are seeking a process that would require bids no later than September 10, 2019, which is just thirty (30) days after the Petition Date and only nineteen (19) days after the appointment of the Committee. Of those nineteen days, only twelve are business days.  Under the milestones set forth in the DIP Agreement, a hearing to approve the sale of substantially all of the Debtors' assets is required to be held no later than September 16, 2019 or as soon thereafter as the Court is available.  Further, under the Budget attached to the DIP Motion, the sale is to close no later than October 27, 2019.

It was not until the afternoon of August 27, 2019, that the Committee's advisors received a list of those parties who the Debtors solicited interest, thereby stunting the process for (i) the Committee to confer with the Debtors' professionals, (ii) the Debtors and/or Committee to solicit those other potentially interested parties, (iii) the review, execution and return of nondisclosure agreements by interested parties, (iv) those parties conducting due diligence, and (v) submission of bids.  Absent a further extension of time, that process is not feasible in fourteen (14) days, particularly where only nine of those days are business days (sandwiched around a holiday weekend).

The Committee appreciates the need for an expedited sale process that minimizes expenses, but the proposed break-neck pace sought by the Debtors and DIP Lender is simply too aggressive, and they would eviscerate any meaningful opportunity for the Committee to find alternative purchasers who could provide greater value to the estates.

Further, the DIP Lender, who bought the senior secured debt less than a week before the Petition Date, will through an affiliate, Loot Crate Acquisition LLC ("LCA") submit a credit bid for the Debtors' assets (Bid Procedures C), however as of August 27, 2019, the Committee had

5

not seen any bid by the DIP Lender or LCA. Accordingly, this Court cannot determine that approving LCA as a Qualified Bidder is a sound exercise of the Debtors' business judgment.

The Bid Procedures are so lopsided that they would chill bidding. Solely by way of example, as noted above, LCA would be deemed a Qualified Bidder (Bid Procedures ¶ C), but it will not be a Back-Up Bidder unless it consents. At the same time, the DIP Lender is also a Consultation Party, which, in turn, creates a myriad of other issues: Consultation Parties are entitled to provide input into the following: whether a potential bidder is a Qualified Bidder in the first instance (Bid Procedures ¶ A); the Debtors would be required to disseminate all Qualified Bids to the DIP Lender immediately upon receipt by the Debtors (Bid Procedures ¶ B); limiting due diligence to other Qualified Bidders (Bid Procedures ¶ D); the conduct and timing of the Auction (Proposed Bid Procedures Order, ¶10, Bid Procedures ¶ E); evaluation of Qualified Bids and the Successful Bid and the Back-Up Bid at the conclusion of the Auction (Bid Procedures ¶¶ B, F, H); the selection of the Successful Bidder (Bid Procedures ¶ F); determining whether to allow a Stalking Horse Agreement and Bid Protections (Proposed Bid Procedures Order, ¶19, Bid Procedures ¶¶ F, J); and modification of the bid procedures (Proposed Bid Procedures Order, ¶19, Bid Procedures ¶ L). Of course, that begs the question: if the Debtors have so thoroughly exhausted the marketing of their assets, why does the DIP Lender and LCA need such lopsided advantages, both in its terms and process. . . ?

Ultimately, neither the DIP Motion nor the Bid Procedures Motion should be approved as sought.  Both need to be extended for a reasonable period of time, but taken together, the DIP Motion and the Bid Procedures Motion would permit the DIP Lender will have succeeded in having stripped the estates bare, leaving nothing to pay prepetition administrative expenses and nothing for the Debtors or a trustee to wind down the estates.

If the DIP Lender wants the benefits of purchasing the Debtors' assets free and clear of all claims liens and encumbrances, there needs to be a full and fair process by which, at a bare minimum, includes a reasonable sale process, after which all administrative expenses are paid in full. Taken together, the DIP Motion and the Bid Procedures Motion fall far short of that minimal standard.

## **BACKGROUND**

1.      The Debtors estimate that approximately $31,622,057 in principal and interest were outstanding under the a certain credit facility (the "Prepetition Credit Facility") as of the Petition Date, and the Debtors estimate that an additional amount of not less than $10,000,000 would also be due as a required Make Whole Amount under the Prepetition Credit Facility. Additionally, the Debtors have stated that they are obligated on account of a Subordinated Convertible Promissory Note in the amount of $2.5 million (the "Prepetition Second Liens"), for which the Debtors may owe as much as $4.4 million. On August 9, 2019, Money Chest, LLC (the "DIP Lender") purchased the claims and respective rights under the Prepetition Credit Facility and the Prepetition Second Liens.

