**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Loot Crate, Inc., *et al.*,[1] | ) | Case No. 19-11791 (BLS) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | Related Docket Nos. 27, 141, 238 |

**ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

Upon the motion (the "Motion")[2] [Docket No. 27], dated August 12, 2019, of Loot Crate, Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (each, a "Debtor" and, collectively, the "Debtors") seeking, *inter alia*, entry of an order (this "Order") (A) approving the sale of the Debtors' assets free and clear of all claims, liens, liabilities, interests, and encumbrances pursuant to (i) that certain Asset Purchase Agreement attached hereto as Exhibit A (the "Asset Purchase Agreement" or the "Stalking Horse Agreement") by and among the Debtors and Loot Crate Acquisition LLC (the "Purchaser" or the "Stalking Horse"), as the designee for the credit bid submitted by Money Chest LLC, the Debtors' prepetition first lien lender and DIP Lender, and (ii) sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Loot Crate, Inc. (7119); Loot Crate Holdings, Inc.; LC Funding, Inc.; and Loot Crate Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Avenue, Los Angeles, CA 90031.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Asset Purchase Agreement, as applicable.

States Bankruptcy Court for the District of Delaware (the "Local Rules"); (B) approving the assumption and assignment of certain Executory Contracts; and (C) granting certain related relief; and the Debtors having determined that the highest and otherwise best offer for the Sale of the Debtors' assets was made by the Stalking Horse in the form of the Stalking Horse Agreement; and the Debtors having received no other bids prior to the deadlines ordered by this Court in the Bid Procedures Order (as defined herein); and the Court having held a hearing on September 26, 2019 (the "Sale Hearing") to approve the Motion and the consummation of the transactions contemplated therein and by the Asset Purchase Agreement (including, without limitation, its related documents, exhibits, and schedules); and the Court having reviewed and considered (i) the Motion, (ii) the objections thereto, if any, (iii) the arguments of counsel made and the evidence proffered or adduced at the Sale Hearing, and (iv) the record of these Cases; and the Court finding that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and after due deliberation thereon; and good cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.      **Jurisdiction and Venue**.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(a).  Venue of these Cases and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.  The Court may enter a final order with respect to the Motion, the Sale, the transactions contemplated thereby, and all related relief, in each case, consistent with Article III of the United States Constitution.

601115596.14

B.      **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion and granted by this Order are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1.

C.      **Petition Date**.  On August 11, 2019 for Loot Crate Inc., Loot Crate Holdings, Inc., and LC Funding, Inc., and on August 12, 2019 for Loot Crate Parent, Inc. (for each Debtor, the "Petition Date"), the Debtors filed voluntary petitions with this Court under the Bankruptcy Code.

D.      **Entry of Bid Procedures Order**.  On September 11, 2019, this Court entered an order (the "Bid Procedures Order") [Docket No. 147], *inter alia*, (i) approving bid procedures (the "Bid Procedures") for the sale of substantially all of the Debtors' assets, (ii) approving related contract assumption and assignment procedures, (iii) authorizing the Debtors to enter into the Stalking Horse Agreement and approving certain bid protections with respect thereto, (iv) scheduling an auction (the "Auction") and sale hearing for the Sale of the Debtors' assets, (v) permitting credit bidding pursuant to section 363(k) of the Bankruptcy Code for the Stalking Horse, (vi) establishing procedures for noticing and determining cure amounts (the "Cure Amounts"), and (vii) granting certain related relief.

E.      **Compliance with Bid Procedures Order**.  As demonstrated by the (i) testimony and other evidence proffered or adduced at the Sale Hearing, (ii) representations made in the Motion and on the record at the Sale Hearing and the hearing to approve the Bid Procedures Order, and (iii) record in these Cases, the Debtors have marketed their assets and conducted the sale process in compliance with the Bid Procedures Order.  The Debtors and their professionals have actively and sufficiently marketed their assets, both prior to and after the Petition Date, and have afforded all potential purchasers a full, fair, and reasonable opportunity to perform due

3

diligence on the Debtors and their assets and make higher and better offers than the Asset Purchase Agreement.

F.      **Notice**.  As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel made at the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the Bid Deadline, the Auction, the Sale Hearing, the Sale, and the assumption and assignment procedures for the Executory Contracts (including the objection deadline with respect to any Cure Amount and the ability of the Purchaser to provide adequate assurance of future performance) has been provided in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and in compliance with the Bid Procedures Order, (ii) such notice was sufficient and appropriate under the particular circumstances,  and (iii) no other or further notice of the Motion, the Bid Deadline, the Auction, the Sale Hearing, the Sale, or the potential assumption and assignment of the Executory Contracts or the Cure Amounts was necessary under the particular circumstances.

G.      **Corporate Authority**.  Subject to entry of this Order, each of the Debtors (i) has full corporate power and authority to execute, deliver, and perform all obligations under the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Purchased Assets to the Purchaser has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (iii) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby, and

601115596.14

(iv) no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtors to consummate such transactions.

H.    **Opportunity to Object**.  A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) the United States Trustee for the District of Delaware, (ii) the creditors listed on the Debtors' creditor matrix, (iii) the Committee, (iv) any parties asserting a security interest in the Purchased Assets, including holders of Claims and Interests (as defined below) in the Purchased Assets to the extent reasonably known to the Debtors, (v) applicable federal, state, county, international, and city tax and regulatory authorities, (vi) each counterparty to the Debtors' executory contracts and unexpired leases, (vii) the Securities and Exchange Commission; (viii) the Office of the United States Attorney for the District of Delaware; (ix) Delaware State Treasury, (x) the Secretary of State of Delaware, and (xi) all parties requesting notice pursuant to Bankruptcy Rule 2002.

I.    **Sale in Best Interest**.  Consummation of the Sale at this time is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

J.    **Business Justification**.  Sound business reasons exist for the Sale.  Entry into the Asset Purchase Agreement constitutes the exercise of sound business judgment by each of the Debtors.  The Court finds that each Debtor has articulated good and sufficient business reasons justifying the Sale.  Such business reasons include, but are not limited to, the following: (i) the Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets, (ii) the Asset Purchase Agreement and the closing thereof presents the best opportunity to realize the value of the Purchased Assets and avoid decline and devaluation of the Purchased Assets, and

601115596.14

(iii) the Asset Purchase Agreement and closing thereof will provide the highest recovery for the Debtors, their respective estates, and other parties in interest.

K. **Arm's-Length Sale**. The Asset Purchase Agreement was negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code or any other remedy for rescission or avoidance under law or equity.

L. **Good Faith Purchaser**. The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law. The Purchaser has been and will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Asset Purchase Agreement.

M. **Consideration**. The consideration provided by the Purchaser for the Purchased Assets pursuant to the Asset Purchase Agreement, including the Credit Bid Amount (as defined herein), (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable non-bankruptcy law.

N. **Assumption of Assumed Contracts**. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts is in the best interests of the Debtors, their estates, and their creditors.

601115596.14

The Assumed Contracts are an integral part of the Purchased Assets being purchased by the Purchaser, and, accordingly, such assumption and assignment of the Assumed Contracts to the Purchaser is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.   Except as expressly assumed by the Purchaser under the Asset Purchase Agreement, the transfer of the Purchased Assets to the Purchaser and the assignment to the Purchaser of the Assumed Contracts will not subject the Purchaser to any liability whatsoever which may become due or owing under the Assumed Contracts prior to the Closing Date (other than the Cure Amounts), or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities (as defined herein).

O.      **Cure/Adequate Assurance**.  The Debtors or the Purchaser, in accordance with the Asset Purchase Agreement, has (i) cured, or has provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Purchaser has provided adequate assurance of future performance under the Assumed Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

P.      **Prompt Consummation**. The Sale of the Purchased Assets must be approved and consummated promptly in order to preserve the value of the Purchased Assets.   Therefore, time

601115596.14

is of the essence in consummating the Sale, and the Debtors and the Purchaser intend to close the Sale as soon as possible.

Q.    **No Intentional Fraudulent Transfer**.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or applicable non-bankruptcy law.

R.    **No Merger; Purchaser Not an Insider; No Successor Liability**.  The Purchaser is not holding itself out to the public as a successor to or a continuation of the Debtors or their estates.  The Purchaser is not and shall not be, considered a successor in interest to any of the Debtors or their estates, by reason of any theory of law or equity, and the Sale does not amount to a consolidation, succession, merger, or *de facto* merger of the Purchaser and the Debtors.  At all times prior to the Closing Date, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and the Purchaser.  The transfer of the Purchased Assets to the Purchaser, and the assumption of the Assumed Liabilities, except as otherwise explicitly set forth in the Asset Purchase Agreement or this Order, does not, and will not, subject the Purchaser to any liability whatsoever, with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing Date or by reason of such transfer, including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of liability, including successor, vicarious, antitrust, environmental, fraudulent transfer or avoidance, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or benefits, *de facto* merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere

continuation, product line, or products liability or law, bulk sales or similar laws, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or other theory of liability whatsoever, whether legal, equitable, or otherwise (collectively, the "Successor or Other Liabilities"). Pursuant to the Asset Purchase Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and thus shall have no liability for the Excluded Liabilities.

S.    **Valid Successful Bid**. Pursuant to the Asset Purchase Agreement and sections 363(b) and 363(k) of the Bankruptcy Code, the Purchaser, in addition to the other consideration offered under the Asset Purchase Agreement, timely submitted a bid (the "Successful Bid") consisting of a $30,000,000 credit bid (the "Credit Bid Amount") of (i) all DIP Obligations (as defined in the DIP Order) outstanding as of the Closing Date, and (ii) a portion of the Prepetition Secured Obligations (as defined in the DIP Order) equal to $30,000,000 less the DIP Obligations as of Closing. The Court finds and determines that:

    a.    The Prepetition Credit Documents and the DIP Documents (each as defined in the DIP Order) authorize the Purchaser's submission of the Successful Bid, including the Credit Bid Amount, on behalf of the Prepetition Secured Parties and the DIP Lenders (each as defined in the DIP Order);

    b.    The Successful Bid was a valid and proper offer pursuant to the Asset Purchase Agreement and a Qualified Bid and in compliance with the Bid Procedures Order;

    c.    There is no cause to limit the Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code;

    d.    In accordance with section 363(k) of the Bankruptcy Code and the Bid Procedures Order, the Debtors valued each dollar of the Credit Bid Amount as equivalent to one dollar of cash, and such valuation was appropriate and represents a reasonable exercise of the Debtors' business judgment;

      e.   No party served with any papers, pleadings, notices, or other items pertaining to the Motion or the Sale has raised any objection to the Credit Bid Amount as a valid, dollar-for-dollar bid of senior secured, perfected, and unavoidable indebtedness as currency for the Sale; and

      f.   Subject to the occurrence of the Closing Date, the Successful Bid is binding on the DIP Lenders and the Prepetition Secured Parties.

T.    **Legal, Valid Transfer**.  The transfer of the Purchased Assets to the Purchaser will be a legal, valid, enforceable, and effective sale and transfer of the Purchased Assets and will vest the Purchaser with all legal, equitable, and beneficial right, title, and interest of the Debtors to the Purchased Assets free and clear of all Claims and Interests (as defined herein), other than the Assumed Liabilities, of any kind or nature whatsoever, including, without limitation, rights or claims that are Successor or Other Liabilities, or that are based on any Successor or Other Liabilities.

U.    **Compliance with Bankruptcy Code Provisions in Respect of the Sale of Personally Identifiable Information**.  Without limiting the foregoing, in accordance with section 332(a) of the Bankruptcy Code, the Court entered an order on September 19, 2019 [Docket No. 188] directing the appointment of a consumer privacy ombudsman (the "Ombudsman"), and the Ombudsman received due and proper notice of the Sale Hearing [Docket No. 189].  Based upon the Court's review of the Ombudsman's report (the "Ombudsman Report") [Docket No. 241] and the statements of the Ombudsman and counsel made at the Sale Hearing regarding the recommendations in the Ombudsman Report and the transfer of personally identifiable information pursuant to section 363(b)(1)(A) and (B) of the Bankruptcy Code, this Court finds that such personally identifiable information may be transferred as part of the Sale, based on the facts, circumstances, and conditions of the Asset Purchase Agreement and the Sale, and there was no showing that such transfer as part of the Sale violates applicable nonbankruptcy law.

V.    **Asset Purchase Agreement Not Modified**.    The terms of the Asset Purchase Agreement, including any exhibits, amendments, supplements, and modifications thereto, are fair and reasonable in all respects.

W.    **Not a *Sub Rosa* Plan**.    The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a plan of reorganization or liquidation for the Debtors.

X.    **Sale Free and Clear**.    The Debtors are the sole and lawful owners of the Purchased Assets, and no other Person has any ownership right, title, or interests therein. The Purchased Assets constitute property of the Debtors' estates and good title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Debtors have (except to the extent otherwise provided in the Asset Purchase Agreement) all right, title, and interest in the Purchased Assets. The transfer of the Purchased Assets to the Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of the Purchased Assets, which transfer vests or will vest the Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any and all (i) liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) or other encumbrances relating to, accruing, or arising any time prior to the Closing Date (collectively, the "Liens"), and (ii) all debts (as that term is defined in section 101(12) of the Bankruptcy Code) arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses,

deeds of trust, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, imperfections or restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, credits, allowances, options, limitations, action, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any shareholder or similar agreement or encumbrance, Liability, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these Cases, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (x) that purport to give to any party a right or option to effect a postpetition setoff against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase, or repurchase right or option, or termination of, any of the Debtors' or the Purchaser's interests in the Purchased Assets, or any similar rights, if any, or (y) in respect of taxes, restrictions, rights of first refusal, charges, or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (the items in this clause (ii), collectively, and together with any "claims" against the Debtors as defined section 101(5) of the Bankruptcy Code, the "Claims", and together with the Liens and other interests of any kind or nature whatsoever, the "Claims and Interests") relating to, accruing, or arising any time prior to the Closing Date) with the exception of the Assumed Liabilities or as provided in this Order.

Y.    **Section 363(f) Satisfied**.  The Debtors may sell the Purchased Assets free and clear of all Claims and Interests (other than the Assumed Liabilities or as provided in this Order) because, with respect to each creditor asserting any Claims and Interests against the Debtors or the Purchased Assets, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Claims and Interests who did not object or withdrew objections to the Sale are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Claims and Interests who did object fall within one or more of the other subsections of section 363(f) Bankruptcy Code.  The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the Sale of the Purchased Assets to the Purchaser, and the assumption and assignment of the Assumed Contracts to the Purchaser, were not free and clear of all Claims and Interests of any kind or nature whatsoever (except the Assumed Liabilities or as provided in this Order), or if the Purchaser would, or in the future could, be liable for any of such Claims and Interests (except the Assumed Liabilities or as provided in this Order).  The Purchaser will not consummate the transactions contemplated by the Asset Purchase Agreement unless the Court expressly orders that none of the Purchaser, its Affiliates, its present or contemplated directors, officers, members, managers, or shareholders, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, postpetition setoff, or otherwise, directly or indirectly, any Claims and Interests (other than, with respect solely to Purchaser, the Assumed Liabilities or as provided in this Order), including rights or claims based on any Successor or Other Liabilities.  The total consideration to be provided under the Asset Purchase Agreement, including the Credit Bid Amount and other consideration provided by the Purchaser to the

601115596.14

Debtors under the Asset Purchase Agreement, reflects the Purchaser's reliance on this Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Claims and Interests (other than the Assumed Liabilities or as provided in this Order) of any kind or nature whatsoever (including, without limitation, any potential Successor or Other Liabilities).

It is therefore **ORDERED, ADJUDGED, AND DECREED EFFECTIVE IMMEDIATELY THAT:**

**General Provisions**

1.      The Motion is GRANTED and APPROVED as set forth herein.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

**Approval of the Sale of the Purchased Assets to the Purchaser**

3.      The Asset Purchase Agreement, attached hereto as Exhibit A, including any exhibits, amendments, supplements, and modifications thereto, is hereby approved.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Sale of the Purchased Assets to the Purchaser free and clear of all Claims and Interests (other than the Assumed Liabilities or as provided in this Order), and the transactions contemplated thereby, are approved.

5.      Except as otherwise specifically provided in the Asset Purchase Agreement or this Order, to the greatest extent permitted under applicable law, the Purchaser shall not be liable for any Claims against the Debtors or any of their predecessors or Affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character

14

(including, without limitation, any Successor or Other Liabilities), whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of or Claims against the Debtors arising at any time, except for the Assumed Liabilities as set forth in the Asset Purchase Agreement or this Order.

6.      The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale shall not affect the validity of the Sale to the Purchaser.  The Purchaser is a purchaser in good faith of the Purchased Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

7.      As a good faith purchaser of the Purchased Assets, the Purchaser has not entered into an agreement with any other potential bidders for the Purchased Assets, and has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets, and therefore neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Purchaser, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

8.      The Successful Bid, as contemplated under the Asset Purchase Agreement, including the Credit Bid Amount, was and is a valid and proper bid under section 363(b) and 363(k) of the Bankruptcy Code and a Qualified Bid pursuant to the Bid Procedures Order.  Upon the Closing Date, the DIP Obligations and a portion of the Prepetition Secured Obligations shall be deemed satisfied in the Credit Bid Amount, and such obligations shall be deemed reduced by such amount, with any remainder thereof constituting an allowed claim with respect to the Prepetition Obligations in each of the Cases without further order of the Court.

The portion of the Purchase Price comprised of the Credit Bid Amount, the Assumed Liabilities, and the other amounts to be paid by the Purchaser under the Asset Purchase Agreement, constitutes consideration for the Purchased Assets.

**Sale and Transfer of Assets**

9.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are hereby authorized to sell the Purchased Assets to the Purchaser and consummate the Sale in accordance with the Asset Purchase Agreement and its related documents, exhibits, and schedules, and to transfer and assign all rights, title, and interests (including common law rights) to all property, licenses, and rights to be conveyed in accordance with the Asset Purchase Agreement.  The Debtors are further authorized to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including, without limitation, the related documents, exhibits, and schedules, and to take all further actions as may be reasonably requested by the Purchaser for the purposes of assigning, transferring, granting, conveying, and conferring to the Purchaser  or reducing the Purchased Assets to possession, as  may  be  necessary  or  appropriate  to  the performance of the Debtors' obligations under the Asset Purchase Agreement.

10.      On the Closing Date, this Order shall be construed as and shall constitute (i) a full and complete general assignment, conveyance, and transfer of the Purchased Assets, and (ii) a bill of sale transferring good and marketable title in such Assets to the Purchaser.  On the Closing Date, this Order shall also be construed as and shall constitute a complete and general assignment of all rights, title, and interests of the Debtors' rights in the Assumed Contracts to the Purchaser.

11.     All entities that are, on the Closing Date or thereafter, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date or upon any subsequent demand by Purchaser.

12.     Except as expressly permitted by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, and creditors holding Claims and Interests of any kind or nature whatsoever against or in the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated, now existing or hereinafter arising), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, or the transfer of the Purchased Assets to the Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting any such Claims and Interests against the Purchaser and its successors, assigns, or the Purchased Assets.

13.     On the Closing Date, the Debtors' creditors are authorized to execute such documents and take all other actions as may be necessary to release their Claims and Interests in the Purchased Assets.

14.     The transfer of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Purchased Assets, and shall vest the Purchaser with all rights, title, and interests of the Debtors in and to the Purchased Assets free and clear of all Claims and Interests of any kind or nature whatsoever, other than the Assumed Liabilities or as provided in this Order.

15.     To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and

governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing Date.

16.     To the extent section 525 of the Bankruptcy Code is applicable, no governmental unit may deny, revoke or suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of the Debtors' Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement, including the Sale and the assumption and assignment of the Assumed Contracts.

## Compliance With Consumer Privacy Requirements of Section 363(b)(1)(B)

16A.     The Debtors and the Purchaser have agreed to implement the recommendations of the Ombudsman contained in the Ombudsman Report and as set forth on the record at the Sale Hearing, in connection with the transfer of the personally identifiable information of the Debtors' customers to the Purchaser, and accordingly the transfer of such personally identifiable information as part of the Sale is authorized and approved.

## Assumption and Assignment of Assumed Contracts

17.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's payment of the Cure Amounts and assumption on the terms set forth in the Asset Purchase Agreement, of the Assumed Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto  are hereby deemed satisfied.

601115596.14

18.     Subject to paragraph 17 of this Order, the Debtors are hereby authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (i) assume and assign the Assumed Contracts to the Purchaser free and clear of all Claims and Interests of any kind or nature whatsoever (other than the Assumed Liabilities) and (ii) execute and deliver such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Purchaser.

19.     The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser upon assumption and assignment in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in section 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such assignment to the Purchaser, except as otherwise provided in the Asset Purchase Agreement and this Order.

20.     All amounts that must be paid and obligations that must be otherwise satisfied, if any, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Assumed Contracts, including costs to obtain any consents or cure any defaults thereunder that are required to be cured pursuant to the Bankruptcy Code to effect the assignment and obtain this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Purchaser upon assumption and assignment of the Assumed Contracts.

601115596.14

21.     Upon the Sale closing and payment of the applicable Cure Amount by the Purchaser, in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Assumed Contracts, and each such Assumed Contract shall be fully enforceable by the Purchaser in accordance with its respective terms and conditions, except as limited by this Order.  To the extent provided in the Asset Purchase Agreement, the Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

22.     If prior to or following the Closing Date it is discovered that a Contract was not on the Cure Notice (as defined in the Bid Procedures Order) (any such Contract, a "Sellers' Previously Omitted Contract") and Purchaser determines in its sole discretion to designate such Contract as an Assumed Contract, the Debtors shall, at the Purchaser's expense, serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Sellers' Previously Omitted Contract of the applicable Cure Amount and the Debtors' intention to assume and assign such Sellers' Previously Omitted Contract to Purchaser.  The Previously Omitted Contract Notice shall provide the counterparties to such Sellers' Previously Omitted Contract with ten (10) days to object, in writing to the Debtors and the Purchaser, to the Cure Amount or the assumption and assignment of its Contract.  If the Contract counterparties, the Debtors, and the Purchaser are unable to reach a consensual resolution with respect to such objection, the Debtors shall, at the Purchaser's expense, file all pleadings required to seek a timely hearing before the Court to determine the applicable Cure Amount (to the extent not previously determined) and obtain approval of the assumption and assignment of the Sellers' Previously Omitted Contract to the Purchaser.

23.     Following the Closing Date, the Purchaser may elect to add any additional Contract identified on the Cure Schedule to Schedule 2.1(a) to the Asset Purchase Agreement, so long as such Contracts were not (i) listed on Schedule 2.1(a) as of Closing, and (ii) previously rejected pursuant to an order of this Court (any such Contract, a "Purchaser Previously Omitted Contract"). If the Purchaser in its discretion designates a Purchaser Previously Omitted Contract as "Assumed," the Debtors shall amend Schedule 2.1(a) to the Asset Purchase Agreement and, at the Purchaser's expense, serve a notice (the "Additional Contract Assignment Notice") on the counterparties to such Purchaser Previously Omitted Contract of the Debtors' intention to assume and assign such Purchaser Previously Omitted Contract in accordance with the Asset Purchase Agreement. The Previously Omitted Contract Notice shall provide the counterparties to such Purchaser Previously Omitted Contract with ten (10) days to object, in writing to the Debtors and the Purchaser, to the assumption and assignment of its Contract. If the Contract counterparties, the Debtors, and the Purchaser are unable to reach a consensual resolution with respect to such objection, the Debtors shall, at the Purchaser's expense, file all pleadings required to seek a timely hearing before the Court to obtain approval of the assumption and assignment of the Purchaser Previously Omitted Contract to the Purchaser.

24.     Any party that may have had the right to consent to the assumption or assignment of an Assumed Contract, including (if applicable) the counterparty to each Assumed Contract, is deemed to have consented to such assumption and assignment for purposes of sections 365(c)(1)(B) and 365(e)(2)(A)(ii) of the Bankruptcy Code and any other applicable law if such party failed to object timely to the assumption or assignment of such Assumed Contract in accordance with the Bid Procedures Order, and the Purchaser shall enjoy all of the Debtors' rights and benefits under each such Assumed Contract as of the applicable date of assumption

without the necessity of obtaining such Contract counterparty's written consent to the assumption or assignment thereof. The Purchaser shall be deemed to have demonstrated adequate assurance of future performance with respect to such Assumed Contract pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

25.     To the extent a counterparty to an Assumed Contract failed to timely object to a Cure Amount (as defined in the Bid Procedures and Bid Procedures Order), such Cure Amount shall be deemed to be finally determined as set forth in the Cure Notice, and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount as set forth in the Cure Notice at any time, and such Cure Amount, when paid, shall completely cure the default(s) under any Assumed Contract to which it relates.

**No Successor Liability; Prohibition of Actions against Purchaser**

26.     The Purchaser is not a "successor" to, continuation of, or alter ego of, any of the Debtors or their estates by reason of any theory of law or equity. Except for the Assumed Liabilities or as provided in this Order, the Purchaser shall not have, assume, or be deemed to have or to assume, or in any way be responsible for, any liability or obligation of any of the Debtors or their estates, or any of the Debtors' predecessors or Affiliates with respect to the Purchased Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement or this Order, the Purchaser shall not be liable for any Claims and Interests against, or with respect to, the Debtors, their estates, or any of the Debtors' predecessors, or Affiliates, including but not limited to, any Successor or Other Liabilities. Neither the purchase of the Purchased Assets by the Purchaser nor the fact that the Purchaser is using any of the Purchased Assets previously operated by the Debtors will cause the Purchaser to be deemed a successor to, combination of, or alter ego of, in

22

any respect, any of the Debtors or the Debtors' businesses, or incur any liability derived therefrom within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, *de facto* merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, or transferee liability, fraudulent transfer or avoidance, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine, or any bulk sales or similar laws, with respect to the Debtors' liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes, arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtors or their Affiliates, or in any way relating to the operation of any of the Purchased Assets prior to the Closing Date.

27.     Except for the Assumed Liabilities, or as otherwise expressly provided for in this Order or the Asset Purchase Agreement, the Purchaser shall not have any liability, responsibility, or obligation for any Claims and Interests of the Debtors or their estates, including any claims, Liabilities, or other obligations arising under or related to any of the Purchased Assets which may become due or owing (i) prior to the Closing Date or (ii) from and after the

601115596.14

Closing Date but which arise out of relate to any act, omission, circumstances, breach, default, or other event occurring prior to the Closing Date.

28.      Except with respect to Assumed Liabilities, or as otherwise permitted by the Asset Purchase Agreement or this Order, all Persons, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, Contract counterparties, customers, landlords, licensors, employees, and other creditors and holders of Claims and Interests of any kind or nature whatsoever against or in any of the Debtors or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, known or unknown, liquidated or unliquidated, senior or subordinate, asserted or unasserted, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing Date, or the transfer of the Purchased Assets to the Purchaser (including without limitation any Successor or Other Liabilities or rights or claims based thereon) shall be, and hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, any of its Affiliates, or any of their respective officers, directors, members, managers, partners, principals, shareholders, professionals, or representatives, successors, assigns, or their respective assets or properties, including, without limitation, the Purchased Assets, the Claims and Interests of any kind or nature whatsoever such Person had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Purchased Assets, such Persons' Claims and Interests or any other interests in and to the Purchased Assets, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding, the

employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral, or other proceeding) against the Purchaser, any of its Affiliates, or any of their respective officers, directors, partners, principals, shareholders, professionals, or representatives, or any of the foregoing's successors, assigns, or their respective assets or properties, including the Purchased Assets; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, any of its Affiliates, or any of their respective officers, directors, partners, principals, shareholders, professionals, or representatives, or any of the foregoing's successors, assigns, or their respective assets or properties, including the Purchased Assets; (iii) creating, perfecting, or enforcing any Claims and Interests against the Purchaser, any of its Affiliates, or any of their respective officers, directors, partners, principals, shareholders, professionals, or representatives, or any of the foregoing's successors, assigns, or their respective assets or properties, including the Purchased Assets; (iv) asserting any postpetition setoff, or right of subrogation of any kind against any obligation due to the Purchaser, any of its Affiliates, or any of their respective officers, directors, partners, principals, shareholders, professionals, or representatives, or any of the foregoing's successors, assigns, or their respective assets or properties, including the Purchased Assets; (v) commencing or continuing any action, in any manner or place, that does not comply with or is inconsistent with the provisions of this Order, other orders of the Court, or the Asset Purchase Agreement or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating, or failing or refusing to transfer any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets in connection with the Sale.

29.    This Order (i) shall be effective as a determination that, as of the Closing Date, all Claims and Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date (other than the Assumed Liabilities or as provided in this Order) have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement. The Purchaser and the Debtors shall take such further steps and execute such further documents, assignments, and instruments as reasonably requested by the other party to implement and effectuate the transactions contemplated in this paragraph and in the Asset Purchase Agreement. All Claims and Interests (other than the Assumed Liabilities or as provided in this Order) existing as of the date of this Order shall be forthwith removed and stricken as against the Purchased Assets effective upon the Closing Date.

30.    If any person or entity that has filed statements or other documents or agreements evidencing Claims and Interests in any of the Purchased Assets does not deliver valid, duly-executed termination statements, instruments of satisfaction, releases of liens and

easements, and any other documents necessary for the purpose of documenting the release of all Claims and Interests (other than the Assumed Liabilities or as provided in this Order) to the Purchaser and the Debtors prior the Closing Date, the Debtors and/or the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to any of the Purchased Assets.

31.     Except as expressly set forth in the Asset Purchase Agreement or this Order, to the greatest extent permitted under applicable law, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Purchased Assets other than for the Assumed Liabilities or as provided in this Order.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement or this Order, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or Affiliates, and the Purchaser shall have no successor liabilities to the greatest extent permitted under applicable law of any kind or character whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the business prior to the Closing Date except as otherwise provided in the Asset Purchase Agreement or this Order, and all parties are hereby forever barred, estopped, and permanently enjoined from asserting any such claims against the Purchaser, its successors and assigns or against the Purchased Assets.

32.     Following the Closing Date, no holder of any such Lien, Claim, or other encumbrance in the Debtors shall interfere with the Purchaser's title to or use and enjoyment of

the Purchased Assets and the Assumed Contracts based on or related to such Lien, Claim, or other encumbrance, or any actions that the Debtors have taken, or may take, in these Cases.

**Resolution of Matters Raised by FUNKO, LLC**

33.    Notwithstanding any other language in the Asset Purchase Agreement or this Order, the Purchaser shall not be authorized to sell any "Gaming Treasures" box containing the POP! or stylized FUNKO marks on the outside of such box.  In addition, nothing in this Order shall preclude any claim on the part of Funko, LLC  ("Funko") for trademark infringement or any related claims against the Purchaser but such claims may only exist to the extent the Purchaser actually sells, after the Closing Date, any "Gaming Treasures" box containing the POP! or stylized FUNKO marks on the outside of such box; to the extent any claim by Funko for trademark infringement or related claims pertain to or arises from the Debtors' actions, the Sale shall be free and clear of such claims, and such claims cannot be asserted against the Purchaser.

**Resolution of PayPal Objection**

34.    PayPal, Inc.'s ("PayPal") response and limited objection to the Motion (the "PayPal Objection") [Docket No. 201] is resolved on the following terms, which terms are deemed an agreement of PayPal, the Debtors, the DIP Lenders, and the Purchaser as set forth on the record, and are made a part of this Order, and the provisions of this Paragraph 34 shall apply and control notwithstanding any other language in the Asset Purchase Agreement or this Order:

a.    PayPal consents to the Sale and the transfer of the Purchased Assets to the Purchaser free and clear of any liens, claims, or interests of PayPal, except as otherwise set forth herein.

b.    Between the Petition Date and September 23, 2019, (i) PayPal has paid over and released to the Debtors from one Account the sum of (y)

$383,297.45, consisting of postpetition payments processed for the Debtors by PayPal as of September 23, 2019, which amounts are net of actual transaction fees, chargebacks, reversals and refunds processed daily by PayPal in the ordinary course of business, plus (z) $17,185.57, the amount requested by the Debtors on or about September 4, 2019 consisting of the Debtors' estimated amount of sales taxes attributable to certain postpetition sales by the Debtors for which PayPal had fully withheld and not paid over the net proceeds of such sales from the Debtors; and (ii) the Debtors had available and withdrew the sum of $14,774.67 from another Account.

       c.      Prior to the Closing Date, the Debtors, the Purchaser, and the DIP Lenders agree to take such action as is necessary to continue to fund the fulfillment of all pending customer subscription orders processed through PayPal, including without limitation the funding of such fulfillment as provided in the DIP Budget.

       d.      Prior to the Closing Date, PayPal shall permit customer renewals and new customer subscriptions under terms generally consistent with prepetition subscription terms governing the relationship between the Debtors and PayPal. Payment of PayPal transaction fees and PayPal processing of transaction fees, chargebacks, reversals, and refunds (whether related to prepetition or postpetition transactions) shall continue to occur as in the ordinary course.  Notwithstanding anything to the contrary in the prepetition terms or course of dealing or conduct as between PayPal and the Debtors, other than for actual transaction fees, chargebacks, reversals, and refunds processed daily by PayPal in the ordinary

course of business (whether related to prepetition or postpetition transactions), PayPal shall not reserve or otherwise hold back any postpetition funds processed in conjunction with postpetition customer renewals and/or new postpetition customer subscriptions and shall promptly pay over and release all such funds to the Debtors.

e.      Prior to the Closing Date, the Debtors, PayPal, and the Purchaser shall cooperate in good faith to negotiate and execute such documents and take such actions that may be necessary to transfer the Debtors' existing PayPal accounts (the "Accounts") and access to those Accounts to the Purchaser prior to the Closing Date.

f.      Prior to the Closing Date, the Purchaser shall identify bank accounts to which the Purchaser will transfer PayPal Account funds for customer renewals and new customer subscriptions from and after the Closing Date, and shall provide to PayPal such information and take such actions that PayPal deems necessary in order to effectively link the Accounts with such bank accounts from and after the Closing Date.

g.      To the extent practicable, promptly after the Closing Date, the Purchaser, with cooperation of the Debtors, shall provide such documentation as reasonably requested by, and reasonably acceptable to, PayPal in order to reasonably calculate and evidence, as of the Closing Date, the amount of (i) past due subscription crate liability owing on customer subscriptions processed by PayPal; and (ii) then-existing future liability on customer subscriptions processed by PayPal (collectively, the "Closing Liability").

h.      Effective upon the Closing Date, the Purchaser shall assume, and is hereby deemed to have assumed, all prepetition and postpetition obligations and liabilities of the Debtors to PayPal, and shall take over all existing PayPal Accounts of the Debtors including all subscriber billing agreements and all liability of or for refunds, claims, chargebacks, reversals, and transaction fees.

i.      Effective upon the Closing Date, the Purchaser is authorized to use PayPal processing through the Accounts in order to renew existing crate subscribers and add new crate subscribers under subscriptions generally consistent with Debtor Loot Crate, Inc.'s prior subscription terms using and in accordance with the standard PayPal User Agreement.

j.      Effective upon the Closing Date, all right, title and interest of the Debtors in any and all PayPal prepetition and postpetition reserves and/or holdbacks relating to the Accounts, as the same may have decreased (the "Closing Reserve"), are deemed transferred to the Purchaser, subject to all rights, claims, interests, and defenses of PayPal (which Closing Reserve is not sold or transferred free and clear of, but rather expressly subject to, the rights, claims, interests, and defenses of PayPal).  From and after the Closing Date, the Debtors shall no longer have any interest in the Closing Reserve or the Accounts, and shall no longer process any transactions through PayPal.

k.      Upon entry of this Order, the Purchaser and PayPal shall, in good faith, take all steps necessary to memorialize and execute an agreement regarding the terms of service governing the processing of customer payments to Purchaser after the Closing Date, the principal terms of which have been previously agreed

31

to by PayPal and the Purchaser (the "PayPal LCA Agreement"). Such terms constitute sensitive business terms not subject to public disclosure; however, the Purchaser and PayPal have offered to provide the Court with a summary of the key business terms in order for the Court to review *in camera* such terms.

l.      Effective upon the Closing Date, the Debtors, for themselves and for their respective bankruptcy estates, the Purchaser, and the DIP Lenders (collectively, the "PayPal Releasing Parties") generally release and discharge PayPal and each of its officers, directors, agents, employees, attorneys, and representatives from any and all claims, liabilities, actions or causes of action, damages, debts or demands whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, prepetition or postpetition, arising on or prior to the Closing Date, including without limitation any of the foregoing arising under, related to or regarding the Debtors' agreements with PayPal, the PayPal processing systems, the Accounts, the processing and/or handling of transactions, funds, the Closing Reserve or any other reserve of holdback, 11 U.S.C. §§ 362, 506(c), 544, 546-550 and other Chapter 5 avoidance actions (the "PayPal Release"). PayPal shall have a priority interest in and to the Closing Reserve, and the PayPal Releasing Parties acknowledge that any liens, claims, and interests that they may otherwise assert in the Closing Reserves or any other right in PayPal reserves or holds is not subject to priming ahead of PayPal's priority interests. Each of the PayPal Releasing Parties acknowledges that it has investigated to its complete satisfaction all facts and potential claims released in this subsection (l) which it may have against PayPal and that there is a risk that after the Closing

Date it will discover, incur, or suffer such claims which were unknown or unanticipated at the time of its agreements embodied herein, that if known on the date of its agreement of this Order and delivery, may have materially affected its decision to agree to the terms herein. Each of the PayPal Releasing Parties acknowledges and agrees that the reason for the PayPal Release is that it is assuming the risk of such unknown claims, and agrees that its agreement to the terms herein applies thereto. In connection herewith, each of the PayPal Releasing Parties expressly waives and relinquishes the benefits of section 1542 of the California Civil Code, to the extent applicable, (and any similar statute under any other applicable law), which section reads as follows:

> A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

m.      Notwithstanding the foregoing provisions of paragraph 34(l), the PayPal Release shall not release PayPal from its obligations as set forth in this Order and the PayPal LCA Agreement.

n.      PayPal irrevocably waives any and all rights or claims to recover from the Debtors, the Purchaser, or the DIP Lenders any legal fees or expenses incurred prior to the Closing Date relating to the Debtors or the Accounts.

o.      The automatic stay under 11 U.S.C. § 362 is hereby terminated to permit the parties (including, without limitation, PayPal and the Purchaser) to take any and all actions necessary or desirable to implement or carry out the terms of this paragraph 34.

p.    The provisions in this paragraph 34 reflect the expectation of the Debtors, PayPal, and the Purchaser that the Sale will close on or before October 1, 2019.  In the event the Closing Date does not occur by October 1, 2019, the Debtors, PayPal, and the Purchaser shall cooperate with each other so as to effectuate the intent of this paragraph 34.

