### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OLD LC, INC., *et al.*,[1] | Case No. 19-11791 (BLS)<br>(Jointly Administered) |
| Debtors. | **Obj. Deadline: June 7, 2022 at 4:00 p.m. (ET)**<br>**Hearing Date: June 14, 2022 at 9:30 a.m. (ET)** |

### JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AUTHORITY PURSUANT TO 11 U.S.C. §§ 363 AND 105 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004 TO ENTER INTO A POSTPETITION AGREEMENT WITH STATERA CAPITAL, LLC

The above-captioned debtors (the "Debtors") and official committee of unsecured creditors (the "Committee," and together with the Debtors, the "Movants") jointly request entry of the proposed order (the "Proposed Order") attached hereto as **Exhibit A**, for authority pursuant to 11 U.S.C. §§ 363 and 105 and Federal Rule of Bankruptcy Procedure 6004 to enter into a postpetition agreement with Statera Capital, LLC or its designated affiliate ("Statera") by and through which Statera will invest in the D&O Action (as defined herein), and in support thereof, the Movants respectfully submit as follows:

### INTRODUCTION

1.      On or about September 27, 2019, the Debtors entered into an agreement to sell substantially all of their assets to Loot Crate Acquisition LLC (the "Purchaser") pursuant to an asset purchase agreement (the "Asset Purchase Agreement"). As set forth in the Asset Purchase Agreement, there were three components of consideration: (i) $30 million payable in the form of a credit bid; (ii) a cash component described as the budgeted reserve, which provided for, among

---

[1]   The Debtors are the following four entities (the last four digits of their respective taxpayer identification number, if any, follow in parentheses): Old LC, Inc. (7119), Old LC Holdings, Inc., Old LCF, Inc., and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is 3401 Pasadena Avenue, Los Angeles, CA 90031.

other things, payment of certain administrative expenses under Section 503(b) of the Bankruptcy Code; and (iii) "the aggregate amounts payable by [Purchaser] pursuant to Section 8.5 in respect of [Debtors'] Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of [Debtors]." See Asset Purchase Agreement § 2.6(a).

2.	Among the assets sold as part of Asset Purchase Agreement, the Purchaser had the right for six months after the sale to direct the assignment of certain claims for breach of fiduciary duty and other commercial tort claims (the "D&O Claims") against, among others: (i) Upfront V, L.P. and its affiliates, including Mark Suster and Dana Kibler, in their affiliate and individual capacities; (ii) Breakwater Credit Opportunity Fund, L.P. and its affiliates, including Saif Mansour, Eric Beckman, Darrick Geant, Aamir Amdani, and Joe Kaczorowski, in their affiliate and individual capacities; and (iii) subject to completion of an investigation, any other former director or officer of the Debtors.   If the Purchaser did not direct assignment, title to the D&O claims would remain in the Debtors' estate, subject to the Purchaser's (i) ongoing consent right over the prosecution of D&O Claims and (ii) right to some portion of the proceeds of the D&O Claims.  On October 1, 2019, the Bankruptcy Court entered an order approving the Sale [Docket No. 254], and the Sale closed.

3.	Six months passed after the closing of the Sale, and the Purchaser did not exercise the right to direct the transfer of the D&O Claims, and the Committee, the Debtors, and the Purchaser engaged in a protracted discussions and negotiations with respect to how the Debtors can emerge from the Chapter 11 process, including providing some benefit to the estates from the most significant remaining asset: the D&O Claims.

4.	On or about October 12, 2020, the Debtors, the Committee, and the Purchaser entered into a term sheet (the "Term Sheet Agreement") by and through which, among other things, the parties agreed that the Committee would have derivative standing to bring the D&O Claims. Additionally, the Purchaser agreed to pay certain expenses in connection with the pursuit of the D&O Claims (the "D&O Expenses") and certain expenses of the estates up to $75,000 (the "Estate Expenses"). The proceeds of the D&O Claims were to be paid pursuant to a waterfall from the proceeds of the D&O Claims under a plan. On October 21, 2020, the Court approved the Term Sheet Agreement [Docket No. 714].

5.	Consistent with the Term Sheet Agreement, on November 2, 2020, the Committee commenced adversary proceeding 20-51002 in pursuit of the D&O Claims (the "D&O Action"). The D&O Action remains pending before this Court, and mediation is currently scheduled for June 17, 2022.

