## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OLD LC, INC, *et al.*,[1] | Case No. 19-11791 (BLS) |
| Debtors. | Jointly Administered |
| | Re: Docket Nos. 833, 834 |
| | **Obj. Deadline: June 7, 2022 at 4:00 p.m. (ET)**<br>**Hrg. Date: June 14, 2022 at 11:00 a.m. (ET)** |

## OBJECTION OF LOOT (ASSIGNMENT FOR THE BENEFIT OF CREDITORS), LLC TO JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AUTHORITY PURSUANT TO 11 U.S.C. § 363 AND 105 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004 TO ENTER INTO A POSTPETITION AGREEMENT WITH STRATERA CAPITAL, LLC

Loot (Assignment for the Benefit of Creditors), LLC (the "**Loot ABC**" and/or the "**Assignee**"), the assignee for the benefit of creditors of The Loot Company ("**TLC**" or "**Purchaser**") hereby objects (the "**Objection**") to the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Authority Pursuant to 11 U.S.C. § 363 and 105 and Federal Rule of Bankruptcy Procedure 6004 to Enter Into a Postpetition Agreement With Stratera Capital, LLC* ("**Stratera**") [Docket No. 833] (the "**Motion**").[2]  In support of this Objection, Loot ABC submits the *Declaration of Ron Bender* filed contemporaneously herewith (the "**Bender Declaration**") and respectfully states as follows:

---

[1] The Debtors are the following four entities (the last four digits of their respective taxpayer identification number, if any, follow in parentheses): Old LC, Inc. (7119); Old LC Holdings, Inc.; Old LCF, Inc.; and Old LC Parent, Inc. The Debtors' noticing address in these Chapter 11 cases is: 3401 Pasadena Avenue, Los Angeles, CA 90031.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

## PRELIMINARY STATEMENT

1.    There are at least four serious problems with the Debtors' pending Motion, any one of which, whether standing alone or in conjunction with any others, warrants denial of the requested relief.

**First**, poorly disguised as an "investment" transaction outside the ordinary course under Section 363 of the Bankruptcy Code, the Motion seeks to foist upon these administratively insolvent estates a shockingly expensive postpetition loan that grants the prospective lender, Stratera, a first priority lien on property that the Debtors' estates do not even own.[3]   Remarkably, no reference is made in the Motion to Section 364 of the Bankruptcy Code and none of those requisite elements for obtaining credit are even addressed in the Motion when the Motion is clearly a financing motion.

**Second**, the Assignee, as representative of the Loot ABC estate is unquestionably the owner and controller of 100% the proceeds of the D&O Claims that the Debtors seek to improperly use and encumber in favor of Stratera.  However, the Assignee does not consent to the Debtors using or encumbering Loot ABC's assets in this or any other manner.

**Third,** putting aside that the property offered as collateral to Stratera in exchange for the loan is not even property of the Debtors' estates, while the Debtors' and Committee's counsel may have agreed to subordinate payment of their administrative claims to Stratera, there is no indication that contingency counsel prosecuting the D&O

---

[3]  The term sheet among the Debtors, Committee and Stratera attached to the Motion (the "**Stratera Term Sheet**") suggests that Stratera's security interest could extend beyond the Litigation proceeds of the D&O Claims and include unidentified "related collateral" and an "all assets" UCC financing statement.  The Assignee objects to this vague and imprecise description of Stratera's purported collateral to the extent that it includes any property of the Loot ABC Estate and accordingly, reserves all rights.

Claims has agreed to do so, or that they even have notice of the Motion and relief requested therein. Indeed, the Motion is entirely silent on whether or how the Stratera loan impacts the calculation of the 30% contingency compensation from the proceeds of the litigation of the D&O Claims (the "**D&O Litigation**" and the proceeds therefrom, the "**D&O Litigation Proceeds**").

**Fourth**, the Assignee offered to make a cost-free and interest-free loan to the Debtors in the sum of $375,000 which the Debtors improvidently rejected in favor of the shockingly expensive, onerous loan by Stratera which is apparently intended to also cover "up to $75,000 to pay certain estate expenses" unrelated to prosecuting the D&O Claims, essentially diverting money from the D&O Litigation Proceeds to the detriment of the Debtors' estates (and the Loot ABC estate) to the tune of hundreds of thousands or potentially millions of dollars.

2.     Simply put, the Debtors cannot ignore or attempt to circumvent the Assignee's rights and interests in the D&O Claims and the D&O Litigation Proceeds. Indeed, the Debtors are only entitled to share in the D&O Litigation Proceeds (and encumber them) if they propose a plan and that plan is confirmed pursuant to the Term Sheet Agreement and the waterfall therein (the "**Waterfall**"). But even if plan confirmation occurs, the Court-approved Waterfall gives the Debtors only a very small portion of the D&O Litigation Proceeds and the Loot ABC estate would continue to be entitled to the vast majority of the D&O Litigation Proceeds. And to date, no such plan has been proposed, much less confirmed during the nearly three years these chapter 11 cases have been pending. The Debtors should not be permitted to encumber assets that they do not have, and may never have any right to, given the overriding rights and interests of the Assignee in and to the D&O Claims and the D&O Litigation Proceeds resulting therefrom.