2.      Just two days later, on August 11, 2019 (the "Petition Date"), the Debtors each filed voluntary bankruptcy petitions.

3.      As set forth in the Declaration of Stuart Kaufman in support of the First Day Motions [Docket No. 4], as of the Petition Date, the Debtors were obligated to their trade creditors for more than $30 million, and they owed sales taxes of more than $5.87 million. Additionally, the Debtors have stated that they owe another party, Clear Finance Technology Corporation d/b/a Clearbanc ("Clearbanc") $2.2 million, however the Debtors do not believe that the obligation to Clearbanc is secured. Finally, as of the Petition Date, the Debtors' had over $20

million in customer orders for which the Debtors received payment, but for which the Debtors had not shipped goods.

4.      Additionally, the Debtors estimate that there are approximately $1,062,700 of prepetition administrative expenses pursuant to Section 503(b)(9) of the Bankruptcy Code.

### A.      The DIP Motion

5.      On the Petition Date, the Debtors filed the DIP Motion, by and through which the Debtors seek authority to borrow a total of $10,000,000.  In exchange for the loan, DIP Lender will receive a first priority lien (other than with respect to the Permitted Priority Liens, the Carve-Out, and the Other Statutory Liabilities) on substantially all of the estates' assets, whether or not previously encumbered, including all commercial tort claims, proceeds of any of the estates' director's and officer's insurance policies, and proceeds from all of the estates' claims and causes of action including avoidance actions.

6.      Further, the DIP Lender will also receive a superpriority administrative expense pursuant to Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens, the Carve-Out, and the Other Statutory Liabilities.

7.      The terms of the DIP Agreement also, among other things, includes milestones for an abbreviated sale process culminating in approval of a sale no more than forty (40) days after the Petition Date.[5]  The estates would be liable to pay interest of 7% per annum interest accruing from and the Closing Date.  Additionally, the Debtors would be responsible for payment of an amount equal to 1.5% of the Commitments to the Lenders on the Closing Date.  Taken together,

---

[5]      Under the DIP Agreement, the Maturity Date could be fewer than twenty-five days after the Petition Date.

the estates would bear costs of interest and fees totaling more than $225,000, which is equal to an annualized rate of return of approximately 23% if the DIP facility remains outstanding for its scheduled 40 day term so that the DIP Lender can preserve and maximize the value of its own collateral.

8.      Further, the DIP Lender will also receive a superpriority administrative expense pursuant to Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens, the Carve-Out, and the Other Statutory Liabilities (the "Superpriority Claims").

9.      The DIP Motion and DIP Agreement also require that the estates waive their right to surcharge the DIP Lenders, any of the Prepetition Lender or their agents or subsidiaries or their collateral pursuant to Sections 105(a), 506(c) or 552(b) of the Bankruptcy Code.  Further, the Debtors are required to waive the estates' rights under the doctrine of marshalling.

10.      By the DIP Motion, the Debtors seek a deadline for the Challenge Period of seventy-five dates following entry of the Interim Order.  The seventy-fifth day is August 28, 2019, just one day after the deadline to close the sale under the Budget.  The DIP Motion would also require the Committee to seek derivative standing to bring an action against the Lenders, and declaring a default if any such action is commenced and not withdrawn within ten business days.  Relatedly, although the Debtors seeking authority to borrow up to $10 million, they are required to escrow $500,000 into an account of the DIP Lender until after the Challenge Period, and such amounts shall not be subject to the Carve-Out.

11.      Finally, as set forth in the Budget, the Debtors' professionals are budgeted to

9

receive fees and expenses totaling almost $2 million.  Under the Budget, the Agents and Lenders are to receive up to $667,777 for their fees and expenses for the eleven-week period through the sale closing.[6]  The budget for Committee's professionals is $250,000 for the same eleven-week period.

### B.    The Bid Procedures Motion

12.    On the Petition Date, the Debtors also filed the Bid Procedures Motion, by and through which they seek the sale of substantially all of the Debtors' assets, with bids due no later than September 10, 2019, and the sale to be approved no later than September 20, 2019.  Under the Budget attached to the Interim DIP Order (as defined herein), the sale is close no later than October 27, 2019.