**Matters Pertaining to Worldpay, LLC (F/K/A Vantiv, LLC)**

35.    Neither this Order nor the Sale shall impair WorldPay's alleged rights or interests in any monies, funds, reserves, or similar assets collected, held, or applied by Worldpay, and the sale and transfer of the Debtors' right, title, and interest in such assets by virtue of this Order and the Closing of the Sale shall be subject to WorldPay's alleged rights or interests.  In addition, nothing in this Order or the Sale shall impair the Purchaser's and the Debtors' ability to challenge such rights or interests on any legal grounds or pursuant to the Bankruptcy Code, or seek other relief under applicable law or the Bankruptcy Code as to WorldPay.

**Deferring Matters Pertaining to Assumption, Assignment, Cure Amounts, and Adequate Assurance of Future Performance as to Certain Objecting Parties**

36.    With respect to objections related to the assumption and assignment of executory contracts and unexpired leases, Cure Amounts, and/or adequate assurance of future performance filed by Just Funky, LLC [Docket No. 192], Oracle America, Inc. [Docket No. 194], Bethesda Softworks, LLC [Docket No. 197, 199], AIA Corporation [Docket No. 202], Warner Bros. Consumer Products Inc. [Docket No. 208], Twentieth Century Fox Licensing and Merchandising and Marvel Brands LLC [Docket No. 210], Worldpay, LLC (F/K/A Vantiv, LLC) [Docket No. 219], and The Ultimate Software Group, Inc. [Docket No. 228] (collectively, the "Objecting Parties"), all such objections are preserved.  Notwithstanding anything in this

601115596.14

Order to the contrary, this Order shall not effectuate any assumption or assignment of the Debtors' executory contracts or unexpired leases with the Objecting Parties (or determine that such executory contracts or unexpired leases are susceptible to assumption or assignment), adjudicate the Cure Amounts due to the Objecting Parties, or determine if or how the Objecting Parties are entitled to any adequate assurance of future performance. If and to the extent the Debtors resolve matters with any of the Objecting Parties, the Debtors may submit subsequent order(s) under certification of counsel, and if and to the extent such matters with any of the Objecting Parties require further hearing, the Debtors shall work with such Objecting Parties to schedule such hearing, and shall provide appropriate notice of same. If any executory contract or unexpired lease is assumed and assigned to the Purchaser, the terms of such contract or lease shall control the parties' dealings thereafter.

37.    Nothing in this Order shall require any Objecting Party to do business with the Purchaser from and after the Closing absent (i) a further order of this Court, (ii) assumption and assignment of such party's executory contract or unexpired lease to the Purchaser, or (iii) the entry into a new agreement or lease or other mutually agreeable arrangements among such Objecting Party and the Purchaser. For the avoidance of doubt (but subject to Paragraph 38 below as to Bethesda Softworks, LLC), the Debtors may continue to operate under any executory contract or unexpired lease pursuant to its terms (subject to the Bankruptcy Code), pending rejection or assumption and assignment of such executory contract or unexpired lease, provided that nothing in this Order shall give the Debtors any greater or lesser rights under such contract or lease.

38.    In addition, with respect to Bethesda Softworks, LLC ("Bethesda"), the Debtors contemplate that, for a limited period after the Closing, and in accordance with the

Transition Services Agreement described in Section 7.6 of the Asset Purchase Agreement, they may continue to operate under any executory contract with Bethesda (subject to the Bankruptcy Code) pending rejection or assumption and assignment of such executory contract; however nothing in this Order, including but not limited to the foregoing, shall, or shall be deemed to, constitute a finding and or conclusion either that (i) such executory contract with Bethesda permits such operation by the Debtors and/or the Purchaser, or (ii) Bethesda consents to such operation.

**Additional Provisions**

39.    The consideration provided by the Purchaser for the Purchased Assets under the Asset Purchase Agreement, including the Credit Bid Amount, constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law.

40.    As specifically provided in the Asset Purchase Agreement, the Debtors will cooperate with the Purchaser, and the Purchaser will cooperate with the Debtors, in a commercially reasonable manner, in each case to ensure that the transaction contemplated in the Asset Purchase Agreement is consummated, and the Debtors will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Asset Purchase Agreement.

41.    This Court shall retain jurisdiction to enforce and implement the terms and provisions of this Order and the Asset Purchase Agreement, including all amendments thereto, any waivers and consents thereunder, except as otherwise provided therein, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Purchased Assets to the Purchaser free and

clear of all Claims and Interests (other than the Assumed Liabilities), or compel the performance of other obligations owed by the Debtors to the Purchaser, (ii) compel performance of any obligations owed to the Debtors, (iii) resolve any disputes arising under or related to the Asset Purchase Agreement, except as otherwise provided therein, (iv) interpret, implement, and enforce the provisions of this Order, and (v) protect the Purchaser against claims made related to any of the Excluded Liabilities or Excluded Assets, any Successor or Other Liabilities related to the Purchased Assets or the Assumed Contracts, or any Claims and Interests asserted in the Debtors or the Purchased Assets, and (vi) require delivery of  any Assets or proceeds thereof by the Debtors to the Purchaser.

42.     The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon (i) the Debtors, (ii) the Debtors' estates, (iii) all creditors of, and holders of equity interests in, the Debtors, (iv) all holders of Liens or other Claims and Interests (whether known or unknown) in, against, or on all or any portion of the Purchased Assets, (v) all Contract counterparties, (vi) the Purchaser and all successors and assigns of the Purchaser, (vii) the Purchased Assets, and (viii) all successors and assigns of each of the foregoing, including, without limitation, any trustee subsequently appointed in the Debtors' Cases, or a Chapter 7 trustee appointed upon a conversion of one or more of these Cases to a case under Chapter 7 of the Bankruptcy Code.  This Order shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, PayPal and the respective successors and assigns of each of the foregoing, including, without limitation, any trustee subsequently appointed in these Cases or upon conversion to Chapter 7 under the Bankruptcy Code, and any Person seeking to assert rights on behalf of any of the foregoing or that belong to the Debtors' estates.  The Asset Purchase Agreement shall be binding in all respects upon the Debtors,

including the obligations of the Debtors to remit funds received from the Purchaser to the applicable Taxing Authorities pursuant to the Sales Tax Funding Commitment.

43.     The failure specifically to include any particular provisions of the Asset Purchase Agreement or its exhibits, schedules, or amendments in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement and its exhibits, schedules, or amendments be authorized and approved in its entirety.

44.     The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that such modifications or amendments are non-material.

45.     Nothing contained in any order entered in these Cases subsequent to entry of this Order, nor in any chapter 11 plans confirmed in these Cases, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

46.     This Order shall be effective and enforceable immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h), 6006(d), and any other provision of the Bankruptcy Code or the Bankruptcy Rules shall not apply.

47.     The provisions of this Order are non-severable and mutually dependent.

48.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (i) to allow the Purchaser to give the Debtors any notice provided for in the Asset Purchase Agreement, and (ii) to allow the Purchaser to take any and all actions permitted by the Asset Purchase Agreement.

601115596.14

49.     The Sale shall not be subject to any bulk sales laws or any similar laws of any state or jurisdiction.

50.     The Debtors and each other person having duties or responsibilities under the Asset Purchase Agreement or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement, to take any action contemplated by the Asset Purchase Agreement or this Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by applicable business corporation law with respect to the implementation and consummation of the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby.

51.     To the extent that any provision of this Order conflicts with the Asset Purchase Agreement, this Order shall control.

52.     Immediately after Closing of the Sale, the Debtors shall file appropriate documentation with governmental authorities changing their names from Loot Crate, Inc., Loot Crate Holdings, Inc., LC Funding, Inc., and Loot Crate Parent, Inc. to Old LC, Inc., Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc., respectively, and file a notice with this Court reflecting the same, and thereafter the caption of these cases shall be

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OLD LC, INC., *et al.*,[1] | ) | |
| | ) | Case No. 19-11791 (BLS) |
| Debtors. | ) | |
| | ) | (Jointly Administered) |

[1]   The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc.  The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Avenue, Los Angeles, CA 90031.

53.     Notwithstanding the possible applicability of Bankruptcy Rule 4001(a)(3), Bankruptcy Rule 6004(h), Bankruptcy Rule 6006(d) or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry and the requirements of Bankruptcy Rule 4001(a)(3), Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d) are hereby waived.

**Dated: October 1st, 2019 Wilmington, Delaware**

**BRENDAN L. SHANNON UNITED STATES BANKRUPTCY JUDGE**

601115596.14

## **Exhibit A**

Asset Purchase Agreement

601115596.14

**EXECUTION VERSION**

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**by and among**

**EACH SELLER LISTED ON THE SIGNATURE PAGES HERETO**
**as Sellers**

**AND**

**LOOT CRATE ACQUISITION LLC**
**as Purchaser**

**September 27, 2019**

## TABLE OF CONTENTS

**Page**

1.      DEFINITIONS. ...................................................................................................... 1
        1.1     Definitions ................................................................................................... 1
        1.2     Cross References ......................................................................................... 8
2.      PURCHASE AND SALE ........................................................................................ 9
        2.1     Purchase and Sale ....................................................................................... 9
        2.2     Excluded Assets ........................................................................................ 13
        2.3     Assumed Liabilities ................................................................................... 14
        2.4     Excluded Liabilities .................................................................................. 15
        2.5     Assumption/Assignment of Contracts and Rights; Executory Contract
                Designation ............................................................................................... 16
        2.6     Consideration; Allocation of Consideration. ............................................. 18
        2.7     Closing ...................................................................................................... 19
        2.8     Deliveries by Sellers ................................................................................. 19
        2.9     Deliveries by Purchaser ............................................................................ 20
        2.10    Cash Transfer ............................................................................................ 20
3.      REPRESENTATIONS AND WARRANTIES OF SELLERS ................................ 20
        3.1     Organization ............................................................................................. 20
        3.2     Corporate Authorization ........................................................................... 20
        3.3     Financial Information ................................................................................ 21
        3.4     Governmental Authorization ..................................................................... 21
        3.5     Noncontravention ...................................................................................... 21
        3.6     Required Consents ..................................................................................... 22
        3.7     Litigation .................................................................................................. 22
        3.8     Permits ...................................................................................................... 22
        3.9     Compliance with Laws and Court Orders .................................................. 22
        3.10    Intellectual Property Rights ....................................................................... 22
        3.11    Environmental Matters .............................................................................. 23
        3.12    Real Property ............................................................................................. 23
        3.13    Employee Benefits .................................................................................... 23
        3.14    Employment and Personnel Matters .......................................................... 25
        3.15    Taxes ......................................................................................................... 26
        3.16    Title to the Purchased Assets ..................................................................... 26
        3.17    Transactions with Affiliates ...................................................................... 26
        3.18    Insurance ................................................................................................... 26
        3.19    Service of Bankruptcy Documents ............................................................ 27
        3.20    Certain Fees ............................................................................................... 27
        3.21    Material Contracts ..................................................................................... 27
        3.22    Licensing Matters ...................................................................................... 27
        3.23    Data Privacy .............................................................................................. 28
        3.24    Customer Lists; Customer Data ................................................................. 28
        3.25    No Other Representations or Warranties; Schedules .................................. 28
4.      REPRESENTATIONS AND WARRANTIES OF PURCHASER .......................... 29
        4.1     Organization ............................................................................................. 29
        4.2     Corporate Authorization ........................................................................... 29
        4.3     Governmental Authorization ..................................................................... 29
        4.4     Noncontravention ...................................................................................... 29
        4.5     Availability of Purchase Price ................................................................... 29
        4.6     Certain Fees ............................................................................................... 29
        4.7     Litigation .................................................................................................. 30

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|

**5.      COVENANTS OF SELLER** .................................................................. 30
    5.1      **Conduct of the Business** ..................................................... 30
    5.2      **Access to Information** ......................................................... 31
    5.3      **Notices of Certain Events** .................................................. 31
    5.4      **Name Change** ...................................................................... 32
    5.5      **Intellectual Property Rights Assignment** ......................... 32

**6.      COVENANTS OF PURCHASER** .......................................................... 32
    6.1      **Books and Records** ............................................................ 32

**7.      COVENANTS OF PURCHASER AND SELLER** ................................. 32
    7.1      **Efforts; Further Assurances** .............................................. 32
    7.2      **Certain Filings** .................................................................... 33
    7.3      **Public Announcements** ....................................................... 33
    7.4      **DIP Loan Documents** .......................................................... 33
    7.5      **Bankruptcy Issues** ............................................................. 33
    7.6      **Transition Services** ............................................................ 34
    7.7      **Wrong Pockets** ................................................................... 34
    7.8      **Notices** ................................................................................ 34
    7.9      **Confidentiality** .................................................................... 35
    7.10    **Budgeted Reserve** ............................................................. 35

**8.      TAX MATTERS** .................................................................................... 35
    8.1      **Tax Cooperation** ................................................................ 35
    8.2      **Transfer Taxes** ................................................................... 36
    8.3      **Property Taxes** ................................................................... 36
    8.4      **Certain Tax Reporting for Employees** .............................. 36
    8.5      **Sales Taxes and Sales Taxes Account** ........................... 36

**9.      EMPLOYEE MATTERS** ....................................................................... 38
    9.1      **Employees and Offers of Employment** ............................. 38
    9.2      **Employee Plans** ................................................................. 39
    9.3      **Workers' Compensation** ..................................................... 40
    9.4      **WARN Act** ........................................................................... 40

**10.     CLOSING CONDITIONS** ..................................................................... 40
    10.1    **Conditions to Obligations of Purchaser and Sellers** ....... 40
    10.2    **Conditions to Obligations of Purchaser** ........................... 41
    10.3    **Conditions to Obligations of Sellers** ................................ 42

**11.     TERMINATION** .................................................................................... 42
    11.1    **Grounds for Termination** .................................................... 42
    11.2    **Effect of Termination** .......................................................... 43
    11.3    **Fees and Expenses** ............................................................ 43
    11.4    **Certain Limitations** ............................................................. 43

**12.     MISCELLANEOUS** .............................................................................. 43
    12.1    **Notices** ................................................................................ 43
    12.2    **Waivers** ............................................................................... 44
    12.3    **Successors and Assigns** .................................................... 44
    12.4    **Governing Law** ................................................................... 44
    12.5    **Jurisdiction** ......................................................................... 45
    12.6    **Waiver of Jury Trial** ........................................................... 45
    12.7    **No Third Party Beneficiaries** ............................................. 45
    12.8    **Entire Agreement; Amendments; Counterparts** ............... 45
    12.9    **Headings; Interpretation** .................................................... 46
    12.10   **Disclosure Schedules** ....................................................... 46

600688115.35

**TABLE OF CONTENTS**
(continued)

**Page**

**12.11**   **No Survival of Representations**.................................................................................46

**TABLE OF CONTENTS**
(continued)

**EXHIBITS**

Exhibit A – Form of Assignment and Assumption Agreement

Exhibit B – Form of Trademark Assignment Agreement

Exhibit C – Form of Power of Attorney

Exhibit D – Form of Leased Real Property Assignment Agreement

Exhibit E – Form of Sales Tax Funding Commitment

600688115.35

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, dated as of September 27, 2019 (this "**Agreement**"), is by and among the seller parties listed on the signature pages hereto (each a "**Seller**" or "**Debtor**"), and LOOT CRATE ACQUISITION LLC, a Delaware limited liability company ("**Purchaser**") and amends and restates in its entirety that certain Asset Purchase Agreement (the "**Original Agreement**") dated as of September 6, 2019 (the "**Original Agreement Date**") by and among Sellers and Purchaser.  Each of Purchaser and Sellers is referred to individually in this Agreement as a "**Party**" and collectively as the "**Parties**."

### RECITALS:

**WHEREAS**, Sellers own and operate an E-Commerce subscription company that specializes in providing customers with curated boxes containing consumer products each month (such businesses and all other businesses conducted by Sellers, the "**Business**");

**WHEREAS**, Sellers desire to sell, transfer, convey, assign and deliver the Purchased Assets and to assign the Assumed Liabilities to Purchaser, and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

**WHEREAS**, on August 11, 2019 as to certain Sellers and August 12, 2019 as to the other Sellers (collectively, the "**Petition Date**"), Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, Debtors' chapter 11 bankruptcy cases are being jointly administered under Case No. 19-11791-BLS in the Bankruptcy Court (the "**Bankruptcy Cases**"); and

**WHEREAS**, the consummation of the transactions contemplated by this Agreement (the "**Transactions**") are subject to, among other things, the entry of an Approval Order in the Bankruptcy Cases under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.    DEFINITIONS.

    **1.1    Definitions**.  The following terms, as used herein, have the following meanings:

        **(a)**    "**Accounts Receivable**" means all accounts and notes receivable (whether current or non-current) of Sellers in respect of goods shipped, products sold or services rendered (including those billed pursuant to Subscriber Orders).

        **(b)**    "**Action**" means any action, suit, arbitration, claim, inquiry, proceeding, mediation, hearing, audit, examination, investigation or other proceeding of any nature, in each case, by or before any Governmental Authority.

        **(c)**    "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or

indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract, as trustee, executor or otherwise.

(d)    "**Budgeted Reserve**" means an amount equal to (i) the accrued, valid and allowed administrative claims that are both expressly contemplated by, and within the terms of, the DIP Budget and not assumed by Purchaser pursuant to Section 2.3(e), *plus* (ii) any other allowed administrative claims to be incurred prior to Closing with Purchaser's express consent in the ordinary course of business which become due after Closing *plus* (iii) $65,000, *plus* (iv) any amounts required to be added pursuant to Section 2.5(d) (if any), *plus* (v) any additional amounts agreed to be added by Purchaser in writing in its sole and absolute discretion, *less* (vi) the aggregate amount of cash retained by the Sellers pursuant to Section 2.2(b).

(e)    "**Bulk Sales Laws**" means (a) the bulk-transfer provisions of the Uniform Commercial Code or any similar Laws in jurisdictions in which any Seller conducts the Business and (b) any Tax-related Laws, or requirements of any jurisdiction relating to bulk sales, or requiring similar notification, certification or withholding requirements, in respect of a sale or transfer of assets, which Laws are applicable to the sale of the Purchased Assets.

(f)    "**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

(g)    "**Cash and Cash Equivalents**" means, as of any applicable time, all cash and cash equivalents (including all undeposited checks) of the Sellers determined in accordance with GAAP, but shall exclude any cash and cash equivalents held in the Sales Taxes Account.

(h)    "**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any Laws promulgated thereunder.

(i)    "**Claim**" means a "**claim**" as defined in Section 101 of the Bankruptcy Code.

(j)    "**Closing Date**" means the date of the Closing.

(k)    "**Code**" means the Internal Revenue Code of 1986, as amended.

(l)    "**Contract**" means any written or oral agreement, contract, subcontract, settlement agreement, lease, sublease, instrument, permit, concession, franchise, binding understanding, note, option, bond, mortgage, indenture, trust document, loan or credit agreement, license, sublicense, insurance policy or other legally binding commitment or undertaking of any nature.

(m)    "**Cure Costs**" means all amounts that must be paid pursuant to Sections 365 of the Bankruptcy Code in connection with the assumption or assignment of the Assumed Contracts to Purchaser as provided herein and in the Approval Order.

(n)    "**Customer Lists**" means any and all customer and subscriber lists and databases, files and other customer records and information maintained by the Sellers in any format whatsoever.

(o)    "*D&O Policy*" means the directors and officers liability insurance policies set forth on Schedule 1.1(o).

(p)    "*DIP Budget*" means the budget as defined in the DIP Order.

(q)    "*DIP Lender*" means Money Chest LLC, a Nevada limited liability company.

(r)    "*DIP Liens*" means the Liens granted to the DIP Lender pursuant to the DIP Order.

(s)    "*DIP Loan*" means the loan of up to Ten Million Dollars ($10,000,000) which is made by the DIP Lender to Loot Crate, Inc., as borrower, Loot Crate Parent, Inc., as parent, and the remaining Debtors as guarantors, as evidenced by the DIP Loan Documents.

(t)    "*DIP Loan Documents*" means the Loan Agreement and any agreements, documents or instruments executed or delivered in connection with the DIP Loan and the financing contemplated by the DIP Order, as the same may be amended, modified, supplemented or restated from time to time.

(u)    "*DIP Order*" means the interim Order or final Order, as applicable, of the Bankruptcy Court in each case in form and substance satisfactory to the DIP Lender approving the DIP Loan and authorizing Sellers' incurrence of post-petition secured financing under Section 364 of the Bankruptcy Code and use of cash collateral under Section 363 of the Bankruptcy Code.

(v)    "*E-Commerce Platform*" means the series of software and hardware applications, including computer hardware and cloud servers, that are integrated into, and through which Sellers transact with customers who enter into subscriptions or place orders for inventory through https://www.lootcrate.com/ (and similar permutations thereof), including the Assumed Contracts set forth on Schedule 2.1(a) pursuant to which such software and hardware applications are owned or licensed by Sellers.

(w)    "*Employee*" means an individual who is employed by any Seller, whether on a full-time or a part-time basis, whether active or inactive, and includes an employee on short-term or long-term disability leave.

(x)    "*Employee Benefit Plan*" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement, arrangement or payroll practice (whether written or unwritten) maintained, sponsored, or contributed or required to be contributed to by a Seller or any ERISA Affiliate or with respect to which a Seller or any ERISA Affiliate has any liability, other than a Multiemployer Plan, as set forth on Schedule 3.13(a).

(y)    "*Environmental Laws*" means, all federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public or employee health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

3.

(z)    "*Environmental Liabilities and Obligations*" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in any way relating to the prior or current ownership or operation of the Business, including Liabilities related to:   (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Substances or waste; (ii) the Release of Hazardous Substances or waste; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i)-(iv) of this definition.

(aa)    "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(bb)    "*ERISA Affiliate*" means any Person that, at any relevant time, is or was treated as a single employer with Sellers for purposes of Code § 414.

(cc)    "*First Lien Loan Agreement*" means that certain prepetition credit agreement, dated as of August 3, 2018 (as it may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date), among Loot Crate, Inc., as borrower, Loot Crate Parent, Inc., as ultimate parent, the other guarantors which are parties thereto, and Purchaser, as successor in interest to Midtown Madison Management LLC, as administrative agent and collateral agent for the lenders party thereto.

(dd)    "*GAAP*" means, at a given time, United States generally accepted accounting principles, and, where applicable, consistently applied throughout the periods involved.

(ee)    "*Governmental Authority*" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory, taxing or arbitral body.

(ff)    "*Hazardous Substances*" means any substance, material or waste which is regulated by any Governmental Authority, including any material, substance or waste which is defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste," "pollutant" or "toxic substance" under any provision of Environmental Law, and including petroleum, petroleum products, asbestos, presumed asbestos-containing material or asbestos-containing material, urea formaldehyde and polychlorinated biphenyls.

(gg)    "*Intellectual Property Rights*" means intellectual property rights in any jurisdiction, including: (i) rights in, arising out of or associated with works of authorship, including rights granted under the Copyright Act and including all applications and registrations for any of the foregoing; (ii) rights in, arising out of or associated with databases; (iii) rights in, arising out of, or associated with inventions, including rights granted under the Patent Act, and including all applications and registrations for any of the foregoing; (iv) rights in, arising out of or associated with trademarks, service marks and trade names including common law rights, rights granted under the Lanham Act and all applications and registrations for any of the foregoing ("*Trademarks*"); (v) rights in, arising out of, or associated with confidential information and trade secrets, including rights described under the Uniform Trade Secrets Act; (vi) rights of attribution and

4.

integrity and other moral rights of an author; (vii) rights in, arising out of or associated with a person's name, voice, signature, photograph, or likeness, including rights of personality, publicity or similar rights; and (viii) rights in, arising out of, or associated with domain names and uniform resource locators ("***Domain Names***").

(hh)    "***Knowledge of Sellers***" or any other similar knowledge qualification in this Agreement means the actual or constructive (i.e., that which a reasonable person should know) knowledge of Christopher Davis, Stuart Kaufman or Mark Palmer, in each case, after due inquiry.

(ii)    "***Law***" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(jj)    "***Leased Real Property***" means real property leased by any Seller and used in connection with the Business.

(kk)    "***Liability***" means any claim, debt, liability, obligation, Tax or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due), whenever or however arising (including those arising out of any contract or tort, whether based on negligence, strict liability or otherwise), and including all costs and expenses related thereto.

(ll)    "***Lien***" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non- contingent, material or non-material, known or unknown.

(mm)    "***Loan Agreement***" means collectively, that certain Debtor-in-Possession Credit Agreement, dated as of August 14, 2019, among Loot Crate, Inc., as borrower, Loot Crate Parent, Inc., as ultimate parent, each other entity that becomes a guarantor party thereto from time to time, the lenders party thereto from time to time and the DIP Lender, as administrative agent and collateral agent (as amended, modified, restated or supplemented from time to time).

(nn)    "***Material Adverse Effect***" means: any (x) event, change, occurrence, circumstance, development or effect (each, an "***Effect***") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on the Purchased Assets, Assumed Liabilities, the Business or the condition of the Sellers (financial or otherwise) taken as a whole; <u>provided</u> that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect:  (i) changes in general business or economic conditions affecting the industry in which the Sellers operate, (ii) changes in national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (iii) changes in, GAAP after the Original Agreement Date, (iv) changes in applicable Laws after the Original Agreement Date, (v) changes resulting from the public announcement of this Agreement or the Transactions (other than for purposes of any representation or warranty contained in <u>Section 3.6</u>), (vi) the failure, in and of itself, of the Sellers to achieve any budgets, projections or forecasts (but, excluding, for the avoidance

of doubt, the underlying causes of any such failure), and (vii) any changes resulting from the public announcement of the filing of the Bankruptcy Cases; or (y) any Effect that would be reasonably likely to prevent, impair or materially delay the Sellers from consummating the Transactions.

(oo)    "**Multiemployer Plan**" means any "**multiemployer plan**" as defined in Section 3(37) of ERISA set forth on <u>Schedule 3.13(b)</u>.

(pp)    "**Order**" means any award, decision, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

(qq)    "**Permits**" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and other similar documents and authorizations issued by any Governmental Authority to any Seller.

(rr)    "**Permitted Liens**" means (i) Liens granted by Purchaser at or after the Closing or pursuant to the Loan Agreement and the loan documents related thereto; (ii) non-Tax Liens that arise under zoning, building codes, land use and other similar Laws, none of which would materially interfere with the ownership or operation by Purchaser of the Purchased Assets following the Closing in substantially the manner as owned and operated immediately prior to the Original Agreement Date; and (iii) any Lien that arises as a result of a non-exclusive license or other non-exclusive grant of rights under Intellectual Property Rights pursuant to Assumed Contracts to use products and services in the ordinary course of business consistent with past practice.

(ss)    "**Person**" means a natural person, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(tt)    "**Post-Petition Subscriber Orders**" means all Subscriber Orders for which Sellers have actually received payment in a Seller bank account after the Petition Date.

(uu)    "**Post-Retirement Liabilities**" means with respect to all Employees and retirees, all Liabilities for the post-retirement benefits, including those provided under the Employee Benefit Plans, as applicable.

(vv)    "**PPP**" means Portage Point Partners.

(ww)    "**Property Taxes**" means all real and personal property Taxes levied with respect to the Purchased Assets for any taxable period or portion thereof.

(xx)    "**Qualified Settlement**" means a settlement entered into with an applicable Taxing Authority for Pre-Petition Sales Taxes that is comprised of (i) payments over a thirty-six (36) month period in an amount (excluding applicable interest and penalties for states other than California and Texas) no greater than one hundred ten percent (110%) of the estimated amount set forth on the Sales Taxes Schedule with respect to such Taxing Authority; provided, however, that the Pre-Closing Payment Plan for California set forth on the Sales Taxes Schedule and the proposed Payment Plan for Texas set forth on the Sales Taxes Schedule, in each case, are each deemed a Qualified Settlement; or (ii) payments over a period of up to six (6) months in an amount no greater than $50,000 in the aggregate with respect to such Taxing Authority.

(yy)    "*Real Property Leases*" means all of Sellers' right, title and interest in all leases, subleases, licenses, concessions and other agreements and all amendments, extensions, renewals, guaranties and other agreements with respect thereto and including the right to all security deposits and other amounts and instruments deposited by or on behalf of any Seller thereunder, pursuant to which such Seller holds a leasehold or subleasehold estate in, or is granted a license or right to use, the Leased Real Property.

(zz)    "*Release*" has the meaning set forth in CERCLA.

(aaa)    "*Representative*" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

(bbb)    "*Sales Taxes Account*" means the segregated bank account established by Sellers to retain Sales Taxes (i) due in respect of, or arising in connection with, customer transactions occurring in the ordinary course of the Business after the Petition Date and (ii) any Sales Taxes transferred, remitted or released by any Person, including any bank, insurance company, or credit card processor, to any Seller, irrespective of whether such funds relate to Sales Taxes of Sellers that arose before, on or after the Petition Date.

(ccc)    "*Schedules*" means the Schedules delivered by Sellers concurrently with the execution and delivery of the Original Agreement.

(ddd)    "*Subscriber Orders*" means all purchase orders or other similar forms or agreements with customers for the provision of a curated box or curated boxes.

(eee)    "*Successor Entity*" means a successor-in-interest to one or more of the Sellers established after the Original Agreement Date in accordance with the Bankruptcy Code and Orders of the Bankruptcy Court.

(fff)    "*Tax*" means (i) any federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority (a "*Taxing Authority*") responsible for the imposition thereof (whether domestic or foreign), whether or not disputed, and (ii) Liability for the payment of any amounts of the type described in clause (i) as a result of being a transferee, party to any agreement or any express or implied obligation to indemnify any other Person.

(ggg)    "*Tax Returns*" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

7.

(hhh) "*Technology*" means technology and all other tangible embodiments of Intellectual Property Rights, whether statutory, common law or otherwise, in any jurisdiction throughout the world, including all: (i) inventions and discoveries, whether or not patentable; (ii) trademarks, service marks, trade dress, logos, slogans, brand names, trade names, Internet domain names and corporate names (whether or not registered), and other identifiers and indicia of origin, and all applications and registrations in connection therewith; (iii) all works of authorship, including audiovisual works, collective works, computer programs, compilations, databases, derivative works, literary works, mask works, and sound recordings; (iv) software, including all computer programs, databases and compilations, descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing and all user documentation, including user manuals and training materials, relating to any of the foregoing; (v) mask works and industrial designs; (vi) trade secrets and other confidential and proprietary information (including inventions, ideas, research and development information, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, schematics, specifications, research records, test information, financial, marketing and business data, customer, subscriber and supplier lists, algorithms and information, pricing and cost information, business and marketing plans and proposals, and databases and compilations, including any and all data and collections of data); and (vii) without limitation to the generality of the foregoing, the E-Commerce Platform.

(iii) "*Transaction Document*" means this Agreement, the Conveyance Agreements, the Transition Services Agreement (as applicable) and the Sales Tax Funding Commitment, together with such other agreements, certificates, and documents, and any exhibits, annexes, schedules, or other attachments thereto, delivered or caused to be delivered incident to or in connection with the Transactions.

(jjj) "*Transferred Employee*" means any Employee who accepts Purchaser's offer of employment after the Closing Date.