6.	The Purchaser subsequently breached its obligation to pay the Debtors' negotiated sales tax obligations under sections 2.6(a) and 8.5 of the Asset Purchase Agreement (the "Sales Tax Obligations"). Upon information and belief, the remaining obligations, as negotiated with the tax entities, exceed $2.6 million. Additionally, despite numerous requests, the Purchaser breached its obligation to pay the D&O Expenses, of which there are currently approximately $111,113.36 outstanding. Accordingly, there is no dispute that the Purchaser breached its obligations to remit payment of the sales tax obligations. Further, there is no dispute that the Purchaser breached its obligations to remit payment of the D&O Expenses and never advanced any funds in respect of the Estate Expenses.

7.	On February 2, 2022, the Debtors after consultation with the Committee, commenced adversary proceeding 22-50107 (the "Purchaser Adversary Proceeding"), by and

through which the Debtors' seek (i) entry of a decree of specific performance of Purchaser's obligations under the Asset Purchase Agreement, including reimbursement of Plaintiffs' costs and expenses incurred in bringing the Purchaser Adversary Proceeding, and requiring pre-funding of an escrow for use in paying the remaining payments for the payment of the tax obligations; (ii) alternatively, entry of a judgment for money damages (iii) entry of an order equitably subordinating Purchaser's Claims and extinguishing the Purchaser's right to any proceeds of the D&O Litigation; and (iv) entry of a judgment avoiding the Transfers and directing recovery of the associated assets for the benefit of the Debtors and their estates.

8.      Almost immediately after the commencement of the Purchaser Adversary Proceeding, the Purchaser filed a declaration of David M. Johnson stating that on February 2, 2022, the Purchaser effectuated an assignment for the benefit of creditors (the "ABC") under California law.  Mr. Johnson, the agent of Loot (Assignment for the Benefit of Creditors), LLC, as Assignee (the "Assignee"), further stated in his declaration that counsel to the Purchaser had been considering the commencement of the ABC since at least December 28, 2021.  On March 21, 2022, the Debtors filed an amended complaint in the Purchaser Adversary Proceeding that named the Assignee as a defendant.

9.      Because the Purchaser defaulted on its obligations under the Term Sheet Agreement to pay the expenses in connection with the D&O Action, the Committee needs financing to continue prosecuting the D&O Claims.  The Committee estimates that, as of May 25, 2022, the Committee had incurred $111,113.36 of expenses, not including future costs such as fees due to the mediator for the D&O Action and expert witness fees.  Further, the Purchaser is in default of its obligations under the Term Sheet Agreement to remit payments for the Estate

4

Expenses, which will be used to pay certain outstanding expenses, including fees due to the United States Trustee.

10.     The Debtors and the Committee have sought financing for the D&O Action from a number of sources, including from the Assignee. Ultimately, the Committee, together with the Debtors, have negotiated a term sheet agreement (the "Investment Term Sheet") with Statera that will, from the Debtors' and Committee's perspective, provide financing that will enable the Committee to pay the outstanding and further expenses in connection with the D&O Action, including mediation fees, and provide the Debtors up to $75,000 to pay certain estate expenses.

11.     By and through this motion, the Debtors and the Committee are jointly seeking approval of the financing as set forth in the Investment Term Sheet.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter final orders concerning this matter.

13.     Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     Pursuant to Rules 7008-1 and 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Committee consents to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5

13475705.v4

**BACKGROUND**

15.    On August 11, 2019, for Old LC, Inc., Old LC Holdings, Inc., and Old LCF, Inc., and on August 12, 2019, for Old LC Parent, Inc. (for each Debtor, the "Petition Date"), the Debtors filed voluntary petitions with this Court under the Bankruptcy Code.  The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and administered jointly and remain pending without a confirmed plan.

16.    The Debtors have been authorized to continue to operate and manage their businesses and assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

17.    On August 22, 2019, the Office of the United States Trustee (the "UST") appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. [Docket No. 63].