3.      The Motion states that "[t]he Debtors and the Committee both believe that, based upon the Purchaser's [alleged] breaches of the Asset Purchase Agreement and the Term Sheet Agreement, the Assignee (as successor to the Purchaser) has no right to any proceeds of the D&O Claims." *See* Motion at ¶ 43. However, the Debtors' assertions are untethered to any evidence or legal basis and completely ignore the express terms contained in the Sales Tax Funding Commitment dated October 1, 2019 between the Debtors and TLC (the "**Sales Tax Funding Commitment**"), which makes clear that the Debtors have no recourse against the Assignee. The Debtors' rights resulting from any alleged breach relate to the Purchaser only. Period. Full stop. The Debtors and the Committee ignore the explicit, non-recourse language of the Sales Tax Funding Commitment and attempt to unilaterally decide the outcome of their Purchaser Adversary Proceeding against the Loot ABC estate before it has been adjudicated, notwithstanding that their position is entirely unsupported by the facts or the law. Thus, the notion that the Debtors have any basis to seek financing and pledge the D&O Litigation Proceeds resulting from the D&O Claims is entirely unsupportable and completely offensive. Assuming, *arguendo*, the Debtors and Committee are correct they have a present right to foreclose upon the D&O Claims and D&O Litigation Proceeds without a security interest or lien, such a draconian and extreme remedy could only be granted pursuant to a final order in the pending Purchaser Adversary Proceeding.[4] Given the clear prohibitions on recourse against any party other than the Purchaser, there is little

---

[4] The Debtors recently amended the Purchaser Adversary Proceeding to include the Assignee. But given the clarity of the operative agreements, including expressly defining the Loot ABC as a "Non-Recourse Party" in the Sales Tax Funding Commitment, there is no legitimate basis for the Debtors to have amended the FAC to include the Loot ABC as a party. Absent a further extension of Loot ABC's deadline to respond to the Purchaser Adversary Proceeding, Loot ABC intends to file a Motion to Dismiss the First Amended Complaint (the "**FAC**"). The Assignee is not a creditor of the Debtors' estates, and the claims for relief for equitable subordination, setoff, unjust enrichment and constructive trust are unsupportable, and in any event, violate the terms of the Sales Tax Funding Commitment attached as Exhibit "A" to the FAC.

likelihood of success of the Debtors' claims against the Assignee. The Assignee is in the process of preparing and filing a motion to dismiss the FAC.

4.      Loot ABC, as a creditor fiduciary for its own estate, seeks to have the D&O Claims successfully resolved to a value-maximizing conclusion. Since the commencement of the Loot ABC, counsel for the Assignee (Ron Bender) was in relatively constant communication with counsel for the Debtors (Mark Duedall) and counsel for the Committee (Jeffrey Waxman) regarding a multitude of issues, but particularly the D&O Litigation. Predominantly during the early stages of the Loot ABC, Mr. Waxman made repeated requests of the Assignee to agree to fund the third-party expenses related to the D&O Litigation. Mr. Bender made clear to Mr. Waxman that unless and until the Assignee was able to consummate a sale of the assets of the Loot ABC estate and hopefully create a pot of unencumbered funds, the Assignee was not in a position to fund any of the third-party expenses related to the D&O Litigation but that the Assignee was going to make every effort to try to create such a pot of unencumbered funds for this purpose. *See* Bender Declaration at ¶ 6.

5.      At the Assignee's request, Mr. Bender participated in a phone call with Mr. Waxman and the D&O Litigation counsel, and a number of phone calls with Mr. Waxman thereafter, in order to understand the nature of the third-party expenses and discuss the D&O Litigation. From these conversations, the Assignee determined that the total third-party expenses related to pursuit of the D&O Litigation would amount to between $250,000-$400,000. *See* Bender Declaration at ¶ 7.

6.      After extensive negotiations, near the end of March 2022, the Assignee was ultimately able to consummate a sale of the assets of the Loot ABC estate (the "**ABC Asset Sale**"), and as the Assignee had represented to the Debtors and the Committee all along, the Assignee did

not sell any of the rights of the ABC estate to the D&O Litigation or the proceeds therefrom. *See* Bender Declaration at ¶ 8. Moreover, the Assignee, through great effort and persistence, was able to retain for the ABC estate the exact sum of $400,000 at the closing of the ABC Asset Sale and was able to persuade the lien holder (who otherwise would have had a right to take those funds) to release its liens against this sum. *See* Bender Declaration at ¶ 9. This was not a coincidence. The Assignee used the high end of the D&O Litigation cost estimate to achieve this result so that the Assignee could fund the third-party expenses needed to prosecute the D&O Claims. *See id*.

7.     Immediately following the closing of the ABC Asset Sale, Mr. Bender made clear to Mr. Duedall and Mr. Waxman that the Assignee was willing to fund the third-party expenses related to the D&O Litigation under certain conditions including the dismissal of the Assignee from the Purchaser Adversary Proceeding with the bankruptcy court to determine the allocation of the existing D&O Litigation Proceeds if and to the extent such proceeds were recovered. The Debtors and Committee then requested to renegotiate the allocation of the ultimate D&O Litigation Proceeds under the Term Sheet Agreement. The Assignee responded that the Assignee did not believe that would be a worthwhile exercise before it was known how much the D&O Litigation Proceeds would be. Instead, the Assignee once again proposed that the Debtors dismiss the Assignee from the Purchaser Adversary Proceeding, with the parties to engage in good faith efforts to negotiate the allocation of the existing D&O Litigation Proceeds under the Waterfall if and to the extent such proceeds were recovered, and for the bankruptcy court to determine the allocation of the existing D&O Litigation Proceeds if and to the extent such proceeds were recovered if such good faith negotiations did not result in resolution. *See* Bender Declaration at ¶ 10.