13.    By the Bid Procedures Motion, the Debtors seek approval of a sale process that would require bids no later than September 10, 2019, which is just thirty (30) days after the Petition Date and only nineteen (19) days after the appointment of the Committee. Of those nineteen days, only twelve are business days (the balance includes three weekends and a federal holiday).  Under the Milestones set forth in the DIP, the hearing to approve the sale would be required to be held no later than September 16, 2019 or as soon thereafter as the Court is available. Further, under the Budget attached to the DIP Motion, the sale is to close no later than October 27, 2019.

14.    Further, the DIP Lender, who bought the senior secured debt less than a week before the Petition Date, will (through an affiliate) submit a credit bid for the Debtors' assets (Bid Procedures C), however as of August 27, 2019, the Committee had not seen any bid by the DIP Lender's affiliate.

---

[6]    It is unclear how much (if any) of that amount is related to the bid to be submitted by LCA.

11128189/3

15.     The Bid Procedures would also allow LCA, an affiliate of the DIP Lender to be deemed a Qualified Bidder (Bid Procedures ¶ C), but LCA will not be a Back-Up Bidder unless it consents. At the same time, the DIP Lender is also a Consultation Party, which, in turn, creates a myriad of other issues: Consultation Parties are entitled to provide input into the following: whether a potential bidder is a Qualified Bidder in the first instance (Bid Procedures ¶ A); the Debtors would be required to disseminate all Qualified Bids to the DIP Lender immediately upon receipt by the Debtors (Bid Procedures ¶ B); limiting due diligence to other Qualified Bidders (Bid Procedures ¶ D); the conduct and timing of the Auction (Proposed Bid Procedures Order, ¶10, Bid Procedures ¶ E); evaluation of Qualified Bids and the Successful Bid and the Back-Up Bid at the conclusion of the Auction (Bid Procedures ¶¶ B, F, H); the selection of the Successful Bidder (Bid Procedures ¶ F); determining whether to allow a Stalking Horse Agreement and Bid Protections (Proposed Bid Procedures Order, ¶19, Bid Procedures ¶¶ F, J); and modification of the bid procedures (Proposed Bid Procedures Order, ¶19, Bid Procedures ¶ L).

16.     On August 22, 2019, the Office of the United States Trustee appointed the Committee.[7]

17.     Almost immediately after the appointment of the Committee and the retention of its professionals, the Committee began to engage with the Debtors and the DIP Lender, including requesting a list of the potentially interested purchasers contacted by the Debtors.  On August 27, 2019, the Committee's professionals received a copy of the list of the parties who the Debtors contacted tor marketing their assets.  Having now had the opportunity to review those parties, the Committee respectfully believes that there could be significant improvements in the potential

---

[7]     The Committee members are (i) Something Inked, (ii) Worldpay, LLC, (iii) R.R. Donnelley, (iv) K&S Specialty Products, (v) Just Funky, LLC, (vi) Major League Baseball Properties, Inc., and (vi) Brian Laibow.

audience for the Debtors' assets, and with a more reasonable amount of time than would otherwise be permitted by the DIP Motion and Bid Procedures Motion, it is possible to locate other potentially interested parties.

**BASIS FOR OBJECTION**

A.      **The Sale Process and the Budget Should Be Extended.**

18.      Seemingly, every bankruptcy case faces some tension between conducting a comprehensive sale process to maximize the value of the debtor's estate and an abbreviated process minimizing postpetition administrative expenses.  The proposed break-neck pace sought by the Debtors and DIP Lender in this case is simply too aggressive, and would eviscerate any meaningful opportunity for the Committee to try to find alternative purchasers who could provide greater value to the estates.

19.      The Debtors are seeking a process that would require bids just seventeen (17) days after the appointment of the Committee.  Of those seventeen days, only nine are business days (the balance includes three weekends and a federal holiday). More critically, the Committee's advisors received a list of those parties from whom the Debtors solicited interest on the afternoon of August 27, 2019.  That allows only fourteen (14) days for the following:  (i) the Committee to confer with the Debtors' professionals, (ii) solicitation of those other potentially interested parties, (iii) those interested parties to execute and return nondisclosure agreements, (iv) have those parties conduct due diligence, and (v) submit a bid.  Absent a further extension of time, that process is not feasible.  The timing required by the DIP Agreement and Bid Procedures Motion need to be adjusted to allow for a reasonable period of time if LCA is to receive the protections it seeks under Section 363 as a good faith purchaser at arms-length.