1.2 **Cross References**. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Adjustment Date | 8.3 |
| Agreement | Preamble |
| Allocation Schedule | 2.6(b) |
| Approval Order | 7.5(b) |
| Assignment and Assumption Agreement | 2.8(b) |
| Assumed Contracts | 2.1(a) |
| Assumed Liabilities | 2.3 |
| Assumed Plans | 9.2(c) |
| Avoidance Actions | 2.1(u) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Closing | 2.7 |
| Closing Statement | 7.10 |
| Conveyance Agreements | 2.8(f) |
| Credit Bid and Release | 2.6(a) |
| Customer Data | 2.1(n) |
| Debtor or Debtors | Recitals |
| Disputed Contract | 2.5(d) |
| Disputed Contract Order | 2.5(d) |

8.

| Term | Section |
|------|---------|
| D&O Claim Rights | 2.1(u) |
| End Date | 11.1(c) |
| Excluded Accounts Receivable | 2.1(c) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Expense Reimbursement | 7.5(a) |
| Expired IP | 3.10 |
| Financial Information | 3.3(a) |
| Leased Real Property Assignment Agreements | 2.8(f) |
| License Agreements | 2.1(l) |
| M&A Qualified Beneficiary | 9.2(f) |
| Material Contracts | 3.21(a) |
| Necessary Consent | 2.5(c) |
| Original Agreement | Preamble |
| Original Agreement Date | Preamble |
| Party or Parties | Preamble |
| Payment Plan Protocols | 8.5(b) |
| Personal Information | 3.23 |
| Petition Date | Recitals |
| Pre-Closing Payment Plans | 8.5(b) |
| Pre-Closing States | 8.5(b) |
| Pre-Petition Sales Taxes | 8.5(a) |
| Post-Closing Payment Plans | 8.5(f) |
| Post-Petition Sales Taxes | 2.3(f) |
| Previously Omitted Contract | 2.5(a) |
| Previously Omitted Contract Notice | 2.5(a) |
| Power of Attorney | 2.8(d) |
| Purchase Price | 2.6(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Purchaser Previously Omitted Contract | 2.5(a) |
| Registered IP | 2.1(f) |
| Sales Tax Funding Commitment | 8.5(e) |
| Sales Taxes | 8.5(g) |
| Sales Taxes Payments | 8.5(a) |
| Sales Taxes Schedule | 8.5(a) |
| Seller or Sellers | Preamble |
| Sellers' Previously Omitted Contract | 2.5(a) |
| Sellers' Property Taxes | 8.3 |
| Straddle Period | 8.3 |
| Tax Claim | 8.1 |
| Taxing Authority | 1.1(fff) |
| Trademark Assignment Agreement | 2.8(c) |
| Transactions | Recitals |
| Transferred Intellectual Property Rights | 2.1(f) |
| Transfer Taxes | 8.2 |
| Transition Services Agreement | 7.6 |

2. **PURCHASE AND SALE.**

  **2.1 Purchase and Sale**.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers agree to sell, assign, transfer, convey and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Sellers, all right, title and interest of Sellers as of the Closing Date in and to all of Sellers' properties and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and

whether or not carried or reflected on the books and records of Sellers that are now, or at the time of Closing will be, used or held for use in or otherwise related to, useful in or necessary for the conduct of, the Business, other than the Excluded Assets (the "***Purchased Assets***"), free and clear of all Liens (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363 of the Bankruptcy Code.  Subject to <u>Section 2.2</u>, the Purchased Assets purchased hereunder shall include, but shall not be limited to, the following:

        **(a)**      all rights of Sellers in or under the Contracts that are set forth on <u>Schedule 2.1(a)</u>; <u>provided</u>, that, notwithstanding any other provision of this Agreement, Purchaser may, in its sole discretion, add or delete any Contracts set forth on <u>Schedule 2.1(a)</u> until two (2) Business Days prior to the Closing Date (or later as provided for herein) and shall promptly notify Sellers of any such addition or deletion by delivery of an updated copy of <u>Schedule 2.1(a)</u> (the Contracts set forth on the <u>Schedule 2.1(a)</u> as of two (2) Business Days prior to the Closing Date or subsequently added thereto, collectively, the "***Assumed Contracts***");

        **(b)**      all inventory of any kind and nature, including all raw materials, works-in-process of any type (including semi-finished goods), finished goods, consigned goods, merchandise (including, any toys, action figures, clothing and apparel, gear, books, DVDs, video games, memorabilia, collectibles, dolls, figurines, gadgets and board and card games), inventory owned by any Seller but which remains in the possession or control of a third party or which is undelivered or in transit, inventory located at a distribution center and other inventories to which the Sellers have title that are in the possession of the Sellers or any third party and used or held for use in connection with the Business;

        **(c)**      all Accounts Receivable (other than Excluded Accounts Receivable), and any and all amounts paid by, payable from, due and owing, or otherwise recoverable from any Governmental Authority, including any customs authority, customs agency, or customs broker, including, but not limited to, any customs drawback rights under the Trade Facilitation and Trade Enforcement Act of 2015, in each case to the extent that such rights are assignable to Purchaser under applicable Law;

        **(d)**      all tangible personal property, including, all machinery, equipment, tools, vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, spare parts, shipping and packaging materials, storeroom contents, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers (including any of the foregoing property that is subject to a lease, but only to the extent that Purchaser assumes such lease as an Assumed Contract) wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Sellers or any other space where Sellers' properties or any other assets may be situated;

        **(e)**      all Permits, including those set forth on <u>Schedule 2.1(e)</u> to the extent the same may be transferred or assigned consistent with their terms;

        **(f)**      all of Sellers' right, title and interest in and to any Intellectual Property Rights, including (i) all Intellectual Property Rights of Sellers that are the subject of an application, certificate, filing, registration, or other document issued by, filed with, or recorded by, any state, government or other public legal authority (the *"**Registered IP**"*), including the items set forth on <u>Schedule 2.1(f)</u>, and including, trademark applications and registrations worldwide for "***Loot Crate***" (for all languages and whether translated, transliterated or phoneticized and any derivation thereof); (ii) other unregistered Intellectual Property Rights of Sellers embodied by or associated with any assets listed or described in this <u>Section 2.1</u>, including Intellectual Property Rights embodied by or

associated with any assets referenced in <u>subsections 2.1(a) through (cc)</u> of this <u>Section 2.1</u>, and (iii) the right to sue for and recover damages, profits and any other remedy in connection therewith, for past, present or future infringement, misappropriation or other violation related to any of the foregoing assets (collectively, the "***Transferred Intellectual Property Rights***");

(g)     to the extent transferrable, the registrations to the social media accounts of Sellers, including those listed on <u>Schedule 2.1(g)</u>, and all content stored thereon; provided, that to the extent transfer is not permissible with respect to any social media account, the Parties shall enter into such alternative arrangement so as to allow Purchaser to access and use such social media account and the content stored thereon to the extent administratively feasible;

(h)     all of Sellers' right, title and interest in and to any Domain Names, including those listed on <u>Schedule 2.1(h)</u>;

(i)     all past, present and future claims, asserted or unasserted, contingent or fixed, known or unknown, against third parties (but no liabilities arising therefrom) related to any warranties, representations and licensing agreements arising out of the operation of the Purchased Assets and the right to collect proceeds and damages therefrom;

(j)     all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors with respect to the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(k)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(l)     all rights of Sellers under or pursuant to the license agreements, sublicense agreements or other arrangements with licensors, including all current statement of works and amendments thereto, that are specifically set forth on <u>Schedule 2.1(a)</u>, as may be amended from time to time (the agreements described in this underline{Section 2.1(l)} shall be referred to herein as the "***License Agreements***");

(m)     all Customer Lists and all other books, records, files and papers of Sellers to the extent related to the Business or the Purchased Assets, including vendor files, equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, personnel files for Employees, Tax records and other similar documents and records (all in the state in which such records and information currently exist), but excluding from the foregoing any information to the extent prohibited by Law for transfer hereunder;

(n)     all subscriber and customer data, information, analysis and modelling derived from any Customer List and branded loyalty promotion programs and other similar information including personal information (such as name, address, telephone number, e-mail address, website and any other database information), customer consents and opt-in/opt-outs, product hierarchy, segmentation (life cycle), customer lifetime value, predictive modeling scores and models used, loyalty information and data, private label programs (including credit card) information and data, offers, coupons and discount information and data, and customer purchase and transaction history at a transaction level (including dollar amounts, dates, and items purchased, but excluding from the foregoing any credit card numbers or related customer payment source, social security numbers, or other information to the extent prohibited by Law for transfer

hereunder) relating to customers of, or collected through or used in the operation of (i) the Business, (ii) the E-Commerce Platform or any similar e-commerce platform owned, operated or controlled by Sellers, (iii) any catalog sales, other online or print mailing or similar distribution channels, (iv) partner e-commerce platforms or retail stores and (v) any Customer Lists (collectively, the "***Customer Data***");

(o)    (i) all artwork and other graphic media used in connection with the Purchased Assets in the marketing of products for Sellers' past and present customers to the extent Sellers have the right, title and interest to such artwork and media and (ii) all content, graphics, literary, audiovisual and artistic works displayed on the websites or boxes to the extent Sellers have the right, title or interest thereto;

(p)    the E-Commerce Platform and all other Technology of Sellers, including the Technology set forth on Schedule 2.1(p);

(q)    except as set forth on Schedule 2.2(b) below, all utility deposits, security deposits, deposits held by parties to the Assumed Contracts, deposits held by vendors or trade creditors, and other deposits of any kind or nature whatsoever;

(r)    the rights described under Section 2.5(b) below;

(s)    all prepaid expenses of any Seller relating to any of the Assumed Contracts;

(t)    Cash and Cash Equivalents in excess of the Budgeted Reserve;

(u)    (i) all rights, claims or causes of action of Sellers, and proceeds thereof, of whatever kind or nature, and whether asserted or unasserted, including, without limitation any causes of action against current and former directors and officers of Sellers and any affiliates of such directors and officers (collectively, the "***D&O Claim Rights***") if Purchaser elects, in its sole discretion, to assume such D&O Claim Rights within six (6) months of the Closing Date, provided, however, the Sellers may only pursue such D&O Claim Rights with Purchaser's written consent and at Purchaser's direction, as the proceeds thereof would remain Purchased Assets; and (ii) all causes of action arising under chapter 5 of the Bankruptcy Code (the "***Avoidance Actions***"); provided, however, that causes of action arising under section 547 of the Bankruptcy Code shall not be affirmatively pursued by Purchaser but may be used in a manner and for the purposes set forth in Section 2.3(e); provided further, however, that with respect to the D&O Claim Rights, such rights shall remain assets of the estates of Sellers until such time as the Purchaser makes its election;

(v)    all of Sellers' right, title and interest in any reserves held by any bank, insurance company, or credit card processor, including those reserves scheduled on Schedule 2.1(v);

(w)    all insurance policies relating to the Business (other than the D&O Policy) including those policies scheduled on Schedule 2.1(w);

(x)    all claims, and proceeds thereof, arising under any insurance policies relating to the Business, and all credits, premium refunds, proceeds, causes of action or rights thereunder, except for any defense costs and expenses payable under the D&O Policy to Employees, directors or officers of any Seller;

(y)    all rights (but none of the obligations, if any) of any Seller related to the current or future assignment to any Seller (or enforcement or registration by any Seller) of

any Intellectual Property Rights (e.g., proprietary information agreements between a Seller, on the one hand, and any Employee, on the other hand);

**(z)** all (i) Post-Petition Subscriber Orders, (ii) Subscriber Orders entered into prior to the Petition Date by a customer using PayPal, Inc., and (iii) Subscriber Orders entered into prior to the Petition Date that Purchaser, in its sole discretion, agrees to fulfill;

**(aa)** the Sales Taxes Account and all cash deposited therein and any deposits in transit with respect to such account;

**(bb)** all goodwill directly arising from, related to or resulting from the Business or the Purchased Assets; and

**(cc)** any other assets, whether tangible or intangible, related to, used in or held for use by, the Business, except for any Excluded Assets.

**2.2    Excluded Assets**.  Notwithstanding any other provision of this Agreement to the contrary, the following assets (the "***Excluded Assets***") shall not be transferred, conveyed, sold or assigned to Purchaser, and the Purchased Assets shall not include any of the following assets:

**(a)** a Seller's corporate seals, stock record books, minute books and organizational documents;

**(b)** any Contract (other than an Assumed Contract) and, as set forth on Schedule 2.2(b), deposits made in respect of professional fee retainers but solely to the extent that such deposit is used to satisfy allowed professional or advisory fees or expenses of professionals or advisors retained under Section 327 or Section 363 of the Bankruptcy Code, including allowed fees or expenses of PPP or Theseus Strategy Group LLP;

**(c)** the D&O Policy and any defense costs and expenses payable under the D&O Policy to Employees, directors or officers of any Seller;

**(d)** all rights of Sellers arising under this Agreement, and under any other agreement between Sellers and Purchaser entered into in connection with this Agreement or the Transactions;

**(e)** all amounts owed to any Seller by any other Seller;

**(f)** any shares of stock or other equity interests in any Seller or any subsidiary of any Seller and any Contracts entered into in connection with the sale or ownership of such shares of stock or other equity interests to the extent not set forth on Section 2.1(a);

**(g)** all assets listed on Schedule 2.2(g) by Purchaser in its sole discretion as of two (2) Business Days before the Closing Date;

**(h)** all bank accounts, deposit accounts, securities accounts, brokerage accounts and other accounts holding any cash, cash equivalents or securities belonging to Sellers set forth on Schedule 2.2(h);

**(i)** all of Sellers' cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions in an amount equal to the Budgeted Reserve;

13.

**(j)**     all Employee Benefit Plans and any assets thereof or relating thereto;

**(k)**     (i) all attorney-client privilege and attorney work-product protection of the Sellers or associated with the Business as a result of legal counsel representing the Sellers or the Business to the extent relating to the structuring, preparation and negotiation of the transactions contemplated by this Agreement (except for any attorney-client privilege and attorney work-product protection relating to Sales Taxes in furtherance of Purchaser's obligations set forth in Section 8.5); (ii) all documents subject to the attorney-client privilege and work-product protection described in subsection (i) (excluding, for the avoidance of doubt, documents subject to the attorney-client privilege and work-product protection relating to Sales Taxes in furtherance of Purchaser's obligations set forth in Section 8.5); and (iii) all documents maintained by Sellers to the extent relating to the structuring, preparation and negotiation of the transactions contemplated by this Agreement (excluding any documents relating to Sales Taxes in furtherance of Purchaser's obligations set forth in Section 8.5);

**(l)**     the Accounts Receivable listed on Schedule 2.2(l) (the "**Excluded Accounts Receivable**"); and

**(m)**     all good faith or other bid deposits submitted by a third party under the terms of the bid procedures.

**2.3     Assumed Liabilities**.   Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the Assumed Liabilities. "**Assumed Liabilities**" shall mean solely the following liabilities:

**(a)**     all liabilities and obligations of Sellers exclusively related to or arising out of Purchaser's ownership of the Purchased Assets (other than the Assumed Contracts) from and after the Closing Date, including, with respect to the Subscriber Orders included in the Purchased Assets, all amounts billed to any customer by Sellers' prior to the Closing Date that are attributable to services not yet provided and to be rendered by Purchaser after the Closing Date;

**(b)**     all liabilities of Sellers under each of the Assumed Contracts that become due from and after the Closing Date;

**(c)**     all costs, expenses and liabilities pro-rated to Purchaser as expenses and liabilities arising on or after the Closing Date as set forth pursuant to the express terms of this Agreement;

**(d)**     all Cure Costs required in connection with the assumption and assignment of any Assumed Contracts;

**(e)**     (i) the administrative claims set forth on Schedule 2.3(e)(i), provided, that, Purchaser may, in its sole discretion, modify the administrative claims set forth on Schedule 2.3(e)(i) until two (2) Business Days prior to the Closing Date solely to remove any unpaid administrative claims and expenses that are not provided for in the DIP Budget; and (ii) valid Claims arising under section 503(b)(9) of the Bankruptcy Code as set forth on Schedule 2.3(e)(ii), which Purchaser may reduce dollar for dollar by the amount of any claim Sellers could have asserted against any such Claim holder pursuant to section 547 of the Bankruptcy Code on a creditor-by-creditor basis, provided that the holder of a 503(b)(9) claim may assert all valid defenses thereto.  In the event that the Purchaser and the holder of a 503(b)(9) claim cannot agree upon the amount of such 503(b)(9) claim to be assumed and paid by the Purchaser as set forth herein, such

14.

503(b)(9) claimant may petition the Court to increase the amount of its 503(b)(9) claim assumed by Purchaser or to adjudicate such 503(b)(9) claimant's hypothetical liability under section 547 of the Bankruptcy Code for the purposes described herein;

**(f)** all liabilities for Sales Taxes arising after the Petition Date with respect to the operation of the Business payable to certain Taxing Authorities ("***Post-Petition Sales Taxes***"); and

**(g)** the Transfer Taxes described in <u>Section 8.2</u>.

In no event shall an Assumed Liability include any Liabilities or obligations of any Seller or its Affiliates that relate to any breach of representation, warranty, covenant or agreement that arose on or prior to the Closing Date. Notwithstanding the foregoing and for the avoidance of doubt, Assumed Liabilities shall not include any Liability that constitutes an "Excluded Liability" or any Liability relating to or arising out of any violation of Law by, or any Claim against, any Seller or any breach, default or violation by any Seller of or under any Assumed Contracts, other than the Cure Costs.

**2.4** **Excluded Liabilities**. Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or Liability or other obligation of Sellers or any predecessor of any Seller of whatever nature, whether presently in existence or arising hereafter. All such other claims, Liabilities and other obligations, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, shall be retained by and remain claims, Liabilities and other obligations of Sellers (all such claims, Liabilities and other obligations not being assumed being herein referred to as the "***Excluded Liabilities***"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

**(a)** all Liabilities related to any Excluded Assets;

**(b)** administrative claims not explicitly set forth on <u>Schedule 2.3(e)</u>;

**(c)** all Liabilities (including Taxes (other than the Transfer Taxes and Post-Petition Sales Taxes)) for or arising in respect of (i) any and all Taxes (other than the Transfer Taxes), irrespective of when asserted, of the Business of one or more Sellers, any of their respective stockholders or equityholders of any Affiliate of any of the foregoing for any taxable period (including any such Taxes or related liabilities that may be imposed on or asserted against Purchaser or any of its Affiliates as a transferee or successor as a result of the transactions contemplated by this Agreement), (ii) any and all Taxes (other than the Post-Petition Sales Taxes) related to or arising from the Business, any of the Assumed Liabilities or any of the Purchased Assets, in each case, for any taxable period (or portion thereof) ending on or before the Closing Date (including any Taxes (other than the Post-Petition Sales Taxes) of any other Person imposed on or required to be paid by Purchaser as a successor or transferee, pursuant to any Assumed Contract, by operation of Law or otherwise to the extent relating to the Business and arising from an event or transaction occurring prior to the Closing or as a result of the failure to comply with any Bulk Sales Laws) and (iii) any Taxes or liabilities arising from the failure to comply with or obtain a certificate under any Bulk Sales Laws (including in respect of the transactions contemplated by this Agreement);

**(d)** all Liabilities relating to the Transferred Employees and all other Employees arising prior to the Closing Date, including Liabilities relating to such Transferred Employees and other Employees employment with any Seller or otherwise arising under the Employee Benefit Plans;

(e)    all Post-Retirement Liabilities;

(f)    all Liabilities under any collective bargaining agreement with any bargaining representative for Sellers' employees;

(g)    all claims for withdrawal liability or contributions related to Seller's participation in any Multiemployer Plan, including those set forth on Schedule 3.13(b);

(h)    all Liabilities relating to Employees, including all Liabilities of Sellers with respect to Employee Benefit Plans and all Liabilities thereunder, accrued and unpaid wages, accrued and unused vacation, sick days and personal days, any severance pay or benefits arising with respect to Transferred Employees, other payments earned but not paid under any incentive or bonus plan or arrangement of the Sellers, and the Employee's share and the employer's share of any payroll Taxes of all Employees of Sellers incurred through the Closing Date;

(i)    all Environmental Liabilities and Obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts arising or existing during Sellers' operation of the Business prior to the Closing Date; provided, that nothing in this Agreement shall in any way (x) diminish the obligation of any entity to comply with Environmental Laws, or (y) diminish the obligations of Sellers to comply with Environmental Laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code;

(j)    all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of or by Sellers' intellectual property and Intellectual Property Rights arising from Sellers' operation of the Business, or ownership or use of the Purchased Assets or Excluded Assets, prior to the Closing Date, including all Actions or claims in respect of any violation of any intellectual property rights, whether arising under a Contract or otherwise;

(k)    except with respect to Cure Costs, all Liabilities arising as a result of any Claim initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including any stockholder or shareholder actions, actions for breach of contract, or any tort actions;

(l)    all Liabilities with respect to any costs and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of each Seller or its Affiliates in connection with the Bankruptcy Cases or the Transactions;

(m)    all Liabilities incurred in the businesses of Sellers prior to the filing of the Bankruptcy Cases other than Assumed Liabilities, including all Liabilities and obligations of Sellers relating to or arising out of Subscriber Orders that are not included in the Purchased Assets;

(n)    all Liabilities for any funded indebtedness;

(o)    any Liability based on successor liability theories, including, product liability claims; and

(p)    any Liability based on any personal injury claims.

2.5    **Assumption/Assignment of Contracts and Rights; Executory Contract Designation**.

(a)     **Assumption/Assignment of Contracts and Rights**.  To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts (and such other Contracts intended to be Assumed Contracts subsequently identified by Purchaser after the Closing Date) shall be assumed by Sellers and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code.   Sellers shall use commercially reasonable efforts to cooperate with Purchaser in its efforts to reduce any Cure Costs and negotiate rent reductions with respect to Real Property Leases that are Assumed Contracts.  Purchaser shall have sole responsibility for paying any Cure Costs due in connection with the assumption and assignment of the Assumed Contracts.  Such efforts shall include, without limitation, providing Purchaser with reasonable access to relevant business records, personnel, equipment, and Purchaser's other reasonable requests in order to allow Purchaser to assist with evaluating the Cure Costs.   Purchaser shall cooperate with Sellers to provide "**adequate assurance**" of Purchaser's future performance under the Assumed Contracts.  If prior to or following Closing, it is discovered that a Contract was not previously provided to Purchaser and, accordingly, such Contract is not listed Schedule 2.1(a) (any such Contract, a "**Sellers' Previously Omitted Contract**"), Sellers shall, promptly following the discovery thereof, notify Purchaser in writing of such Sellers' Previously Omitted Contract.  Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Sellers' Previously Omitted Contract from Sellers, designating such Sellers' Previously Omitted Contract as "Assumed" or "Rejected."  If at any point following Closing, Purchaser elects to add any additional Contract to Schedule 2.1(a) that was not (i) listed on Schedule 2.1(a) as of Closing and (ii) rejected pursuant to a bankruptcy court order (any such Contract, a "**Purchaser Previously Omitted Contract**" and together with any Sellers' Previously Omitted Contract, a "**Previously Omitted Contract**"), Purchaser shall notify Sellers in writing of its designation of such Purchaser Previously Omitted Contract as "Assumed."  If Purchaser designates a Seller Previously Omitted Contract as "Assumed," (A) Schedule 2.1(a) shall be amended to include such Previously Omitted Contract and (B) Sellers shall, at Purchaser's expense, serve a notice (the "**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Agreement.  The Previously  Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) days to object, in writing to Sellers and Purchaser, to the Cure Costs or the assumption of its Contract; and if the counterparties, Sellers and Purchaser are unable to reach a consensual resolution with respect to such objection, Sellers will, at Purchaser's expense, file all pleadings required to seek a timely hearing before the Bankruptcy Court to determine the applicable Cure Costs (to the extent not previously determined) and obtain approval the assumption of the Previously Omitted Contract and payment by Purchaser of such applicable Cure Cost.  If Purchaser designates a Purchaser Previously Omitted Contract as "Assumed," Sellers shall amend Schedule 2.1(a) and, at Purchaser's expense, take all other steps necessary to assume and assign the Purchaser Previously Omitted Contract to Purchaser.  None of the representations or warranties applicable to contracts by this Agreement shall apply to any Purchaser Previously Omitted Contract.

(b)     **Executory Contract Designation**.   On the terms and conditions set forth in this Agreement, Purchaser shall have the sole and exclusive right to select, identify and designate the Assumed Contracts.

(c)     **Non-Assignment of Assumed Contracts**. Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract which, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not assignable or transferable without the consent of any Person, other than the Sellers, any of their respective Affiliates or Purchaser, to the extent that such consent shall not have been given prior to the Closing; provided,

17.

however, that (i) the Sellers shall use, whether before or after the Closing (at Purchaser's expense, if after Closing), its commercially reasonable efforts to obtain all necessary consents (each, a "***Necessary Consent***") to the assignment and transfer thereof, it being understood that, to the extent the foregoing shall require any action by the Sellers that would, or would continue to, have an adverse effect on the business of Purchaser or any of its Affiliates after the Closing, such action shall require the prior written consent of Purchaser, and (ii) in the event that any Assumed Contract is deemed not to be assigned pursuant to clause (i) of this Section 2.5(c), the Sellers shall, at Purchaser's expense, (A) use commercially reasonable efforts to obtain such necessary consents as promptly as practicable after the Closing to the extent administratively feasible and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Assumed Contract, under which Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Assumed Contract with respect to which such Necessary Consent has not been obtained to the extent administratively feasible. Upon satisfying any requisite consent requirement applicable to such Assumed Contract after the Closing, such Assumed Contract shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement. These commercially reasonable efforts shall not require any material payment or other material consideration from the Sellers or Purchaser (other than the Cure Costs, which shall be the responsibility of Purchaser), and any such consent shall contain terms and conditions reasonably acceptable to Purchaser. For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant Assumed Contract.

**(d)**      Upon objection by the non-debtor Contract counterparty to the proposed Cure Costs asserted by Sellers with regard to any Contract (such contract, a "***Disputed Contract***") Sellers shall, at Purchaser's prior written direction, either settle the objection of such party or shall litigate such objection (at Purchaser's expense if after Closing, or with the fees and expenses incurred being added to the Budgeted Reserve if prior to Closing). In no event shall any Seller settle a Cure Costs objection with regard to any Contract without the express written consent of Purchaser (with an email consent being sufficient). Upon entry of an Order determining any Cure Costs regarding any Disputed Contract (the "***Disputed Contract Order***"), Purchaser shall have the option to designate the Disputed Contract as an Excluded Asset, in which case, for the avoidance of doubt, Purchaser shall not assume the Disputed Contract and shall not be responsible for the associated Cure Costs, if any, with such Disputed Contract.  Each Seller agrees that it will promptly take such commercially reasonable actions as are necessary to obtain a final Order of the Bankruptcy Court providing for the assumption and assignment of Assumed Contracts.

**2.6**      **Consideration; Allocation of Consideration**.

**(a)**      In addition to the assumption of the Assumed Liabilities and the Cure Costs, the aggregate consideration (the "***Purchase Price***") for the sale, transfer and delivery of the Purchased Assets, at the Closing, shall be an amount equal to (i) thirty million dollars ($30,000,000) payable in the form of credit bid rights under Section 363(k) of the Bankruptcy Code consisting of the surrender and release by Purchaser of a portion of the Liabilities arising under, or otherwise relating to, the DIP Loan Agreement and First Lien Loan Agreement in an aggregate amount equal to thirty million dollars ($30,000,000) (the "***Credit Bid and Release***") (provided that the Credit Bid and Release shall be reduced dollar for dollar to the extent that Purchaser assumes (in its sole discretion) any portion of the indebtedness under the DIP Loan Agreement or First Lien Loan Agreement), *plus* (ii) the amount of cash payable by Purchaser in respect of the Budgeted Reserve, *plus* (iii) the aggregate amounts payable by Purchaser pursuant to

Section 8.5 in respect of Sellers' Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of Sellers.

(b)     Purchaser and Sellers agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with the allocation schedule (the "**Allocation Schedule**"), which shall be delivered by Purchaser to Sellers within ninety (90) days following the Closing Date. Purchaser and Sellers shall (and shall cause their respective Affiliates to) file all Tax Returns (including IRS Form 8954 (as and to the extent applicable)) and other Tax-related information reports in a manner consistent with the allocation schedule and not take any position inconsistent with such allocation schedule in any Tax-related audit, examination or other proceeding (whether administrative or judicial) unless required by applicable Law. If any Party receives any notice from a Taxing Authority in respect of an audit, examination or other proceeding (whether administrative or judicial) regarding any allocation of the Purchase Price or otherwise proposing an allocation different from the Allocation Schedule, such Party shall notify the other Parties of such notice and provide such other Parties with a copy of such notice, and the Parties hereto shall cooperate with each other in good faith regarding the resolution of any such matter.

(c)     Notwithstanding anything to the contrary herein, Purchaser and its Affiliates shall have the right to withhold any Taxes required by applicable Law (including any Bulk Sales Law) to be withheld or deducted from any payments made by it or its Affiliates pursuant to the terms hereof. Any such withheld or deducted amounts shall be treated for purposes of this Agreement as having been paid to the Person in respect of whom such withholding or deduction was made.

2.7     **Closing**. The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Cooley LLP, 55 Hudson Yards, New York, New York 10001, no later than three (3) Business Days after satisfaction of the conditions set forth in Section 10 (other than those conditions that by their nature are to be satisfied at the Closing (provided that such conditions are capable of being satisfied)), or at such other time or place as Purchaser and Sellers may mutually agree in writing. The Parties may consummate the Closing electronically.

2.8     **Deliveries by Sellers**. At the Closing, Sellers will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)     the Approval Order;

(b)     a duly executed bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit A** (the "**Assignment and Assumption Agreement**");

(c)     a duly executed trademark assignment agreement substantially in the form attached hereto as **Exhibit B** (the "**Trademark Assignment Agreement**"), duly executed by the applicable Seller;

(d)     a duly executed power of attorney substantially in the form attached hereto as **Exhibit C** (the "**Power of Attorney**");

(e)     an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance satisfactory to Purchaser, issued pursuant to Section 1445 of the Code and the Treasury regulations thereunder stating that Seller is not a foreign person as defined in Section 1445 of the Code;

**(f)**  in the event that any Real Property Lease is set forth on Schedule 2.1(a) on the date that is two (2) Business Days prior to the Closing Date, a duly executed assignment and assumption agreement substantially in the form attached hereto as **Exhibit D** with respect to each such Real Property Lease (the "***Leased Real Property Assignment Agreements***" and, together with the Assignment and Assumption Agreement, the Trademark Assignment Agreement and the Leased Real Property Assignment Agreements, the "***Conveyance Agreements***");

**(g)**  a duly executed counterpart to the Transition Services Agreement (if requested by Purchaser and to the extent administratively feasible);

**(h)**  a duly executed counterpart to the Sales Tax Funding Commitment; and

**(i)**  all other documents, assignments, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement, in each case in form and substance reasonably acceptable to Sellers.

**2.9    Deliveries by Purchaser**.  At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

**(a)**  evidence of the Credit Bid and Release in form and substance reasonably satisfactory to Sellers;

**(b)**  duly executed counterparts to the Conveyance Agreements;

**(c)**  a duly executed counterpart to the Transition Services Agreement (if requested by Purchaser and to the extent administratively feasible);

**(d)**  a duly executed counterpart to the Sales Tax Funding Commitment; and

**(e)**  all other documents, instruments and writings reasonably requested by Sellers to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

**2.10    Cash Transfer**.  At the Closing, Sellers shall pay, or cause to be paid, to Purchaser an amount in cash equal to all cash and cash equivalents on hand as of the Closing Date in excess of the Budgeted Reserve by wire transfer of immediately available funds, to the account or accounts designated in writing by Purchaser to Sellers at least two (2) Business Days prior to the Closing.

**3.    REPRESENTATIONS AND WARRANTIES OF SELLERS.**  Except as set forth in the Schedules, each of the Sellers hereby represents and warrants to Purchaser as of the Original Agreement Date and as of the Closing Date as follows:

**3.1    Organization**.  Each Seller is (a) an entity duly incorporated or organized and validly existing under the Laws of its jurisdiction of incorporation or organization, as applicable, (b) has all requisite corporate or limited liability company power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) under the Laws of its jurisdiction of incorporation or organization, as applicable, and in every jurisdiction in which its ownership of property or the conduct of the Business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

**3.2    Corporate Authorization**.  The execution, delivery and performance of this Agreement by each Seller, and the consummation by such Seller of the Transactions, subject to

requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by such Seller.  This Agreement has been duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, upon approval of the Bankruptcy Court.

3.3     **Financial Information**.

(a)     Schedule 3.3(a) sets forth (i) the unaudited financial statements of the Business for the year ended December 31, 2018, consisting of the consolidated balance sheet of Sellers as of December 31, 2018 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended and (ii) an unaudited interim balance sheet for the six-months ended June 30, 2019 (such interim financial statements, together with the financial information described in the preceding clause (i), the "***Financial Information***").   The Financial Information (A) has been prepared from, and is consistent with, the books and records of Sellers, and, except as noted therein, has been prepared in accordance with GAAP, (B) except as noted therein, has been prepared on a basis consistent with prior accounting periods of Sellers, (C) presents fairly, individually and in the aggregate, in all material respects the balances of the specified accounts of the Business for the period covered thereby, and (D) except as noted therein, reflects and fairly presents, individually and in the aggregate, in all material respects the total revenue generated in respect of the Business for each period for which such Financial Information was provided.

(b)     There are no Liabilities of the Business (whether accrued, absolute, contingent or otherwise) required under GAAP to be reflected in the Financial Information that are not reflected therein other than (i) Liabilities for Taxes, (ii) other Liabilities, in each case, incurred in the ordinary course of business since June 30, 2019 and (iii) Liabilities that are not, or would not reasonably be expected to be, individually or in the aggregate, material to the Business.

(c)     Sellers' books and records contain records that reflect, in reasonable detail and in all material respects, the transactions and dispositions of the assets of the Business.   Sellers' system of internal controls over financial reporting is sufficient to provide reasonable assurance (i) that transactions in respect of the Business are recorded as necessary to permit preparation of financial statements in conformity with GAAP, consistently applied, and to derive from such financial statements, financial statements in conformity with GAAP, (ii) that transactions in respect of the Business are executed only in accordance with the fiscal authorization policies of Sellers and (iii) regarding prevention or timely detection of the unauthorized acquisition, use or disposition of the assets of the Business.

(d)     All Accounts Receivables are valid receivables and were incurred in the ordinary course of business consistent with past practice for bona fide products delivered or services rendered and, to the Knowledge of Sellers, are current and collectible.

3.4     **Governmental Authorization**.   The execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions by Sellers require no action by or in respect of, or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

3.5     **Noncontravention**.   Subject to entry by the Bankruptcy Court of the bid procedures order and the Approval Order in the Bankruptcy Cases, the execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions do not and

will not (a) violate any Seller's articles or certificates of incorporation or formation, as amended, or bylaws or operating agreements, (b) assuming compliance with the matters referred to in <u>Section 3.4</u>, violate any applicable Law, or (c) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens and Assumed Liabilities or Liens that will be released at or prior to Closing.

**3.6    Required Consents**.

**(a)**    Except as set forth on <u>Schedule 3.6(a)</u> and assuming that (x) requisite Bankruptcy Court approvals are obtained and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.6(a)</u> are made, given or obtained, as applicable, the execution, delivery and performance by Sellers of this Agreement and the consummation by Sellers of the transactions contemplated hereby, do not: (i) violate the certificate of incorporation or formation, bylaws or limited liability company agreement or equivalent organizational documents of any of the Sellers; (ii) violate any Law applicable to any of the Purchased Assets or by which the Purchased Assets are bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Lien (other than a Permitted Lien) on any Purchased Asset under, any Contract, except, in the case of clauses (ii) and (iii), for any such violations, breaches, defaults or other occurrences that would not reasonably be expected to have a Material Adverse Effect.

**(b)**    Except as set forth on <u>Schedule 3.6(b)</u>, Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Sellers of this Agreement or the consummation by Sellers of the Transactions, except (i) requisite Bankruptcy Court approvals or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not reasonably be expected to prevent or materially impair or delay the Transactions.

**3.7    Litigation**.  Except as disclosed on <u>Schedule 3.7</u>, as of the Original Agreement Date and subject to entry by the Bankruptcy Court of the bid procedures order and the Approval Order in the Bankruptcy Cases, there is no action, suit, investigation or legal or administrative proceeding pending or, to the Knowledge of Sellers, threatened against or affecting, the Purchased Assets, the Assumed Liabilities or the Business.  There are no material unsatisfied judgements, penalties or awards against or affecting the Business, the Purchased Assets or the Assumed Liabilities.

**3.8    Permits**.  <u>Schedule 2.1(e)</u> sets forth a list of all Permits required to conduct and operate the Business in a manner consistent with the current practices of Sellers.  <u>Except as set forth on Schedule 3.8</u>, (a) each Seller is in material compliance with the terms and requirements of each such Permit; and (b) no written notice of violation of any Permit has been received from any Governmental Authority and no proceeding is pending seeking to revoke or limit any such Permit.

**3.9    Compliance with Laws and Court Orders**.  Each Seller is not in material violation of any Law applicable to the ownership and use of the Purchased Assets or the conduct of the Business as currently conducted and to the Knowledge of Sellers, for the past three (3) years, has been in material compliance with all Laws applicable to it or its Business, properties or assets, except where such failure to comply has been cured without any continuing Liability on the part of a Seller or set forth in a Schedule to this Agreement.

**3.10    Intellectual Property Rights**.  <u>Schedule 2.1(f)(i)</u> sets forth an accurate and complete list of all Registered IP, unregistered trademarks included in the Transferred Intellectual

22.