**A.    The Sale of the Debtors' Assets**

18.    Substantially contemporaneously with the filing of the Debtors' bankruptcy petitions, the Debtors filed a motion to approve bidding procedures to sell substantially all of their assets [Docket No. 147] in exchange for (i) $30 million payable in the form of a credit bid; (ii) a cash component described as the budgeted reserve, which provided for, among other things payment of certain administrative expenses under Section 503(b) of the Bankruptcy Code; and (iii) "the aggregate amounts payable by [Purchaser] pursuant to Section 8.5 in respect of [Debtors'] Sales Taxes, including those expenses advanced or reimbursed in connection with the negotiation and settlement of certain Sales Tax obligations of [Debtors]." See Asset Purchase Agreement § 2.6(a).  On October 1, 2019, the Court entered an Order approving the Sale Motion, by and through which the Debtors' assets were sold to the Purchaser pursuant to the Asset Purchase Agreement.

19.     Significantly, among the assets sold to the Purchaser were the D&O Claims.  <u>See</u>

Asset Purchase Agreement, § 2.1(u)(i).  This provision specifically provided that the sale included:

> all rights, claims or causes of action of Sellers, and proceeds thereof, of whatever
> kind or nature, and whether asserted or unasserted, including, without limitation
> any causes of action against current and former directors and officers of Sellers and
> any affiliates of such directors and officers . . . . if Purchaser elects, in its sole
> discretion, to assume such D&O Claim Rights within six (6) months of the Closing
> Date, provided, however, the Sellers may only pursue such D&O Claim Rights with
> Purchaser's written consent and at Purchaser's direction, as the proceeds thereof
> would remain Purchased Assets;

20.     Since the sale, the Debtors have no secured creditors.

**B.      The D&O Action and the Term Sheet Agreement**

21.     Six months passed after the closing of the Sale, and the Purchaser did not exercise

the right to direct the transfer of the D&O Claims, and the Committee, the Debtors, and the

Purchaser engaged in protracted discussions and negotiations with respect to how the Debtors can

emerge from the Chapter 11 process, including providing some benefit to the estates from the only

significant remaining asset: the D&O Claims.

22.     On or about October 12, 2020, the Debtors, the Committee, and the Purchaser

entered into the Term Sheet Agreement by and through which, among other things, the parties

agreed that the Committee would have derivative standing to bring the D&O Claims.  Additionally,

the Purchaser agreed to pay the D&O Expenses in connection with the pursuit of the D&O Claims

and the Estate Expenses.  The proceeds of the D&O Claims were to be paid pursuant to a waterfall

from the proceeds of the D&O Claims under a plan.  On October 21, 2020, the Court approved the

Term Sheet Agreement [Docket No.  714].

23.     Consistent with and in reliance upon the Purchaser's obligation to fund expenses

as set forth in the Term Sheet Agreement, on November 2, 2020, the Committee commenced the

13475705.v4

D&O Action, which remains pending before this Court.  Mediation has been tentatively scheduled in the D&O Action for June 17, 2022.

C.     **The Purchaser's Breach of the Sale Agreement and Term Sheet Agreement and the Assignment for the Benefit of Creditors**

24.     The Purchaser subsequently breached its obligation to pay the Sales Tax Obligations due under the Asset Purchase Agreement.  Upon information and belief, the remaining obligations, as negotiated with the tax entities, exceed $2.6 million.  Additionally, despite numerous requests, the Purchaser breached its obligation under the Term Sheet Agreement by failing to pay the D&O Expenses, of which there are currently approximately $111,113.36 outstanding, not including expenses of the mediator.  Likewise, the Debtors have not received any funding for the Estate Expenses.

25.     On February 2, 2022, the Debtors after consultation with the Committee, commenced adversary proceeding 22-50107, by and through which the Debtors seek a (i) entry of a decree of specific performance of Purchaser's obligations under the Asset Purchase Agreement, including reimbursement of Plaintiffs' costs and expenses incurred in bringing the Purchaser Adversary Proceeding, and requiring pre-funding of an escrow for use in paying the remaining payments for the payment of the tax obligations; (ii) alternatively, entry of a judgment for money damages (iii) entry of an order equitably subordinating Purchaser's Claims and extinguishing the Purchaser's right to any proceeds of the D&O Litigation; and (iv) entry of a judgment avoiding the Transfers and directing recovery of the associated assets for the benefit of the Debtors and their estates.