8.     During these conversations, the Assignee also made clear that it could not fully fund the third-party expenses related to the D&O Litigation if the Assignee had to spend its

resources litigating the FAC at the same time. Since the Assignee had exactly $400,000 in the Loot ABC estate, the Assignee offered to lend $350,000 (later increased to $375,000) to the Debtors' bankruptcy estates to be used to fund the third-party expenses related to the D&O Litigation (the "**Loot ABC Loan**"). *See* Bender Declaration at ¶ 11. Mr. Bender explained that it was not practical for the Assignee to provide all $400,000 as that would leave the Loot ABC estate with no money. However, Mr. Bender made it crystal clear throughout this process that the Loot ABC Loan would be non-recourse – i.e., that repayment would be contingent upon a recovery in the D&O Litigation – and would require no interest, no fees and no costs whatsoever to the bankruptcy estates. *See id.*

9. After weeks of discussions, Mr. Duedall ultimately called Mr. Bender and advised that the Committee had decided not to accept the Assignee's offer and instead would proceed with litigation financing. *See,* Bender Declaration at ¶ 12. In response, Mr. Bender requested the details of the proposed litigation financing and an opportunity to speak with Mr. Duedall and Mr. Waxman one last time because the Assignee was gravely concerned about both the cost and terms of any such litigation financing. Mr. Duedall responded by stating that all parties would see the terms of the proposed litigation financing after the financing motion was filed and that Mr. Waxman declined to have any further discussions on the matter. *See* Bender Declaration at ¶ 12.

10. On May 26, 2022, the Motion was filed. The Assignee did not consent to the Motion and was shocked by the terms of the proposed litigation financing compared to the simplicity and lack of cost and expenses of the Loot ABC Loan. Setting aside the fact that the Debtors do not own the property they seek to pledge to Stratera as collateral, the Stratera Term Sheet commands a return of at least 220% as soon as funds are advanced, and depending upon the timing of when the D&O Litigation concludes, may result in an even higher return. Additionally,

the Stratera Term Sheet provides for reimbursement of Stratera's costs of up to $30,000 (which advances accrue the same excessive interest), but like the granting of liens on the D&O Litigation Proceeds, this fact is nowhere to be found in the Motion. Indeed, the Stratera Term Sheet raises more questions about the transaction than it answers. Interested parties should not have to hunt for the deal terms or guess what might be included in the transaction.

11. In rejecting the Loot ABC Loan, which provided a consensual path to potentially bring these beleaguered, administratively insolvent estates to a conclusion, the Debtors and the Committee have chosen a path that brings significant expense to both the Debtors' and the Loot ABC's estates. The Motion must be denied as it asks the Court to approve a grossly overpriced post-petition credit facility secured by assets that the Debtors neither own nor control, while potentially saddling the Debtors' estates with over a million dollars in senior secured interest obligations (which figure could and likely would end up being much higher), all so that the Debtors can preserve their misguided argument that TLC's breach of the Sales Tax Funding Commitment somehow magically entitles the Debtors to strip off Loot ABC's property interests in the D&O Litigation Proceeds.

## RELEVANT BACKGROUND

**A.    TLC Acquired 100% of the Proceeds of the D&O Claims that the Debtors and the Committee Intend to Pledge as Collateral to Stratera.**

12. On or around October 1, 2019, in selling substantially all of their assets, the Debtors contracted away the right to prosecute, control and receive any of the proceeds from the D&O Claims. Specifically, Section 2.1(u) of the Asset Purchase Agreement ("**APA**") defines "Purchased Assets" to include:

> All rights, claims or causes of action of Sellers, and proceeds thereof, of whatever kind or nature, and whether asserted or unasserted, including, without limitation any causes of action against current and former directors and officers of Sellers and any affiliate of such directors and officers

(collectively, the "D&O Claim Rights") if Purchaser elects, in its sole discretion, to assume such D&O Claim Rights within six (6) months of the Closing Date, provided, however, the Sellers may only pursue such D&O Claim Rights with Purchaser's written consent and at Purchaser's direction, as the proceeds thereof would remain Purchased Assets; (ii) all causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions"); provided, however, that causes of action arising under section 547 of the Bankruptcy Code shall not be affirmatively pursued by Purchaser but may be used in a manner and for the purposes set forth in Section 2.3(e); provided further, however, that with respect to the D&O Claim rights, such rights shall remain assets of the Sellers until such time as the Purchaser makes its election

*See* Asset Purchase Agreement, § 2.6(u). A copy of the Court approved Asset Purchase Agreement is attached as Exhibit "A" to the Bender Declaration.

13. The Purchaser, TLC, did not make the required election to pursue the D&O Claims within the six-month period under Section 2.1(u) meaning that the right to bring the D&O Claims remained with the Debtors. However, notwithstanding the Purchaser's non-election, the Purchaser retained its exclusive consent rights over the D&O Claims along with retention of the right to receive all of the proceeds of the D&O Claims because, pursuant to the second proviso of Section 2.1(u) "the [Debtors] may only pursue such D&O Claim Rights with Purchaser's written consent and at Purchaser's direction" and "the proceeds [of the D&O Litigation] remain Purchased Assets" even in the absence of Purchaser's election. The Debtors fail to mention any of this in the Motion, and it is unclear whether Stratera even understands the underlying dynamics of the APA.

**B. TLC's Alleged Breaches of the Sales Tax Funding Commitment Does Not Entitle the Debtors to Anything More Than An Unsecured Claim Against TLC.**

14. In purchasing the D&O Litigation Proceeds and associated rights and other assets, the Purchaser promised, *inter alia*, to pay "the aggregate amounts payable by Purchaser pursuant to Section 8.5 in respect of Sellers' Sales Taxes" and related expenses. *See* Asset Purchase Agreement § 2.6(a). Section 8.5(e) of the APA sets forth Purchaser's monetary obligations arising

under Section 8.5, which consist of Purchaser's promise to enter into and perform under the so-called "Sales Tax Funding Commitment" as follows:

> On or before the Closing and as a condition thereto, Purchaser and the Sellers will enter into a funding commitment agreement, in the form attached hereto as Exhibit E (the "*Sales Tax Funding Commitment*"), pursuant to which Purchaser shall commit to pay (directly or indirectly) the payments arising under the Pre-Closing Payment Plans on behalf of the Sellers, as applicable, and any Post-Closing Payment Plans in accordance with Section 8.5(f), provided that Purchaser shall have no other obligations under such Sales Tax Funding Commitment; provided, further, that Purchaser, Sellers and the Successor Entity (as applicable), consistent with the applicable requirements set forth in Section 8.1, will cooperate with each other in good faith in the conduct of negotiations with the applicable Taxing Authorities with respect to the Pre-Closing Payment Plans and comply with the Payment Plan Protocols.