**B.      The Postpetition Liens, Adequate Protection, and Superpriority Claims Sought by the DIP Motion Should Not Extend to Previously Unencumbered Assets.**

20.      At this nascent juncture, the Committee has not yet had an opportunity to investigate which assets, if any, remain unencumbered, but the Debtors seek to permit the DIP Lenders to have first priority lien (other than with respect to the Permitted Priority Liens, the Carve-Out, and the Other Statutory Liabilities) on substantially all of the estates' assets including all commercial tort claims, proceeds of any of the estates' director's and officer's insurance policies, and proceeds from all of the estates' claims and causes of action including avoidance actions.  Further, the DIP Lender will also receive the Superpriority Claim, which may otherwise effectively eliminate any source of recovery for unsecured prepetition claims.  The Debtors' commercial tort claims, proceeds of any of the estates' director's and officer's insurance policies, and proceeds from all of the estates' claims and causes of action, including avoidance actions may be the only source for such recovery.

21.      The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy." In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987). Adequate protection is, therefore, a protection for the creditor to assure its collateral is not depreciating or diminishing in value and is made on a case-by-case basis. Id. at 1397; see also United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370 (1988) (finding that an "interest is not adequately protected if the security is depreciating during the term of the stay"). For these reasons, the secured creditor "must, therefore, prove this decline in value -- or the threat of a decline – in order to establish a prima facie case." In re Gunnison Ctr. Apts., LP, 320 B.R. 391, 396 (Bankr. D. Colo. 2005); Save Power Ltd v. Pursuit Athletic Footwear (In re Pursuit Athletic Footwear), 193 B.R. 713, 718 (Bankr. D. Del. 1996) ("[The

13

secured creditor] has the initial burden in proving a prima facie case of cause, which if proved, must be rebutted by [the debtor] if the stay is not to be lifted."); In re Elmira Litho, Inc., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

22.     Secured creditors are only entitled to adequate protection to the extent of the anticipated or actual decrease in value of the secured collateral during the bankruptcy case. See In re First South Savings Assoc., 820 F.2d 700, 710 (5th Cir. 1987); In re Gallegos Research Group, Corp., 193 B.R. 577, 584 (Bankr. D. Col. 1995). A corollary to that rule is that "the adequate protection provided must not substantially exceed that to which the secured creditor is entitled." In re Blehm Land & Castle Co., 859 F.2d 137 (10th Cir. 1988). Finally, in determining the need for adequate protection, "[t]he primary, and often determinative factor, is the existence of an adequate equity cushion." In re Carson, 34 B.R. 502, 506 (Bankr. D. Kan. 1983).

23.     It is well-settled that adequate protection is not to be granted absent a showing of diminution in value. In re Continental Airlines, Inc., 146 B.R. 536, 539 (D. Del. 1992) ("Post-Timbers courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.") (citing United States Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 382, (1988)); In re Saypol, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence vel non of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection."). The Debtors not offered any proof of the declining collateral value, and they are seeking to sell the Prepetition Lender's collateral pursuant to an abbreviated timeline that they and the DIP Lender agreed upon, and unsecured creditors' expense. As such, there is no need to include previously unencumbered assets other than to remove any possibility of recovery for unsecured creditors from the Debtors' proposed sale process.

14

24.     Moreover, even if the Prepetition Secured Parties could provide evidence of a minimal amount of diminution in value of their collateral as a result of priming by the proposed DIP Facility, the Prepetition Secured Parties are nevertheless adequately protected by a sale process that will sell the Debtors' assets in a quick timeframe.  Accordingly, any DIP and Adequate Protection Liens as well as the Superpriority Claims should not include previously unencumbered assets.

25.     As of the Petition Date, there was a possibility that there was adequate assets for unsecured creditors, however, if the Debtors are permitted to encumber the remaining assets, including commercial tort claims, proceeds of any of the estates' director's and officer's insurance policies, and proceeds from all of the estates' claims and causes of action including avoidance actions, it is likely that the Debtors and the DIP Lender will have succeeded in obtaining court approval of a process by which prepetition unsecured creditors will receive nothing.  Absent the approval of such liens and the Superpriority Claims, LCA could still obtain such rights through the sale, subject to an allocation of the purchase price.