Property Rights and any other Intellectual Property Rights included in the Transferred Intellectual Property Rights that is material to the Business, taken as a whole.  One or more Sellers own all Transferred Intellectual Property Rights free and clear of all Liens (other than Permitted Liens) and have valid rights to assign, transfer and convey all rights, title and interest associated therewith pursuant to this Agreement.  Schedule 2.1(f)(ii) sets forth an accurate and complete list of all Registered IP that, to the Knowledge of Sellers, has been abandoned, cancelled or expired within the past three (3) years (the "***Expired IP***").  Except with respect to the Expired IP, all Registered IP remains pending or in full force and effect and has not expired or been cancelled. Except with respect to the Expired IP, the Registered IP is valid and enforceable except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability and the past three (3) years of use and current use by Sellers of the Technology owned by or, to the Knowledge of Sellers, licensed by, the Sellers does not infringe or otherwise violate any Intellectual Property Rights of any other Person, except as would not, individually or in the aggregate, be, or reasonably be expected to be material. To the Knowledge of Sellers, no Person is infringing or otherwise violating the Transferred Intellectual Property Rights.

**3.11    Environmental Matters**.    (a) Other than as described on part (a) of Schedule 3.11, in the last three (3) years, to the Knowledge of Sellers, each Seller has not received any notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Leased Real Property which remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Leased Real Property which remains unperformed, and (b) other than as described on part (b) of Schedule 3.11, to the Knowledge of Sellers, the Leased Real Property is in compliance, in all material respects, with applicable Environmental Laws.  The representations and warranties set forth in this Section 3.11 are the Sellers' sole and exclusive representations and warranties regarding environmental matters.

**3.12    Real Property**.  Seller has made available to Purchaser a true and complete copy of every Real Property Lease.  Except as set forth on Schedule 3.12, (a) each Real Property Lease that is an Assumed Contract is a legal, valid and binding obligation of Seller, and is enforceable against Seller, and is in full force and effect, (b) there are no leases, subleases, licenses, disputes, forbearance programs, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Leased Real Property; (c) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Leased Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; (d) Seller has not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in any Real Property Lease that is an Assumed Contract; and (e) there are no condemnation or eminent domain proceedings pending or threatened with respect to all or any part of the Leased Real Property.  Neither Seller nor, to the Knowledge of Sellers, any other party to a Real Property Lease that is an Assumed Contract is in default under such Real Property Lease and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material default, or permit the termination, modification or acceleration of rent under such Real Property Lease that is an Assumed Contract.  The Leased Real Property constitutes all of the real estate used or occupied for the Business, and no other real estate is necessary for the continued conduct of the Business in its ordinary course.  Each of the Real Property Leases that is an Assumed Contract will continue to be legal, valid, binding, enforceable, and will continue to be in full force and effect on identical terms following the consummation of the transactions contemplated hereby, and, except as set forth on Schedule 3.6(a), no consent of any landlord under any of the Real Property Leases that is an Assumed Contract are required in order for Seller to assign to Purchaser all of its interest under each Real Property Lease that is an Assumed Contract.

**3.13    Employee Benefits**.

**(a)** Schedule 3.13(a) sets forth a complete and accurate list of the Employee Benefit Plans. Sellers have provided to, or made available to, Purchaser true and correct copies of (i) each Employee Benefit Plan (including all plan documents and amendments thereto), (ii) all current trust documents, investment management contracts, custodial agreements and insurance contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the annual report (Form 5500 and all schedules thereto) for the most recent plan year, (v) the most recent Internal Revenue Service determination or opinion letter, if applicable, and (vi) the annual report, actuarial report, financial statement and trustee report for the most recent plan year.

**(b)** Schedule 3.13(b) sets forth a complete and accurate list of all Multiemployer Plans to which any Seller contributes on behalf of any Employees. Sellers represent that they have not contributed to any Multiemployer Plan other than those listed on Schedule 3.13(b) during the past five (5) years.

**(c)** Each Employee Benefit Plan complies in both form and operation and has been established, maintained, funded and administered in all material respects in compliance with its terms, all applicable requirements of ERISA, the Code and other applicable Laws. Each Employee Benefit Plan which is intended to be qualified within the meaning of Code § 401(a) has received a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan. None of the Purchased Assets is subject to any Lien under ERISA or the Code. No Seller has any Liability with respect to any "***employee benefit plan***" (as defined in Section 3(3) of ERISA) that is subject to Section 302 or Title IV of ERISA, or Section 412 of the Code. The transactions contemplated by this Agreement are not transactions to evade or avoid liability (as described in Section 4069(a) or 4212(c) of ERISA).

**(d)** There are no pending audits or investigations by any Governmental Authority involving any Employee Benefit Plan, and there are no pending or, to the Knowledge of Sellers, threatened claims (except for individual claims for benefits payable in the normal operation of the Employee Benefit Plans), suits or proceedings involving any Employee Benefit Plan, any trust or other funding medium thereof, fiduciary thereof or service provider thereto, nor is there any reasonable basis for any such claim, suit or proceeding.

**(e)** With respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law.

**(f)** No Employee Benefit Plan provides benefits, including, death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by law or (ii) death or retirement benefits under an Employee Benefit Plan qualified under Section 401(a) of the Code.

**(g)** Each Seller's execution of, and performance of the transactions contemplated by, this Agreement will not: (i) except as set forth on Schedule 3.13(g)(i), result in any payment or benefit, or increase in payments or benefits or acceleration in the timing of payments or benefits becoming due to any current or former employee, director, officer or independent contractor of such Seller; (ii) except as set forth on Schedule 3.13(g)(ii), limit the right to merge, amend or terminate any Employee Benefit

24.

Plan; or (iii) result in the payment or provision of an "excess parachute payment" under Section 280G of the Code, whether under an Employee Benefit Plan or otherwise.

**(h)** Each Employee Benefit Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code complies in both form and operation with the requirements of Section 409A of the Code in all material respects.

**(i)** Except as would not reasonably be expected to result in material Liability to the Sellers, no individual who performs or has performed services for the Sellers has been improperly excluded from participation in any Employee Benefit Plan.

**(j)** Except as set forth on Schedule 3.13(j), Sellers have performed all material obligations required to be performed by them and are not in any material respect in default under or in violation of any Employee Benefit Plan, nor, to the Knowledge of Sellers, has there been any such material default or violation by any other party to any Employee Benefit Plan.

**3.14    Employment and Personnel Matters**.

**(a)** Schedule 3.14(a) contains an accurate and complete list as of the date set forth on Schedule 3.14 of the names, job classifications, dates of hire, base compensation or wage rate, work location, exempt or non-exempt classification for wage-hour purposes, annual bonus opportunity, accrued but unused sick and vacation leave or paid time off entitlements, and any supplemental or bonus compensation (including any retention bonus arrangements) for all Employees.

**(b)** The Contracts listed on Schedule 3.14(b) include all individual written employment, retention, change in control bonus or severance agreements to which, as of the Original Agreement Date, the Sellers are a party with respect to any Employee.

**(c)** There are no complaints, charges or claims against the Sellers pending or, to the Knowledge of Sellers, threatened with any Governmental Authority or based on, arising out of, in connection with or otherwise relating to the employment or termination of employment or failure to employ by the Sellers, of any individual. The Sellers are and for the past three (3) years, to the Knowledge of the Sellers, have been in material compliance with all Laws relating to wages, hours, severance pay, WARN and any similar state or local "mass layoff" or "plant closing" Law, collective bargaining, discrimination, civil rights, safety and health, immigration, classification of workers as exempt or non-exempt, discrimination, workers compensation, and the collection and withholding of social security taxes and any similar tax.

**(d)** The Sellers have not incurred and do not expect to incur any Liability with respect to any misclassification of any person as an independent contractor rather than as an employee, or as exempt rather than non-exempt for wage and hour purposes.

**(e)** All current Employees and other individual service providers are located in and have a place of employment in the United States, and have authorization and appropriate documentation to work in the United States. Sellers are not party to any collective bargaining agreement with any labor union. There has not been any labor dispute, other than individual grievances, or any activity or proceeding by a labor union or representative thereof to organize any employees of Sellers. Each Seller has not suffered any work stoppage, strike, lockout or other material labor dispute within the past three (3) years, and no such activities are underway or threatened.

25.

(f)    Except as set forth on Schedule 3.14(f), the Sellers have not taken any action which would constitute a "plant closing" or "mass layoff" within the meaning of the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "WARN Act") or similar state of local law, issued any notification of a plant closing or mass layoff required by the WARN Act or similar state or local law, or incurred any liability or obligation under WARN or any similar state or local law that remains unsatisfied.  Except as set forth on Schedule 3.14(f), no terminations prior to the Closing would trigger any notice or other obligations under the WARN Act or similar state or local law.

3.15    **Taxes**.  Except as set forth on part (a) of Schedule 3.15, all Tax Returns (including any IRS Forms W-2 or Forms 1099) required to be filed by or on behalf of each Seller (or any predecessor of a Seller) and all Tax Returns required to be filed in respect of any Purchased Asset, in each case, have been timely filed, and when filed all such Tax Returns were true and correct in all material respects.  Except as set forth on part (b) of Schedule 3.15, all Taxes of each Seller (or any predecessor of a Seller) and all Taxes relating to any Purchased Asset required to have been paid were timely paid or (in respect of withholding or payroll Taxes) duly withheld and paid over.  Except as set forth on part (c) of Schedule 3.15, during the last three (3) tax years, no written claim has been made by any Taxing Authority in a jurisdiction where a Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction with respect to the Purchased Assets, Business or the Assumed Liabilities.  Except as set forth on part (d) of Schedule 3.15, no audit, administrative proceeding or judicial proceeding, that involves any amount of Tax and the Business is pending or threatened in writing.  True and complete copies of all Tax Returns filed by each Seller for each of its three (3) most recent taxable years have been delivered to Purchaser.  None of the Purchased Assets includes any equity interests, securities, stock, shares or other ownership interest in any Person (including any Person that is not a "***United States person***" within the meaning of Code Section 7701(a)(30)).  None of the Purchased Assets includes any "***United States real property interest***" within the meaning of Code Section 897.  Except as set forth on part (e) of Schedule 3.15, no Seller is required to file any Tax Return in any jurisdiction other than a jurisdiction within the United States.  There are no liens on any of the Purchased Assets that arose in connection with any failure (or alleged failure) to pay any Taxes.  Purchaser will not be required to include any income in, or exclude any deduction from income with respect to the Purchased Assets for any taxable period ending after the Closing Date as a result of any action by the Seller in a pre-closing tax period including any change in any method of accounting; any installment sale, open transaction, prepaid amount, or intercompany transaction; or any agreement with any Taxing Authority.

3.16    **Title to the Purchased Assets**.  Each Seller will have at Closing good and marketable title to, or a valid leasehold interest in (or license or other right to use), all the Purchased Assets free and clear of all Liens (other than Permitted Liens and Assumed Liabilities).

3.17    **Transactions with Affiliates**.  Except as disclosed on Schedule 3.17, there are no Assumed Contracts between any Seller with respect to the Business, on the one hand, and any Affiliate of any Seller, on the other, including any loan, guarantee or purchase or sales agreement, other than contracts or agreements which will be terminated prior to the Closing.

3.18    **Insurance**.  As of the Original Agreement Date, all material property and liability insurance policies covering any of the Purchased Assets are in full force and effect, and no written notice of cancellation, termination or revocation or other written notice that any such insurance policy is no longer in full force or effect or that the issuer of any such insurance policy is not willing or able to perform its obligations thereunder has been received by any Seller.  Such policies provide for coverage in amounts deemed by Sellers to be adequate, and all premiums due and payable thereon have been paid in full.

**3.19    Service of Bankruptcy Documents**.  Each Seller has appropriately and timely served all parties in interest with copies of the sale and bid procedures motion and applicable notices in accordance with the bid procedures order.

**3.20    Certain Fees**.    Except as set forth on <u>Schedule 3.20</u>, no agent, broker, investment banker or other person or firm acting on behalf of any Seller or under its authority is or will be entitled to any broker's or finder's fee or any other commission or similar fee or the reimbursement of expenses, directly or indirectly, from any Seller in connection with this Agreement or the Transactions.

**3.21    Material Contracts**.

**(a)**    <u>Schedule 3.21(a)</u> sets forth a true, correct and complete list of the following types of Contracts to which any Seller is a party or by which any Seller is bound or by which the Purchased Assets may be bound or affected (the "***Material Contracts***"):

**(i)**    Assumed Contracts with any Affiliate or current or former officer or director of a Seller;

**(ii)**    the License Agreements;

**(iii)**    any Contract, to the Knowledge of Sellers, containing a covenant that restricts a Seller or any Affiliate of a Seller from engaging in any line of business, conducting the Business in any geographic area, competing with any Person or hiring any Person;

**(iv)**    any Assumed Contract, to the Knowledge of Sellers, granting to any Person an option or a first refusal or similar preferential right to purchase or acquire any material Purchased Assets of the Sellers;

**(v)**    any Contract relating to incurrence of indebtedness or the making of any loans, in each case involving amounts in excess of One Hundred Thousand Dollars ($100,000);

**(vi)**    any Assumed Contract, to the Knowledge of Sellers, granting any "most favored nation" pricing, discounts or benefits to any Person; and

**(vii)**    Contracts relating to a joint venture of the Business or any Seller.

**(b)**    Each of the Material Contracts that is an Assumed Contracts is in full force and effect and is the legal, valid and binding obligation of a Seller, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**(c)**    Prior to the Original Agreement Date, Sellers used reasonable best efforts to deliver to Purchaser a true, complete and accurate copy of (i) each Material Contract (including all amendments thereto) and (ii) each other Contract (including all amendments thereto) that involves amounts in excess of $10,000.

**3.22    Licensing Matters**.  All of the License Agreements are in full force and effect and are valid and binding obligations of a Seller and enforceable against it and the other parties thereto in accordance with their respective terms, subject to certain equitable and other defenses by counterparties to certain of such License Agreements.    Except as set forth in <u>Schedule</u>

27.

3.21(a), all License Agreements comply in all material respects with all applicable Laws, and no party to a License Agreement has asserted any right of rescission or set-off, counterclaim or defense.

**3.23    Data Privacy**.   In connection with its collection, storage, transfer (including transfer across national borders) or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees or other third parties (collectively "***Personal Information***"), each Seller is and, during the last three (3) years, has been in compliance with all applicable Laws in all relevant jurisdictions except as would not, individually or in the aggregate, be, or would reasonably be expected to be, material to the Business taken as a whole and has obtained all necessary rights from third parties and complied in all material respects with all other requirements under applicable Laws to enable the collection, storage, transfer or use of such Personal Information for the purposes of the Business (as is customary in the retail and e-commerce industries) following Closing.  Each Seller has complied in all material respects with the opt-out provisions of its privacy policies and any and all requests of customers to opt out of receipt of marketing messages.   Each Seller has commercially reasonable physical, technical, organizational and administrative security measures in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use or disclosure in accordance with applicable Laws and there have been no security incidents which have resulted in the accidental or unlawful destruction, loss, alteration or unauthorized disclosure of or access to Personal Information during the last three (3) years.

**3.24    Customer Lists; Customer Data**.   The Customer Lists maintained by the Sellers are true, correct and complete in all material respects, and are the only lists of the customers of the Business, and the Sellers have no other or separate list of the customers of the Business.   None of the Sellers has sold, licensed or made available any information or rights contained in any Customer List or any Customer Data (or any portion thereof) to any Person (other than the making available of a Customer List or Customer Data to an Employee in the ordinary course of such Employee's duties for use in connection with services rendered to the Business, or the provision of the Customer Lists under seal in the Bankruptcy Cases).

**3.25    No Other Representations or Warranties; Schedules**.   Except for the representations and warranties contained in Section 3 (as modified by the Schedules hereto) or any Transaction Document, none of Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers, the Purchased Assets, the Assumed Liabilities or the Transactions, and each Seller disclaims any other representations or warranties, whether made by Sellers, any Affiliate of Sellers, or any of Sellers' or their Affiliates' respective Representatives.   Except for the representations and warranties contained in Section 3 (as modified by the Schedules hereto) or any Transaction Document, each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Sellers or any of its Affiliates).   Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business.   The disclosure of any matter or item in any Section of the Schedule will, if not otherwise required to be set forth thereon by the terms of this Agreement, not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Material Adverse Effect with respect to the Sellers.  Sellers acknowledge that except for the representations and warranties made by Purchaser in Section 4, Purchaser does not make (and neither Sellers nor any other Person has not relied upon) any representations or warranties on behalf of Purchaser.  Sellers acknowledge and agree that they (i) have been afforded the opportunity to ask questions of and receive answers from officers and

other key employees of Purchaser and (ii) have conducted their own independent investigation of Purchaser, and have not relied on any representation, warranty or other statement by any Person on behalf of Purchaser, other than the representations and warranties of Purchaser expressly contained in Section 4, and that all other representations and warranties are specifically disclaimed.   Notwithstanding the foregoing, nothing contained in this Section shall limit or otherwise impair in any manner Sellers' right to make a claim for breach of any Transaction Document, actual fraud or willful misconduct.

4.      **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**  Purchaser represents and warrants to each Seller as follows:

4.1      **Organization**.  Purchaser is a Delaware limited liability company duly organized, validly existing and in good standing and has all requisite authority to carry on its business.

4.2      **Corporate Authorization**.   The execution, delivery and performance of this Agreement by Purchaser, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite organizational action, and no other proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by it.  This Agreement has been duly and validly executed and delivered by Purchaser, and, assuming this Agreement is a valid and binding obligation of each Seller, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, upon approval of the Bankruptcy Court.

4.3      **Governmental Authorization**.   The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material effect on Purchaser or its ability to consummate the Transactions.

4.4      **Noncontravention**.   Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, any Seller.

4.5      **Availability of Purchase Price**.  Purchaser has provided to Sellers true and correct copies of documentation evidencing Purchaser's empowerment as of the Closing Date to deliver the Credit Bid and Release.  Purchaser has sufficient funds available to it in cash to pay or cause to be paid any cash portion of the Purchase Price, and the Assumed Liabilities.  Upon the consummation of the Transactions, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.

4.6      **Certain Fees**.  Purchaser has not employed any broker, finder, investment banker or other intermediary or incurred any Liability for any investment banking fees, financial

advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

**4.7    Litigation**.  There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, materially alter or materially delay the Transactions.

**5.    COVENANTS OF SELLER.**  Sellers agree that:

**5.1    Conduct of the Business**.  From the Original Agreement Date until the earlier of the termination of this Agreement pursuant to <u>Section 11.1</u> or the Closing Date, except (a) as disclosed on <u>Schedule 5.1</u>, (b) consented to in writing by Purchaser, (c) as may be required by the Bankruptcy Court (<u>provided</u> that no Seller petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such order of the Bankruptcy Court) or (d) for any action expressly required to be taken pursuant to this Agreement, (i) each Seller shall use commercially reasonable efforts to (A) conduct its Business in the ordinary course consistent with past practice since the Petition Date, (B) comply in all material respects with all applicable Laws (including, maintaining any Permits held by each Seller and required for the current operation of the Business) and all Assumed Contracts and (C) preserve the Business (including the E-Commerce Platform and all systems necessary to maintain the condition and availability of such E-Commerce Platform) intact and preserve the goodwill of and relationships with Governmental Authorities, customers, suppliers, employees and others having business dealings with the Business; and (ii) without limiting the generality of the foregoing, each Seller will not:

    **(a)**    with respect to the Business, acquire a material amount of assets (including any inventory) from any other Person (including by merger, share exchange, joint venture or other extraordinary transaction);

    **(b)**    sell, transfer, lease, license, mortgage, encumber (unless such Lien is removed prior to the Closing, except for the DIP Liens) or otherwise dispose of any Purchased Assets;

    **(c)**    amend, modify or terminate any Material Contract without Purchaser's prior written consent;

    **(d)**    fail to maintain, or allow to lapse, or abandon any Registered IP;

    **(e)**    fail to maintain any Customer Lists or other books and records of the Business in the ordinary course of business;

    **(f)**    destroy or fail to preserve any Customer Data except to the extent required by applicable Law and in the ordinary course of the Business consistent with past practice;

    **(g)**    hire or engage any new Employee or consultant or terminate any Employee (other than a termination for cause);

    **(h)**    increase the compensation, severance or fringe benefits of any Employee;

    **(i)**    change or revoke any method of accounting for tax purposes;

**(j)**    (i) make or change any Tax election or change any method of tax accounting, (ii) settle or compromise or enter into any contractual arrangement in respect of any federal, state, local or foreign Tax liability other than a Qualified Settlement (<u>provided</u>, that Purchaser's consent to any settlement with a Taxing Authority in respect of Sales Taxes shall not be unreasonably conditioned, withheld or delayed), (iii) file an amended Tax Return (other than the Tax Return for fiscal year 2018 only if (x) required by the Office of the U.S. Trustee and (y) all costs, expenses, obligations and Liabilities of such filing are Excluded Liabilities), (iv) enter into any closing agreement relating to any Tax, (v) enter into any voluntary disclosure or similar program with respect to any Tax, (vi) agree to any extension of a statute of limitations, or (vii) surrender any right to claim a Tax refund with respect to the Purchased Assets;

**(k)**    change or modify any material accounting practice, policy or procedure, except as required by GAAP or applicable Law;

**(l)**    enter into any purchase order unless the terms and conditions applicable thereto have been previously approved by Purchaser;

**(m)**    make any broad-based communication to customers of the Business (<u>provided</u> that such consent shall not be unreasonably withheld, condition or delayed in the event that such communication is required by the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure);

**(n)**    make any debits from, or otherwise withdraw any cash from, the Sales Taxes Account, except to pay Sales Taxes as they come due;

**(o)**    agree or commit to do any of the foregoing; or

**(p)**    take any action that would reasonably be expected to cause the failure of any condition contained in <u>Section 10.2</u> (other than actions taken by each Seller in connection with the discharge of its fiduciary duties during the Bankruptcy Cases).

**5.2    Access to Information**.  Subject to applicable Law and except as doing so would violate any fiduciary duty or contractual obligation or would waive any attorney-client privilege of Sellers included in the Excluded Assets (<u>provided</u>, <u>however</u>, in any such case, Sellers and Purchaser shall use commercially reasonable efforts to identify and pursue a permissible method of providing such disclosure without violating such Laws or obligations and without resulting in a loss of such privileges), from the Original Agreement Date until the earlier of the termination of this Agreement pursuant to <u>Section 11.1</u> or the Closing Date, Sellers (a) shall give Purchaser and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of Sellers in each case to the extent relating to the Purchased Assets, as Purchaser reasonably deems necessary in connection with effectuating the Transactions, (b) shall furnish to Purchaser and its Representatives such information as Purchaser and its Representatives reasonably request and (c) shall cooperate reasonably with Purchaser in its investigation of the Purchased Assets or the Business.

**5.3    Notices of Certain Events**.  From the Original Agreement Date until the earlier of the termination of this Agreement pursuant to <u>Section 11.1</u> or the Closing Date, each Seller shall promptly notify Purchaser of:

**(a)**    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

**(b)** any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

**(c)** the commencement of any actions, suits, investigations or proceedings relating to such Seller, any Purchased Asset or the Business that, if pending on the Original Agreement Date, would have been required to have been disclosed pursuant to Section 3.7 or would have resulted in a breach of any representation contained in Section 3.15.

**5.4    Name Change**.  At the closing or within ten (10) Business Days of the Closing Date, Sellers shall use commercially reasonable efforts to take such corporate and other actions necessary to change their company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by the law of the state of their respective organization, and shall promptly thereafter provide Purchaser with written evidence of such name changes.  Sellers shall also prepare and file a motion with the Bankruptcy Court to change the caption of the Bankruptcy Cases to reflect such names changes.

**5.5    Intellectual Property Rights Assignment**.  To the extent any Intellectual Property Rights used by the Business are owned by any directors or officers of the Sellers prior to the Closing, the Sellers shall (a) with respect to any current directors and officers, cause such current directors and officers to assign their entire interest in such Intellectual Property Rights to the Sellers prior to the Closing, and (b) with respect to any former directors and officers, use reasonable best efforts to cause such former directors and officers to assign their entire interest in such Intellectual Property Rights to the Sellers prior to the Closing.  At or prior to the Closing, with respect to certain social media sites identified on Schedule 2.1(g), the Sellers shall make a Person identified by Purchaser a moderator of such accounts in order to provide Purchaser access to such accounts.

6.    **COVENANTS OF PURCHASER.**

**6.1    Books and Records**.  After the Closing Date, Purchaser shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, to the extent necessary to permit Sellers to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit, any claim or litigation matter or for purposes of the Bankruptcy Cases, but not for any dispute or claim between Purchaser and Seller in connection with this Agreement, the Transaction Documents or otherwise), for periods prior to the Closing and shall preserve such books and records until the later of (i) such period as shall be consistent with Purchaser's records retention policy in effect from time to time, (ii) the retention period required by applicable Law or (iii) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Purchaser acknowledges that Sellers have the right to retain originals or copies of all of books and records included in or related to the Purchased Assets for periods prior to the Closing.

7.    **COVENANTS OF PURCHASER AND SELLER.**  Purchaser and each Seller agree that:

**7.1    Efforts; Further Assurances**.  Subject to the terms and conditions of this Agreement, Purchaser and each Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the Transactions contemplated by this Agreement including: (a) the delivery by Sellers to Purchaser of originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not already located at the Leased Real Property, (b) at

Purchaser's expense, acting as Purchaser's agent in order to obtain for Purchaser the benefits under any non-assignable Purchased Assets and cooperating with Purchaser in any other reasonable arrangement designed to provide the benefits of such non-assignable Purchased Assets to Purchaser and (c) at Purchaser's request, physical possession of any Purchased Assets identified by Purchaser that is capable of passing by delivery, with the intent that title in such Purchased Assets shall pass by and upon delivery; provided, however, each Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets).  Each Seller and Purchaser agree to execute and deliver such other documents, assignments, certificates, agreements and other writings and to take such other actions as may be necessary in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

7.2    **Certain Filings**.  Each Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking to timely obtain any such actions, consents, approvals or waivers.

7.3    **Public Announcements**.  Prior to the Closing, Purchaser may make any public announcements or statements concerning the Transactions without the prior written consent of Sellers.  Purchaser acknowledges and agrees that Sellers may provide copies of this Agreement to parties in interest in the Bankruptcy Cases and to those parties to whom any Seller determines it is necessary to provide copies in connection with soliciting higher or better bids for the Purchased Assets or as otherwise necessary or desirable in connection with the Bankruptcy Cases.  Sellers also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the contemplated Transactions in any newspaper selected by Sellers.

7.4    **DIP Loan Documents**.  Notwithstanding anything in this Agreement to the contrary, between the Original Agreement Date and the Closing Date, it shall not be a breach of this Agreement for, and nothing in this Agreement shall (or shall be deemed to) limit or affect the ability of, Sellers to incur indebtedness, encumber the Purchased Assets with the DIP Liens, or borrow funds under the DIP Loan Documents.

7.5    **Bankruptcy Issues**.

(a)    **Expense Reimbursement**.  Upon consummation of a sale of all or substantially all of the Purchased Assets to any third party (or third parties) (other than Purchaser), or if any Seller commits a material breach of this Agreement or unilaterally abandons consummation of the transactions contemplated by this Agreement, Sellers shall pay to Purchaser cash or other immediately available funds in an amount equal to seven hundred and fifty thousand dollars ($750,000) (the "***Expense Reimbursement***"); provided, however, the Expense Reimbursement shall not be due and payable solely if this Agreement is terminated pursuant to Section 11.1(h).  The provisions of this Section 7.5(a) shall survive any termination of this Agreement.  The Expense Reimbursement shall be paid to Purchaser directly from the proceeds of the closing of such sale(s) to any third party, and shall be paid to Purchaser prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Expense Reimbursement).  The obligation to pay the Expense Reimbursement under this Agreement shall be absolute and unconditional and shall not be subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever.

(b)    **Bankruptcy Court Approval of Sale**.  Sellers and Purchaser shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "***Approval Order***") of the Bankruptcy Court in the Bankruptcy Cases in form and substance acceptable to Purchaser containing provisions, including, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Liens, Claims, or other encumbrances (other than Assumed Liabilities and Permitted Liens), and (C) the performance by Sellers of their respective obligations under this Agreement; (ii) authorize and empower Sellers to assign to Purchaser the Assumed Contracts; (iii) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code; (iv) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor or transferee Liability, labor law, de facto merger or substantial continuity; and (v) find that Purchaser shall have no Liability for any Excluded Liability.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

7.6    **Transition Services**.  If requested by Purchaser, in connection with the consummation of the Transactions, the Parties will negotiate in good faith, prior to the Closing, a transition services agreement in form and substance (a) customary for transaction of the type contemplated by this Agreement and (b) reasonably acceptable to the Sellers and Purchaser in their respective reasonable discretion (the "***Transition Services Agreement***"), which will provide for the provision of transition services by the Sellers to the extent administratively feasible to operate the Business in substantially the same manner as currently conducted in accordance with the term set forth therein.

7.7    **Wrong Pockets**.  In the event that either Purchaser or Seller becomes aware that any of the Purchased Assets has not been transferred to Purchaser or that any of the Excluded Assets has been transferred to Purchaser, it shall promptly notify the other and the Parties shall, as soon as reasonably practicable, ensure that such property is transferred, and with any necessary prior third-party consent or approval, to (a) Purchaser, in the case of any Purchased Asset that was not transferred to Purchaser at the Closing, with such costs to do so being at the expense of Sellers; or (b) any Seller, in the case of any Excluded Asset that was transferred to Purchaser at the Closing, with such costs to do so being at the expense of Sellers, except if such Excluded Asset was identified by Purchaser in accordance with the next sentence, in which case, such costs being at the expense of Purchaser.  If, on or after the Closing Date, Purchaser may determine, in its sole discretion, to designate any Assumed Contract as an Excluded Asset and, notwithstanding anything to the contrary herein, such Contract shall be deemed to be an Excluded Asset for all purposes of this Agreement, including the immediately preceding sentence. In addition, if on or after the Closing Date, either Party shall receive any payments or other funds due to the other pursuant to the terms of this Agreement or any other Transaction Document, then the Party receiving such funds shall, within 30 days after receipt of such funds, forward such funds to the proper Party.

7.8    **Notices**.  If at any time (a) Purchaser becomes aware of any material breach by any Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Sellers, or (b) Sellers become aware of any breach by

34.

Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with <u>Section 12.1</u>, in writing of such breach.  Upon such notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

**7.9    Confidentiality**.  From and after the Closing, Sellers shall hold in confidence any and all information, whether written or oral, concerning the Purchased Assets or the Business, except to the extent that such information (a) is generally available to and known by the public through no fault of Sellers or (b) is lawfully acquired by any Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.  If any Seller is compelled to disclose any information by any Action or by other requirements of Law or Order, Sellers shall promptly notify Purchaser in writing and shall disclose only that portion of such information which Sellers are, based on advice of counsel, legally required to be disclosed, provided that Sellers shall, at Purchaser's expense, use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**7.10    Budgeted Reserve**.  Five (5) Business Days prior to the Closing Date, Sellers shall deliver to Purchaser a certificate signed by a duly authorized representative of each Seller setting forth: (a) a statement setting forth Sellers' good faith estimate of the Budgeted Reserve (including each component thereof) and Sellers' good faith estimate of the Cash and Cash Equivalents as of the Closing Date (the "***Closing Statement***"); and (b) all supporting documentation reasonably necessary to calculate the estimate of the Budgeted Reserve and the Cash and Cash Equivalents as of the Closing Date.  From the delivery of the Closing Statement until one (1) Business Day prior to the Closing, Purchaser shall have an opportunity to discuss the calculation of the Budgeted Reserve and the Cash and Cash Equivalents as of the Closing Date with the Sellers and its Representatives, Sellers shall consider in good faith any comments on the Closing Statement submitted by Purchaser, and Sellers may redeliver such statement to reflect any such comments; <u>provided</u>, that even if Sellers and Purchaser do not mutually agree upon the calculations to be included in the Closing Statement, the last statement delivered by Sellers to Purchaser shall be used at Closing as the basis for determining any payment that may need to be made by Purchaser and shall be deemed to be the "Closing Statement"; <u>provided</u>, <u>however</u>, the Sellers agree that such opportunity to review and comment on such calculations shall not (x) limit or otherwise affect Purchaser's remedies under this Agreement or otherwise, or constitute an acknowledgment by Purchaser of the accuracy of the amounts reflected thereon or (y) affect whether Sellers have fulfilled its obligation to deliver a good faith calculation of the Budgeted Reserve pursuant to this <u>Section 7.10</u>.  In addition, notwithstanding anything to the contrary contained herein, Sellers agree that neither Purchaser nor any of its Representatives shall have any obligation to confirm or verify the amounts set forth in the Budgeted Reserve and Purchaser shall be entitled to rely on such calculations.

**8.    TAX MATTERS**.

**8.1    Tax Cooperation**.  Purchaser and Seller agree to reasonably cooperate with each other in connection with the preparation of any Tax Return or filing relating to the Purchased Assets or the Assumed Liabilities, which cooperation shall include furnishing or causing to be furnished to each other, upon reasonable request, as promptly as practicable, such information relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any such Tax Returns to the extent such information is in the relevant party's possession, cooperation in the preparation for any audit or examination by any Taxing Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased

Assets or the Business (each, a "**Tax Claim**"), provided that Seller shall (and shall cause its Affiliates to) (a) promptly notify Purchaser of any notice received in respect to any Tax Claim, (b) promptly notify Purchaser of any significant developments regarding such Tax Claim, (c) permit Purchaser (if Purchaser so chooses) to control the defense and/or resolution of any Tax Claim if any resolution or settlement of such Tax Claim reasonably could be expected to have an effect on Purchaser, any of Purchaser's Affiliates or any Purchased Asset for any taxable period, (d) take all actions and cooperation reasonably necessary in furtherance of the immediately preceding clause (c), and (e) not settle or otherwise resolve any Tax Claim without the prior written consent of Purchaser.

8.2     **Transfer Taxes**.  Any and all sales, use, transfer, stamp, recording or other similar taxes or charges assessed at Closing or at any time thereafter on the transfer of any Purchased Assets (the "**Transfer Taxes**") shall be paid by, and the responsibility of, Purchaser, taking into consideration any exemptions that are available; provided, however, Sellers shall, at their own expense, prepare all Tax Returns required to be filed in respect of any such Transfer Taxes, provided that, with respect to any such Tax Return for which Purchaser is required to join or otherwise execute pursuant to applicable Law, Purchaser (upon Sellers' request) shall join in the filing of such Tax Return, and Sellers shall provide a copy of each such Tax Return to Purchaser.  Purchaser and Sellers shall reasonably cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation in respect of any Transfer Taxes arising from the Transactions.

8.3     **Property Taxes**.  All unpaid real and personal property taxes and assessments on the Purchased Assets for any taxable period commencing on or prior to the Closing Date (the "**Adjustment Date**") and ending on or after the Adjustment Date (a "**Straddle Period**") shall be prorated between Purchaser and Sellers as of the close of business on the Adjustment Date based on the best information then available with (a) Sellers being liable for such Taxes attributable to any portion of a Straddle Period ending on the day prior to the Adjustment Date (such amounts, "**Sellers' Property Taxes**") and (b) Purchaser being liable for such Taxes attributable to any portion of a Straddle Period on or after the Adjustment Date.  Information available after the Adjustment Date that alters the amount of Taxes due with respect to the Straddle Period will be taken into account and any change in the amount of such Taxes shall be prorated between Purchaser and Sellers as set forth in the next sentence.  All such prorations shall be allocated so that items relating to the portion of a Straddle Period ending on the day prior to the Adjustment Date shall be allocated to Sellers based upon the number of days in the Straddle Period prior to the Adjustment Date and items related to the portion of a Straddle Period on and after the Adjustment Date shall be allocated to Purchaser based upon the number of days in the Straddle Period from and after the Adjustment Date.  For purposes of determining Sellers' Property Taxes on the Closing Date under this Agreement, with respect to any real or personal property Taxes for a Straddle Period for which a written assessment or bill has not yet been received from the applicable taxing authority, such amounts shall be determined by assuming that the relevant Tax owed for such period equals no less than one hundred thirty percent (130%) of the amount of such Tax as set forth on the most recent bill or notice that is available. Notwithstanding anything to the contrary herein, neither Purchaser nor any of its Affiliates shall have any liability for or otherwise be required to pay any real or personal property Taxes or other similar Taxes which are liabilities or obligations under any lease or Contract of a Seller to the extent such lease or contract is not an Assumed Contract.