26.     Immediately after the commencement of the Purchaser Adversary Proceeding, the Purchaser filed a declaration of David M. Johnson stating that on February 2, 2022, the Purchaser

13475705.v4

effectuated the ABC under California law.  Mr. Johnson, the agent of Loot (Assignment for the Benefit of Creditors), LLC, as Assignee (the "<u>Assignee</u>"), further stated in his declaration that counsel to the Purchaser, had been considering the commencement of the ABC since at least December 28, 2021.

27.     On March 21, 2022, the Debtors filed an amended complaint in the Purchaser Adversary Proceeding.  The amended complaint named the Assignee as a defendant.

### D.     The Estates' Need for Financing

28.     Because of the Purchaser's default of its obligations under the Term Sheet Agreement to pay the expenses in connection with the D&O Action, the Committee needs financing to continue prosecuting its claims in the D&O Action.  Specifically, the Committee has already incurred approximately $111,113.36 of expenses, not including upcoming costs for mediation and the fees and expenses of its anticipated expert witness.   Additionally, the Purchaser is in default of its obligations under the Term Sheet Agreement to remit payments for the Debtors' estates, which will be used to pay certain outstanding expenses, including fees due to the United States Trustee.

29.     The Debtors and the Committee have sought financing for the D&O Action from multiple sources, including from the Assignee.  Ultimately, the Committee, together with the Debtors, negotiated the Investment Term Sheet with Statera by and through which Statera will make an investment that will, from the Debtors' and Committee's perspective, provide financing that will enable the Committee to pay the expenses that have been incurred and to pay further expenses to be incurred in connection with the D&O Action, including mediator fees and expert witnesses fees.  The proposed transaction, also specifically provides for up to $75,000, specifically designated for the Debtors to pay estate expenses.  A copy of the Investment Term Sheet is attached

9

hereto as **Exhibit B**.  The Debtors, the Committee, and Statera are continuing to negotiate a final

agreement, and once finalized, subject to Court approval, the Movants will supplement this Motion

to include a copy of the finalized agreement.

       **E.**      **Terms of Proposed Agreement with Statera**

       30.      Pursuant to and in accordance with Bankruptcy Rule 6004 and Rule 6004-1 of the

Local Bankruptcy Rule ("Local Rules"),[2] the material provisions of the proposed transaction and

the location of such provisions in the Investment Term Sheet are as follows:[3]

| | |
|---|---|
| **Parties**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Investment Term Sheet, p.1 | The Debtors, the Committee, and Statera |
| **Purchase/Investor as Insider** | No |
| **Terms of Agreement** | This is a private transaction, after the Movants sought litigation financing from other sources. Under the transaction, Statera will be providing up to $500,000 under a multi-draw term draw comprising (i) a immediate payment of up to $110,000 for expenses that have been incurred in connection with the D&O Action, plus up to $75,000 to be used by the Debtors for estate expenses. Further, the Committee shall be entitled to additional deployments once per calendar month for no less than $15,000 for reasonable out-of-pocket costs (including expert witness fees) incurred in connection with the D&O Action.  Additionally, and subject to further agreement among the Debtors, the Committee, and Statera, Statera may invest up to an additional $250,000. |

---

[2]      Although the structure of financing from Statera is an investment, and therefore a sale of the Debtors' interest in the proceeds of the D&O Action, rather than a traditional postpetition loan, for purposes of clarity, the Movants are outlining the terms of the proposed financing pursuant to Local Rule 4001-2, as though the structure was that of a loan.

[3]      The following is a summary of the terms of the transaction, as set forth in the Investment Term Sheet.

| | |
|---|---|
| **Consideration to be Received by Statera** | Statera shall be entitled to receive an amount of the Litigation Proceeds equal to the product of the Multiple *times* the total Deployments (such amount, the "Return on Investment").<br><br>The "Multiple" shall equal 2.2x; provided, that if the full Return on Investment is not paid to Statera by November 30, 2022, the Multiple will increase to 2.5x as of December 1, 2022 and will increase again by 0.5x at each six-month anniversary thereafter.<br><br>Notwithstanding the foregoing, the Return on Investment shall be no less than the sum of the total Deployments *plus* $300,000 (three hundred thousand dollars).<br><br>The Debtors and Committee will satisfy their obligation to pay Statera its full Return on Investment before making any other payments from the proceeds of the D&O Claims to any other person or entity, including counsel to the Debtors and Committee, other law firms, owners, or creditors. |
| **Agreement with Management** | No |
| **Releases** | No |
| **Non-Recourse Liability** | If the D&O Action terminates unfavorably such that proceeds are never recovered by the Debtors or Committee, then in such a case, all deployments by Statera shall be non-recourse as against the Debtors and Committee. |
| **Deadlines** | None |
| **Terms of Investment** | Up to $500,000 under a multi-draw term facility comprising (i) a immediate payment of up to $110,000 for expenses that have been incurred in connection with the D&O Action, plus up to $75,000 to be used by the Debtors for estate expenses.  Further, the Committee shall be entitled to additional deployments one per calendar month for no less than $15,000 for reasonable out-of-pocket costs (including expert witness fees) incurred in connection with the D&O Action.  Additionally, and subject to further agreement |