Asset Purchase Agreement § 8.5(e).

15.     The Sales Tax Funding Commitment is clear and unequivocal and its obligations are expressly non-recourse to anyone other than the Purchaser.  Section 7 of the Sales Tax Funding Commitment provides that its obligations are non-recourse to the Assignee, among other potential parties in interest:

> Notwithstanding anything that may be expressed or implied in this Agreement or any document or instrument delivered in connection herewith or otherwise, **each of the Sellers,** by its acceptance of the benefits hereof, **covenants, agrees and acknowledges** for itself and its Affiliates, and any Person claiming on its or their behalf, from time to time (including, without limitation, the Seller Entities), **that no person other than Purchaser has any liabilities, obligations or commitments** of any nature (whether known or unknown, whether due or to become due, absolute, contingent or otherwise) **hereunder** (in each case subject to the limitations provided herein) **or in connection with the transactions contemplated hereby** and that, notwithstanding that Purchaser is a limited liability company, **no Person other than Purchaser shall have any obligation hereunder** or **under any document or instrument delivered in connection herewith**, against, **or any claim (whether in bankruptcy, tort, contract or otherwise) based on,** in respect of, or by reason of, **this Agreement or arising out of or in connection with the transactions contemplated hereby,** and that **no recourse hereunder** or **under any documents or instruments delivered in connection herewith** or in respect of any oral

representations made or alleged to be made in connection herewith or therewith, **shall be had against, and no personal liability with respect thereto shall attach to**, be imposed upon or otherwise be incurred by (a) **any** former, current or future equity holder, controlling person, director, officer, employee, agent, Affiliate, member, manager, general or limited partner, Representative or successor or **assignee of Purchaser** or (b) any former, current or future equity holder, controlling person, director, officer, employee, agent, affiliate, member, manager, general or limited partner, Representative or successor or assignee of the foregoing (such Persons, collectively, but excluding Purchaser, the "Non-Recourse Parties"), whether by or through attempted piercing of the corporate veil, limited partnership or limited liability company veil, **by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Law**. Notwithstanding anything to the contrary in this Agreement, this Section 7 shall survive the termination and expiration of this Agreement.

Sales Tax Funding Commitment, § 7 (emphasis added). A copy of the Sales Tax Funding Commitment is attached as Exhibit "B" to the Bender Declaration.

16.     Further, the Sales Tax Funding Commitment terminated upon the Debtors' filing of the Purchaser Adversary Proceeding against the Assignee, if not earlier. Section 3.5(b) of the Sales Tax Funding Commitment provides that it "shall terminate, automatically and without any need for any action by any Person, upon:

> **the date that any Seller Entity** or any of their Representatives (i) **asserts in any Action, litigation or other proceeding** (x) that one or more of the provisions in Section 7 of this Agreement are illegal, invalid or unenforceable in whole or in part, (y) **that Purchaser has any liability under this Agreement other than to fund cash payments** (including penalties and interest with respect to any Defaulted Payments) with respect to the Sales Tax Funding Commitment in accordance with the Payment Plans or (z) **any claim or theory of liability against the Non-Recourse Parties (as defined below) relating to this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement** or (ii) asserts, or threatens to assert, any claim against a Non-Recourse Party (as defined below) in connection with this Agreement, the Purchase Agreement or any of the transactions contemplated by this Agreement or the Purchase Agreement (including in respect of any oral representations made or alleged to be made in connection

therewith), whether in any Action, litigation or other proceeding, through
counsel or in any other way; and

Sales Tax Funding Commitment, § 3(b) (emphasis added).

On March 21, 2022, the Debtors filed the FAC in the Purchaser Adversary Proceeding, naming

the Assignee, thereby triggering the automatic termination of the Sales Tax Funding Commitment,

if it had not yet been previously terminated.  However, for avoidance of doubt, §7 expressly

provides that "this Section 7 shall survive the termination and expiration of this Agreement."

Remarkably, the Debtors make no mention of this in the Motion despite the fact that Section 7 is

the death-knell of any claims against the Assignee or the Loot ABC estate.

### C. The Term Sheet Agreement Directs the Distribution of D&O Litigation Proceeds Only Under A Confirmed Plan.

17.    On October 21 2020, the Court approved the Term Sheet Agreement.  *See Order*

*Granting [sic] Motion Of The Official Committee Of Unsecured Creditors (I) Granting Standing*

*And For Authority For The Creditors Committee To Prosecute Certain Claims, And (II) Approving*

*A Term Sheet Among The Debtors, The Committee, And The Purchaser* [Dkt. 714] (the "**Term**

**Sheet Order**").  (*See*, Bender Declaration at Exhibit "C.")  The allocation of the proceeds of the

D&O Claims between and among the TLC Purchaser and the Debtors' estates is one of the main

subjects of the Term Sheet Agreement.  However, the Term Sheet Agreement merely obligates the

parties to negotiate in good faith on a plan that implements its proposed terms.  *See* Term Sheet

Agreement, ¶1 (stating that the term sheet "is a summary of the proposed terms for the resolution

of certain issues. . . through a joint chapter 11 plan of liquidation. . . .").