**C.     The Debtors Should Not be Permitted to Waive The Estates' Rights under Sections 506(c) and 552(b) of the Bankruptcy Code, or the Doctrine of Marshaling.**

26.     By the DIP Motion, the Debtors' agreement to waive the estates' rights to surcharge the DIP Secured Parties and the Prepetition Secured Parties for expenses associated with the preservation and disposition of the collateral pursuant to sections 105(a), 506(c), and 552(b) of the Bankruptcy Code.  Such expenses would  include all costs that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." Brookfield Prod. Credit Ass'n v. Borron, 738 F.2d 951, 952 (8th Cir. 1984) (citations omitted).

27.     Immunizing agreements which prohibit surcharge payment obligations under section 506(c) of the Bankruptcy Code have been found unenforceable on the basis that such provisions "operate as a windfall to the secured creditor at the expense of administrative claimants." In re Lockwood Corp., 223 B.R. 170 (8th Cir. BAP 1998). In addition, the Supreme Court decision in Harford Underwriters Ins. v. Union Planters Bank N.A. (In re Hen House Interstate Inc.), 530 U.S. 1 (2000), makes clear that such waivers, since they are binding upon all parties in interest, should never be lightly granted, nor may the management of a debtor in possession concede this issue for any but compelling reasons. See Hen House, 530 U.S. at 12 (noting that a debtor's decision to waive section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").  The Debtors should not be permitted to waive the estates' rights under Sections 105(a), 506(c) and 552, particularly where, as here, the sale process is designed solely to benefit the DIP Lender.

28.     Similarly, the Court should not require any waiver of the doctrine of marshaling or any similar equitable doctrine. "[Marshalling] requires the senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit." In re Advanced Marketing Servs., Inc., 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007). Marshalling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." Meyer v. United States, 375 U.S. 233, 236 (1963).

29.     The Debtors have standing to assert marshalling rights pursuant to section 544(a) of the Bankruptcy Code. See, e.g., United States v. Houghton (In re Szwyd), 408 B.R. 547, 550 (D. Mass. 2009); Kittay v. Atl. Bank of N.Y. (In re Global Serv. Grp. LLC), 316 B.R. 451, 463

(Bankr. S.D.N.Y. 2004); Official Comm. of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.), 269 B.R. 560, 573-74 (Bankr. D. Del. 2001); In re America's Hobby Ctr., Inc., 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("Because a debtor in possession has all the rights and powers of a trustee, 11 U.S.C. § 1107(a), under the Tampa Chain rationale, standing in the shoes of the debtor in possession, the Committee can assert this [marshaling] claim.").

**D.**     **The DIP Budget Should Adequately Provide for Committee's Professional Fees and for Committee Expenses.**

30.     The Budget provides that the Debtors' professionals may receive fees and expenses totaling almost $2 million, and the fees and expenses for the Agents' and Lenders' professionals may be as much as $667,777.   For the same eleven week period, the amount budgeted for the Committee's professionals is $250,000 (which is equal to one eighth of the amount of the Debtors' professionals, and less than forty percent of the Lenders' professionals).

31.     The Committee is not arguing that it needs a budget as large as the Debtors' or the Lenders' professionals, but the Budget needs to provides reasonable funding for the administration of these cases so the Committee can fulfill its statutory duties.   The current budget does not; and the budget for the Committee's professionals should be increased reasonably, particularly since these cases are proceeding on an expedited pace at the DIP Lenders' direction.

32.     Similarly, the Committee members' expenses must be compensable pursuant to 11 U.S.C. § 503(b)(3)(F).

**E.**     **The Challenge Period Set Forth in the DIP Agreement Should Be Extended Until After the Sale Closes, and the Committee Should Not Be Required to Obtain Derivative Standing.**

33.     By the DIP Motion, the Debtors seek a deadline for the Challenge Period of seventy-five dates following entry of the Interim Order.   The seventy-fifth day is August 28, 2019, just one day after the deadline for the deadline to close the sale under the Budget.   Given

17

that the focus of these cases is to achieve an expedited sale process, the Committee respectfully submits that the Challenge Period should be extended until at least two weeks beyond the closing date of the sale.