8.4     **Certain Tax Reporting for Employees**.  Notwithstanding anything to the contrary herein, unless otherwise directed by Purchaser, the Parties agree to use the "**standard**" method of IRS Revenue Procedure 2004-53 for income and payroll Tax reporting.

8.5     **Sales Taxes and Sales Taxes Account**.

(a)     Schedule 8.5(a) (the "**Sales Taxes Schedule**") sets forth (i) a true, correct and accurate list of potential (whether asserted or unasserted) Liabilities for Sales

Taxes arising prior to the Petition Date with respect to the operation of the Business (the "**Pre-Petition Sales Taxes**") and (ii) a true, correct and accurate list of binding settlements or binding payment plans entered into by the applicable Sellers (or their Representatives) with any Taxing Authority in respect of Sales Taxes (each, a "**Payment Plan**"), as of the Original Agreement Date, together with the applicable payment schedule, which shall include the amount of each payment and the due date of each payment (such payments and, together with any Sales Taxes payments added in accordance with this Section 8.5, collectively the "**Sales Taxes Payments**").  Part (iii) of the Sales Taxes Schedule sets forth a true, correct and accurate description, as of the Original Agreement Date, of the proposed terms of the Payment Plan being negotiated with the Taxing Authority in Texas.

(b)     Prior to the Closing, the applicable Sellers will use best efforts to negotiate and finalize Payment Plans with the Taxing Authorities of the following states (collectively, the "**Pre-Closing States**"):  Florida, New York, Pennsylvania, Texas and Washington (any such Payment Plans entered into after the Original Agreement Date but prior to the Closing, together with the Payment Plans with the Taxing Authorities of California and Washington, the "**Pre-Closing Payment Plans**").   The Sales Taxes Schedule shall be updated by the Sellers on a weekly basis and such updated schedule shall be delivered to Purchaser; provided, that any additional Pre-Closing Payment Plan, including any Payment Plan with a Pre-Closing State, and the applicable payment schedules may be added to the Sales Taxes Schedule if, and only if, (i) such Pre-Closing Payment Plan is either (x) approved by Purchaser under Section 5.1(j) or (y) a Qualified Settlement and (ii) prior to the entry of any such settlement or payment plan, Sellers (x) promptly notified Purchaser of any communication between a Taxing Authority and Sellers regarding such Pre-Petition Sales Taxes and (y) promptly notified Purchaser of any significant developments regarding such Pre-Petition Sales Taxes ((i) and (ii), collectively, the "**Payment Plan Protocols**").

(c)     At least three (3) Business Days prior to the Closing Date, the Sales Taxes Schedule shall be updated by Sellers to include all Pre-Closing Payment Plans and delivered to Purchaser.

(d)     If necessary and desirable to form the Successor Entity, prior to the entry of a sale Order by the Bankruptcy Court approving the Transactions, the Sellers and Purchaser will mutually agree upon the form and structure (including timing for implementation and governance) of the Successor Entity that will be established to assume from the Sellers all Liabilities arising from Pre-Petition Sales Taxes and the Payment Plans.

(e)     On or before the Closing and as a condition thereto, Purchaser and the Sellers will enter into a funding commitment agreement, in the form attached hereto as **Exhibit E** (the "**Sales Tax Funding Commitment**"), pursuant to which Purchaser shall commit to pay (directly or indirectly) the payments arising under the Pre-Closing Payment Plans on behalf of the Sellers, as applicable, and any Post-Closing Payment Plans in accordance with Section 8.5(f), provided that Purchaser shall have no other obligations under such Sales Tax Funding Commitment; provided, further, that Purchaser, Sellers and the Successor Entity (as applicable), consistent with the applicable requirements set forth in Section 8.1, will cooperate with each other in good faith in the conduct of negotiations with the applicable Taxing Authorities with respect to the Pre-Closing Payment Plans and comply with the Payment Plan Protocols.  Purchaser agrees that the Sellers or the Successor Entity, as applicable, shall be a third party beneficiary under the Sales Tax Funding Commitment.

(f)     Following the Closing Date, the Sellers or the Successor Entity, as applicable, will continue to negotiate and finalize Payment Plans (with the finalization of

such Payment Plans to occur no later than nine (9) months after the Closing Date) and if, and only if, such Payment Plans are finalized in accordance with the Payment Plan Protocols with the applicable Taxing Authorities of the remaining states set forth on Schedule 8.5(a)(i) (the "***Post-Closing Payment Plans***"), then Purchaser and Sellers or the Successor Entity, as applicable, shall take such actions as necessary or required herein and under the Sales Tax Funding Commitment to include such Post-Closing Payment Plan as an additional funding obligation thereunder.  Purchaser shall advance or reimburse Sellers and the Successor Entity for the costs and expenses of an accounting firm retained to assist in the negotiation, settlement, finalization and execution of the Post-Closing Payment Plans in an amount not to exceed $50,000 in the aggregate.

**(g)**    From and after the Petition Date through the Closing Date, all of the sales, excise, gross receipts and other Taxes of the Sellers attributable to sales of curated boxes containing consumer products, or any other products of the Business, payable to any Taxing Authority having jurisdiction over any Seller (collectively, "***Sales Taxes***") shall be added to the sales price of such items and collected by the applicable Seller, and all Sales Taxes shall be deposited into the Sales Taxes Account. Notwithstanding anything to the contrary herein, Purchaser shall be given access to the computation of gross receipts for verification of all such tax collections.  In addition to the Sales Tax deposited above, if, at any time prior to the Closing, any Seller receives any funds from any Person in respect of Sales Taxes (whether such Sales Taxes arose before, or after the Petition Date), such Seller shall deposit such funds in the Sales Taxes Account or, only if directed in writing by Purchaser to do so, pay the applicable Taxing Authority in accordance with applicable Law to the extent such Sales Taxes are due. Purchaser agrees that any amounts deposited into the Sales Taxes Account shall be used to pay any Post-Petition Sales Taxes before such amounts are used for any other purpose.  For the avoidance of doubt, after the Closing, in the event that any Person remits any payment to any Seller or the Successor Entity (if applicable) in respect of Sales Taxes, such Seller or the Successor Entity (if applicable) shall promptly notify, and pay such amount to, the applicable Taxing Authority in accordance with applicable Law to the extent such Sales Taxes are due or otherwise to Purchaser.

9.    **EMPLOYEE MATTERS**.

**9.1    Employees and Offers of Employment**.

**(a)**    Purchaser is under no obligation to employ any Employee.  Prior to the Closing Date, each Seller shall notify all of its Employees that their employment will end immediately prior to the Closing unless otherwise agreed to between Sellers and Purchaser.  No Employee will become an employee of Purchaser unless Purchaser makes that Employee a written offer of employment based on initial terms and conditions of employment established solely by Purchaser and the offer is accepted.

**(b)**    Prior to, on or after the Closing Date, Purchaser may, in its sole discretion, elect to make offers of employment to and employ Employees as provided above based on initial terms and conditions of employment established solely by Purchaser.  Each Seller shall retain all obligations and liabilities, if any, for (i) any Claim (including, for unpaid wages, unemployment compensation, employee contract or severance agreement, or resolved but unpaid legal claims, or employee benefits matters) relating to any Transferred Employee's employment by such Seller prior to the Closing Date or separation from employment prior to the Closing, (ii) any lawsuit, administrative charge, arbitration, proceeding, or written demand or notice pertaining to any Transferred Employee and arising out of such Transferred Employee's employment with such Seller prior to the Closing Date, and (iii) any worker's compensation or other claims arising from any injury or illness occurring prior to the Closing Date.

**(c)**      Purchaser shall maintain employee records transferred to Purchaser hereunder for a period of not less than four (4) years and during that period will afford Sellers reasonable access to such records during Purchaser's normal business hours. Purchaser shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Purchaser's treatment of its employee records and applicable Law.

**(d)**      For the avoidance of doubt, Purchaser acknowledges that it will be responsible for all liabilities, obligations and claims arising out of the employment by Purchaser of any Transferred Employee with respect to Purchaser's employment of such Transferred Employee on and after the date of employment of such Transferred Employee with Purchaser.

**9.2     Employee Plans**.

**(a)**      Purchaser shall have no obligation to assume any of Sellers' Employee Benefit Plans.  Unless expressly assumed in writing subsequent to the execution of this Agreement, but prior to Closing, all of Sellers' Employee Benefit Plans and any related liabilities are the responsibility of Sellers.

**(b)**      Purchaser shall have no obligation to continue contributions to any Multiemployer Plan and expressly disclaims any obligation to assume or continue contributing to any Multiemployer Plan following Closing.  All liabilities, including any claims for withdrawal liability or contributions, are solely the responsibility of Sellers.

**(c)**      At Purchaser's option, Purchaser may agree in writing subsequent to the Original Agreement Date, but prior to Closing, to assume some or all of Sellers' Employee Benefit Plans (the "***Assumed Plans***").  By agreeing to assume any such plan, Purchaser assumes all rights, liabilities and obligations arising from and after the Closing for any Assumed Plans.  Purchaser and Sellers shall take such actions as are necessary and reasonably requested by the other Party to cause Purchaser to assume sponsorship of any Assumed Plans as of the Closing Date and to effect the transfer of all assets and benefit liabilities of any Assumed Plans together with all related trust, insurance policies and administrative services agreements, effective as soon as practicable following the Closing Date; provided, however, that Purchaser shall not be assuming or be responsible for any liabilities or obligations arising with respect to or in connection with any Assumed Plans to the extent such liabilities or obligations arose prior to the Closing Date or with respect to any Employee or former Employee of Sellers who does not become a Transferred Employee (except to cause payment for any claim appropriately covered by a transferred insurance policy or any other payment under an Assumed Plan to which such Employee or former Employee is otherwise entitled by Law).

**(d)**      With respect to any Assumed Plans, each Seller will agree to warrant that any Assumed Plan has been established, maintained, funded and administered in material compliance with its terms, ERISA, the Code, and all applicable laws.

**(e)**      On and following the Closing Date, each Seller and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by Section 9.2(a), including exchanging information and data relating to employee benefits and employee benefit plan coverage, except as would result in the violation of any Law.

**(f)**      Each Seller shall be responsible for the payment of any severance payment or benefits that become due to any current or former Employee, officer, director, member, partner or independent contractor as a result of the termination of such individual by such Seller or Affiliate thereof.  Sellers shall be responsible for providing the

39.

notices and continuation coverage required by Section 4980B of the Code to each individual who is or becomes an "***M&A Qualified Beneficiary***" (as defined in Treas. Reg.  Section 54.4980B09) as a result of, or in connection with, the consummation of the transactions contemplated by this Agreement.

(g)     Notwithstanding anything to the contrary in this Agreement, the provisions of this <u>Section 9.2</u> are solely for the benefit of the Parties to this Agreement, and no current or former Employee or any other individual associated therewith shall be regarded for any purpose as a third-party beneficiary of this Agreement, and nothing in this <u>Section 9.2</u> shall be deemed an amendment of any Employee Benefit Plan or be construed to limit the right of Purchaser to amend or terminate any Assumed Plan or other employee benefit plan, program or arrangement, to the extent such amendment or termination is permitted by the terms of the applicable plan.  Nothing herein, expressed or implied, shall confer upon any employee any rights or remedies of any nature or kind whatsoever in regard to an Assumed Plan, under or by reason of any provision of this Agreement.

**9.3     Workers' Compensation**.    Each Seller shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by such Seller's employees prior to the Closing Date.  Each Seller shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within such Seller's facilities and which are alleged to have been sustained or contracted prior to the Closing Date, provided such claims are filed with the appropriate workers' compensation authority within forty-five (45) days after the Transferred Employees' employment date.

**9.4     WARN Act**.

(a)     To the extent required by law, each Seller shall provide notice to all of its Employees that complies with all provisions of (i) the US Worker Adjustment and Retraining Notification Act of 1988, as amended, and (ii) all other applicable Law, including those prohibiting discrimination and requiring notice to employees that their employment will end prior to the Closing regardless of whether Purchaser makes a written offer of employment to any of the Employees.

(b)     Purchaser will not be responsible for and will not assume any Liability for any notices, payments, fines or assessments due to any Person or Governmental Authority pursuant to any applicable Law with respect to the termination, discharge or layoff of employees by Sellers on or before the Closing.

(c)     On Closing, Sellers will provide Purchaser with the books and records (or true and complete copies thereof) relating to the Transferred Employees and such other data and information relating to the Transferred Employees in the possession of Sellers as Purchaser may reasonably require.

**10.     CLOSING CONDITIONS.**

**10.1     Conditions to Obligations of Purchaser and Sellers**.    The obligations of Purchaser and Sellers to consummate the Closing are subject to the satisfaction at or before Closing of each and every one of the following conditions:

(a)     the Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Cases, and the Bankruptcy Court shall have waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order, authorizing the Transactions and approving this Agreement under Sections 105(a), 363

and 365 of the Bankruptcy Code, in form and substance acceptable to Purchaser, and the Approval Order shall contain findings that Purchaser acquired the Purchased Assets in good faith, for fair value, in an arm's length transaction, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed;

**(b)**      Sellers shall have negotiated with the DIP Lender under the DIP Loan for the continued use of cash collateral after Closing such that Sellers may use the Budgeted Reserve to pay all amounts that comprise the Budgeted Reserve; and

**(c)**      no injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

**10.2     Conditions to Obligations of Purchaser**.   The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

**(a)**      each Seller shall have performed in all material respects all of its obligations and agreements hereunder required to be performed by such Seller on or prior to the Closing Date;

**(b)**      the representations and warranties of Seller set forth in <u>Section 3</u> (i) that are not qualified by Material Adverse Effect or other materiality qualifiers will be true and correct in all material respects as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all material respects as of such earlier date) and (ii) that are qualified by Material Adverse Effect or other materiality qualifiers will be true and correct in all respects (without disregarding such Material Adverse Effect or other materiality qualifiers qualifications) as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all respects as of such earlier date);

**(c)**      each Seller shall not be in default in any material respect under the provisions of this Agreement;

**(d)**      no Material Adverse Effect shall have occurred;

**(e)**      Purchaser shall have received an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each Seller certifying that the conditions set forth in <u>Sections 10.2(b)</u>, <u>10.2(c)</u> and <u>10.2(d)</u> have been satisfied;

**(f)**      Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.8</u>;

**(g)**      no party in interest has filed an adversary proceeding or commenced a contested matter challenging the amount, validity, enforceability, perfection or priority of Purchaser's Liens on collateral of the Debtors or obligations owed by the Debtors to Purchaser; and

**(h)**      none of the information contained in any Customer List shall be publicly available or shall have been required to be disclosed in a non-confidential manner.

41.

**10.3    Conditions to Obligations of Sellers**.  The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

**(a)**    Purchaser shall have performed in all respects all of its obligations and agreements hereunder required to be performed by it at or prior to the Closing Date;

**(b)**    the representations and warranties of Purchaser set forth in <u>Section 4</u> (i) that are not qualified by materiality qualifiers will be true and correct in all material respects as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all material respects as of such earlier date) and (ii) that are qualified by materiality qualifiers will be true and correct in all respects (without disregarding such Material Adverse Effect or other materiality qualifiers qualifications) as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all respects as of such earlier date);

**(c)**    Purchaser shall have delivered to Sellers all of the items set forth in <u>Section 2.9</u>;

**(d)**    Sellers shall have received an amount in cash sufficient to fund the Budgeted Reserve to the extent Sellers' cash on hand at closing is insufficient to fund the Budgeted Reserve; and

**(e)**    Sellers shall have received all documents they may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Sellers.

**11.    TERMINATION.**

**11.1    Grounds for Termination**.  This Agreement may be terminated at any time prior to the Closing:

**(a)**    by mutual written agreement of Sellers and Purchaser;

**(b)**    by Purchaser if the Bankruptcy Cases are converted to Chapter 7 cases, or if Bankruptcy Court appoints a trustee or examiner;

**(c)**    by Sellers or Purchaser, if the Closing shall not have been consummated on or before October 1, 2019 (the "***End Date***");

**(d)**    by Purchaser, upon the occurrence of any default or event of default under the DIP Loan that has not been waived in writing by the DIP Lender;

**(e)**    by Purchaser, in the event that Sellers accept a successful bid from a Person other than Purchaser;

**(f)**    by Purchaser if (i) there shall have been a breach by any Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 10.2</u>, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in <u>Section 10.2</u>, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of

being cured, shall not have been cured within the earlier of twenty (20) days after written notice thereof shall have been received by Sellers and the End Date;

(g)   by Sellers or Purchaser, if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Purchaser or Sellers from consummating the Transactions is entered and such Order shall become final;

(h)   by Seller if (i) there shall have been a breach by Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 10.3, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in Section 10.3, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within the earlier of twenty (20) days after written notice thereof shall have been received by Purchaser and the End Date; or

(i)   by Sellers, if (i) Sellers execute a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.

The Party desiring to terminate this Agreement pursuant to this Section 11.1 (other than pursuant to Section 11.1(a)) shall give notice of such termination to the other Party in accordance with Section 12.1.

**11.2   Effect of Termination**.  If this Agreement is terminated as permitted by Section 11.1, such termination shall be without Liability of any Party (or any stockholder, director, officer, employee, agent, consultant or other Representative of such Party) to the other Party to this Agreement except as expressly provided in Sections 7.5(a) and 11.4.  The provisions of Sections 7.5(a), 11.2, 11.3, 11.4, 12.1, 12.4, 12.5, 12.6, 12.8, 12.9, 12.10 and 12.11 shall survive any termination hereof pursuant to Section 11.1.

**11.3   Fees and Expenses**.  Except as otherwise set forth expressly herein, all costs and expenses incurred by the Parties in connection with obtaining Bankruptcy Court approval and consummation of this Agreement and the Transactions contemplated hereby shall be paid by the Party incurring such cost or expense.

**11.4   Certain Limitations**.  IN NO EVENT SHALL EITHER PARTY BE LIABLE, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, FOR ANY LOSSES ARISING FROM OR RELATED TO THIS AGREEMENT THAT ARE IN THE NATURE OF LOST PROFITS OR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, SPECULATIVE OR INCIDENTAL DAMAGES, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.   MISCELLANEOUS.**

**12.1   Notices**.  All notices, requests and other communications to any Party hereunder shall be in writing (including email transmission) and shall be given,

if to Purchaser, to:

Loot Crate Acquisition LLC
c/o Cathy Hershcopf and Robert Winning
55 Hudson Yards

43.

New York, New York 10001
Attention:  Authorized Representatives
email:     chershcopf@cooley.com
           rwinning@cooley.com

with a copy to (which shall not constitute notice):

Cooley LLP
55 Hudson Yards
New York, New York 10001
Attention: Cathy Hershcopf
           Robert Winning
email:     chershcopf@cooley.com
           rwinning@cooley.com

if to Sellers, to:

Loot Crate, Inc.
3401 Pasadena Avenue
Los Angeles, CA 90031-1929
Attention: Mark Palmer
email: Mark@TheseusStrategy.com

with a copy to (which shall not constitute notice):

Bryan Cave Leighton Paisner LLP
1290 Avenue of the Americas
New York, NY 10104-3300
Attention: Andrew Schoulder
email: andrew.schoulder@bclplaw.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

**12.2    Waivers**.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative.

**12.3    Successors and Assigns**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including with respect to the Sellers, any chapter 7 trustee, plan administrator, trustee of a liquidating trust, or other successor arising from the pendency of the Bankruptcy Cases (each a "***Bankruptcy Successor***"); provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party (other than a Bankruptcy Successor).

**12.4    Governing Law**.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

**12.5    Jurisdiction**.

**(a)**    Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.   To the extent the Bankruptcy Court declines, or is otherwise unable to, exercise jurisdiction, then the Parties agree that the state or federal courts in the County of New Castle, State of Delaware, shall have jurisdiction.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 12.1 shall be deemed effective service of process on such Party.

**(b)**    After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any state or federal court located in New Castle County, Delaware having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 12.1 shall be deemed effective service of process on such Party.

**12.6    Waiver of Jury Trial**.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

**12.7    No Third Party Beneficiaries**.  No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

**12.8    Entire Agreement; Amendments; Counterparts**.  This Agreement (including the Schedules and Exhibits hereto) sets forth the entire agreement among the Parties with respect to the subject matter hereof, supersedes in its entirety the Original Agreement and may be amended only by a writing executed by Purchaser and Sellers.  This Agreement may be executed in counterparts, each of which when taken together shall constitute an original.   A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.  This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.  In the event of any conflict or inconsistency between the statements in this Agreement and the bid procedures, the statements in this Agreement shall control.

**12.9    Headings; Interpretation**.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other things extends, and such word or phrase shall not merely mean "if." The term "or" is not exclusive, and shall be interpreted as "and/or." The phrases "the date of this Agreement," "the date hereof," "of even date herewith" and terms of similar import, shall be deemed to refer to the date set forth in the preamble to this Agreement.  A reference to any specific Law or to any provision of any Law, whether or not followed by the phrase "as amended," includes any amendment to, and any modification, re-enactment or successor thereof, any legislative provision substituted therefor and all rules, regulations and statutory instruments issued thereunder or pursuant thereto, except that, for purposes of any representations and warranties in this Agreement that are made as a specific date, references to any specific Law will be deemed to refer to such legislation or provision (and all rules, regulations and statutory instruments issued thereunder or pursuant thereto) as of such date. The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

**12.10    Disclosure Schedules**.  The Parties acknowledge and agree that (a) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (b) the disclosure by Sellers of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.  If any Schedule discloses an item or information, the matter shall be deemed to have been disclosed in all other Schedules to the extent reasonably apparent on the face of such disclosure, notwithstanding the omission of an appropriate cross-reference to such other Schedules.

**12.11    No Survival of Representations**.  Purchaser and Sellers acknowledge and agree that Sellers' representations and warranties set forth in this Agreement shall expire on the Closing Date or upon the earlier termination of this Agreement pursuant to its terms, and be of no further force and effect after such date.  The Parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder for such period expressly set forth in this Agreement, or if not expressly set forth for a period no greater than the earlier of (x) twenty four (24) months after the Closing Date and (y) the date that all of the Sellers have been dissolved.

[Signature pages follow]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PURCHASER:

**Loot Crate Acquisition LLC**

By:

Name: Cathy Hershcopf

Title: Authorized Signatory

*[Signature Page to Amended and Restated Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SELLERS:

**Loot Crate, Inc.**

By:_____

Name: Mark Palmer
Title:    Chief Transformation Officer


**Loot Crate Holdings, Inc.**

By:_____

Name: Mark Palmer
Title:    Chief Transformation Officer


**LC Funding, Inc.**

By:_____

Name: Mark Palmer
Title:    Chief Transformation Officer


**Loot Crate Parent, Inc.**

By:_____

Name: Mark Palmer
Title:    Chief Transformation Officer

**EXHIBIT A**

**Form of Assignment and Assumption Agreement**

**EXHIBIT B**

**Form of Trademark Assignment Agreement**

**EXHIBIT C**

**Form of Power of Attorney**

**EXHIBIT D**

**Form of Leased Real Property Assignment Agreement**

**EXHIBIT E**

**Form of Sales Tax Funding Commitment**

**EXECUTION VERSION**

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**by and among**

**EACH SELLER LISTED ON THE SIGNATURE PAGES HERETO**
**as Sellers**

**AND**

**LOOT CRATE ACQUISITION LLC**
**as Purchaser**

**September 27, 2019**

## TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| **1.** | **DEFINITIONS.** | | 1 |
| | 1.1 | Definitions | 1 |
| | 1.2 | Cross References | 8 |
| **2.** | **PURCHASE AND SALE** | | 9 |
| | 2.1 | Purchase and Sale | 9 |
| | 2.2 | Excluded Assets | 13 |
| | 2.3 | Assumed Liabilities | 14 |
| | 2.4 | Excluded Liabilities | 15 |
| | 2.5 | Assumption/Assignment of Contracts and Rights; Executory Contract Designation | 16 |
| | 2.6 | Consideration; Allocation of Consideration. | 18 |
| | 2.7 | Closing | 19 |
| | 2.8 | Deliveries by Sellers | 19 |
| | 2.9 | Deliveries by Purchaser | 20 |
| | 2.10 | Cash Transfer | 20 |
| **3.** | **REPRESENTATIONS AND WARRANTIES OF SELLERS** | | 20 |
| | 3.1 | Organization | 20 |
| | 3.2 | Corporate Authorization | 20 |
| | 3.3 | Financial Information | 21 |
| | 3.4 | Governmental Authorization | 21 |
| | 3.5 | Noncontravention | 21 |
| | 3.6 | Required Consents | 22 |
| | 3.7 | Litigation | 22 |
| | 3.8 | Permits | 22 |
| | 3.9 | Compliance with Laws and Court Orders | 22 |
| | 3.10 | Intellectual Property Rights | 22 |
| | 3.11 | Environmental Matters | 23 |
| | 3.12 | Real Property | 23 |
| | 3.13 | Employee Benefits | 23 |
| | 3.14 | Employment and Personnel Matters | 25 |
| | 3.15 | Taxes | 26 |
| | 3.16 | Title to the Purchased Assets | 26 |
| | 3.17 | Transactions with Affiliates | 26 |
| | 3.18 | Insurance | 26 |
| | 3.19 | Service of Bankruptcy Documents | 27 |
| | 3.20 | Certain Fees | 27 |
| | 3.21 | Material Contracts | 27 |
| | 3.22 | Licensing Matters | 27 |
| | 3.23 | Data Privacy | 28 |
| | 3.24 | Customer Lists; Customer Data | 28 |
| | 3.25 | No Other Representations or Warranties; Schedules | 28 |
| **4.** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER** | | 29 |
| | 4.1 | Organization | 29 |
| | 4.2 | Corporate Authorization | 29 |
| | 4.3 | Governmental Authorization | 29 |
| | 4.4 | Noncontravention | 29 |
| | 4.5 | Availability of Purchase Price | 29 |
| | 4.6 | Certain Fees | 29 |
| | 4.7 | Litigation | 30 |

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| **5.** | **COVENANTS OF SELLER** | 30 |
| 5.1 | Conduct of the Business | 30 |
| 5.2 | Access to Information | 31 |
| 5.3 | Notices of Certain Events | 31 |
| 5.4 | Name Change | 32 |
| 5.5 | Intellectual Property Rights Assignment | 32 |
| **6.** | **COVENANTS OF PURCHASER** | 32 |
| 6.1 | Books and Records | 32 |
| **7.** | **COVENANTS OF PURCHASER AND SELLER** | 32 |
| 7.1 | Efforts; Further Assurances | 32 |
| 7.2 | Certain Filings | 33 |
| 7.3 | Public Announcements | 33 |
| 7.4 | DIP Loan Documents | 33 |
| 7.5 | Bankruptcy Issues | 33 |
| 7.6 | Transition Services | 34 |
| 7.7 | Wrong Pockets | 34 |
| 7.8 | Notices | 34 |
| 7.9 | Confidentiality | 35 |
| 7.10 | Budgeted Reserve | 35 |
| **8.** | **TAX MATTERS** | 35 |
| 8.1 | Tax Cooperation | 35 |
| 8.2 | Transfer Taxes | 36 |
| 8.3 | Property Taxes | 36 |
| 8.4 | Certain Tax Reporting for Employees | 36 |
| 8.5 | Sales Taxes and Sales Taxes Account | 36 |
| **9.** | **EMPLOYEE MATTERS** | 38 |
| 9.1 | Employees and Offers of Employment | 38 |
| 9.2 | Employee Plans | 39 |
| 9.3 | Workers' Compensation | 40 |
| 9.4 | WARN Act | 40 |
| **10.** | **CLOSING CONDITIONS** | 40 |
| 10.1 | Conditions to Obligations of Purchaser and Sellers | 40 |
| 10.2 | Conditions to Obligations of Purchaser | 41 |
| 10.3 | Conditions to Obligations of Sellers | 42 |
| **11.** | **TERMINATION** | 42 |
| 11.1 | Grounds for Termination | 42 |
| 11.2 | Effect of Termination | 43 |
| 11.3 | Fees and Expenses | 43 |
| 11.4 | Certain Limitations | 43 |
| **12.** | **MISCELLANEOUS** | 43 |
| 12.1 | Notices | 43 |
| 12.2 | Waivers | 44 |
| 12.3 | Successors and Assigns | 44 |
| 12.4 | Governing Law | 44 |
| 12.5 | Jurisdiction | 45 |
| 12.6 | Waiver of Jury Trial | 45 |
| 12.7 | No Third Party Beneficiaries | 45 |
| 12.8 | Entire Agreement; Amendments; Counterparts | 45 |
| 12.9 | Headings; Interpretation | 46 |
| 12.10 | Disclosure Schedules | 46 |

**TABLE OF CONTENTS**
(continued)

**Page**

**12.11    No Survival of Representations**...................................................................................46

**TABLE OF CONTENTS**
(continued)

**EXHIBITS**

Exhibit A – Form of Assignment and Assumption Agreement

Exhibit B – Form of Trademark Assignment Agreement

Exhibit C – Form of Power of Attorney

Exhibit D – Form of Leased Real Property Assignment Agreement

Exhibit E – Form of Sales Tax Funding Commitment

600688115.35

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, dated as of September 27, 2019 (this "*Agreement*"), is by and among the seller parties listed on the signature pages hereto (each a "*Seller*" or "*Debtor*"), and LOOT CRATE ACQUISITION LLC, a Delaware limited liability company ("*Purchaser*") and amends and restates in its entirety that certain Asset Purchase Agreement (the "*Original Agreement*") dated as of September 6, 2019 (the "*Original Agreement Date*") by and among Sellers and Purchaser.  Each of Purchaser and Sellers is referred to individually in this Agreement as a "*Party*" and collectively as the "*Parties*."

### RECITALS:

WHEREAS, Sellers own and operate an E-Commerce subscription company that specializes in providing customers with curated boxes containing consumer products each month (such businesses and all other businesses conducted by Sellers, the "*Business*");

WHEREAS, Sellers desire to sell, transfer, convey, assign and deliver the Purchased Assets and to assign the Assumed Liabilities to Purchaser, and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

WHEREAS, on August 11, 2019 as to certain Sellers and August 12, 2019 as to the other Sellers (collectively, the "*Petition Date*"), Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

WHEREAS, Debtors' chapter 11 bankruptcy cases are being jointly administered under Case No. 19-11791-BLS in the Bankruptcy Court (the "*Bankruptcy Cases*"); and

WHEREAS, the consummation of the transactions contemplated by this Agreement (the "*Transactions*") are subject to, among other things, the entry of an Approval Order in the Bankruptcy Cases under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.      DEFINITIONS.

    1.1      **Definitions**.  The following terms, as used herein, have the following meanings:

        (a)      "*Accounts Receivable*" means all accounts and notes receivable (whether current or non-current) of Sellers in respect of goods shipped, products sold or services rendered (including those billed pursuant to Subscriber Orders).

        (b)      "*Action*" means any action, suit, arbitration, claim, inquiry, proceeding, mediation, hearing, audit, examination, investigation or other proceeding of any nature, in each case, by or before any Governmental Authority.

        (c)      "*Affiliate*" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or

indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract, as trustee, executor or otherwise.

(d) "*Budgeted Reserve*" means an amount equal to (i) the accrued, valid and allowed administrative claims that are both expressly contemplated by, and within the terms of, the DIP Budget and not assumed by Purchaser pursuant to Section 2.3(e), *plus* (ii) any other allowed administrative claims to be incurred prior to Closing with Purchaser's express consent in the ordinary course of business which become due after Closing *plus* (iii) $65,000, *plus* (iv) any amounts required to be added pursuant to Section 2.5(d) (if any), *plus* (v) any additional amounts agreed to be added by Purchaser in writing in its sole and absolute discretion, *less* (vi) the aggregate amount of cash retained by the Sellers pursuant to Section 2.2(b).

(e) "*Bulk Sales Laws*" means (a) the bulk-transfer provisions of the Uniform Commercial Code or any similar Laws in jurisdictions in which any Seller conducts the Business and (b) any Tax-related Laws, or requirements of any jurisdiction relating to bulk sales, or requiring similar notification, certification or withholding requirements, in respect of a sale or transfer of assets, which Laws are applicable to the sale of the Purchased Assets.

(f) "*Business Day*" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

(g) "*Cash and Cash Equivalents*" means, as of any applicable time, all cash and cash equivalents (including all undeposited checks) of the Sellers determined in accordance with GAAP, but shall exclude any cash and cash equivalents held in the Sales Taxes Account.

(h) "*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any Laws promulgated thereunder.

(i) "*Claim*" means a "*claim*" as defined in Section 101 of the Bankruptcy Code.

(j) "*Closing Date*" means the date of the Closing.

(k) "*Code*" means the Internal Revenue Code of 1986, as amended.

(l) "*Contract*" means any written or oral agreement, contract, subcontract, settlement agreement, lease, sublease, instrument, permit, concession, franchise, binding understanding, note, option, bond, mortgage, indenture, trust document, loan or credit agreement, license, sublicense, insurance policy or other legally binding commitment or undertaking of any nature.

(m) "*Cure Costs*" means all amounts that must be paid pursuant to Sections 365 of the Bankruptcy Code in connection with the assumption or assignment of the Assumed Contracts to Purchaser as provided herein and in the Approval Order.

(n) "*Customer Lists*" means any and all customer and subscriber lists and databases, files and other customer records and information maintained by the Sellers in any format whatsoever.

(o)     "**D&O Policy**" means the directors and officers liability insurance policies set forth on Schedule 1.1(o).

(p)     "**DIP Budget**" means the budget as defined in the DIP Order.

(q)     "**DIP Lender**" means Money Chest LLC, a Nevada limited liability company.

(r)     "**DIP Liens**" means the Liens granted to the DIP Lender pursuant to the DIP Order.

(s)     "**DIP Loan**" means the loan of up to Ten Million Dollars ($10,000,000) which is made by the DIP Lender to Loot Crate, Inc., as borrower, Loot Crate Parent, Inc., as parent, and the remaining Debtors as guarantors, as evidenced by the DIP Loan Documents.

(t)     "**DIP Loan Documents**" means the Loan Agreement and any agreements, documents or instruments executed or delivered in connection with the DIP Loan and the financing contemplated by the DIP Order, as the same may be amended, modified, supplemented or restated from time to time.

(u)     "**DIP Order**" means the interim Order or final Order, as applicable, of the Bankruptcy Court in each case in form and substance satisfactory to the DIP Lender approving the DIP Loan and authorizing Sellers' incurrence of post-petition secured financing under Section 364 of the Bankruptcy Code and use of cash collateral under Section 363 of the Bankruptcy Code.

(v)     "**E-Commerce Platform**" means the series of software and hardware applications, including computer hardware and cloud servers, that are integrated into, and through which Sellers transact with customers who enter into subscriptions or place orders for inventory through https://www.lootcrate.com/ (and similar permutations thereof), including the Assumed Contracts set forth on Schedule 2.1(a) pursuant to which such software and hardware applications are owned or licensed by Sellers.

(w)     "**Employee**" means an individual who is employed by any Seller, whether on a full-time or a part-time basis, whether active or inactive, and includes an employee on short-term or long-term disability leave.

(x)     "**Employee Benefit Plan**" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement, arrangement or payroll practice (whether written or unwritten) maintained, sponsored, or contributed or required to be contributed to by a Seller or any ERISA Affiliate or with respect to which a Seller or any ERISA Affiliate has any liability, other than a Multiemployer Plan, as set forth on Schedule 3.13(a).