11

13475705.v4

| | among the Debtors, the Committee, and Statera, Statera may invest up to an additional $250,000. |
|---|---|
| **Good Faith Deposit** | None |
| **Interim Arrangement with Proposed Buyer/Investor** | None |
| **Use of Proceeds** | An immediate payment of up to $110,000 for expenses that have been incurred in connection with the D&O Action, plus up to $75,000 to be used by the Debtors for estate expenses. Further, the Committee shall be entitled to additional deployments one per calendar month for no less than $15,000 for reasonable out-of-pocket costs (including expert witness fees) incurred in connection with the D&O Action. |
| **Sale of Avoidance Actions** | No |
| **Free and Clear of Leases** | No |
| **Credit Bid** | Inapplicable |
| **Relief from Bankruptcy Rule 6004(h)** | Yes |

## **BASIS FOR RELIEF REQUESTED**

31.    Normally, a debtor's financing is achieved through a loan that is to be approved pursuant to 11 U.S.C. § 364. In this case, the Debtors and the Committee were able to negotiate an agreement with Statera, by and through which, Statera will invest in the D&O Action, and will receive payment from the proceeds of the D&O Action. Accordingly, Section 363(c), rather than 364 of the Bankruptcy Code is applicable to the proposed transaction with Statera.

32.    Section 363 of the Bankruptcy Code provides in relevant part, as follows

(b)(1)  The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . .

(c)(1)  If the business of the debtor is authorized to be operated under section . . . . 1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

    (2)  The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
        (A) each entity that has an interest in such cash collateral consents; or
        (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

(d)     The trustee may use, sell, or lease property under subsection (b) or (c) of this section—

 (1)    in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust; and

 (2) only to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362.

(e)     Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. . . . .

(f)     The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

 (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

 (2)  such entity consents;

 (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

 (4)  such interest is in bona fide dispute; or

 (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

33.     To approve use, sale or lease, other than in the ordinary course of business, under Section 363 of the Bankruptcy Code, the Court must find "some articulated business justification." See In re Martin (Myers v. Martin), 91 F.3d 389, 395 (3d Cir. 1996); and In re Abbotts Dairies of Pa. Inc., 788 F. 2d 143 (3d Cir. 1986) (requiring good faith purchasing).  Moreover, Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

34.     Generally, courts have applied four factors to approve the use, sale, or lease of property out of the ordinary course of business, the Court must find some articulated business justification for the proposed action. See, e.g., In re Abbotts Dairies 788 F.2d at 145-47 (implicitly adopting the articulated business justification and good faith tests of Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983)); see also In re Del. &

13

Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in Abbotts Dairies). Further, courts have held that proposed sales of property should be approved under Section 363(b) of the Bankruptcy Code when they are supported by the sound business judgment of the debtor or trustee, as the case may be. See In re Martin, 91 F.3d at 395; Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986).

35.     Further, it is significant that the approval of the agreement does not require any marketing process. In pertinent part, Bankruptcy Rule 6004 states that "all sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). With respect to the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part:

> [T]he notice of a proposed use, sale or lease of property . . . shall include . . . the terms and conditions of any private sale and the deadline for filing objections. The notice of a proposed use, sale or lease of property, including real estate, is sufficient if it generally describes the property.

Fed. R. Bankr. P. 2002(c)(1). Notwithstanding the foregoing, and as more fully set forth herein, the Debtors and Committee sought alternative sources of financing for the D&O Action and administrative expenses, and determined that the proposed transaction with Statera provided the best source of funding on the terms set forth in the Investment Term Sheet.