18.    Importantly, the Term Sheet Agreement does not purport to change the ownership

of the proceeds of the D&O Claims ahead of plan confirmation.   Instead, the Term Sheet

Agreement directs that TLC will be a party to a contemplated liquidating trust agreement and will

contribute its rights to control and recover the proceeds from the D&O Claims to a liquidating trust. *See* Term Sheet Agreement, page 2 ("As part of the Global Settlement, TLC will reassign and transfer any and all claims it purchased and assumed pursuant to the APA relating to fraudulent conveyances, preferences or other chapter 5 causes of action, or under corresponding state law, against, among others: (i) Breakwater and its affiliates (the "Breakwater Avoidance Claim"); and (ii) certain other former directors subject to completion of an investigation . . . "). However, without a confirmed plan and a liquidating trust agreement, there is no question but that the Assignee of the Purchaser retains 100% ownership and control of the D&O Claims and related D&O Litigation Proceeds.

19.     *Even in the event that a plan is confirmed*, pursuant to the Term Sheet Agreement, the parties (including the Debtors and the Committee) all agreed that a very limited portion of the proceeds from the D&O Claims would be allocated to the Debtors' estates to pay certain administrative and unsecured claims. However, even under the Term Sheet Agreement, TLC (and now the Loot ABC estate) is entitled to the vast majority of the proceeds from the D&O Claims, approximating more than 85% based upon the distribution set forth in the Waterfall.

20.     Of the seven tiers of the Waterfall, TLC (and now the ABC estate) stands to recover all or substantially all the amounts due under the 1st, 4th, 6th and 7th tiers as follows:

| | |
|---|---|
| First Tier | **Payment of $225,000 to TLC** in repayment of its advancement of so-called "Operating Costs" |
| Second Tier | $250,000 for pro rata distributions to holders of allowed General Unsecured Claims |
| Third Tier | $525,000 to holders of "Deferred Professional Fees" |
| Fourth Tier | **Payment in full to TLC** of "Third Party Advances" and, to the extent unpaid by TLC, "Third Party Costs" |

| | |
|---|---|
| Fifth Tier | Payment pro rata to each of (i) contingency fee counsel (up to 30% of the Litigation Proceeds under the Supplemental Engagement Letter), or otherwise agreed by the Liquidating Trustee; (ii) the Trust Fiduciary Compensation; (iii) the unpaid reasonable fees and expenses of Delaware co-counsel for the Liquidating Trust, on terms to be mutually agreed by the Debtors and/or the Liquidating Trustee **and TLC**; and (iv) the fees and expenses of any other retained professional for the Liquidating Trust, on terms to be mutually agreed by the Debtors and/or the Liquidating Trustee **and TLC**; |
| Sixth Tier | **Payment to TLC**, until TLC has received $1.5 million; and |
| Seventh Tier | **Once TLC has received $1.5 million**, Litigation Proceeds in excess of such amount shall be allocated as follows: **85% to TLC** (together with the Sixth Tier Obligations, the "TLC Distributions"), and 15% (the "Seventh Tier 15% Allocation") for equal allocation as follows: (i) 7.5% to holders of any remaining unpaid Deferred Professional Fee Claims, pro rata among the holders of such claims until paid in full; and (ii) 7.5% for pro rata distributions to holders of allowed General Unsecured Claims (together with the Second Tier General Unsecured Distribution, the "General Unsecured Distributions"). For the avoidance of doubt, the split of the Seventh Tier 15% Allocation applies to each and every dollar which comprises the Seventh Tier 15% Allocation until Deferred Professional Fees are paid in full, following which, all amounts in the Seventh Tier 15% Allocation shall be paid to holders of allowed General Unsecured Claims |

See Term Sheet Order, Ex. 1 (Plan Term Sheet Agreement), pages 4-5 (emphasis added).

21.     As the Assignee of TLC, the Loot ABC estate has all right, title and interest in the assets of TLC, which includes TLC's interests in the Term Sheet and the 1st, 4th, 6th and 7th tiers of the Waterfall. To put matters in perspective, attached as Exhibit "E" to the Bender Declaration is a detailed breakdown of how a hypothetical recovery of $10 million from the D&O Litigation would be required to be distributed pursuant to the terms of the Court-approved Waterfall. As reflected therein, the Loot ABC estate would receive an aggregate distribution in the sum of approximately $5,176,250 - $5,801,250 (depending upon the amount of third-party expenses advanced). In turn, the Debtors would potentially receive a distribution on their Second, Fifth and Seventh Tier Claims in the aggregate sum of $1,423,000. From this amount, approximately $575,000 would be distributed to General Unsecured Creditors and the balance, approximately $900,000 would otherwise go to pay so-called "Deferred Professional Fees" (in those amounts as provided in the Third and Seventh Tiers). After satisfaction of these amounts, assuming that

Stratera advances $500,000, Debtors cannot afford the proposed Stratera financing. Although it appears that counsel for the Debtors and Committee have agreed to subordinate their Deferred Professional Fees as provided in the Third Tier (in the sum of $525,000), the remaining $900,000 will not be sufficient to repay the at least $1.1 million in interest plus $500,000 in principal that would be owing to Stratera. Even if counsel for the Debtors and Committee waived their Deferred Professional Fees, there would not be enough resources available to satisfy the Stratera obligations. *See* Bender Declaration at ¶ 14.

22. Through a General Assignment, the assignee only receives the company's assets, and none of its liabilities. Indeed, "[t]he procedure of an assignment for the benefit of creditors would be eviscerated if an assignee like Sherwood were required to assume the underlying liabilities of the assignor's insolvent business." See, *Sherwood Partners Inc. v. EOP-Marina Business Center, LLC*, 153 Cal.App.4th 977, 979 (2007). Without question, an assignee for the benefit of creditors has a duty to marshal and protect the assets of an ABC estate. The role of the assignee "is akin to that of a trustee or administrator of an estate who owes fiduciary duties to the estate's beneficiaries." See, *Tatung Company, Ltd. V. Shu Tze Hsu*, 43 F.Supp.3d 1036, 1066 (C.D. Cal. 2014). Here, through the Motion, the Debtors improperly seek to jump ahead of all of the other creditors of the Loot ABC and essentially, without any legal justification whatsoever, seek a "front of the line pass" to the Loot ABC assets. However, the Debtors have not established that they even have a liquidated claim in the Loot ABC, and, at best, any such claim of the Debtors would constitute a general unsecured claim. The Debtors have no legal basis to use the Loot ABC property and have provided no legal authority to support such an overreaching, unorthodox and wildly inappropriate request as presented in the Motion.