34.     The DIP Motion also seeks the unnecessary requirement that the Committee to seek derivative standing to bring an action against the Lenders.   Such a requirement is a substantively unnecessary hurdle.   The Debtors have, by the DIP Motion, already conceded the validity and priority of the Prepetition Liens purchased by the DIP Lender on the eve of bankruptcy.   They are therefore estopped from bringing an action on behalf of the estates. Accordingly, if an action is to be brought, it will almost certainly be brought by the Committee. The requirement for the Committee to seek derivative standing is a waste of time and a waste of resources – both of the estates and this Court - and the Court should require that the requirement that the Committee first obtain derivative standing be removed.

**F.     The Court Cannot Approve the Bid Procedures Until LCA Makes a Bid.**

35.     By the Bid Procedures, the DIP Lender's affiliate, LCA is deemed to be a bidder submit a credit bid for the Debtors' assets (Bid Procedures C), however as of this filing, the Committee has not seen any bid by the DIP Lender's affiliate.   In fairness to the Debtors and the DIP Lender, these cases are proceeding expeditiously, and that has almost certainly affected the parties' ability to reach agreement on an acceptable bid.   The Committee has every expectation that the parties will reach an agreement and consult with the Committee once they have.   Thus far, however, they have not.

36.     It is axiomatic that the sale of the Debtors assets and the process for that sale must be the product of the sound exercise of the Debtors' business judgment, subject to bankruptcy court approval.   Thus far, however, because there is no bid to be considered, the Court cannot

determine that approving the Bid Procedures that would allow LCA as a Qualified Bidder is a sound exercise of the Debtors' business judgment.

> **G.    The DIP Lender/LCA Need to Decide Whether They Want to Be a Consultation Party or a Bidder, and LCA Must Be a Back-Up Bidder.**

37.    As currently constructed, the Bid Procedures are so lopsided that – if there was time to find other potentially interested parties – the Bid Procedures would chill bidding.  For example, DIP Lender (or its affiliate) is deemed a Qualified Bidder (Bid Procedures ¶ C), but it will not be a Back-Up Bidder unless it consents.

38.    At the same time, the DIP Lender is also a Consultation Party, which, in turn, creates a myriad of other issues: Consultation Parties are entitled to provide input into the following: whether a potential bidder is a Qualified Bidder in the first instance (Bid Procedures ¶ A); the Debtors would be required to disseminate all Qualified Bids to the DIP Lender immediately upon receipt by the Debtors (Bid Procedures ¶ B); limiting due diligence to other Qualified Bidders (Bid Procedures ¶ D); the conduct and timing of the Auction (Proposed Bid Procedures Order, ¶10, Bid Procedures ¶ E); evaluation of Qualified Bids and the Successful Bid and the Back-Up Bid at the conclusion of the Auction (Bid Procedures ¶¶ B, F, H); the selection of the Successful Bidder (Bid Procedures ¶ F); determining whether to allow a Stalking Horse Agreement and Bid Protections (Proposed Bid Procedures Order, ¶19, Bid Procedures ¶¶ F, J); and modification of the bid procedures (Proposed Bid Procedures Order, ¶19, Bid Procedures ¶ L).

39.    The Bid Procedures, as currently sought, would chill bidding because it provides LCA with too much of an advantages over other potential bidders.  Accordingly, Bid Procedures need to be revised so that the DIP Lender/LCA cannot serve as both a Consultation Party and a bidder.  Further, LCA must also be a Back-Up Bidder.

## **RESERVATION OF RIGHTS**

40.     The Committee reserves the right to raise additional issues with the proposed DIP

Facility and the Bid Procedures at any time prior to or at the hearing to consider the motions.

WHEREFORE, the Committee seeks (i) entry of an Order denying the DIP Motion,

subject to modifications as set forth herein, (ii) entry of an Order denying the Bid Procedures

requested by the Bid Procedures Motion, including the timing for the sale process, subject to

modifications as set forth herein, and (iii) such other and further relief as is just and appropriate.

Dated: August 28, 2019

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
E-mail:  jwaxman@morrisjames.com
E-mail:  emonzo@morrisjames.com
E-mail:  bkeilson@morrisjames.com

*Proposed Counsel for the Official Committee of*
*Unsecured Creditors*

11128189/3