(y)     "**Environmental Laws**" means, all federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public or employee health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

600688115.35

(z)      "*Environmental Liabilities and Obligations*" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in any way relating to the prior or current ownership or operation of the Business, including Liabilities related to:   (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Substances or waste; (ii) the Release of Hazardous Substances or waste; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i)-(iv) of this definition.

(aa)      "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(bb)      "*ERISA Affiliate*" means any Person that, at any relevant time, is or was treated as a single employer with Sellers for purposes of Code § 414.

(cc)      "*First Lien Loan Agreement*" means that certain prepetition credit agreement, dated as of August 3, 2018 (as it may have been amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date), among Loot Crate, Inc., as borrower, Loot Crate Parent, Inc., as ultimate parent, the other guarantors which are parties thereto, and Purchaser, as successor in interest to Midtown Madison Management LLC, as administrative agent and collateral agent for the lenders party thereto.

(dd)      "*GAAP*" means, at a given time, United States generally accepted accounting principles, and, where applicable, consistently applied throughout the periods involved.

(ee)      "*Governmental Authority*" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory, taxing or arbitral body.

(ff)      "*Hazardous Substances*" means any substance, material or waste which is regulated by any Governmental Authority, including any material, substance or waste which is defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste," "pollutant" or "toxic substance" under any provision of Environmental Law, and including petroleum, petroleum products, asbestos, presumed asbestos-containing material or asbestos-containing material, urea formaldehyde and polychlorinated biphenyls.

(gg)      "*Intellectual Property Rights*" means intellectual property rights in any jurisdiction, including: (i) rights in, arising out of or associated with works of authorship, including rights granted under the Copyright Act and including all applications and registrations for any of the foregoing; (ii) rights in, arising out of or associated with databases; (iii) rights in, arising out of, or associated with inventions, including rights granted under the Patent Act, and including all applications and registrations for any of the foregoing; (iv) rights in, arising out of or associated with trademarks, service marks and trade names including common law rights, rights granted under the Lanham Act and all applications and registrations for any of the foregoing ("*Trademarks*"); (v) rights in, arising out of, or associated with confidential information and trade secrets, including rights described under the Uniform Trade Secrets Act; (vi) rights of attribution and

4.

integrity and other moral rights of an author; (vii) rights in, arising out of or associated with a person's name, voice, signature, photograph, or likeness, including rights of personality, publicity or similar rights; and (viii) rights in, arising out of, or associated with domain names and uniform resource locators ("***Domain Names***").

(hh)     "***Knowledge of Sellers***" or any other similar knowledge qualification in this Agreement means the actual or constructive (i.e., that which a reasonable person should know) knowledge of Christopher Davis, Stuart Kaufman or Mark Palmer, in each case, after due inquiry.

(ii)     "***Law***" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(jj)     "***Leased Real Property***" means real property leased by any Seller and used in connection with the Business.

(kk)     "***Liability***" means any claim, debt, liability, obligation, Tax or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due), whenever or however arising (including those arising out of any contract or tort, whether based on negligence, strict liability or otherwise), and including all costs and expenses related thereto.

(ll)     "***Lien***" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non- contingent, material or non-material, known or unknown.

(mm)     "***Loan Agreement***" means collectively, that certain Debtor-in-Possession Credit Agreement, dated as of August 14, 2019, among Loot Crate, Inc., as borrower, Loot Crate Parent, Inc., as ultimate parent, each other entity that becomes a guarantor party thereto from time to time, the lenders party thereto from time to time and the DIP Lender, as administrative agent and collateral agent (as amended, modified, restated or supplemented from time to time).

(nn)     "***Material Adverse Effect***" means: any (x) event, change, occurrence, circumstance, development or effect (each, an "***Effect***") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on the Purchased Assets, Assumed Liabilities, the Business or the condition of the Sellers (financial or otherwise) taken as a whole; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect:  (i) changes in general business or economic conditions affecting the industry in which the Sellers operate, (ii) changes in national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (iii) changes in, GAAP after the Original Agreement Date, (iv) changes in applicable Laws after the Original Agreement Date, (v) changes resulting from the public announcement of this Agreement or the Transactions (other than for purposes of any representation or warranty contained in Section 3.6), (vi) the failure, in and of itself, of the Sellers to achieve any budgets, projections or forecasts (but, excluding, for the avoidance

600688115.35

of doubt, the underlying causes of any such failure), and (vii) any changes resulting from the public announcement of the filing of the Bankruptcy Cases; or (y) any Effect that would be reasonably likely to prevent, impair or materially delay the Sellers from consummating the Transactions.

(oo)    "*Multiemployer Plan*" means any "*multiemployer plan*" as defined in Section 3(37) of ERISA set forth on <u>Schedule 3.13(b)</u>.

(pp)    "*Order*" means any award, decision, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

(qq)    "*Permits*" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and other similar documents and authorizations issued by any Governmental Authority to any Seller.

(rr)    "*Permitted Liens*" means (i) Liens granted by Purchaser at or after the Closing or pursuant to the Loan Agreement and the loan documents related thereto; (ii) non-Tax Liens that arise under zoning, building codes, land use and other similar Laws, none of which would materially interfere with the ownership or operation by Purchaser of the Purchased Assets following the Closing in substantially the manner as owned and operated immediately prior to the Original Agreement Date; and (iii) any Lien that arises as a result of a non-exclusive license or other non-exclusive grant of rights under Intellectual Property Rights pursuant to Assumed Contracts to use products and services in the ordinary course of business consistent with past practice.

(ss)    "*Person*" means a natural person, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(tt)    "*Post-Petition Subscriber Orders*" means all Subscriber Orders for which Sellers have actually received payment in a Seller bank account after the Petition Date.

(uu)    "*Post-Retirement Liabilities*" means with respect to all Employees and retirees, all Liabilities for the post-retirement benefits, including those provided under the Employee Benefit Plans, as applicable.

(vv)    "*PPP*" means Portage Point Partners.

(ww)    "*Property Taxes*" means all real and personal property Taxes levied with respect to the Purchased Assets for any taxable period or portion thereof.

(xx)    "*Qualified Settlement*" means a settlement entered into with an applicable Taxing Authority for Pre-Petition Sales Taxes that is comprised of (i) payments over a thirty-six (36) month period in an amount (excluding applicable interest and penalties for states other than California and Texas) no greater than one hundred ten percent (110%) of the estimated amount set forth on the Sales Taxes Schedule with respect to such Taxing Authority; provided, however, that the Pre-Closing Payment Plan for California set forth on the Sales Taxes Schedule and the proposed Payment Plan for Texas set forth on the Sales Taxes Schedule, in each case, are each deemed a Qualified Settlement; or (ii) payments over a period of up to six (6) months in an amount no greater than $50,000 in the aggregate with respect to such Taxing Authority.

6.

(yy)    "*Real Property Leases*" means all of Sellers' right, title and interest in all leases, subleases, licenses, concessions and other agreements and all amendments, extensions, renewals, guaranties and other agreements with respect thereto and including the right to all security deposits and other amounts and instruments deposited by or on behalf of any Seller thereunder, pursuant to which such Seller holds a leasehold or subleasehold estate in, or is granted a license or right to use, the Leased Real Property.

(zz)    "*Release*" has the meaning set forth in CERCLA.

(aaa)   "*Representative*" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

(bbb)   "*Sales Taxes Account*" means the segregated bank account established by Sellers to retain Sales Taxes (i) due in respect of, or arising in connection with, customer transactions occurring in the ordinary course of the Business after the Petition Date and (ii) any Sales Taxes transferred, remitted or released by any Person, including any bank, insurance company, or credit card processor, to any Seller, irrespective of whether such funds relate to Sales Taxes of Sellers that arose before, on or after the Petition Date.

(ccc)   "*Schedules*" means the Schedules delivered by Sellers concurrently with the execution and delivery of the Original Agreement.

(ddd)   "*Subscriber Orders*" means all purchase orders or other similar forms or agreements with customers for the provision of a curated box or curated boxes.

(eee)   "*Successor Entity*" means a successor-in-interest to one or more of the Sellers established after the Original Agreement Date in accordance with the Bankruptcy Code and Orders of the Bankruptcy Court.

(fff)   "*Tax*" means (i) any federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority (a "*Taxing Authority*") responsible for the imposition thereof (whether domestic or foreign), whether or not disputed, and (ii) Liability for the payment of any amounts of the type described in clause (i) as a result of being a transferee, party to any agreement or any express or implied obligation to indemnify any other Person.

(ggg)   "*Tax Returns*" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

7.

(hhh)  "*Technology*" means technology and all other tangible embodiments of Intellectual Property Rights, whether statutory, common law or otherwise, in any jurisdiction throughout the world, including all:  (i) inventions and discoveries, whether or not patentable; (ii) trademarks, service marks, trade dress, logos, slogans, brand names, trade names, Internet domain names and corporate names (whether or not registered), and other identifiers and indicia of origin, and all applications and registrations in connection therewith; (iii) all works of authorship, including audiovisual works, collective works, computer programs, compilations, databases, derivative works, literary works, mask works, and sound recordings; (iv) software, including all computer programs, databases and compilations, descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing and all user documentation, including user manuals and training materials, relating to any of the foregoing; (v) mask works and industrial designs; (vi) trade secrets and other confidential and proprietary information (including inventions, ideas, research and development information, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, schematics, specifications, research records, test information, financial, marketing and business data, customer, subscriber and supplier lists, algorithms and information, pricing and cost information, business and marketing plans and proposals, and databases and compilations, including any and all data and collections of data); and (vii) without limitation to the generality of the foregoing, the E-Commerce Platform.

(iii)  "*Transaction Document*" means this Agreement, the Conveyance Agreements, the Transition Services Agreement (as applicable) and the Sales Tax Funding Commitment, together with such other agreements, certificates, and documents, and any exhibits, annexes, schedules, or other attachments thereto, delivered or caused to be delivered incident to or in connection with the Transactions.

(jjj)  "*Transferred Employee*" means any Employee who accepts Purchaser's offer of employment after the Closing Date.

**1.2**  **Cross References**.  Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Adjustment Date | 8.3 |
| Agreement | Preamble |
| Allocation Schedule | 2.6(b) |
| Approval Order | 7.5(b) |
| Assignment and Assumption Agreement | 2.8(b) |
| Assumed Contracts | 2.1(a) |
| Assumed Liabilities | 2.3 |
| Assumed Plans | 9.2(c) |
| Avoidance Actions | 2.1(u) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Closing | 2.7 |
| Closing Statement | 7.10 |
| Conveyance Agreements | 2.8(f) |
| Credit Bid and Release | 2.6(a) |
| Customer Data | 2.1(n) |
| Debtor or Debtors | Recitals |
| Disputed Contract | 2.5(d) |
| Disputed Contract Order | 2.5(d) |

8.

| Term | Section |
|------|---------|
| D&O Claim Rights | 2.1(u) |
| End Date | 11.1(c) |
| Excluded Accounts Receivable | 2.1(c) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Expense Reimbursement | 7.5(a) |
| Expired IP | 3.10 |
| Financial Information | 3.3(a) |
| Leased Real Property Assignment Agreements | 2.8(f) |
| License Agreements | 2.1(l) |
| M&A Qualified Beneficiary | 9.2(f) |
| Material Contracts | 3.21(a) |
| Necessary Consent | 2.5(c) |
| Original Agreement | Preamble |
| Original Agreement Date | Preamble |
| Party or Parties | Preamble |
| Payment Plan Protocols | 8.5(b) |
| Personal Information | 3.23 |
| Petition Date | Recitals |
| Pre-Closing Payment Plans | 8.5(b) |
| Pre-Closing States | 8.5(b) |
| Pre-Petition Sales Taxes | 8.5(a) |
| Post-Closing Payment Plans | 8.5(f) |
| Post-Petition Sales Taxes | 2.3(f) |
| Previously Omitted Contract | 2.5(a) |
| Previously Omitted Contract Notice | 2.5(a) |
| Power of Attorney | 2.8(d) |
| Purchase Price | 2.6(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Purchaser Previously Omitted Contract | 2.5(a) |
| Registered IP | 2.1(f) |
| Sales Tax Funding Commitment | 8.5(e) |
| Sales Taxes | 8.5(g) |
| Sales Taxes Payments | 8.5(a) |
| Sales Taxes Schedule | 8.5(a) |
| Seller or Sellers | Preamble |
| Sellers' Previously Omitted Contract | 2.5(a) |
| Sellers' Property Taxes | 8.3 |
| Straddle Period | 8.3 |
| Tax Claim | 8.1 |
| Taxing Authority | 1.1(fff) |
| Trademark Assignment Agreement | 2.8(c) |
| Transactions | Recitals |
| Transferred Intellectual Property Rights | 2.1(f) |
| Transfer Taxes | 8.2 |
| Transition Services Agreement | 7.6 |

2.      PURCHASE AND SALE.

2.1      **Purchase and Sale**.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers agree to sell, assign, transfer, convey and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Sellers, all right, title and interest of Sellers as of the Closing Date in and to all of Sellers' properties and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and

whether or not carried or reflected on the books and records of Sellers that are now, or at the time of Closing will be, used or held for use in or otherwise related to, useful in or necessary for the conduct of, the Business, other than the Excluded Assets (the "***Purchased Assets***"), free and clear of all Liens (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363 of the Bankruptcy Code.  Subject to <u>Section 2.2</u>, the Purchased Assets purchased hereunder shall include, but shall not be limited to, the following:

        **(a)**      all rights of Sellers in or under the Contracts that are set forth on <u>Schedule 2.1(a)</u>; <u>provided</u>, that, notwithstanding any other provision of this Agreement, Purchaser may, in its sole discretion, add or delete any Contracts set forth on <u>Schedule 2.1(a)</u> until two (2) Business Days prior to the Closing Date (or later as provided for herein) and shall promptly notify Sellers of any such addition or deletion by delivery of an updated copy of <u>Schedule 2.1(a)</u> (the Contracts set forth on the <u>Schedule 2.1(a)</u> as of two (2) Business Days prior to the Closing Date or subsequently added thereto, collectively, the "***Assumed Contracts***");

        **(b)**      all inventory of any kind and nature, including all raw materials, works-in-process of any type (including semi-finished goods), finished goods, consigned goods, merchandise (including, any toys, action figures, clothing and apparel, gear, books, DVDs, video games, memorabilia, collectibles, dolls, figurines, gadgets and board and card games), inventory owned by any Seller but which remains in the possession or control of a third party or which is undelivered or in transit, inventory located at a distribution center and other inventories to which the Sellers have title that are in the possession of the Sellers or any third party and used or held for use in connection with the Business;

        **(c)**      all Accounts Receivable (other than Excluded Accounts Receivable), and any and all amounts paid by, payable from, due and owing, or otherwise recoverable from any Governmental Authority, including any customs authority, customs agency, or customs broker, including, but not limited to, any customs drawback rights under the Trade Facilitation and Trade Enforcement Act of 2015, in each case to the extent that such rights are assignable to Purchaser under applicable Law;

        **(d)**      all tangible personal property, including, all machinery, equipment, tools, vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, spare parts, shipping and packaging materials, storeroom contents, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers (including any of the foregoing property that is subject to a lease, but only to the extent that Purchaser assumes such lease as an Assumed Contract) wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Sellers or any other space where Sellers' properties or any other assets may be situated;

        **(e)**      all Permits, including those set forth on <u>Schedule 2.1(e)</u> to the extent the same may be transferred or assigned consistent with their terms;

        **(f)**      all of Sellers' right, title and interest in and to any Intellectual Property Rights, including (i) all Intellectual Property Rights of Sellers that are the subject of an application, certificate, filing, registration, or other document issued by, filed with, or recorded by, any state, government or other public legal authority (the "***Registered IP***"), including the items set forth on <u>Schedule 2.1(f)</u>, and including, trademark applications and registrations worldwide for "***Loot Crate***" (for all languages and whether translated, transliterated or phoneticized and any derivation thereof); (ii) other unregistered Intellectual Property Rights of Sellers embodied by or associated with any assets listed or described in this <u>Section 2.1</u>, including Intellectual Property Rights embodied by or

associated with any assets referenced in <u>subsections 2.1(a) through (cc)</u> of this <u>Section 2.1</u>, and (iii) the right to sue for and recover damages, profits and any other remedy in connection therewith, for past, present or future infringement, misappropriation or other violation related to any of the foregoing assets (collectively, the "***Transferred Intellectual Property Rights***");

(g)    to the extent transferrable, the registrations to the social media accounts of Sellers, including those listed on <u>Schedule 2.1(g)</u>, and all content stored thereon; provided, that to the extent transfer is not permissible with respect to any social media account, the Parties shall enter into such alternative arrangement so as to allow Purchaser to access and use such social media account and the content stored thereon to the extent administratively feasible;

(h)    all of Sellers' right, title and interest in and to any Domain Names, including those listed on <u>Schedule 2.1(h)</u>;

(i)    all past, present and future claims, asserted or unasserted, contingent or fixed, known or unknown, against third parties (but no liabilities arising therefrom) related to any warranties, representations and licensing agreements arising out of the operation of the Purchased Assets and the right to collect proceeds and damages therefrom;

(j)    all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors with respect to the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(k)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(l)    all rights of Sellers under or pursuant to the license agreements, sublicense agreements or other arrangements with licensors, including all current statement of works and amendments thereto, that are specifically set forth on <u>Schedule 2.1(a)</u>, as may be amended from time to time (the agreements described in this underline{Section 2.1(l)} shall be referred to herein as the "***License Agreements***");

(m)    all Customer Lists and all other books, records, files and papers of Sellers to the extent related to the Business or the Purchased Assets, including vendor files, equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, personnel files for Employees, Tax records and other similar documents and records (all in the state in which such records and information currently exist), but excluding from the foregoing any information to the extent prohibited by Law for transfer hereunder;

(n)    all subscriber and customer data, information, analysis and modelling derived from any Customer List and branded loyalty promotion programs and other similar information including personal information (such as name, address, telephone number, e-mail address, website and any other database information), customer consents and opt-in/opt-outs, product hierarchy, segmentation (life cycle), customer lifetime value, predictive modeling scores and models used, loyalty information and data, private label programs (including credit card) information and data, offers, coupons and discount information and data, and customer purchase and transaction history at a transaction level (including dollar amounts, dates, and items purchased, but excluding from the foregoing any credit card numbers or related customer payment source, social security numbers, or other information to the extent prohibited by Law for transfer

hereunder) relating to customers of, or collected through or used in the operation of (i) the Business, (ii) the E-Commerce Platform or any similar e-commerce platform owned, operated or controlled by Sellers, (iii) any catalog sales, other online or print mailing or similar distribution channels, (iv) partner e-commerce platforms or retail stores and (v) any Customer Lists (collectively, the "***Customer Data***");

(o)     (i) all artwork and other graphic media used in connection with the Purchased Assets in the marketing of products for Sellers' past and present customers to the extent Sellers have the right, title and interest to such artwork and media and (ii) all content, graphics, literary, audiovisual and artistic works displayed on the websites or boxes to the extent Sellers have the right, title or interest thereto;

(p)     the E-Commerce Platform and all other Technology of Sellers, including the Technology set forth on Schedule 2.1(p);

(q)     except as set forth on Schedule 2.2(b) below, all utility deposits, security deposits, deposits held by parties to the Assumed Contracts, deposits held by vendors or trade creditors, and other deposits of any kind or nature whatsoever;

(r)     the rights described under Section 2.5(b) below;

(s)     all prepaid expenses of any Seller relating to any of the Assumed Contracts;

(t)     Cash and Cash Equivalents in excess of the Budgeted Reserve;

(u)     (i) all rights, claims or causes of action of Sellers, and proceeds thereof, of whatever kind or nature, and whether asserted or unasserted, including, without limitation any causes of action against current and former directors and officers of Sellers and any affiliates of such directors and officers (collectively, the "***D&O Claim Rights***") if Purchaser elects, in its sole discretion, to assume such D&O Claim Rights within six (6) months of the Closing Date, provided, however, the Sellers may only pursue such D&O Claim Rights with Purchaser's written consent and at Purchaser's direction, as the proceeds thereof would remain Purchased Assets; and (ii) all causes of action arising under chapter 5 of the Bankruptcy Code (the "***Avoidance Actions***"); provided, however, that causes of action arising under section 547 of the Bankruptcy Code shall not be affirmatively pursued by Purchaser but may be used in a manner and for the purposes set forth in Section 2.3(e); provided further, however, that with respect to the D&O Claim Rights, such rights shall remain assets of the estates of Sellers until such time as the Purchaser makes its election;

(v)     all of Sellers' right, title and interest in any reserves held by any bank, insurance company, or credit card processor, including those reserves scheduled on Schedule 2.1(v);

(w)     all insurance policies relating to the Business (other than the D&O Policy) including those policies scheduled on Schedule 2.1(w);

(x)     all claims, and proceeds thereof, arising under any insurance policies relating to the Business, and all credits, premium refunds, proceeds, causes of action or rights thereunder, except for any defense costs and expenses payable under the D&O Policy to Employees, directors or officers of any Seller;

(y)     all rights (but none of the obligations, if any) of any Seller related to the current or future assignment to any Seller (or enforcement or registration by any Seller) of

12.

any Intellectual Property Rights (e.g., proprietary information agreements between a Seller, on the one hand, and any Employee, on the other hand);

**(z)**    all (i) Post-Petition Subscriber Orders, (ii) Subscriber Orders entered into prior to the Petition Date by a customer using PayPal, Inc., and (iii) Subscriber Orders entered into prior to the Petition Date that Purchaser, in its sole discretion, agrees to fulfill;

**(aa)**    the Sales Taxes Account and all cash deposited therein and any deposits in transit with respect to such account;

**(bb)**    all goodwill directly arising from, related to or resulting from the Business or the Purchased Assets; and

**(cc)**    any other assets, whether tangible or intangible, related to, used in or held for use by, the Business, except for any Excluded Assets.

**2.2    Excluded Assets**.  Notwithstanding any other provision of this Agreement to the contrary, the following assets (the "***Excluded Assets***") shall not be transferred, conveyed, sold or assigned to Purchaser, and the Purchased Assets shall not include any of the following assets:

**(a)**    a Seller's corporate seals, stock record books, minute books and organizational documents;

**(b)**    any Contract (other than an Assumed Contract) and, as set forth on Schedule 2.2(b), deposits made in respect of professional fee retainers but solely to the extent that such deposit is used to satisfy allowed professional or advisory fees or expenses of professionals or advisors retained under Section 327 or Section 363 of the Bankruptcy Code, including allowed fees or expenses of PPP or Theseus Strategy Group LLP;

**(c)**    the D&O Policy and any defense costs and expenses payable under the D&O Policy to Employees, directors or officers of any Seller;

**(d)**    all rights of Sellers arising under this Agreement, and under any other agreement between Sellers and Purchaser entered into in connection with this Agreement or the Transactions;

**(e)**    all amounts owed to any Seller by any other Seller;

**(f)**    any shares of stock or other equity interests in any Seller or any subsidiary of any Seller and any Contracts entered into in connection with the sale or ownership of such shares of stock or other equity interests to the extent not set forth on Section 2.1(a);

**(g)**    all assets listed on Schedule 2.2(g) by Purchaser in its sole discretion as of two (2) Business Days before the Closing Date;

**(h)**    all bank accounts, deposit accounts, securities accounts, brokerage accounts and other accounts holding any cash, cash equivalents or securities belonging to Sellers set forth on Schedule 2.2(h);

**(i)**    all of Sellers' cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions in an amount equal to the Budgeted Reserve;

13.

**(j)**      all Employee Benefit Plans and any assets thereof or relating thereto;

**(k)**      (i) all attorney-client privilege and attorney work-product protection of the Sellers or associated with the Business as a result of legal counsel representing the Sellers or the Business to the extent relating to the structuring, preparation and negotiation of the transactions contemplated by this Agreement (except for any attorney-client privilege and attorney work-product protection relating to Sales Taxes in furtherance of Purchaser's obligations set forth in Section 8.5); (ii) all documents subject to the attorney-client privilege and work-product protection described in subsection (i) (excluding, for the avoidance of doubt, documents subject to the attorney-client privilege and work-product protection relating to Sales Taxes in furtherance of Purchaser's obligations set forth in Section 8.5); and (iii) all documents maintained by Sellers to the extent relating to the structuring, preparation and negotiation of the transactions contemplated by this Agreement (excluding any documents relating to Sales Taxes in furtherance of Purchaser's obligations set forth in Section 8.5);

**(l)**      the Accounts Receivable listed on <u>Schedule 2.2(l)</u> (the "***Excluded Accounts Receivable***"); and

**(m)**      all good faith or other bid deposits submitted by a third party under the terms of the bid procedures.

**2.3      Assumed Liabilities**.    Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the Assumed Liabilities. "***Assumed Liabilities***" shall mean solely the following liabilities:

**(a)**      all liabilities and obligations of Sellers exclusively related to or arising out of Purchaser's ownership of the Purchased Assets (other than the Assumed Contracts) from and after the Closing Date, including, with respect to the Subscriber Orders included in the Purchased Assets, all amounts billed to any customer by Sellers' prior to the Closing Date that are attributable to services not yet provided and to be rendered by Purchaser after the Closing Date;

**(b)**      all liabilities of Sellers under each of the Assumed Contracts that become due from and after the Closing Date;

**(c)**      all costs, expenses and liabilities pro-rated to Purchaser as expenses and liabilities arising on or after the Closing Date as set forth pursuant to the express terms of this Agreement;

**(d)**      all Cure Costs required in connection with the assumption and assignment of any Assumed Contracts;

**(e)**      (i) the administrative claims set forth on <u>Schedule 2.3(e)(i)</u>, provided, that, Purchaser may, in its sole discretion, modify the administrative claims set forth on <u>Schedule 2.3(e)(i)</u> until two (2) Business Days prior to the Closing Date solely to remove any unpaid administrative claims and expenses that are not provided for in the DIP Budget; and (ii) valid Claims arising under section 503(b)(9) of the Bankruptcy Code as set forth on <u>Schedule 2.3(e)(ii)</u>, which Purchaser may reduce dollar for dollar by the amount of any claim Sellers could have asserted against any such Claim holder pursuant to section 547 of the Bankruptcy Code on a creditor-by-creditor basis, provided that the holder of a 503(b)(9) claim may assert all valid defenses thereto.  In the event that the Purchaser and the holder of a 503(b)(9) claim cannot agree upon the amount of such 503(b)(9) claim to be assumed and paid by the Purchaser as set forth herein, such

503(b)(9) claimant may petition the Court to increase the amount of its 503(b)(9) claim assumed by Purchaser or to adjudicate such 503(b)(9) claimant's hypothetical liability under section 547 of the Bankruptcy Code for the purposes described herein;

      **(f)**      all liabilities for Sales Taxes arising after the Petition Date with respect to the operation of the Business payable to certain Taxing Authorities ("***Post-Petition Sales Taxes***"); and

      **(g)**      the Transfer Taxes described in <u>Section 8.2</u>.

In no event shall an Assumed Liability include any Liabilities or obligations of any Seller or its Affiliates that relate to any breach of representation, warranty, covenant or agreement that arose on or prior to the Closing Date.  Notwithstanding the foregoing and for the avoidance of doubt, Assumed Liabilities shall not include any Liability that constitutes an "Excluded Liability" or any Liability relating to or arising out of any violation of Law by, or any Claim against, any Seller or any breach, default or violation by any Seller of or under any Assumed Contracts, other than the Cure Costs.

      **2.4**      **Excluded Liabilities**.  Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or Liability or other obligation of Sellers or any predecessor of any Seller of whatever nature, whether presently in existence or arising hereafter.  All such other claims, Liabilities and other obligations, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, shall be retained by and remain claims, Liabilities and other obligations of Sellers (all such claims, Liabilities and other obligations not being assumed being herein referred to as the "***Excluded Liabilities***").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

      **(a)**      all Liabilities related to any Excluded Assets;

      **(b)**      administrative claims not explicitly set forth on <u>Schedule 2.3(e)</u>;

      **(c)**      all Liabilities (including Taxes (other than the Transfer Taxes and Post-Petition Sales Taxes)) for or arising in respect of (i) any and all Taxes (other than the Transfer Taxes), irrespective of when asserted, of the Business of one or more Sellers, any of their respective stockholders or equityholders of any Affiliate of any of the foregoing for any taxable period (including any such Taxes or related liabilities that may be imposed on or asserted against Purchaser or any of its Affiliates as a transferee or successor as a result of the transactions contemplated by this Agreement), (ii) any and all Taxes (other than the Post-Petition Sales Taxes) related to or arising from the Business, any of the Assumed Liabilities or any of the Purchased Assets, in each case, for any taxable period (or portion thereof) ending on or before the Closing Date (including any Taxes (other than the Post-Petition Sales Taxes) of any other Person imposed on or required to be paid by Purchaser as a successor or transferee, pursuant to any Assumed Contract, by operation of Law or otherwise to the extent relating to the Business and arising from an event or transaction occurring prior to the Closing or as a result of the failure to comply with any Bulk Sales Laws) and (iii) any Taxes or liabilities arising from the failure to comply with or obtain a certificate under any Bulk Sales Laws (including in respect of the transactions contemplated by this Agreement);

      **(d)**      all Liabilities relating to the Transferred Employees and all other Employees arising prior to the Closing Date, including Liabilities relating to such Transferred Employees and other Employees employment with any Seller or otherwise arising under the Employee Benefit Plans;

**(e)**    all Post-Retirement Liabilities;

**(f)**    all Liabilities under any collective bargaining agreement with any bargaining representative for Sellers' employees;

**(g)**    all claims for withdrawal liability or contributions related to Seller's participation in any Multiemployer Plan, including those set forth on Schedule 3.13(b);

**(h)**    all Liabilities relating to Employees, including all Liabilities of Sellers with respect to Employee Benefit Plans and all Liabilities thereunder, accrued and unpaid wages, accrued and unused vacation, sick days and personal days, any severance pay or benefits arising with respect to Transferred Employees, other payments earned but not paid under any incentive or bonus plan or arrangement of the Sellers, and the Employee's share and the employer's share of any payroll Taxes of all Employees of Sellers incurred through the Closing Date;

**(i)**    all Environmental Liabilities and Obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts arising or existing during Sellers' operation of the Business prior to the Closing Date; provided, that nothing in this Agreement shall in any way (x) diminish the obligation of any entity to comply with Environmental Laws, or (y) diminish the obligations of Sellers to comply with Environmental Laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code;

**(j)**    all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of or by Sellers' intellectual property and Intellectual Property Rights arising from Sellers' operation of the Business, or ownership or use of the Purchased Assets or Excluded Assets, prior to the Closing Date, including all Actions or claims in respect of any violation of any intellectual property rights, whether arising under a Contract or otherwise;

**(k)**    except with respect to Cure Costs, all Liabilities arising as a result of any Claim initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including any stockholder or shareholder actions, actions for breach of contract, or any tort actions;

**(l)**    all Liabilities with respect to any costs and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of each Seller or its Affiliates in connection with the Bankruptcy Cases or the Transactions;

**(m)**    all Liabilities incurred in the businesses of Sellers prior to the filing of the Bankruptcy Cases other than Assumed Liabilities, including all Liabilities and obligations of Sellers relating to or arising out of Subscriber Orders that are not included in the Purchased Assets;

**(n)**    all Liabilities for any funded indebtedness;

**(o)**    any Liability based on successor liability theories, including, product liability claims; and

**(p)**    any Liability based on any personal injury claims.

    **2.5**    **Assumption/Assignment of Contracts and Rights; Executory Contract Designation**.

(a)     **Assumption/Assignment of Contracts and Rights**.  To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts (and such other Contracts intended to be Assumed Contracts subsequently identified by Purchaser after the Closing Date) shall be assumed by Sellers and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code.   Sellers shall use commercially reasonable efforts to cooperate with Purchaser in its efforts to reduce any Cure Costs and negotiate rent reductions with respect to Real Property Leases that are Assumed Contracts.   Purchaser shall have sole responsibility for paying any Cure Costs due in connection with the assumption and assignment of the Assumed Contracts.  Such efforts shall include, without limitation, providing Purchaser with reasonable access to relevant business records, personnel, equipment, and Purchaser's other reasonable requests in order to allow Purchaser to assist with evaluating the Cure Costs.   Purchaser shall cooperate with Sellers to provide "***adequate assurance***" of Purchaser's future performance under the Assumed Contracts.  If prior to or following Closing, it is discovered that a Contract was not previously provided to Purchaser and, accordingly, such Contract is not listed Schedule 2.1(a) (any such Contract, a "***Sellers' Previously Omitted Contract***"), Sellers shall, promptly following the discovery thereof, notify Purchaser in writing of such Sellers' Previously Omitted Contract.   Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Sellers' Previously Omitted Contract from Sellers, designating such Sellers' Previously Omitted Contract as "Assumed" or "Rejected."  If at any point following Closing, Purchaser elects to add any additional Contract to Schedule 2.1(a) that was not (i) listed on Schedule 2.1(a) as of Closing and (ii) rejected pursuant to a bankruptcy court order (any such Contract, a "***Purchaser Previously Omitted Contract***" and together with any Sellers' Previously Omitted Contract, a "***Previously Omitted Contract***"), Purchaser shall notify Sellers in writing of its designation of such Purchaser Previously Omitted Contract as "Assumed."  If Purchaser designates a Seller Previously Omitted Contract as "Assumed," (A) Schedule 2.1(a) shall be amended to include such Previously Omitted Contract and (B) Sellers shall, at Purchaser's expense, serve a notice (the "***Previously Omitted Contract Notice***") on the counterparties to such Previously Omitted Contract such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Agreement.  The Previously  Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) days to object, in writing to Sellers and Purchaser, to the Cure Costs or the assumption of its Contract; and if the counterparties, Sellers and Purchaser are unable to reach a consensual resolution with respect to such objection, Sellers will, at Purchaser's expense, file all pleadings required to seek a timely hearing before the Bankruptcy Court to determine the applicable Cure Costs (to the extent not previously determined) and obtain approval the assumption of the Previously Omitted Contract and payment by Purchaser of such applicable Cure Cost.  If Purchaser designates a Purchaser Previously Omitted Contract as "Assumed," Sellers shall amend Schedule 2.1(a) and, at Purchaser's expense, take all other steps necessary to assume and assign the Purchaser Previously Omitted Contract to Purchaser.  None of the representations or warranties applicable to contracts by this Agreement shall apply to any Purchaser Previously Omitted Contract.

(b)     **Executory Contract Designation**.  On the terms and conditions set forth in this Agreement, Purchaser shall have the sole and exclusive right to select, identify and designate the Assumed Contracts.

(c)     **Non-Assignment of Assumed Contracts**. Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract which, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not assignable or transferable without the consent of any Person, other than the Sellers, any of their respective Affiliates or Purchaser, to the extent that such consent shall not have been given prior to the Closing; provided,

however, that (i) the Sellers shall use, whether before or after the Closing (at Purchaser's expense, if after Closing), its commercially reasonable efforts to obtain all necessary consents (each, a "**Necessary Consent**") to the assignment and transfer thereof, it being understood that, to the extent the foregoing shall require any action by the Sellers that would, or would continue to, have an adverse effect on the business of Purchaser or any of its Affiliates after the Closing, such action shall require the prior written consent of Purchaser, and (ii) in the event that any Assumed Contract is deemed not to be assigned pursuant to clause (i) of this Section 2.5(c), the Sellers shall, at Purchaser's expense, (A) use commercially reasonable efforts to obtain such necessary consents as promptly as practicable after the Closing to the extent administratively feasible and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Assumed Contract, under which Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Assumed Contract with respect to which such Necessary Consent has not been obtained to the extent administratively feasible. Upon satisfying any requisite consent requirement applicable to such Assumed Contract after the Closing, such Assumed Contract shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement. These commercially reasonable efforts shall not require any material payment or other material consideration from the Sellers or Purchaser (other than the Cure Costs, which shall be the responsibility of Purchaser), and any such consent shall contain terms and conditions reasonably acceptable to Purchaser. For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant Assumed Contract.