36.     A trustee's showing of sound business justification, in turn, need not be unduly exhaustive; instead the trustee is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a sale depends upon the facts and circumstances of each case. See Lionel, 722 F.2d at 1071. Bankruptcy courts are given substantial discretion in deciding whether to authorize a sale of a debtor's assets outside of the ordinary course

of business.  See In re Chateaugay Corp., 973 F.2d 141, 144 (2d Cir. 1992).  Generally, courts give

broad deference to business decisions of debtors in possession.  See, e.g., Richmond Leasing Co.

v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, a bankruptcy court

generally will respect debtors in possession's business judgment regarding the need for and the

proposed use of funds.  As the court noted in In re Ames Dep't Stores, Inc.:

> [T]he court's discretion under section 364 is to be utilized on grounds that permit
> reasonable business judgment to be exercised so long as the financing agreement
> does not contain terms that leverage the bankruptcy process and powers or its
> purpose is not so much to benefit the estates as it is to benefit a party-in-interest.

115 B.R. 34, 40 (Bankr. S.D.N.Y 1990).

37.    The "sound business judgment" test requires a proponent of a sale to establish four

elements in order to justify a transaction of property outside the ordinary course of business.

These factors are: (a) that a "sound business purpose" justifies the sale of assets outside the

ordinary course of business; (b) that adequate and reasonable notice has been provided to

interested persons; (c) that the trustee or debtor in possession has obtained a fair and reasonable

price; and (d) that the purchaser has acted in good faith. See, e.g., Abbotts Dairies, 788 F.2d at

145-47; In re Exaeris Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008); Titusville Country Club v.

Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re

Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

38.    In this case, ample business justification exists for the Debtors and Committee to

enter into the transaction with Statera.

**The proposed transaction with Statera satisfies the standards of Section 363.**

39.    First and foremost, the proposed transaction with Statera is a product of the business

judgment of each of the Debtors and of the Committee.  Because of the Purchaser's default of its

obligations under the Term Sheet Agreement to pay the expenses in connection with the D&O

Action, the Committee needs financing to continue prosecuting its claims in the D&O Action. Specifically, the Committee has already incurred approximately $111,113.36 of expenses, not including upcoming costs for mediation and the fees and expenses of its anticipated expert witness. Additionally, the Purchaser is in default of its obligations under the Term Sheet Agreement to remit payments for the Debtors' estates, which will be used to pay certain outstanding expenses, including fees due to the United States Trustee. Absent postpetition financing, the Debtors' ability to pursue the D&O Claims, would be severely compromised. The terms of the Financing Facility are the result of a thorough investigation and negotiation process that took place over a period of months.

40.    Based upon that need, the Debtors and Committee sought financing from multiple sources, including from the Assignee. The Committee spoke with multiple potential sources of financing for the D&O Action, and the Committee conferred with the Debtors throughout this process. The overwhelming majority of the potential lenders had no interest based upon one or more of the following reasons: (i) the size of the loan; (ii) the duration of the loan; and (iii) the security to be provided.

41.    Additionally, the Debtors and the Committee also spoke separately with the Assignee on multiple occasions. The Assignee offered to provide an interest-free and cost-free loan of up to $375,000 to the estates. The Debtors and Committee believe that, while the Assignee's offer appears at first blush to be better than the terms to be received by Statera, the terms were ultimately inferior for two significant reasons. First and foremost, the Assignee's proposed loan would be capped at $375,000 with no possibility for additional funding. While the Debtors and the Committee are hopeful that a mediation resolution can be achieved, based upon ongoing communications with the defendants in the D&O Action, the Debtors and the Committee

are not optimistic that the D&O Action will settle at mediation. Accordingly, it is incumbent upon the Debtors and the Committee to consider and select financing that will pay the Committee's expenses to get through trial.   On that basis alone, $375,000 is likely insufficient.

42.     Additionally, $375,000 is definitely insufficient to pay the Committee's expenses in connection with the D&O Action and also to provide money to the estate to pay certain costs. Relatedly, the Assignee's (very) limited war chest could – and likely would – be seen as a weakness to be exploited by the defendants in the D&O Action to pressure the Committee into accepting an offer to settle the D&O Claims that is significantly inferior to what is otherwise warranted. Statera's proposed investment provides more than payment of expenses for the D&O Action ($425,000, plus up to $75,000 for estate expenses) than the Assignee can ($375,000), but as significantly, Statera has also indicated a willingness and ability to extend additional financing, to the extent needed to pursue the D&O Claims by up to $250,000.