23.     In negotiating the Term Sheet, the Debtors and the Committee certainly could have negotiated what would happen if TLC defaulted on its Sales Tax Funding Commitment, but they did not do so.  As a result, the Debtors and the Committee do not now get to just decide among themselves and then implement what an appropriate remedy should be, which is essentially what they have attempted to do in the Motion.

**D.     Ahead of Plan Confirmation, The Assignee Retains Exclusive Control of the D&O Claims.**

24.     To date, no Plan has been proposed, much less confirmed in these chapter 11 cases. Ahead of confirmation of a plan, the Term Sheet Agreement merely obligates the parties to agree on a plan if and when one is proposed.  There are no provisions in the Term Sheet Agreement itself that speak to what happens if a party defaults on the Sales Tax Funding Agreement or the Asset Purchase Agreement.  And, importantly, the Term Sheet Order makes clear that "at any point in time prior to confirmation of a plan that is consistent with the Term Sheet, *Purchaser in its sole discretion may withdraw its consent with respect to the continued prosecution of the D&O Claims*."  *See* Term Sheet Order, page 2 (emphasis added).  These were the rights and interests of TLC that were assigned to the Assignee and now are unquestionably property of the Loot ABC estate.[5]

**E.     Loot ABC, as the Assignee for the Benefit of Creditors of TLC, Holds the Right to Consent to the Prosecution of the D&O Claims and Receive Their Proceeds.**

25.     Effective as of February 2, 2022, TLC assigned its assets to Loot ABC for the benefit of TLC's creditors under California law.  A copy of the Assignment Agreement between TLC and Loot ABC is attached to the Bender Declaration as Exhibit "D."  As a result of the

---

[5] In Debtors' Motion to Dismiss the TLC Counterclaim, Debtors understand this as made clear by their admission that "[a]s a result, Loot (Assignment for the Benefit of Creditors), LLC (the "Loot ABC") succeeded to any rights held by Purchaser/assignor against Debtors."  S*ee* Purchaser Adversary Proceeding (Adv. Proc. No. 22-50107), Dkt No. 57.

General Assignment, Loot ABC received assignment of all of TLC assets, including TLC's right to consent to D&O Claims and recover their proceeds.

**F.     Loot ABC's Attempts to Consensually Resolve the Purchaser Adversary Proceeding and the Debtors' Estates' Need for Financing Have Been Rejected To Date.**

26.     As set forth more fully in the Bender Declaration, the Loot ABC estate has been sued by the Debtors for a host of claims arising from the Purchaser's alleged conduct.   The Assignee vigorously opposes the claims alleged against the Loot ABC estate in the FAC filed in the Purchaser Adversary Proceeding and sees them as facially invalid based upon not only the express prohibitions against pursuing "Non-Recourse Parties" on any such claims under the Sales Tax Funding Commitment, but also the general principals of assignment law, affirming that through the Loot ABC, the Assignee only received TLC's assets, and none of its liabilities.   In performing its duties as the Assignee of the Loot ABC, the Assignee wishes to monetize all of TLC's assets for the benefit of all of TLC's creditors and, in that regard, desires to have the D&O Claims prosecuted to a successful, value-maximizing conclusion.   The relief requested in the Motion not only interferes with the Assignee's performance of its duties, but also the rights and interests of the creditor body of the Loot ABC.

**OBJECTION**

**A.     The Assignee Has Succeeded to the Assets But Not the Liabilities of TLC.**

27.     As a consequence of the General Assignment on February 2, 2022, Loot ABC has succeeded to the assets of TLC under California law.    Loot ABC has not assumed the liabilities of TLC.  The large body of law in California supports an assignment for the benefit of creditors as an alternative to a formal bankruptcy, and a process that is regarded as a "less stigmatic, and less costly, voluntary assignment scheme."  *See*, *Haberbush v. Charles and Dorothy Cummins Family, Ltd.*, 139 Cal.App.4th 1630, 1640 (2006).  Through an assignment, the assignee only receives the

company's assets, and none of its liabilities. Indeed, the policy favoring general assignments for the benefit of creditors, which contemplates the ratable distribution to creditors of the assignor's assets, is preferred over an attachment proceeding, which would otherwise permit an unsecured creditor to establish a priority over other unsecured creditors, and violate the priority scheme recognized in a General Assignment. *See*, Law Revision Commission Comments to California Code of Civil Procedure §493.020. The Debtors' Motion is tantamount to an improper attachment proceeding, particularly here where the Debtors have not even liquidated their putative claims against TLC.

**B.      The Motion's Attempt to Authorize the Use and Encumber the D&O Litigation Proceeds Is Unfounded and Improper.**

28.      A close review of the Term Sheet appended to the Motion reveals that, incredibly, and without TLC's or Loot ABC's consent, the Debtors and Committee propose to grant Stratera a senior lien in 100% of the D&O Litigation Proceeds in complete disregard of the Assignee's rights and interests in the D&O Litigation Proceeds pursuant to the terms of the General Assignment. It is beyond cavil that *the proceeds of the D&O Claims do not actually belong to the Debtors' estates.* Remarkably, the Debtors fail to address this incredibly salient fact in the Motion.