(d)    Upon objection by the non-debtor Contract counterparty to the proposed Cure Costs asserted by Sellers with regard to any Contract (such contract, a "**Disputed Contract**") Sellers shall, at Purchaser's prior written direction, either settle the objection of such party or shall litigate such objection (at Purchaser's expense if after Closing, or with the fees and expenses incurred being added to the Budgeted Reserve if prior to Closing). In no event shall any Seller settle a Cure Costs objection with regard to any Contract without the express written consent of Purchaser (with an email consent being sufficient). Upon entry of an Order determining any Cure Costs regarding any Disputed Contract (the "**Disputed Contract Order**"), Purchaser shall have the option to designate the Disputed Contract as an Excluded Asset, in which case, for the avoidance of doubt, Purchaser shall not assume the Disputed Contract and shall not be responsible for the associated Cure Costs, if any, with such Disputed Contract.  Each Seller agrees that it will promptly take such commercially reasonable actions as are necessary to obtain a final Order of the Bankruptcy Court providing for the assumption and assignment of Assumed Contracts.

## 2.6    Consideration; Allocation of Consideration.

(a)    In addition to the assumption of the Assumed Liabilities and the Cure Costs, the aggregate consideration (the "**Purchase Price**") for the sale, transfer and delivery of the Purchased Assets, at the Closing, shall be an amount equal to (i) thirty million dollars ($30,000,000) payable in the form of credit bid rights under Section 363(k) of the Bankruptcy Code consisting of the surrender and release by Purchaser of a portion of the Liabilities arising under, or otherwise relating to, the DIP Loan Agreement and First Lien Loan Agreement in an aggregate amount equal to thirty million dollars ($30,000,000) (the "**Credit Bid and Release**") (provided that the Credit Bid and Release shall be reduced dollar for dollar to the extent that Purchaser assumes (in its sole discretion) any portion of the indebtedness under the DIP Loan Agreement or First Lien Loan Agreement), plus (ii) the amount of cash payable by Purchaser in respect of the Budgeted Reserve, plus (iii) the aggregate amounts payable by Purchaser pursuant to

18.

Section 8.5 in respect of Sellers' Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of Sellers.

(b)     Purchaser and Sellers agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with the allocation schedule (the "**Allocation Schedule**"), which shall be delivered by Purchaser to Sellers within ninety (90) days following the Closing Date.  Purchaser and Sellers shall (and shall cause their respective Affiliates to) file all Tax Returns (including IRS Form 8954 (as and to the extent applicable)) and other Tax-related information reports in a manner consistent with the allocation schedule and not take any position inconsistent with such allocation schedule in any Tax-related audit, examination or other proceeding (whether administrative or judicial) unless required by applicable Law.  If any Party receives any notice from a Taxing Authority in respect of an audit, examination or other proceeding (whether administrative or judicial) regarding any allocation of the Purchase Price or otherwise proposing an allocation different from the Allocation Schedule, such Party shall notify the other Parties of such notice and provide such other Parties with a copy of such notice, and the Parties hereto shall cooperate with each other in good faith regarding the resolution of any such matter.

(c)     Notwithstanding anything to the contrary herein, Purchaser and its Affiliates shall have the right to withhold any Taxes required by applicable Law (including any Bulk Sales Law) to be withheld or deducted from any payments made by it or its Affiliates pursuant to the terms hereof.  Any such withheld or deducted amounts shall be treated for purposes of this Agreement as having been paid to the Person in respect of whom such withholding or deduction was made.

2.7     **Closing**.  The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Cooley LLP, 55 Hudson Yards, New York, New York 10001, no later than three (3) Business Days after satisfaction of the conditions set forth in Section 10 (other than those conditions that by their nature are to be satisfied at the Closing (provided that such conditions are capable of being satisfied)), or at such other time or place as Purchaser and Sellers may mutually agree in writing. The Parties may consummate the Closing electronically.

2.8     **Deliveries by Sellers**.  At the Closing, Sellers will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)     the Approval Order;

(b)     a duly executed bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit A** (the "**Assignment and Assumption Agreement**");

(c)     a duly executed trademark assignment agreement substantially in the form attached hereto as **Exhibit B** (the "**Trademark Assignment Agreement**"), duly executed by the applicable Seller;

(d)     a duly executed power of attorney substantially in the form attached hereto as **Exhibit C** (the "**Power of Attorney**");

(e)     an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance satisfactory to Purchaser, issued pursuant to Section 1445 of the Code and the Treasury regulations thereunder stating that Seller is not a foreign person as defined in Section 1445 of the Code;

19.

(f)      in the event that any Real Property Lease is set forth on Schedule 2.1(a) on the date that is two (2) Business Days prior to the Closing Date, a duly executed assignment and assumption agreement substantially in the form attached hereto as **Exhibit D** with respect to each such Real Property Lease (the "**Leased Real Property Assignment Agreements**" and, together with the Assignment and Assumption Agreement, the Trademark Assignment Agreement and the Leased Real Property Assignment Agreements, the "**Conveyance Agreements**");

(g)      a duly executed counterpart to the Transition Services Agreement (if requested by Purchaser and to the extent administratively feasible);

(h)      a duly executed counterpart to the Sales Tax Funding Commitment; and

(i)      all other documents, assignments, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement, in each case in form and substance reasonably acceptable to Sellers.

**2.9      Deliveries by Purchaser**.  At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a)      evidence of the Credit Bid and Release in form and substance reasonably satisfactory to Sellers;

(b)      duly executed counterparts to the Conveyance Agreements;

(c)      a duly executed counterpart to the Transition Services Agreement (if requested by Purchaser and to the extent administratively feasible);

(d)      a duly executed counterpart to the Sales Tax Funding Commitment; and

(e)      all other documents, instruments and writings reasonably requested by Sellers to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

**2.10     Cash Transfer**.  At the Closing, Sellers shall pay, or cause to be paid, to Purchaser an amount in cash equal to all cash and cash equivalents on hand as of the Closing Date in excess of the Budgeted Reserve by wire transfer of immediately available funds, to the account or accounts designated in writing by Purchaser to Sellers at least two (2) Business Days prior to the Closing.

**3.      REPRESENTATIONS AND WARRANTIES OF SELLERS.**  Except as set forth in the Schedules, each of the Sellers hereby represents and warrants to Purchaser as of the Original Agreement Date and as of the Closing Date as follows:

**3.1      Organization**.  Each Seller is (a) an entity duly incorporated or organized and validly existing under the Laws of its jurisdiction of incorporation or organization, as applicable, (b) has all requisite corporate or limited liability company power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) under the Laws of its jurisdiction of incorporation or organization, as applicable, and in every jurisdiction in which its ownership of property or the conduct of the Business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

**3.2      Corporate Authorization**.  The execution, delivery and performance of this Agreement by each Seller, and the consummation by such Seller of the Transactions, subject to

requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by such Seller.  This Agreement has been duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, upon approval of the Bankruptcy Court.

   **3.3**    **Financial Information**.

      **(a)**    Schedule 3.3(a) sets forth (i) the unaudited financial statements of the Business for the year ended December 31, 2018, consisting of the consolidated balance sheet of Sellers as of December 31, 2018 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended and (ii) an unaudited interim balance sheet for the six-months ended June 30, 2019 (such interim financial statements, together with the financial information described in the preceding clause (i), the "***Financial Information***").   The Financial Information (A) has been prepared from, and is consistent with, the books and records of Sellers, and, except as noted therein, has been prepared in accordance with GAAP, (B) except as noted therein, has been prepared on a basis consistent with prior accounting periods of Sellers, (C) presents fairly, individually and in the aggregate, in all material respects the balances of the specified accounts of the Business for the period covered thereby, and (D) except as noted therein, reflects and fairly presents, individually and in the aggregate, in all material respects the total revenue generated in respect of the Business for each period for which such Financial Information was provided.

      **(b)**    There are no Liabilities of the Business (whether accrued, absolute, contingent or otherwise) required under GAAP to be reflected in the Financial Information that are not reflected therein other than (i) Liabilities for Taxes, (ii) other Liabilities, in each case, incurred in the ordinary course of business since June 30, 2019 and (iii) Liabilities that are not, or would not reasonably be expected to be, individually or in the aggregate, material to the Business.

      **(c)**    Sellers' books and records contain records that reflect, in reasonable detail and in all material respects, the transactions and dispositions of the assets of the Business.   Sellers' system of internal controls over financial reporting is sufficient to provide reasonable assurance (i) that transactions in respect of the Business are recorded as necessary to permit preparation of financial statements in conformity with GAAP, consistently applied, and to derive from such financial statements, financial statements in conformity with GAAP, (ii) that transactions in respect of the Business are executed only in accordance with the fiscal authorization policies of Sellers and (iii) regarding prevention or timely detection of the unauthorized acquisition, use or disposition of the assets of the Business.

      **(d)**    All Accounts Receivables are valid receivables and were incurred in the ordinary course of business consistent with past practice for bona fide products delivered or services rendered and, to the Knowledge of Sellers, are current and collectible.

   **3.4**    **Governmental Authorization**.   The execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions by Sellers require no action by or in respect of, or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

   **3.5**    **Noncontravention**.   Subject to entry by the Bankruptcy Court of the bid procedures order and the Approval Order in the Bankruptcy Cases, the execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions do not and

21.

will not (a) violate any Seller's articles or certificates of incorporation or formation, as amended, or bylaws or operating agreements, (b) assuming compliance with the matters referred to in <u>Section 3.4</u>, violate any applicable Law, or (c) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens and Assumed Liabilities or Liens that will be released at or prior to Closing.

**3.6     Required Consents**.

**(a)**     Except as set forth on <u>Schedule 3.6(a)</u> and assuming that (x) requisite Bankruptcy Court approvals are obtained and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.6(a)</u> are made, given or obtained, as applicable, the execution, delivery and performance by Sellers of this Agreement and the consummation by Sellers of the transactions contemplated hereby, do not: (i) violate the certificate of incorporation or formation, bylaws or limited liability company agreement or equivalent organizational documents of any of the Sellers; (ii) violate any Law applicable to any of the Purchased Assets or by which the Purchased Assets are bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Lien (other than a Permitted Lien) on any Purchased Asset under, any Contract, except, in the case of clauses (ii) and (iii), for any such violations, breaches, defaults or other occurrences that would not reasonably be expected to have a Material Adverse Effect.

**(b)**     Except as set forth on <u>Schedule 3.6(b)</u>, Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Sellers of this Agreement or the consummation by Sellers of the Transactions, except (i) requisite Bankruptcy Court approvals or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not reasonably be expected to prevent or materially impair or delay the Transactions.

**3.7     Litigation**.  Except as disclosed on <u>Schedule 3.7</u>, as of the Original Agreement Date and subject to entry by the Bankruptcy Court of the bid procedures order and the Approval Order in the Bankruptcy Cases, there is no action, suit, investigation or legal or administrative proceeding pending or, to the Knowledge of Sellers, threatened against or affecting, the Purchased Assets, the Assumed Liabilities or the Business.  There are no material unsatisfied judgements, penalties or awards against or affecting the Business, the Purchased Assets or the Assumed Liabilities.

**3.8     Permits**.  <u>Schedule 2.1(e)</u> sets forth a list of all Permits required to conduct and operate the Business in a manner consistent with the current practices of Sellers.  <u>Except as set forth on Schedule 3.8</u>, (a) each Seller is in material compliance with the terms and requirements of each such Permit; and (b) no written notice of violation of any Permit has been received from any Governmental Authority and no proceeding is pending seeking to revoke or limit any such Permit.

**3.9     Compliance with Laws and Court Orders**.  Each Seller is not in material violation of any Law applicable to the ownership and use of the Purchased Assets or the conduct of the Business as currently conducted and to the Knowledge of Sellers, for the past three (3) years, has been in material compliance with all Laws applicable to it or its Business, properties or assets, except where such failure to comply has been cured without any continuing Liability on the part of a Seller or set forth in a Schedule to this Agreement.

**3.10     Intellectual Property Rights**.  <u>Schedule 2.1(f)(i)</u> sets forth an accurate and complete list of all Registered IP, unregistered trademarks included in the Transferred Intellectual

Property Rights and any other Intellectual Property Rights included in the Transferred Intellectual Property Rights that is material to the Business, taken as a whole. One or more Sellers own all Transferred Intellectual Property Rights free and clear of all Liens (other than Permitted Liens) and have valid rights to assign, transfer and convey all rights, title and interest associated therewith pursuant to this Agreement. Schedule 2.1(f)(ii) sets forth an accurate and complete list of all Registered IP that, to the Knowledge of Sellers, has been abandoned, cancelled or expired within the past three (3) years (the "***Expired IP***"). Except with respect to the Expired IP, all Registered IP remains pending or in full force and effect and has not expired or been cancelled. Except with respect to the Expired IP, the Registered IP is valid and enforceable except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability and the past three (3) years of use and current use by Sellers of the Technology owned by or, to the Knowledge of Sellers, licensed by, the Sellers does not infringe or otherwise violate any Intellectual Property Rights of any other Person, except as would not, individually or in the aggregate, be, or reasonably be expected to be material. To the Knowledge of Sellers, no Person is infringing or otherwise violating the Transferred Intellectual Property Rights.

**3.11    Environmental Matters**.    (a) Other than as described on part (a) of Schedule 3.11, in the last three (3) years, to the Knowledge of Sellers, each Seller has not received any notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Leased Real Property which remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Leased Real Property which remains unperformed, and (b) other than as described on part (b) of Schedule 3.11, to the Knowledge of Sellers, the Leased Real Property is in compliance, in all material respects, with applicable Environmental Laws.  The representations and warranties set forth in this Section 3.11 are the Sellers' sole and exclusive representations and warranties regarding environmental matters.

**3.12    Real Property**.  Seller has made available to Purchaser a true and complete copy of every Real Property Lease.  Except as set forth on Schedule 3.12, (a) each Real Property Lease that is an Assumed Contract is a legal, valid and binding obligation of Seller, and is enforceable against Seller, and is in full force and effect, (b) there are no leases, subleases, licenses, disputes, forbearance programs, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Leased Real Property; (c) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Leased Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; (d) Seller has not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in any Real Property Lease that is an Assumed Contract; and (e) there are no condemnation or eminent domain proceedings pending or threatened with respect to all or any part of the Leased Real Property.  Neither Seller nor, to the Knowledge of Sellers, any other party to a Real Property Lease that is an Assumed Contract is in default under such Real Property Lease and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material default, or permit the termination, modification or acceleration of rent under such Real Property Lease that is an Assumed Contract.  The Leased Real Property constitutes all of the real estate used or occupied for the Business, and no other real estate is necessary for the continued conduct of the Business in its ordinary course.  Each of the Real Property Leases that is an Assumed Contract will continue to be legal, valid, binding, enforceable, and will continue to be in full force and effect on identical terms following the consummation of the transactions contemplated hereby, and, except as set forth on Schedule 3.6(a), no consent of any landlord under any of the Real Property Leases that is an Assumed Contract are required in order for Seller to assign to Purchaser all of its interest under each Real Property Lease that is an Assumed Contract.

**3.13    Employee Benefits**.

23.

**(a)**     Schedule 3.13(a) sets forth a complete and accurate list of the Employee Benefit Plans.  Sellers have provided to, or made available to, Purchaser true and correct copies of (i) each Employee Benefit Plan (including all plan documents and amendments thereto), (ii) all current trust documents, investment management contracts, custodial agreements and insurance contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the annual report (Form 5500 and all schedules thereto) for the most recent plan year, (v) the most recent Internal Revenue Service determination or opinion letter, if applicable, and (vi) the annual report, actuarial report, financial statement and trustee report for the most recent plan year.

**(b)**     Schedule 3.13(b) sets forth a complete and accurate list of all Multiemployer Plans to which any Seller contributes on behalf of any Employees.  Sellers represent that they have not contributed to any Multiemployer Plan other than those listed on Schedule 3.13(b) during the past five (5) years.

**(c)**     Each Employee Benefit Plan complies in both form and operation and has been established, maintained, funded and administered in all material respects in compliance with its terms, all applicable requirements of ERISA, the Code and other applicable Laws.  Each Employee Benefit Plan which is intended to be qualified within the meaning of Code § 401(a) has received a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan.  None of the Purchased Assets is subject to any Lien under ERISA or the Code.  No Seller has any Liability with respect to any "***employee benefit plan***" (as defined in Section 3(3) of ERISA) that is subject to Section 302 or Title IV of ERISA, or Section 412 of the Code.  The transactions contemplated by this Agreement are not transactions to evade or avoid liability (as described in Section 4069(a) or 4212(c) of ERISA).

**(d)**     There are no pending audits or investigations by any Governmental Authority involving any Employee Benefit Plan, and there are no pending or, to the Knowledge of Sellers, threatened claims (except for individual claims for benefits payable in the normal operation of the Employee Benefit Plans), suits or proceedings involving any Employee Benefit Plan, any trust or other funding medium thereof, fiduciary thereof or service provider thereto, nor is there any reasonable basis for any such claim, suit or proceeding.

**(e)**     With respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law.

**(f)**     No Employee Benefit Plan provides benefits, including, death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by law or (ii) death or retirement benefits under an Employee Benefit Plan qualified under Section 401(a) of the Code.

**(g)**     Each Seller's execution of, and performance of the transactions contemplated by, this Agreement will not: (i) except as set forth on Schedule 3.13(g)(i), result in any payment or benefit, or increase in payments or benefits or acceleration in the timing of payments or benefits becoming due to any current or former employee, director, officer or independent contractor of such Seller; (ii) except as set forth on Schedule 3.13(g)(ii), limit the right to merge, amend or terminate any Employee Benefit

Plan; or (iii) result in the payment or provision of an "excess parachute payment" under Section 280G of the Code, whether under an Employee Benefit Plan or otherwise.

(h)     Each Employee Benefit Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code complies in both form and operation with the requirements of Section 409A of the Code in all material respects.

(i)     Except as would not reasonably be expected to result in material Liability to the Sellers, no individual who performs or has performed services for the Sellers has been improperly excluded from participation in any Employee Benefit Plan.

(j)     Except as set forth on Schedule 3.13(j), Sellers have performed all material obligations required to be performed by them and are not in any material respect in default under or in violation of any Employee Benefit Plan, nor, to the Knowledge of Sellers, has there been any such material default or violation by any other party to any Employee Benefit Plan.

**3.14    Employment and Personnel Matters**.

(a)     Schedule 3.14(a) contains an accurate and complete list as of the date set forth on Schedule 3.14 of the names, job classifications, dates of hire, base compensation or wage rate, work location, exempt or non-exempt classification for wage-hour purposes, annual bonus opportunity, accrued but unused sick and vacation leave or paid time off entitlements, and any supplemental or bonus compensation (including any retention bonus arrangements) for all Employees.

(b)     The Contracts listed on Schedule 3.14(b) include all individual written employment, retention, change in control bonus or severance agreements to which, as of the Original Agreement Date, the Sellers are a party with respect to any Employee.

(c)     There are no complaints, charges or claims against the Sellers pending or, to the Knowledge of Sellers, threatened with any Governmental Authority or based on, arising out of, in connection with or otherwise relating to the employment or termination of employment or failure to employ by the Sellers, of any individual.  The Sellers are and for the past three (3) years, to the Knowledge of the Sellers, have been in material compliance with all Laws relating to wages, hours, severance pay, WARN and any similar state or local "mass layoff" or "plant closing" Law, collective bargaining, discrimination, civil rights, safety and health, immigration, classification of workers as exempt or non-exempt, discrimination, workers compensation, and the collection and withholding of social security taxes and any similar tax.

(d)     The Sellers have not incurred and do not expect to incur any Liability with respect to any misclassification of any person as an independent contractor rather than as an employee, or as exempt rather than non-exempt for wage and hour purposes.

(e)     All current Employees and other individual service providers are located in and have a place of employment in the United States, and have authorization and appropriate documentation to work in the United States.  Sellers are not party to any collective bargaining agreement with any labor union.  There has not been any labor dispute, other than individual grievances, or any activity or proceeding by a labor union or representative thereof to organize any employees of Sellers.  Each Seller has not suffered any work stoppage, strike, lockout or other material labor dispute within the past three (3) years, and no such activities are underway or threatened.

**(f)**        Except as set forth on Schedule 3.14(f), the Sellers have not taken any action which would constitute a "plant closing" or "mass layoff" within the meaning of the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "WARN Act") or similar state of local law, issued any notification of a plant closing or mass layoff required by the WARN Act or similar state or local law, or incurred any liability or obligation under WARN or any similar state or local law that remains unsatisfied.  Except as set forth on Schedule 3.14(f), no terminations prior to the Closing would trigger any notice or other obligations under the WARN Act or similar state or local law.

**3.15    Taxes**.  Except as set forth on part (a) of Schedule 3.15, all Tax Returns (including any IRS Forms W-2 or Forms 1099) required to be filed by or on behalf of each Seller (or any predecessor of a Seller) and all Tax Returns required to be filed in respect of any Purchased Asset, in each case, have been timely filed, and when filed all such Tax Returns were true and correct in all material respects.  Except as set forth on part (b) of Schedule 3.15, all Taxes of each Seller (or any predecessor of a Seller) and all Taxes relating to any Purchased Asset required to have been paid were timely paid or (in respect of withholding or payroll Taxes) duly withheld and paid over.  Except as set forth on part (c) of Schedule 3.15, during the last three (3) tax years, no written claim has been made by any Taxing Authority in a jurisdiction where a Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction with respect to the Purchased Assets, Business or the Assumed Liabilities.  Except as set forth on part (d) of Schedule 3.15, no audit, administrative proceeding or judicial proceeding, that involves any amount of Tax and the Business is pending or threatened in writing.  True and complete copies of all Tax Returns filed by each Seller for each of its three (3) most recent taxable years have been delivered to Purchaser.  None of the Purchased Assets includes any equity interests, securities, stock, shares or other ownership interest in any Person (including any Person that is not a "***United States person***" within the meaning of Code Section 7701(a)(30)).  None of the Purchased Assets includes any "***United States real property interest***" within the meaning of Code Section 897.  Except as set forth on part (e) of Schedule 3.15, no Seller is required to file any Tax Return in any jurisdiction other than a jurisdiction within the United States.  There are no liens on any of the Purchased Assets that arose in connection with any failure (or alleged failure) to pay any Taxes.  Purchaser will not be required to include any income in, or exclude any deduction from income with respect to the Purchased Assets for any taxable period ending after the Closing Date as a result of any action by the Seller in a pre-closing tax period including any change in any method of accounting; any installment sale, open transaction, prepaid amount, or intercompany transaction; or any agreement with any Taxing Authority.

**3.16    Title to the Purchased Assets**.  Each Seller will have at Closing good and marketable title to, or a valid leasehold interest in (or license or other right to use), all the Purchased Assets free and clear of all Liens (other than Permitted Liens and Assumed Liabilities).

**3.17    Transactions with Affiliates**.  Except as disclosed on Schedule 3.17, there are no Assumed Contracts between any Seller with respect to the Business, on the one hand, and any Affiliate of any Seller, on the other, including any loan, guarantee or purchase or sales agreement, other than contracts or agreements which will be terminated prior to the Closing.

**3.18    Insurance**.  As of the Original Agreement Date, all material property and liability insurance policies covering any of the Purchased Assets are in full force and effect, and no written notice of cancellation, termination or revocation or other written notice that any such insurance policy is no longer in full force or effect or that the issuer of any such insurance policy is not willing or able to perform its obligations thereunder has been received by any Seller.  Such policies provide for coverage in amounts deemed by Sellers to be adequate, and all premiums due and payable thereon have been paid in full.

**3.19     Service of Bankruptcy Documents**.  Each Seller has appropriately and timely served all parties in interest with copies of the sale and bid procedures motion and applicable notices in accordance with the bid procedures order.

**3.20     Certain Fees**.   Except as set forth on Schedule 3.20, no agent, broker, investment banker or other person or firm acting on behalf of any Seller or under its authority is or will be entitled to any broker's or finder's fee or any other commission or similar fee or the reimbursement of expenses, directly or indirectly, from any Seller in connection with this Agreement or the Transactions.

**3.21     Material Contracts**.

**(a)**     Schedule 3.21(a) sets forth a true, correct and complete list of the following types of Contracts to which any Seller is a party or by which any Seller is bound or by which the Purchased Assets may be bound or affected (the "***Material Contracts***"):

**(i)**     Assumed Contracts with any Affiliate or current or former officer or director of a Seller;

**(ii)**     the License Agreements;

**(iii)**     any Contract, to the Knowledge of Sellers, containing a covenant that restricts a Seller or any Affiliate of a Seller from engaging in any line of business, conducting the Business in any geographic area, competing with any Person or hiring any Person;

**(iv)**     any Assumed Contract, to the Knowledge of Sellers, granting to any Person an option or a first refusal or similar preferential right to purchase or acquire any material Purchased Assets of the Sellers;

**(v)**     any Contract relating to incurrence of indebtedness or the making of any loans, in each case involving amounts in excess of One Hundred Thousand Dollars ($100,000);

**(vi)**     any Assumed Contract, to the Knowledge of Sellers, granting any "most favored nation" pricing, discounts or benefits to any Person; and

**(vii)**     Contracts relating to a joint venture of the Business or any Seller.

**(b)**     Each of the Material Contracts that is an Assumed Contracts is in full force and effect and is the legal, valid and binding obligation of a Seller, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**(c)**     Prior to the Original Agreement Date, Sellers used reasonable best efforts to deliver to Purchaser a true, complete and accurate copy of (i) each Material Contract (including all amendments thereto) and (ii) each other Contract (including all amendments thereto) that involves amounts in excess of $10,000.

**3.22     Licensing Matters**.  All of the License Agreements are in full force and effect and are valid and binding obligations of a Seller and enforceable against it and the other parties thereto in accordance with their respective terms, subject to certain equitable and other defenses by counterparties to certain of such License Agreements.   Except as set forth in Schedule

3.21(a), all License Agreements comply in all material respects with all applicable Laws, and no party to a License Agreement has asserted any right of rescission or set-off, counterclaim or defense.

**3.23    Data Privacy**.   In connection with its collection, storage, transfer (including transfer across national borders) or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees or other third parties (collectively "***Personal Information***"), each Seller is and, during the last three (3) years, has been in compliance with all applicable Laws in all relevant jurisdictions except as would not, individually or in the aggregate, be, or would reasonably be expected to be, material to the Business taken as a whole and has obtained all necessary rights from third parties and complied in all material respects with all other requirements under applicable Laws to enable the collection, storage, transfer or use of such Personal Information for the purposes of the Business (as is customary in the retail and e-commerce industries) following Closing.   Each Seller has complied in all material respects with the opt-out provisions of its privacy policies and any and all requests of customers to opt out of receipt of marketing messages.   Each Seller has commercially reasonable physical, technical, organizational and administrative security measures in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use or disclosure in accordance with applicable Laws and there have been no security incidents which have resulted in the accidental or unlawful destruction, loss, alteration or unauthorized disclosure of or access to Personal Information during the last three (3) years.

**3.24    Customer Lists; Customer Data**.   The Customer Lists maintained by the Sellers are true, correct and complete in all material respects, and are the only lists of the customers of the Business, and the Sellers have no other or separate list of the customers of the Business.   None of the Sellers has sold, licensed or made available any information or rights contained in any Customer List or any Customer Data (or any portion thereof) to any Person (other than the making available of a Customer List or Customer Data to an Employee in the ordinary course of such Employee's duties for use in connection with services rendered to the Business, or the provision of the Customer Lists under seal in the Bankruptcy Cases).

**3.25    No Other Representations or Warranties; Schedules**.   Except for the representations and warranties contained in Section 3 (as modified by the Schedules hereto) or any Transaction Document, none of Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers, the Purchased Assets, the Assumed Liabilities or the Transactions, and each Seller disclaims any other representations or warranties, whether made by Sellers, any Affiliate of Sellers, or any of Sellers' or their Affiliates' respective Representatives.   Except for the representations and warranties contained in Section 3 (as modified by the Schedules hereto) or any Transaction Document, each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Sellers or any of its Affiliates).   Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business.   The disclosure of any matter or item in any Section of the Schedule will, if not otherwise required to be set forth thereon by the terms of this Agreement, not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Material Adverse Effect with respect to the Sellers.   Sellers acknowledge that except for the representations and warranties made by Purchaser in Section 4, Purchaser does not make (and neither Sellers nor any other Person has not relied upon) any representations or warranties on behalf of Purchaser.   Sellers acknowledge and agree that they (i) have been afforded the opportunity to ask questions of and receive answers from officers and

other key employees of Purchaser and (ii) have conducted their own independent investigation of Purchaser, and have not relied on any representation, warranty or other statement by any Person on behalf of Purchaser, other than the representations and warranties of Purchaser expressly contained in <u>Section 4</u>, and that all other representations and warranties are specifically disclaimed.  Notwithstanding the foregoing, nothing contained in this Section shall limit or otherwise impair in any manner Sellers' right to make a claim for breach of any Transaction Document, actual fraud or willful misconduct.

**4.**     **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**  Purchaser represents and warrants to each Seller as follows:

**4.1     Organization**.  Purchaser is a Delaware limited liability company duly organized, validly existing and in good standing and has all requisite authority to carry on its business.

**4.2     Corporate Authorization**.  The execution, delivery and performance of this Agreement by Purchaser, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite organizational action, and no other proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by it.  This Agreement has been duly and validly executed and delivered by Purchaser, and, assuming this Agreement is a valid and binding obligation of each Seller, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, upon approval of the Bankruptcy Court.

**4.3     Governmental Authorization**.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material effect on Purchaser or its ability to consummate the Transactions.

**4.4     Noncontravention**.  Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, any Seller.

**4.5     Availability of Purchase Price**.  Purchaser has provided to Sellers true and correct copies of documentation evidencing Purchaser's empowerment as of the Closing Date to deliver the Credit Bid and Release.  Purchaser has sufficient funds available to it in cash to pay or cause to be paid any cash portion of the Purchase Price, and the Assumed Liabilities.  Upon the consummation of the Transactions, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.

**4.6     Certain Fees**.  Purchaser has not employed any broker, finder, investment banker or other intermediary or incurred any Liability for any investment banking fees, financial

advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

**4.7    Litigation.**  There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, materially alter or materially delay the Transactions.

**5.    COVENANTS OF SELLER.**  Sellers agree that:

**5.1    Conduct of the Business.**  From the Original Agreement Date until the earlier of the termination of this Agreement pursuant to Section 11.1 or the Closing Date, except (a) as disclosed on Schedule 5.1, (b) consented to in writing by Purchaser, (c) as may be required by the Bankruptcy Court (provided that no Seller petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such order of the Bankruptcy Court) or (d) for any action expressly required to be taken pursuant to this Agreement, (i) each Seller shall use commercially reasonable efforts to (A) conduct its Business in the ordinary course consistent with past practice since the Petition Date, (B) comply in all material respects with all applicable Laws (including, maintaining any Permits held by each Seller and required for the current operation of the Business) and all Assumed Contracts and (C) preserve the Business (including the E-Commerce Platform and all systems necessary to maintain the condition and availability of such E-Commerce Platform) intact and preserve the goodwill of and relationships with Governmental Authorities, customers, suppliers, employees and others having business dealings with the Business; and (ii) without limiting the generality of the foregoing, each Seller will not:

> **(a)**    with respect to the Business, acquire a material amount of assets (including any inventory) from any other Person (including by merger, share exchange, joint venture or other extraordinary transaction);

> **(b)**    sell, transfer, lease, license, mortgage, encumber (unless such Lien is removed prior to the Closing, except for the DIP Liens) or otherwise dispose of any Purchased Assets;

> **(c)**    amend, modify or terminate any Material Contract without Purchaser's prior written consent;

> **(d)**    fail to maintain, or allow to lapse, or abandon any Registered IP;

> **(e)**    fail to maintain any Customer Lists or other books and records of the Business in the ordinary course of business;

> **(f)**    destroy or fail to preserve any Customer Data except to the extent required by applicable Law and in the ordinary course of the Business consistent with past practice;

> **(g)**    hire or engage any new Employee or consultant or terminate any Employee (other than a termination for cause);

> **(h)**    increase the compensation, severance or fringe benefits of any Employee;

> **(i)**    change or revoke any method of accounting for tax purposes;

30.

**(j)** (i) make or change any Tax election or change any method of tax accounting, (ii) settle or compromise or enter into any contractual arrangement in respect of any federal, state, local or foreign Tax liability other than a Qualified Settlement (<u>provided</u>, that Purchaser's consent to any settlement with a Taxing Authority in respect of Sales Taxes shall not be unreasonably conditioned, withheld or delayed), (iii) file an amended Tax Return (other than the Tax Return for fiscal year 2018 only if (x) required by the Office of the U.S. Trustee and (y) all costs, expenses, obligations and Liabilities of such filing are Excluded Liabilities), (iv) enter into any closing agreement relating to any Tax, (v) enter into any voluntary disclosure or similar program with respect to any Tax, (vi) agree to any extension of a statute of limitations, or (vii) surrender any right to claim a Tax refund with respect to the Purchased Assets;

**(k)** change or modify any material accounting practice, policy or procedure, except as required by GAAP or applicable Law;

**(l)** enter into any purchase order unless the terms and conditions applicable thereto have been previously approved by Purchaser;

**(m)** make any broad-based communication to customers of the Business (<u>provided</u> that such consent shall not be unreasonably withheld, condition or delayed in the event that such communication is required by the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure);

**(n)** make any debits from, or otherwise withdraw any cash from, the Sales Taxes Account, except to pay Sales Taxes as they come due;

**(o)** agree or commit to do any of the foregoing; or

**(p)** take any action that would reasonably be expected to cause the failure of any condition contained in <u>Section 10.2</u> (other than actions taken by each Seller in connection with the discharge of its fiduciary duties during the Bankruptcy Cases).

**5.2** **Access to Information**.  Subject to applicable Law and except as doing so would violate any fiduciary duty or contractual obligation or would waive any attorney-client privilege of Sellers included in the Excluded Assets (<u>provided</u>, <u>however</u>, in any such case, Sellers and Purchaser shall use commercially reasonable efforts to identify and pursue a permissible method of providing such disclosure without violating such Laws or obligations and without resulting in a loss of such privileges), from the Original Agreement Date until the earlier of the termination of this Agreement pursuant to <u>Section 11.1</u> or the Closing Date, Sellers (a) shall give Purchaser and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of Sellers in each case to the extent relating to the Purchased Assets, as Purchaser reasonably deems necessary in connection with effectuating the Transactions, (b) shall furnish to Purchaser and its Representatives such information as Purchaser and its Representatives reasonably request and (c) shall cooperate reasonably with Purchaser in its investigation of the Purchased Assets or the Business.

**5.3** **Notices of Certain Events**.  From the Original Agreement Date until the earlier of the termination of this Agreement pursuant to <u>Section 11.1</u> or the Closing Date, each Seller shall promptly notify Purchaser of:

**(a)** any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

**(b)**    any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

**(c)**    the commencement of any actions, suits, investigations or proceedings relating to such Seller, any Purchased Asset or the Business that, if pending on the Original Agreement Date, would have been required to have been disclosed pursuant to Section 3.7 or would have resulted in a breach of any representation contained in Section 3.15.

**5.4    Name Change**.  At the closing or within ten (10) Business Days of the Closing Date, Sellers shall use commercially reasonable efforts to take such corporate and other actions necessary to change their company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by the law of the state of their respective organization, and shall promptly thereafter provide Purchaser with written evidence of such name changes.  Sellers shall also prepare and file a motion with the Bankruptcy Court to change the caption of the Bankruptcy Cases to reflect such names changes.