43.     Second, and potentially more importantly, under the Term Sheet Agreement, the Purchaser was entitled to a significant portion of the proceeds from the D&O Claims.  Under the Term Sheet agreement, there are eight tranches in the waterfall for proceeds.  As more fully set forth in the Term Sheet Agreement, the first, fourth, and sixth tranches of payments from proceeds of the D&O Action are due to Purchaser.  Additionally, under the Term Sheet Agreement, the Purchaser is entitled to 85% of all proceeds.  The Debtors and the Committee both believe that, based upon the Purchaser's breaches of the Asset Purchase Agreement and the Term Sheet Agreement, the Assignee (as successor to the Purchaser) has no right to any proceeds of the D&O Claims.  Whether couched with a reservation of rights or not, the Debtors and the Committee each believe that, even if the Assignee had the ability to provide adequate financing – which again, it

likely does not – the acceptance of financing from the Assignee would create significant issues with respect to the Assignee's entitlement to proceeds from the D&O Action.

44.      Ultimately, the Committee, together with the Debtors, negotiated the Investment Term Sheet with Statera which that will provide funding to enable the Committee to pay the expenses that have been incurred and to pay further expenses to be incurred in connection with the D&O Action, and that will provide the Debtors with up to $75,000 to pay estate expenses.

45.      As described above, the Debtors and the Committee believe that the proposed terms and conditions of the transaction with Statera are reasonable and favorable to the estates, and the Debtors' and Committee's decision to obtain funding pursuant to the terms of the Investment Term Sheet represents an exercise of sound business judgment of the Debtors and the Committee to maximize the value of the estates.

## <u>Request for Immediate Relief and Waiver of Stay</u>

46.      Pursuant to Rules 6004(a) and 6004(h) of the Federal Rules of Bankruptcy Procedure and Local Rule 6004-1, the Movants seek (i) immediate entry of an order granting the relief sought herein, (ii) a waiver of the notice requirement of Bankruptcy Rule 6004(a), and (iii) a waiver of any stay of the effectiveness of such an order.

47.      Here, time is of the essence with respect to the ability of the Debtors and Committee to enter into the proposed transaction with Statera.  The Committee has already incurred approximately $111,113.36 of expenses that need to be paid, and there are additional expenses which the Committee will need to incur in short order, including mediator's fees and expert witness fees.  Additionally, the Debtors also have outstanding obligations to the United States Trustee for fees and need to obtain D&O insurance.  Accordingly, hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

## NOTICE

48.      Notice of this Motion is being provided to (i) the United States Trustee; (iii) counsel

for the Purchaser; (iii) counsel for the Assignee; and (iv) all parties that have requested notice

pursuant to Bankruptcy Rule 2002.  The Movants submit that, in light of the nature of the relief

requested, no other or further notice need be given.

## NO PRIOR REQUEST

49.      The Movants have not made any prior motion for the relief sought in the Motion to

this Court or any other.

WHEREFORE, the Movants respectfully request that the Court enter an Order

substantially in the form attached hereto, (i) granting the relief requested herein and such other and

13475705.v4

(ii) granting to the Movants such further relief as the Court may deem just and proper.


Dated: May 26, 2022

ROBINSON & COLE LLP

/s/ Jamie L. Edmonson
Jamie L. Edmonson (No. 4247)
1201 North Market Street
Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile:  (302) 516-1699
Email: jedmonson@rc.com

BRYAN CAVE LEIGHTON PAISNER LLP
Mark I. Duedall (No. 3346)
Brian C. Walsh (Admitted pro hac vice)
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, Georgia 30309-3471
Telephone: (404) 572-6600
Facsimile:  (404) 572-6999
Email: mark.duedall@bclplaw.com
        brian.walsh@bclplaw.com


Andrew J. Schoulder (Admitted pro hac vice)
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-2000
Facsimile:  (212) 541-4630
Email: andrew.schoulder@bclplaw.com

*Co-Counsel to the Debtors and Debtors-in-Possession*

MORRIS JAMES LLP

/s/ Jeffrey R. Waxman
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail:jwaxman@morrisjames.com
E-mail:emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com

*Counsel to the Official Committee of Unsecured Creditors*