29.      Specifically, the Debtors propose to grant Stratera a "first-priority perfected security interest in the Litigation Proceeds and related collateral only . . . and [Stratera] may file an 'all assets' UCC financing statement to evidence its security interest in the Collateral."[6] *See* Term Sheet Page 3, definition of "Collateral." Additionally, contingent on a recovery upon the D&O Claims, the Debtors and the Committee propose to give Stratera the equivalent of an administrative super-priority claim with Stratera receiving payment in full ahead of all other

---

[6] The Assignee assumes the vague reference to an "all assets" UCC financing statement does not purport to expand the proposed collateral grant beyond the proceeds of the D&O Claims but reserves its rights on this point.

creditors, including administrative expenses, and, apparently, even the contingency counsel leading the prosecution of the D&O Claims.  *See* Term Sheet, Page 3, definition of "Return on Investment" ("Counterparties will satisfy their obligation to pay Investor its full Return on Investment before making any other payments from the Litigation Proceeds to any other person or entity, including Counterparties' counsel, other law firms, owners, or creditors.").

30.     Further, and perhaps even more problematic, the transaction with Stratera is premised upon the flawed assumption that the Debtors/Committee have the exclusive ability to consent to and control the D&O Claims. However, they do not.  The Stratera Term Sheet declares that the Debtors/Committee "shall have sole authority to accept or reject proposed settlements related to any litigation."  Stratera Term Sheet, page 5.  This is also factually wrong as affirmed by the APA and Term Sheet.

31.     As set forth above, ahead of confirmation of a plan, the right to consent to the D&O Claims remains with TLC and, in turn, the Assignee and Loot ABC.  The APA clearly reserves consent to the D&O Litigation (along with the right to receive the D&O Litigation proceeds) to TLC.  *See* Asset Purchase Agreement § 2.6(u).  Further, pursuant to the Term Sheet Order, *supra*, "at any point in time prior to confirmation of a plan that is consistent with the Term Sheet, Purchaser in its sole discretion may withdraw its consent with respect to the continued prosecution of the D&O Claims."

32.     While the Debtors rely solely on Section 363 in their papers, it is black letter law that Section 363 and 364 only allow a debtor to use and/or grant liens upon property in which the bankruptcy estate has an interest.  Section 363(b) provides, in pertinent part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, *property of the estate . . . .*"  11 U.S.C. § 363(b) (emphasis added).  Similarly, Sections 364(c) and 364(d),

which authorize the estate to obtain credit secured by liens on property only allow granting of liens on "property of the estate." *See* 11 U.S.C. § 364(c) & (d).[7] *In re Whitehall Jewelers Holdings, Inc.*, No. 08-11261, 2008 WL 2951974, at *4 (Bankr. D. Del. July 28, 2008) (stating that "[a] bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the property is property of the estate"); *Gorka v. Joseph (In re Atl. Gulf Communities Corp.)*, 326 B.R. 294, 298–99 (Bankr. D. Del. 2005) (recognizing that, "[i]mplicit within the statutory grant of authority to sell property under section 363 . . . is the requirement that the estate actually have an interest in the property to be sold"); *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 526 n.56 (5th Cir. 2014) (holding that, because certain shares of stock were not property of the estate, the bankruptcy court's DIP financing orders granting the debtors' DIP lender a first priority lien and security interest in those shares "were not authorized under [section] 364 which only authorizes the imposition of liens on 'property of the estate'").

33.    Further, Section 363(p)(2) of the Bankruptcy Code provides that "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." 11 U.S.C. § 363(p). As set forth above, the Debtors conveyed the right to receive the D&O Litigation Proceeds to TLC, who in turn made a General Assignment of those rights and interests to the Loot ABC estate. Further, neither the non-recourse Sales Tax Funding Commitment nor the inoperative Term Sheet Agreement impact upon the property rights of the Loot ABC. Accordingly, the Assignee has thus carried its burden in demonstrating that the Loot ABC -- and not the Debtors' estates -- is the current owner of the D&O Litigation Proceeds and the underlying D&O Claims.

---

[7] Although the Motion is not premised upon, nor seeks relief pursuant to Section 364, it is notable that the Debtors fail to meet the requisite standards set forth in Section 364 as well.

34.     On the other hand, the Debtors/Committee have failed to carry their burden that the Debtors' estates have anything more than a potentially contingent interest in some nominal portion of the D&O Litigation Proceeds if there is ever a confirmed plan, which to date is entirely non-existent.  The Motion states that "[t]he Debtors and the Committee both believe that, based upon the Purchaser's breaches of the Asset Purchase Agreement and the Term Sheet Agreement, the Assignee (as successor to the Purchaser) has no right to any proceeds of the D&O Claims." *See* Motion at § 43.  But since the Term Sheet Agreement is expressly non-recourse, and specifically states that the Assignee is a "Non-Recourse Party," the alleged failure of the TLC Purchaser to fund amounts due thereunder can only result in an unsecured claim for money damages against TLC and cannot cause the D&O Litigation Proceeds to magically revert back to the Debtors' estates.  No legal gymnastics would support such a perverse outcome and certainly none of the agreements provide for such a result.  Similarly, even if the Purchaser Adversary Proceeding could result in rescission of the Asset Purchase Agreement (a claim for relief that is not even alleged in the FAC), such extraordinary relief to facilitate the proposed Stratera financing is not possible where the Purchaser Adversary Proceeding is still in its early stages, the deadline for Loot ABC to respond to the FAC has not yet passed and there are no dispositive motions pending.

35.     Without so much as establishing that the Debtors' estates have any ownership interest in the D&O Litigation Proceeds, the Motion fails and should be denied.  Further, by plainly threatening to strip off the property interests of the ABC estate and encumber the Loot ABC assets with non-consensual liens in favor of Stratera, and clearly no benefit provided to the Loot ABC, such a transaction would like be deemed a voidable transfer and should be denied for this reason as well.