**5.5    Intellectual Property Rights Assignment**.  To the extent any Intellectual Property Rights used by the Business are owned by any directors or officers of the Sellers prior to the Closing, the Sellers shall (a) with respect to any current directors and officers, cause such current directors and officers to assign their entire interest in such Intellectual Property Rights to the Sellers prior to the Closing, and (b) with respect to any former directors and officers, use reasonable best efforts to cause such former directors and officers to assign their entire interest in such Intellectual Property Rights to the Sellers prior to the Closing.  At or prior to the Closing, with respect to certain social media sites identified on Schedule 2.1(g), the Sellers shall make a Person identified by Purchaser a moderator of such accounts in order to provide Purchaser access to such accounts.

**6.    COVENANTS OF PURCHASER.**

**6.1    Books and Records**.  After the Closing Date, Purchaser shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, to the extent necessary to permit Sellers to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit, any claim or litigation matter or for purposes of the Bankruptcy Cases, but not for any dispute or claim between Purchaser and Seller in connection with this Agreement, the Transaction Documents or otherwise), for periods prior to the Closing and shall preserve such books and records until the later of (i) such period as shall be consistent with Purchaser's records retention policy in effect from time to time, (ii) the retention period required by applicable Law or (iii) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Purchaser acknowledges that Sellers have the right to retain originals or copies of all of books and records included in or related to the Purchased Assets for periods prior to the Closing.

**7.    COVENANTS OF PURCHASER AND SELLER.**  Purchaser and each Seller agree that:

**7.1    Efforts; Further Assurances**.  Subject to the terms and conditions of this Agreement, Purchaser and each Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the Transactions contemplated by this Agreement including: (a) the delivery by Sellers to Purchaser of originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not already located at the Leased Real Property, (b) at

Purchaser's expense, acting as Purchaser's agent in order to obtain for Purchaser the benefits under any non-assignable Purchased Assets and cooperating with Purchaser in any other reasonable arrangement designed to provide the benefits of such non-assignable Purchased Assets to Purchaser and (c) at Purchaser's request, physical possession of any Purchased Assets identified by Purchaser that is capable of passing by delivery, with the intent that title in such Purchased Assets shall pass by and upon delivery; provided, however, each Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets).  Each Seller and Purchaser agree to execute and deliver such other documents, assignments, certificates, agreements and other writings and to take such other actions as may be necessary in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

7.2    **Certain Filings**.  Each Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking to timely obtain any such actions, consents, approvals or waivers.

7.3    **Public Announcements**.  Prior to the Closing, Purchaser may make any public announcements or statements concerning the Transactions without the prior written consent of Sellers.  Purchaser acknowledges and agrees that Sellers may provide copies of this Agreement to parties in interest in the Bankruptcy Cases and to those parties to whom any Seller determines it is necessary to provide copies in connection with soliciting higher or better bids for the Purchased Assets or as otherwise necessary or desirable in connection with the Bankruptcy Cases.  Sellers also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the contemplated Transactions in any newspaper selected by Sellers.

7.4    **DIP Loan Documents**.  Notwithstanding anything in this Agreement to the contrary, between the Original Agreement Date and the Closing Date, it shall not be a breach of this Agreement for, and nothing in this Agreement shall (or shall be deemed to) limit or affect the ability of, Sellers to incur indebtedness, encumber the Purchased Assets with the DIP Liens, or borrow funds under the DIP Loan Documents.

7.5    **Bankruptcy Issues**.

(a)    **Expense Reimbursement**.  Upon consummation of a sale of all or substantially all of the Purchased Assets to any third party (or third parties) (other than Purchaser), or if any Seller commits a material breach of this Agreement or unilaterally abandons consummation of the transactions contemplated by this Agreement, Sellers shall pay to Purchaser cash or other immediately available funds in an amount equal to seven hundred and fifty thousand dollars ($750,000) (the "***Expense Reimbursement***"); provided, however, the Expense Reimbursement shall not be due and payable solely if this Agreement is terminated pursuant to Section 11.1(h).  The provisions of this Section 7.5(a) shall survive any termination of this Agreement.  The Expense Reimbursement shall be paid to Purchaser directly from the proceeds of the closing of such sale(s) to any third party, and shall be paid to Purchaser prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Expense Reimbursement).  The obligation to pay the Expense Reimbursement under this Agreement shall be absolute and unconditional and shall not be subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever.

33.

**(b)      Bankruptcy Court Approval of Sale**.  Sellers and Purchaser shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "**Approval Order**") of the Bankruptcy Court in the Bankruptcy Cases in form and substance acceptable to Purchaser containing provisions, including, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Liens, Claims, or other encumbrances (other than Assumed Liabilities and Permitted Liens), and (C) the performance by Sellers of their respective obligations under this Agreement; (ii) authorize and empower Sellers to assign to Purchaser the Assumed Contracts; (iii) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code; (iv) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor or transferee Liability, labor law, de facto merger or substantial continuity; and (v) find that Purchaser shall have no Liability for any Excluded Liability.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

**7.6      Transition Services**.  If requested by Purchaser, in connection with the consummation of the Transactions, the Parties will negotiate in good faith, prior to the Closing, a transition services agreement in form and substance (a) customary for transaction of the type contemplated by this Agreement and (b) reasonably acceptable to the Sellers and Purchaser in their respective reasonable discretion (the "**Transition Services Agreement**"), which will provide for the provision of transition services by the Sellers to the extent administratively feasible to operate the Business in substantially the same manner as currently conducted in accordance with the term set forth therein.

**7.7      Wrong Pockets**.  In the event that either Purchaser or Seller becomes aware that any of the Purchased Assets has not been transferred to Purchaser or that any of the Excluded Assets has been transferred to Purchaser, it shall promptly notify the other and the Parties shall, as soon as reasonably practicable, ensure that such property is transferred, and with any necessary prior third-party consent or approval, to (a) Purchaser, in the case of any Purchased Asset that was not transferred to Purchaser at the Closing, with such costs to do so being at the expense of Sellers; or (b) any Seller, in the case of any Excluded Asset that was transferred to Purchaser at the Closing, with such costs to do so being at the expense of Sellers, except if such Excluded Asset was identified by Purchaser in accordance with the next sentence, in which case, such costs being at the expense of Purchaser.  If, on or after the Closing Date, Purchaser may determine, in its sole discretion, to designate any Assumed Contract as an Excluded Asset and, notwithstanding anything to the contrary herein, such Contract shall be deemed to be an Excluded Asset for all purposes of this Agreement, including the immediately preceding sentence. In addition, if on or after the Closing Date, either Party shall receive any payments or other funds due to the other pursuant to the terms of this Agreement or any other Transaction Document, then the Party receiving such funds shall, within 30 days after receipt of such funds, forward such funds to the proper Party.

**7.8      Notices**.  If at any time (a) Purchaser becomes aware of any material breach by any Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Sellers, or (b) Sellers become aware of any breach by

34.

Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 12.1, in writing of such breach.  Upon such notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

**7.9    Confidentiality**.  From and after the Closing, Sellers shall hold in confidence any and all information, whether written or oral, concerning the Purchased Assets or the Business, except to the extent that such information (a) is generally available to and known by the public through no fault of Sellers or (b) is lawfully acquired by any Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.  If any Seller is compelled to disclose any information by any Action or by other requirements of Law or Order, Sellers shall promptly notify Purchaser in writing and shall disclose only that portion of such information which Sellers are, based on advice of counsel, legally required to be disclosed, provided that Sellers shall, at Purchaser's expense, use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**7.10    Budgeted Reserve**.  Five (5) Business Days prior to the Closing Date, Sellers shall deliver to Purchaser a certificate signed by a duly authorized representative of each Seller setting forth: (a) a statement setting forth Sellers' good faith estimate of the Budgeted Reserve (including each component thereof) and Sellers' good faith estimate of the Cash and Cash Equivalents as of the Closing Date (the "***Closing Statement***"); and (b) all supporting documentation reasonably necessary to calculate the estimate of the Budgeted Reserve and the Cash and Cash Equivalents as of the Closing Date.  From the delivery of the Closing Statement until one (1) Business Day prior to the Closing, Purchaser shall have an opportunity to discuss the calculation of the Budgeted Reserve and the Cash and Cash Equivalents as of the Closing Date with the Sellers and its Representatives, Sellers shall consider in good faith any comments on the Closing Statement submitted by Purchaser, and Sellers may redeliver such statement to reflect any such comments; provided, that even if Sellers and Purchaser do not mutually agree upon the calculations to be included in the Closing Statement, the last statement delivered by Sellers to Purchaser shall be used at Closing as the basis for determining any payment that may need to be made by Purchaser and shall be deemed to be the "Closing Statement"; provided, however, the Sellers agree that such opportunity to review and comment on such calculations shall not (x) limit or otherwise affect Purchaser's remedies under this Agreement or otherwise, or constitute an acknowledgment by Purchaser of the accuracy of the amounts reflected thereon or (y) affect whether Sellers have fulfilled its obligation to deliver a good faith calculation of the Budgeted Reserve pursuant to this Section 7.10.  In addition, notwithstanding anything to the contrary contained herein, Sellers agree that neither Purchaser nor any of its Representatives shall have any obligation to confirm or verify the amounts set forth in the Budgeted Reserve and Purchaser shall be entitled to rely on such calculations.

**8.    TAX MATTERS**.

**8.1    Tax Cooperation**.  Purchaser and Seller agree to reasonably cooperate with each other in connection with the preparation of any Tax Return or filing relating to the Purchased Assets or the Assumed Liabilities, which cooperation shall include furnishing or causing to be furnished to each other, upon reasonable request, as promptly as practicable, such information relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any such Tax Returns to the extent such information is in the relevant party's possession, cooperation in the preparation for any audit or examination by any Taxing Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased

35.

Assets or the Business (each, a "***Tax Claim***"), provided that Seller shall (and shall cause its Affiliates to) (a) promptly notify Purchaser of any notice received in respect to any Tax Claim, (b) promptly notify Purchaser of any significant developments regarding such Tax Claim, (c) permit Purchaser (if Purchaser so chooses) to control the defense and/or resolution of any Tax Claim if any resolution or settlement of such Tax Claim reasonably could be expected to have an effect on Purchaser, any of Purchaser's Affiliates or any Purchased Asset for any taxable period, (d) take all actions and cooperation reasonably necessary in furtherance of the immediately preceding clause (c), and (e) not settle or otherwise resolve any Tax Claim without the prior written consent of Purchaser.

8.2    **Transfer Taxes**.  Any and all sales, use, transfer, stamp, recording or other similar taxes or charges assessed at Closing or at any time thereafter on the transfer of any Purchased Assets (the "***Transfer Taxes***") shall be paid by, and the responsibility of, Purchaser, taking into consideration any exemptions that are available; provided, however, Sellers shall, at their own expense, prepare all Tax Returns required to be filed in respect of any such Transfer Taxes, provided that, with respect to any such Tax Return for which Purchaser is required to join or otherwise execute pursuant to applicable Law, Purchaser (upon Sellers' request) shall join in the filing of such Tax Return, and Sellers shall provide a copy of each such Tax Return to Purchaser.  Purchaser and Sellers shall reasonably cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation in respect of any Transfer Taxes arising from the Transactions.

8.3    **Property Taxes**.  All unpaid real and personal property taxes and assessments on the Purchased Assets for any taxable period commencing on or prior to the Closing Date (the "***Adjustment Date***") and ending on or after the Adjustment Date (a "***Straddle Period***") shall be prorated between Purchaser and Sellers as of the close of business on the Adjustment Date based on the best information then available with (a) Sellers being liable for such Taxes attributable to any portion of a Straddle Period ending on the day prior to the Adjustment Date (such amounts, "***Sellers' Property Taxes***") and (b) Purchaser being liable for such Taxes attributable to any portion of a Straddle Period on or after the Adjustment Date.  Information available after the Adjustment Date that alters the amount of Taxes due with respect to the Straddle Period will be taken into account and any change in the amount of such Taxes shall be prorated between Purchaser and Sellers as set forth in the next sentence.  All such prorations shall be allocated so that items relating to the portion of a Straddle Period ending on the day prior to the Adjustment Date shall be allocated to Sellers based upon the number of days in the Straddle Period prior to the Adjustment Date and items related to the portion of a Straddle Period on and after the Adjustment Date shall be allocated to Purchaser based upon the number of days in the Straddle Period from and after the Adjustment Date.  For purposes of determining Sellers' Property Taxes on the Closing Date under this Agreement, with respect to any real or personal property Taxes for a Straddle Period for which a written assessment or bill has not yet been received from the applicable taxing authority, such amounts shall be determined by assuming that the relevant Tax owed for such period equals no less than one hundred thirty percent (130%) of the amount of such Tax as set forth on the most recent bill or notice that is available. Notwithstanding anything to the contrary herein, neither Purchaser nor any of its Affiliates shall have any liability for or otherwise be required to pay any real or personal property Taxes or other similar Taxes which are liabilities or obligations under any lease or Contract of a Seller to the extent such lease or contract is not an Assumed Contract.

8.4    **Certain Tax Reporting for Employees**.  Notwithstanding anything to the contrary herein, unless otherwise directed by Purchaser, the Parties agree to use the "***standard***" method of IRS Revenue Procedure 2004-53 for income and payroll Tax reporting.

8.5    **Sales Taxes and Sales Taxes Account**.

(a)    Schedule 8.5(a) (the "***Sales Taxes Schedule***") sets forth (i) a true, correct and accurate list of potential (whether asserted or unasserted) Liabilities for Sales

Taxes arising prior to the Petition Date with respect to the operation of the Business (the "**Pre-Petition Sales Taxes**") and (ii) a true, correct and accurate list of binding settlements or binding payment plans entered into by the applicable Sellers (or their Representatives) with any Taxing Authority in respect of Sales Taxes (each, a "**Payment Plan**"), as of the Original Agreement Date, together with the applicable payment schedule, which shall include the amount of each payment and the due date of each payment (such payments and, together with any Sales Taxes payments added in accordance with this <u>Section 8.5</u>, collectively the "**Sales Taxes Payments**").  Part (iii) of the Sales Taxes Schedule sets forth a true, correct and accurate description, as of the Original Agreement Date, of the proposed terms of the Payment Plan being negotiated with the Taxing Authority in Texas.

(b)     Prior to the Closing, the applicable Sellers will use best efforts to negotiate and finalize Payment Plans with the Taxing Authorities of the following states (collectively, the "**Pre-Closing States**"):  Florida, New York, Pennsylvania, Texas and Washington (any such Payment Plans entered into after the Original Agreement Date but prior to the Closing, together with the Payment Plans with the Taxing Authorities of California and Washington, the "**Pre-Closing Payment Plans**").   The Sales Taxes Schedule shall be updated by the Sellers on a weekly basis and such updated schedule shall be delivered to Purchaser; <u>provided</u>, that any additional Pre-Closing Payment Plan, including any Payment Plan with a Pre-Closing State, and the applicable payment schedules may be added to the Sales Taxes Schedule if, and only if, (i) such Pre-Closing Payment Plan is either (x) approved by Purchaser under <u>Section 5.1(j)</u> or (y) a Qualified Settlement and (ii) prior to the entry of any such settlement or payment plan, Sellers (x) promptly notified Purchaser of any communication between a Taxing Authority and Sellers regarding such Pre-Petition Sales Taxes and (y) promptly notified Purchaser of any significant developments regarding such Pre-Petition Sales Taxes ((i) and (ii), collectively, the "**Payment Plan Protocols**").

(c)     At least three (3) Business Days prior to the Closing Date, the Sales Taxes Schedule shall be updated by Sellers to include all Pre-Closing Payment Plans and delivered to Purchaser.

(d)     If necessary and desirable to form the Successor Entity, prior to the entry of a sale Order by the Bankruptcy Court approving the Transactions, the Sellers and Purchaser will mutually agree upon the form and structure (including timing for implementation and governance) of the Successor Entity that will be established to assume from the Sellers all Liabilities arising from Pre-Petition Sales Taxes and the Payment Plans.

(e)     On or before the Closing and as a condition thereto, Purchaser and the Sellers will enter into a funding commitment agreement, in the form attached hereto as **Exhibit E** (the "**Sales Tax Funding Commitment**"), pursuant to which Purchaser shall commit to pay (directly or indirectly) the payments arising under the Pre-Closing Payment Plans on behalf of the Sellers, as applicable, and any Post-Closing Payment Plans in accordance with <u>Section 8.5(f)</u>, <u>provided</u> that Purchaser shall have no other obligations under such Sales Tax Funding Commitment; <u>provided</u>, <u>further</u>, that Purchaser, Sellers and the Successor Entity (as applicable), consistent with the applicable requirements set forth in <u>Section 8.1</u>, will cooperate with each other in good faith in the conduct of negotiations with the applicable Taxing Authorities with respect to the Pre-Closing Payment Plans and comply with the Payment Plan Protocols.  Purchaser agrees that the Sellers or the Successor Entity, as applicable, shall be a third party beneficiary under the Sales Tax Funding Commitment.

(f)     Following the Closing Date, the Sellers or the Successor Entity, as applicable, will continue to negotiate and finalize Payment Plans (with the finalization of

37.

such Payment Plans to occur no later than nine (9) months after the Closing Date) and if, and only if, such Payment Plans are finalized in accordance with the Payment Plan Protocols with the applicable Taxing Authorities of the remaining states set forth on Schedule 8.5(a)(i) (the "***Post-Closing Payment Plans***"), then Purchaser and Sellers or the Successor Entity, as applicable, shall take such actions as necessary or required herein and under the Sales Tax Funding Commitment to include such Post-Closing Payment Plan as an additional funding obligation thereunder.  Purchaser shall advance or reimburse Sellers and the Successor Entity for the costs and expenses of an accounting firm retained to assist in the negotiation, settlement, finalization and execution of the Post-Closing Payment Plans in an amount not to exceed $50,000 in the aggregate.

**(g)**    From and after the Petition Date through the Closing Date, all of the sales, excise, gross receipts and other Taxes of the Sellers attributable to sales of curated boxes containing consumer products, or any other products of the Business, payable to any Taxing Authority having jurisdiction over any Seller (collectively, "***Sales Taxes***") shall be added to the sales price of such items and collected by the applicable Seller, and all Sales Taxes shall be deposited into the Sales Taxes Account. Notwithstanding anything to the contrary herein, Purchaser shall be given access to the computation of gross receipts for verification of all such tax collections.  In addition to the Sales Tax deposited above, if, at any time prior to the Closing, any Seller receives any funds from any Person in respect of Sales Taxes (whether such Sales Taxes arose before, or after the Petition Date), such Seller shall deposit such funds in the Sales Taxes Account or, only if directed in writing by Purchaser to do so, pay the applicable Taxing Authority in accordance with applicable Law to the extent such Sales Taxes are due. Purchaser agrees that any amounts deposited into the Sales Taxes Account shall be used to pay any Post-Petition Sales Taxes before such amounts are used for any other purpose.  For the avoidance of doubt, after the Closing, in the event that any Person remits any payment to any Seller or the Successor Entity (if applicable) in respect of Sales Taxes, such Seller or the Successor Entity (if applicable) shall promptly notify, and pay such amount to, the applicable Taxing Authority in accordance with applicable Law to the extent such Sales Taxes are due or otherwise to Purchaser.

9.    **EMPLOYEE MATTERS**.

9.1    **Employees and Offers of Employment**.

**(a)**    Purchaser is under no obligation to employ any Employee.  Prior to the Closing Date, each Seller shall notify all of its Employees that their employment will end immediately prior to the Closing unless otherwise agreed to between Sellers and Purchaser.  No Employee will become an employee of Purchaser unless Purchaser makes that Employee a written offer of employment based on initial terms and conditions of employment established solely by Purchaser and the offer is accepted.

**(b)**    Prior to, on or after the Closing Date, Purchaser may, in its sole discretion, elect to make offers of employment to and employ Employees as provided above based on initial terms and conditions of employment established solely by Purchaser. Each Seller shall retain all obligations and liabilities, if any, for (i) any Claim (including, for unpaid wages, unemployment compensation, employee contract or severance agreement, or resolved but unpaid legal claims, or employee benefits matters) relating to any Transferred Employee's employment by such Seller prior to the Closing Date or separation from employment prior to the Closing, (ii) any lawsuit, administrative charge, arbitration, proceeding, or written demand or notice pertaining to any Transferred Employee and arising out of such Transferred Employee's employment with such Seller prior to the Closing Date, and (iii) any worker's compensation or other claims arising from any injury or illness occurring prior to the Closing Date.

**(c)**　　　Purchaser shall maintain employee records transferred to Purchaser hereunder for a period of not less than four (4) years and during that period will afford Sellers reasonable access to such records during Purchaser's normal business hours. Purchaser shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Purchaser's treatment of its employee records and applicable Law.

**(d)**　　　For the avoidance of doubt, Purchaser acknowledges that it will be responsible for all liabilities, obligations and claims arising out of the employment by Purchaser of any Transferred Employee with respect to Purchaser's employment of such Transferred Employee on and after the date of employment of such Transferred Employee with Purchaser.

**9.2**　　**Employee Plans**.

**(a)**　　　Purchaser shall have no obligation to assume any of Sellers' Employee Benefit Plans.  Unless expressly assumed in writing subsequent to the execution of this Agreement, but prior to Closing, all of Sellers' Employee Benefit Plans and any related liabilities are the responsibility of Sellers.

**(b)**　　　Purchaser shall have no obligation to continue contributions to any Multiemployer Plan and expressly disclaims any obligation to assume or continue contributing to any Multiemployer Plan following Closing.  All liabilities, including any claims for withdrawal liability or contributions, are solely the responsibility of Sellers.

**(c)**　　　At Purchaser's option, Purchaser may agree in writing subsequent to the Original Agreement Date, but prior to Closing, to assume some or all of Sellers' Employee Benefit Plans (the "***Assumed Plans***").  By agreeing to assume any such plan, Purchaser assumes all rights, liabilities and obligations arising from and after the Closing for any Assumed Plans.  Purchaser and Sellers shall take such actions as are necessary and reasonably requested by the other Party to cause Purchaser to assume sponsorship of any Assumed Plans as of the Closing Date and to effect the transfer of all assets and benefit liabilities of any Assumed Plans together with all related trust, insurance policies and administrative services agreements, effective as soon as practicable following the Closing Date; provided, however, that Purchaser shall not be assuming or be responsible for any liabilities or obligations arising with respect to or in connection with any Assumed Plans to the extent such liabilities or obligations arose prior to the Closing Date or with respect to any Employee or former Employee of Sellers who does not become a Transferred Employee (except to cause payment for any claim appropriately covered by a transferred insurance policy or any other payment under an Assumed Plan to which such Employee or former Employee is otherwise entitled by Law).

**(d)**　　　With respect to any Assumed Plans, each Seller will agree to warrant that any Assumed Plan has been established, maintained, funded and administered in material compliance with its terms, ERISA, the Code, and all applicable laws.

**(e)**　　　On and following the Closing Date, each Seller and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by Section 9.2(a), including exchanging information and data relating to employee benefits and employee benefit plan coverage, except as would result in the violation of any Law.

**(f)**　　　Each Seller shall be responsible for the payment of any severance payment or benefits that become due to any current or former Employee, officer, director, member, partner or independent contractor as a result of the termination of such individual by such Seller or Affiliate thereof.  Sellers shall be responsible for providing the

39.

notices and continuation coverage required by Section 4980B of the Code to each individual who is or becomes an "**M&A Qualified Beneficiary**" (as defined in Treas. Reg. Section 54.4980B09) as a result of, or in connection with, the consummation of the transactions contemplated by this Agreement.

(g)      Notwithstanding anything to the contrary in this Agreement, the provisions of this Section 9.2 are solely for the benefit of the Parties to this Agreement, and no current or former Employee or any other individual associated therewith shall be regarded for any purpose as a third-party beneficiary of this Agreement, and nothing in this Section 9.2 shall be deemed an amendment of any Employee Benefit Plan or be construed to limit the right of Purchaser to amend or terminate any Assumed Plan or other employee benefit plan, program or arrangement, to the extent such amendment or termination is permitted by the terms of the applicable plan. Nothing herein, expressed or implied, shall confer upon any employee any rights or remedies of any nature or kind whatsoever in regard to an Assumed Plan, under or by reason of any provision of this Agreement.

9.3      **Workers' Compensation**.   Each Seller shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by such Seller's employees prior to the Closing Date. Each Seller shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within such Seller's facilities and which are alleged to have been sustained or contracted prior to the Closing Date, provided such claims are filed with the appropriate workers' compensation authority within forty-five (45) days after the Transferred Employees' employment date.

9.4      **WARN Act**.

(a)      To the extent required by law, each Seller shall provide notice to all of its Employees that complies with all provisions of (i) the US Worker Adjustment and Retraining Notification Act of 1988, as amended, and (ii) all other applicable Law, including those prohibiting discrimination and requiring notice to employees that their employment will end prior to the Closing regardless of whether Purchaser makes a written offer of employment to any of the Employees.

(b)      Purchaser will not be responsible for and will not assume any Liability for any notices, payments, fines or assessments due to any Person or Governmental Authority pursuant to any applicable Law with respect to the termination, discharge or layoff of employees by Sellers on or before the Closing.

(c)      On Closing, Sellers will provide Purchaser with the books and records (or true and complete copies thereof) relating to the Transferred Employees and such other data and information relating to the Transferred Employees in the possession of Sellers as Purchaser may reasonably require.

10.     CLOSING CONDITIONS.

10.1     **Conditions to Obligations of Purchaser and Sellers**.   The obligations of Purchaser and Sellers to consummate the Closing are subject to the satisfaction at or before Closing of each and every one of the following conditions:

(a)      the Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Cases, and the Bankruptcy Court shall have waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order, authorizing the Transactions and approving this Agreement under Sections 105(a), 363

40.

and 365 of the Bankruptcy Code, in form and substance acceptable to Purchaser, and the Approval Order shall contain findings that Purchaser acquired the Purchased Assets in good faith, for fair value, in an arm's length transaction, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed;

**(b)** Sellers shall have negotiated with the DIP Lender under the DIP Loan for the continued use of cash collateral after Closing such that Sellers may use the Budgeted Reserve to pay all amounts that comprise the Budgeted Reserve; and

**(c)** no injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

**10.2   Conditions to Obligations of Purchaser**.   The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

**(a)** each Seller shall have performed in all material respects all of its obligations and agreements hereunder required to be performed by such Seller on or prior to the Closing Date;

**(b)** the representations and warranties of Seller set forth in <u>Section 3</u> (i) that are not qualified by Material Adverse Effect or other materiality qualifiers will be true and correct in all material respects as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all material respects as of such earlier date) and (ii) that are qualified by Material Adverse Effect or other materiality qualifiers will be true and correct in all respects (without disregarding such Material Adverse Effect or other materiality qualifiers qualifications) as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all respects as of such earlier date);

**(c)** each Seller shall not be in default in any material respect under the provisions of this Agreement;

**(d)** no Material Adverse Effect shall have occurred;

**(e)** Purchaser shall have received an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each Seller certifying that the conditions set forth in <u>Sections 10.2(b)</u>, <u>10.2(c)</u> and <u>10.2(d)</u> have been satisfied;

**(f)** Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.8</u>;

**(g)** no party in interest has filed an adversary proceeding or commenced a contested matter challenging the amount, validity, enforceability, perfection or priority of Purchaser's Liens on collateral of the Debtors or obligations owed by the Debtors to Purchaser; and

**(h)** none of the information contained in any Customer List shall be publicly available or shall have been required to be disclosed in a non-confidential manner.

**10.3    Conditions to Obligations of Sellers**.  The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

**(a)**    Purchaser shall have performed in all respects all of its obligations and agreements hereunder required to be performed by it at or prior to the Closing Date;

**(b)**    the representations and warranties of Purchaser set forth in <u>Section 4</u> (i) that are not qualified by materiality qualifiers will be true and correct in all material respects as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all material respects as of such earlier date) and (ii) that are qualified by materiality qualifiers will be true and correct in all respects (without disregarding such Material Adverse Effect or other materiality qualifiers qualifications) as of the Closing Date as if made at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty will be true and correct in all respects as of such earlier date);

**(c)**    Purchaser shall have delivered to Sellers all of the items set forth in <u>Section 2.9</u>;

**(d)**    Sellers shall have received an amount in cash sufficient to fund the Budgeted Reserve to the extent Sellers' cash on hand at closing is insufficient to fund the Budgeted Reserve; and

**(e)**    Sellers shall have received all documents they may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Sellers.

**11.    TERMINATION.**

**11.1    Grounds for Termination**.  This Agreement may be terminated at any time prior to the Closing:

**(a)**    by mutual written agreement of Sellers and Purchaser;

**(b)**    by Purchaser if the Bankruptcy Cases are converted to Chapter 7 cases, or if Bankruptcy Court appoints a trustee or examiner;

**(c)**    by Sellers or Purchaser, if the Closing shall not have been consummated on or before October 1, 2019 (the "***End Date***");

**(d)**    by Purchaser, upon the occurrence of any default or event of default under the DIP Loan that has not been waived in writing by the DIP Lender;

**(e)**    by Purchaser, in the event that Sellers accept a successful bid from a Person other than Purchaser;

**(f)**    by Purchaser if (i) there shall have been a breach by any Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 10.2</u>, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in <u>Section 10.2</u>, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of

being cured, shall not have been cured within the earlier of twenty (20) days after written notice thereof shall have been received by Sellers and the End Date;

(g)    by Sellers or Purchaser, if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Purchaser or Sellers from consummating the Transactions is entered and such Order shall become final;

(h)    by Seller if (i) there shall have been a breach by Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 10.3, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in Section 10.3, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within the earlier of twenty (20) days after written notice thereof shall have been received by Purchaser and the End Date; or

(i)    by Sellers, if (i) Sellers execute a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.

The Party desiring to terminate this Agreement pursuant to this Section 11.1 (other than pursuant to Section 11.1(a)) shall give notice of such termination to the other Party in accordance with Section 12.1.

**11.2    Effect of Termination**.  If this Agreement is terminated as permitted by Section 11.1, such termination shall be without Liability of any Party (or any stockholder, director, officer, employee, agent, consultant or other Representative of such Party) to the other Party to this Agreement except as expressly provided in Sections 7.5(a) and 11.4.  The provisions of Sections 7.5(a), 11.2, 11.3, 11.4, 12.1, 12.4, 12.5, 12.6, 12.8, 12.9, 12.10 and 12.11 shall survive any termination hereof pursuant to Section 11.1.

**11.3    Fees and Expenses**.  Except as otherwise set forth expressly herein, all costs and expenses incurred by the Parties in connection with obtaining Bankruptcy Court approval and consummation of this Agreement and the Transactions contemplated hereby shall be paid by the Party incurring such cost or expense.

**11.4    Certain Limitations**.  IN NO EVENT SHALL EITHER PARTY BE LIABLE, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, FOR ANY LOSSES ARISING FROM OR RELATED TO THIS AGREEMENT THAT ARE IN THE NATURE OF LOST PROFITS OR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, SPECULATIVE OR INCIDENTAL DAMAGES, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.    MISCELLANEOUS.**

**12.1    Notices**.  All notices, requests and other communications to any Party hereunder shall be in writing (including email transmission) and shall be given,

if to Purchaser, to:

Loot Crate Acquisition LLC
c/o Cathy Hershcopf and Robert Winning
55 Hudson Yards

43.

New York, New York 10001
Attention:  Authorized Representatives
email:      chershcopf@cooley.com
            rwinning@cooley.com

with a copy to (which shall not constitute notice):

Cooley LLP
55 Hudson Yards
New York, New York 10001
Attention: Cathy Hershcopf
           Robert Winning
email:     chershcopf@cooley.com
           rwinning@cooley.com

if to Sellers, to:

Loot Crate, Inc.
3401 Pasadena Avenue
Los Angeles, CA 90031-1929
Attention: Mark Palmer
email: Mark@TheseusStrategy.com

with a copy to (which shall not constitute notice):

Bryan Cave Leighton Paisner LLP
1290 Avenue of the Americas
New York, NY 10104-3300
Attention: Andrew Schoulder
email: andrew.schoulder@bclplaw.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.   Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

   **12.2    Waivers**.   No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.   The rights and remedies herein provided shall be cumulative.

   **12.3    Successors and Assigns**.   The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including with respect to the Sellers, any chapter 7 trustee, plan administrator, trustee of a liquidating trust, or other successor arising from the pendency of the Bankruptcy Cases (each a "***Bankruptcy Successor***"); provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party (other than a Bankruptcy Successor).

   **12.4    Governing Law**.   This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

**12.5    Jurisdiction**.

(a)    Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.   To the extent the Bankruptcy Court declines, or is otherwise unable to, exercise jurisdiction, then the Parties agree that the state or federal courts in the County of New Castle, State of Delaware, shall have jurisdiction.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 12.1 shall be deemed effective service of process on such Party.

(b)    After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any state or federal court located in New Castle County, Delaware having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 12.1 shall be deemed effective service of process on such Party.

**12.6    Waiver of Jury Trial**.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

**12.7    No Third Party Beneficiaries**.  No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

**12.8    Entire Agreement; Amendments; Counterparts**.  This Agreement (including the Schedules and Exhibits hereto) sets forth the entire agreement among the Parties with respect to the subject matter hereof, supersedes in its entirety the Original Agreement and may be amended only by a writing executed by Purchaser and Sellers.  This Agreement may be executed in counterparts, each of which when taken together shall constitute an original.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.  This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.  In the event of any conflict or inconsistency between the statements in this Agreement and the bid procedures, the statements in this Agreement shall control.

**12.9    Headings; Interpretation**.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other things extends, and such word or phrase shall not merely mean "if." The term "or" is not exclusive, and shall be interpreted as "and/or." The phrases "the date of this Agreement," "the date hereof," "of even date herewith" and terms of similar import, shall be deemed to refer to the date set forth in the preamble to this Agreement.  A reference to any specific Law or to any provision of any Law, whether or not followed by the phrase "as amended," includes any amendment to, and any modification, re-enactment or successor thereof, any legislative provision substituted therefor and all rules, regulations and statutory instruments issued thereunder or pursuant thereto, except that, for purposes of any representations and warranties in this Agreement that are made as a specific date, references to any specific Law will be deemed to refer to such legislation or provision (and all rules, regulations and statutory instruments issued thereunder or pursuant thereto) as of such date. The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

**12.10    Disclosure Schedules**.  The Parties acknowledge and agree that (a) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (b) the disclosure by Sellers of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.  If any Schedule discloses an item or information, the matter shall be deemed to have been disclosed in all other Schedules to the extent reasonably apparent on the face of such disclosure, notwithstanding the omission of an appropriate cross-reference to such other Schedules.

**12.11    No Survival of Representations**.  Purchaser and Sellers acknowledge and agree that Sellers' representations and warranties set forth in this Agreement shall expire on the Closing Date or upon the earlier termination of this Agreement pursuant to its terms, and be of no further force and effect after such date.  The Parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder for such period expressly set forth in this Agreement, or if not expressly set forth for a period no greater than the earlier of (x) twenty four (24) months after the Closing Date and (y) the date that all of the Sellers have been dissolved.

[Signature pages follow]

46.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PURCHASER:

**Loot Crate Acquisition LLC**

By:

Name:  Cathy Hershcopf

Title:  Authorized Signatory

[*Signature Page to Amended and Restated Asset Purchase Agreement*]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SELLERS:

**Loot Crate, Inc.**

By:_____
Name: Mark Palmer
Title:    Chief Transformation Officer

**Loot Crate Holdings, Inc.**

By:_____
Name: Mark Palmer
Title:    Chief Transformation Officer

**LC Funding, Inc.**

By:_____
Name: Mark Palmer
Title:    Chief Transformation Officer

**Loot Crate Parent, Inc.**

By:_____
Name: Mark Palmer
Title:    Chief Transformation Officer

[*Signature Page to Amended and Restated Asset Purchase Agreement*]

**EXHIBIT A**

**Form of Assignment and Assumption Agreement**

**EXHIBIT B**

**Form of Trademark Assignment Agreement**

**EXHIBIT C**

**Form of Power of Attorney**

**EXHIBIT D**

**Form of Leased Real Property Assignment Agreement**

**EXHIBIT E**

**Form of Sales Tax Funding Commitment**