**C.** **The Proposed Transaction with Stratera is Unreasonable and Should Not Be Approved.**

36. Even if the Court finds that the Debtors' estates have a valid property interest in the D&O Litigation Proceeds and consent rights to the D&O Claims, the Motion should be denied because it describes (or fails to describe) a transaction that cannot be reconciled with the Debtors' fiduciary duties to the Debtors' estates. Indeed, the proposed Stratera transaction does not clearly advance any stakeholder recoveries and imposes an unreasonable and potentially unconscionable financial burden on the Debtors' estates. Even though the Motion seeks to approve a loan secured by all of the D&O Litigation Proceeds, the Motion does not cite, much less purport to comply with, Bankruptcy Code Section 364 and pays mere lip service to DE Local Rule 4001 (which requires explicit disclosure of specific terms of proposed financings). This is extraordinary when the Motion is clearly a financing motion.

37. While the Motion does not even disclose that the Debtors/Committee propose to grant Stratera a security interest in all of the D&O Litigation Proceeds, the description of the interest rate on Stratera's secured loan is confusing and disguises the true cost of the proposed financing. It is only after a careful reading of the Stratera Term Sheet that the reader discovers that Stratera is entitled to what appears to be an eye-popping rate of 220% at the outset regardless of when funds are advanced. Depending on the passage of time, and assuming a successful outcome in the D&O Litigation, Stratera's return on its loan of $500,000 could easily exceed $1,750,000 or more. Such a high rate of return is facially unreasonable and inappropriate, particularly where the Loot ABC Loan was a viable alternative with literally no cost and no interest on any repayment. Moreover, although the Debtors and Committee may now disagree, the Loot ABC Loan was in an amount determined by the Assignee in good faith to be sufficient; thus, the Stratera proposed loan of at least $125,000 more (plus the option to borrow up to $250,000 more)

makes no sense and imposes an extraordinarily expensive burden on the Debtors' estates, with little to no corresponding benefit to the Debtors' estates, which has not been explained or justified under the circumstances. The Motion also fails to disclose that Stratera's fees and expenses shall be paid by the bankruptcy estates, up to $30,000, which amounts shall be deemed advances and accrue interest at the same excessive rate.

38. Why would an already administratively insolvent estate borrow admittedly excessive funds for the sole purpose of paying accrued administrative expenses at a massive premium, where (a) Stratera seeks to be secured by assets which are not property of the bankruptcy estates; and (b) such a loan likely erodes any possible recovery of funds sufficient to make any distribution to unsecured creditors, and/or pay administrative claims? An illustrative chart of the effective interest return to Stratera follows:

| Date of Litigation Resolution | Multiple | Effective Interest Rate (per annum) | Return to Stratera Based on Loan of $500,000[8] |
|---|---|---|---|
| On or before November 30, 2022 | 2.2x | 220% | $1,100,000 |
| On or before May 30, 2023 | 2.5x | 250% | $1,250,000 |
| On or before November, 2023 | 3.0x | 300% | $1,500,000 |
| On or before May 30, 2024 | 3.5x | 350% | $1,750,000 |

39. Critically, unlike normal interest rate loans where interest accrues from the date funds are released to the borrower, here, the "Margin" payable to Stratera is based on all funds advanced regardless of the time they are lent. For example, if the Motion were approved and

---

[8] The return to Stratera could be higher if, for example, Stratera advances up to $30,000 to pay itself back for its expenses, and/or Stratera advances some or all of the $250,000 so-called "Incremental Commitment" above and beyond the initial $500,000 promised.

Stratera were to advance $500,000 on July 1, 2022, Stratera would immediately become entitled to be paid $1,100,000 in interest, **plus the $500,000 principal obligation**, assuming a successful outcome on the D&O Claims the very next day, on July 2, 2022. Thus, there is literally no relationship between the interest rate and the time value of funds.

40. When compared to Loot ABC's offer of an interest free, non-recourse, unsecured loan, the Stratera loan seems dramatically less appealing to these already administratively insolvent estates. Yet the Debtors rejected Loot ABC's proposal and forced Loot ABC to expend resources to oppose the Motion and bring these outrageous improprieties to light.

41. Finally, the Motion appears to simultaneously assume that the provisions of the Term Sheet Agreement that requires the Assignee to share in any D&O Litigation recovery with the bankruptcy estates is somehow enforceable (when of course it was all dependent upon the confirmation of a plan that has never occurred), but that the Waterfall under the Term Sheet Agreement that requires the Debtors to allocate the vast majority of the proceeds of the D&O Claims to the Assignee will not apply. There is no support for this "cherry picking" of rights under the currently inoperative Term Sheet Agreement. Until such time as a plan that incorporates the Term Sheet Agreement is confirmed by the Court, the APA makes clear that TLC, and by assignment, the Assignee, owns all of the D&O Claims, and the Debtors own nothing.

## RESERVATION OF RIGHTS

42. The Assignee and Loot ABC expressly reserve any and all rights, claims, defenses, and remedies, including, without limitation, to supplement this Objection with information learned in discovery, to raise further and other objections to any further documentation of the proposed transaction and the form of any order on the Motion, and to introduce evidence at any hearing regarding the Motion.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Assignee respectfully requests that the Court deny the Motion and grant such other and further relief as the Court deems fair and appropriate.

Dated: June 7, 2022

Respectfully submitted,

**BLANK ROME LLP**

By: ___/s/ Josef W. Mintz___
Josef W. Mintz (DE 5644)
1201 N. Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Josef.Mintz@BlankRome.com

-and-

Ira L. Herman *(pro hac vice pending)*
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5052
Ira.Herman@BlankRome.com

-and-

**LEVENE, NEALE, BENDER, YOO &
GOLUBCHIK L.L.P.**

Ron Bender *(pro hac vice)*
Beth Ann R. Young *(pro hac vice)*
2818 La Cienega Ave.
Los Angeles, CA 90034
310.229.1234
RB@LNBYG.com
BRY@LNBYG.com

*Counsel to Loot (Assignment for the Benefit
of Creditors), LLC*